# EXHIBIT C

## EXCERPTS FROM THE HEARING TRANSCRIPT

## KATHY KING

C O N F I D E N T I A L

287

1                    P R O C E E D I N G S

2              JUDGE KHARE:  Can we go on the record?

3              This next witness is Kathy King.

4              Ms. King, could you please raise your

5    right hand?

6         Whereupon,

7                        KATHY KING

8    was called as a witness and, having been first duly

9    sworn by the Administrative Judge, was examined and

10   testified as follows:

11             JUDGE KHARE:  Thank you.

12             After you testify please don't discuss

13   your testimony with anybody else.

14             THE WITNESS:  Okay.

15             JUDGE KHARE:  Ms. Sobczak

16                   DIRECT EXAMINATION

17             BY MS. SOBCZAK:

18        Q.   Good morning, Ms. King.

19        A.   Good morning.

20        Q.   Please state your name for the record.

21        A.   Kathy King.

22        Q.   Who is your employer?

C O N F I D E N T I A L

289

1      Q.    What is AWSS?

2      A.    Agency Wide Share Services.

3      Q.    Are you familiar with a request for

4  accommodation made by Theresa Bearman?

5      A.    Yes.

6      Q.    How are you familiar with it?

7      A.    At the time I was the Reasonable

8  Accommodations Coordinator for the Washington

9  Metropolitan Area.  So, all the requests that came

10  in from employees located there, they would come to

11  me.  I was actually responsible for actually

12  processing those requests.

13      Q.    What was your understanding of the

14  requested accommodation?

15      A.    The request was for a reassignment to a

16  lawyer position.

17      Q.    Were you involved with the request for

18  accommodation?

19      A.    Yes.  I received the request and once our

20  office obtained the medical documentation it was

21  sent over to the physician and then once we got the

22  assessment back from Dr. Presant, which came back

C O N F I D E N T I A L

290

1  to me, I provided a copy to the manager so they

2  would know what the doctors had suggested or

3  recommended.   They were responsible for carrying

4  out whatever the request was.

5       Q.   Did you have any involvement after that?

6       A.   I think there was at least one or two

7  meetings that management had when they were trying

8  to look for a position for Ms. Bearman.

9            JUDGE KHARE:   When you say management,

10  who specifically do you mean?  Do you recall?

11            THE WITNESS:   Let me see.

12            I can't remember his name.  I think the

13  manager at the time was Dave Williams.  He was

14  involved in the meeting.  There was someone else

15  from the staff, but I can't remember the name

16  because it was several years ago.

17            JUDGE KHARE:   Do you remember how soon it

18  was after you gave them the documents that they had

19  the meeting?

20            THE WITNESS:   No.  I don't remember an

21  exact date or anything.

22            JUDGE KHARE:   Sorry, Ms. Sobczak.

C O N F I D E N T I A L

291

1    Continue.

2            BY MS. SOBCZAK:

3        Q.   So, you were discussing a meeting.

4            Do you recall what happened at the

5    meeting?

6        A.   There were a number of people in

7    attendance at the meeting and what they were trying

8    to do was locate a position for Ms. Bearman.   They

9    started with the Appeals organization because I

10   think they had attorneys at that time.   So, there

11   was a representative there from Appeals,

12   Communications and Liaison.

13           I am not sure if Dave Williams was

14   actually in the room or someone from his staff, but

15   I know there was someone there from Communications

16   and Liaison.

17           There was myself, John Burns, and an

18   attorney I think from GLS was there.

19       Q.   So, you were aware of the efforts to

20   obtain an attorney position for Ms. Bearman?

21       A.   Yes.

22       Q.   And how did you become aware?

**C O N F I D E N T I A L**

292

1        A.    Through the meeting that I attended and,

2    like I said, they started out looking for a

3    position within the Appeals organization.

4        Q.    Are you aware that an attorney position

5    was located for Ms. Bearman?

6        A.    Yes.

7        Q.    How did you become aware of that?

8        A.    John Burns actually called me when they

9    identified a position.  He called me and told me

10   that they had found one for her.

11       Q.    Are you aware of the time frame?

12       A.    Not the exact.  It was like, I don't

13   know, three or four months or something.  I can't

14   remember.  He had called me and said they did find

15   one for her.

16       Q.    Did you draw any conclusions with regard

17   to that time frame?

18            MR. QUINN:  Objection.  Calling for an

19   opinion from the witness.

20            JUDGE KHARE:  Ms. Sobczak.

21            MS. SOBCZAK:  Ms. King was in charge of

22   the Reasonable Accommodation Program and she has

C O N F I D E N T I A L

293

1    had experience with various assignments.

2                JUDGE KHARE:  So, the question is what

3    did she think about the accommodation that they had

4    provided her?

5                MS. SOBCZAK:  Correct.

6                JUDGE KHARE:  I am going to allow that.

7                MR. QUINN:  It is opinion testimony.

8                JUDGE KHARE:  I am going to allow it,

9    Mr. Quinn.

10               You can answer the question, Ms. King.

11               THE WITNESS:  I think it was a pretty

12   reasonable amount of time considering the other

13   cases that we have had.  We still have employees

14   actually on the books where they are still trying

15   to find positions after a year, some two years.

16   So, I think in that short period of time that was

17   pretty good.

18               JUDGE KHARE:  Ms. Sobczak.

19               BY MS. SOBCZAK:

20        Q.    You mentioned that John Burns informed

21   you that a reasonable accommodation was obtained

22   for Ms. Bearman.

CONFIDENTIAL

297

1    do here.

2              It is way out of line.  It is unfair to

3    me.

4              MS. SOBCZAK:  I think that her testimony

5    in her position is relevant.

6              JUDGE KHARE:  I think that there is a way

7    to rephrase the question.  If I understand what

8    your question is, did the actions of management

9    concern you or the delays?

10             Is that the underlying direction you are

11   going?

12             MS. SOBCZAK:  Yes.  Correct.

13             JUDGE KHARE:  I think you can rephrase

14   the question so it doesn't ask for an opinion so

15   much or speculation.

16             MS. SOBCZAK:  Okay.

17             BY MS. SOBCZAK:

18        Q.   How long did it take management to find a

19   position for Ms. Bearman?

20        A.   Like I said, I don't remember exact dates

21   or anything like that, but it may have been three

22   or four months.  I haven't looked at the file in

C O N F I D E N T I A L

298

1    years.  So, I am not sure.  But, like I said, it

2    was three, four, five months, something like that.

3        Q.    Did the actions that you were aware of

4    cause you any concern --

5                MR. QUINN:  Same objection.

6                BY MS. SOBCZAK:

7        Q.    -- regarding management's actions in

8    finding an attorney position for Ms. Bearman?

9                JUDGE KHARE:  I am going to allow it,

10   Mr. Quinn.

11               You can answer the question.

12               THE WITNESS:  No.

13               I mean, they were sort of limited in

14   where they could look for attorney positions within

15   the IRS.  I don't think it was ever discussed, at

16   least not with me, whether or not the person wanted

17   to go outside of the Washington metropolitan area.

18   So, they were pretty limited in where they could

19   look because there weren't a lot of positions

20   within the IRS for attorneys.

21               JUDGE KHARE:  You have said that there

22   are several people who have been on the rolls for

302

1    bureaus under Treasury.  So, we can ask, it is more

2    like a courtesy kind of thing, if we have an

3    employee and we locate something in another bureau,

4    but for the most part they are not taking the

5    employee.

6        Q.   It requires somebody at Treasury to

7    actually do that?

8        A.   Right.  It would have to come from

9    Treasury.

10       Q.   Do you remember actually trying to do

11   that in this case?

12       A.   No.

13       Q.   We will get to that in a few minutes.

14            But you understand that the obligation to

15   reassign under the Rehabilitation Act applies to

16   the whole Department of Treasury, it is not

17   limited?

18            MS. SOBCZAK:  Objection.  Calls for

19   speculation.

20            MR. QUINN:  I am asking how she does her

21   job.  That is it.

22            JUDGE KHARE:  Ask her if that is true.

CONFIDENTIAL

303

1    Don't ask her if she understands.

2              BY MR. QUINN:

3         Q.    Is it true that the obligation under the

4    Rehabilitation Act to reassign an employee applies

5    to the Agency as a whole?  In other words, the

6    Department of Treasury?

7         A.    Yes.

8         Q.    Okay.  Thank you.

9              Now, do you remember keeping notes of

10   your reasonable accommodations search?

11        A.    The search?  I wasn't involved in the

12   search.  I didn't do the search.

13        Q.    Let me show you Exhibit 16 and ask you if

14   these are your notes?

15             JUDGE KHARE:  Hold on just a second.

16             Let's go off the record.

17             (Discussion off the record.)

18             JUDGE KHARE:  Let's go back on the record

19   please.

20             BY MR. QUINN:

21        Q.    Do you want to take a few minutes to read

22   them over because I can see you are a little rusty

EXHIBIT C

EXCERPTS FROM THE
HEARING TRANSCRIPT

BARRY FULCHER

CONFIDENTIAL

350

1              JUDGE KHARE:  You are done, Ms. Nieser.

2    Thank you.

3              We can go off the record.

4              (Recess.)

5              JUDGE KHARE:  Let's go on the record.

6              The next witness is Barry Fulcher.

7              Mr. Fulcher, could you please raise your

8    right hand?

9         Whereupon,

10                   BARRY FULCHER

11   was called as a witness and, having been first duly

12   sworn by the Administrative Judge, was examined and

13   testified as follows:

14             JUDGE KHARE:  Thank you.

15             When you are done testifying here please

16   don't discuss your testimony with anyone.

17             THE WITNESS:  Okay.

18                   DIRECT EXAMINATION

19        BY MS. SOBCZAK:

20        Q.   Good morning, Mr. Fulcher.

21             Please state your name for the record.

22        A.   Barry Fulcher.

CONFIDENTIAL

352

1    interaction with various small business

2    stakeholders.

3         Q.    How many people did you supervise?

4         A.    Generally there were about five.

5         Q.    Were you involved with Ms. Bearman's

6    request for reasonable accommodation?

7         A.    Yes.

8         Q.    When did you first become aware of her

9    request?

10        A.    I don't recall specifically, but my best

11   guess would be approximately November of 1999.

12        Q.    How did you become aware of her request?

13        A.    I believe it was a result of seeing the

14   letter from her physician requesting the

15   accommodation.

16        Q.    After you saw that letter what happened?

17   What was your next involvement with her request for

18   accommodation?

19        A.    The next involvement was really awaiting

20   the decision of the Internal Revenue Service

21   physician, Dr. Presant.  On December 3rd he

22   concurred that a reasonable accommodation or he

C O N F I D E N T I A L

353

1    recommended that a reasonable accommodation be

2    taken for Ms. Bearman.

3        Q.    What was that reasonable accommodation?

4        A.    That either the job be restructured so

5    that it would entail attorney related

6    responsibilities or that she be reasonably

7    accommodated outside the office to another office

8    that would hire her as an attorney.

9        Q.    How did you learn about the December 3rd

10   letter from Dr. Presant?

11       A.    Again, I don't recall specifically, but

12   my best guess is that I would have seen the letter

13   itself.

14       Q.    Do you know how you came to see the

15   letter?

16       A.    Probably from either Mr. Fitzpatrick or

17   Ms. Sottile.

18       Q.    Did they give it to you?

19       A.    A copy.  Yes.

20       Q.    Why did they give it to you?

21       A.    Because they asked for me to take

22   whatever actions I could to accomplish the

C O N F I D E N T I A L

354

1    accommodation.

2        Q.    What, if anything, did you do once you

3    received the December 3rd letter from Dr. Presant?

4        A.    I contacted our Labor Relations Office,

5    also contacted EEO, and soon thereafter set up a

6    meeting including those parties plus several

7    others, that included Appeals, to see what could be

8    done to provide a detail for Ms. Bearman while the

9    reasonable accommodation issue was being worked.

10        Q.    Why did you contact Labor Relations?

11        A.    For guidance.

12        Q.    Why did you contact EEO?

13        A.    For the same reason.  For guidance.

14            JUDGE KHARE:  I am sorry.  Did I just

15    understand you said that you were looking for a

16    detail for her while you were also looking for an

17    accommodation?

18            THE WITNESS:  Yes.

19            The reason for that is it looked like the

20    detail -- well, certainly we were hopeful that a

21    detail could be accomplished quickly.  It looked

22    like the reasonable accommodation route would be a

C O N F I D E N T I A L

356

1       A.    I remember meeting with John Burns

2    thereafter and really using him as a sounding board

3    to see if he thought that what we were taking was a

4    reasonable approach and he concurred with that.

5            Also I am sure I would have met with my

6    managers, Susan Sottile and Rob Fitzpatrick, to let

7    them know.  Of course, Rob was at the meeting, but

8    just to discuss the results of the meeting.

9       Q.    What action did you take next with regard

10   to the reasonable accommodation request?

11      A.    I followed up on the possibility of a

12   detail and also started looking at what the best

13   remedy would be in terms of accomplishing a

14   permanent reasonable accommodation through a

15   transfer to another office that employed attorneys.

16      Q.    So, did you do anything next with regard

17   to that?

18      A.    By early January, I think it was

19   January 4th, memorandums were prepared for several

20   offices within the national office area, in one

21   case for counsel requesting a detail, in other

22   cases notifying three other offices, advising them

CONFIDENTIAL

357

1  that the detail or reassignment was really

2  mandatory and asking what they had available.

3        Q.    And when did you prepare the memo?

4        A.    It would have been not long after the

5  December 16th meeting.

6              That type of memorandum, as I found out,

7  required quite a bit of review through EEO and

8  Labor Relations and my manager to make sure that it

9  was properly prepared.

10       Q.    I am going to show you a document at

11 page 25 of the file.

12             Do you recognize that document?

13       A.    Yes.

14       Q.    What is that?

15       A.    It is the memorandum going to Assistant

16 Commissioners, Examination International and to the

17 Director of Appeals signed by me.

18       Q.    What is the date on that?

19       A.    January 4th, 2000.

20       Q.    So, that is the memo you sent out?

21       A.    Yes.

22       Q.    Take a look at page 22 of the file.

C O N F I D E N T I A L

358

1          Do you recognize that document?

2      A.    Yes.  This is a similar memorandum going

3  to the Chief Counsel, F&M, dated January 4th, 2000.

4      Q.    And that is a memorandum that you also

5  sent out?

6      A.    Yes.

7      Q.    What happened after you sent the memos?

8      A.    Nothing immediately.  I did meet with

9  counsel seeing if they had something available and

10  also followed up with the various offices of the

11  other memorandum that went out to January 4th to

12  determine what they could do with the accommodation.

13      Q.    Did you receive any response with regard

14  to the memos?

15      A.    I didn't get all the information on the

16  same day, but during the period following the

17  memorandum, and following up in each case,

18  determined that there were no positions available.

19      Q.    How did you follow-up?

20      A.    Generally by telephone calls.  Either I

21  would call them or in some cases I think they may

22  have called me.  Also through e-mails.

1        Q.    Did you receive any response from the

2    Office of Chief Counsel?

3        A.    I don't believe there was a formal

4    written response, but the best I remember is that

5    they were not able to accommodate her.  There was

6    quite a bit of give-and-take apparently in regards

7    to their office's responsibility to provide

8    Ms. Bearman a position.

9            JUDGE KHARE:  You said they said they

10   were unable to accommodate her.  What did they say

11   specifically?

12           THE WITNESS:  During the meeting --

13           JUDGE KHARE:  Which meeting is this?

14           THE WITNESS:  This is the face-to-face

15   meeting I had with one of the managers and counsel.

16           JUDGE KHARE:  Which happened

17   approximately when?

18           THE WITNESS:  It would have been either

19   late in '99, like in late December, or in early

20   January.  I just don't recall the exact date.

21           That meeting, it was held at my request.

22   I remember discussing the issue as to what type of

C O N F I D E N T I A L

427

1   me.

2           BY MR. QUINN:

3       Q.    I will let the record speak for itself,

4   Mr. Fulcher, but my recollection of your testimony

5   was that you told me --

6           JUDGE KHARE:  Mr. Quinn, if you are

7   letting the record speak for itself, you don't have

8   to re-testify.

9           MR. QUINN:  That is fine.

10          JUDGE KHARE:  I have a question

11  backtracking to the accommodation.

12          Who had the final say so on what

13  accommodation the Agency was going to offer

14  Ms. Bearman.

15          I mean, once you found one did it have to

16  get approved up the chain?

17          THE WITNESS:  My understanding, and this

18  is what apparently we acted on, was that the letter

19  from Dr. Presant on December 3rd recommended a

20  reasonable accommodation and the IRS, the

21  impression I had was that that was the

22  recommendation we were going to act on and then do

C O N F I D E N T I A L

428

1  what we could to achieve the accommodation.

2          JUDGE KHARE:  Well, what about this issue

3  of Mr. Williams being unhappy with Dr. Presant's

4  recommendation and not understanding his

5  recommendation?

6          Was Mr. Williams involved?

7          It seems to me that he had his finger in

8  the pot, so to speak, because everything was being

9  run by him.  Is that accurate?  Whatever

10  accommodation efforts you were making and whatever

11  you were going to offer her.

12          THE WITNESS:  I would say certainly broad

13  authority and direction, but in terms of day-to-day

14  involvement I really didn't see that.  I think I

15  only had one or two meetings with him over the span

16  of two or three months.

17          JUDGE KHARE:  Okay.  But didn't

18  Mr. Williams tell you to get another evaluation

19  regarding Ms. Bearman's condition?

20          THE WITNESS:  He didn't tell me.

21          What he was interested in was getting a

22  second opinion because his concern was that

C O N F I D E N T I A L

430

1    have worked there too with other staff doctors.

2              So, in January, in early January,

3    Mr. Williams was raising issues regarding the

4    accommodation, was he not?

5              He was involved in January with your

6    deliberations and your finding.

7              Is that accurate?

8              THE WITNESS:  Yes.

9              JUDGE KHARE:  Okay.  That answers my

10   question.

11             I am sorry, Mr. Quinn.  You can continue.

12             BY MR. QUINN:

13        Q.   And that continued right up to January

14   18th, correct?

15             January 6th he told you he was unhappy.

16   On January 18th Dave Williams is still waiting for

17   a letter from Julie asking for an independent

18   evaluation.

19        A.   Yes.

20        Q.   And that was sort of delaying things,

21   wasn't it?

22        A.   No.  Not at all.  We were continuing to

C O N F I D E N T I A L

431

1    proceed with the reasonable accommodation.

2              I believe, without going through these,

3    that there were contacts with the offices that we

4    were seeking a reasonable accommodation with.  At

5    no time did Dave Williams say stop with the

6    reasonable accommodation.  I would have documented

7    it if he had.

8         Q.   I am glad you brought that up,

9    Mr. Fulcher, because looking at your note of

10   1/18 --

11             JUDGE KHARE:  And these notes are

12   Exhibit 2 in the Complainant's proposed exhibits?

13             MR. QUINN:  Yes.

14             BY MR. QUINN:

15        Q.   Looking at your note of January 18th

16   where you acknowledge again that Dave Williams is

17   waiting for this letter requiring Ms. Bearman to

18   submit to an independent evaluation, you went on to

19   say -- this is you talking to Paula, who is David's

20   assistant, right?

21        A.   Yes.

22        Q.   "I said that the RA issue could be worked

C O N F I D E N T I A L

433

1    he thought Ms. Bearman was abusing the reasonable

2    accommodation process.

3                Do you remember that?

4        A.    Where is that?

5        Q.    I will find it for you.

6                JUDGE KHARE:  Please do.

7                It is on page 6, end of the second full

8    paragraph.

9                BY MR. QUINN:

10       Q.    Yes.  Page 6.

11               MS. SOBCZAK:  Which page 6 are you

12   referring to?

13               JUDGE KHARE:  It is the small number 6,

14   the handwritten 6, in his proposed Exhibit 2.

15               BY MR. QUINN:

16       Q.    At the meeting of 1/6 did Mr. Williams

17   say in that meeting that he felt Ms. Bearman was

18   abusing the reasonable accommodation process?

19       A.    Let me just read it.  Hold on.

20               The last paragraph?  Hold on.

21               JUDGE KHARE:  It is the second paragraph

22   that starts off "10:10 meeting".

C O N F I D E N T I A L

434

1                THE WITNESS:  Okay.  Thank you.

2                (Witness reading.)

3                Okay.  If you would ask the question

4       again.

5                BY MR. QUINN:

6           Q.   Well, the question was did Mr. Williams

7       say or suggest that he felt Ms. Bearman's

8       reasonable accommodation request was an abuse of

9       the reasonable accommodation process?

10          A.   I don't know if her name was mentioned

11      per se because what it says in here the employee's

12      name was not mentioned.

13               JUDGE KHARE:  But wasn't the entire

14      meeting about Ms. Bearman?

15               THE WITNESS:  Yes.

16               JUDGE KHARE:  It was about her?

17               THE WITNESS:  Yes.

18               Well, I wasn't at the meeting, but

19      obviously that came up in the meeting.  Whether

20      there were other issues discussed at the meeting I

21      don't know.  But yes, that came up in the meeting.

22               JUDGE KHARE:  But I mean the meeting that

CONFIDENTIAL

435

1    you had on December 6th at 10:10 in the morning you

2    were at.  These are your minutes.  This is your

3    recollection from the meeting.

4              THE WITNESS:  From the 10:10?

5              JUDGE KHARE:  Yes.

6              THE WITNESS:  No.  I wasn't at that

7    meeting.

8              Wait a minute.

9              It is referring back to another meeting

10   that Dave Williams was in with Dave, Mader and the

11   Commissioner, and I definitely wasn't at that

12   meeting.

13             JUDGE KHARE:  Okay.  But at the meeting

14   that you were at on the 6th the subject was

15   Ms. Bearman?

16             THE WITNESS:  Yes.

17             JUDGE KHARE:  Okay.  Thank you.

18             BY MR. QUINN:

19        Q.   Let me ask:  Mr. Williams was a pretty

20   powerful guy, wasn't he?

21        A.   Yes.

22        Q.   Still is, right?

C O N F I D E N T I A L

1       A.    Yes.

2       Q.    You are how many rungs down the ladder

3    from Mr. Williams?

4       A.    At that time I was, let's see, about

5    three.

6       Q.    Is it fair to say that if Mr. Williams

7    thinks that someone is abusing the reasonable

8    accommodation process, someone like yourself, just

9    a cog in the wheel pretty far down the line, who

10   helps her get her accommodation, is not going to be

11   looked on unfavorably?

12      A.    I didn't see it that way and I think the

13   documentation supports that.

14           I proceeded with the reasonable

15   accommodation.  At no time in here will you see

16   that, gee, I better stop because Dave Williams

17   thinks there may be a problem here.  I proceeded

18   with the reasonable accommodation.

19           You will also see that within a month of

20   this meeting that we had a contact to Mr. Burns

21   making the tentative offer for the reasonable

22   accommodation.  I think if anything had been done

C O N F I D E N T I A L

447

1          You may be acquainted with the three

2     strikes law.  If someone commits an offense, you

3     don't punish them to the full extent necessarily.

4     However, if that offense is duplicated or repeated,

5     then the punishment might be harsher.  I think

6     there is something called the Douglas factors that

7     account for that.

8          Q.   Now, some questions came up about the

9     Office of Chief Counsel or placing Ms. Bearman in

10    the Office of Chief Counsel earlier and in your

11    deposition as well.

12          Can you tell me everything that was done

13    to place Ms. Bearman in a position in the Office of

14    Chief Counsel?

15          A.   I met with a manager in Chief Counsel.

16    From my perspective I met with a manager in Chief

17    Counsel.  I also sent them a memorandum asking if

18    they could accommodate her.

19          Q.   If they could accommodate her?

20          A.   Yes.

21          Q.   It was discretionary with you.  You

22    simply asked them whether they would be willing to

C O N F I D E N T I A L

448

1    accommodate her.

2              Is that fair to say?

3        A.    Yes.  That is fair to say.

4        Q.    You didn't tell them they had to

5    accommodate her?

6        A.    No.  I didn't.

7        Q.    What was the reason for making it

8    discretionary for them?

9        A.    Because it was a question as to whether

10   it was discretionary or mandatory on their part.

11       Q.    Who wrote the letter for you that was

12   sent to the Office of Chief Counsel?

13       A.    I would have composed most of it.

14   However, the legal guidance on it probably, I don't

15   recall the specifics, but probably would have come

16   from Labor Relations and GLS or a combination

17   thereof.

18       Q.    So, the letter to Chief Counsel was

19   edited by someone in Chief Counsel's Office before

20   it went out?

21       A.    No.  I didn't say it was edited.  I said

22   guidance for the composition of the letter would

CONFIDENTIAL

449

1    have come from them.

2            What you are suggesting is that once I

3    composed the letter that it was changed and I don't

4    recall that.

5        Q.   You don't know one way or the other if it

6    was changed, but it was certainly reviewed by Chief

7    Counsel's Office, Ms. Barry?

8        A.   In all likelihood.

9        Q.   And then it was sent to Chief Counsel's

10   Office?

11       A.   Yes.

12       Q.   The issue came up.  If you look at page

13   10 of Exhibit 2, the entries of 1/13 and 1/15.

14   Again you could take a minute to read those over if

15   you want to.

16       A.   (Witness reading.)

17            Okay.

18       Q.   This is around January 13th you had a

19   conversation with Stuart Field and Julie Barry,

20   correct?

21       A.   Yes.

22       Q.   Where you discussed whether or not the

C O N F I D E N T I A L

450

1    Department of Treasury was required to accommodate

2    Ms. Bearman on a departmental basis; is that right?

3        A.    Yes.

4        Q.    And Mr. Fields is with the Internal

5    Revenue Service's Labor Relations Division?

6        A.    Yes.

7        Q.    And his opinion was that, yes, they did

8    have to do that, right?

9        A.    Yes.

10       Q.    And what was Ms. Barry's opinion?

11           MS. SOBCZAK:  Objection.  Calls for

12   privileged attorney/client communication.

13           MR. QUINN:  They have presented that.  I

14   have interrogatory answers, we have deposition

15   testimony, in fact, it is in all the briefs, where

16   the Chief Counsel's Office put a witness on to

17   testify that they didn't have to take her, that

18   they were not obligated to accept.

19           JUDGE KHARE:  Could you repeat the

20   question that you just asked the witness?

21           BY MR. QUINN:

22       Q.    The question was:  You have

C O N F I D E N T I A L

451

1    Stuart Fields, the IRS Labor Relations Specialist's

2    response was that, yes, they had to go to Counsel

3    and outside if necessary and then the Chief

4    Counsel's position is obliterated.

5              What was it?  That is my question.

6              MS. SOBCZAK:  Objection.  Calls for

7    attorney/client privilege and we went over this in

8    the deposition where I also objected.

9              MR. QUINN:  I can give you interrogatory

10   answers where Mr. Mihelcic has signed

11   interrogatories on this issue.

12             MS. SOBCZAK:  I think Mr. Mihelcic was

13   not giving legal advice.  Ms. Barry was.

14             JUDGE KHARE:  I think that this can be

15   answered by finding out what legal counsel's final

16   answer was and what Mr. Fulcher did with it.  I

17   think you can get to the same point without getting

18   into privilege.

19             BY MR. QUINN:

20        Q.    What was the final answer from the Office

21   of Chief Counsel as to whether or not the Office of

22   Chief Counsel had to accept Ms. Bearman?

C O N F I D E N T I A L

455

1    have gone to work. I don't know. I just do not

2    remember.

3         Q.   Let me ask you this.

4              There is obviously some dilemma here in

5    that you, being the one responsible for the process

6    of finding a job for Ms. Bearman, on the one hand,

7    know that there is a position open in the Office of

8    Chief Counsel.

9              You knew that, right?

10        A.   Yes.

11        Q.   Through the whole time you were looking

12   there were positions open. You knew that?

13        A.   Ms. Bearman had shared information in

14   regards to that.

15        Q.   So, you knew the position was open. You

16   are the one responsible for the search. And you

17   know this issue here is causing a logjam, the issue

18   being whether or not Chief Counsel has to take

19   Ms. Bearman.

20             Is that an accurate rendition of the

21   circumstances?

22        A.   Well, if Counsel had agreed to take her,

C O N F I D E N T I A L

456

1    then yes, you are absolutely right, there would be

2    no logjam and events would have played out

3    differently.  But that is obviously not what

4    happened.

5         Q.    Is Mr. Williams aware of this search and

6    circumstance?

7         A.    What circumstance?

8         Q.    The fact that, on the one hand, there

9    were open positions in Chief Counsel and, on the

10   other hand, the transfer to that position was being

11   held up over some question as to whether

12           MS. SOBCZAK:  Objection.  Mr. Fuller has

13   no knowledge of what Mr. Williams knows.

14           JUDGE KHARE:  Did Mr. Williams ever say

15   anything about Ms. Bearman going to General

16   Counsel?

17           THE WITNESS:  Not that I remember.  No.

18           BY MR. QUINN:

19        Q.    Do you know whether or not Mr. Williams

20   knew of this issue that there was a question as to

21   whether Ms. Bearman could be placed in the Chief

22   Counsel's office?

**C O N F I D E N T I A L**

458

1    not if the issue at Chief Counsel's Office, whether

2    or not Chief Counsel was obligated to accept

3    Ms. Bearman, was resolved, that Ms. Bearman could

4    have been placed in the Chief Counsel's Office in

5    December.  And I think the witness said yes.

6          Is that fair to say?

7    A.    Well, if there was a willing party there

8    and if there was a willing party at Counsel, yes.

9          JUDGE KHARE:  Your office would not have

10   objected, if the Counsel's Office would have taken

11   her, to sending her over there?

12         THE WITNESS:  Absolutely not.  It would

13   have made life a lot easier for everyone.

14         BY MR. QUINN:

15   Q.    So, the only thing that was stopping from

16   December 3rd forward, as far as you know, the only

17   thing stopping immediate resolution of this problem

18   was this unresolved issue of whether or not Chief

19   Counsel had the obligation to take Ms. Bearman for

20   some time?

21   A.    Recharacterizing the question, if counsel

22   knew that they had an obligation to take

CONFIDENTIAL

459

1    Ms. Bearman and they were willing to act on that

2    obligation, I have no reason to think they

3    wouldn't, yes, it would have been resolved in

4    December.

5         Q.    And it must have been a very frustrating

6    situation for you, who was spending so much of your

7    time on this situation, to have the solution right

8    at hand and to not have it resolved.  That must

9    have been very frustrating.

10              Wasn't it?

11        A.    I appreciate your sympathy, Mr. Quinn,

12   but it was my job.  That is one of the things that

13   makes the job interesting.  You are dealing with a

14   lot of different things.

15              So, yes, it was frustrating, absolutely,

16   and I know it was frustrating for Ms. Bearman.

17        Q.    You were spending a lot of time on this,

18   right?

19        A.    Yes.

20        Q.    And, of course, you knew that

21   Mr. Williams, three levels up, who has described

22   himself as the steward of government money, who

EXHIBIT C

EXCERPTS FROM THE
HEARING TRANSCRIPT

SUSAN SOTTILE

C O N F I D E N T I A L

1                    AFTERNOON SESSION

2                                    (2:30 p.m.)

3              JUDGE KHARE:  Let's go back on the

4       record.

5              Ms. Sottile, could you please raise your

6       right hand?

7          Whereupon,

8                    SUSANNE M. SOTTILE

9       was called as a witness and, having been first duly

10      sworn by the Administrative Judge, was examined and

11      testified as follows:

12             JUDGE KHARE:  Thank you.

13             After you are done testifying, please

14      don't discuss your testimony with anyone else.

15                    DIRECT EXAMINATION

16             BY MS. SOBCZAK:

17          Q.    Good afternoon, Ms. Sottile.

18          A.    Good afternoon.

19          Q.    Please state your name.

20          A.    Susanne M. Sottile.

21          Q.    Who is your employer?

22          A.    The Internal Revenue Service.

CONFIDENTIAL

488

1    request.

2            I did not have expertise with respect to

3    reasonable accommodation.  So, we wanted to make

4    sure that we were able to follow the procedures.

5    So, we engaged a number of experts in the Service

6    to provide guidance to us.  Barry worked on that

7    request.

8            BY MS. SOBCZAK:

9        Q.    Are you familiar with a letter from

10   Dr. Presant regarding the reasonable accommodation

11   request?

12       A.    I don't really remember it very well.  As

13   I said, my recollection is that the first letter

14   had to do with declaring there was a disability and

15   then I think the detail regarding the reasonable

16   accommodation followed.

17       Q.    I just want to show you Dr. Presant's

18   letter.

19            MS. SOBCZAK:  Do you know what that is,

20   Judge Khare?  Is that 56?

21            JUDGE KHARE:  I want to say it is in the

22   70s.

C O N F I D E N T I A L

489

```
1              BY MS. SOBCZAK:
2        Q.    It is at page 280 of the file.
3              Do you recognize that document?
4        A.    I actually don't remember this letter, to
5    be honest.
6        Q.    What is that letter?
7        A.    It is a letter from Dr. Presant to Labor
8    Relations.
9        Q.    What is the date on that letter?
10       A.    December 3rd.
11       Q.    Of?
12       A.    1999.
13       Q.    If you could read the last line of the
14   second full paragraph of that letter?
15       A.    The last line of the second full
16   paragraph?
17       Q.    Yes.
18       A.    Thus I would recommend from a medical
19   point of view that she be accommodated with a
20   position appropriate to her legal and educational
21   background if there is such a position available in
22   your Agency.
```

C O N F I D E N T I A L

490

1      Q.    Now, you testified that you became aware

2    of Ms. Bearman's request in October.

3      A.    Right.

4      Q.    What happened at that time when you

5    became aware?

6      A.    My recollection is when we became aware

7    of it we worked the issue.  I had Barry take the

8    lead and then we also consulted with EEO and Labor

9    Relations and GLS, working also with qualifying

10   from Dave Williams shop to work the request because

11   I don't think that the reasonable accommodation

12   piece of this came in at that time.

13     Q.    Was an opinion sought from Dr. Presant on

14   the medical information from Ms. Bearman's doctor?

15     A.    My recollection is that that is the

16   procedure that when we get a doctor's letter in

17   like that we refer it to the HHS doctor for his

18   views.  That is the procedure.

19     Q.    To your knowledge was that done in this

20   case?

21     A.    Yes.  That was my understanding.

22     Q.    So, this letter that I referred you to on

C O N F I D E N T I A L

491

1    page 280, was that the opinion from the doctor

2    regarding what we should do?

3        A.    It sounds like it is reading it.

4        Q.    So, at what point did you seek guidance,

5    as you testified earlier, and talk to people about

6    what to do?

7        A.    Barry actually started canvassing four

8    positions for the 905, that is the Attorney Advisor

9    position and Counsel, and drafted letters

10   soliciting interest from various organizations that

11   had 905 positions at that time.

12       Q.    And what was your role in this?

13       A.    My role in this was to receive periodic

14   briefings from him, to review letters that were

15   written, to discuss recommendations and to provide

16   concurrence with his recommendations if

17   appropriate.

18            JUDGE KHARE:  So, you had veto power over

19   the accommodation?

20            Say he came to you with an accommodation.

21   You could veto his suggestion?

22            THE WITNESS:  Yes.

**C O N F I D E N T I A L**

527

1    Ms. Bearman was abusing the reasonable

2    accommodation process?

3         A.    He did not say that to me.

4         Q.    Did he say anything similar to that, not

5    using those exact words, but anything that left the

6    inference with you that Mr. Williams thought that

7    Ms. Bearman was misusing the system in some way or

8    that her request was inappropriate?

9         A.    The only thing I can say to that question

10   is indirect information that I received from

11   Steve Whitlock and Barry Fulcher of a meeting that

12   occurred with Mr. Williams and the Commissioner and

13   other people where purportedly he made comments

14   about the reasonable accommodation process.  But I

15   wasn't at that meeting.  So, I don't have direct

16   knowledge.

17        JUDGE KHARE:  But you heard that he said

18   negative things?

19        THE WITNESS:  I heard that he was

20   questioning the reasonable accommodation rules and

21   how people were using them.  That was my

22   impression.

C O N F I D E N T I A L

529

1  Ms. Bearman as quickly as possible.  So, we never

2  really got to a point of veto because we worked on

3  it collaboratively.

4        For instance, I reviewed memos where I

5  felt that the memo needed to cover other points

6  that occurred.

7        So, we never got into a veto mode by the

8  way we were operating.

9    Q.    Did you have the authority, if not the

10  obligation, to override Mr. Fulcher if you felt he

11  wasn't handling the process right?

12    A.    Yes.

13    Q.    Yes?

14    A.    Yes.

15    Q.    And you knew that there was an issue

16  concerning transfer of Ms. Bearman to the Chief

17  Counsel's Office?

18    A.    I knew that was one of the areas we were

19  looking at.

20    Q.    You knew there were open positions there?

21    A.    Yes.

22    Q.    In fact, there were no other open

CONFIDENTIAL

530

1    positions anywhere in the Internal Revenue Service,

2    correct?

3           A.    That is what we found out later.

4           Q.    So, this is the only spot and she is not

5    being transferred there, correct?

6           A.    Yes.

7           Q.    And the reason why she was not being

8    transferred there in your understanding was what?

9           A.    My understanding was, and this is where I

10   relied on the experts, that there needed to be a

11   mutual interest, for instance, like with the

12   District, and that it was not an automatic

13   transfer.  So, in my recollection that was not an

14   option.

15               JUDGE KHARE:   You say there needed to be

16   a mutual interest.

17               THE WITNESS:   Right.

18               JUDGE KHARE:   Could you expand on that?

19               THE WITNESS:   My understanding, and I am

20   not an expert, so I may be characterizing this

21   incorrectly, my understanding was at the time that

22   we could not force a transfer.

C O N F I D E N T I A L

531

1            BY MR. QUINN:

2        Q.    You could not force a transfer?

3        A.    Right.

4        Q.    That was based on an opinion that you got

5    from GLS, right?

6        A.    Yes.

7        Q.    Which is Chief Counsel's Office?

8        A.    Yes.   That was what Mr. Fulcher briefed

9    me.

10        Q.    And you realize that it was a situation

11    where Chief Counsel's Office was giving you an

12    opinion as to whether or not you could force Chief

13    Counsel's Office to take Ms. Bearman?

14        A.    Well, I assumed that they were operating

15    in an independent capacity.   It is their function

16    to do that.

17        Q.    I am sorry.

18        A.    In the sense that they would give us good

19    legal advise regardless of --

20        Q.    Conflicts?

21        A.    -- what office.

22            JUDGE KHARE:   Of what it meant to them?

CONFIDENTIAL

532

1          THE WITNESS:  Right.  That was my

2    operating assumption.

3          BY MR. QUINN:

4      Q.   Did it occur to anyone that perhaps this

5    should be a matter that should go to the Department

6    of Treasury?

7      A.   You raised that last time and I think

8    that is a good point.  I did not consider it.

9      Q.   Did anyone consider it?

10     A.   Not to my knowledge.

11     Q.   Do you know who Ms. Heaton is?

12     A.   I am sorry?

13     Q.   Ms. Heaton.

14     A.   No.

15     Q.   Were you kept abreast of Mr. Fulcher's

16   communications with the Department of Treasury on

17   this issue?

18     A.   No.

19     Q.   Now, you mentioned Ms. Bearman's

20   workload.

21     A.   Yes.

22     Q.   What is the ISO 9000 project?

**C O N F I D E N T I A L**

548

1    There is something you should know.

2                I haven't read all the depositions.

3                THE WITNESS:  Okay.  I am sorry.

4                JUDGE KHARE:  So, you need to answer the

5    questions as they are asked here today.

6                THE WITNESS:  Okay.  Thank you.

7                I knew that Ms. Bearman had a disability

8    around depression when we received the letter in

9    October.  I believe it was October of '99.

10               BY MR. QUINN:

11      Q.    But before that time you knew that

12   Ms. Bearman suffered from a condition that you

13   yourself believed to be depression, is that fair to

14   say, in a layman's sense?

15      A.    Yes.

16      Q.    And you also knew that Ms. Bearman was

17   happier when she had a lot of work to do?

18      A.    Yes.

19      Q.    Happier in the sense that it even

20   relieved the depression?

21      A.    Yes.

22      Q.    And is it fair to say that a decision was

C O N F I D E N T I A L

1    made early on that your office would not be able to

2    accommodate Ms. Bearman's request for an

3    accommodation to the extent that it involved more

4    substantive work to do?

5        A.    I think I testified that we could not

6    restructure the job --

7            JUDGE KHARE:    Ms. Sottile, leave out the

8    I think I testified.    Please just answer the

9    question.

10           THE WITNESS:    Our office could not

11    accommodate a job restructure to a 905, which was

12    the Attorney Advisor position.

13           JUDGE KHARE:    Why is that?

14           THE WITNESS:    Because those are very

15    specific positions.    Most of those positions are in

16    very specific areas of the organization.    They are

17    not in most of the IRS offices.    The type of work

18    we do is not Attorney Advisor.

19           JUDGE KHARE:    It is not as much legal

20    work?

21           THE WITNESS:    I think we would have had a

22    very difficult time.    I received advice that we