## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TESSA E. BERGMAN             :

      Plaintiff,         :

                       :   Civil Action No. <u>06-0303 (GK)</u>

      v.             :

                       :

HENRY M. PAULSON, JR.   :
SECRETARY OF THE TREASURY  :

      Defendant.       :

                       :

## EXHIBITS TO PLAINTIFF'S
## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE

### INDEX TO EXHIBITS

| | |
|---|---|
| Exhibit A | Affidavit of Tessa Bergman |
| Attachment 1 | 12/3/99 letter from Neal L. Presant, M.D., to Ms. Joan McIver, Acting, Headquarters Labor Relations Section |
| Attachment 2 | Office of Chief Counsel, Internal Revenue Service, Vacancy Announcements |
| Attachment 3 | 12/16/99 letter from attorney Francine K. Weiss to Julie Berry, Esq., OCC, re Theresa Bearman's reassignment |
| Attachment 4 | 2/3/00 letter from Barry P. Fulcher to Theresa Bearman terminating administrative leave status and providing an update of job reassignment efforts |
| Attachment 5 | 3/7/00 letter from Barry P. Fulcher to Theresa Bearman re reassignment offer as a Grade 12 attorney in the Baileys Crossroads, Virginia |
| Attachment 6 | Worksheet re W-2 Salary Earned by Tessa Bergman, 2000-2007 |
| Exhibit B | Excerpts from the Deposition Transcript of Barry P. Fulcher, Defendant's Rule 30(b)(6) Designee |
| Exhibit C | Excerpts from the Hearing Transcript<br>• Judith Nowak, M.D.<br>• John R. Burns<br>• David Williams<br>• Kathy King |

- Barry P. Fulcher
- Susan Sottile

Exhibit D          Decision of ALJ Laura Khare, November 25, 2003

Exhibit E          Affidavit of Judith Nowak, M.D.

Exhibit F          Excerpts from Defendant's First, Supplemental and Second Interrogatory Responses

Exhibit G          Excerpts from the Deposition Transcript of Susan Nizer, Defendant's Rule 30(b)(6) designee

# EXHIBIT A

# AFFIDAVIT OF TESSA BERGMAN

AFFIDAVIT

Tessa Bergman, being duly sworn, deposes and says as follows:

1. From September 1998 through March 27, 2000, I was an employee of Defendant Department of Treasury, working as a Management Program Analyst in the Office of Public Liaison and Small Business Affairs of the Internal Revenue Service.

2. From October 1, 1999 through February 2000, I was employed as a GS 14, step 5 on the government pay scale.   In June 2000, I was given a step increase to GS 14, step 6 retroactive to February 2000.

3. I have suffered with mild, chronic depression for most of my life.  The condition is usually manageable, with mild medication, and does not interfere with my day-to-day work activities.

4. In the late summer of 1999, I began to slip into an acute depression.  This had happened to me once before in 1991, when I slipped into an acute depression due to external circumstances in my personal life.

5. I suffered an acute exacerbation of depression in the fall of 1999.  The acute depressive episode I suffered in the fall of 1999 was caused by my work circumstances.  Specifically, I had no substantive work to do.  I was expected to perform clerical tasks, such as scheduling meetings and taking notes at meetings. Most of the time I simply sat at my desk with nothing to do.  My activities were monitored closely by my supervisor, who was also my office mate and  who sat just a few feet away from me.  I was not permitted to have personal telephone calls or internet use and was not permitted to read any non-work related materials.

I had to sign in and out whenever I left the office. Basically, I was required to sit at my desk and do nothing.

6. The only substantive work I had was, a small-business CD Rom project that I had designed myself, was taken away from me by a supervisor, Mr. Fitzpatrick. While I had no work to do, Mr. Fitzpatrick would call me into his office and berate me, usually in front of clerical level employees. All of my activities were closely monitored. It was very clear to me that my supervisors were trying to force me to resign by making my work environment as unpleasant as possible.

7. By October 1999, my depression had reached the point where I was unable to go to work, and I was placed on an approved extended medical leave. On October 22, 1999, my attorney, Francine Weiss, submitted a written request for a reasonable accommodation under the Rehabilitation Act of 1973, as amended (the "Act"), to my employer.

8. I returned to work for financial reasons in mid-December 1999. However, the level of harassment I experienced was extreme. I was given no work to do and expected to sit at my desk all day and do nothing. My supervisors at the time knew that these conditions exacerbated the depression I was suffering, because I told them. My internet and telephone usage was monitored by my office mater, who was also my supervisor. I finally took another extended medical leave in January 2000 and did not return until shortly before I was offered a job in an IRS field office as a reasonable accommodation.

9. My employer retained Neil Presant, M.D., as a consultant to advise whether I was a qualified individual with a disability who required a reasonable accommodation

under the Act and, if so, to recommend a reasonable accommodation. My psychiatrist, Judith Nowak, M.D., kept me abreast of all developments. She offered Dr. Presant access to my medical records and consulted regularly with Dr. Presant.

10. On or about December 3, 1999, Dr. Presant issued a written determination that I had a disability, acute depression, that required a reasonable accommodation under the Act, and he informed Dr. Nowak of the determination. As the most effective reasonable accommodation, Dr. Presant recommended that I be reassigned to an employment position that involved full-time substantive legal work. Attachment 1.

11. In December 1999, Barry Fulcher, my supervisor, informed me that the Internal Revenue Service (IRS) had made a determination that I was a qualified individual with a disability who required a reasonable accommodation under the Act. I was told that my employer would reassign me to a job involving full-time substantive legal work. Barry Fulcher was given lead responsibility to search for a reasonable accommodation for me.

12. In late October 1999 and continuing until March 2000, on multiple occasions I notified Barry Fulcher and other employees of defendant responsible for finding a reasonable accommodation for me that there were open attorney positions in the IRS' Office of Chief Counsel in Washington, DC, at my grade level.

13. I actually gave Mr. Fulcher copies of the job vacancy notices at the Office of Chief Counsel and called that office to confirm that there were, in fact, several open attorney positions at my grade level in Washington, DC. Attachment 2

contains job vacancy announcements, which I provided to Mr. Fulcher and which show that positions at my grade level were open in the Office of Chief Counsel at all relevant times while my employer was searching for a reasonable accommodation for me under the Act.

14. I am a highly qualified tax attorney and am fully qualified for the open attorney position in the IRS Office of Chief Counsel in Washington, DC, at my current grade level. I received a J.D. degree from the University of North Carolina School of Law in 1978 and an L.L.M. degree in taxation from Georgetown University School of Law in 1982. I also have a Master's Degree in Biotechnology from Johns Hopkins University. As an undergraduate, I attended University of Pennsylvania for two years (where I have close to a 4.0 average) and then transferred to University of Arizona for family reasons where I graduated magna cum laude and Phi Beta Kappa. I am, and at all times relevant hereto have been, a member in good standing of the California Bar.

15. I was employed by the IRS' Office of Chief Counsel as an attorney from 1984 through 1988 and worked in one of the most prestigious offices there. I was awarded a Certificate of Merit, received a cash bonus for my work at the IRS Office of Chief Counsel and left the office in good standing in 1988. Thereafter, I was employed as a tax attorney at Mayer, Brown & Platt and Sonnenschein, Nath & Rosenthal in Chicago, Illinois. From January 1993 to January 1995, I was employed as tax counsel to Rep. William Jefferson, a member of the House Ways and Means Committee. From September 1995 to February 1996, I was employed

as tax counsel to Senator John Breaux, a member of the Senate Finance Committee.

16. Mr. Fulcher and many other employees of defendant knew there were open positions at my grade level in the IRS' Office of Chief Counsel in December 1999 and continuing through March 27, 2000. My lawyer wrote to Defendant and advised Defendant of applicable legal precedent that required Defendant to place me in an open position at my grade level in Office of Chief Counsel. Attachment 3. Defendant did not reassign me to one of the open attorney positions. Mr. Fulcher told me repeatedly that I was not reassigned to one of these open positions because the IRS' Office of Chief Counsel was not obligated to accept me. To help with the job reassignment, I submitted a formal application to Office of Chief Counsel in December 1999.

17. On or about February 3, 2000, I received a letter from Mr. Fulcher advising me that I was not reassigned to one of these open positions because the IRS' Office of Chief Counsel was not obligated to accept me. Attachment 4.

18. On or about March 7, 2000, I was offered a position as an estate tax attorney in the Virginia field office of the IRS' Examination Division as a reasonable accommodation. The position was a GS-12 position on the government pay schedule, a significant demotion from my then present position of GS-14, Step 6. I was informed at that time that this position was the accommodation I was to be provided as a reasonable accommodation under the Act. Attachment 5.

19. I was told that if I did not accept the estate tax attorney position, defendant would make no further effort to reassign me to another job. Accordingly, I accepted the

transfer to the Virginia field office as an estate tax attorney, GS-12, in mid- March 2000.   Id.   I was given pay retention agreement, whereby my pay was thereafter effectively frozen at my then current pay level of GS-14, Step 6. Between March 2000 and March 15, 2007, I lost wages of $68,328 as a result of the lower wages paid to me under the so-called pay retention agreement.. From January 1, 2000 to March 26, 2000, I lost an additional $3,120 due to being in non-pay status.   The pay retention agreement froze my then GS-14, step 6 salary until such time as a GS-12,   Step 10 increased to that amount through annual Federal pay increases.   I was not allowed any step increases nor even a full Federal annual increase, but only 50% of what a GS-12, step 10 was allowed.. See Attachment 5.

I swear under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

_Tessa Bergman_
Tessa Bergman

Dated:  April 23, 2007

# EXHIBIT A – ATTACHMENT 1

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service



Health Resources and
Services Administration
Bethesda MD 20814

Federal Occupational Health
4350 East West Highway, 3rd Floor
Bethesda, Maryland 20814
npresant@foh.dhhs.gov

December 3, 1999

Ms. Joan McIver
Acting Chief
Headquarters Labor Relations Section
HQ:HR:MP:L Room 1042
1111 Constitution Avenue NW
Washington, DC 20224

Dear Ms. McIver:

As requested, I have reviewed the additional documentation provided on behalf of Ms. Teresa Bearman, an IRS employee who is requesting a workplace accommodation. The documentation is not medical but rather consists of a letter describing her work history dated November 24, 1999 from the law offices of Kalijarvi, Chuzi, & Newman and her most recent performance appraisal as a Program Analyst.

I am an occupational medicine physician rather than a lawyer by training and would not presume to be able to independently judge the work of a tax attorney. The work history statement from her attorney appears plausible and her performance appraisal indicates that she has met all the critical elements of her current position. In the absence of any controverting evidence from the IRS, I assume that Ms. Bearman is a competent tax attorney. It is also very plausible that a major contributor to her depression is low self-esteem resulting from being in a position in which the required work product is not commensurate with her training and capabilities. Thus, I would recommend from a medical point of view that she be accommodated with a position appropriate to her legal and educational background if there is such a position available in your agency.

Please call me at (301) 594-0273 if you have further questions concerning this matter.

Sincerely,

Neal L. Presant, M.D, CIME
Occupational Medicine Consultant

Fulcher
EXHIBIT
9/13   11   3A-02

TOTAL P.02

000044

280

# EXHIBIT A – ATTACHMENT 2

# Office of Chief Counsel
# Internal Revenue Service
# Vacancy Announcements

| Closing Date | Announcement Number | Series / Grade | Position Title |
|---|---|---|---|
| 12/27/99 | GS-99-35 | GS-905-15 | Supervisory Attorney-Advisor (Tax)/ Director, Advance Pricing Agreement Program |
| 12/27/99 | GS-99-36 | GS-343-15 | Program Analyst/ Director, Advance Pricing Agreement Program |
| 12/28/99 | CC-99-2373 | GS-343-7/9 | Management Analyst |
| 01/04/00 | GS-99-37 | GS-905-15 | Trial Attorney (Tax) Special Trial Attorney |
| 01/05/00 | CC-99-2402 | GS-318-5/6 | Secretary (OA) |
| 01/07/00 | CC-99-2413 | GS-905-14 | Attorney-Adviser (Tax) |
| 01/14/00 | CC-99-2358AA | GS-905-987-14 | Attorney-Adviser (Tax)/Tax Law Specialist |
| 01/14/00 | CC-99-2383 | GS-201-14 | Supervisory Personnel Management Specialist |
| Open Until Filled | CC-99-2382 | GS-201-12 | Personnel Management Specialist |
| Open Until Filled | CC-99-2335 | GS-905-11/12/13/14 | General Attorney (Tax) |
| Open Until Filled | CC-99-2315 | GS-0905-11/12/13/14 | Attorney-Advisor (Tax) |
| Open Until Filled | CC-99-2235 | GS-203-5/6/7 | Personnel Assistant (OA) |
| Open Until Filled | CC-99-2165 | GS-203-5/6/7 | Personnel Assistant (OA) |

24

**VACANCY ANNOUNCEMENT**

| | |
|---|---|
| **DEPARTMENT OF THE TREASURY**<br>**LEGAL DIVISION**<br>**OFFICE OF CHIEF COUNSEL**<br>**for the INTERNAL REVENUE SERVICE** | **ANNOUNCEMENT NUMBER:** CC-99-2315<br>**OPENING DATE:** 11/09/99<br>**CLOSING DATE:** OPEN UNTIL FILLED<br>[POSITIONS MAY BE FILLED AT ANY TIME<br>AFTER THE OPENING DATE] |

**POSITION:**
ATTORNEY-ADVISER (TAX), GS-0905-11/12/13/14 AND/OR
TRIAL ATTORNEY (TAX), GS-0905-11/12/13/14 AND/OR
GENERAL ATTORNEY (TAX), GS-0905-11/12/13/14 AND/OR
GENERAL ATTORNEY, GS-0905-11/12/13/14
[AND/OR TAX LAW SPECIALIST, GS-987-13/14*]
*SEE "AREA OF CONSIDERATION"

PROMOTION POTENTIAL TO GS-14
[THE POSITION TO WHICH ASSIGNED, MAY BE IN THE NTEU CHAPTER 251 BARGAINING
UNIT.]

**SALARY RANGE:**
GS-11: $40,714 TO $52,927 PER ANNUM
GS-12: $48,796 TO $63,436 PER ANNUM
GS-13: $58,027 TO $75,433 PER ANNUM
GS-14: $68,570 TO $89,142 PER ANNUM

**NUMBER OF VACANCIES:**
SEVERAL

**LOCATION:**
INTERNAL REVENUE SERVICE
OFFICE OF CHIEF COUNSEL
WASHINGTON, DC

**NOTE: FOR CHIEF COUNSEL EMPLOYEES ONLY - YOU MUST IDENTIFY EACH ASSISTANT
CHIEF COUNSEL ORGANIZATION OR OFFICE FOR WHICH YOU SEEK CONSIDERATION, AND YOU
MUST SUBMIT A SEPARATE APPLICATION FOR EACH.**

**AREA OF CONSIDERATION:**
ALL SOURCES
(NOTE: RELOCATION EXPENSES WILL NOT BE PAID.)

[*CONSIDERATION FOR THIS POSITION AS A TAX LAW SPECIALIST, GS-987, IS
RESTRICTED TO CERTAIN EMPLOYEES IN THE OFFICE OF CHIEF COUNSEL WHO CURRENTLY
OCCUPY A TAX LAW SPECIALIST POSITION]

**TYPE OF APPOINTMENT:**
THIS IS AN EXCEPTED SERVICE POSITION.  COMPETITIVE SERVICE EMPLOYEES SELECTED
FOR THIS POSITION WILL BE REQUIRED TO CONVERT TO THE EXCEPTED SERVICE UPON
APPOINTMENT TO THE GS-905 SERIES.

**DESCRIPTION:**
THE IRS OFFICE OF CHIEF COUNSEL SEEKS CANDIDATES FOR SEVERAL ATTORNEY
POSITIONS IN ITS NATIONAL OFFICE LOCATED IN WASHINGTON, DC.  THE OFFICE OF
CHIEF COUNSEL SERVES AS INDEPENDENT COUNSEL TO THE IRS COMMISSIONER AND
FURNISHES LEGAL ADVICE AND REPRESENTATION, NATIONWIDE, ON ALL MATTERS RELATED
TO THE ADMINISTRATION AND ENFORCEMENT OF THE INTERNAL REVENUE LAWS.  ATTORNEYS
ARE ENGAGED IN THE DEVELOPMENT AND INTERPRETATION OF TECHNICAL PRINCIPLES AND

- 2 -

RULES FOR THE UNIFORM APPLICATION OF FEDERAL TAX LAWS, AND HANDLE MATTERS BOTH PROCEDURAL AND SUBSTANTIVE IN NATURE. THEY ALSO HAVE EXTENSIVE CLIENT CONTACT AND REGULAR DEALINGS WITH TAXPAYERS AND THEIR ATTORNEYS. MANY ATTORNEYS ALSO HAVE REGULAR DEALINGS WITH THE DEPARTMENT OF THE TREASURY.

**MINIMUM QUALIFICATION REQUIREMENTS:**

CANDIDATES MUST HAVE GRADUATED FROM AN ABA ACCREDITED LAW SCHOOL; BE ADMITTED TO PRACTICE LAW BEFORE THE HIGHEST COURT OF A STATE OR TERRITORY OF THE UNITED STATES; THE DISTRICT OF COLUMBIA; OR THE COMMONWEALTH OF PUERTO RICO; AND:

FOR GS-11: 1) POSSESS A JD, AND

2) GENERALLY, AT LEAST SIX MONTHS OF SIGNIFICANT ATTORNEY OR LAW CLERK EXPERIENCE; OR MUST POSSESS ONE OR MORE "SUPERIOR ACADEMIC ACHIEVEMENTS" SUCH AS GRADUATION IN THE TOP ONE-THIRD OF THE CLASS, ELECTION TO THE ORDER OF THE COIF, SUCCESSFUL MOOT COURT COMPETITION, ACTIVE PARTICIPATION IN THE SCHOOL'S OFFICIAL LAW REVIEW, ETC.

FOR GS-12: 1) POSSESS A JD AND GENERALLY, AT LEAST ONE YEAR OF ATTORNEY OR LAW CLERK EXPERIENCE WHICH INCLUDED ASSIGNMENTS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION, AND A TOTAL RECORD OF EDUCATION AND EXPERIENCE WHICH INDICATED THE ABILITY TO PERFORM LEGAL WORK COMMENSURATE WITH GRADE GS-12.

FOR GS-13: 1) POSSESS A JD AND GENERALLY, AT LEAST TWO AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION, AND GENERALLY, AT LEAST ONE AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION.

FOR GS-14: 1) POSSESS A JD AND GENERALLY, AT LEAST FOUR AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION,  AND GENERALLY, AT LEAST THREE AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION.

**APPLICATION PROCEDURES:**

[PLEASE NOTE THAT WE CANNOT ACCEPT APPLICATIONS IN ELECTRONIC FORMAT.]

- 3 -

THE FOLLOWING APPLICATION MATERIALS ARE REQUIRED:

- A RESUME
- A PHOTOCOPY OF YOUR LAW SCHOOL TRANSCRIPT
- A 6-10 PAGE LEGAL WRITING SAMPLE
- A CHIEF COUNSEL APPLICATION (FORM 6524)
- A DECLARATION FOR FEDERAL EMPLOYMENT (OF-306)

**FOR CHIEF COUNSEL EMPLOYEES ONLY - ALL APPLICANTS MUST SUBMIT A WRITTEN APPLICATION AND A COPY OF THEIR MOST RECENT OFFICIAL PERFORMANCE APPRAISAL (LD-2). A WRITTEN APPLICATION MAY BE IN THE FORMAT OF A RESUME, OF-612, SF-171, OR ANY OTHER FORMAT OF CHOICE. APPLICANTS SHOULD ALSO SUBMIT A COPY OF THEIR MOST RECENT SF-50, "NOTIFICATION OF PERSONNEL ACTION."**

TO OBTAIN THE FORM 6524 AND OF-306, PLEASE CALL (202) 622-7933 OR (202) 622-8000. PLEASE LET US KNOW IF YOU WOULD PREFER TO HAVE THE FORMS FAXED TO YOU.

ALL MATERIALS MUST BE MAILED OR DELIVERED TO THE EMPLOYMENT OFFICE AT THE FOLLOWING ADDRESS:

     OFFICE OF THE CHIEF COUNSEL/INTERNAL REVENUE SERVICE
     PERSONNEL BRANCH, CC:F&M:P:W, ROOM 4032 (ATTN: CC-99-2315)
     1111 CONSTITUTION AVENUE, NW
     WASHINGTON, DC  20224

IN ACCORDANCE WITH 18 U.S.C. 1719 AND 39 U.S.C. 3201, APPLICATIONS MAILED IN A POSTAGE-PAID AGENCY ENVELOPE (PENALTY MAIL) WILL NOT BE CONSIDERED.

**OTHER RELEVANT INFORMATION:**
- MALE APPLICANTS WHO WERE BORN AFTER DECEMBER 31, 1959, MUST BE REGISTERED WITH THE SELECTIVE SERVICE SYSTEM PRIOR TO APPOINTMENT.
- RECEIPT OF APPLICATIONS MAY NOT BE ACKNOWLEDGED, AND CANDIDATES MAY NOT BE NOTIFIED OF THE OUTCOME OF THEIR CONSIDERATION UNTIL THE SELECTION PROCESS IS COMPLETE.
- ALL APPLICATION MATERIALS BECOME THE PROPERTY OF THE OFFICE OF CHIEF COUNSEL AND WILL NOT BE RETURNED.

     THE OFFICE OF CHIEF COUNSEL IS AN EQUAL OPPORTUNITY EMPLOYER

# VACANCY ANNOUNCEMENT

**OFFICE OF THE CHIEF COUNSEL**

**INTERNAL REVENUE SERVICE**

**ANNOUNCEMENT NUMBER:** CC-99-2413

**OPENING DATE:** 12/16/99

**CLOSING DATE:** 01/07/00

**POSITION:**ATTORNEY-ADVISER (TAX), GS-905-14

NO PROMOTION POTENTIAL

THIS IS A NON-BARGAINING UNIT POSITION

**SALARY RANGE:**GS-14: $68,570 TO $89.142 PER ANNUM

**NUMBER OF VACANCIES:** 1

**LOCATIONS:**ASSOCIATE CHIEF COUNSEL (INTERNATIONAL)
BRANCH 3
WASHINGTON, DC

## AREA OF CONSIDERATION:

OFFICE OF THE CHIEF COUNSEL EMPLOYEES - NATIONAL OFFICE

## DUTIES:

AS THE ASSISTANT TO THE BRANCH CHIEF, THE INCUMBENT PERFORMS THE FULL
RANGE OF LEGAL WORK WITHIN THE ASSIGNED BRANCH, AND, IN ADDITION, SERVES AS
A TECHNICAL REVIEWER AND PERFORMS SPECIFIC MANAGEMENT DUTIES ASSIGNED. AS
SUCH, DUTIES INCLUDE. BUT ARE NOT LIMITED TO:

- FURNISHING TECHNICAL INFORMATION, ADVICE, AND ASSISTANCE IN THE
  DEVELOPMENT AND DRAFTING OF TAX LEGISLATION AND LEGISLATION AFFECTING
  THE INTERNAL REVENUE SERVICE AND RELATED MATTERS. PARTICIPATING IN THE
  REVIEW OF DRAFTS OF COMMITTEE REPORTS RELATING TO LEGISLATION.
- INITIATING, DEVELOPING, AND DRAFTING REGULATIONS, REVENUE RULINGS, AND
  OTHER INTERPRETATIONS OF THE INTERNATIONAL PROVISIONS OF THE CODE.
  ADMINISTERING THOSE PROVISIONS, INCLUDING PROVISIONS FOR WHICH
  PRECEDENTS HAVE NOT BEEN ESTABLISHED OR WITH RESPECT TO WHICH THE
  ISSUES ARE HIGHLY CONTROVERSIAL AND SENSITIVE. DEVISING NOVEL
  APPROACHES TO SITUATIONS FOR WHICH NO PRECEDENTS EXIST.
- PERFORMING EXTENSIVE RESEARCH INTO THE BACKGROUND, INCLUDING
  CONGRESSIONAL INTENT, OF STATUTORY PROVISIONS AS REFLECTED IN

48

CONGRESSIONAL HEARINGS, COMMITTEE REPORTS. COURT DECISIONS, ETC.
- PARTICIPATING IN THE DEVELOPMENT OF TREATIES OF INTERNAL REVENUE MATTERS WITH FOREIGN GOVERNMENTS. IN CONNECTION WITH SUCH WORK, ATTENDING CONFERENCES OR MEETINGS TO DISCUSS THE FORMULATION OF TREATIES, PREPARING MINUTES OF MEETING WITH OFFICIALS FROM THE FOREIGN COUNTRY, AND DRAFTING OR REVIEWING DOCUMENTS SUCH AS THE TECHNICAL EXPLANATION OF THE TREATIES.
- PLANNING WORK TO BE ACCOMPLISHED BY SUBORDINATES. DETERMINING WORK PRIORITIES AND PREPARING WORK SCHEDULES FOR COMPLETION OF WORK. ASSIGNING WORK TO SUBORDINATES BASED ON PRIORITIES, THE DIFFICULTY AND REQUIREMENTS OF THE ASSIGNMENT, AND THE CAPABILITIES OF THE EMPLOYEES.
- REVIEWING WORK PRODUCTS OF SUBORDINATES AND ACCEPTING, REVISING, OR REJECTING WORK. STIMULATING ACCOMPLISHMENT OF WORK PRODUCTS AND PROVIDING GUIDANCE IN RESEARCH AND ANALYZING NOVEL AND UNCERTAIN POINTS OF LAW, ETC.
- PREPARING AND REVIEWING MANAGEMENT REPORTS AND PERFORMING OTHER ADMINISTRATIVE DUTIES AS ASSIGNED.

## MINIMUM QUALIFICATION REQUIREMENTS:

CANDIDATES MUST HAVE GRADUATED FROM AN ABA ACCREDITED LAW SCHOOL; BE ADMITTED TO PRACTICE LAW BEFORE THE HIGHEST COURT OF A STATE OR TERRITORY OF THE UNITED STATES; THE DISTRICT OF COLUMBIA; OR THE COMMONWEALTH OF PUERTO RICO; AND:

FOR GS-14: APPLICANTS MUST MEET TIME-IN-GRADE REQUIREMENTS AS OUTLINED IN CCDM (30)42(12)3.

**SPECIALIZED EXPERIENCE** IS THAT WHICH DEMONSTRATES THE ABILITY TO RESEARCH AND ANALYZE FEDERAL TAX ISSUES, MAKE RECOMMENDATIONS, AND PREPARE PAPERS AND REPORTS AS REQUIRED. MINIMUM QUALIFICATION REQUIREMENTS MUST BE MET ON OR BEFORE THE CLOSING DATE OF THIS ANNOUNCEMENT.

## EVALUATIVE METHODS:

APPLICANTS WHO MEET THE MINIMUM ELIGIBILITY AND QUALIFICATION REQUIREMENTS WILL BE CONSIDERED BASED ON THEIR OVERALL BACKGROUND AS IT RELATES TO THE POSITION TO BE FILLED. INTERVIEWS MAY BE HELD AT THE OPTION OF THE OFFICE. ALL APPLICATION MATERIALS AND INTERVIEWS, IF CONDUCTED, WILL BE USED IN THE FINAL EVALUATION AND SELECTION PROCESS.

## APPLICATION PROCEDURES:

ALL APPLICANTS MUST SUBMIT THE FOLLOWING:

1. A WRITTEN APPLICATION. A WRITTEN APPLICATION MAY BE IN THE FORMAT OF A RESUME, OPTIONAL APPLICATION FOR FEDERAL EMPLOYMENT (OF 612), SF-171, AND APPLICATION YOU MAY HAVE USED WITH ANOTHER EMPLOYER, OR ANY OTHER FORMAT YOU CHOOSE. (MANDATORY)
2. A COPY OF YOUR MOST RECENT SF-50, "NOTIFICATION OF PERSONNEL ACTION".

49

WHICH INDICATES YOUR ELIGIBILITY TO APPLY FOR THIS POSITION. (MANDATORY)
3. A COPY OF YOUR MOST RECENT OFFICIAL PERFORMANCE APPRAISAL, OR A STATEMENT WITH REASONS AS TO WHY YOU DO NOT HAVE SUCH AN APPRAISAL. (MANDATORY)

IF ADDITIONAL INFORMATION IS DESIRED, PLEASE CALL (202) 622-8000.

APPLICATIONS MUST BE POSTMARKED ON OR BEFORE THE CLOSING DATE OF THIS ANNOUNCEMENT AND RECEIVED IN THE PERSONNEL BRANCH; AT THE ADDRESS INDICATED BELOW NO LATER THAN 5 WORK DAYS AFTER THIS CLOSING DATE. IN ACCORDANCE WITH 18 U.S.C. 1719 AND 39 U.S.C. 3201, APPLICATIONS MAILED IN A POSTAGE-PAID AGENCY ENVELOPE (PENALTY MAIL) WILL NOT BE CONSIDERED. FAXED APPLICATIONS WILL NOT BE ACCEPTED.

## MAIL OR DELIVER APPLICATION PACKAGES TO:

OFFICE OF THE CHIEF COUNSEL/INTERNAL REVENUE SERVICE

PERSONNEL BRANCH, CC:F&M:P:W, ROOM 4032 (99-2413)

1111 CONSTITUTION AVENUE, N.W.

WASHINGTON, D.C. 20224

## OTHER RELEVANT INFORMATION:

- RECEIPT OF APPLICATIONS MAY NOT BE ACKNOWLEDGED, AND CANDIDATES MAY NOT BE NOTIFIED OF THE OUTCOME OF THEIR CONSIDERATION UNTIL THE SELECTION PROCESS IS COMPLETE.
- ALL APPLICATION MATERIALS BECOME THE PROPERTY OF THE OFFICE OF CHIEF COUNSEL AND WILL NOT BE RETURNED.

**THE OFFICE OF CHIEF COUNSEL IS AN EQUAL OPPORTUNITY EMPLOYER**

50

EXHIBIT A – ATTACHMENT 3

LAW OFFICES

# KALIJARVI, CHUZI & NEWMAN, P.C.

SUITE 1011

JUNE D. W. KALIJARVI

GEORGE M. CHUZI

ELIZABETH L. NEWMAN

———

THOMAS J. TRGOVAC

MARGARET E. JOHNSON

———

OF COUNSEL:

STEPHEN L. SPITZ

1730 K STREET, N.W.

WASHINGTON, D.C. 20006

(202) 331-9260

FAX: (202) 872-9562

600 CAMERON STREET

ALEXANDRIA, VIRGINIA 22314

———

SUITE 800

7475 WISCONSIN AVENUE

BETHESDA, MD 20814

———

OF COUNSEL:

FRANCINE K. WEISS

December 16, 1999

By Facsimile

Julie Berry, Esq.
Chief Counsel's Office
Department of the Treasury
1111 Constitution Avenue, N.W.
Washington, D.C.  20224

Re: Theresa Bearman

Dear Ms. Berry:

You have told me for the past two weeks that the Agency is
relying on EEOC Regulation 29 CFR 1614.203(g) in attempting to
find a position for this firm's client Theresa Bearman.  Please
be aware that the EEOC held in Flowers v. Henderson, 1999 WL
767730 (September 9, 1999) that such regulation was too limited
in view of its March 1, 1999 policy guidance on reasonable
accommodation.  The EEOC held that

> The Commission's guidance on reasonable accommodation,
> which clearly sets forth the ADA requirements made
> applicable to Rehabilitation Act cases pursuant to the
> October 29, 1992 amendments to the Rehabilitation
> Act, observes that the ADA contains no language
> limiting the obligation to reassign only to positions
> within a particular office, branch, etc., but advises
> that, "[r]ather, the extent to which an employer must
> search for a vacant position will be an issue of
> undue hardship."  EEOC Enforcement Guidance on Reasonable
> Accommodation and Undue Hardship under the Americans
> with Disabilities Act, No. 915.002, question 27, p.

235

42 (March 1, 1999).

Footnote #4.

We are aware that the Office of Chief Counsel has a vacancy announcement listing Attorney-Adviser positions in "The IRS Office of Chief Counsel" at Grade Level 14. We ask that you immediately take action to determine whether Ms. Bearman can be assigned to any of these vacant GS 14 positions. Your present strategy which is to review attorney positions available in the IRS (which somehow inexplicably excludes the Chief Counsel's Office) and then "contact" the Chief Counsel's Office is contrary to law.

We ask that you contact us immediately to discuss what actions that you have taken and plan to take to find Ms. Bearman a position. Much valuable time has already been lost because of unacceptable Agency delay.

*NO RESPONSE*

Sincerely,

Francine K. Weiss

Francine K. Weiss

EXHIBIT A – ATTACHMENT 4

Exhibit 6

February 3, 2000


Ms. Theresa E. Bearman
2911 South Dinwiddie Street
Apartment C-2
Arlington, Virginia 22206

Dear Terri:

The purpose of this letter is to confirm in writing a voice mail message I left at your home last week, to address your voice mail reply to me, and to respond to the concerns raised in your January 30, 2000 letter to me, which I received on January 31.

On Friday, January 28, 2000, at about 3:15 p.m., I left a voice mail message at your home informing you that your administrative leave status was being terminated effective close of business that day. I also informed you that the Service would continue to allow you to work a flexible schedule in your present position, as requested by Dr. Judith A. Nowak, your treating physician, in her December 3, 1999 letter to Joan C. McIver, Acting Chief, Labor Relations Section.

I received Dr. Nowak□s January 21, 2000 letter on January 28, 2000. In accordance with that letter, and the fact that you informed me you are suffering from influenza, you will continue in an approved leave status (sick leave, annual leave, or leave without pay, depending on your preference and leave account availability) until further notice. This decision takes into consideration the concerns raised in your January 28, 2000 voice mail to me, Dr. Nowak□s most recent medical opinion and your January 30, 2000 letter.

Terri, as requested in your January 30, 2000 letter I am providing you an update of the Service□s efforts to achieve an appropriate reasonable accommodation for you. I have been in contact with the Office of the Assistant Commissioner (Examination) and expect to receive a reply from that office in the next several days as to whether they are able to offer you a GS-905-14 position.

I have also been in contact with the Office of the Assistant Commissioner (International) regarding appropriate reassignment possibilities. On January 18, 2000, I was informed that they do not have any vacant GS-905-14 positions and do not believe they will have any such positions in the near future.

I also asked the District Directors for Virginia-West Virginia and Delaware-Maryland to

Fulcher
EXHIBIT
7  3-19-02

000026

0000017

2

determine if they can assist you within our commuting area. I expect to hear back from them by mid-February.

We have been in contact with the Office of the Chief Counsel in an effort to reasonably accommodate you. However, that office is not part of the Service and the Service has no authority to offer you a position outside the agency. Nevertheless, we shared your resume with that office and informed them of your interest. I understand you have applied for vacant positions in the Office of the Chief Counsel and encourage you to continue to apply for all positions for which you qualify and are interested.

Terri, I hope this addresses your immediate concerns regarding your leave status and the Service[]s continuing efforts to obtain an appropriate reasonable accommodation for your medical condition. If you wish to discuss the contents of this letter, or have any questions, please give me a call on (202) 622-6051.

Sincerely,


Barry P. Fulcher
Chief, Business Liaison

cc: Joan A. McIver
    John Burns
    Steve Whitlock

000027

0000018

# EXHIBIT A – ATTACHMENT 5

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

March 7, 2000

HIEF COMMUNICATIONS
AND LIAISON

Theresa Bearman
2911 South Dinwiddie Street
Apartment C-2
Arlington, Virginia 22206

     Re: Request for Reasonable Accommodation

Dear Terri:

This letter responds to your request for a reasonable accommodation.

Based on the information provided by your physician, it is her opinion that you are unable to perform the duties of your current GS-14 program analyst position because of your medical condition, and that a reasonable accommodation would include either restructuring your current position to include the full time practice of law, or reassigning you into an attorney position. We have reviewed the request and I have determined that it is not possible for the Service to restructure your current position to include the full time practice of law. As previously stated, we have made an exhaustive review of vacant attorney positions in the Washington D.C. metropolitan area. Our search was restricted to those locations because you told me you were not mobile outside them.

As a result of our review, the Service is making you a reassignment offer to the following vacant attorney position:

        Position: GS-905-12, Attorney (Estate Tax)
        Office: Virginia/West Virginia District, Southeast Region
        Division: Examination Division
        Post of Duty: Baileys Crossroads, Virginia

Because this position is at a lower grade than your current GS-14 position, the Agency is also offering you pay retention. Under pay retention, you will retain either your current salary or 150 percent of the tenth step of the new grade, whichever is less. Additionally, during the time you are on pay retention, you will receive 50 percent of all comparability increases based on the tenth step of your new grade. Your entitlement to pay retention will cease when your salary can be accommodated within the pay range of your new grade or if you are promoted. The journeyman level of the Attorney (Estate Tax) position is a GS-12.

Since this offer is at a lower grade, you are not obligated to accept it. Please be

223

advised, however, that inasmuch as this offer represents the reasonable accommodation you requested, the Agency's obligation, if any, to accommodate you through a reassignment may cease if you decline this offer.

Please let me know by March 16, 2000, whether you will accept this offer. I have attached hereto a Position Description for the GS-905-12 Attorney (Estate Tax) position as well as additional information concerning the current General Schedule Pay Rates and information concerning pay retention.

Please sign this letter below on the designated signature line if you accept this offer. I am also available to assist you if you have any further questions concerning this position or retained pay.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

I, Theresa Bearman, hereby accept the offered position of GS-905-12, Attorney (Estate Tax), in the Virginia/West Virginia District.

Theresa Bearman                                3-16-00
Theresa Bearman                                Date

ე 2 4

# EXHIBIT A – ATTACHMENT 6

**W-2 Salary Earned**

| Year | W-2 Salary |
|------|-----------|
| 2000 | $71,463 |
| 2001 | 85006 |
| 2002 | 87522 |
| 2003 | 89862 |
| 2004 | 93173 |
| 2005 | 96621 |
| 2006 | 99573 |
| 2007 | 103117 |
|      | **$726,337** |

| | |
|---|---|
| Total GS Salary | $794,665 |
| Total W-2 Salary | 726337 |
| Lost wages | **$68,328** |

## GS SCHEDULE

| YEAR | PP26 previous yr. | PP 1-3 step increases PP 4-25 | PP 1-25 | | TOTAL ANNUAL | |
|------|-------------------|-------------------------------|---------|--------|--------------|----|
| 2000 | $2,989 | $9,409 | $71,030 | | $83,428 | step increase from step 5 to 6 |
| 2001 | 3229 | | | 83796 | $87,025 | $0 |
| 2002 | 3351 | | | 87796 | $91,147 | $0 |
| 2003 | 3512 | 10985 | 82860 | | $97,357 | $0 step increase from 6 to 7 |
| 2004 | 3766 | | | 98320 | $102,086 | $0 |
| 2005 | 3933 | | | 101965 | $105,898 | $0 |
| 2006 | 4079 | 12656 | 95390 | | $112,125 | $0 step increase from 7 to 8 |
| 2007 | 4336 | | | 111263 | $115,599 | $0 |
| | | | | | **$794,665** | |

**NOTES**

1. The 26 pay periods do not match the calendar year. The year begins with PP26 from previous year and ends with PP 25 of current year.

2. Step increases occur in PP4 of years 2003 and 2006. This is the first full pay period following the anniversary of the employee's start date, February 6, 1995.

3. Step increase to GS-14, step 7 in 2003; step increase to GS 14, step 8 in 2006.

4. Lost wges for the year 2000 were the result of being in non-pay status for the months of January, February and March 2000. All other lost wages claimed were a result of lower wages paid under the pay retention agreement.

# EXHIBIT B

# EXCERPTS FROM THE DEPOSITION TRANSCRIPT OF BARRY P. FULCHER DEFENDANT'S RULE 30(b)(6) DESIGNEE

1

EQUAL OPPORTUNITY EMPLOYMENT COMMISSION

WASHINGTON, D.C.

```
- - - - - - - - - - - - - - - x
                               :
THERESA E. BEARMAN,            :
                               :
        Complainant,           :
                               :    Case No.
     v.                        :
                               :    00-1103
PAUL H. O'NEILL, Secretary,    :
U.S. Department of the         :
Treasury, et al.,              :
                               :
        Respondents.           :
                               :
- - - - - - - - - - - - - - - x
```

Washington, D.C.
Tuesday, March 19, 2002

The deposition of BARRY P. FULCHER, called for

examination by counsel for the Complainant in the

above-entitled matter, pursuant to notice, in the

offices of Claxton, Sale & Quinn, 910 16th Street,

N.W., Suite 500, Washington, D.C., convened at 1:13

p.m., before Shawna Hum Browne, RPR, a Notary

Public in and for the District of Columbia, when

were present on behalf of the parties:

2

APPEARANCES:

On behalf of the Complainant:

      JOHN D. QUINN, ESQ.
      Claxton, Sale & Quinn, P.C.
      Suite 500
      910 - 16th Street, N.W.
      Washington, D.C. 20006
      (202) 833-4170

On behalf of the Respondents:

      DEANNE SOBCZAK, ESQ.
      General Legal Services
      U.S. Department of the Treasury
      Second Floor
      950 L'Enfant Plaza, S.W.
      Washington, D.C. 20024-2123
      (202) 283-7923

- - -

C O N T E N T S

|  | EXAMINATION BY COUNSEL FOR | |
| --- | --- | --- |
| WITNESS | COMPLAINANT | RESPONDENT |
| BARRY P. FULCHER | | |
| by Mr. Quinn | 4 | |
| by Ms. Sobczak | | 143 |
| by Mr. Quinn | 145 | |

4

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | Whereupon, |
| 3 | BARRY P. FULCHER |
| 4 | was called for examination by counsel for the |
| 5 | Complainant and, after having been first duly sworn |
| 6 | by the Notary Public, was examined and testified as |
| 7 | follows: |
| 8 | EXAMINATION BY COUNSEL FOR THE COMPLAINANT |
| 9 | BY MR. QUINN: |
| 10 | Q.    Please state your full name for the |
| 11 | record. |
| 12 | A.    Barry Preston Fulcher. |
| 13 | Q.    And your business and residence |
| 14 | addresses, please, Mr. Fulcher. |
| 15 | A.    Business is 1111 Constitution Avenue, |
| 16 | Northwest.  Residence is 5903 Mount Eagle Drive, |
| 17 | Apartment 318, Alexandria, Virginia, 22303. |
| 18 | Q.    I'm going to be asking you some questions |
| 19 | in the deposition today.  Have you ever had your |
| 20 | deposition taken before? |
| 21 | A.    No. |
| 22 | Q.    Just to give you a few ground rules, if |

5

1    you don't understand any of my questions, please

2    ask me to clarify; I'll be happy to do so.  And

3    also, you have to answer orally, not by shaking of

4    the head or a gesture, so the court reporter can

5    take it down.

6        A.    All right.

7        Q.    If you need to take a break, just let us

8    know.  We can accommodate that.

9            MR. QUINN:  Let me show you--have this

10    marked as Exhibit No. 1 if I could.

11                        (Fulcher Exhibit No. 1 was

12                        marked for identification.)

13        (Witness handed document.)

14            BY MR. QUINN:

15        Q.    You are here in response to this Notice

16    of Deposition.  I know Exhibit No. 1 mentioned

17    February 22nd, but the date was actually continued

18    to today.  Are you the individual who was appointed

19    to testify to the issues in this Notice of

20    Deposition by the respondent?

21        A.    Yes.

22        Q.    Some of these issues you're not going to

6

1    testify to, though, is my understanding.  If you

2    could just give me which ones, the numbers.  Maybe

3    counsel can do it.

4            MS. SOBCZAK:  Mr. Fulcher will testify to

5    1, 2, 3, 4, 6, and 17 through 34.

6            BY MR. QUINN:

7        Q.    Is that your understanding, Mr. Fulcher?

8        A.    Yes.

9        Q.    Now, I know the Secretary of Treasury

10   didn't personally appoint you as the one to

11   testify.  Who did that?

12       A.    To testify?

13       Q.    Yes.  Who is the one who appointed you as

14   designated to testify on behalf of the Department

15   of Treasury?

16       A.    I believe it was the GLS attorney.

17       Q.    Now, you understand, I'm asking you for

18   the collective knowledge of the Department of

19   Treasury in answering the questions in this

20   deposition today?

21       A.    Yes.

22       Q.    So when I say "you," unless I specify you

11

1        A.    Yes, that's correct.

2        Q.    And you were the one responsible for

3   responding to the request for accommodation that

4   was made by Ms. Bearman?

5        A.    I had first-line responsibility; that's

6   correct.

7        Q.    When did you assume that responsibility?

8        A.    At the time that I became aware of that

9   her physician had sent a letter requesting

10  reasonable accommodation; however, at that point

11  the reasonable accommodation issue was still up as

12  to whether or not the letter constituted a

13  requirement for the IRS to provide reasonable

14  accommodation.

15       Q.    At some point in time, the Service made a

16  determination that they were, in fact, required to

17  find a reasonable accommodation for Ms. Bearman; is

18  that correct?

19       A.    That's correct.  I believe it was

20  December 3rd.

21       Q.    December 3rd.

22             And that was based on a determination

1    made by an independent medical analyst?

2         A.    I believe it was made by Dr. Presant, the

3    IRS--the person IRS contracted with for physician

4    services.

5         Q.    Okay.  Were you the one responsible for

6    assembling documents in response for the request

7    for production of documents in this case?

8         A.    I don't know who had responsibility for

9    that.  I provided the documentation that I had

10   available.

11        Q.    You were asked to provide your own

12   documents; is that right?

13        A.    Yes.

14        Q.    Okay.  You didn't have any input into the

15   overall process of producing documents?

16        A.    Only to the extent for the documents that

17   I had.

18        Q.    What did you do to satisfy yourself on

19   item No. 33 that you have collective knowledge of

20   the Department of Treasury concerning the efforts

21   to respond to complainant's discovery request?

22        A.    I'm sorry, would you rephrase that please

27

1  of.

2      Q.    Are you aware of anything that wasn't put

3  in writing?

4      A.    I--I have no idea what might not have

5  been put in writing.  I don't know what the

6  conditions of the repayment were other than Ms.

7  Green was apparently dissatisfied with

8  the--whatever the conditions were being met.

9      Q.    Now, you were the point person in

10  identifying a reasonable accommodation job position

11  for Ms. Bearman; is that right?

12      A.    Yes.

13      Q.    And when did you begin looking for a

14  reasonable accommodation?

15      A.    Very shortly after Dr. Presant made the

16  determination that the--that Ms. Bearman was

17  eligible for reasonable accommodation.

18      Q.    Within a few days?

19      A.    I recall that the letter from Ms.

20  Bearman's physician--I think it was dated October

21  22nd--in which I think it was Dr. Nowak made the

22  case for reasonable accommodation.  And that letter

28

1   went to Dr. Presant.  Dr. Presant made his decision

2   or at least reduced it to writing on December 3rd.

3   And at that point that's when we actively began

4   seeking reasonable accommodation.

5          MR. QUINN:  Can I have this marked as No.

6   3.

7                    (Fulcher Exhibit No. 3 was

8                    marked for identification.)

9          (Witness handed document.)

10         BY MR. QUINN:

11     Q.    Take a look at Exhibit No. 3 and ask you

12   whether or not you recall at about that same time

13   Ms. Bearman advised you that that particular

14   position was vacant in the Office of Chief Counsel?

15     A.    I don't recall the specific vacancy or

16   the specific timing.  I do recall that Ms. Bearman

17   on more than one occasion advised that there were

18   positions open as a counsel.

19     Q.    So at the time you understood from Dr.

20   Presant that you had to look for an attorney

21   position for Ms. Bearman, you knew there were jobs

22   opening in the Office of Chief Counsel in

1    Washington, D.C. Attorney General's?

2       A.   At the point and time that Dr. Presant--I

3    don't recall the time other than I do remember when

4    the, you know, when the determination was made by

5    him.  I also know that there was an open issue at

6    some point in time as to what the Service's

7    responsibility was and what Counsel's

8    responsibility was in arranging for a transfer to

9    Counsel.

10       Q.   By "Counsel," you mean Chief Counsel?

11       A.   Yes.

12       Q.   Okay.  During the time you were looking,

13    and I'm focusing back in early December, you were

14    aware that there were positions open, attorney

15    positions open in Chief Counsel's office; is that

16    fair to say?

17       A.   No, it's not fair to say because I don't

18    recall the exact timing of that.

19       Q.   Did you ask?

20       A.   Generally, if an employee is interested

21    in a position, they apply for it.  That's, you

22    know, that's a fairly standard way of doing it.

30

1  The Counsel issue, it was an open issue.  The

2  Service did not, you know, did not acknowledge an

3  obligation to go to Counsel or to require or to ask

4  Counsel to arrange for a transfer, so--

5      Q.   What do you mean by that?

6      A.   I believe Ms. Bearman's position was that

7  Counsel as a result of reasonable accommodation was

8  obligated to pick her up.  And the Service nor

9  Counsel agreed with that position or at least they

10 were looking into whether there was a

11 responsibility.  And the GLS attorney--

12         MS. SOBCZAK:  Objection as to any

13 privileged conversations as to what the GLS

14 attorney's advice may have been.

15         THE WITNESS:  Okay.  It was an open issue

16 as to whether the Service had or Counsel had a

17 responsibility to pick up an IRS person.

18         BY MR. QUINN:

19     Q.   Did Ms. Berry tell you that the--

20         MS. SOBCZAK:  Objection.  Calls for--

21         MR. QUINN:  Let me ask the question

22 first.

38

1     A.   Because what I wanted to do initially was

2    to do something quickly.  There was a sort of a

3    note of crisis in the letter from Ms. Bearman's

4    physician, and it certainly implied that something

5    needed to be done sooner rather than later.  I went

6    to the Office of Appeals, which hires attorneys

7    within IRS to see what could be done to accommodate

8    her on a detail as an attorney in an attorney

9    position.

10    Q.   But Ms. Bearman had a request if not an

11    information that jobs were available in the Chief

12    Counsel's office as of December 3rd, hadn't she?

13    Hadn't she made that known to you?

14    A.   I don't recall the date.  You know, I

15    don't have any specific recollection of this

16    document.  I do know that Ms. Bearman was

17    interested in going to Counsel, that she had once

18    worked there.

19    Q.   You knew she was interested in going to

20    Chief Counsel's office when you started your

21    inquiry, right?

22    A.   Yes.

1       Q.    You knew she'd already worked at Chief

2    Counsel, so she was qualified to work there; is

3    that right?

4       A.    I had no reason to believe she wasn't.

5       Q.    My question is, why didn't you ask Chief

6    Counsel in the first instance?

7       A.    Well, I thought I made it clear that I

8    did talk to a supervisor in Chief Counsel's office

9    about a detail or a transfer.

10      Q.    And when did you do that?

11      A.    I don't recall the date.

12      Q.    Was it the first office you--

13      A.    It would have been early on because I

14   wanted to do what I could to accommodate her.  I

15   had absolutely no reason not to fulfill her

16   request.  The issue was whether we had--you know,

17   whether Counsel had an obligation to pick her up.

18   I would have been more than happy--for that matter,

19   I was proactive about going to Counsel and also

20   sent a memorandum to Counsel formalizing the

21   request.

22      Q.    Is it your testimony that Chief Counsel

56

1    it's quite possible I missed that meeting.

2        Q.    Okay.  It says, "The consensus is that

3    IRS has to accommodate her (not CC)."  What does

4    that mean?

5        A.    Not having written it down, I can only

6    guess what it means.

7        Q.    What's your guess at what it means?

8        A.    That IRS--in accordance with Dr.

9    Presant's letter, IRS should provide reasonable

10   accommodation, but Chief Counsel does not.

11       Q.    So apparently it was concluded at some

12   time that the Chief Counsel's office did not have

13   to accept Ms. Bearman as a transferee in response

14   to her request for an accommodation; is that fair

15   to say?

16       A.    I believe that going from memory that

17   this continued to be an open issue as to what

18   Counsel's responsibilities are.  I don't think it

19   was decided as of that date.  I think it was

20   later.  I don't know what the decision is now.

21       Q.    Okay.

22       A.    To me it was--what I heard, it was an

57

1    open issue.

2        Q.   Well, I'm not asking what you heard.  I

3    mean, I want to know whether it is an open issue or

4    not.  What is the Internal Revenue or the

5    Department of Treasury's position on this?  Did

6    they or did they not have to accept Ms. Bearman as

7    a transferee?

8        A.   She's not working for Counsel, but I do

9    not know the answer to that.  That is way outside

10   my area of expertise.  That issue was discussed

11   elsewhere and way above me.  I don't know what the

12   end result was.

13       Q.   Well, what happened? is my question.

14   There were open positions, and I think in your

15   admissions, you've said--I can go through them if

16   you want--that during the period of October 22nd,

17   1999, through first of March 2000, there were open

18   positions in the Office of Chief Counsel for

19   attorneys in the Washington, D.C. area.  Do we

20   agree on that?

21       A.   Yes, there's a vacancy announcement.

22       Q.   I want to know why Ms. Bearman was not

1    the normal performance standards of the job, and I

2    asked her where that information came from, and she

3    said she had spoken to EEO counselor Eddy Coleman,

4    and I said I would check into that.  I contacted

5    Mr. Coleman when I was at home the next day, and he

6    informed me that that was not the case, that she

7    was in fact required to work up to the performance

8    standards of the position.

9         Q.    Did Ms. Bearman ever not work up to the

10   performance standards of her position?

11        A.    That wasn't the issue.  The issue was

12   that she said she didn't have to.  It wasn't a

13   matter of her not having.  It was what she said she

14   would do, the present and the future, not the past.

15        Q.    I understand.  But my question was, did

16   she ever not work up to performance standards?

17        A.    Her evaluation indicated she was

18   performing at a fully acceptable level.

19        Q.    What was Ms. Bearman's workload like in

20   the period, say, September through October 1999?

21        A.    She had the workload that--well, let me

22   digress for a moment.  Each of the analysts on the

1    A.   In reading the file, yes, there was a

2   note of that, but none of those complaints were

3   directed to me.  At no time did she say, Gee, you

4   know, I don't have enough work to do.  Do you have

5   something that I could be doing?  That never

6   happened.

7    Q.   Who did she direct the complaints to?

8    A.   I don't know.  I believe it was to

9   Mr. Fitzpatrick, but that's--I don't recall

10   specifically from the file.

11    Q.   What was done about those complaints?

12    A.   I don't know.  I wasn't aware.  From my

13   own perspective, I wasn't aware that she was

14   experiencing a shortfall of activity.

15    Q.   The complaints were made, right?

16    A.   Not to me.

17    Q.   Complaints were made, correct?

18    A.   According to--yes.

19    Q.   And what I want to know is, what, if

20   anything, the IRS did in response to those

21   complaints?

22    A.   I don't know the answer to that.

MILLER REPORTING CO., INC.
735 - 8TH STREET, S.E.
WASHINGTON, D.C.  20003
(202) 546-6666

67

1      Q.    Can you tell me anything that they did in

2   response to those complaints?

3      A.    You've told me as much as I already knew,

4   and I'm not aware of any additional actions.

5      Q.    Let me ask you this:  Tell me everything

6   the Internal Revenue Service did in response to Ms.

7   Bearman's complaint that she didn't have enough

8   work to do.

9      A.    I just told you everything that I knew.

10      Q.    Nothing?

11      A.    Right.

12      Q.    I may have asked you this.  Was a request

13   made to the Chief Counsel's office that Ms. Bearman

14   be detailed for 120 days?

15      A.    Not that I recall.  I do recall the

16   request being made to Appeals.

17      Q.    Was there a meeting between Mr. Burns--do

18   you know who Mr. Burns is?

19      A.    Yes.

20      Q.    Do you know who a Mr. Mihelcic is--

21      A.    No.

22      Q.    --in the Chief Counsel's office?

1    made as to--or you know, when it was made.  I guess

2    my expectation at that point was if they had a

3    vacancy and they could accommodate her, it would

4    be, you know, highly desirable that they do so.  In

5    the memorandum itself, it says, (Reading) The GLS

6    advised IRS, must accommodate this individual;

7    therefore, we send this request to all parts of the

8    Service.

9         Q.   You're telling the Associate Chief

10   Counsel that they must place her in any open

11   position they have?

12        A.   That's what the memorandum says, yes.

13        Q.   That's what you were telling them to do?

14        A.   Within my authority.  I don't think I

15   need to be telling them to do much of anything.  I

16   would say it was more of a request.

17        Q.   Did anyone at the--in the Department of

18   Treasury ever tell the Chief Counsel's office that

19   they must place Ms. Bearman?

20        A.   I don't know, I don't know.

21        Q.   Did anyone in any office of the

22   Department of Treasury ever tell--ever state in

73

1    response to Ms. Bearman's request for accommodation

2    that they had to place her?

3          A.    I'm sorry, will you repeat?

4          Q.    Yes.  You were the one responsible for

5    finding the accommodation, right?

6          A.    (No response.)

7          Q.    You have to answer.

8          A.    Yes.

9          Q.    Throughout the process, was any office of

10   any department or bureau in the Department of

11   Treasury ever told that they had to place Ms.

12   Bearman in any open position?

13         A.    Well, on the face of it, this memorandum

14   says that, that they must acomm--you know, that we

15   would appreciate your response by December 30th.

16   General Legal Services also advised that the IRS

17   must accommodate this individual, and therefore we

18   are sending this request to all parts of the

19   Service within the commuting area.  So that says it

20   pretty plainly.

21         Q.    So you're saying that the Chief Counsel's

22   office was instructed to place her?

1  I was relaying a message that GLS had apparently

2  provided me that there was a requirement to take

3  Ms. Bearman if there was a vacancy availability.

4        Q.    I'm asking you what was done.

5             MS. SOBCZAK:  Objection.  Asked and

6  answered.

7             MR. QUINN:  I don't think it's asked and

8  answered.

9             BY MR. QUINN:

10       Q.    Were bureaus and offices in the

11  Department of Treasury told that they had to take

12  Ms. Bearman?

13       A.    Within the Internal Revenue Service, yes.

14       Q.    When did that happen?

15       A.    There was this memorandum here plus I

16  believe in early January, I think January 4th, we

17  sent memorandums to the Virginia/West Virginia

18  district and the Maryland/Delaware district asking

19  if they had positions available because this had

20  not been successful.

21             There's a strong level of interest in

22  placing Ms. Bearman in an attorney position.  You

1    A.    A meeting had been held in early

2    December--I think it was December 12th--with

3    Appeals and with other parties to see if a detail

4    could be arranged to Appeals for Ms. Bearman for

5    120 days.  And that, I believe, was what that

6    discussion focused upon.

7    Q.    It sounds like Appeals was interested in

8    taking her at that time.

9    A.    There was a--we had had ongoing meetings

10   with Appeals and discussions with Appeals to

11   arrange that very same thing.  Yes, I would agree

12   there was a level of interest on the part of

13   Appeals.

14   Q.    And that issue was then tabled because of

15   Ms. Bearman's paid administrative leave status?

16   A.    Yes.

17   Q.    Now, later on you have a comment down

18   here at the bottom of the page it says, (Reading)

19   Dave was unhappy with Dr. Presant's granting of

20   reasonable accommodation.  What's the basis of that

21   statement?

22   A.    That was based on my interpretation of

110

1   his reaction to the reasonable accommodation.

2   There was some concern on his part about the mixed

3   message, I believe, from Ms. Bearman's physician.

4        Q.   Was there general dissatisfaction of the

5   fact that Dr. Presant was not Ms. Bearman's

6   physician; it was your physician?

7        A.   Right, that's correct.

8        Q.   Is it fair to say that the IRS was

9   unhappy that the physician that they hired was

10  actually supporting Ms. Bearman's position in this

11  matter?

12       A.   No, I don't think that was the issue at

13  all.  I think it had more to do with whether all

14  factors had been considered in regards to the

15  reasonable accommodation request.  For example,

16  the--Ms. Bearman's physician--I believe it was in

17  December--indicated that Ms. Bearman was totally

18  unable to work, that she was irritable, that she

19  couldn't sit at her desk, and that she just

20  couldn't focus on the job at hand.  And then on the

21  basis of that, we should approve her absence from

22  the office.

113

1      A.    Yes.

2      Q.    And in this letter, page 2, is that where

3  you--can I take that to mean that a decision was

4  made that the Office of Chief Counsel would not

5  hire Ms. Bearman, would not take Ms. Bearman?

6      A.    I wouldn't say that.  Just that they are

7  not part of the IRS and that if she was interested

8  in a position with them, she should apply.

9      Q.    Well, your letter says that that office,

10 the Chief Counsel is not part of this Service.  The

11 Service is the IRS?

12     A.    Yes.

13     Q.    And the Service has no authority to offer

14 you a position outside the agency.  What does that

15 mean?

16     A.    That Counsel is not part of IRS and that

17 we don't have--IRS does not have the authority to

18 offer you the position as IRS.

19     Q.    You mean the IRS could not place Ms.

20 Bearman in the Chief Counsel's office?

21     A.    That's correct.

22     Q.    And is it--am I missing something, or is

114

1  it clear that the Chief Counsel's office wouldn't

2  take her at this point in time?

3      A.  Well, they had not taken her, so--either

4  on a detail or reassignment, so, yes, you're

5  correct.

6      Q.  Okay, fine.  And any time after this

7  February 3rd, 2000 letter, did you go to someone

8  higher up in Department of Treasury and ask them to

9  simply place her in the Office of Chief Counsel?

10     A.  I did not, no.

11         MR. QUINN:  Would you mark this as the

12  next exhibit.

13                    (Fulcher Exhibit No. 8 was

14                    marked for identification.)

15     (Witness handed document.)

16         BY MR. QUINN:

17     Q.  Can you identify Exhibit No. 8, please.

18     A.  It's a memorandum that I sent to

19  Associate Chief Counsel, Financial and Management,

20  requesting a reasonable accommodation for Ms.

21  Bearman.

22     Q.  Were there similar memos sent to other

123

1                              marked for identification.)

2                  (Witness handed document.)

3                  BY MR. QUINN:

4          Q.    Can you identify Exhibit No. 11, please.

5    Can you identify that document?

6          A.    Pardon me?

7          Q.    What is that document?

8          A.    It's a document from Labor

9    Relations--excuse me, from Dr. Presant to Labor

10   Relations.

11         Q.    In case we haven't identified it for the

12   record, who is Dr. Presant?

13         A.    The IRS physician.

14         Q.    And he's the person or consultant

15   responsible for determining whether or not Ms.

16   Bearman had a disability that required reasonable

17   accommodation; is that right?

18         A.    In this case he was, yes.

19         Q.    And he made the determination that she

20   did require reasonable accommodation?

21         A.    Yes.

22         Q.    And that determination is as reflected in

124

1    Exhibit No. 11; is that correct?

2        A.    Yes.

3            MR. QUINN:    Twelve.

4                    (Fulcher Exhibit No. 12 was

5                    marked for identification.)

6        (Witness handed document.)

7        BY MR. QUINN:

8        Q.    Exhibit 12 is a document that the IRS

9    produced in this case.  Do you know what it is?

10       A.    Yes.

11       Q.    What is it?

12       A.    It's an e-mail from Ms. Bearman to the

13   office secretary saying that she was in the Chief

14   Counsel library this morning for a couple of hours

15   trying to finish her self-assessments.  And the

16   secretary's asking because she wasn't sure whether

17   she needed to relieve from Ms. Bearman for the time

18   that she was away from the office.

19       Q.    Was there some requirement that employees

20   report where they are at all times?

21       A.    There was a memorandum that had gone out

22   from Sue Sottile or perhaps Mr. Fitzpatrick, asking