EXHIBIT C

EXCERPTS FROM THE
HEARING TRANSCRIPT

EXHIBIT C

EXCERPTS FROM THE
HEARING TRANSCRIPT

JUDITH NOWAK, M.D.

C O N F I D E N T I A L

1    don't discuss your testimony with anyone outside of

2    this room.

3         THE WITNESS:  That is fine.

4              DIRECT EXAMINATION

5         BY MR. QUINN:

6    Q.    Good morning, Dr. Nowak.

7    A.    Good morning.

8    Q.    Could you state your full name for the

9    record?

10   A.    Judith Ann Nowak.

11   Q.    Give us a summary of your education,

12   please.

13   A.    Undergraduate Biochemistry Degree,

14   Cornell University Medical School.  School of

15   Medicine, Cornell University.  Residency,

16   University of Virginia.  Fellowship back at Cornell

17   at the Westchester Division, New York Hospital,

18   Cornell Medical.

19        I also did psycho-analytic training at

20   the Washington Psycho-Analytic Institute.  So, I

21   have a degree from there as well.

22   Q.    Do you have any medical licenses?

**C O N F I D E N T I A L**

1      A.   Yes.  I am licensed to practice medicine

2   in the District of Columbia, Virginia and Maryland.

3      Q.   Do you have any board certifications?

4      A.   I am Board Certified in Psychiatry.

5      Q.   And is that your practice?

6      A.   Yes.  I am an adult and adolescent

7   psychiatrist.

8      Q.   Is that here in the District?

9      A.   Here in the District.  That is my only

10  office.

11     Q.   Do you have any medical school faculty

12  appointments?

13     A.   Yes.  I am a Clinical Professor of

14  Psychiatry at George Washington University Medical

15  Center.

16     Q.   How long have you been practicing

17  psychiatry?

18     A.   I finished my residency in 1977.  So,

19  what is that?  25 years.

20     Q.   Okay.

21     A.   Or thereabouts.

22     Q.   I don't want to ask you a lot of

C O N F I D E N T I A L

31

1    questions about what happened before October 1999,

2    but if could you just give a summary, a brief

3    summary, of your treatment of Ms. Bearman and what

4    her medical condition was up to that point in time?

5        A.    Up to that point.  Yes.

6            In fact, up to that point in time, all I

7    did was medication management of what was through

8    that period really largely a low grade chronic

9    depression, which is technically called dysthymia,

10   D-Y-S-T-H-Y-M-I-A.  I did not see her for

11   psychotherapy.  I managed the medication.

12           There were certainly periods in which

13   there were bumps, ups and downs, but the medication

14   management treatment was pretty much uncomplicated.

15       Q.    During this time period was Ms. Bearman

16   able to function in a job?

17       A.    Yes.  Absolutely, as far as I knew, and I

18   think I knew a lot.

19           There was a period of time in which she

20   was in therapy and it was her original therapist

21   who had referred her to me for medication

22   management.  So, we certainly spoke and I knew more

C O N F I D E N T I A L

32

1  than what I knew in a brief medication visit and

2  there were no problems or concerns regarding her

3  ability to work.

4      Q.    Other than the bumps, was she, I guess if

5  there is such a thing as a normal person?  Did she

6  live a normal life like everybody else?

7      A.    Yes.

8      Q.    This was the case up until I guess late

9  summer of 1999.  What happened after that if you

10  can tell me?

11      A.    She developed a major depressive disorder

12  and it was obvious to me it was dramatic.  I mean,

13  she was in crisis.

14          If you want, I can talk a bit about the

15  symptoms of that.

16      Q.    What is depression, first of all?

17      A.    It is a biological illness.  I want to

18  explain a few things about it because I think it

19  will help me later to explain how stress affects

20  it.

21          We know it is a biological illness.  You

22  can actually demonstrate that there are parts of

CONFIDENTIAL

35

1    person virtually sleeps 12, 14, 16 hours a day and

2    feels as if they can't ever really quite wake up.

3        It may be associated infrequently with an

4    appetite disturbance.  Again, it can either take

5    the form of anorexia with loss of appetite and

6    weight loss or be the opposite.  It is often

7    associated very specifically with sweet and

8    carbohydrate craving.

9        An additional component of this is that

10   people who have a depressive syndrome may know that

11   there are times when they are not depressed that

12   they are capable of taking pleasure in certain

13   activities.  There is a sense of, and it is related

14   to the depressed mood, kind of a pleasure being

15   drained out of one's activities.  And also a

16   tendency sometimes to irritability.

17       That is the basic kind of symptom complex

18   that is a projection of the depressive illness.

19       Q.   I think your testimony was that at some

20   point in time in the fall of 1999 Ms. Bearman's

21   condition deteriorated?

22       A.   Yes.  Dramatically.

C O N F I D E N T I A L

36

1     Q.    From a low grade chronic depression to an

2  acute?

3     A.    Major depressive disorder.

4        I left out one thing.  Just to add it to

5  the list of symptoms often associated, and this

6  isn't necessarily true of Terri, but often

7  depression is associated with hopelessness,

8  despair, great negativity and sometimes with

9  suicidal ideas and even suicidal plans and

10  attempts.

11        I just wanted to make sure I added that

12  because I didn't say that.

13     Q.    I am going to ask you for just a few

14  opinions based on your treatment of Ms. Bearman.

15  When I ask for opinions, if you could please

16  express them in terms of a reasonable degree of

17  medical certainty, I would appreciate it.

18     A.    Okay.

19     Q.    Do we have that understanding, when we

20  are talking about opinions we are talking about a

21  reasonable degree of medical certainty?

22     A.    Yes.

C O N F I D E N T I A L

37

1      Q.    Do you have any opinion as to what the

2    cause of Ms. Bearman's depressive condition was in

3    the fall of 1999?

4      A.    Yes.

5           It seemed to me that once I started

6    seeing her much more frequently and also for much

7    longer sessions, not just 20 or 30 minute

8    medication visits, but the typical 50 minute or

9    longer sessions, in which to really try to get at

10   the root of what was going on in addition to trying

11   to medicate what was happening, I became convinced

12   that this was work-related and that it was

13   connected to the fact that she is a quite

14   intelligent, intellectually proud and

15   intellectually smart person who found herself in a

16   position in which a main project she had had been

17   taken away from her and that she was doing

18   incredibly boring and dull work.

19           Also it became clear from what she was

20   describing that there seemed to be an atmosphere

21   of, I don't know what else to call it other than

22   harassment.  Her boss, I gather, was a person who

C O N F I D E N T I A L

38

1    was seated near her in the office.  They began

2    checking on her computer to see whether she was

3    doing her work or doing outside activities,

4    checking her in and out time.

5            My understanding is this was not done for

6    anyone at her level, it wasn't a routine part of

7    the office practice.  So, there was this sense of

8    people looking to find complaint and criticism.

9            She felt tremendously isolated too, came

10   to feel tremendously isolated within the office

11   environment.

12       Q.   Now, you are relying, to a certain

13   degree, on what you are told by Ms. Bearman, right?

14       A.   Yes.

15       Q.   How do you know it is true?

16       A.   I don't absolutely know it is true and I

17   assume some of this you are going to have to

18   establish in other ways, but what one does as a

19   psychiatrist is let people tell a story.  They tell

20   their personal story and they give you details

21   about that personal story.  They present it in a

22   particular context and one has a sense that this

C O N F I D E N T I A L

39

1    story holds true, that the details fit together,

2    that there are not major inconsistencies.

3            One thing that is important to me is that

4    the person who tells me this story isn't expecting

5    me to believe it just because they say so.  You

6    know, there is the presenting of data.  I have

7    looked at it every way.  There is a sense that the

8    person is self-critical in an intellectual way.

9    That also gives me a sense.

10           I mean, I will never forgot one of my

11   former teachers was Otto Kernberg.  I don't mean

12   this to be an analogy at all.  He worked in Chile

13   at the time of the dictatorship and someone came to

14   his office and claimed that the secret police were

15   out to get him.  What Otto Kernberg said is that

16   one way in which he became convinced that this guy

17   was not paranoid was that he was capable of

18   empathically taking the psychiatrist position of

19   not expecting him to believe it and saying I know

20   this could sound crazy, blah, blah, blah, but

21   presenting facts.  And actually when Kernberg used

22   this example he was teaching us, because he is one

C O N F I D E N T I A L

40

1    of my former teachers, he was teaching us something

2    about the way in which you can form a judgment

3    regarding whether what somebody is presenting is

4    plausible or not.

5            All I can say is that Terri met all the

6    tests and the stories that she told consistently

7    held together.  She continued to be self-reflecting

8    and self-critical in an intellectual sense.  She

9    didn't expect me to believe it just because she

10   said so.

11       Q.   Did you form any opinions, at least in

12   October of 1999, whether Terri's disability

13   required a reasonable accommodation in her job and,

14   if so, what would those accommodations be?

15       A.   Yes.

16           I was trying, and I think it is obvious

17   in my medical records, I was trying to medicate her

18   out of it and there is no question that the efforts

19   that I made were of some help, but the problem is

20   that if you have a person with a depression in a

21   major stressed environment, you could just pour

22   pills at it ad infinitum and it is not going to

CONFIDENTIAL

41

1   lead to necessarily a remission.  So, I just

2   didn't.

3            I can't tell you whether it was

4   October 5th or the 20th or even November 1st.  I

5   reviewed my records, but I don't have an exact

6   sense of where the date is, but sometime in that

7   fall period, it became clear to me that she needed

8   an accommodation and it was my impression that it

9   could take two forms.  One form would be that she

10  stay where she was, but she be given something

11  substantively interesting and intellectually

12  meaningful to do and that the harping harassment

13  stop or she be given another work assignment.

14       Q.   Now, Terri returned to work sometime in

15  December of 1999?

16       A.   Again, I know it was December.

17       Q.   Do you have any opinion, based on your

18  treatment and observations, as to whether or not

19  Ms. Bearman's medical condition stayed the same,

20  got better or got worse after she returned to work?

21       A.   It deteriorated.  It deteriorated.

22       Q.   Do you have an opinion as to why it

C O N F I D E N T I A L

42

1   deteriorated?

2        A.    Yes.  Because she went back into the same

3   environment not only not having anything

4   substantive to do, often doing clerical work and

5   often having nothing to do whatsoever, being

6   isolated.

7             I have seen this, by the way, be a

8   major stressor for many other people in work

9   environments.

10            There was that, combined with the

11  increase in the harassment and the feeling that her

12  employers didn't believe her in some way, that they

13  weren't addressing the problem and that the

14  environment was getting worse.

15            That is my sense of it.

16       Q.    Was there anything about Terri's

17  particular medical condition or particular

18  presentation that made isolation or being singled

19  out for special treatment particularly damaging to

20  her?

21       A.    Yes.  In fact, it really relates to the

22  issue too of how there could be a genetic

CONFIDENTIAL

43

1    predisposition and there is a family history.

2                We now know, and there is a huge research

3    division out at NIH looking at this, how early

4    abuse experiences in children can actually

5    hard-wire in a biological depression.  Terri came

6    from an emotionally abusive family environment.

7    That also was a contributing factor here.  I think

8    it was quite inadvertent and accidental, but what

9    was being done at work was a kind of facsimile

10   reproduction, if you will, of the kind of traumatic

11   experiences that she had in her own family.

12               So, the combination of isolation,

13   constant negative feedback, failure to make any

14   effort to perceive that she was, if you will, in

15   childhood a good child, as an adult a good citizen,

16   and potentially a really good employee.  In an

17   effort to work to help her function at her best in

18   this situation, it recreated again, in symbolic

19   form, and I think quite inadvertently, some of the

20   traumas of her childhood, and that contributed.

21        Q.   Do you have any opinion as to what would

22   have happened say, for example, in mid-December if

C O N F I D E N T I A L

46

1      Q.    Are you saying that you are more

2  vulnerable to reinjury?

3      A.    Yes.   Absolutely.   It is called kindling.

4  That is the technical term for it.

5      Q.    Does that mean the trough is lower?

6           In other words, if Ms. Bearman were to

7  slip into depression again, the bottom would be

8  lower?

9      A.    Well, it was pretty low as it was.

10          I mean, I suppose it could go a little

11  bit lower, but actually what I would say is really

12  more a fact that I could say because it slipped

13  pretty low, it was very worrisome there, especially

14  sometime in December, the end of December.   It is

15  that the trigger is lessened, if you will, that the

16  person is more likely to fall into that kind of

17  lowest trough more quickly and responds perhaps to

18  lesser stressors or stressors maintained for a

19  lesser period of time.

20      Q.    One of the issues in this case is going

21  to be whether Ms. Bearman suffered mental anguish,

22  pain and suffering.

C O N F I D E N T I A L

47

1          Now, it is sometimes easy for a layman to

2    understand if you have a back injury, an arm

3    injury, we can all understand what that means, but

4    can you in some way describe the pain and suffering

5    that Ms. Bearman was experiencing as a result of

6    this depressive episode in December, January,

7    February?

8          A.    Well, I think we can, but often it is

9    while the pain and anguish of a physical symptom

10   may be more something that people can relate to

11   more empathically and more readily, in fact, the

12   pain and suffering of mental anguish is much worse.

13   It is much worse.

14          While depression doesn't cause any kind

15   of psychosis, there is always a sense that you are

16   losing in some way.  There is a deeper sense of

17   loss of control over the integrity of your own

18   psyche, your own emotions, your own experience.

19   There is deep fears about whether you are ever

20   going to be able to recover again.  You could say

21   that the depression itself and the length of time

22   it lasts contributes to the sense of despair.

C O N F I D E N T I A L

48

1          You know, a physical injury, and I guess

2     there are degrees of it, quadriplegia being a

3     physical injury that I think is catastrophic, but

4     minor but difficult back injuries, other injuries,

5     there is a sense that you locate them more in the

6     soma and that it is easier to see how you can

7     negotiate around them, whereas the state of

8     depression is like a cloud that descends and colors

9     one's experience really of the whole world.  So, it

10    is quite extreme.

11         Q.   And, again, I am not sure we got this,

12    but do you have an opinion as to the degree of

13    mental anguish and suffering that Ms. Bearman

14    experienced?

15         I am talking about December '99 through

16    March of 2000.

17         A.   I think it was extreme.

18         MR. QUINN:  Thank you.

19         I have no further questions.

20         JUDGE KHARE:  Ms. Sobczak.

21         MS. SOBCZAK:  Yes.

22              CROSS EXAMINATION

EXHIBIT C

EXCERPTS FROM THE
HEARING TRANSCRIPT

JOHN R. BURNS

CONFIDENTIAL

216

1    please.

2              (Discussion off the record.)

3              (Recess.)

4              JUDGE KHARE:  Back on the record.

5         Mr. Burns, could you please raise your

6    right hand?

7         Whereupon,

8                   JOHN R. BURNS

9    was called as a witness and, having been first duly

10   sworn by the Administrative Judge, was examined and

11   testified as follows:

12             JUDGE KHARE:  Thank you.

13             After you testify please don't discuss

14   what you have said here today with anybody else.

15             THE WITNESS:  That is fine.

16                  DIRECT EXAMINATION

17             BY MR. QUINN:

18        Q.   Good afternoon, Mr. Burns.

19             Please state your full name and address

20   for the record.

21        A.   My name is John Russell Burns.  My

22   address is Longview, 8763 John Mosby Highway,

CONFIDENTIAL

217

1    Boyce, Virginia 22620.

2        Q.    You were an employee of the Department of

3    the Treasury?

4        A.    That is correct.

5        Q.    For how many years?

6        A.    30 years.

7        Q.    What was your position in the Department

8    of Treasury, at least the last few?

9        A.    The last few.

10            I came to Washington as a full-time

11   Investigator for the EEO.  Then I took over the

12   position of Head Counselor for Headquarters, which

13   was the first full position.  Then I became an EEO

14   Liaison, which, pardon my language, is actually a

15   bastard position.  There were only four or five of

16   us and basically it was set up to try to solve

17   issues before they came to this level.

18       Q.    Did you have some involvement with the

19   Office of Public Liaison, Small Business Affairs?

20   That would be Ms. Bearman's office.

21       A.    Ms. Bearman's office.  Yes.  I did.  That

22   office fell under the Commissioner's Complex with

C O N F I D E N T I A L

220

1    issue before it would go to a full-blown hearing

2    like this.  We would go one-on-one with the

3    executives and the employees.  That is what the

4    position was all about.

5        Q.   Do you remember when you first got

6    involved in the matter?

7        A.   It had to be early October or mid-October

8    of '99.

9        Q.   Right after Ms. Bearman made a request?

10       A.   Yes.  That is correct.

11       Q.   What did the Department of Treasury do at

12   that time?  Do you remember?

13       A.   Basically nothing.

14       Q.   Did they ask for an opinion from

15   Dr. Presant?

16       A.   They asked for an opinion from

17   Dr. Presant.  That opinion would have been

18   requested sometime in October.  Dr. Presant didn't

19   come back with an answer until the early part of

20   December, which for all intents and purposes was a

21   long time for Dr. Presant.

22            So, I checked it out and I said, all

C O N F I D E N T I A L

221

1  right, why is this taking so long?  The response I

2  got back was when he had made contact with

3  Barry Fulcher's office, nothing came out of it.  He

4  needed to know what the Complainant's job was so he

5  could make a decision.  Based on that he gave his

6  letter and in that letter it stated you need to

7  move the employee.

8      Q.    Were you kept abreast of Dr. Presant's

9  opinion when it was ultimately issued?

10     A.    Oh, yes.

11     Q.    And did you, at that same time, do some

12  investigation of Ms. Bearman's job circumstances to

13  get a sense for the validity of her concerns?

14     A.    Yes.

15          Fortunately, we were all on the same

16  floor, seventh floor.  So, my office, as liaison,

17  was just a few doors down.  That office that Terri

18  was in at that time was just starting up.  I don't

19  know how many employees were in that office.

20          I checked to see what kind of work was

21  there because Terri was saying I don't have any

22  work to do, I am coming in and I am sitting.

CONFIDENTIAL

222

1    Several of the employees, other employees, were

2    questioned and they were saying the same thing,

3    there is nothing to do.

4             JUDGE KHARE:  Wait.  Several of the other

5    employees were saying there is nothing for

6    Ms. Bearman to do or there was nothing for anybody

7    to do?

8             THE WITNESS:  No.  Anybody to do.

9             As I said, it was a brand new office.  It

10   was just being set up under Sue.  There were maybe

11   eight or nine folks involved.  They probably had

12   enough work for one or two people, not eight or

13   nine.  So, they were trying to split up this little

14   bit of work amongst eight or nine folks.

15            JUDGE KHARE:  So, the time period you are

16   talking about is when they were all complaining

17   about not having any work?

18            THE WITNESS:  Basically probably from

19   July, August, September through October when this

20   all hit the fan.

21            JUDGE KHARE:  Okay.

22            BY MR. QUINN:

CONFIDENTIAL

223

1    Q.    I am directing your attention now to

2    December 1999.

3         What did you learn about Ms. Bearman's

4    workload then when she returned to work?

5    A.    There still wasn't any work.  Nobody had

6    anything to do.

7    Q.    What about employee monitoring of

8    Ms. Bearman's time?  Do you know anything about

9    that?

10    A.    Yes.  Because Barry sat, I want to say

11    one desk or two desks away, she was under a glass

12    dome.  They were watching exactly what she did.  I

13    mean, Barry even admitted that in our meeting with

14    Steve.

15    Q.    He admitted it to you?

16    A.    Yes.  He admitted it in the meeting.

17    Q.    That he was micro-managing her time?

18    A.    Well, he didn't say micro-managing, but

19    he said he was monitoring her time because that is

20    what they were hitting her on at the time, time and

21    attendance.

22    Q.    You mean they had made some decision to

C O N F I D E N T I A L

225

1    It didn't make any sense to me.

2              I said, what do you mean where is she?

3    There is a law library.  She is an attorney.  She

4    has her workload.  Is this set in stone in one

5    particular place?  Where do you go to get it?  How

6    do you deal with this?  I knew my job meant I

7    travel all over the place.

8              JUDGE KHARE:  What did Mr. Fulcher say

9    when you said that?

10             THE WITNESS:  He basically said, John, we

11   have to monitor her.  I said, all right, I am not

12   fighting this issue.

13             BY MR. QUINN:

14      Q.   Were you involved in the process of

15   helping find a reasonable accommodation for

16   Ms. Bearman?

17      A.   I was involved in that process inasmuch

18   as I knew that Dr. Presant, as I said, had sent

19   back a letter that said you need to move this

20   employee.  Then all of a sudden I am hearing, no,

21   we are not moving this employee.

22      Q.   Who said that?

C O N F I D E N T I A L

226

1        A.    Barry said it to me.  Sue said it to me.

2              So, then I said I am on my way to David's

3    office.  As I said, that was my job.  I had contact

4    with David Williams.

5        Q.    What do you mean by we are not going to

6    transfer her to another job?

7        A.    That is what I am getting to.

8              This came from David Williams because

9    when I said, David, you have to move this employee,

10   you have a letter from our doctor, he said, no, I

11   am not moving a problem.  I said, wait a minute,

12   wait a minute, wait a minute, you can't do this.

13   This is EEO.  Here is a disability.  It is on

14   record.  Here is our doctor that we have used -- I

15   have been doing EEO for 17 years and it has been

16   the same doctor and we have used his decision to

17   base hundreds of cases on and now you want to

18   change the rules and regulations?  I don't think

19   so.  I said, no, no, no, you have to move her.  I

20   am not moving a problem.

21             I said, well, what can you do with the

22   job?  We are not restructuring it.  There is

**C O N F I D E N T I A L**

1    nothing we can do with it.  So, basically what he

2    is saying to me is, I am not restructuring the job,

3    I am not moving the employee, so she can either sit

4    there and like it or get the hell out of dodge.

5            Three simple answers, folks.  You deal

6    with it.

7        Q.    What did they actually do about the

8    problem as far as you could see, the dilemma that

9    was there?

10        A.    They didn't do a thing.  It sat there.

11   And probably two or three weeks later I went back

12   and said, what have you done?

13            JUDGE KHARE:  Two or three weeks later

14   being when, what month?

15            THE WITNESS:  December still.

16            JUDGE KHARE:  December still.

17            THE WITNESS:  I said, what have you done?

18   Well, we are going to draft a letter to see if we

19   can place her someplace else.  I thought, that is

20   nice, it has taken you two or three weeks to draft

21   a letter.

22            I thought, all right, let me do some more

C O N F I D E N T I A L

1    checking.  They hadn't contacted my office for a

2    letter.  They didn't contact Kathy King for a

3    letter and she is the Reasonable Accommodations

4    Officer.  Who are they contacting?  Or are they

5    trying to sit there and fumble around and figure

6    out what they are doing?

7              I have no idea when the letter finally

8    went out.

9        Q.    Over the period December into January,

10   December '99 to January 2000, did Mr. Williams make

11   that comment to you more than once about not moving

12   the problem?

13       A.    Yes.  He did.

14             MR. QUINN:  I don't have any further

15   questions.

16                   CROSS EXAMINATION

17             BY MS. SOBCZAK:

18       Q.    Good afternoon, Mr. Burns.

19       A.    Good afternoon.

20       Q.    I am Deanne Sobczak, Agency Counsel.

21             Now, you gave a declaration to the EEO

22   Investigator in this case, correct?

**C O N F I D E N T I A L**

1        Q.    Correct.

2        A.    Now, you tell me about your time

3    parameters here.

4        Q.    The August 8th, 2000 declaration occurred

5    closer in time to the events that took place?

6        A.    Almost a year later.

7        Q.    Right.

8              And you certified that the information

9    contained in that declaration was correct, right?

10       A.    That is correct.

11       Q.    Now, you didn't state in that declaration

12    that anyone intentionally delayed finding an

13    accommodation for Complainant?

14       A.    I am not sure that it was an intentional

15    delay on Barry Fulcher's part.  I think nobody knew

16    what to do because David kept saying I am not

17    moving a problem.

18              What was going on there -- you can put

19    this on the record or keep it off.  I don't care.

20              JUDGE KHARE:  For the record, we are on

21    the record.

22              THE WITNESS:  Okay.

CONFIDENTIAL

231

1          Everybody considered David Williams

2     connected to the hip of Rossotti.  So, nobody was

3     going against David Williams.

4          BY MS. SOBCZAK:

5          Q.   So, now you are saying that there was not

6     an intentional delay?

7          A.   I wouldn't say it was an intentional

8     delay.  It was a delay, however you want to phrase

9     it.

10         Q.   Didn't you recently sign a declaration

11    where you said it was an intentional delay, two

12    weeks ago in fact?

13         A.   Yes.  I think I sent the declaration in

14    here.

15              MR. QUINN:  I think the witness should be

16    given his affidavit because his affidavit says it

17    too.  You are questioning as if his affidavit

18    doesn't say this and it does.

19              MS. SOBCZAK:  The affidavit does not say

20    there was an intentional delay.

21              MR. QUINN:  Before you question him about

22    his affidavit, he should be given a chance to read

CONFIDENTIAL

235

1          JUDGE KHARE:  What about the time

2     monitoring?

3          THE WITNESS:  As I said, when we had that

4     meeting in Steve Whitlock's office, which was a

5     meeting basically set up so the Commissioner would

6     know what the devil is going on, it was discussed

7     at that point and it fell on deaf ears.  And, yes,

8     I can get things done and did, but, you know, when

9     you hit a rock, you are going to stop and basically

10    that is where it was and that is where I said

11    everybody was scared to death of David because he

12    was connected at the hip to the Commissioner.

13    Nobody dealt with that.  So, we were barred.

14          BY MS. SOBCZAK:

15     Q.    Do you consider yourself a friend of

16    Ms. Bearman?

17     A.    She is an employee of the IRS.  She is

18    one of the people who came to my office.  No.

19     Q.    Did she call you at home?

20     A.    Yes.  She has.

21     Q.    Did she confide personal matters to you?

22     A.    No.  Confided about this case.

CONFIDENTIAL

242

1          THE WITNESS:  I can't give you an

2     example.  As I said, I have been doing this for 17

3     years.

4          JUDGE KHARE:  Do you have anything else,

5     Ms. Sobczak?

6          MS. SOBCZAK:  No.

7          JUDGE KHARE:  Mr. Quinn?

8          MR. QUINN:  Yes.  Just a couple of

9     questions.

10               REDIRECT EXAMINATION

11          BY MR. QUINN:

12     Q.    You mentioned Ms. Heaton was contacted

13     about this, about the request that Ms. Bearman be

14     moved to the Chief Counsel's office.

15          Do you remember what Ms. Heaton's advice

16     was?

17     A.    Ms. Heaton's advice was, yes, we can move

18     her, that is under Treasury.

19     Q.    And did Mr. Fulcher or Mr. Williams or

20     anybody else in the Office of Public Liaison make

21     any effort to go around Chief Counsel and talk to

22     somebody at Treasury to move her to Chief Counsel's

# EXHIBIT C

## EXCERPTS FROM THE
## HEARING TRANSCRIPT

## DAVID WILLIAMS

C O N F I D E N T I A L

243

1   Office?

2        A.    No.    Not that I know of.    Nobody said a

3   word to me about it.

4                  MR. QUINN:    Thank you.

5                  No further questions.

6                  JUDGE KHARE:    Thank you.    You are

7   excused.    Thank you very much.

8                  Let's go off the record.

9                  (Recess.)

10                 JUDGE KHARE:    Let's go on the record.

11                 Mr. Williams, could you please raise your

12  right hand?

13       Whereupon,

14                      DAVID WILLIAMS

15  was called as a witness and, having been first duly

16  sworn by the Administrative Judge, was examined and

17  testified as follows:

18                 JUDGE KHARE:    Thank you.

19                 After you testify, please don't discuss

20  what you have said here today with anybody.

21                 THE WITNESS:    I will not.

22                      DIRECT EXAMINATION

245

1    relations with external liaison groups essentially.

2    And also the Privacy Advocate Service, Privacy

3    Advocate Office and the Freedom of Information Act

4    administrative part, that is run out of my office

5    for the IRS.

6         Q.    What are your duties?

7         A.    I run the whole thing.  I am the senior

8    executive in charge of that.  Also sort of a

9    different part of my job is strategic advice to the

10   Commissioner.  Under the last Commissioner I was

11   his strategic advisor and counselor as well.

12        Q.    How many people do you supervise?

13        A.    Approximately 600.  It depends on the

14   day.

15        Q.    Ms. Bearman worked in Communications and

16   Liaison at one time?

17        A.    She did.  She worked in Legislative

18   Affairs when I got there and I subsequently

19   transferred her to what was then Small Business and

20   Public Liaison.  It is now called National Public

21   Liaison.

22        Q.    And when was that?

C O N F I D E N T I A L

253

1        Q.   And why did you do that?  Why did you

2   have those questions?

3        A.   Well, as a manager and, frankly, as a

4   steward of public money, I think I have a duty and

5   responsibility to insure that when we deal with

6   these kinds of situations we exercise due diligence

7   and caution before acceding to demands made that I

8   don't understand, and I needed some validity behind

9   this before I was willing to proceed.

10       Q.   And did your staff follow up?

11       A.   Yes.  They did.

12       Q.   What was the outcome of that?

13       A.   At some point in time Dr. Presant said

14   that this was valid and that he believed this

15   constituted a legitimate claim for reasonable

16   accommodation, at which point we proceeded to seek

17   reasonable accommodation for Ms. Bearman, which the

18   time frame I don't remember exactly, but it was

19   several months I believe between the time the

20   request was made and the time we found a position

21   that met the standard for reasonable accommodation

22   and she accepted.

C O N F I D E N T I A L

264

1          A.    When I was shown these letters by

2     Sue Sottile and they are, on their face, rather

3     odd.  Sue noted that.  I read them and had the same

4     conclusion.  I don't remember when.

5          Q.    But your own doctor didn't see the

6     problem, did he?

7          A.    Subsequently, no, he did not.

8          Q.    You don't have any medical training

9     yourself, do you?

10          A.    Which is why I asked for an outside

11     opinion.

12          Q.    You went further than that though.

13               You were actually unhappy with

14     Dr. Presant's opinion, weren't you?

15          A.    I questioned whether Dr. Presant had

16     actually looked at this material and I had to

17     verify that he indeed had and he had made that

18     decision.  At that point, though I did not like

19     what Dr. Presant said, he is the dispositive person

20     in this case and we moved to find a reasonable

21     accommodation.

22               JUDGE KHARE:  You said that you

C O N F I D E N T I A L

265

1    questioned whether or not Dr. Presant had looked at

2    the file in this case just now.

3              How did you follow up on that?

4              THE WITNESS:  I asked my staff what is

5    the process.  They send this thing in to

6    Dr. Presant.  At some point he issues a ruling.

7    And they came in and said he has ruled she is

8    eligible for reasonable accommodation.  That is it.

9              JUDGE KHARE:  That is it.

10             And it was that ruling that you

11   questioned?

12             THE WITNESS:  No.  No.

13             I mean, I said, yes, I don't like that,

14   that doesn't make sense to me, but if that is what

15   a qualified medical doctor employed by the IRS

16   says, we have to follow it, and we did.  I still

17   have questions about it.

18             BY MR. QUINN:

19       Q.    You have no idea when that was?

20       A.    It was sometime in that time period, but

21   it wasn't immediately.  Whenever it was, it is

22   not -- I don't remember exactly.

C O N F I D E N T I A L

266

1      Q.    What do you mean by that time period?

2      A.    The end of 1999.

3      Q.    The end of 1999.

4            So, it would have been about the time I

5      notice in Mr. Fulcher's records on January 6th

6      where you said you were unhappy with Dr. Presant's

7      granting of reasonable accommodation.

8            I am happy to show it to you if you want.

9      A.    No.

10     Q.    Is that about right?

11     A.    To this day I am still unhappy with it.

12     Q.    But at that time is when you reconciled

13     for yourself that you were going to accept it?

14     A.    When Dr. Presant, as the Agency third

15     party validator, said this is a reasonable

16     accommodation case, that is the end of the story.

17     Q.    But he said that on December 3rd, didn't

18     he?

19     A.    I don't know.

20     Q.    Well, can I refresh your recollection on

21     that?

22     A.    Well, you seem to know the date. I will

C O N F I D E N T I A L

269

1    explanation.  However, as I said before, when the

2    doctor told me or told my staff and they told me

3    that this met the standard for reasonable

4    accommodation, that was the end of the story.  She

5    got a reasonable accommodation and she got it as

6    quickly as we could provide it to her.

7         Q.   But you also had a different problem.

8    You thought it was simply unfair that Ms. Bearman

9    be transferred to the Chief Counsel'S Office?

10        A.   Not unfair.  I do think any reasonable

11   person would question why someone should be

12   transferred to an office when they couldn't get the

13   job competitively.

14        Q.   Is that one of the grounds for your

15   opposition to the reasonable accommodation?

16        A.   I didn't say I opposed the reasonable

17   accommodation.  Those are words you are putting in

18   my mouth.

19        Q.   But you went a lot further than this

20   reference to Mr. Fulcher's reference on January

21   6th.

22             Didn't you actually have the Chief

C O N F I D E N T I A L

270

1    Counsel's Office, General Legal Services, draft a

2    letter for Dr. Presant in late January asking that

3    he order an independent examination of Ms. Bearman?

4         A.    I asked them to look at it and they

5    convinced me that in the end that wasn't a good

6    idea.

7         Q.    That was a month later.

8               That was almost a month later, wasn't it?

9         A.    It may have been.  I don't remember the

10   dates.

11              JUDGE KHARE:  Is this letter in the

12   record, Mr. Quinn?

13              MR. QUINN:  Yes.  It is.  It is in the

14   record at Page 290.

15              JUDGE KHARE:  But this letter did not go

16   out; is that correct?

17              THE WITNESS:  I believe it did not go

18   out.  I believe they said there was really no need

19   to do it.

20              BY MR. QUINN:

21         Q.    Is that because Dr. Presant wouldn't sign

22   it?

C O N F I D E N T I A L

272

1          BY MR. QUINN:

2          Q.    Did I misunderstand your testimony to say

3    that on or about January 6th you thought you had

4    reconciled that Dr. Presant's opinion would be

5    accepted?

6          A.    You did misunderstand my testimony.

7                What I did say was that when my staff

8    informed me that Dr. Presant had decided that she

9    was eligible for a reasonable accommodation, I

10   asked my staff to proceed with finding it for her.

11         Q.    When did you first become unhappy with

12   Dr. Presant's opinion?

13         A.    First become unhappy?

14         Q.    Yes.    When did it first strike you?

15         A.    When Dr. Presant provided no evidence to

16   me whatsoever or explanation as to how one could in

17   ten days come to such a startling conclusion.

18         Q.    You supervised 600 employees?

19         A.    I do now.    I did not then.

20         Q.    You are at what level in the IRS?

21         A.    I report directly to the Commissioner.    I

22   am one of the most senior executives there.

1    learned that he did agree to that.

2         Q.    You knew that there were job openings in

3    the Chief Counsel's Office that she was looking

4    for, didn't you?

5         A.    Yes.

6         Q.    You knew the Chief Counsel, didn't you?

7         A.    Right.

8         Q.    You knew that the people that were

9    looking for a reasonable accommodation were running

10   into a brick wall in trying to get her transferred

11   to Chief Counsel, didn't you?

12        A.    No.   Not a brick wall.   They are not part

13   of the IRS and therefore she is not transferable in

14   the same way.

15        Q.    But you made no effort to intercede to

16   see if it could get done?

17        A.    Frankly, Ms. Bearman had competed, and I

18   don't remember when I found this out, had competed

19   for a job in Counsel and had not gotten it and I

20   don't think it is appropriate for me to be pushing

21   when we are in middle of a situation in which we

22   have doctors sort of reviewing each other and we

CONFIDENTIAL

275

1    have stepped into a reasonable accommodation

2    situation for me to get directly involved in the

3    process.  That is why the staff did what they were

4    supposed to do, which I don't really know what the

5    details were based on it.

6          JUDGE KHARE:  I have a couple of

7    questions to follow-up on this because I am a

8    little bit confused.

9          You said that it was not appropriate to

10   push for her to get the slot in the Counsel's

11   Office and that staff handled it.

12         You were letting the staff work on it?

13         THE WITNESS:  Right.

14         JUDGE KHARE:  What staff?

15         THE WITNESS:  Well, it is now bigger

16   because we have reorganized, but I have individuals

17   who handle personnel and work with experts in the

18   EEO and other offices.

19         JUDGE KHARE:  Who was that then?

20         THE WITNESS:  At that time it was a woman

21   named Paula Fyne, who is now the head of what is

22   ridiculously called in my small division strategic

C O N F I D E N T I A L

278

1      Q.   Take a look at page number 62 in the

2  record, if you would.

3      A.   Okay.

4           (Witness reading document.)

5           I have read it.

6      Q.   Does that accurately reflect what

7  happened?

8      A.   It is possible.  I don't remember it.

9  But I do -- I don't remember it.

10     Q.   Just directing your attention to the July

11  through December period of 1999, can you tell me

12  what the workload was like for the employees in the

13  Office of Public Liaison?

14     A.   I think it varied.  I don't know

15  specifically what the workload was like for an

16  individual.

17     Q.   You are aware of complaints that

18  Ms. Bearman had that she had no work to do, aren't

19  you?

20     A.   Ms. Bearman I believe made those

21  assertions.  I did not ever hear them directly from

22  Ms. Bearman.