EXHIBIT D

DECISION OF ALJ LAURA KHARE
NOVEMBER 25, 2003

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, NW., Suite 200
Washington, D.C. 20005

DEPT. OF THE TREASURY
DO RECEIVED

2003 DEC -1 P 12: 52

OFFICE OF EQU...
...ORTUNITY PRO....

|  |  |
|---|---|
| Theresa E. Bearman,<br>Complainant,<br><br>v.<br><br>Paul H. O'Neill, Secretary,<br>US Department of the Treasury,<br>Agency. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

EEOC No. 100-A1-7426X

Agency No. 00-1103

## DECISION

Pursuant to the EEOC's regulations at 29 C.F.R. § 1614.109 (2002), I conducted a hearing in the above-captioned matter on March 18-19, 2003. The procedural facts are contained in the case file and will not be reiterated in this decision. All jurisdictional requirements have been met.

In addition to the parties' pleadings, the record before me consists of the Report of Investigation (ROI) and the Hearing Transcript (HT). Judith Nowak, Complainant, John Burns, David Williams, Kathy King, Susan Neiser, Barry Fulcher, and Susanne Sottile testified.

### ISSUE

The issues in this matter are:

I. Beginning on October 22, 1999, was the Complainant denied a reasonable accommodation for her disability when her request for job restructuring or reassignment was not granted?

II. Was Complainant subjected to a hostile work environment based on her disability and in retaliation for requesting a reasonable accommodation when:

1. From January 1 to October 4, 1999, she was given secretarial and clerical duties and not work at a GS-14 level;

2. On November 19, 2000, management intervened and a payment arrangement made by Complainant and IRS Customer Service and threatened Complainant with discipline once the money was repaid;

3. In December 1999, Complainant's request for compensatory leave for a religious observance was denied;

4. Complainant's repeated requests to be placed on a 120-day detail as an interim accommodation were denied;

5. Between December 13 and 15, 1999, Complainant was charged absent without leave for 14 hours;

6. On December 23, 1999, management monitored Complainant's phone and Internet use;

7. On January 3, 2000, Complainant was expected to perform full-time work while working part-time; and

8. On January 6, 2000, management delayed responding to Complainant's request regarding being placed on administrative leave.

<u>FACTS</u>

During the time at issue, Complainant was a GS-14 step 6 Management Program Analyst the Office of Public Liaison, Small Business Affairs, with the Agency. HT at 101, 106; ROI at 113. Prior to holding that position, she practiced tax law for approximately fifteen years and had an L.L.M. in taxation. ROI at 166.

Susanne Sottile (no disability) was Complainant's first-level supervisor until July 1999, when she became Complainant's third-level supervisor and Barry Fulcher (no disability) became Complainant's first-level supervisor. HT at 118. Robert Fitzpatrick (no disability) was her second-level supervisor.

Sottile knew Complainant suffered from depression beginning in September 1998 when Complainant told her in relation to a scheduling request. HT at 122. Complainant also told Fulcher when they were coworkers that she suffered from depression. HT at 126.

In the spring of 1999, Complainant complained to Sottile that the nature of her work was less substantive than she would like. After that, a CD-ROM project she was spearheading "started gradually to go down hill." HT at 120.

2

On October 4, 1999, Complainant took medical leave for the onset of a severe major depressive episode. ROI at 113.

On October 11, 1999, Complainant's psychiatrist, Judith Nowak, wrote the Agency's physician, Neil Presant (disability status unknown), to request a medical leave of absence for her client.

On October 22, 1999, Complainant requested an accommodation in writing through Presant and David Williams, the chief of Communications and Liaison, of which Complainant's office was a division. Complainant provided a letter from Nowak indicating that Complainant was experiencing a severe major depressive order, including "severe fatigue, irritability, marked difficult concentrating, much difficulty taking initiative, social withdrawal, anhedonia, and a depressed hopeless mood but no suicidal ideation. Nowak indicated that job restructuring or a transfer would accommodate Complainant's disability. ROI at Exs. 3 & 4.

Complainant heard nothing, and on November 15, 1999, her counsel tried to contact Williams by phone. Counsel was unsuccessful and followed up in writing. Williams then called counsel on either November 15 or 16 and told her the matter had been assigned to Labor Relations.

On November 23, the Agency requested authorizations from the Complainant to discuss her work history performance with her prior supervisors. Complainant provided that authorization on November 24, 1999.

Sometime in November 1999, Fulcher became aware of Complainant's request for an accommodation when he saw a letter from Complainant's physician, Judith Nowak. HT at 352. Fulcher testified at the hearing that he became the "point person" for the accommodation search. HT at 381. Sottile was to "provide concurrence with [Fulcher's] recommendations if appropriate." Williams also had the option to weigh in on any accommodation Sottile and Fulcher settled on. HT at 491-492.

On November 26, 1999, Complainant exhausted all of her sick, annual, and advanced sick leave. ROI at Ex. 3. Fulcher notified her of this in writing and placed her on leave without pay (LWOP) beginning November 28, 1999 through December 28, 1999. ROI at Ex. 3.

On December 3, 1999, the Agency's physician, Presant, recommended Complainant be accommodated. He recommended that her job either be restructured or that Complainant be transferred. HT at 353. One of Fulcher's supervisors then asked him to act on Complainant's request. HT at 353-54. Fulcher began looking into the accommodation as well as a detail for Complainant to occur until an accommodation could be granted. HT at 354.

On December 15, 2003, Complainant returned to the office to work part time with Nowak's approval. She was to work 6 hours a day with a flexible start time.

3

On December 16, 1999, Fulcher held a meeting to discuss accommodations for Complainant. ROI Ex. 5.

On December 21, 1999, Complainant requested three months leave under the Family Medical Leave Act (FMLA), to begin on December 28, 1999. Fulcher approved that leave on December 23, 2003. Complainant continued to come to work, however, and when Fulcher asked about it, she indicated she wouldn't be out every day, just some. HT at Ex. 3.

On January 4, 2000, Fulcher issued a memorandum to offices "within the national office area" asking what positions they had available to which Complainant could be detailed. HT at 357. Fulcher followed up on the memo via email and telephone. In late December or early January, he also met with the Counsel's office. HT at 360.

In mid-January 2000, Fulcher updated Complainant in a formal memorandum about the efforts being taken to accommodate her. HT at 364.

On February 7, 2000, Fulcher secured an informal offer for an accommodation from one of the Agency's district offices and on March 7, 2000, a formal offer was made. Complainant accepted the offer.

The entire time Complainant was seeking an accommodation, there were attorney vacancies for which she was qualified in the Agency's Chief Counsel's Office. HT at 148.

## ANALYSIS

To establish a *prima facie* case of disability discrimination under a failure to accommodate theory, the complainant must demonstrate that: 1) she is an "individual with a disability" as defined in 29 C.F.R. § 1630.2(g); 2) she is a "qualified individual with a disability" as defined in 29 C.F.R. § 1630.2(m); and 3) she was subjected to an adverse personnel action under circumstances giving rise to an inference of disability discrimination and/or denied an accommodation. 29 C.F.R. § 1630.2(g) defines an individual with a disability as one who: (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such impairment; or (3) is regarded as having such an impairment. Major life activities include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." An impairment is substantially limiting when it prevents an individual from performing a major life activity or when it significantly restricts the condition, manner or duration under which an individual can perform a major life activity, compared to the average person in the general population. *Durinzi v. United States Postal Serv.*, EEOC Appeal No. 01A11800 (Jul. 18, 2003)(citations omitted).

Absent undue hardship, an employer must provide reasonable accommodation for the physical or mental limitations of an employee (or applicant for employment) if the employee (or

4

applicant) is an individual with a disability who is otherwise qualified. The term ""qualified individual with a disability," with respect to employment, is defined as a disabled person who, with or without a reasonable accommodation, can perform the essential functions of the position held or desired. 29 C.F.R. § 1630.2(m). The term "position" is not limited to the position held by the employee, but also includes positions that the employee could have held as a result of reassignment. 29 C.F.R. §1630.2(o)(2)(ii).

It is well-settled that harassment based on an individual's religion and disability is actionable. In order to establish a claim of harassment under those bases, the complainant must show that: (1) she belongs to the statutorily protected classes; (2) she was subjected to unwelcome conduct related to his membership in those classes; (3) the harassment complained of was based on her religion and/or disability; (4) the harassment had the purpose or effect of unreasonably interfering with her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. *Frazier v. United States Postal Serv.*, EEOC Appeal No. 01A02260 (Sept. 4, 2002)(citations omitted).

Once Complainant has established her prima facie case, the burden then shifts to the Agency to articulate a legitimate, non-discriminatory rationale for its action. *Burdine*, 450 U.S. at 253-54, n. 6; *McDonnell Douglas*, 411 U.S. at 802. If the Agency can produce this rationale, the Complainant must then show that the articulated rationale was not the true reason, but a pretext for discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of persuasion to the issue of discrimination always remains with the Complainant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

I. Beginning on October 22, 1999, was the Complainant denied a reasonable accommodation for her disability when her request for job restructuring or reassignment was not granted?

There is no dispute that Complainant is an qualified individual with a disability entitled to an accommodation. I find, however, that contrary to her assertion, Complainant was not denied a reasonable accommodation. Complainant was reassigned to an attorney position consistent with her needs. The real issue therefore is the delay in the reassignment, and it is clear that the Agency acted with sufficient haste. An employer should respond expeditiously to a request for reasonable accommodation. In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was too complex to provide. *Spotts v. Dep't of Transportation*, EEOC Appeal No. 01A23852 (Oct. 27, 2003)(citations omitted)(Agency did not

5

act when it spent several months purposely selecting merchandise that would accommodate complainant's needs and where most of what complainant desired was accomplished within a few months except the part-time clerical help, which required more time given its complexity).

Complainant first requested reassignment or restructuring on October 22, 1999. The record shows that Complainant's request was forwarded to the Labor Relations Office. The employee to which it was assigned for processing retired however, and the office then reassigned the case on November 16, 1999. On November 23, 1999, the Agency requested an authorization from Complainant to look into her past work history, and on December 3, 1999, Presant concurred with Nowak's recommendation to restructure Complainant's position or reassign her. Fulcher testified that either Sottile or Fitzpatrick asked him to act on Complainant's request. HT at 353-354. Fulcher then contacted the Labor Relations office and the EEO office for guidance and held a meeting on December 16, 1999. HT at 354-355. An appeals office representative, Robert Fitzpatrick, Williams's executive assistant, John Burns form the EEO office, Mendola from Appeals, and Kathy King attended the meeting. Fulcher then met with Burns to double check the approach he was taking, i.e., researching the possibility of a detail and a transfer to an office that employed attorneys. HT at 356.

Three weeks later, on January 4, 2000, Fulcher, after review by Sottile, the EEO office, and Labor Relations, sent a letter to offices within the national office area to find out what was available. HT at 357, 410. He followed up via phone and email. HT at 358. No national office had a vacancy, so Fulcher checked with the offices of the District Director for Maryland, Delaware, Richmond, and West Virginia. As a result, on February 7, 2000, the office of West Virginia tentatively offered Complainant a GS-12 attorney slot in Bailey's Crossroads. They made a formal offer that included pay retention on March 7, 2000. HT at 360-361. Fulcher credibly testified that the delay between the tentative and formal offers was partially a result of the need to work out pay retention. Because the accommodation Complainant requested was complex and the record is rife with evidence that the Agency was actively seeking a position for her throughout the entire period at issue, I find that the delay between request and accommodation was reasonable.

I also find that the Agency did not discriminate against Complainant when it reassigned her to a GS-12 slot. When there are no vacant equivalent positions available, the agency must then look to reassign the employee to a vacant lower level position for which the individual is qualified. *Olson v. Dep't of the Treasury*, EEOC Appeal No. 01983200 (Jul. 19, 2001)(citations omitted). Here, there is no evidence that any other vacancy existed.

I next find that the Agency did not discriminate against Complainant when it did not restructure her program analyst position to be a legal position. When it restructures a position, an Agency has no duty to accommodate an employee by eliminating the essential functions of the position. *Gong v. United States Postal Serv.*, EEOC Appeal No. 01A05584 (Mar. 19, 2003).

I also find that the Agency did not discriminate against Complainant when it reassigned

6

her instead of placing her on detail.  The record indicates that while working on the
reassignment, Fulcher also tried to find Complainant a detail and that the Appeals Division
offered Complainant a detail but that Williams was reluctant to fund it.  HT at 411-412.  If more
than one accommodation is effective, "the preference of the individual with a disability should be
given primary consideration; however, the employer providing the accommodation has the
ultimate discretion to choose between effective accommodations." 29 C.F.R. § 1630.9; *See also
Enforcement Guidance*, Question 9 (Mar. 1, 1999); *Polen v. Dep't of Defense*, EEOC Appeal No.
01970984 (Jan. 16, 2001).  Thus, while complainant may be entitled to an effective reasonable
accommodation under the Rehabilitation Act, she is not entitled to the accommodation of her
choice. *Olson v. Dep't of the Treasury*, EEOC Appeal No. 01983200 (Jul. 19, 2001).  Here,
Complainant was timely accommodated with one of the options she presented to the Agency.

    As evidence that the delay was pretextual, Complainant pointed to the fact that there were
vacant attorney positions available in the Chief Counsel's office while the Agency was looking
for a slot for her.[1]  However, I find this evidence to be non-persuasive.[2]  Under section 501 of
the Rehabilitation Act at 29 C.F.R. § 1614.203, in effect at the time Complainant sought
reassignment, the Agency was only required to offer reassignment to a funded vacant position
located in the same commuting area and serviced by the same appointing authority, and at the
same grade or level.  Here, Williams testified, and Complainant did not rebut, that the Chief
Counsel's Office was under a different appointing authority than the Office of Communications
and Public Liaison.[3]

    Complainant also proffered as evidence of pretext that in January 2000, Williams was
unhappy with Presant's concurrence with Nowak's recommendation, and considered asking him

---

    [1]Complainant applied for the position independently of her Division's efforts on her
behalf.  She was not selected, but that vacancy announcement is not before me.

    [2] The parties are advised that 29 C.F.R. § 1614.203(g), which governed and limited the
obligation of reassignment in the Federal sector, has been superseded and no longer applies.  67
Fed. Reg. 35732 (5/21/01), to be codified as 29 C.F.R. § 203(b).  The ADA standards  apply to
all conduct on or after June 20, 2002, and emphasize, among other things, a broader search for a
vacancy.  The ADA regulations regarding reassignment can be found at 29 C.F.R.  §§ 1630.2(o)
and 1630.9.  Additional information can be found in the Appendix to the ADA regulations and in
the EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under
the Americans with Disabilities Act (March 1, 1999) at Questions 25 - 30.  These documents are
available on the EEOC's website at www.eeoc.gov.

    [3] Although the Chief Counsel's office was under no obligation to take Complainant,
Fulcher met in late December 1999/early January 2000 with them to try to arrange reassignment
there, anyway. HT at 359.

to independently examine Complainant. He even went so far as to have a letter drafted to that effect, but it was not sent. There is no evidence, however, that any misgivings Williams had interfered with Fulcher's efforts.

Finally, as pretext evidence, Complainant offered the testimony of John Burns. He testified that the Agency was not really working to accommodate her and was dragging its feet because it considered her to be a problem. HT at 226. I find that Burns was not credible because he then refused to say the delay was deliberate. HT at 231. He also claimed to have knowledge of other people who were transferred out of their hiring authority but was unable to cite a single example.

II. Was Complainant subjected to a hostile work environment based on her disability and in retaliation for requesting a reasonable accommodation when:

1. From January 1 to October 4, 1999, she was given secretarial and clerical duties and not work at a GS-14 level;

I find that Complainant failed to state a prima facie claim of retaliation regarding this claim. She did not request a reasonable accommodation until October 22, 1999, after the assignments at issue.

I also find that Complainant failed to state a prima facie case of disability discrimination regarding any change in her duties. Complainant testified that beginning in July 1999, her work became "more and more . . . secretarial and clerical . . . ," that she was told several times a month to go to meetings and take notes, and was limited to arranging meeting logistics instead of playing a substantive role. HT at 126. In August 1999, she was reprimanded for arriving late at a Congressional hearing that she was assigned to cover. She also testified that in the summer of 1999, Robert Fitzpatrick took over a CD-ROM project she had been heading and then refused to meet with her. HT at 121. She claimed that she was denied the opportunity to provide substantive contributions to briefing books used for meetings. Complainant also alleged that Sottile would not provide feedback on her work and that she was not being assigned new projects. HT at 124-128. I find that Complainant failed to link any of these assignments (or lack thereof) to her depression.

2. On November 19, 2000, management intervened and a payment arrangement made by Complainant and IRS Customer Service and threatened Complainant with discipline once the money was repaid;

On September 28, 1999, the Agency paid Complainant $1,321 in an emergency salary payment. Complainant wrote a check to repay the advance on October 7, 1998, but the check was not honored because of insufficient funds. ROI at 189. Complainant then made one $50.00 payment on September 23, 1999, but the balance remained and on November 19, 1999, Fulcher wrote Complainant and told her she needed to repay the money by December 10, 1999, because she was violating the employee code of conduct. HT at 379. I find Complainant failed to show that Fulcher's order to repay the money was linked to either of her protected categories and therefore failed to establish a prima facie case. I also find that even assuming arguendo that she had stated a prima facie case, the Agency articulated a legitimate, non-discriminatory rationale for its actions. Fulcher credibly testified he intervened because customer service called him to say she had been unable to reach Complainant. He followed up, found out Complainant owed money in violation of the employees' code of conduct, and met with Labor Relations.

Complainant offered as evidence of pretext her unsupported assertion that Fulcher intervened and called customer service, not that it called him. However, Complainant could have called the customer service representative to testify, and did not.

3. In December 1999, Complainant's request for compensatory leave for a religious observance was denied;

On December 7, 1999, Complainant, who was out of the office on leave without pay status, faxed a request for advanced religious compensatory time off for December 6-11, 1999, so that she could celebrate Hanukkah. Fulcher denied the leave. I find that Complainant failed to state a prima facie case of harassment with regard to Fulcher's denial, for she made no connection between his denial and her protected categories.[4]

I next find that even if Complainant had stated a prima facie case, Fulcher articulated a legitimate, nondiscriminatory rationale for denying the leave. He testified he denied the leave because Complainant waited until the day after the time off she wanted began to request it when office procedures required she make her request no later than 15 days in advance; she seemed unlikely to be able to repay the leave within the necessary time period, and she already had a 42 hour religious compensatory time deficit. HT at 381, ROI at 138 & 39.

I also find that Complainant failed to show Fulcher's rationale was pretextual. On December 16, 1999, Complainant wrote Fulcher a memo in which she showed that her leave records were incorrect and that she really owed only 18 hours from 1997 an d 1998 to the

_____

[4]Complainant was not denied the time off to observe the holiday, so this will not be analyzed as a denial of an accommodation request.

9

Agency when she made her December 7, 1999, request.   Rather than support her argument of pretext, it only buttresses Fulcher's belief that she was unlikely to be able to repay any additional compensatory time.

      **4.  Complainant's repeated requests to be placed on a 120-day detail as an interim accommodation were denied;**

      I find Complainant failed to link any detail denial to her protected categories, and even if she did, the Agency articulated a legitimate, non-discriminatory rationale for its actions.  When he received her request, one of the first actions Fulcher took was to contact the Appeals Office in headquarters to see if a detail could be arranged.  HT at 347.  On January 4, 2000, Fulcher contacted offices in Headquarters to find a detail and prepared several memoranda to offices within the national office area, in one case for counsel requesting a detail, in other cases notifying three other offices, advising them  that the detail or reassignment was really mandatory and asking what they had available. HT at 357.  Sottile and Fulcher both testified that the Appeals Office detail ultimately fell through because of funding issues.  HT at 412, 492. Complainant presented no evidence to the contrary.

      **5.  Between December 13 and 15, 1999, Complainant was charged absent without leave for 14 hours;**

      On December 3, 1999, Nowak wrote the Agency and indicated that Complainant was improved enough to return to work for six hour days beginning the week of December 6.  On December 7, 2003, Complainant faxed Fulcher and indicated she would be back in the office the week of December 13, 1999.

      On December 14, 1999, Fulcher called Complainant at home but she didn't answer it. Instead, she emailed him and said:

      Please refrain from phoning me at home for any reason for I find this intrusive and not helpful to my recovery.  In case you have missed the point, I am trying to recover from a serious illness.

      If you need to communicate with me, please use the mail, as you have done successfully on several previous occasions.

HT Exhibit 3.

On December 16, 2003, Fulcher charged Complainant with 14 hours AWOL time.

I find that Complainant failed to show that Fulcher's action was a result of her protected categories, and if she had, the Agency articulated a legitimate, nondiscriminatory rationale for its actions. At the hearing, Fulcher testified that, based on correspondence form Complainant's doctor, he expected Complainant to be in the office beginning December 13, 1999, and she was not. HT at 383 & 384. Complainant failed to show that this rationale was pretextual. She argued that she had been approved for LWOP until December 28, 1999; however, her correspondence indicated that plan had changed and she would be back in the office. She was not.

    6. On December 23, 1999, management monitored Complainant's phone and Internet use;

Complainant alleges, based on her own observations and alleged remarks by two other employees that Fulcher monitored her phone and internet use from his desk, which was approximately three feet from hers.[5] However, she failed to link this activity to her protected categories. Fulcher credibly denied monitoring Complainant but did testify he could see and hear because there was no partition between their offices. HT at 389. Complainant offered no evidence that his rationale was pretextual.

    7. On January 3, 2000, Complainant was expected to perform full-time work while working part-time; and

I find Complainant failed to establish that this occurred. There is no evidence in the record that she was expected to do eight hours of work in a partial day.

    8. On January 6, 2000, management delayed responding to Complainant's request regarding being placed on administrative leave.

On January 5, 2000, Complainant repeatedly called the Commissioner's office regarding her accommodation and told them it was a matter of life and death that she be given an appointment. On January 6, 2000, Fulcher placed Complainant on administrative leave during a telephone conversation. ROI at Ex. 5. He testified that he did so because of Complainant's calls

---

[5]Complainant did not call either of the employees who allegedly commented as witnesses.

to the Commissioner's office the day before. On January 12, 2000, Fulcher issued Complainant a memorandum indicating he was placing her on administrative leave. I find that Complainant failed to show that the six day delay between notified orally of being placed on leave and receiving written notification was related to her protected categories.


## DECISION


For the reasons set forth above, I find that Complainant did not prove by a preponderance of the evidence that she was discriminated against on the basis of her disability or protected activity.


November 25, 2003

Laura Khare


## NOTICE TO THE PARTIES


*TO THE AGENCY:*


This office will hold the report of investigation and the complaint file for sixty days, during which time the agency may arrange for their retrieval. If we do not hear from the agency within sixty days, we will destroy our copy of these materials.


Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.


Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

12

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### *TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

### *WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

### BY MAIL:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

P.O. Box 19848

Washington, D.C. 20036

### BY PERSONAL DELIVERY:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

1801 L Street, NW

Washington, D.C. 20507


BY FACSIMILE:


Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*


## COMPLIANCE WITH AN AGENCY FINAL ACTION


Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

14

## CERTIFICATE OF SERVICE

I certify that on November 26, 2003, the foregoing decision was sent to the following:

John Quinn
Claxton , Sale, & Quinn, P.C.
910 16th St., NW
Suite 500
Washington, DC 20006


Deanne M. Sobzcak
General Legal Services
Office of Chief Counsel
IRS
P.O. Box 22369
Washington, DC 20026


Mariam Harvey, Acting, Director
Office of Equal Opportunity Programs
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Metropolitan Square, Room 6037
Washington, D.C.  20220


Laura Khare

# EXHIBIT E

# AFFIDAVIT OF JUDITH NOWAK, M.D.

## AFFIDAVIT

Judith Nowak, M.D., being duly sworn, deposes and says as follows:

1.    My name is Judith Nowak, M.D.  I am a medial doctor licensed to practice

       medicine in the District of Columbia, Virginia and Maryland.  I am Board

       Certified in Psychiatry.

2.    I was Tessa Bergman's psychiatrist at all times relevant to this case.

3.    In the administrative proceedings, I rendered the opinion to a reasonable

       degree of medical certainty that Tessa Bergman had a disability, depression,

       that required as a reasonable accommodation a transfer to job involving

       substantive and intellectually challenging work.  I rendered the opinion that

       Ms. Bergman is completely capable of performing her job functions with such

       a reasonable accommodation and is capable of performing on a high

       intellectual and professional level as a lawyer.

4.    I consulted with Neil Presant, M.D., a physician retained by the Department of

       Treasury to evaluate Ms. Bergman's request for a reasonable accommodation.

       In my discussions with Dr. Presant, he agreed with my assessment that Ms.

       Bergman was a qualified individual with a disability (depression) who

       required a reasonable accommodation.  Dr. Present and I agreed that the

       appropriate accommodation for Ms. Bergman would be a position involving

       substantive legal work.

5.    In consulting with Dr. Presant, I offered him complete access to Ms.

       Bergman's medical records.  I also made myself available to answer any

       questions Dr. Presant had concerning Ms. Bergman's medical and mental

condition, and I did provide information to Dr. Presant about Ms. Bergman's

medical and mental condition.

I swear under penalty of perjury that the foregoing is true and correct to the best of

my knowledge and belief.

Judith Nowak, M.D.

Dated: April 24, 2007

# EXHIBIT F

# EXCERPTS FROM DEFENDANT'S
# FIRST, SUPPLEMENTAL AND SECOND
# INTERROGATORY RESPONSES

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| THERESA E. BEARMAN,<br>Complainant, | ) <br>) <br>) <br>) | EEOC Case No.<br>100-A1-7426X |
| v. | ) <br>) <br>) | Agency Case No.<br>TD 00-1056 |
| PAUL H. O'NEILL, SECRETARY,<br>DEPARTMENT OF THE TREASURY,<br>Agency. | ) <br>) <br>) <br>) | DATE: February 14, 2002 |

### AGENCY'S RESPONSE TO COMPLAINANT'S
### FIRST INTERROGATORIES

The Agency, Paul H. O'Neill, Secretary, Department of the Treasury, pursuant to

Rule 33 of the Federal Rules of Civil Procedure, answers and objects to Complainant's

First Interrogatories as follows.

1. Identify all persons with knowledge of the facts and circumstances alleged in the

complaint and provide a detailed summary of all facts known by such person.

### RESPONSE

1.  Barry Fulcher, Senior Program Analyst, Office of Tax Administration

Coordination, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-

4807, see Investigative File (IF) at tab 4; Susanne M. Sottile, Acting Director, National

Public Liaison, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-

4037, see IF at tab 5; David Williams, Chief, Communications and Liaison, IRS, 1111

Constitution Avenue, NW, Washington, D.C.  20224, 202-622-5440, see Investigative File

(IF) at tab 6; Julie Barry, Attorney, Office of Chief Counsel, IRS, General Legal Services,

2

950 L'Enfant Plaza, SW, Washington, D.C.  20224, 202-283-7900, see IF at tab 7; Robert

Fitzpatrick, Senior Advisor to Deputy Chief of  Communication and Liaison, IRS, 1111

Constitution Avenue, NW, Washington, D.C.  20224, 202-622-6117, conferred with Barry

Fulcher regarding the Complainant's request for reasonable accommodation, and the

other issues accepted for investigation in this complaint.  In addition, Mr. Fulcher kept Mr.

Fitzpatrick informed on action taken on various issues, including her reasonable

accommodation request, administrative leave, and the other issues accepted for

investigation in the complaint.  Other individuals with knowledge include labor relations

specialists:  Stuart Fields, Joan McIver, Madeline Mendola, all located at 1111 Constitution

Avenue, NW, Washington, D.C.  20224, 202-622-4432, who all have knowledge of the

labor relations issues, including the request for reasonable accommodation and the

religious compensatory time issue.  The following also have information about the

reasonable accommodation issue:  Kathy King, Reasonable Accommodation Specialist,

New Carrollton Federal Building, 5000 Ellin Road, Lanham, Maryland 20706, 202-283-

4993; John Burns, EEO Specialist, 1111 Constitution Avenue, NW, Washington, D.C.

20224, 202-622-8367.


2. Identify and describe all communications relating to efforts to obtain an alternate job

position for complainant to accommodate her claimed disability , including interim

accommodations.

## RESPONSE

2.  Barry Fulcher sent memoranda on January 4, 2000, to the following:  Associate

3

Chief Counsel (Finance and Management), Assistant Commissioner (Examination), Assistant Commissioner (International), National Director of Appeals, District Director Delaware-Maryland District, District Director, Virginia-West Virginia District. The memoranda explained that Mr. Fulcher's office had a GS-14 senior program analyst requesting a reasonable accommodation and that a transfer to an attorney position would be an appropriate reasonable accommodation. The memoranda described the Complainant's background and asked that Mr. Fulcher be contacted to discuss possible reassignment of the Complainant. Although not positive, Mr. Fulcher believes he made follow up telephone calls to all of these individuals to discuss a possible reassignment. On January 21, 2000, Mr. Fulcher sent an e-mail to the Executive Assistant, Appeals division, requesting a response to his memorandum. The Executive Assistant responded to Mr. Fulcher by e-mail on January 21, 2000, stating that a 120 day detail might be possible if the individual was willing to work FOIA cases, but the Appeals Division did not have funding for such a detail. Mr. Fulcher subsequently discussed the possible detail with the Executive Assistant of the Appeals Division on January 31, 2000, in which it was reiterated that although interested, the Appeals Division did not have funding for a detail. However, the Communications and Liaison Division was not able to fund the position. The Executive Assistant, Appeals Division, in an e-mail dated February 8, 2000, stated that the detail was no longer a consideration because of the unavailability of funding. An attorney position was located in the Virginia/West Virginia District office. On February 18, 2000, Mr. Fulcher received a memorandum from the Examination Division stating that they have no series 905 attorney positions available. On February 16, 2000, the Richmond District

4

stated to Julie Barry that they may have a GS-12 attorney position available for the

Complainant at the Bailey's Crossroads, Virginia location. On February 18, 2000, William

Robertson of the Virginia/West Virginia District Office contacted Mr. Fulcher and stated

that the Virginia/West Virginia office would be willing to pay the salary difference between

a GS-12 and GS-14 if that office could obtain approval. On March 6, 2000, Mr. Fulcher

received a fax from the Virginia/West Virginia office stating that they would offer a position

to the Complainant with pay retention.

3. Identify every person or office you contacted in attempting to obtain an alternate job

position for complainant, including interim accommodations.

### RESPONSE

3. See response to Interrogatory Number 4 above.

4. State all reasons why complainant was not transferred to each job position identified in

your response to interrogatory number 3 and identify all persons with knowledge of such

facts.

### RESPONSE

4. The Complainant was not transferred to the International Division because it did

not have any attorney positions available. The Complainant was not transferred to the

Examination Division because it did not have any series 905 attorney positions available.

The Complainant was not transferred to the Appeals Division because funding was not

available. The Complainant was not transferred to the other offices because those offices

5

did not provide a positive response to Mr. Fulcher prior to the offer from the Virginia/West Virginia office.

5. State all reasons why you did not seek a position for complainant in the Office of Chief Counsel of the Internal Revenue Service in response to her request for an accommodation.

**RESPONSE**

5.  The Agency objects to Interrogatory Number 5 because it is untrue.  The Agency did attempt to find a position for the Complainant in the Office of Chief Counsel, Internal Revenue Service.

6. Identify each job position (requiring a law degree) in the Office of Chief Counsel that was open at any time between November 1, 1999 and March 27, 2000 and state the educational and professional experience of the person hired for each position.

**RESPONSE**

6.  The Agency is in the process of identifying the positions available in the Office of Chief Counsel between November 1, 1999 and March 27, 2000.  The Agency objects to the second part of Interrogatory Number 6 regarding the educational and professional experience of the person hired for each position because it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

7. Identify each of your employees who were denied a request for advance religious compensatory leave and state all reasons for denial of each request.

**RESPONSE**

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## WASHINGTON FIELD OFFICE

| | | |
|---|---|---|
| THERESA E. BEARMAN,<br>Complainant, | )<br>)<br>) | EEOC Case No.<br>100-A1-7426X |
| v. | )<br>) | Agency Case No.<br>TD 00-1056 |
| PAUL H. O'NEILL, SECRETARY,<br>DEPARTMENT OF THE TREASURY,<br>Agency. | )<br>)<br>) | DATE: April 11, 2002 |

### AGENCY'S SUPPLEMENTAL RESPONSE TO COMPLAINANT'S
### FIRST INTERROGATORIES

The Agency, Paul H. O'Neill, Secretary, Department of the Treasury, pursuant to Rule 33 of the Federal Rules of Civil Procedure, answers and objects to Complainant's First Interrogatories as follows.

### INTERROGATORY

4. State all reasons why complainant was not transferred to each job position identified in your response to interrogatory number 3 and identify all persons with knowledge of such facts.

### SUPPLEMENTAL RESPONSE

4. The Agency objects to Interrogatory 4 because it is overly burdensome. Without waiving this objection, the Agency supplements its previous response as follows. The complainant was not transferred to a position in the Office of Chief Counsel because the Office of Chief Counsel made a determination that it had no legal obligation to place the complainant, an IRS employee, in a position in the Office of Chief Counsel because the

2

Office of Chief Counsel and the Internal Revenue Service are separate organizations with separate personnel authorities. Thus, the inquiry dated January 4, 2000, made by Barry Fulcher, as to whether the Office of Chief Counsel would be willing to accept the complainant for a vacancy was not acted upon by the Office of Chief Counsel. In making this decision, Richard Mihelcic, the Associate Chief Counsel, Finance and Management, neither received nor considered any information other than the legal obligation of the Office of Chief Counsel. In addition to the individuals previously identified, Richard Mihelcic, Associate Chief Counsel, Finance and Management, Office of Chief Counsel Internal Revenue Service, 1111 Constitution Avenue, NW, Washington, D.C. 20224, 202-622-3330, has knowledge of these facts.

**INTERROGATORY**

6. Identify each job position (requiring a law degree) in the Office of Chief Counsel that was open at any time between November 1, 1999 and March 27, 2000 and state the educational and professional experience of the person hired for each position.

**RESPONSE**

**6.** The following job positions (requiring a law degree) were open in the Office of Chief Counsel between November 1, 1999, and March 27, 2000: 7 Attorney Advisor positions in the International Division; 2 Attorney positions in the Northeast General Legal Services office; 1 Attorney position in the Southeast General Legal Services office; 2 Attorney positions, 1 Special Trial Attorney position, and 1 Area Regional Counsel temporary position in the Mid-west General Legal Services office; 5 Attorney positions and 1 Special Trial Attorney position in the Western General Legal Services office; 6 Attorney positions,

3

8 Attorney Advisory Tax positions, 3 Trial Attorney positions, 1 Branch Chief position, and 1 Assistant Branch Chief position in the Domestic Division; 2 Attorney positions, 5 Attorney Advisor positions, 1 Branch Chief position, 1 Senior Technical Reviewer position, and 1 Special counsel to the Associate Chief Counsel position in the Employee Benefits and Exempt Organizations Division; 1 Attorney position, 5 Docket Attorney positions, and 2 Senior Technical Reviewer positions in the Enforcement Division.

### INTERROGATORY

10.  Identify all employees responsible for the recording and entry into the timekeeping system of all information referring or relating to the complainant, and provide a complete statement of the training received by each such employee with respect to the timekeeping system and requirements for confidentiality of employee information.

### SUPPLEMENTAL RESPONSE

**10.**  Ramona Johnson, Program Analyst, National Public Liaison, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-7038, received Department of Treasury TIMUS Training; Alicia Chandler, 1111 Constitution Avenue, NW, Washington, D.C. 20224, 202-622-7503, received Department of Treasury TIMUS Training; Sharron Lane, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-927-5646, received on the job training, including instruction from the payroll supervisor.

### INTERROGATORY

13. Identify all persons who assisted in preparing respondent's response to complainant's first request for production of documents.

### SUPPLEMENTAL RESPONSE

4

13.  Susanne M. Sottile, Acting Director, National Public Liaison, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-4037; Nancy Thoma, Program Manager, National Public Liaison, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-4262; Crystal Jenkins, Reasonable Accommodations Specialist, IRS, 8100 Corporate Drive, Landover, Maryland 20785, 202-283-0616; Cindy Patterson, EEO Office, IRS, 1111 Constitution Avenue, NW, Washington, D.C.  20224, 202-622-2154.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual information set forth in the Agency's Supplemental Response to Complainant's First Interrogatories for Interrogatory Number 4 is true and correct.

4/11/02
DATE

RICHARD J. MIHELCIC
Associate Chief Counsel
Finance and Management
Office of Chief Counsel
Internal Revenue Service

5

For the Agency,

DEANNE SOBCZAK
Attorney, Area Counsel, Washington, D.C.
General Legal Services
950 L'Enfant Plaza, SW,  Floor 2,
Washington, D.C.  20024-2123
Tele: 202-283-7923
FAX: 202-283-7978

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
## WASHINGTON FIELD OFFICE

| | |
|---|---|
| THERESA E. BEARMAN,<br>　　　　Complainant,<br><br>　　　　v.<br><br>PAUL H. O'NEILL, SECRETARY,<br>DEPARTMENT OF THE TREASURY,<br>　　　　Agency. | EEOC Case No.<br>100-A1-7426X<br><br>Agency Case No.<br>　TD 00-1056<br><br>DATE:　December 5, 2002 |

### AGENCY'S RESPONSE TO COMPLAINANT'S
### SECOND INTERROGATORIES

The Agency, Paul H. O'Neill, Secretary, Department of the Treasury, pursuant to

Rule 33 of the Federal Rules of Civil Procedure, answers and objects to Complainant's

Second Interrogatories as follows.

### INTERROGATORY

5.  State all facts known to Richard Mihelcic as to why Ms. Bearman was not placed in a

position in the Office of Chief Counsel.

### RESPONSE

5.  Richard Mihelcic knows the following facts:  Ms. Bearman was not placed in a position

in the Office of Chief Counsel because the Internal Revenue Service and the Office of

Chief Counsel are separate organizations with separate personnel authorities.   The Office

of Chief Counsel made a determination that it had no obligation to place an IRS employee

in a position within the Office of Chief Counsel.  The Office of Chief Counsel does not take

reassignments from other agencies, including the IRS.

2

### INTERROGATORY

6.  Identify all communications between Richard Mihelcic and any person regarding Theresa Bearman.

### RESPONSE

6.  Richard Mihelcic recalls that he contacted Julie Barry because she was listed as a contact on the January 4, 2000, memorandum and he asked her what precipitated the memorandum.  Ms. Barry responded that an IRS employee was seeking a reasonable accommodation that involved coming to the Office of Chief Counsel as an attorney and that it was Ms. Barry's understanding that the person had worked as an attorney in the Office of Chief Counsel previously.  This conversation occurred shortly after Barry Fulcher sent the January 4, 2000, memorandum to Mr. Mihelcic, inquiring whether the Office of Chief Counsel would be willing to accept the Complainant for any current, funded vacancies.  Mr. Mihelcic does not recall any other communications regarding Ms. Bearman.

### INTERROGATORY

7.  State all reasons why Ms. Bearman's administrative leave was terminated on or about January 29, 2000 and identify all communications related to such decision.

### RESPONSE

7.  Administrative leave was authorized for the Complainant beginning January 6, 2000, because as a result of a telephone conversation the Complainant had with someone on the Commissioner's staff, it was perceived that the Complainant was very upset and that the Complainant considered the situation to be a matter of life or death.  It was decided that

3

administrative leave be authorized for the Complainant until her situation could be further

evaluated by her physician, Dr. Nowak. This was conveyed to the Complainant in a letter

dated January 12, 2000, from Barry Fulcher. In the January 12, 2000 letter, Mr. Fulcher

asked the Complainant to have Dr. Nowak provide an opinion regarding the

Complainant's ability to work in light of the circumstances. In addition, Dr. Present, the

doctor with whom the Agency consulted, communicated with Dr. Nowak regarding the

Complainant's situation in light of the conversation with the Commissioner's staff. Dr.

Nowak provided a letter dated January 21, 2000; however, the letter did not address the

Complainant's comments that precipitated placing her on administrative leave. In the

absence of any information from the Complainant's doctor regarding the situation, the

Complainant was taken off of administrative leave on January 28, 2000. All

communications regarding this decision have previously been provided.

### INTERROGATORY

8. Identify, separately for each month for the period October 1999 through March 2000,

each employee of the Department of Treasury who had the authority to place Ms. Bearman

in an open position in the Office of Chief Counsel in response to her request for a

reasonable accommodation, identify all communications with each of these employees

regarding placing Ms. Bearman in the Office of Chief Counsel and state why each person

contacted about placing Ms. Bearman did not place Ms. Bearman in an open position in

the Office of Chief Counsel.

4

## RESPONSE

8.  The Agency objects to Interrogatory Number 8 to the extent that it calls for a legal

conclusion regarding reasonable accommodation for the Complainant.  Without waiving

this objection, the Agency states that a review of the relevant Treasury Orders (attached)

indicates that the Assistant Secretary (Management), Department of the Treasury, has

personnel authority over both the IRS and the Office of Chief Counsel, as delegated by the

Secretary of the Treasury.  In light of the separate personnel authorities of the IRS and the

Office of Chief Counsel, the Assistant Secretary (Management), Department of the

Treasury, and the Secretary of the Treasury had authority to reassign the Complainant to

an open position in the Office of Chief Counsel during the stated time frame.  These

individuals were not contacted regarding reassigning the Complainant to the Office of

Chief Counsel.

## INTERROGATORY

9.   Identify all communications between David Williams and any other person related in

any way to Ms. Bearman's request for an accommodation.

## RESPONSE

9.  David Williams received periodic updates from his staff regarding the status of the

Complainant's reasonable accommodation request.  He does not recall the exact dates, or

the substance of the updates.  The individuals who provided Mr. Williams with the updates

included Paula Fyne and Marthia Ruffin.  On a broader basis, Mr. Williams also discussed

5

reasonable accommodation in general and questions regarding the reasonable

accommodation statute/regulations with officials familiar with human resources practices

at the IRS.

## INTERROGATORY

10.  Identify all communications between any person employed by the Department of

Treasury and John Burns related in any way to Theresa Bearman.

## RESPONSE

10.  John Burns is no longer a federal employee.  After reasonable inquiry, Agency counsel

has not been able to locate any forwarding information regarding Mr. Burns.  Mr. Burns

engaged in general discussions at various times regarding roles and responsibilities in the

reasonable accommodation process.  Communications containing the information

requested are located in the documents previously provided to the Complainant.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual information set forth in the Agency's Response to Complainant's Second Interrogatories for Interrogatory Numbers 5 and 6 is true and correct.

12/4/02
DATE

RICHARD J. MIHELCIC
Associate Chief Counsel
Finance and Management
Office of Chief Counsel
Internal Revenue Service

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual information set forth in the Agency's Response to Complainant's Second Interrogatories for Interrogatory Number 9 is true and correct.

12-4-07
DATE

DAVID R. WILLIAMS
Chief Communications and Liaison
Internal Revenue Service

For the Agency,

DEANNE SOBCZAK
Attorney, Area Counsel, Washington, D.C.
General Legal Services
950 L'Enfant Plaza, SW, Floor 2,
Washington, D.C. 20024-2123
Tele: 202-283-7923
FAX: 202-283-7978

EXHIBIT G

EXCERPTS FROM THE
DEPOSITION TRANSCRIPT OF
SUSAN NIZER
DEFENDANT'S RULE 30(b)(6) DESIGNEE

1

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

```
                                )
IN THE MATTER OF:               )
                                )
THERESA E. BEARMAN,             )
                                )
      Complainant,              )
                                )
v.                              )   EEOC No. 100-A1-7426X
                                )   Agency No. TD-00-1056
PAUL H. O'NEILL, SECRETARY,     )
DEPARTMENT OF THE TREASURY,     )
                                )
      Agency.                   )
                                )
```

Deposition of

SUSAN NIESER

a witness of lawful age, taken on behalf of the

Agency, pursuant to notice, in the offices of

the Internal Revenue Service, 950 L'Enfant Plaza,

Washington, D.C., on Wednesday, March 20th, 2002, at

10:15 a.m., before George Holmes, Notary Public in and

for the District of Columbia, when were present:

APPEARANCES:

On behalf of the Complainant:

JOHN D. QUINN, ESQ.
Claxton, Sole & Quinn          ORIGINAL
Suite 500
910 16th Street, N.W.
Washington, D.C.  20006

On behalf of the Agency:

DEANNE SOBCZAK, ESQ.
General Legal Services
Office of Chief Counsel, IRS

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

1          MR. QUINN:  John Quinn, Counsel for

2   Complainant.

3          MS. BEARMAN:  Theresa Bearman, Complainant.

4          THE WITNESS:  And my name is Susan Nieser,

5   and I'm the witness for this deposition.

6                        EXAMINATION

7          BY MR. QUINN:

8      Q    Ms. Nieser, my name is John Quinn.  I'm going

9   to be asking you some questions in this deposition

10  today, and just a couple things.  If you have any -- if

11  you don't understand my question, please ask me to

12  clarify and I'll be happy to do so.

13          Have you ever had your deposition taken

14  before?

15      A    No, I haven't.

16      Q    Where do you work?

17      A    I work in -- work for the Office of Chief

18  Counsel, IRS Office of Chief Counsel, and Labor,

19  Employee Relations Division.

20      Q    And what's your work address?

21      A    1111 Constitution Avenue, Northwest,

22  Washington, D.C., Room 4022.

23      Q    And your home address?

24      A    My home address is 1614 Key Boulevard in

25  Arlington, Virginia.

5

1    Q    And how long have you worked for the Internal

2    Revenue Service?

3    A    I've worked for the IRS Office of Chief

4    Counsel since 1989.

5    Q    Okay.  And what's your educational

6    background?

7    A    I have a Bachelor's degree and also a J.D.

8    degree.

9    Q    You understand that you're testifying here

10    pursuant to a notice of deposition, and I've got a copy

11    of that.  There are some markings on it, but without

12    the markings, is this the notice of deposition you're

13    here in response to?  It's a five-page exhibit marked

14    Nieser 1.

15                              (The document referred to was

16                              marked for identification as

17                              Nieser Exhibit 1.)

18              BY MR. QUINN:

19    A    Yes.  Ms. Sobczak showed me the exhibit

20    portion of this.

21    Q    And I understand that you're the individual

22    appointed by the Department of Treasury to testify to

23    Items Number 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, and

24    16, is that correct?

25              MS. SOBCZAK:  I, as the attorney handling

6

1    this case, have made a determination that Ms. Nieser is

2    in the best position to answer the noted questions on

3    behalf of the Department of Treasury.

4              MR. QUINN:  The numbers I just gave?

5              MS. SOBCZAK:  Yes.

6              MR. QUINN:  Okay.

7              BY MR. QUINN:

8        Q    By the way, you also have to answer

9    affirmatively.

10       A    I understand.

11       Q    So you are that individual?

12       A    Yes.  Ms. Sobczak did --

13       Q    Okay.

14       A    -- me to be that individual.

15       Q    Okay.  And what did you do to prepare for

16   today's deposition?

17       A    What I did to prepare for today's deposition

18   is I had a conversation with Ms. Sobczak about the

19   information that was noted on the exhibit.

20       Q    Mm-hmm.

21       A    I also talked to various people in the

22   Personnel Office, and I also looked through a number of

23   files in preparation for the deposition.

24       Q    Okay.  And which Personnel Office are you --

25       A    The IRS Office of Chief Counsel has a

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

13

1    office.

2        MS. SOBCZAK:  And I responded.

3        MR. QUINN:  You did not respond.  There was

4    no response, and there's no response now.

5        MS. SOBCZAK:  I believe there was a response

6    to the interrogatory.

7        MR. QUINN:  There was no response.

8        (Pause)

9        MR. QUINN:  Okay.  We're not going to get

10    anywhere, but I'll run through this stuff just so we

11    get it for the record.

12        BY MR. QUINN:

13    Q    Ms. Nieser, Item Number 5 that you're

14    appointed to testify about --

15        MS. SOBCZAK:  Do you have a copy of that for

16    her to look at?

17        MR. QUINN:  Yes, I do.

18        BY MR. QUINN:

19    A    Sure.

20    Q    Okay.  Asks for each employment position open

21    at any time during this period, the identification of

22    it, and then every reason why Complainant was not

23    placed in every one of those positions.  Can you answer

24    that question?

25    A    Let me talk to you about the number of

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

14

1     positions that were open during that time period.

2         Q     Okay.

3         A     During that entire time period, we had one

4     vacancy announcement called an open continuous vacancy

5     announcement, but it was a general announcement for

6     attorneys at all the levels that we hire at, 12, 13,

7     and 14.  And it was a general announcement for all

8     particular areas.  We also had a number of specific

9     announcements, which I can talk about if you'd like me

10    to.

11        Q     Sure.

12        A     The specific announcements, based upon the

13    records that I personally reviewed, were that in 1999

14    there were two specific announcements for the times --

15    that were open during the time period that you talked

16    about where people who were not employees of the Office

17    of Chief Counsel could apply for those.  For the entire

18    year of 2000, there were 19 vacancy announcements that

19    were open where individuals who were not employees of

20    the Office of Chief Counsel could testify.  And for the

21    relevant period of 2001, there were five vacancy

22    announcements.

23        Q     Okay.  Which positions were open in November

24    of 1999?

25        A     That would be those two that I talked about,

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

16

1      A     I wouldn't -- I don't know if I would

2   characterize it as plenty.  There were -- there was an

3   availability for people to apply who did not work for

4   the Office of Chief Counsel.

5      Q     Okay.  Now, tell me every reason why Ms.

6   Bearman was not placed in one of those positions?

7      A     Now, Ms. Bearman, as I -- as -- as it was

8   explained to me, was not an employee of the Office of

9   Chief Counsel at the time, and there is a relationship

10  difference between the IRS and the Office of Chief

11  Counsel.  So, she could have applied for a position.  I

12  don't know whether she did apply for a position, but

13  she could have applied for a position with the IRS

14  Office of Chief Counsel.

15     Q     Can you tell me every reason why Ms. Bearman

16  was not placed in one of those open positions?

17     A     I don't know the answer to that question.

18     Q     You have -- the -- the Department of Treasury

19  has no information on that?

20     A     Oh, I personally have no information about

21  that, and the records that I -- that I -- that I've

22  looked through had -- gave me no answers to those

23  questions.

24     Q     Well, you're all I have.  You're the person

25  appointed by the Department of Treasury to tell me

1    every reason why Ms. Bearman was not appointed to one

2    of those positions, and your answer is, you have no

3    reason?

4        A    I've answered the question to the best of my

5    ability based upon my personal knowledge and the

6    records that I went through --

7        Q    Okay.  What reason --

8        A    -- in preparation for this.

9        Q    Tell me every reason that you have why she

10    wasn't appointed to one of those open positions.

11            MS. SOBCZAK:  Objection.  Asked and answered.

12    She doesn't know.

13            BY MR. QUINN:

14        Q    Just give me a list, every -- every reason

15    you have.  If you have none, just say "none."

16        A    My counsel has objected to that question.

17        Q    I know, and you can answer the question.

18        A    I did answer the question previously.

19        Q    And I'm asking you to answer it again.

20        A    The answer is that she -- if she was not an

21    employee of the IRS Office of Chief Counsel, she could

22    have applied for a position.  She could have applied

23    for one of the -- she could have applied under one of

24    the open vacancy announcements.

25        Q    Okay.  Again, I'm just asking you to give me

**EXECUTIVE COURT REPORTERS, INC.**
**(301) 565-0064**

18

1    a list of every reason --

2              MS. SOBCZAK:  Objection -- the witness to --

3    told you the answer.

4              MR. QUINN:  I don't think that's the answer.

5              MS. SOBCZAK:  -- but you need to move on.

6              BY MR. QUINN:

7         Q    I -- I want to -- I want a list of every

8    single reason why Ms. Bearman was not placed in one of

9    those open positions in 1999.

10        A    I've answered the question to the best of my

11   ability.

12        Q    You have -- so you have no other reasons than

13   what you've told me so far?

14        A    She could have applied under a vacant

15   announcement.  She was not a part of the IRS Office of

16   Chief Counsel.

17        Q    But those jobs were open to people who were

18   not part of the Office of Chief Counsel?

19        A    They were.  They -- they had to apply and

20   they would have been considered.

21        Q    She wasn't disqualified because she was not a

22   part of the Office of Chief Counsel?

23        A    She has to apply.

24        Q    You're saying she wasn't -- she didn't apply?

25        A    I don't know whether she --