**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TESSA E. BERGMAN | : | |
| Plaintiff, | : | |
| | : | Civil Action No. <u>06-0303 (GK)</u> |
| v. | : | |
| HENRY M. PAULSON, JR.<br>SECRETARY OF THE TREASURY | : | |
| Defendant. | : | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Tessa Bergman, moves for Partial Summary Judgment against Defendant, Henry M. Paulson, Jr., Secretary of the Treasury, pursuant to Rule 56 of the Federal Rues of Civil Procedure.

Plaintiff moves for partial summary judgment on the grounds that Defendant unlawfully discriminated against her and otherwise denied her a reasonable accommodation under the Rehabilitation Act of 1973, as amended, by assigning her, as a reasonable accommodation, after several months delay, to a lower graded position when other positions at Plaintiff's then current grade level were available within Plaintiff's commuting area.

Plaintiff submits a Statement of Material Facts as to Which There Is No Genuine Issue, supporting affidavits and other documents, deposition testimony and a Memorandum of Law in

Support of Motion for Partial Summary Judgment, which are attached hereto and incorporated herein.

Respectfully submitted,

_____
John D. Quinn, Esq,
Stephen Sale, Esq.
Sale & Quinn, P.C.
910 16th Street, N.W., Suite 500
Washington, DC  20006
Tel:  (202) 833-4170
Fax: (202) 887-5137

Counsel for Plaintiff

Dated:  April 26, 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| TESSA E. BERGMAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 06-0303 (GK) |
| v. | : | |
| | : | |
| HENRY M. PAULSON, JR. | : | |
| SECRETARY OF THE TREASURY | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Tessa E. Bergman ("Plaintiff") submits her memorandum of law in support of her motion for partial summary judgment, and states as follows:

## INTRODUCTION

Plaintiff's complaint that Defendant Department of Treasury[1] ("Defendant") discriminated against her under the Rehabilitation Act of 1973 (Pub. L. 93-112), as amended (29 C.F.R 1614.203) (1997) (the "Act"), has two distinct and independent claims. The claim that is amenable to resolution on summary judgment is whether Defendant, in searching for a job reassignment as a reasonable accommodation for Plaintiff's disability under the Act, violated the Act when it refused to assign Plaintiff to a vacant, funded position at Plaintiff's current grade level in the IRS' Office of Chief Counsel in Washington, D.C. ("OCC"), but instead waited

---

[1] The name of Defendant changed automatically from John W. Snow to Henry M. Paulson, Jr., pursuant to Rule 25 (d) of the Federal Rules of Civil Procedure, upon his appointment as Secretary of Treasury.

several months to assign Plaintiff to a position at a lower grade level in an IRS field office in Virginia.[2]

In the administrative proceedings below, the parties filed cross motions for summary judgment on the legal issue of whether Defendant was obligated to reassign Plaintiff to one of the open OCC positions and, in doing so, both parties necessarily certified that there were no disputed material facts related to this issue and that the case could be resolved as a matter of law. The specific legal issue involved is whether Defendant could limit its search under the Act for a job reassignment to open positions in the employing agency (the IRS) or whether Defendant was required to assign Plaintiff to an open position based on an agency-wide search of the Defendant (the Department of Treasury) in finding a reasonable accommodation under the Act. This distinction is of crucial importance here, because Defendant limited the scope of its search to the employing agency, the IRS, and would not reassign Plaintiff to one of many open positions at Plaintiff's grade level in Washington, D.C., that were available in the IRS' Office of Chief Counsel on the grounds that OCC was a separate appointing authority.

To narrow the issue even further, both parties agreed below that the 1992 amendments to the Act requires a broader agency-wide search (*i.e.*, the entire Treasury Department). However, Defendant argued below, and the ALJ found, that the limited reasonable accommodations search that was conducted was appropriate because the 1992 amendments to the Act did not become law when signed by the President in 1992, but only became law 10 years later, in 2002, when the EEO actually published final regulations implementing the law. The ALJ's ruling on this crucial issue of law is both illogical and inconsistent with unanimous court and EEO decisions holding

---

[2] The claim that involves disputed facts is whether Defendant retaliated against Plaintiff for making a request for an accommodation under the Act. In addition, the issue of whether punitive damages for intentional violations of the Act are not included in this motion. These are factually uncomplicated claims that will involve just a few witnesses and little, if any, expert testimony.

that the 1992 law became law in 1992 and was applicable to the facts of this case, which occurred in 1999 and 2000.  The decision is also inconsistent with the United States Code, which plainly states that the 1992 amendments were effective when the law was enacted--on October 29, 1992.

In defending this case at the administrative level, Defendant repeatedly and consistently conceded that Plaintiff was a qualified individual with a disability under the Act.  Witness after witness offered by Defendant asserted that the opinion of an independent physician retained by Defendant to evaluate Plaintiff's claim that she had a disability that required a job transfer was a conclusive and final decision that required Defendant to find a reasonable accommodation for Plaintiff under the Act.  Defendant presented two witnesses at the hearing that testified unequivocally as to the foregoing, and at least three other employees of Defendant testified that Defendant had the obligation to find a reasonable accommodation for Plaintiff's disability under the Act.  In issuing her opinion, the ALJ found that the parties have "no dispute that Complainant [Bergman] is a qualified individual with a disability entitled to an accommodation."  Exhibit ("Exh.") D to Statement of Material Facts as to Which There Is No Genuine Issue, Decision of ALJ Khare, p. 5.

Defendant took this position below to rebut Plaintiff's claims that a senior IRS executive personally delayed the search for a reasonable accommodation while he made a futile attempt to subvert the independent physician's decision that Plaintiff was a qualified individual with a disability entitled to an accommodation under the Act.  Thus, Defendant persuaded the ALJ that they took their obligations under the Act seriously and were resolute in trying to reassign Plaintiff promptly as soon as an independent physician made the conclusive determination that Plaintiff had a disability that required an accommodation.  Defendant presented multiple

witnesses to testify below to their exhaustive search for an accommodation under the Act that resulted in a job being offered to Plaintiff in the Virginia field office of the IRS, and not in OCC, because it was determined that Defendant could not assign Plaintiff to one of the open, funded positions in OCC at Plaintiff's grade level because OCC was a separate agency from IRS.

Now, apparently recognizing that the legal underpinnings of the ALJ's decision are indefensible, Defendant indicates that it intends to make a 180-degree reversal from the position Defendant took in prevailing at the administrative level. Defendant has indicated that it intends to present evidence that Plaintiff never had a disability at all that required a reasonable accommodation under the Act and that Defendant's search to find a reasonable accommodation for Plaintiff was voluntary and not obligatory. As set forth below, Defendant is bound by the testimony of its employees, and the employees cannot simply change their sworn testimony to defeat a summary judgment motion. Further, Defendant prevailed below on the basis that Plaintiff was a qualified individual with a disability and is barred by principles of judicial estoppel recognized by this Court from changing its fundamental position now.

## STATEMENT OF FACTS

1.    <u>Background Facts</u>.

In August 1998, Plaintiff was approached by David Williams, Chief of the IRS' Office of Communication and Liaison, and asked if she would be interested in working for a new office under his management that Mr. Williams described as dealing with issues of a high priority to him and to the Commissioner. Plaintiff accepted a position in the Office of Public Liaison ("OPL") offered by Mr. Williams after receiving assurances that the position would involve substantive issues of income tax law. Mr. Williams was not only a former colleague and friend of Plaintiff's, but he also had considerable influence with the IRS Commissioner. Exh. C,

Hearing Transcript ("HT") (Burns), pp. 230, 231, 235; (Williams), p. 245; (Fulcher), pp. 435, 436.

Plaintiff's first-line supervisor from September 1998 to July 1999 was Acting Director Susanne Sottile, who reported directly to David Williams. Plaintiff had informed Ms. Sottile from the beginning that she suffered from clinical depression, which was controlled by medication. Exh. C, HT (Sottile), p. 548. Sottile knew Plaintiff's depression was "relieved" when Plaintiff had a lot of work to do. *Id.*

By July 1999, what had started out as a small, informal staff of nine at OPL grew rapidly. Exh. C, HT (Burns), p. 222. The problem, however, was that there was little or no substantive work to do in the office. *Id.* EEO investigator John Burns testified that there was only enough work in the entire office to keep one or two employees busy, and most employees in the office simply had no substantive work to do. Ex. C, HT (Burns), pp. 221, 222. The only substantive work project Plaintiff had in 1999 was a small business CD-ROM project that she created herself and that was a high priority project in the office. That project was taken away from Plaintiff by a newly hired supervisor, Mr. Fitzpatrick, who also apparently had little work to do. Exh. A, Affidavit of T. Bergman, ¶ 5.

OPL subsequently organized into branches, and Barry Fulcher became a branch chief and Plaintiff's first-line supervisor. Mr. Fulcher reported directly to Mr. Fitzpatrick. Mr. Fulcher was both Plaintiff's office mate and supervisor who sat just a few feet away from Plaintiff. Exh. C, HT (Burns), p. 223.

In the summer of 1999, Plaintiff began complaining to her supervisor that she had no substantive or meaningful work to do. Despite these complaints, Plaintiff was given no work to do. Instead of giving Plaintiff substantive work, Ms. Sottile and Mr. Fitzpatrick began finding

fault with Plaintiff. Plaintiff primarily was given clerical or non-professional work, such as putting together briefing books for meetings and calling various scheduling secretaries of IRS officers to get them to attend meetings. Exh. A, ¶ 5.

After her complaints about having little substantive work to do, Plaintiff was subjected to close monitoring by Mr. Fulcher, who was her office mate as well as her supervisor, and by other co-workers who were instructed to monitor and report on Plaintiff's comings and goings. Exh. C, HT (Burns), pp. 223-225. A pattern began of Mr. Fitzpatrick calling Plaintiff into his office where she was orally criticized and demeaned in front of a co-worker, usually a clerical-level employee. Clerical employees began treating her as a subordinate and, generally, Plaintiff was singled out for high scrutiny and regularly criticized without just cause. Management often reprimanded Plaintiff in the presence of other employees. Exh. A, ¶ 6.

Plaintiff has had mild chronic depression all of her adult life. After months of isolation from other employees, no substantive work and accumulated criticism from management, Plaintiff began to slip into acute depression. Exh. C, HT (Nowak), pp. 32, 36-38. Finally, on October 4, 1999, Plaintiff took an extended medical leave.

Up to this point in her work experience, Plaintiff's mild, chronic depression had been easily managed with medication and did not interfere with her work. Exh. C, HT (Nowak), pp. 30-32. In October 1999, Plaintiff's therapist, Dr. Judith Nowak, who heretofore had only been monitoring Plaintiff's medication, diagnosed Plaintiff as suffering from acute depression brought about by a hostile work environment. Dr. Nowak opined that Plaintiff's request for medical leave should be granted, and that the likely cause of Plaintiff's deterioration was a lack of self-esteem resulting from having no substantive work to perform and from being assigned work that was far below her abilities. Exh. C, HT (Nowak), pp. 36-43; 46-48. On October 22, 1999,

through a letter from her attorney, Plaintiff submitted a written request for a reasonable accommodation under the Act.  Exh. A, ¶ 7.  Also in October 1999, Defendant retained Dr. Presant to evaluate Plaintiff's medical condition.  Exh. C, HT (Burns), p. 222.  After consulting with Dr. Nowak and reviewing Plaintiff's medical and psychiatric records, Dr. Presant issued his finding that Plaintiff had a disability that required a work reassignment to a job that involved substantive legal work.  Exh. C, HT (Sottile), pp. 488, 489; Exh. A, ¶ 10, Attachment 1.

Plaintiff returned to the office on a part-time basis on December 15, 1999, after more than a two-month absence, because she was unable to pay her bills.  Intense efforts to force Plaintiff to resign began immediately upon her return.  Although Plaintiff had been on approved medical leave, Mr. Fulcher, her first-line supervisor, informed her that she had been listed as "AWOL."  Exh. C, HT (Fulcher), pp. 464-468.  A copy of the office time and leave policy was placed on her chair when she returned to work that day.  *Id.*  Mr. Fulcher, who was also Plaintiff's office mate and sat just a few feet away from her, also monitored Plaintiff's internet and telephone usage.  Exh. C, HT (Burns), p. 223.  Although Defendant knew that Plaintiff was suffering from severe depression and that Plaintiff's depression improved when she had work to do (Exh. C, HT (Sottile), p. 548), when Defendant's Rule 30(b)(6) witness was asked what was done in response to Plaintiff's numerous requests to be assigned work, he candidly responded "nothing."  Exh. B (Fulcher Deposition), pp. 66-67.  Plaintiff was given no work to do but was expected to sit at her desk for eight hours and do nothing yet, at the same time, her office mate, Fulcher, had been assigned to monitor Plaintiff to ensure that she scrupulously followed time and leave policy.  Exh. C, HT (Burns), pp. 223, 226-27; Exh. A, ¶¶ 5-8.

Continuing into January 2000, Plaintiff found it impossible to continue part-time employment, and her condition further deteriorated.  Her every movement was being monitored.

These actions were designed to exacerbate Plaintiff's already fragile condition in the apparent expectation that she would resign or take some action that would permit Defendant to terminate her. Plaintiff was granted another extended paid medical leave through late January 2000. Exh. A, ¶ 8.

       2.    <u>Facts Related to Summary Judgment</u>.

Defendant Department of Treasury employed Plaintiff as a GS-14, Step 6, Management Program Analyst in the Office of Public Liaison and Small Business Affairs. Exh. A, ¶¶ 1-2. It was not disputed below that Plaintiff suffers from a disability within the meaning of the Act and that Plaintiff's disability required Defendant to provide her with a reasonable accommodation. Plaintiff suffers from clinical depression. Exh. D, HT (Nowak), pp. 35-42; Exh. D, Opinion, p. 5; Exh. A, Attachment 1. Her condition is effectively managed through medication and has no effect on her higher cognitive or intellectual functioning, and it does not impair her job performance at all. Exh. C, HT (Nowak), pp. 31-32. However, in October 1999, Plaintiff's otherwise benign depression became acute depression due, in major part, to work conditions that are explained in further detail below but which generally involved job harassment by superiors and a lack of substantive work. Exh. C, HT (Nowak), pp. 32, 36-38. Plaintiff's psychiatrist, Judith Nowak, M.D., determined that, because of Plaintiff's acute depression, Plaintiff required an extended leave. Exh. A, ¶¶ 6-7. Dr. Nowak rendered the opinion that, to a reasonable degree of medical certainty, Plaintiff was fully capable of performing her job if she received an accommodation in the form of a job reassignment to a position involving substantive legal work consistent with her experience and abilities. Exh. C, HT (Nowak), pp. 40-41. Dr. Nowak recommended an immediate job transfer, because she believed that the job circumstances in Plaintiff's office were a major contributor to Plaintiff's acute depression. *Id.*

On October 22, 1999, Plaintiff requested a job reassignment to a position involving substantive work commensurate with her abilities. Exh. A, ¶¶ 7-10. The Department of Treasury appointed an independent physician, Neil Presant, M.D., to perform a medical evaluation of Plaintiff to determine whether Plaintiff had a disability that required a reasonable accommodation. Deposition testimony of B. Fulcher, Rule 30(b)(6) designee for Defendant, Exh. B, pp. 11-12, 123, 124. Dr. Presant consulted with Dr. Nowak and was offered full access to Plaintiff's medical and psychiatric records. Exh. E, Nowak Aff., ¶¶ 4-5. Dr. Nowak and Dr. Presant had several discussions, and Dr. Presant agreed with Dr. Nowak's opinion that Plaintiff was fully capable of performing a job if her position was restructured to include substantive legal work. *Id.* On December 3, 1999, Dr. Presant issued a finding that Plaintiff had a disability that required a work reassignment to a position involving full-time legal work. Exh. C, HT (Fulcher), pp. 352-354; (Sottile), pp. 488, 489); Exh. B, pp. 11-12, 123-124; Exh. A, Attachment 1. Defendant treated Dr. Presant's decision as conclusive and final and recognized that, as issued, it imposed a formal obligation on Defendant to reassign Plaintiff to another job.[3]

David Williams, the Chief of the Office that employed Plaintiff, testified that Dr. Presant's decision was "dispositive" and that, once the decision was made, "we have to follow it, and we did." Exh. C, HT (Williams), p. 265. Mr. Williams also testified that, "When Dr. Presant, as the agency third party validator, said this is a reasonable accommodation case, that is the end of the story." Exh. C, HT (Williams), p. 266. The official appointed as Defendant's designee under Rule 30(b)(6) to testify as to whether Plaintiff was a qualified individual with a disability, Barry Fulcher, testified that Dr. Presant's December 3rd opinion was the "final say-so," Exh. C, HT (Fulcher), at 427, and that, after Dr. Presant made his determination, Defendant

---

[3] Defendant also initially determined that it would not be possible to restructure Plaintiff's job as an accommodation under the Act. Exh. C, HT (Sottile), p. 549.

was "in fact required to find a reasonable accommodation" for Plaintiff under the Act.   Exh. B, pp. 11-12; 123-124.   Fulcher himself stated no less than <u>six</u> times in his deposition that, based on Dr. Presant's determination, Defendant was obligated to find a new job involving legal work for Plaintiff in response to her request for a reasonable accommodation.  Exh. B, pp. 11-12, 56, 72, 73, 74, 75, 123-124.    Fulcher stated repeatedly that he advised IRS officials and the Associate Chief Counsel that it was a requirement to take Ms. Bergman if there was a vacancy available and that OCC "must place her in any open position they have."  Exh. B, pp. 72.   The letter advising the Associate Chief Counsel that they "must place her in any open position they have" was actually reviewed by the GLS branch of OCC before it was sent to the Associate Chief Counsel.  Exh. B, p. 75.

It is also undisputed that there were vacant, funded positions at Plaintiff's grade level in OCC at the time Plaintiff first made a request for an accommodation, and those positions were open during the entire period (December 1999 through March 2000) when Defendant was searching for a reasonable accommodation for Plaintiff.   Exh. F, Interrogatory Responses of Defendant ("Interrogatory Responses")[4], First Interrogatory Responses Nos. 2, 3; Supplemental Interrogatory Responses, No. 6; Exh. A, ¶¶ 12-13, Attachment 2.   Mr. Fulcher, the "point person" for finding a reasonable accommodation for Plaintiff, knew at all times while he was conducting his search for a reasonable accommodation that there were open positions at Plaintiff's grade level in OCC (Exh. B, pp. 38, 57) and that Plaintiff was qualified for these positions.[5]  Exh. B, p. 39.  Ms. Sottile was Mr. Fulcher's supervisor and had "veto power" over

---

[4] Exhibit F contains excerpts from Defendant's First, Supplemental and Second Interrogatory Responses.
[5] Defendant also submitted interrogatory responses stating that the "only" reason Plaintiff was not transferred to one of the open OCC positions was that IRS could not force OCC to take

his actions in finding a reasonable accommodation.  Ms. Sottile also knew that there were open attorney positions at Plaintiff's grade level in OCC while the search for a reasonable accommodation was underway and that there were no open attorney positions anywhere else in the IRS.  Exh. C, HT (Sottile), pp. 529-530.

Plaintiff notified her supervisors many times, in writing, about the vacant positions, both before and after Dr. Present's determination.  Exh. A, ¶¶ 12-13; Exh. B, p. 28.  Plaintiff repeatedly requested reassignment to one of the open OCC positions.  *Id.*  There were open positions in OCC at Plaintiff's grade level for which Plaintiff was qualified.  In its interrogatory answers, Defendant identified no less than 57 open positions in OCC at the time it was searching for a reasonable accommodation under the Act for Plaintiff.  Exh. F, First Interrogatory Responses 2-3; Supplemental Interrogatory Response No. 6.    Defendant's corporate designee testified that there was no reason to believe that Plaintiff was not qualified for one of the open positions, and lack of job qualifications was not a reason for refusing to place her in an open position at OCC.  Exh. B, p. 39; Exh. F, Supplemental Interrogatory Response No. 4.

Plaintiff is an experienced income tax attorney who met all of the qualifications for the open OCC positions.  Exh. A, ¶¶ 14-15, Attachment 2.  Plaintiff is, and at all times relevant hereto was, a member in good standing of the State Bar of California.  She is a 1978 graduate of the University of North Carolina Law School and has a Master's Degree in Taxation from Georgetown University School of Law (1982).  Plaintiff also holds a Master of Science degree in Biotechnology from Johns Hopkins University (1998).  Exh. A, ¶ 14.  Plaintiff attended the

---

Plaintiff.  Exh. F, Second Interrogatory Responses, No. 5.  Lack of qualifications was not given as a reason for not placing Plaintiff in an open position at OCC.

University of Pennsylvania for two years where she had near perfect grades before graduating Phi Beta Kappa and magna cum laude from the University of Arizona.[6]  Exh. A, ¶¶ 14-15.

Plaintiff had considerable familiarity with the vacant OCC positions, as she was formerly employed by OCC.  Exh. A, ¶ 15.  From 1984 through 1988, Plaintiff was employed as an income tax attorney by OCC, where she served with distinction. Plaintiff served in OCC's Washington, D.C., headquarters in OCC's prestigious Legislation & Regulations Division from 1984 to 1986, and in the then newly established International Division from mid-1986 through 1987, where she was assigned complex projects.    *Id*.  While at OCC, Plaintiff received a Certificate of Merit together with a cash bonus for her work in the former Division.  *Id*.  After leaving OCC, Plaintiff worked in the tax departments of two major Chicago law firms, after which she returned to Washington, D.C., where she served as tax counsel to both Rep. William Jefferson, a member of the House Ways and Means Committee, and to Senator John Breaux.  *Id*. Plaintiff advised both parties on various areas of income and international taxation.   Plaintiff is, without question, both a talented individual and a highly competent and experienced tax attorney.

Mr. Fulcher, Defendant's corporate designee, was also the person primarily responsible for finding Plaintiff a reasonable accommodation. Exh. B, pp. 11, 73.  Plaintiff repeatedly notified Mr. Fulcher that there were vacant attorney positions in OCC, and Fulcher, in turn, wrote a memo to OCC informing the Associate Chief Counsel that OCC "must accommodate this individual." Exh. B, p. 72.  Fulcher testified on behalf of Defendant that OCC was told that "there was a requirement to take [Plaintiff] if there was a vacancy available" in OCC.  Exh. B, p. 75.  Although OCC's own attorneys assisted in drafting the memo from IRS to OCC informing

---

[6] Plaintiff had to transfer for her final two years due to personal family matters.

OCC that it was obligated to place Plaintiff in a vacant position (*Id.*, Exh. C, HT (Fulcher), pp. 356-58; 448-51), OCC nevertheless, through December 1999 and January 2000, regarded its obligation to accept Plaintiff as an "open issue."[7]  Exh. B (Fulcher Depo), p. 30, Exh. C, HT (Sottile), pp. 530-32.  The IRS' Labor Relations Office advised OCC that OCC was "required to accommodate" Plaintiff under the Act by placing Plaintiff in one of the open OCC positions. Exh. C, HT (Fulcher), pp. 449-50.  Despite the opinion of IRS' Office of Labor Relations, citations provided by Plaintiff of pertinent case authorities and EEO regulations[8] that required Plaintiff's assignment to OCC, and the opinions of OCC staff lawyers, OCC nevertheless refused to take Plaintiff and refused to give any reason for not hiring her.  The IRS formally notified Plaintiff in writing on February 3, 2000, that it had no authority to place her in an open OCC position.  Exh. A, Attachment 4.    Given the overwhelming opinion that Defendant had an obligation to assign Plaintiff to OCC, Defendant's refusal to do so must be regarded as intentional.

Defendant's refusal to place Plaintiff in one of the open OCC positions had nothing to do with her qualifications as Defendant admitted that her performance appraisals had been "fully acceptable" and that she was qualified to work in OCC.  Exh. B, pp. 39, 63.  Defendant claimed no "undue hardship" in transferring Plaintiff to OCC, as they could not make any such claim given her extensive experience in tax law and a record showing that she performed with distinction in one of OCC's most elite offices.

---

[7]  General Legal Services, a branch of OCC with offices in the IRS that advised the IRS on personnel matters, apparently assisted Fulcher in drafting the memo from IRS to OCC advising OCC that it was obligated to place Plaintiff in a vacant position in OCC.  The "open issue" as to OCC's obligation was apparently the view of OCC's management.

[8]  During the search for a reasonable accommodation, Plaintiff informed Defendant that the then current EEOC Enforcement Guidance manual indicated that Plaintiff's reassignment to one of those vacancies was mandatory under the Rehabilitation Act and that the "same appointing authority" criteria had not been the law since 1992.  Exh. A, ¶ 16, Attachment 3.

Rather, Defendant candidly admits that the ***only*** reason Plaintiff was not reassigned to one of the 57 open OCC positions was that Defendant did not have to place Plaintiff, an IRS employee, in OCC, because OCC is under a "separate appointing authority" from the IRS. Thus, in response to an interrogatory asking Defendant to state "every reason why Plaintiff was not placed in an open position in OCC," Defendant stated as follows:

> The complainant was not transferred to a position in the Office of Chief Counsel because the Office of Chief Counsel made a determination that it had no legal obligation to place the complainant, an IRS employee, in a position in the Office of Chief Counsel because the Office of Chief Counsel and the Internal Revenue Service are separate organizations with separate personnel authorities. Thus, the inquiry dated January 4, 2000 by Barry Fulcher, as to whether the Office of Chief Counsel would be willing to accept the complainant for a vacancy was not acted upon by the Office of Chief Counsel.

Exh. F, Second Interrogatory Response No. 5; Supplemental Interrogatory Response No. 4. Thus, although OCC had 57 job openings and hired many attorneys during the relevant time period, including four former OCC employees, Defendant would not consider placing Plaintiff in an open position at Plaintiff's grade level as a reasonable accommodation under the Act. Defendant also appointed Susan Nizer, under Rule 30(b)(6), to testify at deposition as to all reasons why Defendant was not placed in an open position in OCC, and the ***only*** reason given by Ms. Nizer was that Defendant did not have to place Plaintiff in an open OCC position because OCC was not part of the IRS. Exh. G, Nizer Depo., pp. 16-18. Ms. Nizer offered similar testimony at the administrative hearing. Defendant notified Plaintiff in writing on February 3, 2000, that the IRS could not place Plaintiff in an OCC position because OCC was under a "separate appointing authority" and did not have to accept Plaintiff. Exh. A, Attachment 4. Defendant's Rule 30(b)(6) witness conceded that the search for a reasonable accommodation would have ended in December 1999 by transferring Plaintiff to a vacant OCC position but for the fact that Defendant's search was limited to the Internal Revenue Service, and OCC would not

14

accept Plaintiff as a reasonable accommodation under the Act job transfer ***only*** because OCC did

not have to take her.[9]  Exh. C, HT (Fulcher), pp. 458-59.

The circumstances are perhaps best explained by the hearing testimony of Ms. Sottile:

Q:      You knew there were open positions [in OCC]?
A:      Yes.
Q:      In fact, there were no other open positions anywhere in the Internal
        Revenue Service, correct?
A:      That is what we found out later.
Q:      So [OCC] is the only spot and she is not being transferred there, correct?
A:      Yes.
Q:      And the reason why she was not being transferred there in your
        understanding was what?

                                    *    *    *

A:      We could not force a transfer.

Exh. C, HT (Sottile), pp. 529-30.  Defendant also called Kathy King, the IRS reasonable

accommodation specialist assigned to Plaintiff's case as a witness at the administrative hearing.

Ms. King testified unequivocally that she understood Defendant had an "obligation under the

Rehabilitation Act to reassign [employees seeking reasonable accommodations] to open

positions within the entire Department of Treasury.  Exh. C., HT (King), p. 303.  Nevertheless,

King stated that she was limited to looking for a job reassignment to open positions in the IRS.

Exh. C., HT (King),  p. 298.  She indicated that "they were pretty limited in where they could

look because there weren't a lot of positions within the IRS for attorneys."  *Id.*

The involvement of David Williams, Chief of the IRS' Office of Communications and

Liaison, contributed to the unusual circumstances where OCC refused to even consider placing a

highly qualified tax lawyer and former distinguished employee of OCC into an open position at

OCC as an accommodation under the Act.   Williams, a close associate of a former IRS

---

[9] As discussed below, Defendant contended below that the IRS Office of Chief Counsel is part of
the Department of Treasury but is not part of the IRS.

Commissioner who is self-described as "one of the most senior executives in the IRS," managed approximately 600 employees, including Plaintiff.   Exh. C, HT (Williams), pp. 245, 272. Defendant admitted that Mr. Williams was "unhappy" that Dr. Presant had determined that Plaintiff was to be granted a reasonable accommodation.   Exh. B (Fulcher Depo), p. 109.   Mr. Williams complained to the former IRS Commissioner that he believed the reasonable accommodation process was being abused at IRS and took a personal interest in Plaintiff's request for an accommodation and the resultant job search.   Exh. C, HT (Sottile), p. 527. Through January 2000, Williams was pressuring his subordinates to reverse Dr. Presant's opinion, and he even went so far as to have a letter drafted instructing Plaintiff to submit to another medical examination.   Exh. C, HT (Williams), pp. 269-70.   Mr. Williams was particularly opposed to moving Plaintiff to OCC, because he felt it was inappropriate for Plaintiff to use the reasonable accommodation process to attain a position that she could not get through the normal application process.[10]   Exh. C, HT (Williams), pp. 274-75.

John Burns was the Department of Treasury EEO Liaison Officer assigned to Plaintiff's case from its inception.   Exh. C, HT (Burns), p. 221.   Mr. Burns (now retired) had worked for the Department of Treasury for 30 years, first as a full-time investigator for the EEO office and as an EEO Liaison for the last 17 years.   Mr. Williams informed Mr. Burns on several occasions that Defendant was required to transfer Plaintiff to an open OCC position.   Burns testified that Mr. Williams refused and stated that he did not want to find an accommodation for Plaintiff because he did not want to "move a problem."   Exh. C, HT (Burns), p. 226.   Mr. Burns has stated that, despite being counseled that he was violating the law, Mr. Williams repeatedly told Mr. Burns

---

[10]  Williams was apparently unaware that Plaintiff had submitted an application to OCC to facilitate the reasonable accommodation search, and OCC refused even to consider the application.  Exh. A, ¶ 13.

that he was not going to transfer Plaintiff anywhere.  Exh. C, HT (Burns), pp. 225-28.  Mr. Burns

heard the same thing from Barry Fulcher and from Sue Sottile.  *Id.*  He confronted Mr. Williams

several times, one on one, and repeatedly got the same answer.  Mr. Williams stated that he was

not moving "a problem" regardless of what the law said.  *Id.*

Plaintiff claimed in the administrative proceedings that Williams' actions delayed the

reasonable accommodation process and thereby effectively denied Plaintiff a reasonable

accommodation.  Williams testified at the administrative hearing that his involvement did not

delay the reasonable accommodation process.  To support his contention that his involvement did

not cause any delay, Williams testified repeatedly and consistently that Dr. Presant's decision on

December 3, 1999, was "conclusive" and "the end of the story" and that it meant that Plaintiff

was entitled to a reasonable accommodation.  He stated that the process moved inexorably

forward without any interference from his office immediately following Dr. Presant's December

3, 1999, determination, until Plaintiff was ultimately transferred on March 27, 2000.

On March 7, 2000, Plaintiff received an offer of reassignment to an attorney position in a

Virginia field office.  The offer stated that since the position was two grades lower, she was not

obligated to take it but, if she refused it, the IRS might consider its obligation to furnish her an

accommodation to be terminated.  Exh. A, Attachment 5.  The position was at a GS-12 level, two

grades below her GS-14 level, even though the GS-14 vacancies were still open in OCC.   Exh.

A, ¶¶ 18-19.  The job involved neither income tax nor international tax matters in which Plaintiff

had years of expertise, but involved estate and gift taxes, in which fields she had no practice

experience whatsoever.  Her salary was essentially frozen at a GS-14, Step 6.  She would no

longer be eligible for step increases or for full cost of living adjustments.  Plaintiff has lost

approximately $68,328 in wages so far as a result of Defendant's actions and an incongruously

17

named "pay retention" agreement. Exh. A, ¶ 19. This loss affects her retirement benefits and has precluded her from any opportunities for promotion to a GS-15 Attorney-Adviser position, since those positions are almost always available only to current OCC employees. Moreover, Plaintiff had no say in the terms of the pay agreement--it was take it or leave it. On March 16, 2000, Plaintiff accepted the reassignment under duress.

ARGUMENT

I.    DEFENDANT'S IRS OFFICE OF CHIEF COUNSEL WAS OBLIGATED TO ASSIGN PLAINTIFF TO ONE OF ITS VACANT ATTORNEY-ADVISER POSITIONS IN DECEMBER 1999.

This motion for partial summary judgment involves a single controlling question of law that was submitted to Administrative Law Judge Khare in the proceedings below on cross-motions for partial summary judgment. The ALJ never decided the cross-motions for summary judgment and instead held a full hearing and dismissed the controlling legal issue in a cryptic footnote with no substantive discussion. Exh. D, Opinion, p. 7 fn. 2. The controlling issue of law was whether 1992 amendments to the Rehabilitation Act requiring a broad agency-wide search became law in 1992 when signed by the President or whether the law did not take effect until 10 years later in 2002 when EEOC issued final regulations implementing the new law. The ALJ chose the latter interpretation advocated by Defendant and ruled that the 1992 law did not become effective until 2002. As set forth below, this was clear error of law.

1.    1992 Amendments to the Act Eliminated the Separate Appointing Authority Distinction.

Prior to 1992, the Act was the principal law governing the rights of disabled employees of Federal agencies. Under the pre-1992 Act, a Federal agency was only required to appoint an employee to a position in the "same appointing authority" when searching for a reasonable accommodation under the Act. Defendant argued that, because OCC was a "separate appointing

18

authority" from IRS, IRS could not transfer one of its employees to OCC to satisfy its obligation to find a reasonable accommodation under the Act. In 1992, however, Congress amended the Act to extend the broader protections of the Americans with Disabilities Act of 1990 (hereinafter "ADA") (Pub. L. 101-136) to employees of Federal agencies, as well as to employees of the private sector through enactment of the 1992 Amendments. See 29 U.S.C. 791(g), "The standards used to determine whether this section has been violated . . . shall be the standards applied under title I of the Americans with Disabilities Act of 1990." The ADA standard, applicable after 1992, does not limit the scope of a reasonable accommodation search to the "same appointing authority." See *Flowers v. Henderson,* 1999 WL 767730 (EEOC), fn. 5, "[t]he ADA contains no language limiting the obligation to reassign only to positions within a particular office, branch, etc.," but advises that "rather, the extent to which an employer must search for a vacant position will be an issue of undue hardship."

Stated otherwise, the 1992 amendments to the Act required an agency-wide search; *i.e.,* the Department of Treasury, and was limited only where a defendant agency can show that a job transfer would cause an undue hardship. In this case, Defendant asserted that the **only** reason it did not assign Plaintiff to an open position in OCC was that Defendant was not required to transfer Plaintiff, an IRS employee, to OCC because IRS and OCC were separate appointing authorities. Defendant thereby conceded that "undue hardship" was not a reason for not transferring Plaintiff to OCC. Exh. F, Supplemental Interrogatory Response No. 4. Indeed, the **only** reason given by Defendant for not placing Plaintiff in an open OCC position was that IRS could not force a transfer of Plaintiff to OCC because IRS and OCC were "separate appointing authorities." *Id.*

19

2.  <u>The Effective Date of the 1992 Amendments Was October 29, 1992</u>.

The ALJ and Defendant recognized below that the 1992 amendments to the Act eliminate the "separate appointing authority" distinction and require a broad agency-wide (*i.e.*, the Treasury Department) search, but then held that the 1992 amendments to the Act did not become effective until June 2002 when EEOC actually published regulations implementing the 1992 Act. Ex. D, p. 7, fn. 2.  Because it is clear that the broader ADA standards for finding a reasonable accommodation require a broader, department-wide search and are not limited by the "same appointing authority" that was applicable under the Act before it was amended, the effective date of the 1992 amendments was the ultimate legal issue in this case.  The ALJ determined that the 1992 amendments to the Act did not become effective until 2002 when the EEOC actually published regulations implementing them.  This ruling was clear error.  The 1992 amendment to Section 20 U.S.C. 791(g) is "effective on enactment" (*i.e.*, on October 29, 1992).  See, 29 U.S.C. 791 History and Notes; 29 U.S.C. 701 History and Notes setting forth the effective date of 1992 amendments.  See *Kemer v. Johnson,* 900 F. Supp. 677, 681, n. 6, stating that the effective date of the 1992 amendments to the Rehabilitation Act was October 29, 1992, and that all actions arising after that date are subject to the 1992 amendments.

At least two other U.S. District Courts have recognized that the 1992 amendments to the Rehabilitation Act became law in 1992 when the President signed the new law.  In *Robinson v. Runyon*, 987 F. Supp. 620, 622 (N.D. Ohio 1997) (citing 29 U.S.C. 794(d)), this court stated, "Before 1992, employers were not required to reassign employees to suitable positions under the Rehabilitation Act. However, Congress amended the Act to provide that the standards of the ADA, under which reassignment was an option, applied in the Rehabilitation Act context." The

same conclusion is reached in *Nightwander v. Henderson,* 172 F. Supp.2d. 951, 963 n.10 (W.D. Ohio 2001).

EEOC cases also hold that the 1992 regulations became law in 1992, not in 2002 when EEOC issued regulations implementing the law. *Flowers v. Henderson,* 1999 WL 767730 (EEOC), n.5, squarely rejected respondent's argument that the pre-1992 "same appointing authority" language applied after the law was signed in 1992, as follows:

> Pursuant to 29 C.F.R. 1614.203(g), the agency's reassignment obligation is limited to any "funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level." In this regard, the agency is advised, however, that under the Americans with Disabilities Act (ADA), and in accordance with the Commission's March 1, 1999, policy guidance on reasonable accommodation, the employer's obligation to offer reassignment to a vacant position **is not so limited** [emphasis added]. The Commission's guidance on reasonable accommodation, which clearly sets forth the ADA requirements made applicable to Rehabilitation Act cases pursuant to the October 29, 1992 amendments to the Rehabilitation Act, observes that the ADA contains no language limiting the obligation to reassign only to positions within a particular office, branch, etc., but advises that "rather, the extent to which an employer must search for a vacant position will be an issue of undue hardship….

While formal regulations were not issued until 2002, the EEOC issued guidelines long before June 2002 stating that the Rehabilitation Act regulation that Defendant argues is applicable is actually not applicable:

> … The Rehabilitation Act regulations governing reassignment of federal employees with disabilities, which were promulgated several months prior to the enactment of the Rehabilitation Act Amendment, differ in several respects from the ADA's requirements. <u>See</u>, 29 C.F.R. 1614.203(g) (1997). **For non-discrimination purposes, federal agencies must follow the ADA standards.** [emphasis added]
> *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* Number 915.001, March 1, 1999 *(Enforcement Guidelines)* footnote 71.

The 1999 *Enforcement Guidance,* at Question 27, further states:

> Is an employer's obligation to offer reassignment to a vacant position **limited to those vacancies within an employee's office, branch, agency, department,**

> **facility, personnel system** (if the employer has more than a single personnel system) **or geographical area?** (emphasis added)
>
> No. This is true even if the employer has a policy prohibiting transfers from one office, branch, agency, department, facility, personnel system, or geographical area to another. The ADA contains no language limiting the obligation to reassign only to positions within an office, branch, agency, etc. Rather the extent to which an employer must search for a vacant position will be an issue of undue hardship….

Thus, from October 29, 1992, forward, the broader ADA standard governs the scope of the search for a reasonable accommodation. After that date, the "separate appointing authority" or "separate commuting area" limitations in an agency's obligation to find a reasonable accommodation have been replaced, and "undue hardship" is the sole limiting condition.

3.  <u>Defendant Violated the Act By Refusing To Assign Plaintiff To OCC</u>.

The ADA and the Rehabilitation Act of 1973, as amended by the Rehabilitation Act Amendments of 1992 (the "Act"), define discrimination as follows:

> …not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an **undue hardship** on the operations of the business of such covered entity; … (emphasis added)
> 42 U.S.C. 12112(b)(5)(A)(B).

The law is clear that where, as here, an employee shows that a reasonable accommodation is possible and that she is qualified, the employer bears the burden of proving that providing that accommodation would impose an undue hardship on Defendant. *Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 728 (6th Cir. 2000). An employer *must* reassign the employee to a vacant position. *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1165 (10th Cir. 1999). While an employee cannot force an employer to provide a specific accommodation if another reasonable accommodation is available, an employer fails to provide a reasonable accommodation if he appoints an employee to a lower graded position when an accommodation

is available at the employee's current pay level.  *Id.  Citing, Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir. 1996).  Specifically, a job reassignment does not constitute a reasonable accommodation under the Act where an employer appoints an employee to a position with lower pay and benefits and less advantages of a former position when other positions are available that do not involve lower pay and benefits.  *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 99 (2nd Cir. 1999).

Defendant did not claim that transferring Plaintiff to OCC would cause any undue hardship.  Rather, in response to interrogatories requesting every reason why Plaintiff was not reassigned to OCC, Defendant stated that the "only" reason it did not transfer Plaintiff to OCC was that Defendant did not have to transfer an IRS employee to OCC  because OCC and IRS were "different appointing authorities."  Defendant's Rule 30(b)(6) designees repeatedly stated the same exclusive reason for not transferring Plaintiff to OCC.  Defendant thus violated the Act by not assigning Plaintiff to a vacant, funded position in OCC but by instead assigning her after months of delay to a lower graded position in an IRS field office.

4.  Defendant Admitted That Plaintiff Is A Qualified Individual With a Disability.

In proceedings below, Defendant conceded that Plaintiff was a qualified individual with a disability and defended the case on the basis that the accommodation it provided for Plaintiff was a reasonable accommodation under the Act.  This in turn was supported by Defendant's argument that it was not required to assign Plaintiff to an open OCC position because OCC was a separate appointing authority from IRS.  Apparently recognizing that there is no legal basis for the "same appointing authority" defense, Defendant has indicated that it now intends to argue that Plaintiff is not a qualified individual with a disability entitled to a reasonable accommodation under the Act.  Thus, after insisting through seven years of litigation that it complied with the Act and

23

provided a reasonable accommodation under the Act for Plaintiff's disability, Defendant now intends to argue that Plaintiff was not disabled at all and, therefore, not entitled to a reasonable accommodation under the Act.

The Supreme Court recently affirmed the applicability of judicial estoppel in Federal court. *New Hampshire v. Maine,* 52 U.S. 742, 750, 121 S.Ct. 1808 (2001). In order for judicial estoppel to apply, "a party's later position must be clearly inconsistent with its earlier position." *Id.* Following *New Hampshire,* this Court recently endorsed judicial estoppel, holding that it generally prevents a party who prevails in the administrative level of a case based on one contention or argument from relying on a contradictory position or argument in a subsequent Court proceeding. *Howard v. Gutierrez,* 2007 U.S. Dist. LEXIS 8249, No. 05-1968 (JDB). Other courts have uniformly recognized that the purpose of the doctrine is "to protect the integrity of the judicial process," *Edwards v. Aetna Life Ins. Co.,* 690 F. 2d 595, 598 (6th Cir. 1982), "by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir. 1993). See *In re Cassidy,* 892 F.2d 637, 641 (7th Cir. 1990) ("Judicial estoppel is a doctrine intended to prevent the perversion of the judicial process"); *Allen v. Zurich Ins. Co.,* 667 F. 2d 1162, 1166 (4th Cir. 1982) (judicial estoppel "protects the essential integrity of the judicial process").

There could be no clearer case of judicial estoppel than this one. Administrative Law Judge Khare found that "[t]here is no dispute that Complainant [Bergman] is a qualified individual with a disability entitled to an accommodation." Exh. D, p. 5. Plaintiff's expert, Judith Nowak, M.D., testified in detail that Plaintiff was a qualified individual with a disability who required reassignment to a position involving substantive work as a reasonable accommodation under the Act. Defendant did not dispute Dr. Nowak's opinion that Plaintiff was

a qualified individual with a disability.  Instead, Defendant repeatedly submitted testimony on the administrative record below that Defendant made the determination that Plaintiff was a qualified individual with a disability, including the following:

1.  Defendant retained Neal L. Presant for an independent medical opinion on whether Plaintiff was entitled to a reasonable accommodation.  Dr. Presant gave the opinion that "a major contributor to [Plaintiff's] depression is low self-esteem resulting from being in a position in which the required work product is not commensurate with her training and capabilities."  Dr. Presant recommended that Plaintiff "be accommodated with a position appropriate to her legal and educational background."  Exh. A, Attachment 1.

2.  The witness designated by defendant to testify pursuant to Rule 30(b)(6) as to whether Plaintiff was a qualified individual with a disability, Barry Fulcher, testified that, upon receipt of Dr. Presant's report, the IRS "made a determination that [Defendant was], in fact, required to find a reasonable accommodation" for Plaintiff under the Act.  Exh. B, pp. 11-12, 123-24.

3.  David Williams is the Director of Communications and Liaison, the bureau of the IRS that employed Plaintiff.  Mr. Williams supervises 600 employees and described himself as "one of the most senior executives" employed by the IRS.  Mr. Williams had a supervisory role in Ms. Bergman's request for an accommodation.  Mr. Williams testified that Dr. Presant's determination was "dispositive."  Exh. C, HT (Williams), p. 264.  He stated that after a physician hired by Defendant to evaluate a request for a reasonable accommodation made such a determination "we have to follow it, and we did."  Exh. C, HT (Williams), p. 265.  Mr. Williams further testified that "[w]hen Dr. Presant, as the agency third party validator, said this is a reasonable accommodation case, that is the end of the story."  *Id.*

Summary judgment is supported by the unequivocal sworn deposition testimony of Defendant's Rule 30(b)(6) designee who repeatedly testified that upon receipt of Dr. Presant's report, the IRS "made a determination that [Defendant was], in fact, required to find a reasonable accommodation" for Plaintiff under the Act.  Exh. B, pp. 11-12, 123-24.  Numerous other employees of Defendant testified similarly.  A party cannot dispute his or her own sworn deposition testimony on summary judgment.  *Perma Research & Dev. Co., v. Singer Co.,* 410 F.2d 572, 577-78 (2nd Cir. 1969); *Baer v. Chase*, 392 F.3d 609, 624 (3rd Cir. 2004).

5.      <u>Plaintiff Is Entitled to Summary Judgment.</u>

The unrebutted facts are that Plaintiff is a highly experienced tax attorney who possesses an L.L.M. in taxation who has practiced in the fields of income and international taxation for more than 20 years and who worked previously in OCC and acquitted herself with distinction while there.  There is no dispute that there were several open attorney-advisor positions in the OCC at Plaintiff's grade level between December 1999 and March 2000 or that Plaintiff was eminently qualified for those positions.  There is also no dispute that Defendant chose to wait several months and instead assign Plaintiff to a lower graded position in an IRS field office. Defendant has alleged no undue hardship for refusing to appoint Plaintiff to an open OCC position and instead has asserted candidly that the sole reason for not transferring Plaintiff to such a position was that it did not have to do so.  Defendant is clearly wrong on this issue of law, because the "same appointing authority" distinction relied on by Defendant was abandoned in 1992.

Plaintiff was a qualified individual with a disability who was denied a reasonable accommodation under the Act when Defendant refused to transfer her to a vacant, funded position in OCC at her current grade level.  Summary judgment is, therefore, appropriate.

6.      <u>Plaintiff Has Been Damaged.</u>

Plaintiff has presented persuasive evidence that Defendant discriminated against her and denied her a reasonable accommodation under the Act when it refused to place Plaintiff in an open OCC position at her grade level in Washington, D.C., and instead transferred her several months later to a position two grades below her grade of GS 14, Step 6.  Plaintiff is entitled to be made whole for any loss of earnings she experienced as a result of the unlawful discrimination, plus attorney's fees and costs.  29 C.F.R. 1614.501(a)(4).  Plaintiff submits her affidavit showing

that, as of the date of this motion, she has suffered damages of $68,328 as a result of Defendant's actions and the terms of the so-called pay retention agreement.  Plaintiff seeks an award of $68,328, plus attorney's fees.  In addition, Plaintiff is entitled to be placed in the position that she would have occupied but for the discrimination.  29 C.F.R. 1614.501(a)(3); 29 C.F.R. 1614.501(b and (b)(ii).  Plaintiff states in her affidavit that her current grade level would be GS 14, Step 8. Exh. A,  Attachment 6.  Plaintiff respectfully requests that the Court order Defendant to place Plaintiff in an open income tax attorney position in OCC at the grade GS 14, Step 8, at IRS headquarters in Washington, D.C., and order the elimination from her employment files of all negative references related to the events alleged herein.

Conclusion.

Plaintiff respectfully requests that the Court enter partial summary judgment in favor of Plaintiff and against Defendant and that the Court order Defendant to pay Plaintiff damages of $68,328, plus reasonable attorney's fees and costs, and further order that Defendant be required to reassign Plaintiff to an open income tax attorney position in the IRS Office of Chief Counsel, at the grade GS 14, Step 8, at its national headquarters in Washington, D.C.

Respectfully submitted,


_____
John D. Quinn, Esq,
Stephen Sale, Esq.
Sale & Quinn, P.C.
910 16th Street, N.W.,  Suite 500
Washington, DC  20006
Tel:  (202) 833-4170
Fax: (202) 887-5137

Counsel for Plaintiff

April 26, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| TESSA E. BERGMAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. <u>06-0303 (GK)</u> |
| v. | : | |
| | : | |
| HENRY M. PAULSON, JR. | : | |
| SECRETARY OF THE TREASURY | : | |
| | : | |
| Defendant. | : | |
| | : | |

**STATEMENT OF MATERIAL FACTS AS TO WHICH**
**THERE IS NO GENUINE ISSUE**

Plaintiff Tessa E. Bergman, by the undersigned counsel, submits her Statement of Material Facts as to Which There is No Genuine Issue in support of her Motion for Summary Judgment, as follows:

1.        From September 1998 through March 27, 2000, Plaintiff was an employee of Defendant Department of Treasury, working as a Management Program Analyst in the Office of Public Liaison and Small Business Affairs of the Internal Revenue Service. <u>Source</u>:  Affidavit of T. Bergman, Exhibit ("Exh.") A, ¶ 1.

2.        Through March 27, 2000, Plaintiff was employed at GS 14, Step 6, on the government pay scale. <u>Source</u>:  Exh. A, ¶ 2.

3.        On or about October 22, 1999, Plaintiff, through her attorney, submitted a written request for a reasonable accommodation under the Rehabilitation Act of 1973, as amended (the "Act"). <u>Source</u>:  Exh. A, ¶ 7.

4.          Defendant retained Neil Presant, M.D., to advise Defendant whether Plaintiff had a disability that required a reasonable accommodation under the Act.  Source:  Deposition of Barry Fulcher, Exh. B, pp. 11-12, 123-24; Exh. C, Hearing Transcript ("HT") (Burns), p. 222.

5.          Dr. Presant had access to all of Plaintiff's medical records in the possession, custody and control of Plaintiff's Psychiatrist, Judith Nowak, M.D.  Source:  Affidavit of Judith Nowak, M.D., Exh. E, ¶ 5.

6.          In performing his functions as consultant to the Defendant in this matter, Dr. Presant consulted with Plaintiff's Psychiatrist, Judith Nowak, M.D.  Source:  Exh. E, ¶ 4.

7.          On or about December 3, 1999, Dr. Presant issued a written determination that Plaintiff had a disability, acute depression, that required a reasonable accommodation under the Act.  Source:  Exh. A, ¶ 10, Attachment 1; Exh. C, HT (Sottile), pp. 488-89.

8.          As a reasonable accommodation under the Act, Dr. Presant recommended that Plaintiff's job be restructured to include substantive legal work or that Plaintiff be reassigned to an employment position that involved substantive legal work.  Source:  Exh. A, ¶ 10, Attachment 1.

9.          It was not feasible to restructure Plaintiff's current position to include substantive legal work.  Source:  Exh. A, Attachment 5; Exh. C, HT (Sottile), p. 549.

10.         On or about December 3, 1999, Defendant, through employees of the Internal Revenue Service, made a determination that the reasonable accommodation it was required to find for Plaintiff under the Act was reassignment to an employment position involving substantive legal work.  Source:  Exh. A, ¶ 10, Attachment 1; Exh. B, pp. 11-12, 72-75, 123-24; Exh. C, HT (Williams), p. 253; (Fulcher), pp. 352-54, 435-36, 449-50; (Sottile), pp. 488-89.

11.         At all times between October 22, 1999, and March 27, 2000, Plaintiff was a qualified individual with a disability within the meaning of the Act.  Source:  Exh. A,  ¶¶ 9-10,

Attachment 1; Exh. B, pp. 11-12, 72-75, 123-24; Exh. C, HT (Williams), pp. 245, 265-66, 269-70; (Fulcher), pp. 352-54, 427-28, 449-50; (Sottile), pp. 488-89; (Nowak), pp. 30-32, 36-43, 46-48; Exh. D, p. 5.

12.     Based on Dr. Presant's opinion, on or about December 3, 1999, Defendant, through employees of the Internal Revenue Service, made a determination that Plaintiff had a disability that required Defendant to find a reasonable accommodation for Plaintiff under the Act.  Source:  Exh. A, ¶ 11, Attachment 1; Exh. B, pp. 11-12, 72-75, 123-24; Exh. C, HT (Burns), pp. 221, 226; (Williams), p. 245; (Fulcher), pp. 352-54, 435-36, 449-50.

13.     Defendant's determination, based on the opinion of Dr. Presant, was a conclusive and final determination by Defendant that Plaintiff was a qualified individual with a disability who required a reasonable accommodation under the Act.  Source:  Exh. B, pp. 11-12, 56, 72-75, 109, 123-24; Exh. C, HT (Burns), pp. 225-28; (Williams), pp. 245, 265-66, 269-70, 272, 274-75; (Fulcher), pp. 427, 428; (Sottile), p. 527.

14.     Defendant offered repeated testimony in the administrative proceedings that the determination based on the opinion of Dr. Presant was a conclusive and final determination by Defendant that Plaintiff was a qualified individual with a disability who required a reasonable accommodation under the Act.  Source:  Exh. B, pp. 11-12, 56, 72-75, 109, 123-24; Exh. C, HT (Burns), pp. 225-28; (Williams), pp. 245, 265-66, 269-70, 272, 274-75; (Fulcher), pp. 427, 428; (Sottile), p. 527.

15.     On or about December 3, 1999, Barry Fulcher, an employee of Defendant, was assigned the lead responsibility to search for a reasonable accommodation under the Act for Plaintiff.  Source:  Exh. B, pp. 11, 38, 57, 73; Exh. C, HT (Sottile), pp. 529-30.

16.     Beginning in early December 1999 and continuing until March 27, 2000, Defendant was aware that there were open attorney positions in the IRS Office of Chief Counsel

in Washington, D.C., at Plaintiff's grade level.  <u>Source</u>:  Exh. A, ¶ 12, Attachment 2; Exh. B, pp. 28, 38, 57; Exh. F, Supplemental Responses, No. 6.

17.    On several occasions between December 3, 1999, and March 27, 2000, Plaintiff requested reassignment to an open attorney position in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level.  <u>Source</u>: Exh. A, ¶¶ 12, 13, Attachment 3; Exh. B, pp. 28, 38, 57.

18.    At all times between December 3, 1999, and March 27, 2000, there were open attorney positions in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level. <u>Source</u>:  Exh. A, ¶¶ 12, 13, Attachment 2; Exh. D, Deposition of Susan Nizer, pp. 13-15; Exh. F, Supplemental Interrogatory Responses of Defendant, No. 6.

19.    At all times between December 3, 1999, and March 27, 2000, there were no attorney positions open in the Internal Revenue Service at Plaintiff's grade level in the Washington, D.C., metropolitan area.  <u>Source</u>: Exh. C, HT (Sottile), pp. 529-30; (King), p. 298.

20.    At all times between December 3, 1999, and early February 2000, there were no attorney positions open in the Internal Revenue Service in the Washington, D.C., metropolitan area. <u>Source</u>: Exh. C, HT (Sottile), pp. 529-30.

21.    At all times between December 3, 1999, and March 27, 2000, the open attorney positions in OCC were the only attorney positions at Plaintiff's grade level open in the Department of Treasury in the Washington, D.C., metropolitan area that Defendant identified in its search to find a reasonable accommodation for Plaintiff.  <u>Source</u>:  Exh. C, HT (Sottile), pp. 529-30.

22.    Plaintiff was at all times fully qualified for an open attorney position in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level.  <u>Source</u>:  Exh. A, ¶ 14; Exh. B, pp. 39, 63; Exh. F, Response to Second Interrogatories, No. 5.

23.        At all relevant times in 1999 and 2000, Plaintiff was a highly experienced income tax attorney.  <u>Source</u>: Exh. A, ¶ 14.

24.        Plaintiff was awarded a J.D. degree from the University of North Carolina School of Law in 1978.  <u>Source</u>:  Exh. A, ¶ 14.

25.        Plaintiff was awarded an LLM degree in taxation from Georgetown University School of Law in 1982.  <u>Source</u>:  Exh. A, ¶ 14.

26.        In 1999 and 2000, Plaintiff was a member in good standing of the State Bar of California. <u>Source</u>:  Exh. A, ¶ 14.

27.        Plaintiff was employed by the IRS Office of Chief Counsel as an attorney from 1984 through 1988.  <u>Source</u>:  Exh. A, ¶ 15.

28.        Plaintiff was awarded a Certificate of Merit and received a cash bonus for her work in the IRS Office of Chief Counsel.  <u>Source</u>: Exh. A, ¶ 15.

29.        After she left the IRS Office of Chief Counsel in 1988, Plaintiff was employed as a tax attorney with Mayer, Brown & Platt and Sonnenschein, Nath & Rosenthal in Chicago, Illinois. <u>Source</u>:  Exh. A, ¶ 15.

30.        From 1993 to 1995, Plaintiff was employed as tax counsel to Rep. William Jefferson, a member of the House Ways and Means Committee.  <u>Source</u>:  Exh. A, ¶ 15.

31.        From September 1995 to February 1996, Plaintiff was employed as tax counsel to Senator John Breaux, a member of the Senate Finance Committee.  <u>Source</u>:  Exh. A, ¶ 15.

32.        Beginning December 3, 1999, and continuing through March 27, 2000, Defendant did not reassign Plaintiff to one of the open attorney positions in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level.  <u>Source</u>: Exh. A, ¶ 16, Attachment 3; Exh. B, p. 30; Exh. F, Second Interrogatory Responses, No. 5.

33.         Reassignment of Plaintiff between December 3, 1999, and March 27, 2000, to one of the open attorney positions in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level would not have imposed an undue burden on Defendant.  Source:  Exh. B, pp. 39, 63; Exh. F, Second Interrogatory Responses, No. 5; Exh. G, pp. 16-18.

34.         The only reason Defendant did not reassign Plaintiff to an open attorney position in the IRS Office of Chief Counsel in Washington, D.C., at Plaintiff's grade level was because Defendant determined that the IRS Office of Chief Counsel was not obligated to accept Plaintiff, because the IRS Office of Chief Counsel was a separate appointing authority from the Internal Revenue Service which employed Plaintiff.  Source:  Exh. A, ¶ 17, Attachment 3; Exh. B, pp. 56, 113-14; Exh. C, HT (Fulcher), pp. 356-58, 448-51, 458-59; (Sottile), pp. 530-32; Exh. F, Second Interrogatory Responses, No. 5; Supplemental Interrogatory Responses, No. 6.

35.         Defendant had been advised by Plaintiff and by its own staff that Defendant was obligated to reassign Plaintiff to an open position in OCC as a reasonable accommodation under the Act.  Exh. A, Attachment 3; Exh. B, pp. 72-75; Exh. C, HT (Fulcher), pp. 356-58, 448-51; (King), p. 303.

36.         But for Defendant's determination that it was not obligated to place Plaintiff in one of the open OCC positions, Plaintiff would have been reassigned to an attorney position at her grade level in OCC in December 1999.  Source:  Exh. C, HT (Fulcher), pp. 458-59.

37.         On or about March 7, 2000, Plaintiff was offered a position as an estate tax attorney in the Virginia field office of the IRS as a reasonable accommodation under the Act. Source:  Exh. A, ¶ 18, Attachment 4.

38.         The position was a GS 12, Step 00, position on the government pay schedule. Source:  Exh. A, ¶ 18, Attachment 4.

39.	Plaintiff was informed at that time that if she did not accept the estate tax attorney position Defendant would make no further effort to reassign her to another job.  <u>Source</u>:  Exh. A, ¶ 19, Attachment 4.

40.	Plaintiff accepted the transfer to the Virginia field office as an estate tax attorney, GS 12, Step 00, in early March 2000.  <u>Source</u>:  Exh. A, ¶ 19.

41.	While Plaintiff was offered a pay retention agreement, her pay was thereafter frozen at her current pay level of GS 14, Step 6.  <u>Source</u>:  Exh. A, ¶ 19.

42.	Between March 2000 and March 15, 2007, Plaintiff has lost wages of $68,328 as a result of the lower wages paid to her due to Defendant's actions and due to the terms of the pay retention agreement.  <u>Source</u>:  Exh. A, ¶ 8, Attachment 6.

Respectfully submitted,


_____
John D. Quinn, Esq,
Stephen Sale, Esq.
Sale & Quinn, P.C.
910 16th Street, N.W.,  Suite 500
Washington, DC  20006
Tel:  (202) 833-4170
Fax: (202) 887-5137

Counsel for Plaintiff

April 26, 2007

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| TESSA E. BERGMAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. <u>06-0303 (GK)</u> |
| v. | : | |
| | : | |
| HENRY M. PAULSON, JR. | : | |
| SECRETARY OF THE TREASURY | : | |
| | : | |
| Defendant. | : | |
| | : | |

ORDER

In consideration of the motion for partial summary judgment of Plaintiff Tessa Bergman, and the response thereto of Defendant, it is this ____ day of _____, 2007:

ORDERED, that the motion for partial summary judgment is granted.

Judgment shall be entered in favor of Plaintiff Tessa Bergman and against Defendant, Henry M. Paulson, Jr., Secretary of the Treasury as follows:

1. For compensatory damages in the amount of $68,328;

2. For reasonable attorney's fees and costs of Plaintiff in this case and in the administrative proceedings below, in an amount to be determined based a submission by Plaintiff under Rule 54;

3. That Defendant shall, within fifteen days hereof place Plaintiff in a position in the Office of Chief Counsel, in Washington, D.C. as an income tax attorney and that Plaintiff's initial grade and salary be established at GS 14, Step 8; and

4. That all negative references be removed from Plaintiff's personnel files for incidents occurring on or after December 3, 1999.

_____
Gladys Kessler
United States District Judge