# EXHIBIT C

# EXCERPTS FROM THE HEARING TRANSCRIPT

# EXHIBIT C

# EXCERPTS FROM THE HEARING TRANSCRIPT

# JUDITH NOWAK, M.D.

don't discuss your testimony with anyone outside of this room.

THE WITNESS: That is fine.

DIRECT EXAMINATION

BY MR. QUINN:

Q. Good morning, Dr. Nowak.

A. Good morning.

Q. Could you state your full name for the record?

A. Judith Ann Nowak.

Q. Give us a summary of your education, please.

A. Undergraduate Biochemistry Degree, Cornell University Medical School. School of Medicine, Cornell University. Residency, University of Virginia. Fellowship back at Cornell at the Westchester Division, New York Hospital, Cornell Medical.

I also did psycho-analytic training at the Washington Psycho-Analytic Institute. So, I have a degree from there as well.

Q. Do you have any medical licenses?

A. Yes. I am licensed to practice medicine in the District of Columbia, Virginia and Maryland.

Q. Do you have any board certifications?

A. I am Board Certified in Psychiatry.

Q. And is that your practice?

A. Yes. I am an adult and adolescent psychiatrist.

Q. Is that here in the District?

A. Here in the District. That is my only office.

Q. Do you have any medical school faculty appointments?

A. Yes. I am a Clinical Professor of Psychiatry at George Washington University Medical Center.

Q. How long have you been practicing psychiatry?

A. I finished my residency in 1977. So, what is that? 25 years.

Q. Okay.

A. Or thereabouts.

Q. I don't want to ask you a lot of

questions about what happened before October 1999, but if could you just give a summary, a brief summary, of your treatment of Ms. Bearman and what her medical condition was up to that point in time?

A. Up to that point. Yes.

In fact, up to that point in time, all I did was medication management of what was through that period really largely a low grade chronic depression, which is technically called dysthymia, D-Y-S-T-H-Y-M-I-A. I did not see her for psychotherapy. I managed the medication.

There were certainly periods in which there were bumps, ups and downs, but the medication management treatment was pretty much uncomplicated.

Q. During this time period was Ms. Bearman able to function in a job?

A. Yes. Absolutely, as far as I knew, and I think I knew a lot.

There was a period of time in which she was in therapy and it was her original therapist who had referred her to me for medication management. So, we certainly spoke and I knew more

than what I knew in a brief medication visit and there were no problems or concerns regarding her ability to work.

Q. Other than the bumps, was she, I guess if there is such a thing as a normal person? Did she live a normal life like everybody else?

A. Yes.

Q. This was the case up until I guess late summer of 1999. What happened after that if you can tell me?

A. She developed a major depressive disorder and it was obvious to me it was dramatic. I mean, she was in crisis.

If you want, I can talk a bit about the symptoms of that.

Q. What is depression, first of all?

A. It is a biological illness. I want to explain a few things about it because I think it will help me later to explain how stress affects it.

We know it is a biological illness. You can actually demonstrate that there are parts of

person virtually sleeps 12, 14, 16 hours a day and feels as if they can't ever really quite wake up.

It may be associated infrequently with an appetite disturbance. Again, it can either take the form of anorexia with loss of appetite and weight loss or be the opposite. It is often associated very specifically with sweet and carbohydrate craving.

An additional component of this is that people who have a depressive syndrome may know that there are times when they are not depressed that they are capable of taking pleasure in certain activities. There is a sense of, and it is related to the depressed mood, kind of a pleasure being drained out of one's activities. And also a tendency sometimes to irritability.

That is the basic kind of symptom complex that is a projection of the depressive illness.

Q. I think your testimony was that at some point in time in the fall of 1999 Ms. Bearman's condition deteriorated?

A. Yes. Dramatically.

Q. From a low grade chronic depression to an acute?

A. Major depressive disorder.

I left out one thing. Just to add it to the list of symptoms often associated, and this isn't necessarily true of Terri, but often depression is associated with hopelessness, despair, great negativity and sometimes with suicidal ideas and even suicidal plans and attempts.

I just wanted to make sure I added that because I didn't say that.

Q. I am going to ask you for just a few opinions based on your treatment of Ms. Bearman. When I ask for opinions, if you could please express them in terms of a reasonable degree of medical certainty, I would appreciate it.

A. Okay.

Q. Do we have that understanding, when we are talking about opinions we are talking about a reasonable degree of medical certainty?

A. Yes.

Q. Do you have any opinion as to what the cause of Ms. Bearman's depressive condition was in the fall of 1999?

A. Yes.

It seemed to me that once I started seeing her much more frequently and also for much longer sessions, not just 20 or 30 minute medication visits, but the typical 50 minute or longer sessions, in which to really try to get at the root of what was going on in addition to trying to medicate what was happening, I became convinced that this was work-related and that it was connected to the fact that she is a quite intelligent, intellectually proud and intellectually smart person who found herself in a position in which a main project she had had been taken away from her and that she was doing incredibly boring and dull work.

Also it became clear from what she was describing that there seemed to be an atmosphere of, I don't know what else to call it other than harassment. Her boss, I gather, was a person who

was seated near her in the office. They began checking on her computer to see whether she was doing her work or doing outside activities, checking her in and out time.

My understanding is this was not done for anyone at her level, it wasn't a routine part of the office practice. So, there was this sense of people looking to find complaint and criticism.

She felt tremendously isolated too, came to feel tremendously isolated within the office environment.

Q. Now, you are relying, to a certain degree, on what you are told by Ms. Bearman, right?

A. Yes.

Q. How do you know it is true?

A. I don't absolutely know it is true and I assume some of this you are going to have to establish in other ways, but what one does as a psychiatrist is let people tell a story. They tell their personal story and they give you details about that personal story. They present it in a particular context and one has a sense that this

story holds true, that the details fit together, that there are not major inconsistencies.

One thing that is important to me is that the person who tells me this story isn't expecting me to believe it just because they say so. You know, there is the presenting of data. I have looked at it every way. There is a sense that the person is self-critical in an intellectual way. That also gives me a sense.

I mean, I will never forgot one of my former teachers was Otto Kernberg. I don't mean this to be an analogy at all. He worked in Chile at the time of the dictatorship and someone came to his office and claimed that the secret police were out to get him. What Otto Kernberg said is that one way in which he became convinced that this guy was not paranoid was that he was capable of empathically taking the psychiatrist position of not expecting him to believe it and saying I know this could sound crazy, blah, blah, blah, but presenting facts. And actually when Kernberg used this example he was teaching us, because he is one

of my former teachers, he was teaching us something about the way in which you can form a judgment regarding whether what somebody is presenting is plausible or not.

All I can say is that Terri met all the tests and the stories that she told consistently held together. She continued to be self-reflecting and self-critical in an intellectual sense. She didn't expect me to believe it just because she said so.

Q. Did you form any opinions, at least in October of 1999, whether Terri's disability required a reasonable accommodation in her job and, if so, what would those accommodations be?

A. Yes.

I was trying, and I think it is obvious in my medical records, I was trying to medicate her out of it and there is no question that the efforts that I made were of some help, but the problem is that if you have a person with a depression in a major stressed environment, you could just pour pills at it ad infinitum and it is not going to

lead to necessarily a remission. So, I just didn't.

I can't tell you whether it was October 5th or the 20th or even November 1st. I reviewed my records, but I don't have an exact sense of where the date is, but sometime in that fall period, it became clear to me that she needed an accommodation and it was my impression that it could take two forms. One form would be that she stay where she was, but she be given something substantively interesting and intellectually meaningful to do and that the harping harassment stop or she be given another work assignment.

Q. Now, Terri returned to work sometime in December of 1999?

A. Again, I know it was December.

Q. Do you have any opinion, based on your treatment and observations, as to whether or not Ms. Bearman's medical condition stayed the same, got better or got worse after she returned to work?

A. It deteriorated. It deteriorated.

Q. Do you have an opinion as to why it

deteriorated?

A. Yes. Because she went back into the same environment not only not having anything substantive to do, often doing clerical work and often having nothing to do whatsoever, being isolated.

I have seen this, by the way, be a major stressor for many other people in work environments.

There was that, combined with the increase in the harassment and the feeling that her employers didn't believe her in some way, that they weren't addressing the problem and that the environment was getting worse.

That is my sense of it.

Q. Was there anything about Terri's particular medical condition or particular presentation that made isolation or being singled out for special treatment particularly damaging to her?

A. Yes. In fact, it really relates to the issue too of how there could be a genetic

predisposition and there is a family history.

We now know, and there is a huge research division out at NIH looking at this, how early abuse experiences in children can actually hard-wire in a biological depression. Terri came from an emotionally abusive family environment. That also was a contributing factor here. I think it was quite inadvertent and accidental, but what was being done at work was a kind of facsimile reproduction, if you will, of the kind of traumatic experiences that she had in her own family.

So, the combination of isolation, constant negative feedback, failure to make any effort to perceive that she was, if you will, in childhood a good child, as an adult a good citizen, and potentially a really good employee. In an effort to work to help her function at her best in this situation, it recreated again, in symbolic form, and I think quite inadvertently, some of the traumas of her childhood, and that contributed.

Q. Do you have any opinion as to what would have happened say, for example, in mid-December if

Q. Are you saying that you are more vulnerable to reinjury?

A. Yes. Absolutely. It is called kindling. That is the technical term for it.

Q. Does that mean the trough is lower?

In other words, if Ms. Bearman were to slip into depression again, the bottom would be lower?

A. Well, it was pretty low as it was.

I mean, I suppose it could go a little bit lower, but actually what I would say is really more a fact that I could say because it slipped pretty low, it was very worrisome there, especially sometime in December, the end of December. It is that the trigger is lessened, if you will, that the person is more likely to fall into that kind of lowest trough more quickly and responds perhaps to lesser stressors or stressors maintained for a lesser period of time.

Q. One of the issues in this case is going to be whether Ms. Bearman suffered mental anguish, pain and suffering.

Now, it is sometimes easy for a layman to understand if you have a back injury, an arm injury, we can all understand what that means, but can you in some way describe the pain and suffering that Ms. Bearman was experiencing as a result of this depressive episode in December, January, February?

A. Well, I think we can, but often it is while the pain and anguish of a physical symptom may be more something that people can relate to more empathically and more readily, in fact, the pain and suffering of mental anguish is much worse. It is much worse.

While depression doesn't cause any kind of psychosis, there is always a sense that you are losing in some way. There is a deeper sense of loss of control over the integrity of your own psyche, your own emotions, your own experience. There is deep fears about whether you are ever going to be able to recover again. You could say that the depression itself and the length of time it lasts contributes to the sense of despair.

You know, a physical injury, and I guess there are degrees of it, quadriplegia being a physical injury that I think is catastrophic, but minor but difficult back injuries, other injuries, there is a sense that you locate them more in the soma and that it is easier to see how you can negotiate around them, whereas the state of depression is like a cloud that descends and colors one's experience really of the whole world. So, it is quite extreme.

Q. And, again, I am not sure we got this, but do you have an opinion as to the degree of mental anguish and suffering that Ms. Bearman experienced?

I am talking about December '99 through March of 2000.

A. I think it was extreme.

MR. QUINN: Thank you.

I have no further questions.

JUDGE KHARE: Ms. Sobczak.

MS. SOBCZAK: Yes.

CROSS EXAMINATION

# EXHIBIT C

# EXCERPTS FROM THE HEARING TRANSCRIPT

# JOHN R. BURNS

please.

(Discussion off the record.)

(Recess.)

JUDGE KHARE: Back on the record.

Mr. Burns, could you please raise your right hand?

Whereupon,

JOHN R. BURNS

was called as a witness and, having been first duly sworn by the Administrative Judge, was examined and testified as follows:

JUDGE KHARE: Thank you.

After you testify please don't discuss what you have said here today with anybody else.

THE WITNESS: That is fine.

DIRECT EXAMINATION

BY MR. QUINN:

Q. Good afternoon, Mr. Burns.

Please state your full name and address for the record.

A. My name is John Russell Burns. My address is Longview, 8763 John Mosby Highway,

Boyce, Virginia 22620.

Q. You were an employee of the Department of the Treasury?

A. That is correct.

Q. For how many years?

A. 30 years.

Q. What was your position in the Department of Treasury, at least the last few?

A. The last few.

I came to Washington as a full-time Investigator for the EEO. Then I took over the position of Head Counselor for Headquarters, which was the first full position. Then I became an EEO Liaison, which, pardon my language, is actually a bastard position. There were only four or five of us and basically it was set up to try to solve issues before they came to this level.

Q. Did you have some involvement with the Office of Public Liaison, Small Business Affairs? That would be Ms. Bearman's office.

A. Ms. Bearman's office. Yes. I did. That office fell under the Commissioner's Complex with

issue before it would go to a full-blown hearing like this. We would go one-on-one with the executives and the employees. That is what the position was all about.

Q. Do you remember when you first got involved in the matter?

A. It had to be early October or mid-October of '99.

Q. Right after Ms. Bearman made a request?

A. Yes. That is correct.

Q. What did the Department of Treasury do at that time? Do you remember?

A. Basically nothing.

Q. Did they ask for an opinion from Dr. Presant?

A. They asked for an opinion from Dr. Presant. That opinion would have been requested sometime in October. Dr. Presant didn't come back with an answer until the early part of December, which for all intents and purposes was a long time for Dr. Presant.

So, I checked it out and I said, all

right, why is this taking so long? The response I got back was when he had made contact with Barry Fulcher's office, nothing came out of it. He needed to know what the Complainant's job was so he could make a decision. Based on that he gave his letter and in that letter it stated you need to move the employee.

Q. Were you kept abreast of Dr. Presant's opinion when it was ultimately issued?

A. Oh, yes.

Q. And did you, at that same time, do some investigation of Ms. Bearman's job circumstances to get a sense for the validity of her concerns?

A. Yes.

Fortunately, we were all on the same floor, seventh floor. So, my office, as liaison, was just a few doors down. That office that Terri was in at that time was just starting up. I don't know how many employees were in that office.

I checked to see what kind of work was there because Terri was saying I don't have any work to do, I am coming in and I am sitting.

Several of the employees, other employees, were questioned and they were saying the same thing, there is nothing to do.

JUDGE KHARE: Wait. Several of the other employees were saying there is nothing for Ms. Bearman to do or there was nothing for anybody to do?

THE WITNESS: No. Anybody to do.

As I said, it was a brand new office. It was just being set up under Sue. There were maybe eight or nine folks involved. They probably had enough work for one or two people, not eight or nine. So, they were trying to split up this little bit of work amongst eight or nine folks.

JUDGE KHARE: So, the time period you are talking about is when they were all complaining about not having any work?

THE WITNESS: Basically probably from July, August, September through October when this all hit the fan.

JUDGE KHARE: Okay.

BY MR. QUINN:

Q. I am directing your attention now to December 1999.

What did you learn about Ms. Bearman's workload then when she returned to work?

A. There still wasn't any work. Nobody had anything to do.

Q. What about employee monitoring of Ms. Bearman's time? Do you know anything about that?

A. Yes. Because Barry sat, I want to say one desk or two desks away, she was under a glass dome. They were watching exactly what she did. I mean, Barry even admitted that in our meeting with Steve.

Q. He admitted it to you?

A. Yes. He admitted it in the meeting.

Q. That he was micro-managing her time?

A. Well, he didn't say micro-managing, but he said he was monitoring her time because that is what they were hitting her on at the time, time and attendance.

Q. You mean they had made some decision to

It didn't make any sense to me.

I said, what do you mean where is she? There is a law library. She is an attorney. She has her workload. Is this set in stone in one particular place? Where do you go to get it? How do you deal with this? I knew my job meant I travel all over the place.

JUDGE KHARE: What did Mr. Fulcher say when you said that?

THE WITNESS: He basically said, John, we have to monitor her. I said, all right, I am not fighting this issue.

BY MR. QUINN:

Q. Were you involved in the process of helping find a reasonable accommodation for Ms. Bearman?

A. I was involved in that process inasmuch as I knew that Dr. Presant, as I said, had sent back a letter that said you need to move this employee. Then all of a sudden I am hearing, no, we are not moving this employee.

Q. Who said that?

A. Barry said it to me. Sue said it to me.

So, then I said I am on my way to David's office. As I said, that was my job. I had contact with David Williams.

Q. What do you mean by we are not going to transfer her to another job?

A. That is what I am getting to.

This came from David Williams because when I said, David, you have to move this employee, you have a letter from our doctor, he said, no, I am not moving a problem. I said, wait a minute, wait a minute, wait a minute, you can't do this. This is EEO. Here is a disability. It is on record. Here is our doctor that we have used -- I have been doing EEO for 17 years and it has been the same doctor and we have used his decision to base hundreds of cases on and now you want to change the rules and regulations? I don't think so. I said, no, no, no, you have to move her. I am not moving a problem.

I said, well, what can you do with the job? We are not restructuring it. There is

nothing we can do with it. So, basically what he is saying to me is, I am not restructuring the job, I am not moving the employee, so she can either sit there and like it or get the hell out of dodge.

Three simple answers, folks. You deal with it.

Q. What did they actually do about the problem as far as you could see, the dilemma that was there?

A. They didn't do a thing. It sat there. And probably two or three weeks later I went back and said, what have you done?

JUDGE KHARE: Two or three weeks later being when, what month?

THE WITNESS: December still.

JUDGE KHARE: December still.

THE WITNESS: I said, what have you done? Well, we are going to draft a letter to see if we can place her someplace else. I thought, that is nice, it has taken you two or three weeks to draft a letter.

I thought, all right, let me do some more

checking. They hadn't contacted my office for a letter. They didn't contact Kathy King for a letter and she is the Reasonable Accommodations Officer. Who are they contacting? Or are they trying to sit there and fumble around and figure out what they are doing?

I have no idea when the letter finally went out.

Q. Over the period December into January, December '99 to January 2000, did Mr. Williams make that comment to you more than once about not moving the problem?

A. Yes. He did.

MR. QUINN: I don't have any further questions.

CROSS EXAMINATION

BY MS. SOBCZAK:

Q. Good afternoon, Mr. Burns.

A. Good afternoon.

Q. I am Deanne Sobczak, Agency Counsel.

Now, you gave a declaration to the EEO Investigator in this case, correct?

Q. Correct.

A. Now, you tell me about your time parameters here.

Q. The August 8th, 2000 declaration occurred closer in time to the events that took place?

A. Almost a year later.

Q. Right.

And you certified that the information contained in that declaration was correct, right?

A. That is correct.

Q. Now, you didn't state in that declaration that anyone intentionally delayed finding an accommodation for Complainant?

A. I am not sure that it was an intentional delay on Barry Fulcher's part. I think nobody knew what to do because David kept saying I am not moving a problem.

What was going on there -- you can put this on the record or keep it off. I don't care.

JUDGE KHARE: For the record, we are on the record.

THE WITNESS: Okay.

Everybody considered David Williams connected to the hip of Rossotti. So, nobody was going against David Williams.

BY MS. SOBCZAK:

Q. So, now you are saying that there was not an intentional delay?

A. I wouldn't say it was an intentional delay. It was a delay, however you want to phrase it.

Q. Didn't you recently sign a declaration where you said it was an intentional delay, two weeks ago in fact?

A. Yes. I think I sent the declaration in here.

MR. QUINN: I think the witness should be given his affidavit because his affidavit says it too. You are questioning as if his affidavit doesn't say this and it does.

MS. SOBCZAK: The affidavit does not say there was an intentional delay.

MR. QUINN: Before you question him about his affidavit, he should be given a chance to read

JUDGE KHARE: What about the time monitoring?

THE WITNESS: As I said, when we had that meeting in Steve Whitlock's office, which was a meeting basically set up so the Commissioner would know what the devil is going on, it was discussed at that point and it fell on deaf ears. And, yes, I can get things done and did, but, you know, when you hit a rock, you are going to stop and basically that is where it was and that is where I said everybody was scared to death of David because he was connected at the hip to the Commissioner. Nobody dealt with that. So, we were barred.

BY MS. SOBCZAK:

Q. Do you consider yourself a friend of Ms. Bearman?

A. She is an employee of the IRS. She is one of the people who came to my office. No.

Q. Did she call you at home?

A. Yes. She has.

Q. Did she confide personal matters to you?

A. No. Confided about this case.

THE WITNESS: I can't give you an example. As I said, I have been doing this for 17 years.

JUDGE KHARE: Do you have anything else, Ms. Sobczak?

MS. SOBCZAK: No.

JUDGE KHARE: Mr. Quinn?

MR. QUINN: Yes. Just a couple of questions.

REDIRECT EXAMINATION

BY MR. QUINN:

Q. You mentioned Ms. Heaton was contacted about this, about the request that Ms. Bearman be moved to the Chief Counsel's office.

Do you remember what Ms. Heaton's advice was?

A. Ms. Heaton's advice was, yes, we can move her, that is under Treasury.

Q. And did Mr. Fulcher or Mr. Williams or anybody else in the Office of Public Liaison make any effort to go around Chief Counsel and talk to somebody at Treasury to move her to Chief Counsel's

# EXHIBIT C

# EXCERPTS FROM THE HEARING TRANSCRIPT

# DAVID WILLIAMS

Office?

A. No. Not that I know of. Nobody said a word to me about it.

MR. QUINN: Thank you.

No further questions.

JUDGE KHARE: Thank you. You are excused. Thank you very much.

Let's go off the record.

(Recess.)

JUDGE KHARE: Let's go on the record.

Mr. Williams, could you please raise your right hand?

Whereupon,

DAVID WILLIAMS

was called as a witness and, having been first duly sworn by the Administrative Judge, was examined and testified as follows:

JUDGE KHARE: Thank you.

After you testify, please don't discuss what you have said here today with anybody.

THE WITNESS: I will not.

DIRECT EXAMINATION

relations with external liaison groups essentially. And also the Privacy Advocate Service, Privacy Advocate Office and the Freedom of Information Act administrative part, that is run out of my office for the IRS.

Q. What are your duties?

A. I run the whole thing. I am the senior executive in charge of that. Also sort of a different part of my job is strategic advice to the Commissioner. Under the last Commissioner I was his strategic advisor and counselor as well.

Q. How many people do you supervise?

A. Approximately 600. It depends on the day.

Q. Ms. Bearman worked in Communications and Liaison at one time?

A. She did. She worked in Legislative Affairs when I got there and I subsequently transferred her to what was then Small Business and Public Liaison. It is now called National Public Liaison.

Q. And when was that?

Q. And why did you do that? Why did you have those questions?

A. Well, as a manager and, frankly, as a steward of public money, I think I have a duty and responsibility to insure that when we deal with these kinds of situations we exercise due diligence and caution before acceding to demands made that I don't understand, and I needed some validity behind this before I was willing to proceed.

Q. And did your staff follow up?

A. Yes. They did.

Q. What was the outcome of that?

A. At some point in time Dr. Presant said that this was valid and that he believed this constituted a legitimate claim for reasonable accommodation, at which point we proceeded to seek reasonable accommodation for Ms. Bearman, which the time frame I don't remember exactly, but it was several months I believe between the time the request was made and the time we found a position that met the standard for reasonable accommodation and she accepted.

A. When I was shown these letters by Sue Sottile and they are, on their face, rather odd. Sue noted that. I read them and had the same conclusion. I don't remember when.

Q. But your own doctor didn't see the problem, did he?

A. Subsequently, no, he did not.

Q. You don't have any medical training yourself, do you?

A. Which is why I asked for an outside opinion.

Q. You went further than that though.

You were actually unhappy with Dr. Presant's opinion, weren't you?

A. I questioned whether Dr. Presant had actually looked at this material and I had to verify that he indeed had and he had made that decision. At that point, though I did not like what Dr. Presant said, he is the dispositive person in this case and we moved to find a reasonable accommodation.

JUDGE KHARE: You said that you

questioned whether or not Dr. Presant had looked at the file in this case just now.

How did you follow up on that?

THE WITNESS: I asked my staff what is the process. They send this thing in to Dr. Presant. At some point he issues a ruling. And they came in and said he has ruled she is eligible for reasonable accommodation. That is it.

JUDGE KHARE: That is it.

And it was that ruling that you questioned?

THE WITNESS: No. No.

I mean, I said, yes, I don't like that, that doesn't make sense to me, but if that is what a qualified medical doctor employed by the IRS says, we have to follow it, and we did. I still have questions about it.

BY MR. QUINN:

Q. You have no idea when that was?

A. It was sometime in that time period, but it wasn't immediately. Whenever it was, it is not -- I don't remember exactly.

Q. What do you mean by that time period?

A. The end of 1999.

Q. The end of 1999.

So, it would have been about the time I notice in Mr. Fulcher's records on January 6th where you said you were unhappy with Dr. Presant's granting of reasonable accommodation.

I am happy to show it to you if you want.

A. No.

Q. Is that about right?

A. To this day I am still unhappy with it.

Q. But at that time is when you reconciled for yourself that you were going to accept it?

A. When Dr. Presant, as the Agency third party validator, said this is a reasonable accommodation case, that is the end of the story.

Q. But he said that on December 3rd, didn't he?

A. I don't know.

Q. Well, can I refresh your recollection on that?

A. Well, you seem to know the date. I will

explanation. However, as I said before, when the doctor told me or told my staff and they told me that this met the standard for reasonable accommodation, that was the end of the story. She got a reasonable accommodation and she got it as quickly as we could provide it to her.

Q. But you also had a different problem. You thought it was simply unfair that Ms. Bearman be transferred to the Chief Counsel'S Office?

A. Not unfair. I do think any reasonable person would question why someone should be transferred to an office when they couldn't get the job competitively.

Q. Is that one of the grounds for your opposition to the reasonable accommodation?

A. I didn't say I opposed the reasonable accommodation. Those are words you are putting in my mouth.

Q. But you went a lot further than this reference to Mr. Fulcher's reference on January 6th.

Didn't you actually have the Chief

Counsel's Office, General Legal Services, draft a letter for Dr. Presant in late January asking that he order an independent examination of Ms. Bearman?

A. I asked them to look at it and they convinced me that in the end that wasn't a good idea.

Q. That was a month later.

That was almost a month later, wasn't it?

A. It may have been. I don't remember the dates.

JUDGE KHARE: Is this letter in the record, Mr. Quinn?

MR. QUINN: Yes. It is. It is in the record at Page 290.

JUDGE KHARE: But this letter did not go out; is that correct?

THE WITNESS: I believe it did not go out. I believe they said there was really no need to do it.

BY MR. QUINN:

Q. Is that because Dr. Presant wouldn't sign it?

BY MR. QUINN:

Q. Did I misunderstand your testimony to say that on or about January 6th you thought you had reconciled that Dr. Presant's opinion would be accepted?

A. You did misunderstand my testimony.

What I did say was that when my staff informed me that Dr. Presant had decided that she was eligible for a reasonable accommodation, I asked my staff to proceed with finding it for her.

Q. When did you first become unhappy with Dr. Presant's opinion?

A. First become unhappy?

Q. Yes. When did it first strike you?

A. When Dr. Presant provided no evidence to me whatsoever or explanation as to how one could in ten days come to such a startling conclusion.

Q. You supervised 600 employees?

A. I do now. I did not then.

Q. You are at what level in the IRS?

A. I report directly to the Commissioner. I am one of the most senior executives there.

learned that he did agree to that.

Q. You knew that there were job openings in the Chief Counsel's Office that she was looking for, didn't you?

A. Yes.

Q. You knew the Chief Counsel, didn't you?

A. Right.

Q. You knew that the people that were looking for a reasonable accommodation were running into a brick wall in trying to get her transferred to Chief Counsel, didn't you?

A. No. Not a brick wall. They are not part of the IRS and therefore she is not transferable in the same way.

Q. But you made no effort to intercede to see if it could get done?

A. Frankly, Ms. Bearman had competed, and I don't remember when I found this out, had competed for a job in Counsel and had not gotten it and I don't think it is appropriate for me to be pushing when we are in middle of a situation in which we have doctors sort of reviewing each other and we

have stepped into a reasonable accommodation situation for me to get directly involved in the process. That is why the staff did what they were supposed to do, which I don't really know what the details were based on it.

JUDGE KHARE: I have a couple of questions to follow-up on this because I am a little bit confused.

You said that it was not appropriate to push for her to get the slot in the Counsel's Office and that staff handled it.

You were letting the staff work on it?

THE WITNESS: Right.

JUDGE KHARE: What staff?

THE WITNESS: Well, it is now bigger because we have reorganized, but I have individuals who handle personnel and work with experts in the EEO and other offices.

JUDGE KHARE: Who was that then?

THE WITNESS: At that time it was a woman named Paula Fyne, who is now the head of what is ridiculously called in my small division Strategic

Q. Take a look at page number 62 in the record, if you would.

A. Okay.

(Witness reading document.)

I have read it.

Q. Does that accurately reflect what happened?

A. It is possible. I don't remember it. But I do -- I don't remember it.

Q. Just directing your attention to the July through December period of 1999, can you tell me what the workload was like for the employees in the Office of Public Liaison?

A. I think it varied. I don't know specifically what the workload was like for an individual.

Q. You are aware of complaints that Ms. Bearman had that she had no work to do, aren't you?

A. Ms. Bearman I believe made those assertions. I did not ever hear them directly from Ms. Bearman.