UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TESSA E.  BERGMAN,                                    :
                    Plaintiff                        :
                                                     :     Civ. Action No. 06-0303 (GK)
V.                                                   :
JOHN W. SNOW,                                        :
Secretary, Department of the Treasury,               :
                    Defendant                        :


## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        Pursuant to Rule 56, Federal Rules of Civil Procedure, defendant respectfully submits this

Motion for Summary Judgment._____

        Plaintiff's complaint alleges violation of the Rehabilitation Act and retaliation.  She

alleges that she is a qualified individual with a disability and that following her request for a

reasonable accommodation the defendant violated the rehabilitation act, inter alia,  because it took

over four and one half months to find her a new position, she was not reassigned to positions she

wanted as a detail or on a permanent basis, and the agency was not sufficiently responsive and

interactive with her during the search for an accommodation.

        Plaintiff is an attorney.  From 1984 to 1987 she was an attorney advisor in the Office of

Chief Counsel of the Department of the Treasury.  She left the Chief Counsel's Office to join a

private law firm and later worked for a congressman as his tax counsel and legislative director.  In

1995 she was hired by the IRS in the Office of Legislative Affairs as a legislative analysis officer.

That position is not classified as an attorney position.  She subsequently transferred to the Office

of Public Liaison and Small Business Affairs in IRS.  The position in the Office of Public Liaison

and Small Business Affairs also was not classified as an attorney position.  It was a Management

and Program Analyst position.   Plaintiff became disenchanted with the position feeling that it did not utilize her "significant tax and tax-related small business experience."

By letter dated October 11, 1999, plaintiff's health care provider reported that plaintiff was unable to work due to a depressive condition, and that there  were no accommodations that would result in her being able to work and suggested at least 30 days off for recovery.

By letter dated October 21, 1999, the doctor stated that she had had  "the opportunity to understand [plaintiff's] situation in greater depth.  I believe she could function at her job and return to work if an accommodation is made.  This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where [plaintiff] worked previously . . . .The reason for this is that [plaintiff's] self esteem is at a very low level in her current position.  Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized and unable to work."

In the fall of 1999, plaintiff had applied  for a position in the office of Chief Counsel and was not selected.

By letter dated December 3, 1999, her health care provider advised that plaintiff had to return to work for financial reasons and that although she was not fully recuperated, she was sufficiently improved to return part-time at a recommended 6 hour work day.

After an emotional outburst by plaintiff, the agency placed her on administrative leave.

In March 2000, plaintiff accepted transfer to the Virginia-West Virginia Division  of the South East Region as an estate tax attorney advisor.  Since plaintiff was at the GS 14 level, and the attorney advisor position was a 12, the transfer agreement included a pay retention agreement.

Plaintiff contends that she should have been transferred to a vacant position in the Chief Counsel's Office in November 1999, and that the 4 ½ months between her request for accommodation and her transfer was unreasonable.

As set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff has not met her burden of establishing a prima facie case that there was any discrimination or retaliation.  Plaintiff is not a qualified individual with a disability, did not seek a reasonable accommodation, and had no right to any accommodation or protection under the Act. Additionally, all actions of the agency were not material adverse actions.

In the alternative, assuming that plaintiff could prove a prima facie case, the agency's actions were done for legitimate and non-retaliatory reasons.

_____There are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law.  Wherefore, defendant respectfully requests that plaintiff's complaint be dismissed

with prejudice as to all counts.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____
RUDOLPH  CONTRERAS, D.C. Bar No.  434122
Assistant United States Attorney

_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TESSA E. BERGMAN,
   Plaintiff,

          Case No. 06-0303 (GK)

  v.

JOHN W. SNOW,
    Defendant

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

   Defendant respectfully submits this memorandum in support of its motion for summary

judgment.

BACKGROUND

   From February 1995 to 1998, plaintiff Bergman, aka Bearman,  was employed in a non-

attorney position as a Legislative Analysis Officer in the Legislative Affairs Office of the Internal

Revenue Service ("IRS").  Investigative File ("IF") at p. 27; EEOTr:Bearman at p. 99-102.

Plaintiff apparently liked her job at the Office of Legislative Affairs.  *Id*. at p. 103:14-17.

   In 1996, while working full-time at the IRS, plaintiff entered a part-time graduate program

at Johns Hopkins University and in two years earned a Masters Degree in Biotechnology. *Id.* at p.

111-112.  In the summer of 1997, plaintiff sat for the Patent Bar examination, and passed.  *Id.*

   In 1998 there was a major restructuring of the IRS.  *Id* at p. 103-104.  The Office of

Legislative Affairs lost most of its important functions, "So, our reason for being sort of

evaporated.  Most of us were kind of left to find other positions."  *Id*. at 104.  A former colleague

of plaintiff's from the Hill, David Williams,  had come on board as the chief of the area that

Legislative Affairs was in.  *Id.*  Plaintiff was "beginning to put out feelers" for a new position, and

talked with him about possible employment options.  *Id.* at 104-105.   Mr. Williams told plaintiff

about a new office which was in the embryonic stage, and suggested that plaintiff talk with the

Acting Director, Sue Sottile.  The new office was the Small Business Affairs and Public Liaison

Office.  *Id*.   "The way he described it was that he thought as the office evolved it would be very

helpful to her to have somebody with my kind of technical background in tax. . . . So, it appeared

to be a good fit. ."  *Id*. at p. 105-106.

        Therefore, in September 1998, plaintiff moved to the Office of Public Liaison.  *Id*. Her

position was a GS-14 Management Program Analyst. IF at p. 102; 303-307.   For approximately

the first six months, plaintiff was satisfied with her job at the Office of Public Liaison : "There

were only nine of us on the staff. . . .[I]t was stimulating because I worked directly with Sue [the

acting director].  She had an open door policy.  You could walk into her office at will and sit

down and brainstorm. . . ."   *Id*. at p. 107.  "What was particularly nice about it was that it was

very free-flowing, it wasn't at all bureaucratic."  *Id.* at 112.  Plaintiff also was satisfied with the

level of substantive work she was doing.  *Id*. at p. 113.  She was responsible for organizing

meetings with "stakeholder groups" and finding out what their concerns were. *Id.* at 113-114.  "I

enjoyed doing that kind of work."  *Id.* at. 114.

        The only "substantive tax law" work plaintiff was doing involved translating the concerns

of the stakeholder groups into laymen's terms, recommending how the problem could be

remedied "who we needed to talk to and why it was important that we get these things fixed."  *Id*.

        In the beginning, plaintiff "usually created my own work." *Id*. at 115.  Two major projects

plaintiff was working on involved developing a Web site and putting together a section on tax

laws impacting doing business abroad for a CD-ROM being developed for the small business

community. *Id*. at 115-116.

**Things Change At Work**

As plaintiff explained:

[F]rom September '98 when I joined the office to the spring of '99, the office grew
exponentially. * * * We went from a staff of 9 to a staff of . .  around 20 or 25
very quickly, and it went from my being able to deal directly with Sue, having
conversations with her and developing things that way, to having 2 people
interposed between me and Sue.  They had hired a Deputy Director and then in
July of 1999 a man who had been my co-worker, Barry Fulcher, all of a sudden
became my supervisor. . . .

* * *

Well, as we progressed in the year 1999 and as the office got bigger and bigger and
became more bureaucratized there were branches set up.  I think eventually we had
three branches.  There were branch chiefs.  I remember the selection criteria for a
branch chief was who is interested in being a branch chief . . . .

Everything became more formalized.  All communications went through
several levels.  Every week or every other week we were being handed a memo
with new office procedures and the office procedures changed from week to week.

*Id*. at p. 117-121.

Ms. Sottile had hired a Deputy, Mr. Fitzpatrick.  I had been working on the
CD-ROM project. . .together with Chief Counsel, with a woman who was in
charge of the CD-ROM project, and then all of a sudden Mr. Fitzpatrick interjects
himself and he is taking over the project.

Nobody had told me that.  I don't know if he was even told that the genesis
of the project was with me.  I attempted to sit down with him and I wanted to
explain it to him, my vision of it, my timetable, whatever.  He refused to meet with
me.  He refused to let me brief him and he just started demanding things, drafts of
things.

*Id*. at 121-122.

Plaintiff further stated she believed that she was being relegated to "secretarial and

clerical" work because "any substantive material that went into the briefing book was not written

by me.  I had to go find people in Chief Counsel whose area it was.  They wouldn't take anything

3

that I wrote on a technical subject. *Id.* at p. 123-125.    At some point in the middle of 1999, "I no

longer had access to Sue Sottile at all. Orders came down from Mr. Fitzpatrick.  And then when

Mr. Fulcher became my supervisor it went from Mr. Fitzpatrick to Mr. Fulcher to me.  *Id.* at p.

125.

>    As plaintiff summarized her feelings:

>>    I was becoming increasingly stressed as a result during the time period
>> when Mr. Fulcher became my supervisor.
>>    The one project that was my baby was taken away from me by Mr.
>> Fitzpatrick.  I had gone to Sue and indicated that I just didn't think that the
>> position, as it was originally described, was working out the way I had envisioned
>> and would she help me, either providing me with better work or helping me to
>> transfer to a position where they could really use my skills.  The answer that came
>> back was no. . . .

*Id.* at p. 133-134.

**Plaintiff goes on sick leave**

On October 4, 1999, plaintiff began medical leave and did not return to work until

December 15, 1999.  On October 4, 1999, plaintiff became upset and went to Ms. Sottile's office

"and I said I have to take medical leave." *Id.* at p. 135-136.    Ms. Sottile expressed sympathy and

concern and let her take leave. *Id.* at p. 136-138.  Plaintiff's doctor, Judith Nowak, sent a hand

written memorandum to Ms. Sottile dated October 7, 1999 which stated:

>    Ms. Bearman is under my medical care.  In my medical opinion, she is temporarily
> unable to work.  I anticipate she will be absent from work for a period of thirty
> days.

10/7/99 Nowak note.

Plaintiff was on leave without pay and requested advanced sick leave.   10/18/99 Mendola

Memo.  Due to the request for advanced sick leave,  Dr. Neil Presant, an occupational medicine

consultant with the Department of Health and Human Services, was asked to review plaintiff's

medical documentation and advise whether her medical condition justified her being disabled for

30 days.  *Id.*  The medical documentation sent was a letter from Dr. Nowak dated October 11,

1999.  Dr. Nowak wrote  that plaintiff had "suffered an acute exacerbation of a chronic medical

illness which necessitates a medical leave of absence. "  IF at p. 59-60, 10/11/99 Nowak ltr.  The

doctor further wrote that plaintiff had

> relaspe[d] into severe Major Depressive Disorder (DSMIV 296.34).  Her
> symptoms include  fatigue, irritability, marked difficulty concentrating, much
> difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless
> mood but no suicidal ideation.  Ms. Bearman simply cannot stay at her desk or
> attend to her work: even at home, Ms. Bearman is requiring the aid of family and
> friends with basic demands of daily living.  Therefore, she is unable to work.
> There are no accommodations that could be made at the present time by her
> employer that would result in her being able to work.
>
>        * * * I cannot predict with great specificity how long it will be before Ms.
> Bearman is able to return to work but the time course of past periods required for
> recovery suggests that a period of 30 days out of work is a reasonable expectation.

*Id*.

By letter dated October 26, 1999, Dr. Presant advised the IRS's labor relations specialist

that he had received Dr. Nowak's October 11, 1999 letter, and had spoken with Dr. Nowak.

10/26/99 Presant ltr.  He stated that

> The medical evidence establishes that Ms. Bearman has been suffering from a
> medical condition  that could reasonably be expected to have caused her to miss
> work during the time in question.  Her condition thus justifies her being absent
> from the workplace.  Dr. Nowak estimates that Ms. Bearman should be able to
> return to the workplace in about 6-8 weeks.  She stated, however, that this will
> require an accommodation.  She was not at liberty to discuss this accommodation
> right now. But the IRS will evidently be receiving this accommodation request
> shortly through Ms. Bearman's lawyer.

*Id.*

The next day, on October 27, 1999, Ms. Sottile sent a memorandum to plaintiff's

supervisor, Mr. Fulcher, advising him that based on Dr. Presant's letter of October 26, 1999,

plaintiff had been credited with 240 hours [30 days] of advance sick leave which plaintiff had

requested.  She also advised that plaintiff had been accepted into the Leave Sharing Program,

under which plaintiff could request employees in Communications and Liaison to donate their

annual leave to her. 10/27/99 Sottile memo.

The advanced leave ran out at the end of November, and plaintiff sought leave without

pay.  EEOTr:Bearman at p. 138.  See 11/23/99 Nowak ltr and 11/26/99 Presant ltr.    By letter

dated December 1, 1999, Mr. Fulcher advised plaintiff that Dr. Presant had concurred in her

request for another four weeks of leave:

> Our timekeeping records indicate that as of November 29, you exhausted all of
> your sick leave and advance sick leave.  As of November 29, you entered into
> Leave Without Pay (LWOP) status.  Therefore, the 160 hours of leave that was
> authorized by Dr. Presant will be processed as LWOP to the extent it is used.
>
> At this time we are unable to grant you any additional advance leave beyond the
> 240 hours you already received and used.  Unless you are authorized additional
> leave, you will be expected to report to work effective December 28, 1999.
>
> Terri, on November 19, and per our earlier conversation, I sent a copy of the
> memorandum, Request for Leave Donation, to the Chief Operations Officer asking
> that he share it with his personnel.  We will periodically check to see if any leave
> has been donated to you and notify you accordingly.

IF. at p. 69, 12/1/99 Fulcher ltr.

Although plaintiff was authorized leave without pay until December 28, 1999, she

returned to work before that on a reduced schedule.  Dr. Nowak sent to the labor relations office a

letter dated December 3, 1999, stating that

> Ms. Bearman . . .must return to work next week for financial reasons.  She is not
> fully recuperated but I believe that she is sufficiently improved to be able to return
> part-time with short term accommodations, especially if she can anticipate the near
> future granting of the longer term accommodations we have requested and that
> have not yet been decided.

6

> Ms Bearman continues to have difficulty with attention and concentration and has diminished energy and fatigues more readily. Therefore, I request that she be allowed to work part-time for several weeks. I would recommend a 6 hour work day from approximately 10 AM to 4 PM with some flexibility for determining the beginning and end of her day. I feel this is necessary for a short period but one which I cannot yet specify exactly.

IF at p. 73.

Plaintiff, however, did not return to work the next week. Instead, plaintiff sent to her supervisor, Mr. Fulcher, a letter dated December 7, 1999, which stated:

> Please be advised that for the week of December 5, 1999, I will not be returning to work due to religious observance. Accordingly, I am requesting the grant of advanced religious comp time for the duration of this observance, which will terminate on December 11, 1999. The letter dated December 3, 1999, from my physician, Dr. Judith Nowak, will then be in effect beginning the week of December 13, 1999. . . .

IF at p. 74.

By letter dated December 9, 1999, Mr. Fulcher advised plaintiff that her request for 40 hours advanced religious compensatory time was denied because she already had advanced compensatory time which had not been repaid and because her request was not timely. IF at p. 76.

Plaintiff returned to work on December 15, 1999. EEOTr:Bearman at p. 149. She had been out continuously since October 4, 1999. *Id.*

On about December 21, 1999, plaintiff submitted an Application for Leave Under the Family and Medical Leave Act ("FMLA"). Attached to it is a Certification of Physician signed on December 21, 1999. IF at p. 146-148. The application requested 480 hours of leave without pay from December 28, 1999 to March 21, 2000. *Id.* Mr. Fulcher approved the request. IF at p.

150.  Plaintiff continued to come in to work.  Concerning the approved FMLA leave, plaintiff told Mr. Fulcher that she intended to use it as needed.  IF at p. 150.

Plaintiff reports that the first week in January 2000, she had a panic attack.  EEOTr: Bearman at p.160.  She contacted the Commissioner's office on January 5, 1999, and told them that it was a matter of life and death that she see the Commissioner.  *Id.* at p. 162.  The next day, January 6, 2000,  Mr. Fulcher called plaintiff and told her not to come in to work. Later that day he informed her that she was being placed on paid administrative leave.  *Id.*  Plaintiff received written confirmation by letter dated January 12, 2000.  IF at p. 167.   It advised that in the perception of the Commissioner's office "that you were very upset and considered the situation to be a matter of life or death.  Based on the recommendation of the Director, Complaint Processing, we decided it was in the best interest of all, including you and the staff, that administrative leave be authorized until the situation could be further evaluated by your physician, Dr. Nowak."  IF at p. 167.   The letter requested an opinion from plaintiff's doctor concerning when she could return to work.  *Id.*  The letter also informed plaintiff of the steps that had been taken concerning her accommodation request.  *Id.*

Dr. Nowak responded by letter dated January 21, 2000, "Ms. Bearman should not be required to return to work until such time as her request for a reasonable accommodation is acted upon."  IF at p. 164.

On January 26 or 27, 2000, plaintiff received a voice mail from Mr. Fulcher stating that her paid administrative leave was being terminated and that she should return to work on Monday EEOTr:Bearman at p. 165.  Plaintiff did so until she moved to an attorney position in IRS.  *Id.* at p. 167.

**The request for an attorney position**

While the matters discussed above were unfolding, the IRS began a search for an accommodation to an attorney position.  On October 22, 1999, plaintiff's counsel sent a letter to David Williams, the Chief of Communications and Liaison,  requesting the accommodation. Attached thereto was a letter from Dr. Nowak dated October 21, 1999.  IF at p. 56-58. Dr. Nowak's letter stated

> I have had the opportunity to understand Ms. Bearman's situation in greater depth.  I believe she could function at her job and return to work if a accommodation is made. This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where [plaintiff] previously worked for over three years and received a certificate of merit.  The reason for this is that Ms. Bearman's self esteem is at a very low level in her current position.  Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized and unable to work.

IF. at p. 61.  On February 7, 2000, Mr. Fulcher obtained an informal offer from one of the IRS's district offices to take plaintiff in an attorney position. EEOTr: Fulcher at 360-361.  Since the position was at a lower grade, a pay retention agreement was worked out and on March 7, 2000, a formal offer was made to plaintiff. *Id*.  Plaintiff accepted the position with pay retention.

## STANDARD OF REVIEW

**Summary Judgment**

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir. 1995).  A genuine issue is one that could change the outcome of the

9

litigation.  *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 243 (1986).  While all evidence and

the inferences drawn therefrom must be considered in the light most favorable to the nonmoving

party, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986), a

complaint should be dismissed if it "appears beyond a reasonable doubt that plaintiff can prove no

set of facts in support of his claim which would entitle him to relief."  *See Conley v. Gibson*, 355

U.S. 41, 45-46 (1957).

### Retaliation Claim

To establish a prima facie case of retaliation, "the plaintiff must present evidence that (1)

he engaged in protected activity; (2) the employer took a material adverse action against him; and

(3) the adverse action was causally related to the exercise of his rights."  *Moses v. Howard*

*University Hosp.*,  2007 WL 442218, *5 (D.D.C. 2007) (*citing Holcomb v. Powell*, 433 F.3d 889,

901-02 (D.C.Cir.2006);  *Hussain v. Nicholson*, 435 F.3d 359, 366 (D.C.Cir. 2006).  *See Rochon v.*

*Gonzales,* 438 F3d. 1211, 1219 (D.C.Cir. 2006) (Action must be such as would dissuade a

reasonable employee from making or supporting a charge of discrimination).  Once an employee

makes such a showing, it "raises a 'rebuttable presumption of unlawful discrimination,'" shifting

the burden to the defendant to rebut such presumption. *Id.  (Citing Smith v. District of Columbia*,

430 F.3d 450, 455 (D.C.Cir.2005) and *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428,

433 (D.C.Cir.2000)).

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows

that for a discrimination claim, defendant must articulate legitimate non-discriminatory reasons

for its actions and plaintiff then has the burden of proving that defendant's actions were taken for

reasons other than those offered, but instead, for a retaliatory purpose. *Moses v. Howard University Hosp.*, 2007 WL 442218, at *6.

      *In Totten v. Norton*, 421 F.Supp.2d 115, (D.D.C. 2006), this Court recently noted that

> Although it is not necessary for a Title VII reprisal plaintiff to show that the "alleged retaliation affected his pay or benefits-in other words, an adverse action may involve something short of what ordinarily would be considered a "personnel action"– a plaintiff nonetheless must point to an action that has "materially adverse consequences" for him. *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C.Cir. 2002); *see also Rochon*, at 1219 ("[M]ateriality is implicit in the term 'discriminate' as it is used in Title VII."); *Brown v. Brody*, 199 F.3d 446, 457 (1999) (plaintiff must demonstrate "materially adverse consequences ... such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm"). ... The touchstone of materiality in this context, the D.C. Circuit has said, is whether the "employer's challenged action ... would have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 1219.

*Totten* at 120-21. In granting that defendant's motion to dismiss the retaliation claim, *Totten* also stated that the Courts in this Circuit have held that purely psychic injuries -- e.g. embarrassment, public humiliation, loss of reputation, mere inconveniences --  do not qualify as adverse actions for purposes of federal anti-discrimination statutes, noting that *Rochon*, at 1219 stated "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Totten*,  421 F.Supp.2d at 120 -121.

      In order to establish a prima facie case of retaliation, a complainant also must show a casual connection existed between the materially adverse action and her statutorily protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985); *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C. Cir. 1984).

### Rehabilitation Act

      The Rehabilitation Act provides that the standards governing employment discrimination claims applicable under the Americans with Disabilities Act ("ADA") apply to the Rehabilitation

Act, 29 U.S.C. § 794(d), and thus, the legal principles are the same. *Pantazes v. Jackson.* 366

F.Supp.2d 57, 65 -66 (D.D.C.2005).

> To make out a claim under the [Rehabilitation]Act, plaintiff must present direct
> evidence of discrimination based on his disability, or he may provide indirect
> evidence of discrimination. For certain Rehabilitation Act claims, the three-step
> burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792. .
> .(1973), applies. *Duncan v. WMATA,* 240 F.3d 1110, 1114 (D.C.Cir.2001) (en
> banc). But as the D.C. Circuit has noted, that "test is not equally applicable to all
> cases" alleging disability discrimination. *Barth v. Gelb,* 2 F.3d 1180, 1186
> (D.C.Cir.1993). In particular, in a reasonable accommodation case, plaintiff
> "carries the burden of proving by a preponderance of the evidence that [he] has a
> disability, but with a reasonable accommodation (which [he] must describe), [he]
> can perform the essential functions of [his] job." *Flemmings v. Howard Univ.,* 198
> F.3d 857, 861 (D.C.Cir.1999). This approach governs cases "(1) where the
> employer claims non-discriminatory reasons for its adverse employment action;
> [and] (2) where the employer maintains that the employee is not an otherwise
> qualified individual with a disability, or that no reasonable accommodation is
> available, so that the plaintiff falls outside the scope of ADA protection." *Id.*
> (citing *Barth,* 2 F.3d at 1186).

*Pantazes v. Jackson,* 366 F.Supp.2d 57, 66 (D.D.C.2005).

> To make out a prima facie case of discrimination under the Rehabilitation Act for
> failure to accommodate, see 29 U.S.C. § 794(a). . .a plaintiff must show "(1) that
> he was an individual with a disability within the meaning of the statute; (2) that the
> employer had notice of his disability; (3) that with reasonable accommodation he
> could perform the essential functions of the position; and (4) that the employer
> refused to make such accommodations."

*Pantazes v. Jackson,* 366 F.Supp.2d 57, 66 (D.D.C.2005).

The Act defines a "qualified individual with a disability" as "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions of

the employment position that individual holds or desires." *Id.* § 12111(8).

*Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 579 -580 (3rd Cir.1998). "[T]he burden is on

the employee to prove that [s]he is 'an otherwise qualified' individual." *Id.* (*citing Buckingham v.*

*United States*, 998 F.2d 735, 739-40 (9th Cir.1993)).

12

**Plaintiff cannot establish a prima facie case of discrimination under the Rehabilitation Act Because She Is Not "An Individual with a Disability".**

To sustain a disability discrimination claim pursuant to the Rehabilitation Act, a plaintiff must establish that she has a disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002); *Stein v. Ashcroft*, 284 F.3d 721, 724 (7th Cir. 2002).   In pertinent part, the Rehabilitation Act defines an "individual with a disability" as a person who has "a physical or mental impairment which substantially limits one or more of such person's major life activities."  29 U.S.C. § 705(20)(B).  "'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota v. Williams*, 122 S.Ct. 681, 691 (2002).  However, merely having an impairment does not make one disabled.  *Toyota*, 122 S.Ct. at 690. A claimant must instead demonstrate that the impairment **substantially** limits **a major life activity**, *see id.* (citation omitted), and is permanent or long-term.   *Paegle v. Dep't of the Interior*, 813 F.Supp. 61, 64 (D.D.C. 1993).  A major life activity is one that is of central importance to an individual's daily life, *Toyota v. Williams*, 122 S.Ct. at 691, and includes such functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. *Stein*, 284 F.3d at 724 (citation and quotation marks omitted).

In *Toyota*, the Supreme Court cautioned that in meeting the requirements of establishing a disability protected by the Rehabilitation Act "[i]t is insufficient for individuals attempting to prove disability status to merely submit evidence of a medical diagnosis of an impairment. Instead, the Act requires those 'claiming the Act's protection...to prove a disability by offering evidence that the extent of the limitation [caused by the impairment] in terms of their own experience is substantial.'" *Toyota,* 122 S.Ct. at 691-692 (citation omitted).  Also, "mitigating measures" like medication and devices "must be taken into account in judging whether an

13

individual possesses a disability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999);

*Sutton v. United Air Lines*, 527 U.S. 471, 488-489 (1999); *Tangires v. Johns Hopkins Hospital*, 79

F.Supp.2d 587, 595 (D.Md. 2000).

Here, plaintiff has described two impairments or two stages of impairment: the first is

plaintiff's long term low grade Chronic Depression.  The second is major depression.  Defendant

does not contest that plaintiff has a mental impairment.  However, plaintiff has not met her burden

of showing that her impairment substantially limited any of her major life activities.

**Low Grade Chronic Depression**

Plaintiff indicates she has had chronic depression all of her life.   However, she has

offered no evidence that her low grade chronic depression substantially limited any major life

activity.  *See* Nowak 2007 Depo. at p.6- 8: When plaintiff came to Dr. Nowak in 1996 for,

(b)_____ - _____ _____ _____ _____ _____ _____

_____ _____ _____ _____ _____

_____ _____ _____ _____

pleasure." *Id.* at p. 7.   Plaintiff was working and reported no problems carrying out her job.  *Id.*

Plaintiff described her condition as follows: "Chronic low grade depression is the type of

thing where you can function perfectly normally.  You are not at all intellectually impaired.  Your

moods may blip up and down. * * * I have been living with this for a long time and most people

who live with depression, it is like a diabetic has to take insulin, but they can do whatever they

need to do during the course of their day.  It is the same type of thing.  You are aware of it, but it

doesn't impair your ability to do what you need to do.  EEOTr :Bearman at p. 109-110.  Plaintiff

explained that "I would occasionally over the years have some contact with my family and that

could cause me anxiety for a day, a day-and a-half.  That is what I call a blip. . . . But for the most part my mood is fairly well stable at a point where I don't feel the least bit impaired."  *Id*. at 110-111.

Indeed, while suffering from chronic depression, plaintiff's history is one of high achievement, including graduation from college with a double major with distinction, obtaining a JD and a LLM in taxation, work on the Hill and distinguished service at the Office of General Counsel at IRS.  IF at 27-29, EEO TR: Bergman at 90-99.

This was interrupted by a brief  period in 1991 when plaintiff was hospitalized for major depression.  Bergman 2007 Depo at p. 10-12.

After plaintiff was released from the hospital, she returned to Washington and worked part time.  *Id.* at p. 12. She then took care of her ill parents in New Jersey for about six months.  *Id.*. Then she returned to Washington and worked as tax counsel and legislative director for Congressman Jefferson.  *Id*. at p. 12-13.  During this period she took off a day or two in November/December due to her "Seasonal Affective Disorder," but not for any extended periods. *Id.* at p. 14-15.  She then went back to the IRS and worked as a Legislative Affairs Officer in the Legislative Affairs Office, where she took off from work due to depression, "Never more than you have to take off for having a common cold."  *Id*. at p. 16. On rare occasions on some mornings plaintiff could not get out of bed, but would get relief from medications.  *Id.* at p. 17-18.  Plaintiff could always carry out the functions of her job. *Id*. at p. 18.  Indeed, during this time,  in addition to carrying out her job functions, in 1996 while working full-time at the IRS, plaintiff entered a part-time graduate program at Johns Hopkins University and in two years earned a Masters

15

Degree in Biotechnology. EEOTr Bearman at p. 111-112.  In the summer of 1997, plaintiff sat for

the Patent Bar examination, and passed.  *Id.*

    Thus, plaintiff has not met her burden of showing that her chronic low grade depression

substantially limited any major life activity.

    **Major Depression**

    Plaintiff also has not met her burden of showing that the major depression into which she

reportedly fell beginning in October 1999, substantially limited any major life activity.  Dr.

Nowak's letter of October 11, 1999, discussed plaintiff's hospitalization in 1999.

> She was hospitalized in 1991 with an acute depressive episode.  She was
> treated with Prozac and rapidly responded.  There have been no subsequent
> hospitalizations since that time.

IF at p. 59-60;  Bergman 2007 Depo at Ex. 3.  The doctor then described plaintiff's deterioration

in 1999 as follows:

> There has been a gradual deterioration of her symptoms since approximately mid
> August 1999 with a dramatic worsening over the past week to ten days.  This has
> resulted in a relapse into severe Major Depressive Disorder (DSMIV 296.34).  Her
> symptoms include  fatigue, irritability, marked difficulty concentrating, much
> difficulty taking initiative, social withdrawal, anhedonia[1] and a depressed hopeless
> mood but no suicidal ideation.  Ms. Bearman simply cannot stay at her desk or
> attend to her work: even at home, Ms. Bearman is requiring the aid of family and
> friends with basic demands of daily living.  Therefore, she is unable to work.
> There are no accommodations that could be made at the present time by her
> employer that would result in her being able to work.
>
>     Ms Bearman is engaged in an intensive outpatient program of
> psychotherapy and medication readjustment. . . .For now we are working on
> psychosocial stressors, reevaluating her medical status, and adjusting her
> medication - most recently by increasing her Celexa to 30mg qd.  Her past
> responsiveness to these interventions suggests that her condition has not become
> static and well stabilized (**that is–there is no evidence of chronic disability**).  I

_____

    [1]  "Anhedonia means an inability to express pleasure."  Nowak 2007 Depo at p.7.

> cannot predict with great specificity how long it will be before Ms. Bearman is able
> to return to work but the time course of past periods required for recovery suggests
> that a period of 30 days out of work is a reasonable expectation.

*Id*. (emphasis added).

Thus, Dr. Nowak's letter described a short term impairment which was subject to control by therapy and medication.  More importantly,  the Doctor's letter does not specify any major life function which was substantially impaired except work.  "She is unable to work."  *Id*.

Additionally, plaintiff's deposition testimony established that there was absolutely no basis for the doctor's statement that plaintiff required aid in the basic demands of daily living. Plaintiff testified that the only family and friends aiding her were one friend and a cousin. Their assistance was limited to giving her moral support by talking with her.  Bergman 2007 Depo at p. 75-76.  The only other type of support plaintiff said she needed was psychiatric.  *Id*. at p. 76. Plaintiff could dress herself, drive, and take care of her pet cat.  *Id.* at p. 75-78.

In addition to plaintiff's admissions, the record also shows no evidence of substantial impairment of plaintiff's major life functions, except for the alleged function of work.

In 1999 plaintiff lived alone.  She drove back and forth to work.  *Id.* at p. 7-8.  On October 4, 1999, plaintiff was at work, and told Ms. Sottile she was ill had to take leave. Bergman 2007 Depo at p 53-55.  On October 5 plaintiff called Dr. Nowak, whose notes reflect:

(b)(b)-- ------------------------ ----------------------------- --------------------------- ----
-------------------------- -------------------------- ------------------------- ------- ----------------
----------- ------------------------------------ ---------------- ------------------------------ --
----------------- ------------- ------------------------------------------- ------------ ---------
------------------- -------------------- ---------------------------- ----------
---- ------------------------------------------------- --------------------------------
---------------------------- --------

Nowak 2007 Depo at p. 39.  Plaintiff went in to Dr. Nowak's office on October 7, 1999.  The

doctor's notes on that day state:

> **(b)**
> **(b)**----------------- ------- --------------------------------------------------------
> ----------------------------------- ---------------------------- -------------------------
> ------

Nowak notes at entry dated 10/7/99; Nowak 2007 Depo at p. 42-43.  When asked what it meant

when she wrote on October 7 that plaintiff was " moderately depressed," the doctor replied as

follows:

> **(b)**
> **(b)** ----------- --- ------- -------------------- ----- ------- -----------------------
> ------------
>  --      ------------- ----------------- ----------------- ------------- ------------------
> --- ------------------- ------------------------------- ------ -- ------------- ------------
> --- ----------------- -------- ----------------- -------------------------------------
> ---------------- ---------- ------- --
>  --      ------ ------------------ ----- ------- ------
>  --      ------------ -------- --------------------------------- --------- ---- -------
> ------------------- ---- -- ------ ----------- ------------------- ------- ---- -------
> ---------- --------- ---------- ------------------------- -------- ----------------------
> ---- ------ ----------------------------- ------- ---- -------------------- -----------
> -- -- --- -- -- --- -- -- ---- ----- ---- -- -------- --- --- --------------- --- ------- --
> ---------- ------ ------ ---------- ----- ----------- -- --------- ---- -- -- ------ ------ ----
> ---------- ---------------- --
>          --      ----- ---
>          --      ------------- --------------------------------------- ---

Nowak Depo 2007 at p. 44 (emphasis added).  Plaintiff went back to Dr. Nowak's office on

October 11, 1999.  The doctor's notes for October 11 reflect

> **(b)**  **(b)**       --- -- ------ ---- --- -- ---- --- ---------- ---------------
>          --      -------
>          --      ----- ------------ ---
>          --      ------------------------------- ----- ---------------------- --------- ------
>          ---- --------------- ------------ ------------ -------- ----- -------------- -------- ---
>          ---------- ---------- -----------
>          --      ----------------
>          --      ------------- -----
>          --      ------------------------

(b)

**(b)** ---------------------- --------- ------- ------------ -------------------------------------
----------- ------------------------------------------------------------------ ------- -----------
-- ---------------------------- ----- -------- -- -- --- -- ------ - - ----------- --- ----- ----
------- ----------------------- ----------------------- ----------------------------- -------
--- ---- ------ ----- --- --- --------------------- -----

Nowak 2007 Depo at p. 46.  The notes continue

(b)

**(b)**---- ---------------------- ------- ------------------------ ------- ----------- ------
--- --------- ---- ----- ------ ------------ ------------ --------- -- ------- --- ------- ---- -- ---
- --- -- --- -- ------ ---- --------- --- -- ----------------- --- ------- --- ------ --- --- ----- ---
--- ------ ------------------------

Nowak progress note dated 10/11/99; Nowak 2007 depo at. P. 52.

Two days later, October 13,  plaintiff missed an appointment because her car was stolen, but she did not display inability to deal with the situation.  Nowak 2007 Depo at p. 56 .

(b)

**(b)** ------ --------------------------------------------- --------- -----
-- ---- ------------------------ ------------------------------------------ ------------
-------------- ----------------- ------------------------------------
-- ---- ------ --- -- ------ --- -- ------ -- -- --- --- --------- -------- 
-------- ------- ----- -----------------------------------------------------------------
------------------------------ ------------------- ------------------------ ----- ------
- ---------------- -- ------------ ---------- ------------------- ----------------- -----
-------------------------------- --------- ----------- -------------------- ----------- --------
--- ------------ ---- ---- -- ------------ -- --- --- ------- -
-- -------------------------------------- ---- ----------------
-- ------------------------------------------------------------------------------- -
-------- ------------------ ----------------------------------------------------------- -
- -------------- ----- ---------- ------ ----------- ----------------------------- -----------
------ -------- ------- ----- ----------- - ------------------ ------------------- ------- -----
---- ------ --- ----------- ---- ---- - ----- ------ ---- ---

*Id*.  Thus, in a stressful situation,  plaintiff could interact with the police and insurance company.

Dr. Nowak submitted a letter dated October 21, 1999 in which she recommended an accommodation for plaintiff:

I have had the opportunity to understand Ms. Bearman's situation in greater depth.  I believe she could function at her job and return to work if a

19

> accommodation is made. This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where [plaintiff] previously worked for over three years and received a certificate of merit.  The reason for this is that Ms. Bearman's **self esteem** is at a very low level in her current position.  Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized and unable to work.

IF. at p. 61. (Emphasis added).

Plaintiff submitted a Rule 26 expert statement from Dr. Nowak dated December 14, 2006.

Docket Number15 at Document 15-2.   The statement says that "In October 1999 Ms. Bergman had a disability as a result of her depression that prevented her from doing her job as then configured."  12/14/99 Nowak letter at p. 1.  The Rule 26 statement does not mention any other major life function allegedly significantly impaired by plaintiff's depression.  The cover letter submitted by plaintiff's counsel similarly does not claim that Dr. Nowak will testify to significant impairment of any major life activity other than work.  *Id.* at Document 15-1.

Additionally, at her deposition Dr. Nowak did not contend that any major life function was substantially impaired except for working:

**(b)**

> **(b)** --- -- -------------------------- ---- -- ------ ----- ---- ----- ------- --- ---- --- - ------ -
> -- - ---------- ------ ---- --- -- ---- -------- ---- ---- --- --
> -- ---- ----- ---- --- ----- -- --- -- --- ------- - --------- --- ------ ----- --- ---- -----
> --------------- ------------- ----- ----- ------------------- ------------- --------------
> - --- -------- -- --------- ---- ----- - -- --------- ----- ----- --- ---- ---- ----- - --- --- -
> --------- ----------------- ---------------- ----------------- ----------------- -------------
> --------------------------------------- ------------------------------ ----- ------------
> -------------------- -
>         -- ------------------------------------------------- -------------------
>         -- ------------------------------------------------ --------- ----------------------- -
> ------ -------
>         -- ----- --- --- ---------
>         -- - ----- ---- ---- ----- -----
>         -- --- ------- -- ------ ---------- --
>         -- ------------ ------------------------- ------ ----- ------- ---- ----- -------
> ------ ------------- --------- ---- --- ---- -- ---- ------------------- -------------- ----- -----
>         --- ------------ ----- -- ---- ------- - ----
>         -- --- - ----- -- -- - ---- ----- ------ -- -- - ---- ------ --- - ------- -- -- --
> -- --------------- ---- ------------------------ ---- -------- --- ----------- - ------ - ---
> -------------

Nowak 2007 Depo. at p. 70-71.

Plaintiff has not met her burden of proving that any major life function other than work was substantially impaired by her major depression.

**Plaintiff has not proved that the major life activity of work was substantially impaired by her major depression**

**The *Sutton* Test**

The Supreme Court has ruled that:

When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege

---

[2] See above, plaintiff says the only support she got from her friend and cousin was "moral support."

[3] While eating has been recognized as a major life activity, defendant is unaware of any authority that food preparation alone is a major life activiry. Moreover, food preparation has no relevance to whether plaintiff can carry out any function of her job.

they are unable to work in a broad class of jobs. Reflecting this requirement, the EEOC uses a specialized definition of the term "substantially limits" when referring to the major life activity of working:

"significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. **The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.**" § 1630.2(j)(3)(i).

The EEOC further identifies several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." §§ 1630.2(j)(3)(ii)(A), (B). To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-492 (1999). Plaintiff Bergman has not alleged or proven that her disability has precluded her from being able to do a wide range of jobs. Plaintiff has not even pointed to any element of her job, as a Program Analyst in the Office of Public Liaison and Small Business Affairs, which she could not do. *See e.g.* Bergman 2007 Depo at p. 29 (Q. Were you able to do the work? A. I was able to do what ever was asked of me."). Rather, plaintiff did not like her job and wanted to work as a tax attorney. See *Id.* at 41-42. (" Q. Did you ever specify what kind of work you wanted when you asked for more work? A. Well, you're assuming that I did ask for more work. What I told Ms. Curry was I had 20 years experience as an international tax attorney and that was the type of work I wanted to do, and that was the type of work I expected to be doing."); p. 58-59 (" A. When I first joined the Office in September of 1998, my understanding was that I was to be the principle legal advisor as to how -- as to tax issues

22

affecting the small business community, and that I was to provide any guidance necessary relative to those issues.  Q.  And you were perfectly able to carry those functions out, is that correct?  A. Yes.  Q.  . . .What you had a problem with was not having something to do, is that correct?  A. Exactly. * * *  Q.  Was there **any job** that you felt you could not carry out the functions of?  A. The only thing I could not do was sit at my desk eight hours a day with nothing to do.") (emphasis added)

Plaintiff has not met her burden of showing that her impairment disqualified her from a substantial class or range of jobs.  *See Gasser v. District of Columbia*,  442 F.3d 758, 764 (D.C.Cir. 2006).  Plaintiff is an attorney with a Masters in Taxation and has passed the Patent Bar.  There are a plethora of jobs for attorneys in the Washington D.C. area,  including in the federal and local legislative and executive branches, trade groups,  private law firms and private industry both national and international.  Plaintiff has not shown herself to be disqualified from any of these myriad job possibilities by her impairment.

As Dr. Nowak's note of October 11, 1999 reflects



Nowak progress note dated 10/11/99; Nowak 2007 Depo at. p. 52.  Plaintiff's boredom and lack of job satisfaction denote solely her inability to do one specific job, the Management Program Analyst position in the Office of Public Liaison as it evolved.  *See Gaul v. Lucent Technologies, Inc.*,  134 F.3d 576, 580 fn.3 (3rd Cir.1998); 29 C.F.R. §§ 1630.2(j)(3)(i); *Weiler v. Household Finance Corp.* 101 F.3d 519, 525 (7th Cir. 1996).

When plaintiff Bergman took the job in the Office of Public Liaison she thought that "it appeared to be a good fit. While it was, you know, that nobody knew how this office was going to develop because it was in the very early stages, I thought this might be a good idea." EEOTr:Bearman at p. 105-106. As it evolved, that particular job ultimately was not "a good fit" for her. However, plaintiff's inability to work at that particular job -- because she was bored, not sufficiently intellectually stimulated, lost self esteem -- does not constitute a substantial limitation of a ''major life activity."

Plaintiff has failed to establish an essential element of her accommodation claim. Therefore, her claim must be dismissed because she had no right to an accommodation under the Rehabilitation Act nor any right to any of the protections of the Rehabilitation Act or ADA.

**Plaintiff's accommodation request was not reasonable**

The ADA defines the term "discriminate" to include

not making reasonable accommodations **to the known physical or mental limitations** of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity

42 U.S.C. § 12112(b)(5)(A).

Doctor Nowak's letter of October 21 stated the reason for her recommendation -- that plaintiff's job be restructured to the full-time practice of law or alternatively a transfer to the Chief Counsel's office – as follows:

The reason for this is that Ms. Bearman's **self esteem** is at a very low level in her current position.

IF at p. 61. In discussing the self esteem issue, Dr. Nowak testified that she recommended that plaintiff be transferred:

24

Because she is an intellectually active person. Her work is a very important source of self-esteem. Doing meaningful and good work, I mean in and of itself, that matters to her. That work being meaningful to the people for whom she does it, getting some kind of positive feedback for it, is an enormously important part of what maintains her sense of self esteem.

She found the environment she was in to be demeaning and it created a catastrophic injury to her self esteem.

EEOTr:Nowak at p. 57. Dr. Nowak also testified

I became convinced that this was work-related and that it was connected to the fact that she is a quite intelligent, intellectually proud and intellectually smart person who found herself in a position in which a main project she had had been taken away from her and that she was doing incredibly boring and dull work.

*Id*. at p. 37.

Making an accommodation on the basis of plaintiff's self esteem would impose an impractical obligation on defendant and would impose an undue hardship not only on defendant's operation, but also the operations of any employer. If defendant had to accommodate to plaintiff's "self esteem," it would, among other things, have an obligation to insure that she not be given what to her was "boring or dull;" the defendant would have to insure that the assignments plaintiff got were "meaningful to her;" the defendant would have to insure that the assignments rose to plaintiff's "intellectual" requirements; the defendant would have to insure that plaintiff's supervisors gave her positive feedback. This would impose an enormous and unwarranted burden on defendant, and would place the Court in the position of dictating what particular work assignments are required. The requested accommodation is unreasonable as a matter of law. *See Gaul v. Lucent Technologies, Inc*., 134 F.3d 576, 581 (3rd Cir.1998)

Based on the foregoing, we conclude that Gaul has failed to satisfy his burden for three reasons. First, Gaul's proposed accommodation would impose a wholly impractical obligation on AT & T or any employer. Indeed, AT & T could never achieve more than temporary compliance because compliance would depend entirely on Gaul's stress level at any given moment. This, in turn, would depend on an infinite number of variables, few of which AT & T controls. Moreover, the term "prolonged and inordinate stress" is not only subject to constant change, it is also

25

subject to tremendous abuse. The only certainty for AT & T would be its obligation to transfer Gaul to another department whenever he becomes "stressed out" by a coworker or supervisor. It is difficult to imagine a more amorphous "standard" to impose on an employer.

Second, Gaul's proposed accommodation would also impose extraordinary administrative burdens on AT & T. In order to reduce Gaul's exposure to coworkers who cause him prolonged and inordinate stress, AT & T supervisors would have to consider, among other things, Gaul's stress level whenever assigning projects to workers or teams, changing work locations, or planning social events. Such considerations would require far too much oversight and are simply not required under law.

Third, by asking to be transferred away from individuals who cause him prolonged and inordinate stress, Gaul is essentially asking this court to establish the conditions of his employment, most notably, with whom he will work. However, "[n]othing in the ADA allows this shift in responsibility." Weiler, 101 F.3d at 526. "Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy. Congress intended simply that disabled persons have the same opportunities available to them as are available to nondisabled persons." Wernick v. Federal Reserve Bank of N.Y., 91 F.3d 379, 384 (2d Cir.1996).

In sum, Gaul does not meet his burden under Shiring because his proposed accommodation was unreasonable as a matter of law. Therefore, Gaul is not a "qualified individual" under the ADA.

*Id.; see Thompson v. Rice,* 422 F.Supp.2d 158, 177 (D.D.C.2006)(*"Moreover, because a request to alleviate stress and anxiety caused by an employee's working conditions is generally unreasonable, the Court would dismiss the 2001 reasonable accommodation claim on this ground alone. See Gaul v. Lucent Technologies*, 134 F.3d 576, 581 (3d Cir.1998); *Newby v. Whitman*, 340 F.Supp.2d 637, 657-58 (M.D.N.C.2004)".)

Therefore, plaintiff Bergman is not a "qualified individual" under the ADA, and defendant was not required to accommodate her as requested.

**Plaintiff has not proven any actionable failure to engage in the "interactive process"**

Plaintiff argues that the defendant failed to engage in the "interactive" process required by the ADA.

26

> Because the interactive process is not an end in itself, it is not sufficient for [the employee] to show that the [employer] failed to engage in an interactive process or that it caused the interactive process to break down. Rather, [the employee] must show that the result of the inadequate interactive process was the failure of the [employer] to fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the qualified individual a reasonable accommodation." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015-16 (7th Cir.2000) (*quoting Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996)). The interactive process begins when an employee requests an accommodation. Once this process has begun, both the employer and the employee have a duty to act in good faith, *Conneen v. MBNA America Bank, N.A.*, 334 F.3d 318, 333 (3d Cir.2003), and the absence of good faith, including unreasonable delays caused by an employer, can serve as evidence of an ADA violation. *See, e.g., Picinich v. United Parcel Serv.*, 321 F.Supp.2d 485, 514 (N.D.N.Y.2004).

*Pantazes v. Jackson,* 366 F.Supp.2d 57, 70 (D.D.C.2005)

Plaintiff cannot meet her burden of showing that defendant did not make a good faith effort to assist her in seeking an accommodation.  Nor can she show that defendant failed to communicate in good faith with her and her representatives concerning her various requests for accommodation.

On October 4, plaintiff told Ms. Sottile she had to take a medical leave.  Ms. Sottile allowed her to go.  EEOTr:Bearman at 136-138.

Plaintiff was on leave without pay, and requested advanced sick leave. 10/18/99 Mendola Memo.   Labor Relations asked Dr. Presant to review plaintiff's medical documentation and "advise if her condition justifies her being totally disabled for work for 30 days or more."  *Id.* On October 26, 1999 at 8:05 AM Dr. Presant advised that he had read the medical documentation, Dr. Nowak's October 11th letter, and had spoken with Dr. Nowak.  He said that the medical evidence established that plaintiff's medical condition could reasonably be expected to have caused her to miss work during the time in question and Dr. Nowak estimated that plaintiff should be able to return to work in 6-8 weeks. IF at 284.  That day, Ms. Sottile approved the 240 hours of advanced sick leave. 10/27/99 Sottile memo to Chief Communications and Liaison.  Ms. Sottile also

forwarded a Leave Sharing Memorandum for Ms. Bergman.  Ms. Sotille also stated "Although we

can't be sure what accommodation Terri's lawyer will request, it is possible that it will involve a job

transfer to a less stressful office.  Considering the responsibilities her present job entails I would

support her reassignment to a less stressful job.  *Id.*

Meanwhile, on October 22 , 1999, plaintiff's lawyer sent to Dr. Presant , with a courtesy

copy to David Williams, Chief, Communications & Liaison, the request for an accommodation of

job restructuring to include the full time practice of law or a transfer to the Chief counsel's Office.

IF at 56-60.  On October 29, 1999, Kathy King faxed to Dr. Presant the accommodation request

letters from plaintiff's attorney and doctor.  10/29/99 King fax.

Plaintiff's lawyer sent Mr. Williams a letter on November 15, 1999, stating they had

received no response to the request, and asking that he contact them about plaintiff's

accommodation request.  IF at p. 62-63.   The following day, Mr. Williams informed plaintiff's

attorney that he had forwarded the request to the Office of Labor Relations.  IF at p. 118.

On November 15, 1999, Dr. Presant sent to Ms. King, the EEO Specialist, a letter stating

that  he needed information about why plaintiff left her legal position.  11/15/99 Presant ltr.  On

November 17, plaintiff's attorney spoke with the Acting Section Chief for Labor Relations, Ms.

McIver; she stated that the request had been assigned to someone who had just left the IRS and that

Ms McIver had not looked at the request yet.  IF at p. 118-119.  On November 23, 1999, Ms.

McIver sent to plaintiff's attorney a letter requesting a release from plaintiff allowing the release of

her employment information.  IF at p. 66.  Labor Relations received a response on November 24,

1999. IF at p. 67-68, 119.  On November 24, 1999, plaintiff spoke with Ms. McIver, who promised

to help expedite plaintiff's request.  IF at P. 119.   November 25, 1999 was Thanksgiving.

November 25 was on a Thursday.   See 1999 Calendar

On December 2, 1999, Labor Relations responded to Dr. Presant's November 15, 1999 request for additional information. In keeping with the promise to plaintiff, they also told him "Due to the urgency of this case and some extenuating circumstances, I am requesting that you expedite this request and provide your recommendations on the subject case by close of business on Friday, December 3, 1999, or no later than Tuesday, December 7, 1999." 12/2/99 McIver lrt. Dr. Presant responded the next day, and recommended "from a medical point of view that she be accommodated with a position appropriate to her legal and educational background if there is such a position available in your agency." IF at p. 280.

After the recommendation was received from Dr. Presant, Mr. Fulcher was put in charge of the accommodation. EEOTr:Fulcher at pp. 352-353. Mr. Fulcher contacted Labor Relations and the EEO Office. *Id.* at p. 354. He was exploring whether plaintiff could be provided a detail while the accommodation was being worked. *Id.* The meeting was held on about December 16. *Id.* A manager from Appeals was at the meeting and "expressed interest in arranging a detail if she could receive approval from her executive." *Id.* As is discussed below in the retaliation section, funding for the detail could not be worked out. Shortly after the December 16 meeting, Mr. Fulcher prepared memoranda for IRS Offices in the national office area and for Counsel's office. *Id*. at p. 356-357. The memoranda were reviewed through EEO, Labor Relations and his manager. *Id.* at p. 357. On January 4, 2000, the memoranda were sent out. *Id.* at p. 357-358; IF at p. 22 (memo to Chief Counsel) & p. 25 (memo to IRS organizations Examination, International, Appeals requesting responses by January 15). Those three organizations within the IRS were selected because they were the IRS organizations that had GS-905 attorney-advisor positions. IF at p. 22. Mr. Fulcher met with Counsel's office and followed up with the other organizations. EEOTr:Fulcher at p. 358-

360.  Counsel's Office initially did not give him a firm answer one way or the other, and Mr. Fulcher got negative responses from the other offices.  *Id.*

Having obtained no positive responses, Mr. Fulcher expanded his search to IRS offices in Maryland, Delaware, Richmond and Virginia/West Virginia.  *Id.* at p. 360.  Virginia/ West Virginia offered a position at its Bailey's Crossroads Office, as a Grade 12 attorney.  *Id.* at 360-361.  On February 7, 2000, a tentative offer was made to John Burns, in EEO.  A final offer was made to plaintiff on March 7, 2000.  *Id.* at 361.  Between February 7 and March 7 they worked out an agreement in which the District offered pay retention to plaintiff.  *Id.*  Mr. Fulcher gave plaintiff a formal update on his search efforts in a January correspondence.  *Id.* at 364; IF at p. 167-168.  Mr. Fulcher did not tell plaintiff orally what steps were being taken because "As events unfolded Ms. Bearman really wasn't in the office very often because of her illness.  I don't recall telling her in person what the results were, but it certainly was no secret."  EEOTr:Fulcher at p. 364.

Plaintiff's counsel also was in contact with Ms. Barry, the GLC attorney assigned to the matter.  IF at 119.  Her attorney sent Ms. Barry on December 16, 1999 "legal and administrative precedent supporting my request to be assigned to an attorney position in the Office of Chief Counsel.  Ms. Barry consistently maintained that the Office of Chief Counsel was not part of IRS and, therefore, the law was no applicable."  *Id.* at p. 119.

In the interim, on November 23, 1999, Dr. Nowak sent to Dr. Presant a letter asking that plaintiff's medical leave of absence be extended by one month.  IF at p. 283, 11/23/99 Nowak letter.  On November 26, 1999, Dr. Present sent a letter to Labor Relations concurring in the request for 4 more weeks of leave.  11/26/99 Presant ltr.  On December 1, 1999 Mr. Fulcher sent plaintiff a letter advising that her request for an additional four weeks of leave had been granted and would be processed as leave without pay (LWOP).  As of November 29, 1999, plaintiff had exhausted all of

her sick leave, annual leave and advanced sick leave.  Therefore she was on a LWOP status as of

November 29.  Fulcher 12/1/99 ltr.   Without additional authorized leave, plaintiff would be

expected to report to work on December 28, 1999.  *Id.* As is discussed below in the retaliation

section, during the period while defendant was working on the job transfer request, plaintiff in

December was allowed an accommodation of returning to work on a reduced 10AM to 4PM duty

schedule.  In January, when defendant's managers became concerned because of her mention of a

life and death situation, plaintiff was placed on indefinite leave with pay, pending receipt of an

evaluation from Dr. Nowak that plaintiff could return to work.  IF at p. 167-168.

   Defendant was responsive to plaintiff's multiple requests for accommodation and

communicated with plaintiff's representatives and plaintiff concerning these requests.  When

plaintiff said she needed to be off from work, the defendant gave her leave.  When plaintiff said she

wanted to come back to work on a revised schedule, defendant allowed that.  Plaintiff's doctor said

that plaintiff needed to work full time as an attorney.  Mr. Fulcher had to go to different

organizations within IRS to seek an attorney position for plaintiff and he made inquiry outside the

IRS to Chief Counsel's office.   He made reasonable efforts to obtain an attorney position for

plaintiff and did so within a reasonable time.  Further, Mr. Fulcher did find an attorney position for

plaintiff.  Additionally, although plaintiff did not like the response, according to plaintiff GLS

attorney Barry consistently communicated to plaintiff's counsel the position that Chief Counsel was

not required to give plaintiff an attorney position as an accommodation.

   Here plaintiff's attorney and doctor made it quite clear what accommodations were being

requested, and defendant acted on those requests.  Thus, although plaintiff is not entitled to any

protections under the Rehabilitation Act or the ADA, the defendant did engage in good faith in an

interactive process with her and her representatives.

**Plaintiff Had No Right to Transfer to the Office of Chief Counsel**

Plaintiff contends that the agency could not limit its search for transfer options to the appointing authority of the IRS, but was required to transfer her to the Office of Chief Counsel.

At the times pertinent to this case, 29 C.F.R. § 1614.203 (g) provided :

> When a nonprobationary employee becomes unable to perform the essential functions of his or her position even with reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position located in the same commuting area and serviced by the same appointing authority, the essential functions of which the individual would be able to perform with reasonable accommodation if necessary unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of the program. In the absence of a position at the same grade or level, an offer of reassignment to a vacant position at the highest available grade or level below the employee's current grade or level shall be required.

29 C.F.R. §1614.203 (g).   This C.F.R. section  was not amended until May 21, 2002. See 29 C.F.R. § 1614.203 (b).

As is indicated above, the Office of Chief Counsel, through GLS attorney Barry consistently took the position that it was not obligated to transfer plaintiff to an attorney position in that office, pursuant to 29 C.F.R. §1614.203 (g).  Plaintiff took the position that due to the 1992 Amendments to the Rehabilitation Act, the agency had to follow ADA standards and that the "undue hardship" test under the ADA superseded the CFR and required transfer to an available position outside of the appointing authority of the IRS.

As did the Administrative Judge in this matter, see Hearing Decision at p. 7 , several Courts, either explicitly or implicitly,  have rejected plaintiff's position. *See Mitchell v. Crowell*,  975 F.Supp. 1440, 1442 fn 2 (N.D.Ala.1997) ("With respect to plaintiff's argument that the October 29, 1992 amendments to the Rehabilitation Act incorporate the broader standards of the ADA, and thus, supersede any limitations imposed upon plaintiff's transfer rights under 29 C.F.R. § 1614.203, the

court is of the opinion that defendants' reassignment obligations are defined by 29 C.F.R. § 1614.203(g)."); *Jacobs v. Henderson,* 2001 WL 34866606, *17( M.D.Ala.2001), motion for reconsideration denied by *Jacobs v. Potter.* 2005 WL 3690546, *1 (M.D.Ala.2005) (involving 1997-1998 activities and both describing appropriate standard as offer to reassign "a nonprobationary employee . . . to a funded vacant position located in the same commuting area and serviced by the same appointing authority . . . unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program."); *Craig v. Potter,* 2003 WL 21349469, *7 (N.D.Ind.2003)( citing 29 C.F.R. § 1614.203(g) (1998) as the appropriate standard for reasonable accommodation discrimination allegations of June 26, 1999, *id.* at *3 ); *Bennett v. Henderson,* 15 F.Supp.2d 1097, 1108 (D.Kan.,1998)(same for 1994-1995 allegations) *affirmed* 172 F.3d 62 (Table) (10th Cir. 1999).

IRS and the Office of Chief Counsel have distinctly separate appointing authorities. *See* EEOTr: Nieser at p. 329-333; Department of the Treasury, Internal Revenue Service and Department of the Treasury, office of Chief Counsel, Internal Revenue Service, and National Treasury Employees Union, 56 FLRA No. 76 (2000) (Attachment 2); Treasury Order 107-07 (Attachment 3). Therefore, even if plaintiff had been protected by the ADA and the Rehabilitation Act, transfer to the Office of Chief counsel was not required.

**Retaliation**

Plaintiff's complaint alleges that she was retaliated against for asserting her rights under the Rehabilitation Act. Complaint at ¶15. The acts of retaliation discussed below are those which plaintiff claimed before the EEOC. Investigative summary at p. 1-2.

**January 1999 to October 4, 1999, given secretarial and clerical duties and was not given work to perform at a GS-14 level**

Plaintiff made her request for an accommodation through the October 22, 1999 letter of her attorney.  IF at p. 56-58.  Plaintiff's initial contact with an EEO counselor concerning her request for accommodation was on December 15, 1999.  IF at p. 18.  Therefore, there can be no causal connection between her request for accommodation and alleged actions which occurred before her request for accommodation.

### November 19, 1999, management intervened in a payment arrangement . . . regarding repayment of monies owed to the IRS and threatened potential disciplinary action

In September 1998, plaintiff incurred a debt to the IRS as the result of an emergency salary payment of $1,321.86.  IF at p. 189.  The IRS records reflect that plaintiff submitted a personal check to IRS for the amount owed in October 1998, but that the check bounced due to insufficient funds in plaintiff's account.  *Id.*   In September 1999, plaintiff paid $50.  IF at p. 191.

Plaintiff's complaint to the EEO alleged that Ms. Sottile had her supervisor intervene in a payment arrangement plaintiff had made with customer service and that Sottile had the date of the repayment accelerated by 6 weeks to a time when she knew plaintiff  would be on leave without pay status.  IF at p. 114.  Plaintiff also claimed that after she had paid,  "I was further threatened by my supervisor with potential disciplinary action." *Id.*

Plaintiff's supervisor, Mr. Fulcher, was notified of plaintiff's debt in November 1999 when a Customer Service employee called him, because plaintiff had not been returning her calls.  EEO Tr:Fulcher at p. 377, 426.  He found out about the bounced check and that an arrangement had been made to repay the balance over a period of time. However, in the intervening year only one payment had been made and that was for the amount of $50. *Id*. at p. 378.   Mr. Fulcher "met with Labor Relations to obtain some guidance from them and the result was that three days later, November 16th, a memorandum was sent to Ms. Bearman stating that the payment needed to be made by . . .

December 10th, or that disciplinary action could be taken." *Id.* at p. 379. He issued plaintiff a letter dated November 16, 1999. IF at p. 189. The letter cited to the ethical standard which requires employees "to satisfy in good faith" their financial obligations, and stated "In good faith means an honest intention to fulfill any just financial obligation in a timely manner. Failure to meet this standard can result in disciplinary action up to and including removal. Therefore, it is mandatory that you promptly repay, in full, you outstanding debt no later than December 10, 1999. . . ." *Id.* Plaintiff paid off the debt by check dated December 6, 1999 IF at p. 190. No disciplinary action was taken against plaintiff. IF at p. 247; EEOTr:Fulcher at p. 379.

Plaintiff has failed to meet her burden of showing any material adverse action. Plaintiff owed $1,321.86 to the IRS. In October of 1998 she issued to IRS a check which bounced. In over a year she had made only one payment, a $50 check issued on September 23, 1999. IF at p. 191. Therefore, she owed the IRS $1,271.86. Plaintiff made the payment on December 6. No disciplinary action was taken. Plaintiff has not established how paying a debt that she owed is a material adverse action. Indeed it appears that she did not even have to pay interest on the amount owed. Advising that disciplinary action could be taken is not a material adverse action.

In the alternative, assuming that the Court were to conclude that plaintiff did suffer an adverse action, the legitimate non-retaliatory reason for Mr. Fulcher's action is that after learning of plaintiff's debt and its history, he consulted Labor Relations for guidance and the November 16 letter resulted from their guidance. The IRS is an agency which imposes stiff interest and penalties on taxpayers who are slow or delinquent in paying their debts to the IRS. It is not surprising that they would seek payment of such an outstanding debt from an employee.

**December 1999, plaintiff's request for compensatory leave for religious observation was denied**

Although plaintiff was authorized leave without pay until December 28, 1999, Dr. Nowak

sent to the labor relations office a letter dated December 3, 1999, stating that

> Ms. Bearman . . .must return to work next week for financial reasons.  She is not
> fully recuperated but I believe that she is sufficiently improved to be able to return
> part-time with short term accommodations. . . .
>      Ms Bearman continues to have difficulty with attention and concentration
> and has diminished energy and fatigues more readily.  Therefore, I request that she
> be allowed to work part-time for several weeks.  I would recommend a 6 hour work
> day from approximately 10 AM to 4 PM with some flexibility for determining the
> beginning and end of her day.  I feel this is necessary for a short period but one
> which I cannot yet specify exactly.

IF at p. 73.   However, plaintiff did not return to work the next week. Instead, plaintiff sent to her

supervisor, Mr. Fulcher, a letter dated December 7, 1999, which requested advanced religious comp

time for the  week and indicated plaintiff would be returning to work beginning the week of

December 13. 1999.  IF at p. 74.

By letter dated December 9, 1999, Mr. Fulcher advised plaintiff that her request for 40 hours

advanced religious compensatory time was denied.  The letter advised her that any time missed for

the week of December 6th would be charged as leave without pay.  IF at p. 76.[4]   He explained that

the federal regulations provide that religious compensatory time should be granted unless granting

the time "interferes with the efficient accomplishment of an agency's mission.  Pursuant to the

Service's Time and Leave Handbook the Service has determined that the efficient accomplishment

of its mission may be interfered with if, 'no opportunities are foreseen, within a reasonable length of

time (120 days), at which the employee will be unable to repay.

---

[4]  Although the religious compensatory time was denied and plaintiff did not come in, a
decision was made to place plaintiff on leave without pay (LWOP) rather than AWOL.
EEOTr:Fulcher at p. 383.

 compensatory time taken.'" *Id.*    The records reflected that plaintiff already had a 42-hour religious

compensatory time deficit which had been in existence since at least January 1, 1999. *Id.* "An

additional 40 hour deficit would make it very difficult for you to repay the advanced leave within

the next 120 days.  Repayment of the leave is even more problematic since your physician does not

believe you should return to a full-time schedule for al least several weeks. *Id.*  Plaintiff also had

failed to follow office procedure requiring that leave be requested in advance. *Id.* Such a request is

to be made 15 business days in advance of the anticipated start date.  EEOTr:Fulcher at p. 380

Thus, the legitimate non-discriminatory reason for Mr. Fulcher's action is reflected in his December

9, 1999 letter. *Id.* at 380-382.  After plaintiff returned to work, she sent Mr. Fulcher an e-mail on

December 16 stating that the time and attendance records were incorrect and that she only owed 18

hours from 1997 and 1998.  Plaintiff's inability to repay the 18 hours in that two year period

supports Mr. Fulcher's belief that she would be unable to repay any additional advanced

compensatory time within a 120 day period.

### Plaintiff was charged Absent without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999

Plaintiff's request for advance religious compensatory time had stated that she would be

returning to work on December 13.  IF at p. 74.   The letter from plaintiff's doctor had stated that

she would be starting work the week of December 5, but only from 10AM to 4PM.  IF at p. 73.

However, plaintiff was absent on December 13th and 14th and two hours late on December 15.

EEOTr:Fulcher at p. 383.  Plaintiff's doctor did not give any excuse for plaintiff being absent. *Id.* at

p. 384.  Plaintiff did not call in to tell Mr. Fulcher she would not be working those days. *Id.* at p.

385.  She received an e-mail from Mr. Fulcher on December 16, 1999.  It advised that she was

being placed on Absent Without Leave (AWOL) for 6 hours on December 13, 6 hours on December 14 and 2 hours on December 15. IF at p. 91.

Plaintiff has not established that placing her on AWOL is a material adverse action. Plaintiff stated "The letter said I was approved for leave without pay status through December 28th and I would be expected to return to work on December 28th, 1999.  It was my understanding that my absences were excused, **not pay status**, but excused through December 28th of '99."  EEOTr: Bergman at p. 150.(emphasis added).  Since plaintiff would not be a pay status whether designated as AWOL or LWOP, there was no material adverse action.

Additionally, as is reflected in his memorandum, it was Mr. Fulcher's understanding that plaintiff was returning to work on December 6, and plaintiff had said in her request for advance comp time that she would be returning December 13 per Dr. Nowak's letter.  Doctor Nowak's letter can reasonably be interpreted as meaning that plaintiff no longer needed the advance leave since plaintiff could return to work on a limited work schedule basis.  Plaintiff  had not contacted Mr. Fulcher and had not requested leave for the 6 hours she was expected to work on December 13, 14, and 2 hours on Dec. 15.   Thus, he reasonably believed her to be away without leave.

**The plaintiff's repeated requests to be placed on a 120-day detail, as an interim accommodation , was ignored**

Plaintiff has offered no proof that a request for a detail was ignored.  About December 16, 1999 the issue of a detail with Appeals came up.  EEOTr:Fulcher at p. 411.  There were issues as to whether there was a vacant position and how it was going to be funded.  *Id* at p. 412.  On January 6, 2000 the issue of the detail to Appeals was discussed.  *Id.*  Fulcher Ex 2 at Bates #23.  Just the day before, plaintiff had called the Commissioner's Office.  *Id.* at Bates # 24 (10:10 meeting).  "It was agreed that her comments to Steve may or may not be construed as suicidal but that IRS should

38

come down on the side of caution until someone qualified could make that determination." *Id.*
Therefore it was decided that Dr. Presant should contact plaintiff's doctor. *Id.*    In relation to the
detail, "We tentatively agreed that work on the detail should be delayed until the medical issue was
resolved."*Id.*  Plaintiff was told not to come into the office on January 6, and was placed on paid
administrative leave.  *See* EEOTr:Bearman at 160-167.

Dr. Nowak responded to the agency's inquiry about when plaintiff could return to work by
letter dated January 21, 2000, "Ms. Bearman should not be required to return to work until such
time as her request for a reasonable accommodation is acted upon."  IF at p. 164.

On February 1, 2000, Mr. Fulcher was advised that Dave Williams did not want to pay for
the detail and that they should check to see if Appeals would pay for the detail.  EEOTr: at Fulcher
Ex. 2 at Bates # 27.  On February 3, Mr. Fulcher inquired whether Appeals would be willing to
absorb the cost of plaintiff's detail since his division was picking up the costs associated with an
appeals employee detail.  *Id.*  On February 8, 2000, Mr. Fulcher was advised that Appeals could not
fund the detail.          Thus, plaintiff has not offered proof that her request for a detail was ignored.

**On December 23, 1999, management monitored the plaintiff's telephone calls
and use of the internet**

Plaintiff's complaint to the EEO counselor was that when she returned to work part time, i.e.
beginning on December 1, 1999, "Ms. Sottile had my supervisor monitor my phone calls and even
my use of the Internet.  This occurred on December 23, 1999, 2 days before Christmas.  IF at p. 122.

Plaintiff and Mr. Fulcher shared an office, and they sat approximately three to five feet
apart.  Bergman 2007 depo at p. 33.  The seating arrangement remained the same when he became
her supervisor.  *Id*. at p. 36.  There was no partition between them.  "A.  My desk was behind me,
his desk was behind him, so we faced -- we could -- if we turned around we faced each other.  He

could see my computer.  He could see what I was looking at on my computer and he could hear my

phone conversations."  Bergman 2007 Depo at p. 36.  Plaintiff related that one day Mr. Fulcher was

watching what she was doing on the computer and told her that it was against office policy to surf

the internet.  *Id.* at p. 46.  No written action was taken against plaintiff.  *Id.* at p. 47.  Plaintiff related

that on one occasion Mr. Fulcher heard her making a telephone call to her father and told her it was

against office policy to make personal calls.  *Id.* at p. 49-50.

Mr. Fulcher's affidavit reflects that he did not systemically monitor plaintiff's or any other

employee's use of the telephones and internet.  IF at p. 248.  He did notice non-government related

activity on plaintiff's screen; plaintiff was not issued an official reprimand or any type of discipline.

*Id.*  Thus, plaintiff has failed to establish that any material adverse action occurred.

**On January 3, 2000, the plaintiff was expected to perform the work of a full
time employee while working part-time**

Plaintiff testified that she did not have any work assignments when she came back on

December 15, other than making one or two telephone calls.  EEOTr:Bergman at p. 150-151

Plaintiff was asked: "What did you do in your job during this time frame after December 15th?"

She responded: "Basically for the time I was there, I was required to sit at my desk and look busy."

*Id*. at p. 153.   When asked "Did you have any work assignment whatsoever?"  Plaintiff responded

"No."  *Id*. at p. 155.

By her own admission plaintiff did little to no substantive work after she returned part time.

Plaintiff had not identified any full-time work assignment which she was required to do on January

3, 2000.  Plaintiff has shown no material adverse action.

**During the week of February 3, 2000 the plaintiff's attorney was subjected to
abusive language by  GLS employees when plaintiff's attorney requested the
status of plaintiff's requests for accommodation.**

The use of abusive language to someone other than plaintiff is not an action against plaintiff, much less an adverse action.

In the incident in question, an agency counsel hung up on plaintiff's counsel "in a fit of pique" IF at p. 275.   Plaintiff's counsel called and "demanded that I get to the bottom of some AWOL charges against her client.  Because the Complainant had a number of leave issues, I asked her attorney for the particulars of the AWOL charges and the dates of the AWOL charges.  Her attorney responded that she did not know.  I then suggested to the attorney that it would be difficult for me to get to the bottom of the matter if she could not even provide me with the necessary information.  The Complainant's attorney then asked for the name of my supervisor.  I provided his name and telephone number and hung up."  *Id.*

### On February 26, 2000, the plaintiff was denied a within grade increase to a GS-14 step 6

Plaintiff did not allege that her supervisors affirmatively denied her a within grade increase. Rather, she alleged "Had management responded to my request for reasonable accommodation, and avoided the unnecessary delay in at least providing a temporary accommodation, it would not have been necessary to take leave without pay and I would have received a within grade increase to GS-14 step 6 in February 2000."  IF at p. 115. [5]   Plaintiff got her step increase: "Just prior to my accepting reasonable accommodation with the pay retention agreement I had got my step increase to a Step 6, and it was the GS-14, Step 6 salary to which the pay retention applied."  EEOTr:Bearman at p. 184.

However, as this court has ruled:

---

[5]   Neither Ms. Sottile nor Mr. Fulcher took any affirmative steps to deny plaintiff a within grade increase.  IF at p. 248, 257.

> it is well-settled that in assessing whether a Title VII violation has occurred the "proper focus is upon the time of the **discriminatory acts**, not upon the time at which the **consequences** of the acts became most painful."

*Jarmon v. Powell,* 208 F.Supp.2d 21, 30 (D.D.C.2002).  Thus, in assessing whether plaintiff has met her burden concerning this particular claim of retaliation, the **consequence** of alleged prior acts is not relevant.  Plaintiff alleges no affirmative act of reprisal, only the consequence of a prior act.  Therefore, plaintiff has failed to sustain her burden of showing a prima facie case of retaliation.

### On January 6, 1999, the manager delayed responding to plaintiff's request regarding the decision to place the plaintiff on paid administrative

As has been discussed above, a decision was made on January 6, 2000, to place plaintiff on administrative leave with pay for an indefinite period.  EEOTr: Fulcher at p. 389-390.  This was communicated telephonically to plaintiff on January 6th.   Plaintiff asked her supervisor, Mr. Fulcher, to confirm the decision in a letter to her as soon as possible.  IF at p. 108.   Plaintiff was sent a letter dated January 12, 2000.  Plaintiff  alleged that Ms. Sottile "deliberately attempted to delay the sending of the confirmation letter . . .and to get the decision revoked."  IF at p. 108.

Plaintiff's allegation of an "attempt" fails to even allege, much less prove,  a material adverse action.  Mr. Fulcher advised that it took to January 12 to get the letter out because "The memorandum was pretty sensitive and we wanted to make sure we were acting appropriately, that the wording was correct, and the letter . . .went to more than one person, it went through Labor Relations.  It just took some administrative time to insure it was prepared correctly and met our needs as well as the employees."  EEOTr:Fulcher at p. 391-92.

### PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT[6].

---

[6]  The complaint filed in District Court does not allege a hostile work environment and, therefore, such a claim arguably is not before the Court.  However, since the EEO Investigative

(continued...)

Employees are also protected from a hostile work environment stemming from retaliation. A violation occurs where a plaintiff's workplace is "permeated with [retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). To make a prima facie case of a hostile work environment, plaintiff must show: (1) that she is a member of a protected class; (2) that she was subject to unwelcomed harassment; (3) that the harassment occurred because of her protected status; and (4) that the employer knew or should have known of the harassment and failed to take preventative action. *Jones v. Billington*, 12 F.Supp. 2d 1 (D.D.C. 1997). Beyond simply a mechanical test, courts judge the workplace conditions by looking at the totality of the circumstances. These factors include the frequency of the conduct in question, its severity, its offensiveness, and its impact on work performance. *See Faragher v. City of Boca Raton*, 524 U.S. 774, 787-88 (1998); *Raymond v. United States Capitol Police Board*, 157 F.Supp. 2d 50, 58 (D.D.C. 2001).

Vital to a claim is the connection between the alleged hostility and a plaintiff's protected status. "Everyone can be characterized by sex, race, ethnicity, and many bosses are harsh, unjust, and rude. It is therefore important in hostile environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Bryant v. Brownlee*, 265 F.Supp. 52, 63 (D.D.C. 2003) (*citing Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)). The Supreme Court has stated its hope that "these standards for judging hostility are sufficiently

---

[6](...continued)
Summary lists the alleged acts of retaliation discussed above as evidence of an alleged hostile work environment, defendant addresses hostile work environment in this memorandum.

demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

Here the alleged evidence of a hostile work environment is the alleged acts of retaliation addressed above. IF Summary of Investigation at p. 4-11; IF at pp. 14-15, 102-108, 113-116, 117-124; Bergman 2007 Depo at pp 66- 68. Plaintiff has failed to establish that any of the individual acts was an actionable act of retaliation. Additionally, plaintiff has offered no evidence of retaliatory intent. Plaintiff testified that she had no oral contact with Ms. Sottile, Mr. Fitzpatrick or Mr. Fulcher from the time of her departure on October 6, 1999 to her return on December 15, 1999. Bergman 2007 Depo. at p. 60. The written contact included the denial of her request for advanced religious compensatory time and the letter sent to her about the repayment of her salary. A review of those documents does not demonstrate any retaliatory animus or harassment. Plaintiff took umbrage with the reminders about office procedures left on her chair when she returned. *Id*. at p. 64. However, there also was nothing harassing or offensive about the e-mail or the procedures. IF at p. 171-179. Indeed, plaintiff admits that she did not have any conversation with Mr. Fulcher about the documents. Bergman 2007 Depo at p. 64. The only communications plaintiff relates are that "First I was AWOL. Then I was away from my desk. I was five minutes arriving at the office, things like that." *Id*. at 65. Plaintiff also cited monitoring her computer use and listening to plaintiff's end of her telephone calls on one day as acts of harassment *Id.* at pp 67-68.

Plaintiff was asked if Mr. Fulcher ever made any disparaging statements to her regarding her request for accommodation:

> Q:   Did her ever say anything negative to you concerning your request for an accommodation?
> A:   Yes, He said to me that I was limiting myself by insisting on full time legal work.
> `   Q:   What else did he say?

A:    That's the only disparaging or the only negative comment he made to me
       concerning the reasonable accommodation.

* * *

Q:    . . .And what did you take that to comment to mean from him?

A:    That they were not going to consider reassigning me to one of the vacant positions
       in the Office of Chief Counsel.

Bergman EEOTr. at p. 69.

When viewed in its totality, the evidence in plaintiff's favor does not demonstrate that she

was subjected to working in a workplace that was in any manner permeated "with [retaliatory]

intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of

her employment. . . ." *Barbour v. Browner*, 181 F.3d 1342, 1348 (D.C. Cir. 1999)(citing *Sprague v.*

*Thorn Americas, Inc.,* 129 F.3d 1355, 1366 (10th Cir.1997) (five mild incidents of harassment over

16 month period did not create hostile working environment); *Saxton v. American Tel. & Tel. Co.,*

10 F.3d 526, 534 (7th Cir.1993) (same with two incidents over three week period); *cf. Tomka v.*

*Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) (sexual assault sufficiently severe to create hostile

work environment).   The Supreme Court has made it clear that "conduct must be extreme to amount

to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998).   Similar to *Keeley v. Small*

[P]laintiff's alleged "hostile" events are the very employment actions [s]he claims are
retaliatory; [s]he cannot so easily bootstrap alleged retaliatory incidents into a
broader hostile work environment claim. *See Lester v. Natsios*, 290 F.Supp.2d at 33
("Discrete acts constituting discrimination or retaliation claims are different in kind
from a hostile work environment claim that must be based on severe and pervasive
discriminatory intimidation or insult."). Plaintiff's claim simply does not meet the
threshold of severe, pervasive and abusive retaliatory conduct, and thus defendant is
entitled to summary judgment on this claim as well.

*Keeley v. Small,* 391 F.Supp.2d 30,  51 (D.D.C.2005).

## CONCLUSION

Therefore, defendant's motion for summary judgment should be granted.

45

Respectfully submitted,


_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____
RUDOLPH  CONTRERAS, D.C. Bar #434122
Assistant United States Attorney


_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TESSA E. BERGMAN,
            Plaintiff,

                                     Case No. 06-0303 (GK)

        v.

JOHN W. SNOW,
                Defendant

## STATEMENT OF MATERIAL FACTS

Defendant respectfully submits this statement of material facts as to which there is no genuine dispute.

1.  By letter dated October 11, 1999, plaintiff's doctor, Dr. Judith Nowak wrote  that plaintiff had "suffered an acute exacerbation of a chronic medical illness which necessitates a medical leave of absence. "  IF at p. 59-60, 10/11/99 Nowak ltr.  The doctor further wrote that plaintiff had

> relaspe[d] into severe Major Depressive Disorder (DSMIV 296.34).  Her symptoms include  fatigue, irritability, marked difficulty concentrating, much difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless mood but no suicidal ideation.  Ms. Bearman simply cannot stay at her desk or attend to her work: even at home, Ms. Bearman is requiring the aid of family and friends with basic demands of daily living.  Therefore, she is unable to work.  There are no accommodations that could be made at the present time by her employer that would result in her being able to work.

> * * * I cannot predict with great specificity how long it will be before Ms. Bearman is able to return to work but the time course of past periods required for recovery suggests that a period of 30 days out of work is a reasonable expectation.

*Id*.

2.  By letter dated October 22, 1999, plaintiff's counsel requested an accommodation for plaintiff.  Attached thereto was a letter from Dr. Nowak dated October 21, 1999.  IF at p. 56-58. Dr. Nowak's letter stated

1

> I have had the opportunity to understand Ms. Bearman's situation in greater depth.  I believe she could function at her job and return to work if a accommodation is made. This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where [plaintiff] previously worked for over three years and received a certificate of merit.  The reason for this is that Ms. Bearman's self esteem is at a very low level in her current position.  Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized and unable to work.

IF. at p. 61.

3.  Plaintiff submitted a Rule 26 expert statement from Dr. Nowak dated December 14, 2006.  Docket Number15 at Document 15-2.   The statement says that "In October 1999 Ms. Bergman had a disability as a result of her depression that prevented her from doing her job as then configured."  12/14/99 Nowak letter at p. 1.  The Rule 26 statement does not mention any other major life function allegedly significantly impaired by plaintiff's depression.  The cover letter submitted by plaintiff's counsel similarly does not claim that Dr. Nowak will testify to significant impairment of any major life activity other than work.  *Id*. at Document 15-1.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney


_____
RUDOLPH  CONTRERAS, D.C. Bar No.  434122
Assistant United States Attorney


_____
RHONDA C. FIELDS
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
202/514/6970

2

3