# INVESTIGATIVE FILE
## OF
# EQUAL EMPLOYMENT OPPORTUNITY
## COMPLAINT
## FILED BY
## Theresa E. Bearman

# TD NUMBER:    00-1103

SUBMITTED BY:    Althea Lee
                 EEO Investigator



## Investigative Summary

Discrimination Complaint of  Theresa E. Bearman and Lawrence H. Summers,
Secretary of the Treasury

## TD Case Number 00-1103

## <u>Claims Accepted:</u>

Was the Complainant not reasonably accommodated because of her disability
(physical-clinical depression and mental-acute major depressive episode)
commencing on October 22, 1999, when the Complainant's request for
reasonable accommodation (job restructuring that would provide the
Complainant full-time legal work or reassignment to the Office of Chief Counsel)
was denied?

Was the Complainant subjected to a hostile work environment because of
discrimination based on the Complainant's religion (Judaism) and disability
(physical-clinical depression and mental acute major depressive episode) and
retaliation because of the Complainant's October 22, 1999, request for
reasonable accommodation under the Rehabilitation Act when:

(1)     in January 1999 to October 4, 1999, the Complainant was given
        secretarial and clerical duties and was not given work to perform at a GS-
        14 level;

(2)     on November 19, 1999, management intervened in a payment
        arrangement made by the Complainant and the IRS Customer Service
        regarding repayment of monies owed to the IRS and threatened the
        Complainant with potential disciplinary action once the Complainant had
        paid the requisite amount owed to the IRS;

(3)     in December 1999, the Complainant's request for compensatory leave for
        religious observance was denied;

(4)     the Complainant's repeated requests to be placed on a 120-day detail (as
        interim accommodation pending permanent action) to remove the
        Complainant from a hostile work environment was ignored;

(5)     the Complainant was charged Absent Without Leave (AWOL) 6 hours on
        December 13, 1999, 6 hours on December 14, 1999 and 2 hours on
        December 15, 1999;

2

    (6)    on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet; _ ?₍...₎

    (7)    on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time; _ ₍...₎

    (8)    during the week of February 3, 2000, the Complainant's attorney was subjected to abusive language by GLS employees when the Complainant's attorney requested the status of the Complainant's requests for accommodation;

    (9)    on February 26, 2000, the Complainant was denied a within grade increase to GS-14 step 6;  _ ₍...₎ - b/c of AWOL - no formal denial

    (10)    on January 6, 1999, the manager delayed responding to the Complainant's request regarding the decision to place the Complainant on paid administrative leave. (To be confirmed in writing)?

The Complainant is employed by the Internal Revenue Service (IRS) as an Attorney (Estate Tax), GS-905-12 in the Richmond District Office.

**Reasonable Accommodation**

The record shows that the Complainant suffers from a "severe Major Depressive Disorder." The complainant's physician, Judith A. Nowak, M.D. noted that the Complainant's disability could be reasonably accommodated by either restructuring her current position to include the full time practice of law or reassigning her into a position in the Office of Chief Counsel. IF Ex, 9, pp. 286-300

The Complainant states that she was denied reasonable accommodation for her disability because her supervisor failed to take action on her request for accommodation within a reasonable time. The Complainant states she initially requested reasonable accommodation for her disability through a letter issued by her attorney on October 22, 1999. The accommodation requested by the Complainant is that her job be restructured so that the functions of her position are the fulltime practice of law. IF Ex. 2, p.117-118.

The record shows that by letter dated December 3, 1999, the Occupational Medical Consultant, Federal Occupational Health notified the agency (Acting Chief, Headquarter Labor Relations Section) that he recommended that the

3

Complainant be accommodated with a position appropriate to her legal and educational background, if there is such a position available in the agency. IF Ex, 9, p. 280

The record shows other documentation related to the Complainant's medical condition. IF Ex, 9, pp. 281-292

The Complainant's supervisor, former Senior Management/Program Analyst (no disability) acknowledges the Complainant's request for reasonable accommodation. He states that he was aware that the Complainant had requested reasonable accommodation. He further states that he became aware of the Complainant's disability and request for accommodation when the Complainant submitted her request for reasonable accommodation through the physician and Labor Relations Office. He states that the Complainant requested to be placed in an attorney's position. The Supervisor states that as a means of accommodating the Complainant's disability, he worked with General Legal Services, Labor Relations and the EEO Office to arrange a lateral transfer for the Complainant into an attorney position. 1 The supervisor states that he contacted the Appeals Office and the Richmond, Virginia and Baltimore Maryland District Offices. He was able to find a position in Richmond, Virginia for the Complainant as an Attorney (Estate Tax), GS-905-12. The Complainant was reassigned to this position. IF Ex.1, p.25 and Ex. 4, p. 247

The acting Director, National Public Liaison, GS-340-15 (no disability) confirms that the Complainant was offered and accepted a position in the Virginia-West Virginia District. IF Ex, 5,p. 254

The record shows that the Complainant was issued a letter dated March 7, 2000, offering her the position of Attorney (Estate Tax), GS-509-12 with pay retention as an accommodation for her disability. The Complainant's post of duty was Bailey Crossroads, Virginia, Exam Division, Virginia-West Virginia District. The record shows a copy of the SF-50B acknowledging this action. IF Ex. 9, pp. 288-289 and Ex. 13 p. 319

The record shows that the Complainant's supervisor had no previous requests from any employee for reasonable accommodation during the years 1997- 1999. IF Ex. 4, p. 248 and Ex 10, p. 302

---

1 The Complainant was working in a Management Program Analyst, GS-343-14 position at the time of this event.

4

## Hostile Work Environment

The Complainant states that on several occasions she requested to be placed on a 120-day detail to remove her from a hostile work environment. She states that she was on medical leave and was forced to return to work due to financial reasons. She states that every day she was forced to return to work, her health continued to deteriorate. She states that management continually ignored her request for accommodation. In support of her claim, the Complainant cites the following incidents:

## (1) Secretarial and Clerical Duties

The Complainant states that with the approval of her Director, she took a medical leave of absence due to the onset of a severe major depressive episode. By letter dated October 22, 1999, she requested reasonable accommodation due to her mental and physical disability. She states that her disability was rendered acute because of the circumstances surrounding the job. She states that one circumstance occurred from January 1999 to October 1999. During this period, ninety-nine percent of the time she had no work assignments and that the work she was assigned was clerical or secretarial in nature. She also states that the work was inappropriate for someone of a GS-14 step 6 level. 2   She states that she has considerable experience as a tax attorney; a former attorney-advisor in the office of Chief Counsel – both Domestic and International Divisions and she has an advanced law degree in Federal taxation. She states that although she has requested amelioration of the situation, management refused to take any action. IF Ex. 2, p. 118

The Complainant's supervisor does not agree that ninety-nine percent of the time the Complainant had no assignments or that the Complainant was assigned mostly clerical and secretarial work. He states that the Complainant did receive an assignment where she was to contact certain individuals regarding a project and to record the minutes of the meeting. He acknowledges that this assignment had some clerical aspects, but was not totally clerical. IF Ex. 4, p. 248

The acting Director, National Public Liaison states that during the period in question the Complainant was a GS-343-14, Program Analyst, and not an attorney (GS-905 series). The acting Director states that the Complainant was given responsibilities commensurate with her position description. These

---

2 This was the Complainant's grade at the time of the triggering event.

5

responsibilities included reviewing draft Chief Counsel regulations, designing an international section of the IRS Tax Pro Corner on the Web site, enhancing the small business CD-ROM, attending Congressional hearings and analyzing external views on buy down reduction. She states that during October through December 1999, the Complainant's supervisor assigned work to the Complainant, including analysis of tax materials. IF Ex. 5 p. 257

## (2) Payment of Money Owed to IRS

The record shows that on September 29, 1998, the Complainant received $1,321.86 from the IRS for an emergency salary payment. On October 7, 1998, the Complainant remitted a personal check to pay back the $1,321.86, but the bank did not honor the check due to insufficient funds. The Complainant later paid back $50.00 to partially satisfy her debt. IF Ex. 3, p. 189

The Complainant states that her second line supervisor, the Acting Director, National Public Liaison intervened in the arrangement that she had made with the IRS to repay the amount that was outstanding. This resulted in the payment being accelerated by six weeks. She states that once she paid requisite amount, her supervisor threatened her with potential disciplinary action. IF Ex. 2, p. 114

The Acting Director, National Public Liaison replies that the Complainant's supervisor was called by a representative from Customer Service who stated that the Complainant had not repaid the emergency salary payment that she had received. After contacting the Complainant her supervisor issued her a letter regarding the matter. IF Ex. 5, p. 255

The Complainant's supervisor confirms that he received a phone call from Customer Service regarding the Complainant's repayment agreement. He states that based on the IRS Interim Handbook of Employee Conduct and Ethical Behavior he issued the Complainant a letter regarding outstanding debts. No disciplinary action was taken against the Complainant. IF Ex. 4, p. 247

The record shows a September 29, 1998, letter addressed to the Complainant from her supervisor that explains that the personal check to pay back the $1,321.86 that she owed to the IRS was not honored by the bank due to insufficient funds. It further refers the Complainant to the rules of conduct. IF Ex. 3, p. 189

6

The IRS Interim Handbook of Employee Conduct and Ethical Behavior § 216.6 refers to employee indebtedness. IF Ex. 20, p. 352

## (3) Leave for Religious Observances

The Complainant states that her second line supervisor, the Acting Director, National Public Liaison denied her request for advanced compensatory leave for religious observance based upon inaccurate information. When provided with the correct information and asked to reconsider her denial of the time for religious observance, her second line supervisor did not respond. The Complainant states that this resulted in a lost of one weeks salary. IF Ex. 2, p 114

The Acting Director, National Public Liaison replies that she was not involved in denial of the Complainant's request for leave. The Complainant's supervisor handles leave for the Complainant. She states the Complainant's supervisor did, however, share with her (Acting Director) a letter sent to the Complainant that sets forth the reasons for the denial of the request. IF Ex. 5, p. 255

The Complainant's supervisor states that leave for religious observance must be requested at least 15 days in advance. The Complainant submitted her request for leave for religious observance for the week beginning on December 6, 1999, on December 7, 1999. The guidelines provide that an employee should be expected to pay back the religious compensatory time within 120 days. The supervisor states that the Complainant had utilized a substantial amount of advance leave and it was doubtful that the Complainant would be able to pay back the leave in the 120 day time period. The Complainant's supervisor consulted Labor Relations about denying the religious leave to the Complainant and they were in agreement that it should be denied. IF Ex. 4, p. 247

A letter dated December 9, 1999, was issued to the Complainant stating that her request for advanced religious compensatory time for the week of December 6, 1999, was not approved. The letter states that the Complainant currently had a 42 hour religious compensatory leave deficit and that an additional 40 hour deficit would make it difficult for her to repay the advanced leave within the next 120 days. IF Ex. 3, p. 159

There were no other employees who requested compensatory religious leave from the Complainants supervisor in the two years immediately prior to when the Complainant requested leave. IF Ex. 4, p. 248

7

The IRS Time and Leave Handbook, Document 11103, revised September 1999, on pages 110 through 112 provides instructions on how compensatory time off for religious observances is to be administered. IF Ex. 16

### (4) Request for 120 Day Detail

The Complainant states that on several occasions she requested a 120-day detail to remove her from a hostile work environment, but management ignored her request. IF Ex. 2, p. 120

The Complainant's supervisor replies that although he was unable to provide a 120 detail to the Complainant, he made an attempt to provide it and her request was not ignored. IF Ex. 4, p. 248

The acting Director, National Public Liaison states that the Complainant's supervisor was working the reasonable accommodation for a permanent position and not a 120-day detail. She states that the supervisor was looking for a permanent position for the Complainant. IF Ex. 5 p. 257

The Acting EEO Officer confirms that management was attempting to find a permanent position to accommodate the Complainant and felt that placing her in a temporary position would only result in placing them in the same position 120 days latter. IF Ex. 8, p. 278A

### (5) AWOL

The Complainant states that her second line supervisor, the Acting Director, National Public Liaison placed her on AWOL on December 13, 14, and 15, 1999, even though she had received approval for LWOP on those days. IF Ex. 2, p. 114

The acting Director, National Public Liaison replies that she was not involved in this matter and that the Complainant's supervisor handled the Complainant's leave. IF Ex. 5, p. 255

The Complainant's supervisor states that the Complainant was on LWOP the week of December 6, 1999, because she had requested religious leave for that week. The Complainant was expected to return to work the next week, but did not return on December 13 and 14, 1999 and was absent part of December 15, 1999. She did not notify her supervisor until the afternoon of December 15, 1999, that she would be absent. Consequently she was charged with AWOL. IF Ex. 4, p.

8

247-248

There were no other employees who were placed on AWOL by the Complainant's supervisor in the two years immediately prior to when the Complainant was placed on AWOL. IF Ex. 4, p. 248

The IRS Time and Leave Handbook, Document 11103, revised September 1999, on pages 88 and 89 define AWOL and supervisory responsibility for its administration. IF Ex. 16

**(6) Monitoring of Phone Calls**

The Complainant states that on December 23, 1999, her supervisor monitored her use of the telephone and Internet. She states that her second line supervisor acting Director, National Public Liaison, had her first line supervisor monitor her phone calls and use of the Internet. IF Ex. 2, p.115

The Complainant's second line manager denies the allegation. IF Ex. 5, p. 255

The Complainant's first line supervisor states that the Complainant was previously counseled by the acting Director, National Public Liaison about the use of her personal computer for reasons other than he did not systematically monitor the Complainant or any other employees use of the phone or Internet. However, he did notice non-government related activities on the Complainant's computer screen. The Complainant's supervisor states that he did not issue the Complainant an official reprimand or take any disciplinary action against her for use of the phone or Internet. He states that he issued a memorandum to all employees regarding use of the phone and computers. IF Ex. 4, p. 248

The acting Director, National Public Liaison had no knowledge of the allegation. She further states that to her knowledge no employees have had their telephone calls or use of the Internet monitored. She states that IRS has a policy on Internet Usage. This policy was shared with the entire staff. IF Ex. 5, pp. 255-256

**(7) Performance as a Full Time Employee**

The Complainant states that she was subjected to daily harassment when she returned to work part-time. She states she was told daily that she was expected to perform at a full performance level while she was working in a part-time status.

9

IF Ex. 2, p. 115

The Complainant's supervisor states that he received a letter from the
Complainant's doctor stating that the Complainant would only be able to work 6
hours a day. He further states that he did not tell the Complainant that she would
be expected to work a full time schedule while assigned a part time tour of duty.
IF Ex. 4, p. 248

The acting, EEO Officer states that when the Complainant's supervisor received
a letter from the Complainant's doctor regarding part-time work, the manager was
concern that the doctor did not state how much work was expected from the
Complainant. The acting, EEO Officer states that he explained to the manager
that under a doctors' letter, light duty meant the employee would not be expected
to do the full range of duties for the normal job. He states that the supervisor
advised him that he had been in touch with Labor Relations an General Legal
Services and that they were in agreement with his statement that the doctors'
letter did not mention a limitation to work ability.    IF, Ex. 8 p. 278a

**(8) Complainant's attorney Subjected to Abusive Language**

The Complainant states that Julie Barry, Attorney-Advisor in General Legal
Services, used abusive language with her attorney and then hung the phone up
on her attorney. She states that this happened when Barry was asked to provide
information concerning the status of her request during the week of February 3,
2000 (LWOP). IF Ex. 1, p. 103d

Julie Barry, General Attorney (no disability) denies using abusive language to the
Complainant's attorney, but admit to hanging up on her in a "fit of pique". She
states that the incident did not concern the Complainant's reasonable
accommodation request. Rather, the Complainant's attorney telephoned her and
demanded that she get to the bottom of some AWOL charges against the
Complainant. Barry states that because the Complainant had a number of leave
issues, she asked the attorney for the particulars of the AWOL charges and the
dates of the AWOL charges. The Complainant's attorney responded that she did
not know. Barry states that she then suggested to the attorney that it would be
difficult for her to get to the bottom of the matter if she could not provide her with
the necessary information. Barry states that he Complainant's attorney
requested the name of her supervisor, she provided his name and telephone
number and hung up. Within minutes, she states that the Complainant's attorney
called back and gave her more specific information about the AWOL charges and

10

she apologized for hanging up on her.  IF Ex. 7, p. 275

## (9) Complainant Denied Within Grade Increase

The Complainant states that as a result of management's failure to provide her with reasonable accommodation, by providing her with a temporary reassignment, she was required to take leave without pay. According to the Complainant, this resulted in her not receiving a within grade increase in February of 2000. IF Ex. 2, P. 115

The Complainant's supervisor replies that he did not do anything to prevent the Complainant from receiving a step increase. IF Ex. 4, p. 248

The acting Director, National Public Liaison states that no employees under her supervision were denied a grade increase.  IF Ex. 5, p. 257

## (10) Request for Administrative Leave on January 6, 2000

The Complainant states that she was approved for 12 weeks of unpaid leave under the Family and Medical Leave Act (FMLA) beginning December 28, 1999. Despite the fact that she was still disabled, she still returned to work on a part-time basis in late December and early January due to financial circumstances. She states that the acting Director, National Public Liaison had her supervisor threaten to record her as AWOL for the hours that she did not work.  She states that because of this situation, she contacted the Director of the Commissioner's Complaint Processing and Analysis Group (Director) to advise of the desperate nature of her situation and of her hostile work environment.  Following a meeting convened by the Director, the decision was made to place her immediately on paid administrative leave.  When this was communicated to her on January 3, 2000, she asked her supervisor to confirm the decision in a letter to her as soon as possible.  She states her supervisor agreed.  She further states that despite the decision was made at a level of authority senior to the acting National Director, Public Liaison, she discovered that the acting Director, National Public Liaison deliberately attempted delay sending the confirmation letter she had requested and attempted to get the decision revoked.  IF Ex. 1, p. 108

The Complainant's supervisor replies that any delays in providing the Complainant with written conformation of the decision to place her on administrative leave on January 6, 2000, were the result of administrative procedures. IF Ex. 4, p. 248

11

The acting Director, National Public Liaison (Complainant's second line manager) states that the Complainant's supervisor placed the Complainant on administrative leave based on concern for the Complainant's ability to come to work.  IF, Ex. 5, p. 258

The record shows a letter issued to the Complainant on January 12, 2000, by the Chief, Business Liaison, that explained the reason why the Complainant was placed on administrative leave.  The Chief, states that he was informed on January 6, 2000, that the Complainant had telephoned the Commissioner's staff and the Director, Complaint Processing an Analysis Group regarding an update on her request for reasonable accommodation.  The Chief states that it was the perception of the above offices that the Complainant was very upset and considered the situation to be a matter of life or death.  He states that based on the recommendation from the Director, Complaint Processing it was decided, that it was in the best interest of all, to authorize administrative leave to the Complainant until the situation could be further evaluated by the Complainant's doctor. IF Ex. 5. P. 261

## A.    DESCRIPTION OF COMPLAINT

Name and Address of Complainant
        Theresa E. Bearman
        2911 South Dinwiddie St. C-2
        Arlington, VA 22206

Complainant's Position At Time of Alleged Discrimination
        Internal Revenue Service
        Communications and Liaison /Office of Public Liaison and Small Business
        Affairs
        Management Program Analyst GS 343-14

Organizational Location of Complainant's Position
        Internal Revenue Service
        1111 Constitution Ave  N.W.
        Washington, D C 20224

Name and Location of Agency Involved in Complaint
        U.S. Treasury
        Internal Revenue Service
        1111 Constitution Ave N. W.
        Washington, DC  20224

DATE OF ALLEGED DISCRIMINATION:

        January 3, 2000

STATEMENT OF BASIS AND ISSUES IN COMPLAINT:

Was the Complainant not reasonably accommodated because of her disability (physical-clinical depression and mental – acute major depressive episode) commencing on October 22, 1999, when the Complainant's request for reasonable accommodation (job restructuring or reassignment to Chief Counsel) was denied?

Was the Complainant discriminated against because of her religion (Judaism), disability (physical-clinical depression and mental-acute major depressive episode) when the Complainant was subjected to a hostile work environment when:

(1)     on November 19, 1999, management violated the Complainant's repayment agreement;

(2)     on December 1999, the Complainant's request for compensatory leave for religious observance was denied; and

(3)     the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999; 6 hours on December 14, 1999 and 2 hours on December 15, 1999?

Was the Complainant discriminated against because of her disability (physical-clinical depression and mental-acute major depressive episode), religion (Judaism) and retaliated against because of her involvement with the EEO process (contacted the EEO Officer on December 15, 1999, to request an EEO Counselor) when:

(1)     on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet;

(2)     on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time; and

(3)     on February 26, 2000 the Complainant was denied a within-grade increase to a GS-14 step 6?

DEPARTMENT OF THE TREASURY
REGIONAL COMPLAINT CENTER
WASHINGTON

DATE: AUG 25 2000

TO: DIRECTOR, EQUAL OPPORTUNITY &
ORGANIZATIONAL MANAGEMENT
INTERNAL REVENUE

FROM: Michael Morgan-Gaide, Director
Regional Complaint Center

SUBJECT: Complaint of Theresa E. Bearman and Lawrence H. Summers
Secretary of the Treasury
TD Case Number: 00-1103M

This letter refers further to the above complaint of discrimination filed on
February 17, 2000.

The acceptance letter dated May 17, 2000, of the above complaint was
previously amended on June 22, 2000. The previous amended
acceptance letter has been amended to include additional issues. The
amended issues that were investigated are:

> Was the Complainant not reasonably accommodated because of her
> disability (physical-clinical depression and mental-acute major
> depressive episode) commencing on October 22, 1999, when the
> Complainant's request for reasonable accommodation (job
> restructuring that would provide the Complainant full-time legal work
> or reassignment to the Office of Chief Counsel) was denied?

> Was the Complainant subjected to a hostile work environment
> because of discrimination based on the Complainant's religion
> (Judaism) and disability (physical-clinical depression and mental
> acute major depressive episode) and retaliation because of the
> Complainant's October 22, 1999, request for reasonable
> accommodation under the Rehabilitation Act when:

> (1)  in January 1999 to October 4, 1999, the Complainant was
>      given secretarial and clerical duties and was not given work to
>      perform at a GS-14 level;

/

(2)    on November 19, 1999, management intervened in a payment arrangement made by the Complainant and the IRS Customer Service regarding repayment of monies owed to the IRS and threatened the Complainant with potential disciplinary action once the Complainant had paid the requisite amount owed to the IRS;

(3)    in December 1999, the Complainant's request for compensatory leave for religious observance was denied;

(4)    the Complainant's repeated requests to be placed on a 120-day detail (as interim accommodation pending permanent action) to remove the Complainant from a hostile work environment was ignored;

(5)    the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999;

(6)    on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet;

(7)    on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time;

(8)    during the week of February 3, 2000, the Complainant's attorney was subjected to abusive language by GLS employees when the Complainant's attorney requested the status of the Complainant's requests for accommodation;

(9)    on February 26, 2000, the Complainant was denied a within grade increase to GS-14 step 6;

(10)    on January 6, 1999, the manager delayed responding to the Complainant's request regarding the decision to place the Complainant on paid administrative leave. (To be confirmed in writing)?

If you have any questions regarding this matter, please contact the EEO Specialist Eva Kinebrew at (202) 377-6714.

2

DEPARTMENT OF THE TREASURY

REGIONAL COMPLAINT CENTER

WASHINGTON

**AUG 25 2000**

Ms. Theresa E. Bearman
2911 S. Dinwiddie Street, C-2
Arlington, VA 22206

Complaint of Theresa E. Bearman
and Lawrence H. Summers,
Secretary of the Treasury
TD Case Number: 00-1103M

Dear Ms. Bearman:

This letter refers to the above complaint of discrimination filed on
February 17, 2000, and in response to your telephone conversation with
Evon Lee on July 17, 2000, regarding the issues in the amended
acceptance letter that was issued to you on June 22, 2000. The previously
amended acceptance letter has been amended to include additional
issues. The amended claims that were investigated are:

> Was the Complainant not reasonably accommodated because of her
> disability (physical-clinical depression and mental-acute major
> depressive episode) commencing on October 22, 1999, when the
> Complainant's request for reasonable accommodation (job
> restructuring that would provide the Complainant full-time legal work
> or reassignment to the Office of Chief Counsel) was denied?
>
> Was the Complainant subjected to a hostile work environment
> because of discrimination based on the Complainant's religion
> (Judaism) and disability (physical-clinical depression and mental
> acute major depressive episode) and retaliation because of the
> Complainant's October 22, 1999, request for reasonable
> accommodation under the Rehabilitation Act when:
>
> (1)   in January 1999 to October 4, 1999, the Complainant was
>       given secretarial and clerical duties and was not given work to
>       perform at a GS-14 level;
>
> (2)   on November 19, 1999, management intervened in a payment
>       arrangement made by the Complainant and the IRS Customer
>       Service regarding repayment of monies owed to the IRS and
>       threatened the Complainant with potential disciplinary action
>       once the Complainant had paid the requisite amount owed to
>       the IRS;

3

(3)     in December 1999, the Complainant's request for compensatory leave for religious observance was denied;

(4)     the Complainant's repeated requests to be placed on a 120-day detail (as interim accommodation pending permanent action) to remove the Complainant from a hostile work environment was ignored;

(5)     the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999;

(6)     on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet;

(7)     on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time;

(8)     during the week of February 3, 2000, the Complainant's attorney was subjected to abusive language by GLS employees when the Complainant's attorney requested the status of the Complainant's requests for accommodation;

(9)     on February 26, 2000, the Complainant was denied a within grade increase to GS-14 step 6;

(10)    on January 6, 1999, the manager delayed responding to the Complainant's request regarding the decision to place the Complainant on paid administrative leave.  (To be confirmed in writing)?

If you have any questions regarding this matter, please contact the EEO Specialist, Eva Kinebrew at (202) 377-6714.

Sincerely,

Michael Morgan-Gaide
Director

REGIONAL COMPLAINT CENTER
WASHINGTON

DATE: JUN 2 2 2000

TO: DIRECTOR, EQUAL OPPORTUNITY &
ORGANIZATIONAL MANAGEMENT
INTERNAL REVENUE SERVICE

FROM: Michael Morgan-Gaide, Director
Regional Complaint Center

SUBJECT: Complaint of Theresa E. Bearman and Lawrence H. Summers
Secretary of the Treasury
TD Case Number: 00-1103

This in further reference to the above complaint of discrimination filed on
February 17, 2000.

The acceptance letter of the above complaint was previously submitted to
you on May 17, 2000. The acceptance letter has been amended to add to
the issues previously accepted. The amended issues to be investigated
are:

> Was the Complainant not reasonably accommodated because of her
> disability (physical – clinical depression and mental – acute major
> depressive episode) commencing on October 22, 1999, when the
> Complainant's request for reasonable accommodation (job
> restructuring or reassignment to Chief Counsel) was denied?

> Was the Complainant discriminated against because of her religion
> (Judaism), disability (physical – clinical depression and mental –
> acute major depressive episode) when the Complainant was
> subjected to a hostile work environment when:

> (1)     on November 19, 1999, management violated the
>         Complainant's repayment agreement;

> (2)     in December 1999, the Complainant's request for
>         compensatory leave for religious observance was denied; and

42

(3)    the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999; 6 hours on December 14, 1999 and 2 hours on December 15, 1999?

Was the Complainant discriminated against because of her disability (physical – clinical depression and mental – acute major depressive episode), religion (Judaism) and retaliated against because of her involvement with the EEO process (contacted the EEO Officer on December 15, 1999, to request an EEO Counselor) when:

1)    on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet;

2)    on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time; and

3)    on February 26, 2000, the Complainant was denied a within-grade increase to a GS-14 step 6?

If you have any questions regarding this matter, please contact the EEO Specialist Eva Kinebrew at (202) 377-6714.

4b

DEPARTMENT OF THE TREASURY
REGIONAL COMPLAINT CENTER -
WASHINGTON

JUN 2 2 2000

Ms. Theresa E. Bearman
2911 S. Dinwiddle Street, C-2
Arlington, VA 22206

Complaint of Theresa E. Bearman
and Lawrence H. Summers,
Secretary of the treasury
TD Case Number: 00-1103M

Dear Ms. Bearman:

This letter refers to the above-referenced complaint of discrimination filed
on February 17, 2000 and in response to your letter dated April 26, 2000,
regarding the issues in the acceptance letter that was previously issued to
you on April 17, 2000. The acceptance letter has been amended to
include additional issues and to modify the issues previously accepted.
The amended issues to be investigated are:

> Was the Complainant not reasonably accommodated because of her
> disability (physical – clinical depression and mental – acute major
> depressive episode) commencing on October 22, 1999, when the
> Complainant's request for reasonable accommodation (job
> restructuring or reassignment to Chief Counsel) was denied?

> Was the Complainant discriminated against because of her religion
> (Judaism), disability (physical – clinical depression and mental –
> acute major depressive episode) when the Complainant was
> subjected to a hostile work environment when:

> (1)    on November 19, 1999, management violated the
>        Complainant's repayment agreement;

> (2)    in December 1999, the Complainant's request for
>        compensatory leave for religious observance was denied; and

> (3)    the Complainant was charged Absent Without Leave (AWOL)
>        6 hours on December 13, 1999; 6 hours on December 14,
>        1999 and 2 hours on December 15, 1999?

4C

Was the Complainant discriminated against because of her disability (physical – clinical depression and mental – acute major depressive episode), religion (Judaism) and retaliated against because of her involvement with the EEO process (contacted the EEO Officer on December 15, 1999, to request an EEO Counselor) when:

1)  on December 23, 1999, management monitored the Complainant's telephone calls and use of the internet;

2)  on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time; and

3)  on February 26, 2000, the Complainant was denied a within-grade increase to a GS-14 step 6?

If you have any questions regarding this matter, please contact the EEO Specialist, Eva Kinebrew at (202) 377-6714.

Sincerely,

Michael Morgan-Gaide
Director

4d



DEPARTMENT OF THE TREASURY
REGIONAL COMPLAINT CENTER
WASHINGTON

DATE: APR 17 2000

TO:   DIRECTOR, EQUAL OPPORTUNITY &
      ORGANIZATIONAL MANAGEMENT
      INTERNAL REVENUE SERVICE

FROM: Michael Morgan-Gaide, Director
      Regional Complaint Center

SUBJECT:  Complaint of Theresa E. Bearman and Lawrence H. Summers,
          Secretary of the Treasury
          TD Case Number: 00-1103

This is a notification that our office has received the above referenced formal
complaint filed on February 17, 2000.  The following issues have been
accepted for processing:

> Was the Complainant not reasonably accommodated because of her
> disability (physical and mental – major clinical depression) when on
> October 22, 1999, the Complainant's request for reasonable
> accommodation (job restructuring or reassignment to Chief Counsel) was
> not addressed.

> Was the Complainant retaliated against because of her involvement in
> the EEO process (filed formal complaint) when:

> (1)    On November 19, 1999, the supervisor violated the Complainant's
>        repayment agreement;

> (2)    in December 1999, the Complainant's request for compensatory
>        leave for religious observance was denied;

> (3)    on December 13, 14 and 15, the Complainant was charged Absent
>        Without Leave (AWOL); and

5

2

(4)    on December 23, 1999, the supervisor monitored the
Complainant's telephone calls and use of the internet.

Attached is a copy of the formal complaint. This information is being provided
to make you aware of the specific allegations being raised. **While this
information should be shared with the Complainant's Head of Office,
further disclosure to others, especially those who may have some
involvement in the matter, would be improper.** An EEO investigator will be
assigned to investigate the issues accepted for processing. The investigator
will be contacting you soon to confirm the dates of the investigation and to
request administrative support. In order for the investigation to be completed
effectively, please be prepared to provide the investigator with:

- a private room with a telephone
  (located away from the parties to the complaint)
- access to a computer and printer
- copying and typing assistance
- necessary supplies

If, due to security requirements, you are unable to provide the investigator with
the support described above, please notify the EEO Specialist assigned to this
case so that other appropriate arrangements can be made.

Please assure that the management officials from whom testimony will be
needed are promptly notified of the investigation and are available to meet with
the investigator. Management witnesses should be made aware of the
complaint process, their role in the process, and the role of the investigator.

While on site, the investigator is under the direction of the Regional Complaint
Center. Any questions or concerns about the investigation should be directed
to the EEO specialist assigned to the complaint.

The investigator is authorized to: (1) investigate all aspects of the complaint;
(2) require that all employees of the agency having knowledge of the matter
complained of furnish testimony under oath or affirmation; and (3) gain access
to all documents and records pertinent to the case. Employees are required to
fully respond to requests for testimony and documentary evidence in a timely

- 3 -

manner. Failure to do so may draw an adverse inference that the requested information would have reflected unfavorably on the party refusing to provide the information (29 CFR §1614.108(c)(3)(i)).

In accordance with provisions of the Equal Employment Opportunity Commission (EEOC) Regulations, 29 CFR §1614.603, the parties must make reasonable efforts to voluntarily settle the complaint throughout the administrative process. Accordingly, after the case has been investigated and all the facts are available to both parties, my office will contact you for the purpose of attempting resolution. The terms of any settlement will be reduced to writing to ensure there are no misunderstandings, and you will be provided a copy.

If no settlement is reached, the complainant may elect a final agency decision by the Treasury Department with or without a hearing before an EEOC Administrative Judge. If the complaint involves an issue appealable to the Merit Systems Protection Board (a mixed case), the complainant is not entitled to a hearing before the EEOC.

If you have any questions, please contact EEO Specialist Eva Kinebrew at (202) 377-6714. We appreciate your assistance in this matter.


Attachment: Copy of Formal Complaint



**DEPARTMENT OF THE TREASURY**
**REGIONAL COMPLAINT CENTER**
**WASHINGTON**

APR 1 7 2000

Ms. Theresa E. Bearman
2911 S. Dinwiddie Street, C-2
Arlington, VA 22206

Complaint of Theresa E. Bearman
and Lawrence H. Summers,
Secretary of the Treasury
TD Case Number: 00-1103

Dear Ms. Bearman:

This letter refers to the above referenced complaint of discrimination filed on
February 17, 2000.

Based on our review of the formal complaint and the EEO Counseling Report, the
complaint is accepted for processing under the provisions of the Equal
Employment Opportunity Commission (EEOC) regulations, 29 CFR Part §1614.
The issues to be investigated are:

> Was the Complainant not reasonably accommodated because of her
> disability (physical and mental – major clinical depression) when on
> October 22, 1999, the Complainant's request for reasonable
> accommodation (job restructuring or reassignment to Chief Counsel) was
> not addressed.

> Was the Complainant retaliated against because of her involvement in the
> EEO process (filed formal complaint) when:

> (1)   On November 19, 1999, the supervisor violated the Complainant's
>        repayment agreement;

> (2)   in December 1999, the Complainant's request for compensatory
>        leave for religious observance was denied;

> (3)   on December 13, 14 and 15, the Complainant was charged Absent
>        Without Leave (AWOL); and

$\frac{q}{8}$

2

(4)    on December 23, 1999, the supervisor monitored the Complainant's telephone calls and use of the internet.

If you disagree with the issues, please notify me in writing within five days of receipt of this letter. Please be clear and concise in your response. If no response is received, I will assume that you agree with the issues and will proceed with the investigation of the complaint.

An EEO Investigator will be assigned to thoroughly investigate all aspects of the issues accepted for processing. The investigator has the authority to administer oaths and to require employees to furnish affidavits under oath or affirmation without a promise of confidentiality or, alternatively, by written statements under penalty of perjury. The complainant has a responsibility to cooperate with the investigator in timely scheduling an appointment, meeting with the investigator and providing necessary written statements. Failure to do so may result in the dismissal of the complaint for failure to cooperate.

Any affidavit, written statement, or documentary evidence submitted to the investigator is subject to prohibitions against improper disclosures. All parties who provide statements or documentary evidence bear the responsibility to ensure that the submissions are properly sanitized, and should consult with bureau disclosure officials if there are any questions concerning what material would constitute disclosure.

In accordance with §1614.603 of the regulations, the parties must make reasonable efforts to voluntarily settle the complaint throughout the process. The terms of any settlement agreement will be reduced to writing, and you will be given a copy.

Upon completion of the investigation, you will be furnished a copy of the Investigative File and an election form on which you may elect one of the following options: (1) a hearing and decision by an EEOC Administrative Judge; (2) a final decision by the Department of the Treasury without a hearing; or (3) withdrawal of the complaint.

You will have the right to appeal the Department's final decision or final order to the EEOC, Office of Federal Operations, or file a civil action in federal district court.

9

3

If you have any further questions regarding the processing of your complaint, please contact EEO Specialist Eva Kinebrew at (202) 377-6714.

Sincerely,

Michael Morgan-Gaide
Director

/ 0

DEPARTMENT OF THE TREASURY
REGIONAL COMPLAINT CENTER
WASHINGTON

Ms. Theresa E. Bearman                                    JUN 27 2000
2911 S. Denwiddie Street, C-2
Arlington, VA  22206

                              Complaint of Theresa E. Bearman
                              and Lawrence H. Summers,
                              Secretary of the Treasury
                              TD Case Number:  00-1103

Dear Ms. Bearman:

Enclosed with your complaint dated February 24, 2000, was a Form 12217
Section 1203 Allegation Referral Form.  Please be advised that the office
that processes 1203 claims is:

         Internal Revenue Service
         Discrimination Complaint Review Unit
         1111 Constitution Avenue, NW, Room 2422
         Washington, DC  20224

As part of the Internal Revenue Services implementation of 1203(b)(3), the
Discrimination Complaint Review Unit (DCRU) was established to review
all settlement agreements and findings of discrimination closed on or after
July 22, 1998.  Therefore, I am returning to you Form 12217 for
appropriate filing.

If you have any questions concerning this matter please contact Kent
Hardcastle, Senior EEO Specialist DCRU at (202) 622-4496.

                              Sincerely,

                              Michael Morgan-Gaide
                              Director

Enclosure:

/02

As I told you during our telephone conversation yesterday, April 12th, major depressive episode is a form of clinical depression that is extremely severe. The two are descriptive of the same condition. Clinical depression is a mental disability that is almost always associated with and tends to cause various physical disabilities such as, in my case, frequent severe migraine headaches.

Enclosed is a copy of a recent letter from my physician confirming the above.

Theresa C. Bearman
4-13-00

11

Judith A. Nowak, M.D.,P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, DC  20037-2346
tel. 202-887-5495
fax. 202-466-5582
1 March 2000

IRS Leave Bank Medical Review Board
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC  20224

Attention:  Renee Marbley
Re:  Theresa Bearman

I am writing this letter to update the status of the medical condition of my patient, Theresa Bearman. Ms. Bearman has and continues to be suffering from an acute exacerbation of a chronic depressive disorder, which exacerbation began in October, 1999. She continues to suffer from quite severe symptoms which include difficulty concentrating, extreme fatigue, loss of appetite and associated frequent migraine headaches.

Ms. Bearman's deterioration has been precipitated, in part, by the circumstances of her work situation. Because of this, she attempted to improve her condition by requesting a reassignment to another position, either on a 120-day detail or a permanent basis, within the IRS under the "reasonable accommodation" provisions of the Rehabilitation Act of 1973. Unfortunately, instead of assisting Ms. Bearman, her supervisors have not only failed to act on her request but have also acted in ways that appear to be retaliative and hostile. This has taken the form of denial of as much paid leave as possible as well as imposition of punitive disciplinary measures. As a result, Ms. Bearman has used up all sources of paid and advanced

p 2.

the situation has also affected her general physical health resulting in multiple respiratory and other infections that have caused her to often be unable to work over the past several months. Although Ms. Bearman has continued to appeal to every authority within the INS for assistance, this situation continues to the present day.

Ms. Bearman is now faced with choosing between her health or her livelihood and is facing dire financial difficulties. I am therefore requesting on her behalf that she be given every consideration possible in her request for assignment of annual leave and that the Review Board exercise its discretion to award her more than the maximum 240 hours, given the exigency and lack of fault in her current condition.

Sincerely
*Judith A. Nowak, MD*
Judith A. Nowak, MD

13

My manager sent me a memo dated November 19, 1999, indicating that he was notified of the arrearage on November 16, 1999. It was in the November 19th memo that he demanded payment by December 10 and threatened me with disciplinary measures if I did not comply.

The woman in Customer Service with whom I had the agreement to pay at the end of January 2000 is Nancy Greene.

*Theresa E Bearman*

4-12-00

14

The date on which my supervisor was monitoring my phone calls and my use of the Internet was December 23, 1999. This was the day before the Federal holiday that fell that year on Christmas Eve, December 24, 1999.


Therese C. Bearman
4-11-00

**EEO COUNSELING REPORT - INDIVIDUAL COMPLAINT**
**PART I (Through Initial Interview)**
(Follow separate instructions and use a continuation sheet if necessary)


RECEIVED MAR 17 2000

| 1. Regional Complaints Center Name, Address and Telephone Number | 2. EEO Officer Name, Address & Telephone Number | 3. EEO Counselor Name, Address & Telephone Number | 4. Date Counseling First Sought |
|---|---|---|---|
| WRCC Dir:Michael Morgan-Gaide, Suite 640 800 K.St., NW Washington, DC 20224 (202)377-6730 | IRS/NCFB Headquarters, EOM Dir:Thelma Harris M:HQ:EOM, NCFBC2-401, 5000 Ellin Rd. Lanham, MD.20706 (202)283-4960 | Eddie Coleman IRS/NCFB,C2-121 M:HQ:EOM 5000 Ellin Rd. Lanham, MD. 20706 (202) 283-7480 | 12/15/99 <br><br> **5. Date of First Interview** <br><br> 12/17/99 |

| 6. Employee or Applicant: Name, Business or Home Address. Employee: Official title, Series & Grade. | 8. Matter Causing Complaint or Issue |
|---|---|
| Theresa Bearman <br><br> **7. Basis or Type of Discrimination** <br><br> __ Age <br> Date of Birth <br> ___ <br> D/M/Y <br><br> __ Religion    __ Color    ___ Race <br> ____ <br><br> __ National Origin    Sex    __ Other <br> _____    - <br><br> X Retaliation/ Reprisal for in Complaints Process    X Handicap:    Involvement <br> __ Mental <br> X_ Physical | __ Appointment    __ Pay <br> _ Training    __Assgt of Duties <br> _ Promotion    __ Within Grade Inc <br> __ Awards    __ Reassignment <br> __ Change to Lower    __ Reinstatement <br> __ Working    __ Removal/ <br> Conditions    Separation <br> __ Classification    __ Conv to P/T CC <br> __ Reprimand    __ Duty Hours <br> __ Resignation    __ Eval-Appraisal <br> __ Retirement    Merit Pay <br> __ Sexual Harrassment <br> _ Eval-Appraisal <br> Non Merit Pay    __ Suspension <br> __ Exam/Test    __ Termination <br> During <br> Probation <br> __Harassment    Overtime <br> _X_ Other    __ Time/Attendance    (Explain) <br> **Denile of reasonable accommodation request by Mgt.** |

9. An EEO Counselor cannot reveal the identity of a person who has come for counseling, except when authorized to do so by the person counseled. Is Complainant willing to have his/her name revealed during the counseling stage? Yes -X- No ____ . If answer is "Yes," Complainant must give permission by signing name in the space following:

| 10. Organization Where Alleged Discrimination Occurred and Date of Occurrence. CL: PL | 11. Give date Complainant became aware of alleged discrimination if substantially different from that shown in 10. Explain. 12/1/99 |
|---|---|

12. If complaint appears to be untimely, what explanation is offered to explain why Counselor was not contacted within 45 days

13. Provide a brief description of complaint, summarizing actions which caused counseling to be sought and which complainant believes are discriminatory. No response to her request for reasonable accommodation (physical & mental)

14. Remedial Action Desired by Complainat
Placement as an attorney in Chief Counsel

15. On the same matter has Complainant filed a grievance under a negotiated procedure?
   Yes ___ No X_
   Under the Agency grievance system? Yes ___ No _X
   Has Complainant appealed to the Merit Systems Protection Board? Yes ___ No X_
   If grievance or appeal has been filed, what is its status?

| 16. Does Complainant elect to have a Representative?    Yes _ No X_    19 | 17. Signature of Counselor and Date <br> Eddie Coleman    12/17/99 |
|---|---|



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

January 4, 2000

CHIEF COMMUNICATIONS
AND LIAISON

MEMORANDUM FOR ASSOCIATE CHIEF COUNSEL (F&M)

FROM:          Barry Fulcher
               Chief Business Liaison CL:SB

SUBJECT:       Attorney-Advisor-GS-905 Series Positions

We currently have an GS-14 senior program analyst in the Office of Public Liaison and Small Business Affairs who is requesting a reasonable accommodation for her medical condition. The employee's physician indicated that she would be able to adequately perform the duties and responsibilities of an attorney and that a transfer to an attorney position would be an appropriate reasonable accommodation. The Service's physician agreed with this assessment. This employee has a law degree and has previously worked for the Office of Chief Counsel.

We are making our best efforts to accommodate this employee, and are therefore writing to inquire as to whether your organization would be willing to accept her for any of your current, funded National Office vacancies. We are also sending similar requests to those organizations within the Service (and within the commuting area) that also have GS-905 positions.

If you need further information regarding this matter, please feel free to contact me at 622-6051. If you need additional background concerning this matter, you may contact Julie Barry of General Legal Services at 283-7912.

Thank you for your attention to this matter.

# Reminder to Managers Regarding Chief Counsel Applicants

Chief Counsel employees are not considered internal applicants for IRS vacancy announcements. If you are announcing a job and wish to consider Chief Counsel applicants, you must expand the area of consideration to include Department of Treasury or external applicants. For further information, please contact your servicing personnel specialist.



DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

January 4, 2000

CHIEF COMMUNICATIONS
AND LIAISON

MEMORANDUM FOR ASSISTANT COMMISSIONER (EXAMINATION),
                        ASSISTANT COMMISSIONER (INTERNATIONAL)
                        NATIONAL DIRECTOR OF APPEALS

FROM:           Barry Fulcher
                Chief, Business Liaison CL:SB

SUBJECT:        Attorney-Advisor-GS-905 Series Positions

We currently have an GS-14 senior program analyst in the Office of Public Liaison and
Small Business Affairs who is requesting a reasonable accommodation for her medical
condition. The employee's physician indicated that she would be able to adequately
perform the duties and responsibilities of an attorney and that a transfer to an attorney
position would be an appropriate reasonable accommodation. The Service's physician
agreed with this assessment. .

Consequently, we are writing to inquire as to whether your organization currently has or
anticipates having in the near future any funded, vacant attorney positions to which this
employee can be reassigned. As you know, the Service is obligated to reasonably
accommodate the known physical or mental limitations of an otherwise qualified
employee with a disability.

If your organization does have or anticipates having such an attorney vacancy, please
contact me at 622-6051 so that we may discuss this matter further. Please also call me
if you do not anticipate having a vacancy. This employee has a law degree and has
practiced as an attorney for a number of years.

We would appreciate your response by January 15, 2000. If you need any further
background information concerning this matter, you may also contact John Burns in
EEO and Organizational Management at 622-8367 or Julie Barry in General Legal
Services at 283-7912.

25

THERESA E. BEARMAN

RECEIVED
PERSONNEL

99 DEC 15 P12: 48

December 13, 1999

Office of the Chief Counsel
Internal Revenue Service
Personnel Branch, CC:F&M:P:W
Room 4032
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

ATTN: CC-99-2315

Dear Sir or Madam:

I am writing to apply for the position of Attorney-Adviser (General or Tax) as advertised in the above-referenced Vacancy Announcement. Enclosed herein are the requested documents for your consideration.

I have been a practicing tax attorney for 18 years and possess an M.L.T. from Georgetown University (1982). I previously served as an Attorney-Adviser in the Office of Chief Counsel, Legislation & Regulations Division from 1984 to 1986, and in the Office of the Associate Chief Counsel (International) from 1986 through 1987. During my time in those offices, I was a principal author of the original issue discount regulations, for which work I received a Certificate of Merit together with a cash award. Additionally, I co-authored Notice 87-11 setting forth the rules governing the tax treatment of integrated economic hedges, and spent my final year working exclusively in the area of the taxation of complex financial instruments, including interest rate and foreign currency swap agreements and forward contracts, options and section 1256 contracts, and derivative instruments. During the 1990-1991 year, I co-chaired an ABA Section of Taxation Subcommittee on the Time Value of Money.

I am aware that the Office of Chief Counsel is looking to attract the services of experienced tax attorneys. For my part, I found working in the Chief Counsel's Office to have been among the most intellectually challenging and rigorous work I have experienced during my career, and I would very much like to return to the Office.

Sincerely,

Theresa E. Bearman

Enclosures

2911 S. DINWIDDIE STREET, APT C-2
2912 ARLINGTON, VA. 22206

26

# THERESA E. BEARMAN

*2911 S. Dinwiddie Street Apt. C-2 • Arlington, VA.  22206 • 202-622-3246 (day) 703-671-1813 (eve.)*

## OBJECTIVE

To practice in the field of tax law, both domestic and foreign, at a senior executive/managerial level.

## CAREER HIGHLIGHTS

Principal author of proposed original issued discount regulations, published in the Federal Register in April 1986.

Co-chair, 1990, American Bar Association Section on Taxation, Time Value of Money Subcommittee of Committee on Financial Transactions.

Principal author of proposed foreign currency transaction regulations and of IRS Announcement on integrated economic hedges.

## EXPERIENCE

INTERNAL REVENUE SERVICE
*Legislative Analysis Officer, February 1995-September 1995; February 1996 to present*
Responsibilities include drafting and analysis of tax legislation, both substantive and procedural, and primary IRS liaison with Congress.

OFFICE OF SENATOR JOHN B. BREAUX
*Tax counsel/IRS Fellow; October 1995 to February 1996*
Responsibilities included working closely with the senator and staff in other Senate offices on FY 1996 Budget Reconciliation legislation.  Drafted amendments and formulated strategy for Senate Finance Committee and floor action, and participated in Bipartisan Budget Coalition activities.

OFFICE OF REPRESENTATIVE WILLIAM J. JEFFERSON
*Tax and trade counsel, January 1993 to January 1995*
Senior legislative aide responsible for all tax and international trade issues for member of House Ways and Means Committee.  Focus upon issues of particular interest to small business community, oil and gas and petrochemical industries.

SONNENSCHEIN, NATH & ROSENTHAL
*Senior tax associate, June 1989 to June 1990*
General tax practice in large Chicago law firm.  Specific areas of emphasis included international business transactions, tax treaty matters, and financial products.

27

## THERESA E. BEARMAN                                      PAGE TWO

MAYER, BROWN & PLATT
*Senior tax associate, January 1988 to June 1989*
General tax practice in large Chicago law firm.  Specific areas of emphasis included financial products and securities transactions, real estate, and international tax matters.

INTERNAL REVENUE SERVICE
*Attorney-adviser, July 1984 to December 1987*
Responsibilities included drafting of regulations, public and private letter rulings and technical advice memoranda.  Areas of emphasis included tax accounting issues, international tax and foreign currency transactions, and financial products.

EDISON ELECTRIC INSTITUTE
*Legislative Representative for Taxes, June 1982 to December 1983*
Responsibilities included liaison with administrative agencies and Congressional committees, speech writing, and preparation of Congressional testimony.

OFFICE OF REPRESENTATIVE MARTY RUSSO
*Tax counsel/Senior legislative aide, August 1980 to May 1982*
Responsibilities included all areas of jurisdiction within the House Ways and Means Committee including legislation involving tax, trade, public assistance, health care, social security and unemployment compensation.

## EDUCATION

GEORGETOWN UNIVERSITY LAW CENTER
*L.L.M. in Taxation, February 1982*

UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL
*J.D., 1978*
Member, Holderness Moot Court Bench; teaching assistant, legal research and writing.

UNIVERSITY OF ARIZONA
*B.A. in History with minor in microbiology and chemistry, 1975*
Honors: Phi Beta Kappa, Phi Kappa Phi, Dean's List, University Scholarship Award.

UNIVERSITY OF PENNSYLVANIA
*1971 to 1973, School of Liberal Arts and School of Allied Medical Professions*
Honors: Dean's List.

## ADMISSION TO THE BAR

Admitted to California and Illinois Bars.

28

VACANCY ANNOUNCEMENT

| | |
|---|---|
| **DEPARTMENT OF THE TREASURY**<br>**LEGAL DIVISION**<br>**OFFICE OF CHIEF COUNSEL**<br>**for the INTERNAL REVENUE SERVICE** | **ANNOUNCEMENT NUMBER:** CC-99-2315<br>**OPENING DATE:** 11/09/99<br>**CLOSING DATE:** OPEN UNTIL FILLED<br>[POSITIONS MAY BE FILLED AT ANY TIME<br>AFTER THE OPENING DATE] |

**POSITION:**
ATTORNEY-ADVISER (TAX), GS-0905-11/12/13/14 AND/OR
TRIAL ATTORNEY (TAX), GS-0905-11/12/13/14 AND/OR
GENERAL ATTORNEY (TAX), GS-0905-11/12/13/14 AND/OR
GENERAL ATTORNEY, GS-0905-11/12/13/14
[AND/OR TAX LAW SPECIALIST, GS-987-13/14*]
*SEE "AREA OF CONSIDERATION"

PROMOTION POTENTIAL TO GS-14
[THE POSITION TO WHICH ASSIGNED, MAY BE IN THE NTEU CHAPTER 251 BARGAINING
UNIT.]

**SALARY RANGE:**
GS-11: $40,714 TO $52,927 PER ANNUM
GS-12: $48,796 TO $63,436 PER ANNUM
GS-13: $58,027 TO $75,433 PER ANNUM
GS-14: $68,570 TO $89,142 PER ANNUM

**NUMBER OF VACANCIES:**
SEVERAL

**LOCATION:**
INTERNAL REVENUE SERVICE
OFFICE OF CHIEF COUNSEL
WASHINGTON, DC

**NOTE: FOR CHIEF COUNSEL EMPLOYEES ONLY - YOU MUST IDENTIFY EACH ASSISTANT
CHIEF COUNSEL ORGANIZATION OR OFFICE FOR WHICH YOU SEEK CONSIDERATION, AND YOU
MUST SUBMIT A SEPARATE APPLICATION FOR EACH.**

**AREA OF CONSIDERATION:**
ALL SOURCES
(NOTE: RELOCATION EXPENSES WILL NOT BE PAID.)

[*CONSIDERATION FOR THIS POSITION AS A TAX LAW SPECIALIST, GS-987, IS
RESTRICTED TO CERTAIN EMPLOYEES IN THE OFFICE OF CHIEF COUNSEL WHO CURRENTLY
OCCUPY A TAX LAW SPECIALIST POSITION]

**TYPE OF APPOINTMENT:**
THIS IS AN EXCEPTED SERVICE POSITION.  COMPETITIVE SERVICE EMPLOYEES SELECTED
FOR THIS POSITION WILL BE REQUIRED TO CONVERT TO THE EXCEPTED SERVICE UPON
APPOINTMENT TO THE GS-905 SERIES.

**DESCRIPTION:**
THE IRS OFFICE OF CHIEF COUNSEL SEEKS CANDIDATES FOR SEVERAL ATTORNEY
POSITIONS IN ITS NATIONAL OFFICE LOCATED IN WASHINGTON, DC.  THE OFFICE OF
CHIEF COUNSEL SERVES AS INDEPENDENT COUNSEL TO THE IRS COMMISSIONER AND
FURNISHES LEGAL ADVICE AND REPRESENTATION, NATIONWIDE, ON ALL MATTERS RELATED
TO THE ADMINISTRATION AND ENFORCEMENT OF THE INTERNAL REVENUE LAWS.  ATTORNEYS
ARE ENGAGED IN THE DEVELOPMENT AND INTERPRETATION OF TECHNICAL PRINCIPLES AND

- 2 -

RULES FOR THE UNIFORM APPLICATION OF FEDERAL TAX LAWS, AND HANDLE MATTERS BOTH PROCEDURAL AND SUBSTANTIVE IN NATURE.   THEY ALSO HAVE EXTENSIVE CLIENT CONTACT AND REGULAR DEALINGS WITH TAXPAYERS AND THEIR ATTORNEYS. MANY ATTORNEYS ALSO HAVE REGULAR DEALINGS WITH THE DEPARTMENT OF THE TREASURY.

## MINIMUM QUALIFICATION REQUIREMENTS:

CANDIDATES MUST HAVE GRADUATED FROM AN ABA ACCREDITED LAW SCHOOL; BE ADMITTED TO PRACTICE LAW BEFORE THE HIGHEST COURT OF A STATE OR TERRITORY OF THE UNITED STATES; THE DISTRICT OF COLUMBIA; OR THE COMMONWEALTH OF PUERTO RICO; AND:

FOR GS-11: 1) POSSESS A JD, AND

2) GENERALLY, AT LEAST SIX MONTHS OF SIGNIFICANT ATTORNEY OR LAW CLERK EXPERIENCE; OR MUST POSSESS ONE OR MORE "SUPERIOR ACADEMIC ACHIEVEMENTS" SUCH AS GRADUATION IN THE TOP ONE-THIRD OF THE CLASS, ELECTION TO THE ORDER OF THE COIF, SUCCESSFUL MOOT COURT COMPETITION, ACTIVE PARTICIPATION IN THE SCHOOL'S OFFICIAL LAW REVIEW, ETC.

FOR GS-12: 1) POSSESS A JD AND GENERALLY, AT LEAST ONE YEAR OF ATTORNEY OR LAW CLERK EXPERIENCE WHICH INCLUDED ASSIGNMENTS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION, AND A TOTAL RECORD OF EDUCATION AND EXPERIENCE WHICH INDICATED THE ABILITY TO PERFORM LEGAL WORK COMMENSURATE WITH GRADE GS-12.

FOR GS-13: 1) POSSESS A JD AND GENERALLY, AT LEAST TWO AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION, AND GENERALLY, AT LEAST ONE AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION.

FOR GS-14: 1) POSSESS A JD AND GENERALLY, AT LEAST FOUR AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION, OR

2) POSSESS AN LL.M. IN TAXATION,  AND GENERALLY, AT LEAST THREE AND ONE-HALF YEARS OF ATTORNEY OR LAW CLERK EXPERIENCE IN A LEGAL SPECIALIZATION RELEVANT TO THE OFFICE OF CHIEF COUNSEL SUCH AS FEDERAL TAXATION, WHICH INCLUDED ASSIGNMENTS INVOLVING COMPLEX AND DIFFICULT LEGAL QUESTIONS REQUIRING EXTENSIVE RESEARCH, ANALYSIS, AND EVALUATION.

## APPLICATION PROCEDURES:

[PLEASE NOTE THAT WE CANNOT ACCEPT APPLICATIONS IN ELECTRONIC FORMAT.]

30

- 3 -

THE FOLLOWING APPLICATION MATERIALS ARE REQUIRED:

- A RESUME
- A PHOTOCOPY OF YOUR LAW SCHOOL TRANSCRIPT
- A 6-10 PAGE LEGAL WRITING SAMPLE
- A CHIEF COUNSEL APPLICATION (FORM 6524)
- A DECLARATION FOR FEDERAL EMPLOYMENT (OF-306)

**FOR CHIEF COUNSEL EMPLOYEES ONLY - ALL APPLICANTS MUST SUBMIT A WRITTEN APPLICATION AND A COPY OF THEIR MOST RECENT OFFICIAL PERFORMANCE APPRAISAL (LD-2). A WRITTEN APPLICATION MAY BE IN THE FORMAT OF A RESUME, OF-612, SF-171, OR ANY OTHER FORMAT OF CHOICE. APPLICANTS SHOULD ALSO SUBMIT A COPY OF THEIR MOST RECENT SF-50, "NOTIFICATION OF PERSONNEL ACTION."**

TO OBTAIN THE FORM 6524 AND OF-306, PLEASE CALL (202) 622-7933 OR (202) 622-8000. PLEASE LET US KNOW IF YOU WOULD PREFER TO HAVE THE FORMS FAXED TO YOU.

ALL MATERIALS MUST BE MAILED OR DELIVERED TO THE EMPLOYMENT OFFICE AT THE FOLLOWING ADDRESS:

      OFFICE OF THE CHIEF COUNSEL/INTERNAL REVENUE SERVICE
      PERSONNEL BRANCH, CC:F&M:P:W, ROOM 4032 (ATTN: CC-99-2315)
      1111 CONSTITUTION AVENUE, NW
      WASHINGTON, DC  20224

IN ACCORDANCE WITH 18 U.S.C. 1719 AND 39 U.S.C. 3201, APPLICATIONS MAILED IN A POSTAGE-PAID AGENCY ENVELOPE (PENALTY MAIL) WILL NOT BE CONSIDERED.

**OTHER RELEVANT INFORMATION:**
- MALE APPLICANTS WHO WERE BORN AFTER DECEMBER 31, 1959, MUST BE REGISTERED WITH THE SELECTIVE SERVICE SYSTEM PRIOR TO APPOINTMENT.
- RECEIPT OF APPLICATIONS MAY NOT BE ACKNOWLEDGED, AND CANDIDATES MAY NOT BE NOTIFIED OF THE OUTCOME OF THEIR CONSIDERATION UNTIL THE SELECTION PROCESS IS COMPLETE.
- ALL APPLICATION MATERIALS BECOME THE PROPERTY OF THE OFFICE OF CHIEF COUNSEL AND WILL NOT BE RETURNED.

    THE OFFICE OF CHIEF COUNSEL IS AN EQUAL OPPORTUNITY EMPLOYER



**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
**WASHINGTON, D.C. 20224**

December 1, 1999

CHIEF COMMUNICATIONS
AND LIAISON

Ms. Theresa Bearman
Internal Revenue Service
Washington, D.C. 20224

Dear Terri:

On November 26, 1999, Dr. Neal Presant notified Labor Relations and concurred with
your physician's request that you be granted another four weeks of leave.

Our timekeeping records indicate that as of November 29, 1999, you exhausted all of
your sick leave, annual leave and advance sick leave. As of November 29, you
entered into Leave Without Pay (LWOP), status. Therefore, the 160 hours of leave
that was authorized by Dr. Presant will be processed as LWOP to the extent it is used.

At this time we are unable to grant you any additional advance leave beyond the 240
hours you already received and used. Unless you are authorized additional leave, you
will be expected to report to work effective December 28, 1999.

Terri, on November 19, and per our earlier conversation, I sent a copy of the
memorandum, Request for Leave Donation, to the Chief Operations Officer asking that
he share it with his personnel. We will periodically check to see if any leave has been
donated to you and notify you accordingly. If there are any questions, please contact
me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

41

2911 S. Dinwiddie Street, A
C-2
Arlington, VA. 22206

December 7, 1999

Mr. Barry Fulcher
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C. 20224
CL:PL:B

Dear Barry:

Please be advised that for the week of December 6, 1999, I
will not be returning to work due to religious observance.
Accordingly, I am requesting the grant of advanced religious
comp time for the duration of this observance, which will
terminate on December 11, 1999.  The letter dated December
3, 1999, from my physician, Dr. Judith Nowak, will then be in
effect beginning the week of December 13, 1999.  If you do
not yet have a copy of this letter, you may acquire said letter
from Ms. Jean McIver in the Labor Relations Office.

Sincerely,

Theresa Bearman

came in on Dec. 15th

42



CHIEF COMMUNICATIONS
AND LIAISON

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

December 9, 1999

Ms. Theresa Bearman
2911 S. Dinwiddie Street
Apt. C-2
Arlington, Va. 22206

Dear Terri:

Terri, thank you for the fax you sent me on December 7, 1999 requesting 40 hours of advanced religious compensatory time for the week of December 6. As you know, we have always granted your prior requests for religious compensatory time. However, I cannot approve your request for an additional 40 hours. Therefore, any time missed for the week of December 6th will be charged as Leave Without Pay.

Federal regulations specify that religious compensatory time should be granted unless granting such time "interfere{s} with the efficient accomplishment of an agency's mission." Pursuant to the Service's Time and Leave Handbook the Service has determined that the efficient accomplishment of its mission may be interfered with if, "no opportunities are foreseen, within a reasonable length of time (120 days), at which the employee will be able to repay compensatory time taken."

You currently have a 42-hour religious compensatory time deficit that has existed since at least January 1, 1999. An additional 40 hour deficit would make it very difficult for you to repay the advanced leave within the next 120 days. Repayment of the leave is even more problematic since your physician does not believe you should return to a full-time schedule for at least several weeks.

Our office procedures specify that employees request leave in advance and you failed to meet this requirement. In the future and in accordance with Federal regulations, you should notify your supervisor at least 15 days in advance of any request for time off for religious observance. If there are any questions, please contact me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

43

# Memorandum

**To:**  Barry Fulcher

**CC:**  Sue Sottile; Lisa Thomas

**From:**  Terri Bearman

**Date:**  12/16/99

**Re:**  Denial of religious compensatory leave

---

Regarding your memo of December 9, 1999, denying my request for religious leave, according to my Earnings and Leave statements for both 1998 and 1999, your information is inaccurate. (See attached copies)  The primary reason for this is that when I made up the time, it was improperly coded as credit hours into the TIMIS system instead of reducing my religious comp. balance.

The attached copies of leave statements for pay period 25 of 1998 and pay period 23 for 1999 indicate that for 1999 my religious leave balance is only 3 hours and for 1998 is only 15 hours.  Given this clarification, I suggest that you might want to rethink your decision.  Since I plan to return to work full-time once action on my medical accomodation request is taken, it is more than likely that the hours may be made up working less than 2 extra days per month.

The salient criterion here is that the IRS is not harmed either way if the leave is granted, whereas I am substantially harmed and denied rightful compensation if not at least given the opportunity, pursuant to IRS leave policy, to make the time up.

Attachments

1

LAW OFFICES

# KALIJARVI, CHUZI & NEWMAN, P.C.

SUITE 1011

1730 K STREET, N.W.

WASHINGTON, D.C. 20006

(202) 331-9260

FAX: (202) 872-9562

JUNE D. W. KALIJARVI
GEORGE M. CHUZI
ELIZABETH L. NEWMAN
—
THOMAS J. TRGOVAC
MARGARET E. JOHNSON

OF COUNSEL:
STEPHEN L. SPITZ

600 CAMERON STREET
ALEXANDRIA, VIRGINIA 22314
—
SUITE 800
7475 WISCONSIN AVENUE
BETHESDA, MD 20814
—
OF COUNSEL:
FRANCINE K. WEISS

October 22, 1999

By Hand Delivery

Neil Presant, M.D.
Internal Revenue Service
HQ:HR:MP:1, 10421R
1111 Constitution Avenue, N.W.
Washington, D.C.

Re: <u>Theresa Bearman</u>

Dear Dr. Presant:

This firm represents Theresa Bearman, an attorney, who has worked for the Internal Revenue Service ("IRS") for eight years.  During this period, her performance ratings have been good and she has received a certificate of merit award and a commendation from a former IRS Commissioner.

Ms. Bearman's psychiatrist, Dr. Judith Nowak, M.D., by letter dated October 11, 1999, requested a medical leave of absence for Ms. Bearman because Ms. Bearman suffered a severe Major Depressive Disorder (DSMIV 296.34), which included "severe fatigue, irritability, marked difficulty concentrating, much difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless mood but no suicidal ideation."  Dr. Nowak indicated that at that time Ms. Bearman was unable to work and IRS could not provide an accommodation would assist her in doing so.  (Exhibit 1).

Enclosed is a letter from Dr. Nowak dated October 21, 1999. (Exhibit 2).  In the letter, Dr. Nowak indicates that, at this time, the IRS can provide an accommodation which will permit Ms. Bearman to return to work.  This accommodation is job restruc- turing so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present

56

position, Dr. Nowak recommends a transfer to the Chief Counsel's office where she previously worked for over three years and received a certificate of merit. Dr. Nowak explains that Ms. Bearman's self esteem is at a very low level and therefore without such accommodation, Ms. Bearman's health is likely to deteriorate, forcing her to be hospitalized, and unable to work.

We believe that Ms. Bearman is a qualified handicapped person within the Rehabilitation Act ("Act") and that such accommodation should be made. Under the Act, Ms. Bearman is a "handicapped person" because she has a record of a mental impairment which substantially limited one or more major life activities. 29 C.F.R. 1614.702 (a)(2). Specifically, in 1991, Ms. Bearman was hospitalized for two and a half months for an acute depressive episode. Such hospitalization is more than sufficient to establish that one or more major life activities (e.g. caring for one's self, learning, working) were substantially limited by her impairment. School Bd. Of Nassau County v. Arline, 480 U.S. 273 (1987). In addition, Ms. Bearman, age 45, has a record of treatment for her mental impairment, including psychological abuse, since her early twenties.

Ms. Bearman is also a "qualified handicapped person" under the Act. A "qualified handicapped person"

> means with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others ....

29 C.F.R. 1614.702(f). Ms. Bearman has had good performance ratings for eight years, so there is no question that she can perform the essential functions of her position. According to Dr. Nowak, Ms. Bearman can perform the essential functions of her position "without endangering [her] health" through hospitalization if the requested accommodation is made.

We therefore request that IRS make the requested accommodation and notify us by November 1, 1999 as to what action will be taken.

We appreciate your attention to this matter.

Sincerely,

Francine K Weiss

Francine K. Weiss

cc: David Williams, Chief, Communications & Liaison

58

Judith A. Nowak, M.D., P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, D.C. 20037-2346
202-887-5495
F. 202-466-5582
11 October 1999

Neil Presant, MD                                    Re:  Theresa Bearman
Internal Revenue Service
HQ:HR:MP:L, 1042IR
1111 Constitution Avenue, NW
Washington, DC 20224

Dear Dr. Presant:

I am writing to document that Ms. Bearman has suffered an acute exacerbation of a chronic medical illness which necessitates a medical leave of absence.

Ms. Bearman suffered from chronic low grade depressive symptoms(Dysthymic Disorder DSMIV 300.40) with distinct periods of worsening consistent with a diagnosis of Major Depressive Disorder( DSMIV 296.33) since childhood.  There is a significant family history of depression on both the maternal and paternal side.  Ms. Bearman has been in treatment nearly consistently since her early twenties.

She was hospitalized in 1991 with an acute depressive episode.  She was treated with Prozac and rapidly responded.  There have been no subsequent hospitalizations since that time.  Ms. Bearman demonstrates a pattern of initial good response to several antidepressants followed by relapse of more severe symptoms. She has had brief periods of euthymia but even at best functioning has displayed some residual symptoms (sleep disorder characterized by frequent awakenings, low energy, and a mood she characterizes as "looking at life through a gray voil.").  She has normal thyroid functioning and no evidence of any other contributory medical problem.  ·She drinks almost no alcohol and uses no drugs.

I have been following Ms. Bearman since June, 1996 for psychopharmacological treatment of her depression.  Prior to our work together, she had tried multiple pharmacological regimens which included SSRI's(Zoloft and Prozac), TCA's(Pamelor),  augmentation strategies using Lithium and Ritalin(both unsuccessful and abandoned).  We have tried Effexor, at times of exacerbation of symptoms, to doses as high as XR  375mg qd.  There is a side effect ceiling such that high doses cause a severe worsening of sleep disturbance which cannot be readily treated with Trazodone.  In recent months, Ms. Bearman was doing rather well on a combination of Effexor XR  150mg qd and Celexa 20mg qd.



59

There has been a gradual deterioration of her symptoms since approximately mid August 1999 with a dramatic worsening over the past week to ten days. This has resulted in a relapse into severe Major Depressive Disorder (DSMIV 296.34). Her symptoms include severe fatigue, irritability, marked difficulty concentrating, much difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless mood but no suicidal ideation. Ms. Bearman simply cannot stay at her desk or attend to her work: even at home, Ms. Bearman is requiring the aid of family and friends with basic demands of daily living. Therefore, she is unable to work. There are no accommodations that could be made at the present time by her employer that would result in her being able to work.

Ms. Bearman is engaged in an intensive outpatient program of psychotherapy and medication readjustment. We will certainly use other resources (eg hospitalization) if those prove to be necessary. For now, we are working on psychosocial stressors, reevaluating her medical status, and adjusting her medication--most recently, by increasing her Celexa to 30mg qd. Her past responsiveness to these interventions suggests that her condition has not become static and well stabilized (that is--there is no evidence of chronic disability). I cannot predict with great specificity how long it will be before Ms. Bearman is able to return to work but the time course of past periods required for recovery suggests that a period of 30 days out of work is a reasonable expectation.

Please let me know if you require any further information.

Sincerely,

Judith A. Nowak, MD

60

Judith A. Nowak, M.D.,P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, DC  20037-2346
tel. 202-887-5495
fax. 202-466-5582
21 October 1999

Neil Presant, MD
Internal Revenue Service
HQ:HR:MP:L,1042IR
1111 Constitution Avenue, NW
Washington, DC  20224

Re:  Theresa Bearman

Dear Dr. Presant:

I am writing this as an addendum to my letter dated 11 October 1999.

I have had the opportunity to understand Ms. Bearman's situation in greater depth.  I believe she could function at her job and return to work if an accommodation is made.  This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law.  If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where Mr. Bearman worked previously for over three years and received a certificate of merit.   The reason for this is that Ms. Bearman's self esteem is at a very low level in her current position.  Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized  and unable to work.

If you have any questions, please let me know.

Sincerely,

Judith Nowak, MD

Judith A. Nowak, MD

61


PLAINTIFF'S
EXHIBIT

LAW OFFICES

# KALIJARVI, CHUZI & NEWMAN, P.C.

SUITE 1011

1730 K STREET. N.W.

WASHINGTON, D.C. 20006

(202) 331-9260

Fax: (202) 872-9562

JUNE D. W. KALIJARVI
GEORGE M. CHUZI
ELIZABETH L. NEWMAN

THOMAS J. TRGOVAC
MARGARET E. JOHNSON

OF COUNSEL
STEPHEN L. SPITZ

600 CAMERON STREET
ALEXANDRIA, VIRGINIA 22314

SUITE 800
7475 WISCONSIN AVENUE
BETHESDA. MD 20814

OF COUNSEL
FRANCINE K. WEISS

November 15, 1999

By Facsimile

David Williams, Chief, Communications & Liaison
Internal Revenue Service
1111 Constitution Avenue, N.W., Room 3116
Washington, D.C. 20224

Re: <u>Theresa Bearman</u>

Dear Chief Williams:

This firm represents Theresa Bearman, an attorney, who has worked
for the Internal Revenue Service ("IRS") for eight years. By
letter dated October 22, 1999 to IRS physician, Neil Present,
M.D., and copied to you, we requested an accommodation on behalf
of Ms. Bearman because of her serious medical condition which
necessitated her being on a medical leave of absence. We asked
to be notified by November 1, 1999 as to what action IRS would
take in response to our request.

To date, we have not received a response. We contacted you by
telephone on Wednesday morning, November 10, 1999, and left a
message for you to contact us. On Friday, November 12, 1999, at
8:00 a.m. before our offices opened, you left a telephone message
that you were returning our call. We returned your call Friday
and asked that you be paged, but did not receive a return call.
This morning, Monday, November 15, 1999, at approximately 9:15
a.m., we again left a message for you to contact us, but as of
yet, we have not received a response.

62

We request that you contact us as soon as possible regarding the
status of Ms. Bearman's accommodation request.

Sincerely,

Francine K. Weiss

Francine K. Weiss

63



**CHIEF COMMUNICATIONS
AND LIAISON**

**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
**WASHINGTON, D.C. 20224**

November 19, 1999

Ms. Theresa Bearman
Internal Revenue Service
Washington, D.C.  20224

Dear Terri:

On November 16, 1999, I was notified by Customer Service that their records show that you owe the IRS $1,271.86.  This debt was incurred as a result of an emergency salary payment of $1,321.86 that you requested and received on September 29, 1998.

Customer Service records indicate that on October 7, 1998,  you remitted a personal check payable to the IRS for $1,321.86.  However, their records show that the check was not honored by your bank due to insufficient funds.  Customer Service records indicate that you later paid $50.00 to partially satisfy your debt.  That leaves an unpaid balance of $1,271.86.

Section 216.6 of Document 9335, *Interim Handbook of Employee Conduct and Ethical Behavior* and Section 2635.809 of Document 9077, *Standards of ethical conduct for employees of the executive branch* requires federal employees to satisfy in good faith their obligations as citizens, including all just financial obligations, especially those such as Federal, state, or local taxes.  In good faith means an honest intention to fulfill any just financial obligation in a timely manner.   Failure to meet this standard can result in disciplinary action up to and including removal.  Therefore, it is mandatory that you promptly repay, in full, your outstanding debt no later than December 10, 1999, or submit proof of prior repayment.

If there are any questions, or if the information that Customer Service provided is incomplete or incorrect please contact me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

6 4

THERESA E. BEARMAN 09/91
PH 703-671-1813
2911 S DINWIDDIE ST, APT C-2
ARLINGTON, VA 22206

2067
68-760/560
BRANCH 05528

DATE _Dec. 6, 1999_

PAY TO THE
ORDER OF _Internal Revenue Service_ ____ | $ _1271 86/100_

_Twelve Hundred Seventy-one + 86/100_ DOLLARS

FIRST UNION
First Union National Bank
Alexandria, Virginia
R/T 056007604

FOR ____

_Theresa E. Bearman_

⑈056007604⑈ 1070 2205057B3⑈ 2067

_Recvid $ 12/9/99_

_Nancy Greene_
_CSC_

65

'9  00:26 FAX 202 872 0562     KALIJARVI CHUZI & NEWMAN     98729562   P.62
                                         TO
-7  '99 17:30  FROM LRNES

### DEPARTMENT OF THE TREASURY
#### INTERNAL REVENUE SERVICE
#### WASHINGTON, D.C. 20224

## NOV 23 1999

Ms. Francine K. Weiss
Kalijarvi, Chuzi, and Newotte
1730 K Street, N.W., Suite 1011
Washington, D.C. 20006

Dear Ms. Weiss:

I am writing concerning Theresa Bearman's reasonable accommodation request. In order to process and make a determination on this request, Dr. Neal L. Presant, the Service's Medicine Consultant has requested additional information regarding Ms. Bearman's work history and performance. Specifically, he needs to know the nature of the work and the duties and responsibilities assigned to Ms. Bearman. He also needs to ascertain whether there were performance related issues and problems associated with the work. Finally, Dr. Presant needs to know why Ms. Bearman left her former legal position and the following questions must be addressed: (1) Were there problems with her work? (2) Why did she leave that position and was it voluntary? Copies of Ms. Bearman's current and past performance appraisals will be provided to Dr. Presant.

The information delineated above must be provided by Ms. Bearman's supervisor(s). In that regard, we need Ms. Bearman's authorization to release this information. Please have her concur with this request by signing below and returning this letter to the following address:

            Internal Revenue Service
            1111 Constitution Avenue, N.W., Room 1034
            Washington, D.C. 20024

If you have any further questions regarding this request, please contact me on (202) 622-4595.

                                        Sincerely,

                                        Jean C. McIver
                                        Acting Section Chief
                                        Labor Relations Section

Theresa Bearman
Date: Nov 24, 1999

66

LAW OFFICES

# KALIJARVI, CHUZI & NEWMAN, P.C.

SUITE 1011
1730 K STREET, N.W.
WASHINGTON, D.C. 20006
(202) 331-9260

FAX (202) 872-9562

JUNE D. W. KALIJARVI
GEORGE M. CHUZI
ELIZABETH L. NEWMAN
———
THOMAS J. TRGOVAC
MARGARET E. JOHNSON
———
OF COUNSEL
STEPHEN L. SPITZ

600 CAMERON STREET
ALEXANDRIA, VIRGINIA 22314
———
SUITE 800
7475 WISCONSIN AVENUE
BETHESDA, MD 20814
———
OF COUNSEL
FRANCINE K. WEISS

November 24, 1999

By Facsimile

Joan C. McIver, Acting Section Chief
Labor Relations Section
Department of the Treasury
Internal Revenue Service
Washington, D.C.  20024

Re: Theresa Bearman

Dear Acting Chief McIver:

As requested in your November 23, 1999 letter regarding above-captioned Internal Revenue Service attorney Theresa Bearman, enclosed is the signed permission for Dr. L. Neal Presant to obtain information regarding Ms. Bearman's work history and performance.

For the record:

(1) Ms. Bearman left the Office of Chief Counsel in December 1987 to take a job as a tax associate with a prestigious law firm in Chicago, Illinois.  During her time in the Office of Chief Counsel, she received a Certificate of Merit plus a cash award for work done on a particularly complex project.

(2) She has not received an evaluation for the past two years, but all the evaluations prior to that were rated fully acceptable.  During her time in Legislative Affairs, she both drafted and implemented, on behalf of the IRS, legislation affecting taxpayers' rights.  Had there been sufficient funds, she would have received an award for this also, but did receive a personal commendation from the Commissioner for her work on the project.

67

(3) In her current position, her duties and responsibilities are largely of a clerical and secretarial nature. She is expected to take minutes of meeting and transcribe them, put together non-technical briefing books for meetings, draft agendas and arrange meetings at which her technical and legal expertise is never put to use. She functions primarily as a facilitator and not as a technical, legal aide, which was how the position was originally described to her. Most of the time, however, she has no work to do and has never had sufficient work of an appropriate nature to keep her busy for an entire 8 hour workday. When she raised this issue and asked for help from her supervisor in getting more appropriate work for a tax attorney of 20 years' experience, she was flat out refused with no reason given.

We would appreciate your transmitting this letter to Dr. Peasant.

We also appreciate your agreement to expedite this case in any way you can, including sending by facsimile this material to Dr. Peasant. Please let us know if there is anything else you need. Thank you.

Sincerely,

Francine K. Weiss

Francine K. Weiss

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

December 1, 1999

CHIEF COMMUNICATIONS
AND LIAISON

Ms. Theresa Bearman
Internal Revenue Service
Washington, D.C. 20224

Dear Terri:

On November 26, 1999, Dr. Neal Presant notified Labor Relations and concurred with your physician's request that you be granted another four weeks of leave.

Our timekeeping records indicate that as of November 29, 1999, you exhausted all of your sick leave, annual leave and advance sick leave. As of November 29, you entered into Leave Without Pay (LWOP), status. Therefore, the 160 hours of leave that was authorized by Dr. Presant will be processed as LWOP to the extent it is used.

At this time we are unable to grant you any additional advance leave beyond the 240 hours you already received and used. Unless you are authorized additional leave, you will be expected to report to work effective December 28, 1999.

Terri, on November 19, and per our earlier conversation, I sent a copy of the memorandum, Request for Leave Donation, to the Chief Operations Officer asking that he share it with his personnel. We will periodically check to see if any leave has been donated to you and notify you accordingly. If there are any questions, please contact me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

69

Judith A. Nowak, M.D.,P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, DC  20037-2346
tel. 202-887-5495
fax. 202-466-5582
3 December 1999

Ms. Joan McIver
Acting Chief, Labor Relations Office
Internal Revenue Service
Washington, DC

Re:  Theresa Bearman

      I am the physician of record for Ms. Bearman, who must return to work next week for financial reasons.  She is not fully recuperated but I believe that she is sufficiently improved to be able to return part-time with short-term accommodations, especially if she can anticipate the near future granting of the longer term accommodations we have requested and that have not yet been decided.

      Ms. Bearman continues to have difficulty with attention and concentration and has diminished energy and fatigues more readily.  Therefore, I request that she be allowed to work part-time for several weeks.  I would recommend a 6 hour work day from approximately 10 AM to 4 PM with some flexibility for determining the beginning and end of her day.  I feel this will be necessary for a short period but one which I cannot yet specify exactly.  Please let us know if any other information is required.

                        Sincerely,

                        Judith A. Nowak, MD

73

2911 S. Dinwiddie Street, A
C-2
Arlington, VA. 22206

December 7, 1999

Mr. Barry Fulcher
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C.  2^?24
CL:PL:B

Dear Barry:

Please be advised that for the week of December 6, 1999, I
will not be returning to work due to religious observance.
Accordingly, I am requesting the grant of advanced religious
comp time for the duration of this observance, which will
terminate on December 11, 1999.  The letter dated December
3, 1999, from my physician, Dr. Judith Nowak, will then be in
effect beginning the week of December 13, 1999.   If you do
not yet have a copy of this letter, you may acquire said letter
from Ms. Joan McIver in the Labor Relations Office.

Sincerely,

Theresa Bearman

74



**DEPARTMENT OF THE TREASURY**
**INTERNAL REVENUE SERVICE**
WASHINGTON, D.C. 20224

December 9, 1999

CHIEF COMMUNICATIONS
AND LIAISON

Ms. Theresa Bearman
2911 S. Dinwiddie Street
Apt. C-2
Arlington, Va. 22206

Dear Terri:

Terri, thank you for the fax you sent me on December 7, 1999 requesting 40 hours of advanced religious compensatory time for the week of December 6. As you know, we have always granted your prior requests for religious compensatory time. However, I cannot approve your request for an additional 40 hours. Therefore, any time missed for the week of December 6th will be charged as Leave Without Pay.

Federal regulations specify that religious compensatory time should be granted unless granting such time "interfere{s} with the efficient accomplishment of an agency's mission." Pursuant to the Service's Time and Leave Handbook the Service has determined that the efficient accomplishment of its mission may be interfered with if, "no opportunities are foreseen, within a reasonable length of time (120 days), at which the employee will be able to repay compensatory time taken."

You currently have a 42-hour religious compensatory time deficit that has existed since at least January 1, 1999. An additional 40 hour deficit would make it very difficult for you to repay the advanced leave within the next 120 days. Repayment of the leave is even more problematic since your physician does not believe you should return to a full-time schedule for at least several weeks.

Our office procedures specify that employees request leave in advance and you failed to meet this requirement. In the future and in accordance with Federal regulations, you should notify your supervisor at least 15 days in advance of any request for time off for religious observance. If there are any questions, please contact me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

76

## Fulcher Barry P

| | |
|---|---|
| From: | Fulcher Barry P |
| Sent: | Thursday, December 16, 1999 12:39 PM |
| To: | Bearman Terri |
| Cc: | Sottile Sue M; Fitzpatrick Robert J |
| Subject: | Office Procedures |

| | |
|---|---|
| Importance: | High |

Terri, you are being placed on Absent Without Leave (AWOL) for 6 hours on December 13,  6 hours on December 14 and 2 hours on December 15.  You will be on LWOP for the balance of time for those days.  You are being placed on AWOL because you  did not receive approval for the leave.  Our understanding from your physician letter dated December 3, 1999) was that you would be returning to work effective December 6th.  You did not report to work on that day and I did not hear from you until the afternoon of December 7 when you faxed a request for religious leave for the week of December 6th.  Any accrued or donated leave will be credited to you for that week and any deficit will be processed as Leave Without Pay.  Employees are expected to follow all time and attendance requirements and failure to meet them can result in disciplinary action.

Terri, I reviewed the note you left me (dated December 15, 1999), in response to the office attendance policies that Robert Fitzpatrick provided all employees.  Your note said that the letter on file from your physician says that "for the foreseeable future, especially pending my request for a medical accommodation, that a certain flexibility be applied in the case of my attendance".  Terri I read that letter again and it refers only to your tour of duty.  It does not relieve you of your work related responsibilities.  Your physician "recommends a 6 hour work day from approximately 10:00 to 4PM with some flexibility for determining the beginning and end of her day."  While in a work status, I expect you to focus on work activities in accordance with your critical elements and performance standards and Service and office policies.  Also, the 10:00 - 4PM timeframes recommended by your physician does not account for a 30 minute lunch break so you should plan on being in the office for an additional 30 minutes so you can receive credit for a six hour day.  Please let me know f you would like to discuss these issues.

Barry Fulcher

9 1

Judith A. Nowak, M.D., P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, D.C. 20037-2346
202-887-5495
F. 202-466-5582
21 December 1999

Mr. Barry P. Fulcher
Acting Chief, Business Liaison
CL:PL:B
Room 7559
Internal Revenue Service
1111 Constitution Avenue, NW
Washington, DC 20224

RE: Theresa Bearman

Dear Mr. Fulcher:

Theresa Bearman, who is a patient under my care, has advised me today of
several facts.

First, she informs me that you have told her that when she is in the office,
despite her documented and continuing disability, she is expected to perform at full
performance level. As I believe I indicated in my letter dated October 11, 1999 and
October 21, 1999 (copies attached), this will not be possible. Ms. Bearman has
returned to work only because the extensive delay and lack of cooperation by the
agency in processing her request for a reasonable accommodation under the
Rehabilitation and American With Disabilities Acts have forced her to do so to prevent
her becoming destitute. Her ability to return to work is subject, on a day to day basis,
by her condition, which is deteriorating because of this delay which seems
unnecessary and unconscionable.

Additionally, in my letter of December 3, 1999 (copy attached), I suggested that
Ms. Bearman be _allowed_ return to work on a part-time basis and suggested, as an
example, possible working hours. I understand that you have interpreted my letter in a
strict, literal manner such that it apply only to her tour of duty and nothing else.
Therefore, let me clarify. All possible accommodations should be made to all aspects
of Ms. Bearman's return to part-time work, including, but not limited to:  1)  the right to
choose not to take a lunch break for which she will be charged when she may only be
capable of staying at work for a limited time and wishes to be as productive as
possible; 2)  the right to have the approval of her right to leave without pay status, as
indicated in your letter dated December 1, 1999 (copy attached), apply for any periods
through December 28, 1999, for which she does not report to work due to her
continuing illness;  and 3) pending approval of her anticipated request for leave under

92

the Family and Medical Leave Act, for which I will provide certification, that she continue to be on leave without pay status when not at the office.

Mr. Bearman informs me that she has repeatedly been denied leave for various purposes and was recorded as AWOL despite having been approved for leave without pay status. Ms. Bearman's medical condition is very precarious and it is my medical opinion that any further treatment of this kind (which does appear to me as harrassment) will cause her further harm possibly to the point of requiring hospitalization. Please be so advised.

Sincerely,

*Judith Nowak*

Judith A. Nowak, MD

93

Affidavit                    Theresa E. Bearman                        00-1103

1.      Provide your name, job title, disability, religion, brief work history.

Theresa E. Bearman, at time of complaint Management Program Analyst, GS 343-14.
My disability, acute major depressive episode a form of clinical depression.  It
is both a physical and mental disability. Religion - Judaism. Present position
Attorney (Estate Tax) GS-905-12.

2.      Describe your participation in previous protected EEO activities:

        I was retaliated against for requesting a reasonable accommodation under
the Rehabilitation of Act of  1973, in the form of either a job restructuring or
a reassignment.  The request was made in writing on October 22, 1999.


3. What incidence(s) occurred that led you to believe that your request for
   reasonable accommodation for your disability (physical and mental -major
   clinical depression) was not adequately addressed?

I am claiming that I was denied a reasonable accommodation due to the following:
1) undue delay caused entirely by the failure of my supervisor to take action on
the request by providing either a temporary or permanent accommodation within a
reasonable amount of time and by the consistent failure to respond to my
requests for information concerning or action on the request.  and 2) the fact
that from November 1999 on, there were 2 fully funded, vacant positions for
which I was fully qualified, such positions were at the same grade,. GS-14, and
I repeatedly made the existence of such positions known to my supervisor, Ms.
Sottile, and Ms. Barry of the General Counsel's Office.  Despite this, they
failed to take action.

On October 4, 1999, with the knowledge and approval of my director, S. Sottile,
I took a medical leave of absence due to the onset of a severe major depressive
episode.  By letter dated October 22, 1999, I requested through my attorney that
a reasonable accommodation be made under the Rehabilitation Act of 1973 (Rehab.
Act) (Pub. L. 93-112), as amended by the Rehabilitation Act Amendments of 1992,
1614.203c (1997) due to mental and physical disability.  My disability was
rendered acute in large part because of the circumstances surrounding the job.
Those circumstances are that from the period from January 1999 to October 4,
1999, I have had no work to do for 99% of the time.  Moreover, the small amount
of work that I was given was mostly secretarial and clerical in nature and
completely inappropriate for someone of a GS-14 step 6 (my grade at that time),
considering the extensive experience that I have.  I am, and had been for 20
years, a tax attorney, a former Attorney-Advisor in the Office of Chief Counsel
(both Domestic and International divisions), and I have an advanced law degree
in Federal taxation from Georgetown University.  Although I have previously
requested amelioration of the situation from both my director, Susanne Sottile,
and the Chief of Communications and Liaison, David Williams, on an informal
voluntary basis, both parties flat out refused to take any ameliorative action
and gave no reason therefor.  Julie Barry, Attorney-Advisor in General Legal
Service, Office of the Chief Counsel, went so far as to use abusive language

1/3

with and then to hang up on my attorney when last asked to provide information concerning the status of my request for reasonable accommodation during the week of February 3, 2000. She later admitted to having done so in front of EEO officials and a member of the Commissioners staff.

As of the date of filing of this complaint, no action whatsoever had been taken with respect to my October 22, 1999, written request for a reasonable accommodation in the nature of either a job restructuring that would provide me with full-time legal work, in lieu thereof, a transfer to the Office of Chief Counsel. Nor was any attempt made to provide an interim accommodation, pending permanent action on my request. I have several times in the past asked to be placed on a 120-day detail to remove me from what was an extremely hostile work environment that was deleterious to my health. I remain under a doctor's care. Management continually ignored my request for accommodation. As well as my request for information concerning what actions were being taken to grant the request or at the least an interim accommodation. I was forced to return to work out of dire financial need. Every day that I was forced to return to that work environment, my health continued to deteriorate.

I was subjected to daily harassment when I returned to work part-time and, Ms. Sottile incorrectly applied the terms of the Family Medical Leave Act to which I had acquired approval in December 1999, by listing me as AWOL when I was working on a part time basis.

4.  Why do you believe that you were discriminated against because of your religion (Judaism), disability (physical-clinical depression and mental-acute major depressive episode) when you were subjected to a hostile work environment when: On November 19, 1999, management intervened in a payment arrangement made by you through Customer Service regarding repayment of monies owed to the IRS; In December 1999, your request for compensatory leave for religious observance was denied and you were charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999?

Ms. Sottile had my supervisor intervene in an arrangement that I had made independently with Nancy Green, an employee in Customer Service, to repay an outstanding amount owed to the IRS, and had the date of the payment accelerated by 6 weeks to a time when she knew I would be in LWOP status; moreover, once I paid the requisite amount I was further threatened by my supervisor with potential disciplinary action, even though I had complied with the advanced payment schedule. Upon subsequent investigation, I learned that my original arrangement to pay the amount at a later date was fully within the regulations governing repayments of amounts owed, and therefore, the acceleration of the payment date was not required by any IRS regulation or policy. It was done strictly to push me.

In December 1999, Ms. Sottile denied my request for advanced compensatory leave for religious observance; her denial was based upon completely inaccurate information. When provided with the correct information and asked to reconsider her decision, I received no response at all, and thus was caused to suffer the loss of another week's worth of salary.

Ms Sottile directly violated IRS leave policy and regulation by having me recorded as Absent Without Leave (AWOL) on December 13, 14, 15, of 1999, despite the fact that I had previously received approval for leave without pay(LWOP) status for those days.

114

5.   Why do you believe you were discriminated against because of your disability, religion, and retaliated against when: On December 23, 1999, management monitored your telephone calls and use of the internet; On January 3, 2000, you were expected to perform the work of a full-time employee while working part-time; and On February 26, 2000, you were denied a within-grade increase to a GS-14 step 6:

When I returned to work part-time, Ms. Sottile had my supervisor monitor my phone calls and even monitor my use of the Internet on my computer. Although I had presented my supervisor with a letter from my physician indicating that I was still functioning under a significant disability and returned to work part-time only out of financial need, I was continually harassed on a daily basis by being told that I was expected to perform at full performance level while I was there.

The extended uncompensated leave that I required as a result of management's failure to provide reasonable accommodation caused a delay in my step increase. Had management responded to my request for reasonable accommodation, and avoided the unnecessary delay in at least providing a temporary accommodation, it would not have been necessary to take leave without pay and I would have received a within grade increase to GS-14 step 6 in February 2000. I have to date, not received this scheduled increase.

6.   Explain how you were treated prior to your participation in the EEO process; then explain how the treatment changed after your participation in the EEO process.

Prior to my participation in the EEO process, I did not feel that my job was threatened. Subsequent to my participation in the process, I was frequently monitored, given memoranda regarding leave policy, (when other employees were not monitored, or given memoranda regarding leave policy), and my telephone calls were listened to and documented (no other employees were subjected to such monitoring).

7.   What remedies are you seeking as a part of this complaint?

Immediate action on October 22, 1999, request for reasonable accommodation under the Rehabilitation and Americans with Disabilities Acts through reassignment to a position that 1)provides sufficient work to keep an employee productively occupied for a full 8 hour day, and ii) work of appropriate complexity preferably, full-time legal work-for an employee who is a tax attorney with an advanced degree in tax law and 20 years experience with a rating of GS-14 step 6;

Back pay with interest

All negative leave balances eliminated and positive annual and sick leave balances restored

Removal of AWOL status for any dates after October 4, 1999

Reimbursement for attorneys fees and out of pocket medical expenses incurred since October 4, 1999; and

Compensation for mental anguish, pain and suffering.

I understand that the information provided is not to be considered confidential and that it may be shown to the interested parties.

I (swear, affirm) that the information provided is true and complete to the best of my knowledge and belief.

Executed on the _20_ day of _July_, 2000.

(Complainant)

(Investigator)

8/31/00
(Date)

116

Amended Affidavit          Theresa E. Bearman          00-1103

1. Provide your name, job title, disability, religion, brief work history.

Theresa E. Bearman, at time of complaint Management Program Analyst, GS 343-14. My disability, acute major depressive episode a form of clinical depression. It is both a physical and mental disability. Religion - Judaism. Present position Attorney (Estate Tax) GS-905-12.

2. Describe your participation in previous protected EEO activities:

I was retaliated against for requesting a reasonable accommodation under the Rehabilitation of Act of 1973, in the form of either a job restructuring or a reassignment. The request was made in writing on October 22, 1999.

While an employee in the Office of Legislative Affairs, I submitted a complaint alleging physical and verbal assault and intimidation against my branch chief to the Office of Inspection. This was over 2 years ago, the Office of Inspection is now defunct, but the complaint was never answered.

On August 20,1999, I requested the intervention of an EEO counselor, Ms. Marlene Curry, due to harassment by Ms. Sue Sottile's deputy.

3. What incidences occurred that led you to believe that your request for reasonable accommodation for your disability (physical and mental -major clinical depression) was not adequately addressed?

I am claiming that I was denied a reasonable accommodation due to the following:

1) unnecessary delay caused entirely by the failure of my supervisor and IRS management to take action on the request by providing either a temporary or permanent accommodation within a reasonable amount of time and by the consistent failure to respond to my requests for information concerning or action on the request and 2) the fact that from November 1999 on, there were 2 fully funded, vacant positions for which I was fully qualified, such positions were at the same grade of my present position, GS-14, and I repeatedly made the existence of such positions known to my supervisor, to Ms. Sottile, and, through my attorney, to Ms. Barrv of the General Counsel's Office. Despite this, they all failed to acknowledge the existence of these positions or to take any action required by the Rehabilitation Act.

On October 4, 1999, with the knowledge and approval of my director, S. Sottile:, I took a medical leave of absence due to the onset of a severe major

117

depressive episode. By letter dated October 22, 1999, I requested through my attorney that a reasonable accommodation be made under the Rehabilitation Act of 1973 (Rehabilitation Act) (Pub. L. 93-112), as amended by the Rehabilitation Act Amendments of 1992, 29 C.F.R. 1614.203(c) (1997) due to mental and physical disability. This letter was accompanied by letters from my physician, Judith Nowak, M.D. dated October 11 and 22, 1999, and subsequently supported by a letter from the agency doctor, Dr. Neil Presant, dated November 26, 1999, recommending that reasonable accommodation be granted.

My disability was rendered acute in large part because of the circumstances surrounding the job. Those circumstances are that from the period from January 1999 to October 4,1999, 1 have had no work to do for 99% of the time. Moreover, the small amount of work that I was given was mostly secretarial and clerical in nature and completely inappropriate for someone of a GS-14 step 5 (my grade at that time) considering the extensive experience that I have. I am, and had been for 20 years, a tax attorney, a former Attorney-Advisor in the Office of Chief Counsel (both Domestic and International divisions), and I have an advanced law degree in Federal taxation from Georgetown University. Although I have previously requested amelioration of the situation from both my director, Susanne Sottile and the Chief of Communications and Liaison, David Williams, through the auspices of an EEO counselor, both parties flat out refused to take any ameliorative action and gave no reason therefore. Julie Barry, an Attorney-Advisor in the General Legal Services Division of Office of the Chief Counsel and the attorney ostensibly assigned to my case, went so far as to use abusive language with and then to hang up on my attorney on January 6, 2000, when my attorney expressed exasperation with her lack of cooperation and failure provide information concerning the status of my request for reasonable accommodation and asked to speak with her supervisor. Ms. Barry later admitted to having done so in front of EEO officials and a member of the Commissioner's staff.

Further evidence of unnecessary delay is as follows:

The letter of October 22, 1999, was addressed to Dr. Neil Presant and a copy was sent to David Williams, Chief, Communications & Liaison, and requested a reply by November 1. There was no reply then or later, and on November 10, 1999, my attorney phoned Mr. Williams' office. There was no reply. My attorney again phoned on November 12 and November 15, with no results, although Mr. Williams' secretary confirmed that he was at work. My attorney faxed a letter to Mr. Williams on November 15th, documenting her attempts to reach him and his failure to respond. The following day, Mr. Williams informed my attorney that he had nothing to do with the request for reasonable accommodation and had forwarded it to the Office of Labor Relations.

On November 17, 1999, my attorney spoke with Ms. Joan McIver, Acting Section Chief for Labor Relations. Ms. McIver stated that my request had been assigned to someone who had just left the IRS, and that she had not looked at

the request yet. She then indicated that the agency doctor would need more information before my request was considered, but that she couldn't tell my attorney at that time what that information would be and that it would probably take another week to find this out. On November 23, 1999, my attorney again spoke with Ms. McIver who then faxed the letter requesting the additional information. I responded to the letter and faxed it to Ms. McIver the following day, November 24, 1999. In a telephone conversation that same day, Ms. McIver promised to help expedite my request. On December 2, 1999, after having failed to receive any response or action from Ms. McIver, my attorney sent another letter, reminding her of her promise to help expedite my case. On this same day, I drafted and hand-delivered to Commissioner Rossotti's office a letter explaining the obstructive tactics thus far encountered by me and pleading for his help due to my concern for my deteriorating health. One week later on December 9, 1999, I placed a follow-up call to his office and was told that no such letter was ever received. I spoke with a Ms. Dana Hans who asked me to fax to her a copy of the letter and other documents I had originally submitted. I was also informed that the Commissioner had set up an office for the handling of employee complaints and that the director's name was Steve Whitlock. I left several messages for Mr. Whitlock, none of which was returned. On December 14, 1999, I again phoned the Commissioner's office and spoke to Ms. Hans. She said she couldn't find the documents I faxed to her, but would search their computer system for it. I later received a phone call from someone in Mr. Whitlock's office, telling me to consult with my supervisor, Barry Fulcher. When I explained that I filed a complaint because Mr. Fulcher was not cooperating, they hung up.

By letter dated December 14, 1999, my attorney advised Julie Barry of her concern that no action was being taken and that Ms. Barry would not even give her any idea for a time frame within which a resolution might be reached. In a letter dated December 16, 1999, to Ms. Barry my attorney included legal and administrative precedent supporting my request to be reassigned to an attorney position in the Office of Chief Counsel. Ms. Barry consistently maintained that the Office of Chief Counsel was not part of the IRS and, therefore, the law was not applicable. She offered no citations or other substantiation for her position.

I had returned to work on a part-time basis the last week of December 1999, purely out of financial need, although I was still quite ill. When still no action or information was forthcoming, I spent the afternoon of January 5, 2000, on the telephone trying to get an appointment with Commissioner Rossotti. I had to call back every 15 minutes for 4 hours and tell them that it was a matter of life and death. Finally, late that afternoon, I received a call from Steve Whitlock, who said he would look into the situation. I was placed on paid administrative leave the following day. There was a meeting on January 6, 2000, called by Mr. Whitlock concerning my case. Present at the meeting were John Burns, EEO Liaison officer, Kathy King, EEO Reasonable Accommodation Specialist, Barry

Fulcher, Julie Barry and Mr. Whitlock. Mr. Burns, having first-hand knowledge of the discussion at that meeting, later informed me of its occurrence.

The administrative leave was later confirmed in a letter from Barry Fulcher, dated January 12, 2000, in which he requested an opinion from my physician as to when I would be able to report back to work. He stated that I the decision was made to place me on administrative leave because of concerns that my condition might be life-threatening. In a letter dated, January 21, 2000, my physician stated clearly that I would be medically able to return to work when my request for reasonable accommodation was acted upon. It was in this letter that Mr. Fulcher first offered any information regarding the search for a reasonable accommodation and despite Ms. Barry's earlier assertions to the contrary, the search included the Office of the Associate Chief Counsel. By return letter, dated January 16, 2000, I again informed Mr. Fulcher of the 2 vacant GS-905 positions in the Office of the Associate Chief Counsel (Domestic). This was ignored.

On Friday, January 28, 1999, I received a voice mail message at 5P.M. informing me that the administrative leave was terminated and that I was to report to work on the following Monday. When I asked Barry Fulcher why, after soliciting my doctor's opinion, he and Ms. Sottile chose to ignore it, he had no explanation. I was thus required to return to the same hostile working environment that — precipitated my being placed on administrative leave and placed me in a situation wherein I feared for my life. I later received a phone call from Mr. Whitlock stating that the Commissioner's office could no longer be involved. I asked him if he understood that I was suffering grave medical and financial harm and that he could be exposing the agency to liability and he replied that he did so understand, but nevertheless, the Commissioner's office was withdrawing from the situation.

As of the data of filing of the original complaint, no action whatsoever had been taken with respect to my October 22, 1999, written request for a reasonable accommodation in the nature of either a job restructuring that would provide me with full-time legal work, in lieu thereof, a transfer to the Office of Chief Counsel. Nor was any attempt made to provide an interim accommodation, pending permanent action on my request. I have several times in the past asked to be placed on a 120-day detail, and John Burns, an EEO official, had made a similar request on my behalf and directly spoke with Richard Mihelcic of the Office of Chief Counsel about a possible detail to Chief Counsel to remove me from what was an extremely hostile work environment that was deleterious to my health. Nothing came of any of the requests. I remain under a doctor's care. Management continually ignored my request for accommodation. As well as my request for information concerning what actions were being taken to grant the request or at the least an interim accommodation. I was forced to return to work out of dire financial need. Every day that I was forced to return to that hostile work environment, my health continued to deteriorate.

I was subjected to daily harassment when I returned to work part-time and, Ms. Sottile incorrectly applied the terms of the Family Medical Leave Act to which I had acquired approval in December 1999, by listing me as AWOL when I was working on a part time basis.

Ultimately, by letter dated March 7, 2000, I was offered the opportunity to transfer to an Attorney-Advisor, GS-905, position in the Examination Division in the Southeast Region. However, this position was at a grade GS-12, 2 grades lower than my then current status. I was advised that because of this, I did not have to take the offer, but that if I did not, the IRS would consider its obligation to find a reasonable accommodation for me to be terminated. While I was offered a pay retention agreement, that agreement provided that I was only to receive 50% of whatever annual Federal pay increases were legislated in the future. So I remain financially harmed. The 2 vacant GS-905 positions in the Office of Chief Counsel, to the best of my knowledge remain open.

4. Why do you believe that you were discriminated against because of your religion (Judaism), disability (physical-clinical depression and mental-acute major depressive episode) when you were subjected to a hostile work environment when: On November 19, 1999, management intervened in a payment arrangement made by you through Customer Service regarding repayment of monies owed to the IRS; In December 1999, your request for compensatory leave for religious observance was denied and you were charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 24, 1999 and 2 hours on December 15, 1999?

Ms. Sottile had my manager, Barry Fulcher, intervene in an arrangement that I had made independently with Nancy Green, an employee in Customer Service, to repay an outstanding amount owed to the IRS, and had the date of the payment accelerated by 6 weeks to a time when she knew I would be in leave without pay status; moreover, once I paid the requisite amount I was further threatened by Mr. Fulcher with potential disciplinary action, even though I had complied with the advanced payment schedule. Upon subsequent investigation, I learned from Nancy Green that my original arrangement, negotiated with her directly, to pay the amount at a later date was fully within the regulations governing repayments of amounts owed, and therefore, the acceleration of the payment date was not required by any IRS regulation or policy. It was done strictly to punish me.

In December 1999, Ms. Sottile denied my request for advanced compensatory leave for religious observance; her denial was based upon completely inaccurate information. When provided with the correct information and asked to reconsider her decision, I received no response at all, and thus was caused to suffer the loss of another week's worth of salary.

Ms Sottile directly violated IRS leave policy and regulation by having me recorded as Absent Without Leave (AWOL) on December 13, 14, 15, of 1999, despite the fact that I had previously received approval for leave without pay (LWOP) status for those days. Continuously throughout the year 1999, Ms. Sottile applied the leave rules in a selective fashion with respect to me that other workers in the office were not subject to. She charged me for annual leave for taking lunch, and would charge me leave because she said she saw the lights out in my office on several afternoons. When I offered explanations of these incidences, backed up by opinions from the Personnel Office, I was ignored. I was repeatedly given copies of the office leave policy for no apparent reason, although distribution of the policy was not office wide. On several occasions, Ms. Sottile would charge me an hour of leave for being 10 minutes late and would not let recompense me for the lost 50 minutes. Ms. Sottile had direct knowledge that I suffered from clinical depression and took medication that left me with a slight morning hangover. She, nevertheless, refused to let me work a later shift, from 9:30 to 6, to avoid any more charges against my annual leave. As a result of Ms. Sottile's selective application of the leave rules to my detriment, and in spite of her knowledge of my depression, I have lost an inordinate amount of compensation and have accrued a very large leave without pay balance. Moreover, Ms. Sottile had a practice of regularly changing timekeepers, several of whom had little or no training in the TIMIS system. Many mistakes were entered into the computer system because of this. Despite my requests for corrections, none were ever made and I am, today, still trying to undo the errors made due to this lax managerial policy.

5. Why do you believe you were discriminated against because of your disability, religion, and retaliated against when: On December 23, 1999, management monitored your telephone calls and use of the internet; on January 3, 2000, you were expected to perform the work of a full-time employee while working part-time; and On February 26, 2000, you were denied a within-grade increase to a GS-14 step 6.

When I returned to work part-time, Ms. Sottile had my supervisor monitor my phone calls and even monitor my use of the Internet on my computer. This occurred on December 23, 1999, 2 days before Christmas. Although I had presented my supervisor with a letter from my physician indicating that I was still functioning under a significant disability and returned to work part-time only out of financial need, I was continually harassed on a daily basis by being told that I was expected to perform at full performance level while I was there. The extended uncompensated leave that I required as a result of management's failure to provide reasonable accommodation caused a delay in my step increase. Had management responded to my request for reasonable accommodation, and avoided the unnecessary delay in at least providing a temporary accommodation, it would not have been necessary to take leave

122

without pay and I would have received a within grade increase to GS-14 step 6 in February 2000.   I have to date, not received this scheduled increase.

6.   Explain how you were treated prior to your participation in the EEO process; then explain how the treatment changed after your participation in the EEO process.

Prior to my participation in the EEO process, I did not feel that my job was threatened.  Subsequent to my participation in the process, I was frequently monitored, given memoranda regarding leave policy, (when other employees were not monitored, or repeatedly given memoranda regarding leave policy), and my telephone calls were listened to and documented (no other employees were subjected to such monitoring).  After I began participation in the EEO process, I felt not only my job but also my finances and my health to be threatened.

7.   What remedies are you seeking as a part of this complaint?

a. Immediate action on October 22, 1999, request for reasonable accommodation under  the Rehabilitation and Americans with Disabilities Acts through reassignment to a position that:  i)provides sufficient work to keep an employee productively occupied for a full 8 hour day, and ii) work of appropriate complexity preferably, full,-time legal work for an employee who is a tax attorney with an advanced degree in tax law and 20 years experience with a rating of GS-14 step-6;

b. Lost back pay with interest; increase to a GS-14, step 6 retroactive to the due date of Feb.16, 2000, with interest;

c. All negative leave balances eliminated and positive annual and sick leave balances restored;

d. Removal of AWOL status for any dates after October 4, 1999;

e.  Reimbursement for attorneys fees incurred from October 4, 1999 forward and out of pocket medical expenses incurred since October 4, 1999;

f. Compensation for mental anguish,  pain and suffering;

g.  Reinstatement of eligibility for 100% of future annual Federal pay increases, and

h.  Removal from my personnel file of any derogatory material relating to any of the incidents described above.

I certify, under penalty of perjury, that all of the statements made in this affidavit are true, complete, and correct to the best of my knowledge and belief.

Theresa E. Bearman

8-1-00

Date

# Application for Leave Under the Family and Medical Leave Act

Name (Please print - first, last, mi)  *Theresa E. Bearman*

2. Social Security Number  *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*

Position (Title, Series, Grade)  *Program Analyst GS 14-343 Step 5*

Purpose of Leave (Check appropriate category):

- [ ] Birth of a son or daughter and care of such child. (5 CFR 630.1230a(l))
- [ ] Placement of son or daughter with you for adoption or foster care. (5 CFR 630.1230a(2))
- [ ] Care of your spouse, son, daughter, or parent who has a serious health condition. (5 CFR 630.1230a(3))
- [X] A personal serious health condition which prohibits you from performing the essential functions of your position. (5 CFR 630.1230a(4))

| Anticipated starting date | 6. Anticipated Ending Date |
|---|---|
| *12-28-99* | *3-21-00* |

Please indicate below the total number of hours of each type of leave you anticipate needing for the current condition/event.

*LWOP*

| a. Hours of sick leave | b. Hours of annual leave | c. Hours of leave without pay |
|---|---|---|
|  |  | *480* |

If leave is for a medical condition, is medical certification included with application?

[X] Yes          [ ] No

Additional information relevant to your application. (if applicable)

*Continuation of disability as described in attached letters from treating physician*

|  | APPROVED |  |  | DISAPPROVED |  |
|---|---|---|---|---|---|
| Name |  |  | 14. Name |  |  |
| Title |  | Date | 15. Title |  | Date |
| Dates of FMLA |  |  | 16. Justification for denial of FMLA |  |  |
| Beginning Date: | b. Ending Date |  | a. [ ] No entitlement. |  |  |
|  |  |  | b. [ ] Entitlement used for current 12 month period. |  |  |
| [ ] Provisionally approved pending medical certification. |  |  | c. [ ] Unacceptable final medical certification. *(Based on third option)* |  |  |

Form 9611 (Rev. 7-97)          Cat No. 20486E          Department of the Treasury-Internal Revenue Service

*140*

| Certification of Physician or Practitioner (Family and Medical Leave Act of 1993) | U.S. Department of Labor Employment Standards Administration Wage and Hour Division |
|---|---|
| 1. Employee's Name *(handwritten)* | 2. Patient's Name (if other than employee) |

**3. Diagnosis**

*Major Depressive Disorder 296.34*

| 4. Date condition commenced *chronic* *recent acute worsening - early Sept* | 5. Probable duration of condition *12 weeks beginning on 12/28/99* |
|---|---|

6. Regimen of treatment to be prescribed (indicate number of visits, general nature and duration of treatment, including referral to other provider of health services. Include schedule of visits or treatment, if it is medically necessary for the employee to be off work on an intermittent basis or to work less than the employee's normal schedule of hours per day or days per week.)

a. By Physical or Practitioner:

*once weekly psychotherapy - others as needed pharmacological management.*

b. By another provider of health services, if referred by a Practitioner:

*N/A*

If this certification relates to care for the employee's seriously-ill family member, skip items 7, 8, and 9 and proceed to Items 13 thru 20 on reverse side. Otherwise, continue below.

Check Yes or No in the boxes below, as appropriate

7. Is inpatient hospitalization of the employee required? [ ] Yes [X] No *Not at this time. It may become necessary, especially if there is further delay in*

8. Is employee able to perform work of any kind? (If "NO", skip to item 9) [✓] Yes [ ] No *→ with following provision: make accommodations!*

9. Is employee able to perform the functions of employee's position? (Answer after reviewing statement from employer of essential functions of employee's position, or, if none provided, after discussing with employee) [✓] Yes [ ] No *but only on part time basis and not able to work routinely everyday and needs accommodations.*

| 10. Signature of Physical or Practitioner *(handwritten signature) MD* | 11. Date 12-21-99 | 12. Type of Practice (Field of Specialization, if any) *Psychiatry* |
|---|---|---|

Form WH-380

149

For certification relating to care for the employee's seriously-ill family member, complete items 13 thru 17 below as they apply to the family member and proceed to item 20. *N/A - Reference is to M, Beaman*

13. Is inpatient hospitalization of the employee required?  [ ] Yes  [ ] No    *herself*

14. Does (or will) the patient require assistance for basic medical, hygiene, nutritional needs, safety or transportation?  [ ] Yes  [ ] No

15. After review of the employee's signed statement (See item 17 below), is the employee's presence necessary or would it be beneficial for the care of the patient? (This may include psychological comfort.)  [ ] Yes  [ ] No

16. Estimate the period of time care is needed or the employee's presence would be beneficial.

**Item 17 is to be completed by the employee needing family leave**

17. When Family Leave is needed to care for a seriously-ill family member, the employee shall state the care he or she will provide and an estimate of the time period which this care will be provided, including a schedule if leave is to be taken intermittently or on a reduced leave schedule.

| 18. Employee Signature | 19. Date 12-21-99 |
| 20. Signature of Physician or Practitioner *Judith Nomde, MD* | 21. Date 12/21/99 | 22. Type of Practice (Field of Specialization, if any) *Psychiatry* |

148

**Bearman Terri**

| | |
|---|---|
| **To:** | Fulcher Barry P |
| **Subject:** | Family Leave |

Barry,

Regarding your memo of January 3, I applied for Family and Medical Leave because there may be times when I will not be able to come to work. I cannot know this on anything other than day-to-day basis, because of my medical problem. This was, I believe, made clear in several letters from my physician. Therefore, it would be impossible for me to give you a planned schedule in advance. If I had not requested the leave and had to take off, no doubt you would list me as AWOL as you did, inappropriately, before.

Requesting approval of leave does not mean a solid commitment to take it but rather, if the need to take it arises, the approval is there. Otherwise, the leave rules make no sense.

To be clear, I will notify you in the morning on any day that I will either not be in or not be in by 10AM. I can provide you, once again, with medical documentation, if you wish, substantiating the fact that my attendance will have to be decided on a day-to-day basis. If you have any problems with this, please discuss it with Eddie Colman, 283-4780, before you decide to deny me approved leave, since a flexible schedule is an accomodation required under the Rehabilitation Act and the ADA.

151

January 16, 2000

Barry Fulcher
Internal Revenue Service
1111 Constitution Avenue, N.W.
CL:PL, Rm. 7566
Washington, D.C.  20224

Dear Barry:

I received your letter dated January 13, 2000, last Friday, January 14th.  I will pass on your request for an opinion as to when I can return to work to Dr. Nowak, however, due to the holiday weekend, I will not be able to do so until Tuesday, January 18, 2000, the deadline you indicated in your letter. Due to the requirements of medical confidentiality, I will have her respond to the agency doctor, Neil Presant. While I cannot speak for her directly, Dr. Nowak may need additional time to respond beyond the given deadline.

As I indicated in a previous voice message, the correction of my time sheet for pay period 1 is fine. However, please apply the balance of the annual leave retroactively to pay periods 24 and 25 to restore to me the lost salary I suffered due to being placed in LWOP status. If, as result of reducing the LWOP balance, annual and sick leave is restored to me, please make the necessary adjustments. Also, as I indicated to you by phone, please contact Renee Marbley to donate 6 hours of accrued annual leave as a membership contribution to join the leave bank.

As for the search for a reasonable accommodation, I note that you have expanded the search to include the Office of Chief Counsel. Please be advised that there are currently 3 vacant, funded positions in that office – 2 in the Office of Associate Chief Counsel (Domestic) and one in the Office of Associate Chief Counsel (International) – for which I am fully qualified and for which I have applied through normal procedures. These are attorney-advisor positions listed in IRS Vacancy Announcements 2315, 2413, and 2358AA, respectively. Please also refer to the EEOC Enforcement Guidance:Reasonable Accommodation and Undue Hardship under the Americans with Disabilities Act, No. 915.002 (March 1, 1999), questions 27 & 29, which indicate that the only limitation on an employer's obligation to provide a reasonable accommodation is undue hardship, and that if a position is vacant and the employee is qualified for it, the employee must be reassigned.

Sincerely,

Terri Bearman

163

Judith A. Nowak, M.D.,P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, DC  20037-2346
tel. 202-887-5495
fax. 202-466-5582
21 January 2000

Neil Presant, MD
Internal Revenue Service
HQ:HR:MP:L,1042IR
1111 Constitution Avenue, NW
Washington, DC  20224

Re:  Theresa Bearman

Dear Dr. Presant:

I have been asked by Ms. Bearman's supervisors to provide an opinion as to when Ms. Bearman may be able to return to work.

I understand that Ms. Bearman is currently on paid administrative leave.  Her previous attempt to return to work on a part-time basis resulted in a further deterioration of her condition due to the hostility of the environment to which she returned.

It is my professional medical opinion that Ms. Bearman should not be required to return to work until such time as her request for a reasonable accommodation is acted upon.  That request was filed on October 22, 1999, and to the best of my knowledge, Ms. Bearman remains in the same position she was in on that date.

Sincerely,

Judith A. Nowak, MD

2911 S. Dinwiddie Street, Apt. C-2
Arlington, VA. 22206

January 30, 2000

Mr. Barry Fulcher
Internal Revenue Service
1111 Constitution Avenue, N.W.
CL:PL, Rm. 7566
Washington, D.C. 20224

<u>CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

Dear Barry:

In your letter dated January 12, 2000, you confirmed my leave status as being paid administrative leave and gave as the reason therefor that I had communicated to Steve Whitlock on the Commissioner's staff my fear that my health had deteriorated to a life-threatening condition. In that letter, you asked me to have Dr. Nowak provide a medical opinion as to when I would be able to return to work.

That opinion, dated January 21, 2000 (copy attached) was provided via Dr. Presant, clearly indicating that I would be able to return to work only when some action was taken on my request of October 22, 1999, for a reasonable accommodation under the Rehabilitation and American with Disabilities Act. To date, I have not received confirmation from you that you received such opinion. Administrative leave notwithstanding, the medical circumstances that underlay that original request remain extant. Furthermore, I have requested as well at least an interim arrangement of a 120-day detail pending a more permanent arrangement. This, too, has gone unanswered. Finally, I have repeatedly made you and others aware of currently vacant, funded positions for which I am wholly and completely qualified, yet I have received no feedback on this either. In light of this, your contention that you have taken my request seriously is controverted by the facts. Moreover, the inordinate passage of time since that request, taken together with the failure to provide even an interim accommodation only serve to exacerbate the long-term harm to my health. On a personal note, this failure to act, whether part of a deliberate strategy or not, is unconscionable and beneath contempt and reflects directly upon those who are in any way a party to it, whether willingly or not.

As regards any attempt to effect a change in my current leave status and require me to return to work, I respectfully request the following :

165

January 30, 2000

Barry Fulcher                                                          - 2 -

     1) I would appreciate it if you would confirm in writing your receipt of Dr. Nowak's opinion together with notice of how you plan to proceed in light of that opinion, as you stated you would do in your letter of January 12.

     2) If there is to be a change in my current status of administrative leave, I assume and expect that I will be given the proper amount of notice in written form before any <u>official</u> change is made.

     3) If an accommodation, either temporary or permanent, has been arranged so that I may return to work, please provide the details thereof. If, conversely, you decide to take action contrary to the medical opinion that you requested, please so advise in writing together with an explanation of how my return to the *status quo ante*, which placed me in a life threatening situation requiring you to put me on administrative leave, can be justified. It is crucial that I have this information <u>prior</u> to being required to return to work.

     If this letter is not addressed in all its particulars and some concrete relief from this ordeal arranged immediately, be aware that I intend to take this issue next to the House Ways and Means Oversight Subcommittee. Since the Commissioner's Office has indicated it will not intervene any further, I have no choice but to seek redress from those to whom the Commissioner must answer.

                         Sincerely yours,

                         *Terri Berman*

Enclosure

cc: John Burns, EEO
    Eddie Colman, EEO
    Steve Whitlock

166

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

January 12, 2000

EF COMMUNICATIONS
AND LIAISON

Ms. Theresa Bearman
2911 S. Dinwiddie Street
Apt. C-2
Arlington, Va. 22206

Dear Terri:

Terri, as a follow up to the telephone conversation I had with you on January 6, 2000, I
want to explain why I placed you on administrative leave as of January 6. I also want to
update you on the actions the IRS is taking to meet your reasonable accommodation
request.

I was informed on Thursday, January 6, 2000, that you telephoned the Commissioner's
staff and the Director, Complaint Processing & Analysis Group and asked for an update
on your reasonable accommodation request. I understand these conversations
occurred late in the afternoon on Wednesday, January 5, 2000. It was their perception
that you were very upset and considered the situation to be a matter of life or death.

Based on the recommendation of the Director, Complaint Processing, we decided it
was in the best interest of all, including, you and the staff, that administrative leave be
authorized until the situation could be further evaluated by your physician, Dr. Nowak.

I understand that Dr. Presant has been apprised of this situation and has already
communicated the same to Dr. Nowak last week. Given the circumstances, we are
asking that you have Dr. Nowak provide an opinion regarding your ability to return to
work. Please have Dr. Nowak provide this opinion to me no later than Tuesday,
January 18. Once received, we will let you know what the next steps will be.

Last week you sent me an e-mail asking the status of your reasonable accommodation
request. I want to assure you that we have taken your request seriously and have been
actively working it. On January 4, we sent a written request to the Assistant
Commissioners Examination, International, the National Director of Appeals and the
Associate Chief Counsel (Finance and Management) and requested their assistance in
accommodating you.

147

On December 16, 1999, we met with a representative from the Director of Practice to discuss your reasonable accommodation since that office has Attorney-Advisor positions. I believe this information was shared with your attorney by our General Legal Services Office.

For your further information, I want to let you know that your reasonable accommodation request is being handled by Senior Reasonable Accommodation Specialist Kathy King. She can be reached at 202-283-4993.

If there are any questions, please call me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief Business Liaison

168

# TERRI BEARMAN

---

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Barry Fulcher | Terri Bearman |

| COMPANY: | DATE: |
|---|---|
| | 01/10/00 |

| FAX NUMBER: | TOTAL NO. OF PAGES INCLUDING COVER: |
|---|---|
| 202-622-8345 | 2 |

| PHONE NUMBER: | SENDER'S REFERENCE NUMBER: |
|---|---|
| | |

| RE: | YOUR REFERENCE NUMBER: |
|---|---|
| | |

☐ URGENT    ☐ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

---

2911 S. DINWIDDIE STREET
ARLINGTON, VA. 22206

169

2911 S. Dinwiddie Street. Apt. C-2

Arlington, VA.  22206

January 10, 2000

Mr. Barry P. Fulcher
Office of Public Liaison and Small Business Affairs
CL:PL
Internal Revenue Service
1111 Constitution Avenue, N.W.
Washington, D.C.  20224

Dear Barry;

This is to confirm our telephone conversation of last Thursday, January 6th, to the effect that I am being placed on paid administrative leave for an indefinite period and will not be required to come into the office.

Thank you for your offer of any assistance I might need and for your concern as to my health.

Sincerely,

*Terri Bearman*

Terri Bearman

**Fulcher Barry P**

| | |
|---|---|
| **To:** | Bearman Terri |
| **Cc:** | Sottile Sue M; Fitzpatrick Robert J |
| **Subject:** | FW: Reminder |
| **Importance:** | High |

Terri, since you have been away from the office for awhile I wanted to be sure that you remember our office policies regarding signing out when you are away from your desk. Please review the expectations that were prepared by Robert Fitzpatrick (see below).

Additionally, I am providing you a copy of the memorandum prepared by Sue Sottile on October 5, 1999, Subject: Office Time and Attendance Procedures/Guidelines  Please see me promptly if there are any questions concerning these requirements.

**Barry Fulcher**

-----Original Message-----
| | |
|---|---|
| **From:** | Fitzpatrick Robert J |
| **Sent:** | Sunday, October 03, 1999 8:52 AM |
| **To:** | Lane Sharron M; Bearman Terri; Criste Marlene A; Chandler Alicia R; Brendes Lisa M; del Toro Merci J; Ryan Candace C; Singleton Michael K; Wilds Lorenza; Lyons Matthew S; Desler Anne C; Desler Anne C; Brungard Rebecca M |
| **Cc:** | Fulcher Barry P; Turville Mary A; Robinson Robin D; Sottile Sue M |
| **Subject:** | Reminder |
| **Importance:** | High |

For most of you this has always been your practice but I want to remind everyone in the office that I and Sue must know where you are in case we need to get a hold of you during the day.  So please keep this in mind if you step away from your desk for more than a short period (please get a copy of the office procedures from Robin if need another copy).  It is not uncommon for Sue or other IRS executives to have questions concerning one of your projects that needs to be swered right away.  If we can't find you it can be embarrassing for the office.  If you are going to be away from your desk please follow our office procedures and mark the board in the front office. For those of you in the external modernization branch (since you names are not on board) please leave a note on your computer screen or the like. Thanks for your cooperation.

Robert J. Fitzpatrick
Deputy National Director
Public Liaison & Small Business Affairs)
(202) 927-5646

171

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

October 5, 1999

MEMORANDUM FOR STAFF, OFFICE OF PUBLIC LIAISON AND SMALL BUSINESS
                        AFFAIRS

FROM:           *Sue Sottile*
                Sue Sottile
                National Director, Public Liaison and Small Business Affairs

SUBJECT:        Office Time and Attendance Procedures/Guidelines

This memorandum revises previous issuance regarding the Office's time and attendance procedures and guidelines. One of my primary responsibilities as National Director is to provide guidance and support to my staff. The attached procedures are based on official IRS guidelines, including IRM 601 (Hours of Duty and Absences and Leave Handbook) and the Time and Leave Handbook. I want to ensure that we continue working as successfully as we have in the past, ensuring program accomplishments are met through our teaming approach while meeting your leave needs.

Robin Robinson, as Staff Advisor will assist me in ensuring that these procedures and guidelines are maintained. In addition, Sharon Lane, as Timekeeper will be maintaining scheduled leave on my calendar, as well as documenting official time.

I know that this continued approach will provide certainty to you and facilitate the successful teaming approach we have utilized in this office. Please let Robin or me know if you have any further questions.

Attachments

172

## Office of Public Liaison and Small Business Affairs
### Time and Attendance Procedures
### January 19, 1999

## TOUR OF DUTY

- All Office of Public Liaison and Small Business Affairs employees should make sure that the National Director has approved their tour of duty (please use the attached form). Should you require to make changes to a previously approved tour of duty, please submit this form as well.

- All Office of Public Liaison and Small Business Affairs employees should observe their approved tour of duty, unless on leave or travel status, or away on business meetings.

- If you expect to be away from the office for more than 30 minutes, please notify the National Director (or Acting National Director) about where you will be by providing a room and telephone number where you can be reached. This can be accomplished through cc:Mail, VMS, or written notifications.

## LUNCH

To ensure appropriate office coverage, employees should take their lunch period between the following three core hours — 11:00 am to 2:00 pm. Employees must request leave if they will be away from the office for longer than the scheduled lunch period.

## LEAVE REQUESTS

- Unscheduled annual leave should be kept to a minimum.

- To ensure adequate office coverage, all leave should be requested in advance whenever possible, preferably one pay period in advance. Please submit a Form SF-71 (see attached form) for each block of leave being requested.

- Exceptional absences of less than one hour, caused by personal uncontrollable circumstances may be handled administratively. Employees should secure the National Director's (or Acting National Director's) approval to make-up the missed time by working beyond the established tour of duty's departure time, equivalent to the time missed earlier in the day. Examples of exceptional circumstances include transportation and childcare problems.

173

- 2 -

▸ Employees should notify the National Director (or Acting National Director) of the need to take unscheduled annual or sick leave within two hours of the start of their tour of duty.

▸ Unexcused tardiness or absences from the office will be handled by charging AWOL in 15-minute increments.

## CREDIT HOURS OR COMPENSATION

▸ All requests to work credit hours or compensatory time need to be approved in advance by the National Director (or Acting National Director) and worked at the office — unless the time is requested as part of attending a meeting away from the office and/or during travel.

▸ There is a credit hour limit of two credit hours on a work day and 10 credit hours on a non-work day.

▸ If an employee is required to remain at a work site away from the office (while on travel, while attending a business meeting off-site) outside the regularly scheduled tour of duty, the employee will be entitled to credit hours for the time above and beyond the scheduled time of departure. However, credit hours are not available to compensate for travel time back to the office or home, because the hours of work could have been controlled. For additional information please refer to *IRM 0601, Handbook of Hours of Duty and Absence and Leave, section 216.6 — Conditions Under Which Travel Away From the Official Duty Station is Hours of Work.*

▸ Due to the nature of our office's programs and mission, Flexiplace is not a viable work schedule for the staff.

▸ Please use the attached prescribed form to request credit hours.

174

12-15-99

Barry,

A letter on file with the HR office from my physician states that for the forseeable future, especially pending my request for a medical accomodation, that a certain flexibility be applied in the case of my attendance. This is a recommendation of my physician.

If you have any problem with this, you may take

175

it up with Joan McIvee in
LR. If you need further
satisfaction, you may deal
with my attorney, Francine
Weiss at (202) 331-4260.
All matters concerning leave
questions should be directed
either to her or to my
physician, Judith Nowak
(202) 887-5495. Either of these
persons, or both, are authorized
to speak on my behalf.

Terri

176

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

October 5, 1999


MEMORANDUM FOR STAFF, OFFICE OF PUBLIC LIAISON AND SMALL BUSINESS
                AFFAIRS

FROM:           *Sue Sottile*
                Sue Sottile
                National Director, Public Liaison and Small Business Affairs

SUBJECT:        Office Time and Attendance Procedures/Guidelines


This memorandum revises previous issuance regarding the Office's time and
attendance procedures and guidelines. One of my primary responsibilities as National
Director is to provide guidance and support to my staff. The attached procedures are
based on official IRS guidelines, including IRM 601 (Hours of Duty and Absences and
Leave Handbook) and the Time and Leave Handbook. I want to ensure that we
continue working as successfully as we have in the past, ensuring program
accomplishments are met through our teaming approach while meeting your leave
needs.

Robin Robinson, as Staff Advisor will assist me in ensuring that these procedures and
guidelines are maintained. In addition, Sharon Lane, as Timekeeper will be maintaining
scheduled leave on my calendar, as well as documenting official time.

I know that this continued approach will provide certainty to you and facilitate the
successful teaming approach we have utilized in this office. Please let Robin or me
know if you have any further questions.


Attachments

**Office of Public Liaison and Small Business Affairs**
**Time and Attendance Procedures**
January 19, 1999

## TOUR OF DUTY

- All Office of Public Liaison and Small Business Affairs employees should make sure that the National Director has approved their tour of duty (please use the attached form). Should you require to make changes to a previously approved tour of duty, please submit this form as well.

- All Office of Public Liaison and Small Business Affairs employees should observe their approved tour of duty, unless on leave or travel status, or away on business meetings.

- If you expect to be away from the office for more than 30 minutes, please notify the National Director (or Acting National Director) about where you will be by providing a room and telephone number where you can be reached. This can be accomplished through cc:Mail, VMS, or written notifications.

## LUNCH

To ensure appropriate office coverage, employees should take their lunch period between the following three core hours — 11:00 am to 2:00 pm. Employees must request leave if they will be away from the office for longer than the scheduled lunch period.

## LEAVE REQUESTS

- Unscheduled annual leave should be kept to a minimum.

- To ensure adequate office coverage, all leave should be requested in advance whenever possible, preferably one pay period in advance. Please submit a Form SF-71 (see attached form) for each block of leave being requested.

- Exceptional absences of less than one hour, caused by personal uncontrollable circumstances may be handled administratively. Employees should secure the National Director's (or Acting National Director's) approval to make-up the missed time by working beyond the established tour of duty's departure time, equivalent to the time missed earlier in the day. Examples of exceptional circumstances include transportation and childcare problems.

178

- 2 -

- ► Employees should notify the National Director (or Acting National Director) of the need to take unscheduled annual or sick leave within two hours of the start of their tour of duty.

- ► Unexcused tardiness or absences from the office will be handled by charging AWOL in 15-minute increments.

## CREDIT HOURS OR COMPENSATION

- ► All requests to work credit hours or compensatory time need to be approved in advance by the National Director (or Acting National Director) and worked at the office — unless the time is requested as part of attending a meeting away from the office and/or during travel.

- ► There is a credit hour limit of two credit hours on a work day and 10 credit hours on a non-work day.

- ► If an employee is required to remain at a work site away from the office (while on travel, while attending a business meeting off-site) outside the regularly scheduled tour of duty, the employee will be entitled to credit hours for the time above and beyond the scheduled time of departure.  However, credit hours are not available to compensate for travel time back to the office or home, because the hours of work could have been controlled.  For additional information please refer to *IRM 0601, Handbook of Hours of Duty and Absence and Leave, section 216.6 — Conditions Under Which Travel Away From the Official Duty Station is Hours of Work.*

- ► Due to the nature of our office's programs and mission, Flexiplace is not a viable work schedule for the staff.

- ► Please use the attached prescribed form to request credit hours.

179

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

November 19, 1999

ƎF COMMUNICATIONS
AND LIAISON

Ms. Theresa Bearman
Internal Revenue Service
Washington, D.C. 20224

Dear Terri:

On November 16, 1999, I was notified by Customer Service that their records show that you owe the IRS $1,271.86. This debt was incurred as a result of an emergency salary payment of $1,321.86 that you requested and received on September 29, 1998.

Customer Service records indicate that on October 7, 1998, you remitted a personal check payable to the IRS for $1,321.86. However, their records show that the check was not honored by your bank due to insufficient funds. Customer Service records indicate that you later paid $50.00 to partially satisfy your debt. That leaves an unpaid balance of $1,271.86.

Section 216.6 of Document 9335, *Interim Handbook of Employee Conduct and Ethical Behavior* and Section 2635.809 of Document 9077, *Standards of ethical conduct for employees of the executive branch* requires federal employees to satisfy in good faith their obligations as citizens, including all just financial obligations, especially those such as Federal, state, or local taxes. In good faith means an honest intention to fulfill any just financial obligation in a timely manner. Failure to meet this standard can result in disciplinary action up to and including removal. Therefore, it is mandatory that you promptly repay, in full, your outstanding debt no later than December 10, 1999, or submit proof of prior repayment.

If there are any questions, or if the information that Customer Service provided is incomplete or incorrect please contact me at 202-622-6051.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

189

THERESA E. BEARMAN    09/91
PH 703-671-1813
2911 S DINWIDDIE ST, APT C-2
ARLINGTON, VA 22206

2067

68-760/560
BRANCH 05528

DATE _Dec. 6, 1999_

PAY TO THE
ORDER OF _Internal Revenue Service_    $ 1271 86/100

_Twelve Hundred Seventy-one + 86/100_ DOLLARS

FIRST UNION    First Union National Bank
Alexandria, Virginia
R/T 056007604

FOR _____    _Theresa C. Bearman_

⑈056007604⑈ 1070220505783⑈ 2067

_Received 12/9/99_

_Nancy Greene_
_CSC_

190

THERESA E. BEARMAN  09/91                              2021
703-871-1813                                    68-760/560
811 S DINWIDDIE ST, APT C-2                     BRANCH 05528
ARLINGTON, VA 22206
230165855  003  6032  1916  03/23     DATE Sept 23,1999

PAY TO THE
ORDER OF  IRS                              | $ 50 00/100

Fifty + no +/100 ——————————————— DOLLARS

FIRST UNION    First Union National Bank
               Alexandria, Virginia
               R/T 056007604

FOR partial repayment emerg.        Theresa E. Bearman
                    salary
⑈:056007604⑈: 1070 2 20 50 5783⑈  2021 ⑈000000 5000⑈

---

THERESA E. BEARMAN  09/91                              2067
-871-1813                                       68-760/560
DINWIDDIE ST, APT C-2                           BRANCH 05528
GTON, VA 22206
230470551  024  6770  8112  04  21     DATE Dec.6, 1999

PAY TO THE
ORDER OF  Internal Revenue Service        | $ 1271 86/100

Twelve hundred seventy-one + 86/100 DOLLARS

FIRST UNION    First Union National Bank
               Alexandria, Virginia
               R/T 056007604

FOR _____        Theresa E. Bearman
⑈:056007604⑈: 1070 2 20 50 5783⑈  2067 ⑈0000 127186⑈

191



192

LAW OFFICES

# KALIJARVI, CHUZI & NEWMAN, P.C.

SUITE 1011

JUNE D. W. KALIJARVI
GEORGE M. CHUZI
ELIZABETH L. NEWMAN
———
THOMAS J. TRGOVAC
MARGARET E. JOHNSON

OF COUNSEL:
STEPHEN L. SPITZ

1730 K STREET, N.W.

WASHINGTON, D.C. 20006

(202) 331-9260
———

FAX: (202) 872-9562

600 CAMERON STREET
ALEXANDRIA, VIRGINIA 22314
———
SUITE 800
7475 WISCONSIN AVENUE
BETHESDA, MD 20814
———

OF COUNSEL:
FRANCINE K. WEISS

October 22, 1999

By Hand Delivery

Neil Presant, M.D.
Internal Revenue Service
HQ:HR:MP:1, 10421R
1111 Constitution Avenue, N.W.
Washington, D.C.

Re: <u>Theresa Bearman</u>

Dear Dr. Presant:

This firm represents Theresa Bearman, an attorney, who has worked
for the Internal Revenue Service ("IRS") for eight years. During
this period, her performance ratings have been good and she has
received a certificate of merit award and a commendation from a
former IRS Commissioner.

Ms. Bearman's psychiatrist, Dr. Judith Nowak, M.D., by letter
dated October 11, 1999, requested a medical leave of absence for
Ms. Bearman because Ms. Bearman suffered a severe Major
Depressive Disorder (DSMIV 296.34), which included "severe
fatigue, irritability, marked difficulty concentrating, much
difficulty taking initiative, social withdrawal, anhedonia and a
depressed hopeless mood but no suicidal ideation." Dr. Nowak
indicated that at that time Ms. Bearman was unable to work and
IRS could not provide an accommodation would assist her in doing
so. (Exhibit 1).

Enclosed is a letter from Dr. Nowak dated October 21, 1999.
(Exhibit 2). In the letter, Dr. Nowak indicates that, at this
time, the IRS can provide an accommodation which will permit Ms.
Bearman to return to work. This accommodation is job restruc-
turing so that the functions of her position in the Office of
Public Liaison & Small Business Affairs include the full time
practice of law. If this is not possible in her present

*195*

position, Dr. Nowak recommends a transfer to the Chief Counsel's office where she previously worked for over three years and received a certificate of merit. Dr. Nowak explains that Ms. Bearman's self esteem is at a very low level and therefore without such accommodation, Ms. Bearman's health is likely to deteriorate, forcing her to be hospitalized, and unable to work.

We believe that Ms. Bearman is a qualified handicapped person within the Rehabilitation Act ("Act") and that such accommodation should be made. Under the Act, Ms. Bearman is a "handicapped person" because she has a record of a mental impairment which substantially limited one or more major life activities. 29 C.F.R. 1614.702 (a)(2). Specifically, in 1991, Ms. Bearman was hospitalized for two and a half months for an acute depressive episode. Such hospitalization is more than sufficient to establish that one or more major life activities (e.g. caring for one's self, learning, working) were substantially limited by her impairment. School Bd. Of Nassau County v. Arline, 480 U.S. 273 (1987). In addition, Ms. Bearman, age 45, has a record of treatment for her mental impairment, including psychological abuse, since her early twenties.

Ms. Bearman is also a "qualified handicapped person" under the Act. A "qualified handicapped person"

> means with respect to employment, a handicapped person who, with or without reasonable accommodation, can perform the essential functions of the position in question without endangering the health and safety of the individual or others ....

29 C.F.R. 1614.702(f). Ms. Bearman has had good performance ratings for eight years, so there is no question that she can perform the essential functions of her position. According to Dr. Nowak, Ms. Bearman can perform the essential functions of her position "without endangering [her] health" through hospitalization if the requested accommodation is made.

We therefore request that IRS make the requested accommodation and notify us by November 1, 1999 as to what action will be taken.

196

We appreciate your attention to this matter.

Sincerely,

*Francine K Weiss*

Francine K. Weiss

cc: David Williams, Chief, Communications & Liaison

197

Judith A. Nowak, M.D., P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, D.C. 20037-2346
202-887-5495
F. 202-466-5582
11 October 1999


Neil Presant, MD                                    Re:  Theresa Bearman
Internal Revenue Service
HQ:HR:MP:L, 1042IR
1111 Constitution Avenue, NW
Washington, DC 20224

Dear Dr. Presant:

I am writing to document that Ms. Bearman has suffered an acute exacerbation of a chronic medical illness which necessitates a medical leave of absence.

Ms. Bearman suffered from chronic low grade depressive symptoms(Dysthymic Disorder DSMIV 300.40) with distinct periods of worsening consistent with a diagnosis of Major Depressive Disorder( DSMIV 296.33) since childhood.  There is a significant family history of depression on both the maternal and paternal side.  Ms. Bearman has been in treatment nearly consistently since her early twenties.

She was hospitalized in 1991 with an acute depressive episode.  She was treated with Prozac and rapidly responded.  There have been no subsequent hospitalizations since that time.  Ms. Bearman demonstrates a pattern of initial good response to several antidepressants followed by relapse of more severe symptoms.  She has had brief periods of euthymia but even at best functioning has displayed some residual symptoms (sleep disorder characterized by frequent awakenings, low energy, and a mood she characterizes as "looking at life through a gray veil.").  She has normal thyroid functioning and no evidence of any other contributory medical problem. ·She drinks almost no alcohol and uses no drugs.

I have been following Ms. Bearman since June, 1996 for psychopharmacological treatment of her depression.  Prior to our work together, she had tried multiple pharmacological regimens which included SSRI's(Zoloft and Prozac), TCA's(Pamelor),  augmentation strategies using Lithium and Ritalin(both unsuccessful and abandoned).  We have tried Effexor, at times of exacerbation of symptoms, to doses as high as XR 375mg qd.  There is a side effect ceiling such that high doses cause a severe worsening of sleep disturbance which cannot be readily treated with Trazodone.  In recent months, Ms. Bearman was doing rather well on a combination of Effexor XR  150mg qd and Celexa 20mg qd.



There has been a gradual deterioration of her symptoms since approximately mid August 1999 with a dramatic worsening over the past week to ten days. This has resulted in a relapse into severe Major Depressive Disorder (DSMIV 296.34). Her symptoms include severe fatigue, irritability, marked difficulty concentrating, much difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless mood but no suicidal ideation. Ms. Bearman simply cannot stay at her desk or attend to her work: even at home, Ms. Bearman is requiring the aid of family and friends with basic demands of daily living. Therefore, she is unable to work. There are no accommodations that could be made at the present time by her employer that would result in her being able to work.

Ms. Bearman is engaged in an intensive outpatient program of psychotherapy and medication readjustment. We will certainly use other resources (eg hospitalization) if those prove to be necessary. For now, we are working on psychosocial stressors, reevaluating her medical status, and adjusting her medication--most recently, by increasing her Celexa to 30mg qd. Her past responsiveness to these interventions suggests that her condition has not become static and well stabilized (that is--there is no evidence of chronic disability). I cannot predict with great specificity how long it will be before Ms. Bearman is able to return to work but the time course of past periods required for recovery suggests that a period of 30 days out of work is a reasonable expectation.

Please let me know if you require any further information.

Sincerely,

Judith A. Nowak, MD

199

Judith A. Nowak, M.D.,P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, DC 20037-2346
tel. 202-887-5495
fax. 202-466-5582
21 October 1999

Neil Presant, MD
Internal Revenue Service
HQ:HR:MP:L,1042IR
1111 Constitution Avenue, NW
Washington, DC 20224

Re: Theresa Bearman

Dear Dr. Presant:

I am writing this as an addendum to my letter dated 11 October 1999.

I have had the opportunity to understand Ms. Bearman's situation in greater depth. I believe she could function at her job and return to work if an accommodation is made. This accommodation is a job restructuring so that the functions of her position in the Office of Public Liaison & Small Business Affairs include the full time practice of law. If this is not possible in her present position, I would recommend a transfer to the Chief Counsel's office where Mr. Bearman worked previously for over three years and received a certificate of merit. The reason for this is that Ms. Bearman's self esteem is at a very low level in her current position. Without this accommodation, her health is likely to deteriorate, forcing her to be hospitalized and unable to work.

If you have any questions, please let me know.

Sincerely,

Judith A. Nowak, MD



200



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

HIEF COMMUNICATIONS
AND LIAISON

March 7, 2000

Theresa Bearman
2911 South Dinwiddie Street
Apartment C-2
Arlington, Virginia 22206

Re: <u>Request for Reasonable Accommodation</u>

Dear Terri:

This letter responds to your request for a reasonable accommodation.

Based on the information provided by your physician, it is her opinion that you are unable to perform the duties of your current GS-14 program analyst position because of your medical condition, and that a reasonable accommodation would include either restructuring your current position to include the full time practice of law, or reassigning you into an attorney position. We have reviewed the request and I have determined that it is not possible for the Service to restructure your current position to include the full time practice of law. As previously stated, we have made an exhaustive review of vacant attorney positions in the Washington D.C. metropolitan area. Our search was restricted to those locations because you told me you were not mobile outside them.

As a result of our review, the Service is making you a reassignment offer to the following vacant attorney position:

> Position: GS-905-12, Attorney (Estate Tax)
> Office: Virginia/West Virginia District, Southeast Region
> Division: Examination Division
> Post of Duty: Baileys Crossroads, Virginia

Because this position is at a lower grade than your current GS-14 position, the Agency is also offering you pay retention. Under pay retention, you will retain either your current salary or 150 percent of the tenth step of the new grade, whichever is less. Additionally, during the time you are on pay retention, you will receive 50 percent of all comparability increases based on the tenth step of your new grade. Your entitlement to pay retention will cease when your salary can be accommodated within the pay range of your new grade or if you are promoted. The journeyman level of the Attorney (Estate Tax) position is a GS-12.

Since this offer is at a lower grade, you are not obligated to accept it. Please be

323

advised, however, that inasmuch as this offer represents the reasonable accommodation you requested, the Agency's obligation, if any, to accommodate you through a reassignment may cease if you decline this offer.

Please let me know by March 16, 2000, whether you will accept this offer. I have attached hereto a Position Description for the GS-905-12 Attorney (Estate Tax) position as well as additional information concerning the current General Schedule Pay Rates and information concerning pay .etention.

Please sign this letter below on the designated signature line if you accept this offer. I am also available to assist you if you have any further questions concerning this position or retained pay.

Sincerely,

Barry P. Fulcher
Chief, Business Liaison

I, Theresa Bearman, hereby accept the offered position of GS-905-12, Attorney (Estate Tax), in the Virginia/West Virginia District.

Theresa Bearman                                    3-16-00
Theresa Bearman                                    Date

724

Affidavit of Barry Fulcher                 Washington D C

Barry P. Fulcher, Chief, Business Liaison, GS 340-14 Program Manager. No disability

I have worked in my present position for approximately one year. Prior to that I was a Senior Management/Program Analyst. At the time of the triggering events (October 1999 through December 1999), I was the Complainant's first line manager.

I was aware that the Complainant had requested reasonable accommodation (participated in the EEO process). I became aware when the Complainant submitted her request for reasonable accommodation through the physician and Labor Relations Office. The Complainant requested to be placed in an attorney position. As a means of accommodating the Complainant I worked with the Government Legal Services (GLS) office, Labor Relations, and EEO. I contacted persons in National Office, that hire attorneys in an effort to arrange a lateral transfer. I checked for temporary accommodations and I also talked to persons in the Appeals office about a detail. My attempts were unsuccessful. I contacted the District Offices in Richmond, VA and Baltimore, MD. Baltimore did not have positions available, but the Richmond office was able to accommodate and the Complainant was reassigned to the Richmond office as a grade 12.

Regarding the Complainant's repayment agreement. I received a call from Customer Service employee, Nancy Green regarding the Complainant's repayment agreement. I telephoned the Customer Service employee's manager to inquire as to why I was not notified about the Complainant's balance due to Internal Revenue Service (IRS). The Customer Service manager explained to me the situation that had taken place. Based on the IRS Interim Handbook of Employee Conduct and Ethical Behavior I issued the Complainant a letter regarding payment of outstanding debts. There was no disciplinary action taken. The letter was basically a standard letter, approved by Labor Relations.

Regarding religious leave. On December 7, 1999, I received the Complainant's request for religious holiday leave. The religious holiday was the week of December 6, 1999. Therefore the request was received after the holiday began. The Complainant had previously been given religious comp time. However, the employee had an existing unpaid comp time balance. The guidelines state that request for leave should be submitted 15 days in advance, and the employee should be expected to repay the comp time within 120 days. Since the Complainant had utilized a substantial amount of advance leave, it was doubtful that she would be able to repay all of the outstanding leave in the time required, as she was working a part time schedule, therefore the request for compensatory leave for religious observance was not granted. Labor Relations agreed with my decision.

Regarding Complainant's charge of Absent Without Leave (AWOL). The Complainant was scheduled to return to work on December 6 (per letter received from Complainant's physician). The Complainant did not return to work on December 6th as scheduled and therefore was charged LWOP. The employee was not charged with AWOL since she had requested the week off for religious reasons. However, the employee did not return to work the following week and did not notify me that she would be absent until the afternoon of December 15. Consequently she was

charged with AWOL for December 13, 14 and two hours on December 15.    I have no
documentation in my records stating why the Complainant did not return on December 13 as
scheduled.

Bearman TD NO. 00-1103 Affidavit of Barry Fulcher page 2

Regarding monitoring the Complainant's phone calls and use of internet.  The complainant was
counseled by the National Director S. Sottile previously about the use of her personal computer
for reasons other than government use. I did not systemically monitor the Complainant or any
other employees use of the telephone or internet.  I did notice non government related activities
on the Complainant's screen, but there was no systemic monitoring of the Complainant, nor was
the Complainant issued an official reprimand or any type of discipline for her actions.  All of the
employees did receive a memo/reminder regarding the use of telephones and computers.

Regarding Complainant's work assignments.  I do not agree that ninety-nine percent of the time
the Complainant had no assignments or was given clerical and secretarial duties to perform.  The
Complainant did receive an assignment where she was asked to contact certain individuals
regarding a project, and to record the minutes of the meeting.  The assignment did have some
clerical aspects, but was not totally clerical.

Request for 120 day detail.  I attended a meeting to discuss a detail or reassignment for the
benefit of the Complainant.  Although I was unable to provide the detail, there was an attempt
made to provide the requested detail, and the Complainant's request was not ignored.

I have no knowledge of an unnecessary delay in providing the Complainant a written confirmation
regarding the decision to place her administrative leave in January 2000.  Any delays were the
result of administrative procedures.

The issue regarding full time work expectations while working part time.  I received a letter from
the Complainant's physician stating that the Complainant would only be able to work 6 hours a
day.  I never told the Complainant that she would be expected to work a full time schedule while
assigned a part time tour of duty.

I did not do anything to stop or delay the Complainant's receipt of a within grade.

There were no other employees supervised by me in 1997, 1998 and 1999 that made request for
reasonable accommodation.

There were no other employees supervised by me in 1997, 1998, 1999 that were charged AWOL.

There were no other employees supervised by me in 1997, 1998, 1999 requesting compensatory
leave for religious observance.

2 48

I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

I swear that the information provided is true and complete to the best of my knowledge and belief

Signature _____

Date _7/19/00_

Investigator _____

249

RE:   EEO Complaint of Theresa E. Bearman
      TD No. 00-1103

Please provide a response to the following, then sign and date your statement under penalty of perjury:

Was the Complainant's disability (physical-clinical depression and mental-acute major depressive episode) religion (Judaism) and prior participation in the EEO process a factor in your decisions regarding either of the following allegations:

- on November 19, 1999, management violated the Complainant's repayment agreement

- in December 1999, the Complainant's request for compensatory leave for religious observance was denied

- the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999

- on December 23, 1999, management monitored the Complainant's telephone call and use of the internet

- on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time

- on February 26, 2000, the Complainant was denied a within-grade increase to a GS-14 step 6

RESPONSE:
*No.*

I declare under penalty of perjury that the foregoing is true and complete

_____            _7/10/00_
         Name                              Date

250

**Interrogatory Management Statement**
**Theresa Bearman**

1. **Identify the state and county in which you are currently employed.**

   Washington, D.C,

2. **State your name, title, series, grade. Do you have a disability?**

   Susanne M. Sottile, Acting Director, National Public Liaison, 340-15. I do not have a disability.

3. **How long have you worked in your present position?**

   Since Communication and Liaison was established on July 16, 20000. Prior to that, I was the National Director, Public Liaison and Small Business Affairs, since August 1998.

4. **What is your professional relationship to the Complainant from October 1999 through December 1999?**

   I was Ms. Bearman's second line manager. Mr. Fulcher was Ms. Bearman's first line manager of record.

5. **Were you aware of the Complainant's participation in the EEO process? If the answer is yes, when and how did you become aware?**

   Not directly. During October - December 1999, Mr. John Burns of the EEO office and Mr. Fulcher were in contact on several issues, including the request for reasonable accommodation. Mr. Fulcher handled these contacts directly.

6. **Was there a request from the Complainant for reasonable accommodation? If the answer is yes, what type of accommodation did the Complainant request? What was the response to the Complainant's request?**

   Yes. Ms. Bearman requested to be reassigned to an attorney-advisor position within IRS. An attorney-advisor position was identified in the Virginia/West Virginia district and was offered to Ms. Bearman, who accepted the position.

7. **Was the Complainant offered reasonable accommodation by management? If the answer is yes, what was offered the Complainant?**

**On January 3, 2000, the Complainant was expected to perform the work of a full time employee while working full-time.**

Mr. Fulcher, Ms. Bearman's manager of record, would have direct knowledge of this situation and allegation.

**On February 26, 2000, the Complainant was denied a within grade increase to a GS-14 step 6.**

I have no knowledge of this allegation.

**Please provide the names of any similarly situated employees supervised by you in 1998, 1999 and 2000 that were denied within grade increase and state whether or not they have a disability.**

No employees were denied a grade increase.

**Ninety-nine percent of the time the Complainant had no assignments and the remainder of the time she was given clerical and secretarial duties to perform which did not commensurate with her position description and grade level of GS-14 step 6, Tax Attorney.**

During the period in question (and also for the period within the office) Ms. Bearman was a GS-343-14 Program Analyst, not an attorney which is a GS-905 series. Ms. Bearman was given responsibilities commensurate with her position description, including reviewing draft Chief Counsel regulations, designing an international section of the IRS' Tax Pro Corner on the Web site, enhancing the IRS small business CD-ROM, attending Congressional hearings, analyzing external views on burden reduction. During October - December 1999 Mr. Fulcher assigned work to Ms. Bearman, including analysis of tax materials, such the Taxpayer Advocate's Report to Congress.

**Complainant's requests for a 120-day detail were ignored and no accommodation was effected.**

Mr. Fulcher was Ms Bearman's manager of record and was responding to the reasonable accommodation request during the period in question, contacting Examination, International, and Appeals for Attorney-Advisor positions in the GS-905 series. I did not have any direct contact with Ms. Bearman during that time. Any request for a 120-day detail during that time would have been made to Mr. Fulcher, who was working the reasonable accommodation for a permanent position, which is what Ms. Bearman, had requested.

259

RE:    EEO Complaint of Theresa E. Bearman
       TD No. 00-1103

Please provide a response to the following, then sign and date your statement under penalty of perjury:

Was the Complainant's disability (physical-clinical depression and mental-acute major depressive episode) religion (Judaism) and prior participation in the EEO process a factor in any of the decisions you made regarding either of the following allegations:

- (1) on November 19, 1999, management violated the Complainant's repayment agreement

- (2) in December 1999, the Complainant's request for compensatory leave for religious observance was denied

- (3) the Complainant was charged Absent Without Leave (AWOL) 6 hours on December 13, 1999, 6 hours on December 14, 1999 and 2 hours on December 15, 1999

- (4) on December 23, 1999, management monitored the Complainant's telephone call and use of the internet

- (5) on January 3, 2000, the Complainant was expected to perform the work of a full-time employee while working part-time

- (6) on February 26, 2000, the Complainant was denied a within-grade increase to a GS-14 step 6

RESPONSE:

(1) See Response # 8 en Interogatory Management Statement
(2) See Response # 9 en Interrogatory Management Statement attached
(3) See Response # 10 en Interrogatory Management Statement attached
(4) See Response # 11 en same document noted above
(5) Mr. Fielder, Ms Bearman's manager of record, would have direct knowledge
(6) I have no knowledge of this allegation

I declare under penalty of perjury that the foregoing is true and complete

_____        _____
Name                              Date

259

I understand that the information provided is not to be considered confidential and that it maybe shown to the interested parties.

I (swear, affirm) that the information provided is true and complete to the best of my knowledge and belief.

Executed on the ___8___ day of _August_ 2000.

_Susanne H. Little_
**Despondant**

_Aug 8, 2000_
**Date**

_Arthur W. Lee_
**Investigator**

260

**Theresa E. Bearman and Lawrence H. Summers, Secretary, Department of the Treasury**

### Supplemental Affidavit of Julie A. Barry

The following Affidavit is provided in response to questions asked of me on July 19, 2000 by EEO Investigator Althea Lee. The questions asked and my responses are provided below:

Question: Did you use abusive language toward and hang up on the Complainant's attorney when she asked you to provide information regarding the status of the Complainant's request for reasonable accommodation.

Answer: I deny using abusive language to the Complainant's attorney but admit to hanging up on her in a fit of pique. However, the incident did not concern the Complainant's reasonable accommodation request. Rather, the Complainant's attorney telephoned me and demanded that I get to the bottom of some AWOL charges against her client. Because the Complainant had a number of leave issues, I asked her attorney for the particulars of the AWOL charges and the dates of the AWOL charges. Her attorney responded that she did not know. I then suggested to the attorney that it would be difficult for me to get to get to the bottom of the matter if she could not even provide me with the necessary information. The Complainant's attorney then asked for the name of my supervisor. I provided his name and telephone number and hung up. Within minutes, the Complainant's attorney called me back and gave me more specific information about the AWOL charges, at which time I apologized for hanging up on her.

Question: Where you contacted by management regarding any type of disciplinary action against the Complainant for monies owed to the Internal Revenue Service.

Answer: I was never asked for a legal opinion concerning whether a disciplinary action was warranted against the Complainant regarding monies she owed to the Internal Revenue Service. I do recall, however, that I was asked to review a draft letter of reprimand regarding the Complainant's failure to satisfy promptly an obligation to the United States. I do not know, however, whether the letter of reprimand was ever issued.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under the penalty of perjury that the forgoing is true and correct.

Dated 7/19/00

Julie A. Barry

275

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Health Resources and
Services Administration
Bethesda MD 20814

Federal Occupational Health
4350 East West Highway, 3rd Floor
Bethesda, Maryland 20814
npressnt@foh.dhhs.gov

December 3, 1999

Ms. Joan McIver
Acting Chief
Headquarters Labor Relations Section
HQ:HR:MP:L Room 1042
1111 Constitution Avenue NW
Washington, DC 20224

Dear Ms. McIver:

As requested, I have reviewed the additional documentation provided on behalf of Ms. Teresa
Bearman, an IRS employee who is requesting a workplace accommodation. The
documentation is not medical but rather consists of a letter describing her work history dated
November 24, 1999 from the law offices of Kalijarvi, Chuzi, & Newman and her most recent
performance appraisal as a Program Analyst.

I am an occupational medicine physician rather than a lawyer by training and would not
presume to be able to independently judge the work of a tax attorney. The work history
statement from her attorney appears plausible and her performance appraisal indicates that she
has met all the critical elements of her current position. In the absence of any controverting
evidence from the IRS, I assume that Ms. Bearman is a competent tax attorney. It is also very
plausible that a major contributor to her depression is low self-esteem resulting from being in a
position in which the required work product is not commensurate with her training and
capabilities. Thus, I would recommend from a medical point of view that she be
accommodated with a position appropriate to her legal and educational background if there is
such a position available in your agency.

Please call me at (301) 594-0273 if you have further questions concerning this matter.

Sincerely,

Neal L. Pressnt, M.D, CIME
Occupational Medicine Consultant

280



# HQ LABOR RELATIONS

## M:HQ:HR:MP:L

### FACSIMILE TRANSMITTAL SHEET

### PHONE: 202 622-4852
### FAX: 202 622-4629

Date of Transmittal: _12-8-99_

Transmittal for: _Kathy Glover_

Phone: _283-4993_

FAX: _283-7296_

Number of pages (including cover sheet): _2)_

Transmittal sent by: _Joan Mc Clu_

Phone: _____

Comments: _Re: Assignment from Dr. Presant on_
_Theresa Bearman_

_281_

DEPARTMENT OF HEALTH AND HUMAN SERVICES
PUBLIC HEALTH SERVICE
FEDERAL OCCUPATIONAL HEALTH

TELEPHONE 301-594-0260   FAX 301-594-4991
4350 EAST-WEST HIGHWAY ● ROOM 3-2A2 ● BETHESDA, MARYLAND 20814

DATE: 11/15/99

TO: Kathy King

AGENCY: IRS - EEO

PHONE:

FAX: (202) 283 7296

FROM: Neal T Present MD

TELEPHONE (301) 594-0250/0260 IMMEDIATELY IF RETRANSMISSION IS NECESSARY

NUMBER OF PAGES
(NOT INCLUDING COVER PAGE)

SUBJECT:

Medical

Confidential

282

**DEPARTMENT OF HEALTH & HUMAN SERVICES**                              Public Health Service

Health Resources and
 Services Administration
Bethesda MD 20814

Federal Occupational Health
4350 East West Highway, 3rd Floor
Bethesda, Maryland 20814
npresant@foh.dhhs.gov

November 15, 1999

Ms. Kathy King
Headquarters Operations, C2-451
Equal Opportunity & Organizational Management
Special Programs and Community Management
5000 Ellin Road
Lanham, Maryland 20706

Dear Ms. King:

As requested, I am writing to inform you of what issue I need clarified on the case of Theresa
Bearman before I can give you an opinion on her reasonable accommodation request. Dr.
Judith Nowak, her psychiatrist, has told me that a major cause of her depression is low self-
esteem because she is a lawyer currently not performing in a legal position. She apparently
previously worked as a lawyer in the Office of the Chief Counsel and for reasons unknown to
me is now working in a non-legal position. While working in a position below one's capacity is
certainly a reasonable cause for low self-esteem, I would need to know why she was removed
from or voluntarily left the legal position she formerly had. Were there problems with her
work? Why did the move take place? Was it totally voluntary? I would need frank answers to
these questions to help determine whether giving her a legal position would be a reasonable
accommodation in this case.

Please call me at (301) 594-0273 if you have further questions concerning this matter.

Sincerely,

Neal L. Presant, M.D, CIME
Occupational Medicine Consultant

283                                         TOTAL P.02



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Health Resources and
Services Administration
Bethesda MD 20814

Federal Occupational Health
4350 East West Highway, 3rd Floor
Bethesda, Maryland 20814
npresant@foh.dhhs.gov

October 26, 1999

Ms. Madeline Mendola
Labor Relations Specialist
Internal Revenue Service
A:HQ:HR:MP:L
Washington, DC 20224

Dear Ms. Mendola:

As requested, I have reviewed the medical documentation provided by Ms. Theresa Bearman, an employee of the IRS who has been absent from the workplace for several weeks. The documentation consists of letter dated October 11, 1999 from her psychiatrist, Dr. Judith Nowak. In addition, I spoke directly with Dr. Nowak about the case.

The medical evidence establishes that Ms. Bearman has been suffering from a medical condition that could reasonably be expected to have caused her to miss work during the time in question. Her condition thus justifies her being absent from the workplace. Dr. Nowak estimates that Ms. Bearman should be able to return to the workplace in about 6-8 weeks. She stated, however, that this will require an accommodation. She was not at liberty to discuss this accommodation right now, but the IRS will evidently be receiving this accommodation request shortly through Ms. Bearman's lawyer.

Please call me at (301) 594-0273 if you have further questions concerning this matter.

Sincerely,

Neal L. Presant, M.D, CIME
Occupational Medicine Consultant

284

5000 Ellin Road, Lanham, MD 20706
M:HQ:EOM/CPAL/C2-432
Phone: (202) 283-4995  FAX: (202) 283-7296

**Internal Revenue Service**



| To: | Joan McIver, Labor Relations Specialist | From: | Kathy G. King, R/A Specialist |
|-----|------|------|------|
| Fax: | (202) 622-4629 | Pages: | 2, including the cover page |
| Phone: | (202) 622-4595 | Date: | November 16, 1999 |
| Re: | Ltr. From Dr. Neal Presant | CC: | [Click here and type name] |

**Urgent  For Review**       **X Per  Conversation**    **Please Reply**       **Please Recycle**

Good Morning Joan,

Per our phone conversation yesterday afternoon, attached is documentation I received from Neal
L. Presant, M.D. in regards to Theresa Bearman. If you have any additional questions, please do
not hesitate to contact me at the number listed above.

Attachment

285

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Health Resources and
 Services Administration
Bethesda MD 20814

Federal Occupational Health
4350 East West Highway, 3rd Floor
Bethesda, Maryland 20814
npresant@foh.dhhs.gov

November 15, 1999

Ms. Kathy King
Headquarters Operations, C2-451
Equal Opportunity & Organizational Management
Special Programs and Community Management
5000 Ellin Road
Lanham, Maryland 20706

Dear Ms. King:

As requested, I am writing to inform you of what issue I need clarified on the case of Theresa Bearman before I can give you an opinion on her reasonable accommodation request. Dr. Judith Nowak, her psychiatrist, has told me that a major cause of her depression is low self-esteem because she is a lawyer currently not performing in a legal position. She apparently previously worked as a lawyer in the Office of the Chief Counsel and for reasons unknown to me is now working in a non-legal position. While working in a position below one's capacity is certainly a reasonable cause for low self-esteem, I would need to know why she was removed from or voluntarily left the legal position she formerly had. Were there problems with her work? Why did the move take place? Was it totally voluntary? I would need frank answers to these questions to help determine whether giving her a legal position would be a reasonable accommodation in this case.

Please call me at (301) 594-0273 if you have further questions concerning this matter.

Sincerely,

Neal L. Presant, M.D, CIME
Occupational Medicine Consultant

286

TOTAL P.02

SPD No.  91600

Classification: GS-343-14
Classification Title:  MANAGEMENT/PROGRAM ANALYST
Organizational Title:  ~~PROJECT MANAGER~~ MANAGEMENT/PROGRAM ANALYST
Location:  ~~METRO/METROCEN SITE~~  NATIONAL OFFICE; AND ALL FIELD LOCATIONS
FLSA Status:  EXEMPT
Competitive Level Code:

Duties and Responsibilities Approved:        4/28/94
                                            (Date)

_____
Director, Administrative Services Project


Classification Approved:        4/28/94
                               (Date)

_____
Director, Human Resources Division

        I certify that this is an accurate statement of the major
duties and responsibilities of this position and its
organizational relationships, and that the position is necessary
to carry out government functions for which I am responsible.
This certification is made with the knowledge that this
information is to be used for statutory purposes relating to
appointment and payment of public funds, and that false or
misleading statements may constitute violations of such statutes
or their implementing regulations.


_____        _____
Signature of Immediate Supervisor              (Date)


        All other levels of supervision which propose or approve
official statements of duties and responsibilities are attesting
to the same effect as the immediate supervisor.

        The classification of this position may be appealed.
Published standards or other information upon which the
classification is based may be reviewed.  Information may be
obtained from your supervisor or your Personnel Office.
FINANCIAL DISCLOSURE:  TO BE DETERMINED BY MANAGER
SENSITIVITY: NONCRITICAL SENSITIVE (OR TO BE DETERMINED BY MANAGER/MAJOR DUTIES)
SUPERVISION CODE:  "8" ~~MANAGEMENT OFFICIAL~~
8U
THIS POSITION IS AT THE FULL PERFORMANCE LEVEL, GS-14, NO PROMOTION POTENTIAL EXISTS.

303

Classification Title: Management and Program Analyst
Organizational Title: ~~Project Manager~~ MANAGEMENT/PROGRAM ANALYST
Series/Grade: GS-343-14

## Introduction

The incumbent serves as ~~a Project Manager~~ an Expert Analyst, who is responsible for accomplishing major analytical studies and/or projects relating to substantive, mission-oriented programs of the Internal Revenue Service. The assignments are usually carried out on behalf of the National Office and involve complex programs, systems, or issues that are Servicewide in scope.

## Major Duties INCUMBENT MAY PERFORM ANY COMBINATION OF THE FOLLOWING MAJOR DUTIES:

- Meets with managers and executives within the Service to define the overall goals and objectives of the project.

- Prepares action plans and schedules for various phases of project accomplishment, both short and long-range; ensures that plans are consistent with Service goals, schedules, and policies.

- Prepares recommendation for resource requirements to accomplish the project; negotiates with managers of various components of the Service to obtain needed resources and support.

- Establishes a system to review, control, and report on project status.

- Plans, coordinates, and establishes operating methods and procedures for accomplishment of project mission; as needed, directs the development and accomplishment of employee training relating to the project.

- Monitors project status and adjusts work plans for project accomplishment.

- Conducts in-depth analyses of project data, requirements, and impact; identifies problem areas and determines how to resolve them.

- Manages project resources to meet goals and objectives. As needed, recommends adjustment of resources.

- Prepares agency directives, IRM issuances, memoranda, Servicewide policy statements, and other written guidelines and recommendations relating to the project.

- Conducts briefings and prepares comprehensive reports to keep managers and executives advised of project plans and progress and to communicate findings and recommendations.

304

-2-

- Coordinates the impact of the project with employees and managers in all affected areas within the Service and with individuals and organizations outside the Service.

- Resolves any relationship problems or conflicts that impede progress; ensures that all involved parties work effectively toward timely completion of the project.

- Represents National Office interests and endeavors for the assigned project throughout the Service; functions as the resident expert relating to all aspects of project planning, execution, and implementation.

- Performs other duties as assigned.

## Factor 1 - Knowledge Required by the Position
(1550 points)                                              FLD 1-8

- Expert knowledge of a wide range of analytical and evaluative methods and techniques, both qualitative and quantitative, to accomplish complex projects or studies of broad scope.

- Comprehensive knowledge of the range of laws, policies, regulations, and precedents applicable to the segment(s) of the Service's program affected by the assigned project or study.

- Knowledge of the overall mission, objectives, functions, policies, and organizational structure of the Internal Revenue Service.

- Knowledge of the objectives of the project and its relation to the Service's various functions and overall program.

- Knowledge of management principles and processes to perform project management duties and to effectively coordinate and integrate project objectives and recommendations with key line and/or staff functions of the Service.

- Ability to work effectively with others and to maintain harmonious relationships with all parties.

- Ability to communicate effectively both orally and in writing.

## Factor 2 - Supervisory Controls     FLD 2-5    (650 points)

The incumbent reports to ~~the Regional Director of Support~~ a Supervisory Position ~~Services~~ who provides administrative direction in terms of overall project objectives, priorities, and policies.  The employee has responsibility for independently planning, designing, and carrying out the project.  Findings and recommendations are considered technically authoritative and are

3c·5

considered technically authoritative and are normally accepted without significant change. Completed work is normally reviewed only for its potential effect on the broad policies and goals of the Service.

## Factor 3 – Guidelines                    FLD 3-5    (650 points)

Guidelines are broadly stated and nonspecific, e.g., broad administrative policy statements concerning the project or the problem being studied and/or basic legislation requiring extensive interpretation. The incumbent uses judgment and discretion in interpreting and revising existing policy and regulatory guidance for use by others. The incumbent is considered an expert in the development and interpretation of guidelines relating to management and execution of the assigned project.

## Factor 4 – Complexity                    FLD 4-5    (325 points)

The incumbent plans, organizes, and carries through to completion broad, long-term, analytical studies/projects requiring analysis of effectiveness, efficiency, and productivity of substantive, mission-oriented programs. Decisions regarding what needs to be done include major areas of uncertainty in approach, methodology, or interpretation and evaluation processes due to such elements as continuing program changes, technological developments, or conflicting requirements. The work requires originating new methods, establishing criteria, or developing new information.

## Factor 5 – Scope and Effect               FLD 5-5    (325 points)

The purpose of the work is to analyze and evaluate major aspects of substantive, mission-oriented programs. Study reports typically contain findings and recommendations of major significance to top management of the Service and often serve as the basis for new systems, regulations, or programs.

## Factor 6 – Personal Contacts              FLD 6-3 (See Factor 7)

Contacts are with all levels of management in the Region, National Office, and other regions. Additionally, the incumbent may have occasional contacts with high-ranking officials external to the Service, e.g., with heads of other agencies, top congressional staff officials, state executive or legislative leaders, or executives of comparable private sector organizations.

## Factor 7 – Purpose of Contacts            FLD 7-C    (180 points)

The purpose of contacts is to disseminate or explain information, gather facts, conduct analyses, and coordinate project activities and to influence managers or other officials to accept and implement findings and recommendations on organizational improvement or program effectiveness. There may be resistance due to such issues as organizational conflict, competing objectives, or resource problems.

*206*

<u>Factor 8 - Physical Demands</u>                 FLD 8-1         (5 points)

The work is primarily sedentary.  No unusual physical demands are required.

<u>Factor 9 - Work Environment</u>                 FLD 9-1         (5 points)

Work is performed in a typical office setting, presenting no unusual environmental risks or discomforts. Frequent travel may be required.

TOTAL         (3690 points)

RANGE 3605 - 4050 = GS-14

                                                      GS-14

307