# TRANSCRIPT OF PROCEEDINGS

# CONFIDENTIAL

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, N.W., Suite 200
Washington, D.C.  20005

- - - - - - - - - - - - - - - - x

THERESA E. BEARMAN,                :

      Complainant,               :

    vs.                              :    EEOC No. 100-A1-7426X

PAUL H. O'NEILL, SECRETARY,        :    Agency No. 00-1105
U.S. DEPARTMENT OF THE
TREASURY                           :

      Agency.                    :

- - - - - - - - - - - - - - - - x

## VOLUME I

Pages 1 thru 282

Washington, D.C.
March 18, 2008

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003
(202) 546-6666

CONFIDENTIAL

1

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

- - - - - - - - - - - - - - - x
THERESA E. BEARMAN,                  :
                                     :
          Complainant,               :
                                     :
     vs.                             :
                                     : EEOC No. 100-A1-7426X
PAUL H. O'NEILL, SECRETARY,          : Agency No. 00-1103
U.S. DEPARTMENT OF THE               :
TREASURY,                            :
                                     :
          Agency.                    :
- - - - - - - - - - - - - - - x

**VOLUME I**

Tuesday, March 18, 2003

U.S. Department of the Treasury
Second Floor
950 L'Enfant Plaza, S.W.
Washington, D.C.

The hearing in the above-entitled matter
convened, pursuant to notice, at 9:30 a.m.

BEFORE:

HONORABLE LAURA KHARE
Administrative Judge
Equal Employment Opportunity Commission
Washington Field Office
1400 L Street, N.W., Suite 200
Washington, D.C. 20005

MILLER REPORTING CO., INC.
735 - 8TH STREET, S.E.
WASHINGTON, D.C. 20003
(202) 546-6666

C O N F I D E N T I A L

2

APPEARANCES:

On behalf of the Complainant:

JOHN D. QUINN, ESQ.
Claxton, Sale & Quinn, P.C.
Suite 500
910 16th Street, N.W.
Washington, D.C.  20006
(202) 833-4170


On behalf of the Agency:

DEANNE SOBCZAK, ESQ.
General Legal Services
U.S. Department of the Treasury
Second Floor
950 L'Enfant Plaza, S.W.
Washington, D.C.  20024-2123
(202) 283-7923


ALSO PRESENT:

THERESA E. BEARMAN, Complainant

STEVE KAPLAN, Intern, EEOC

DIANE HOURY, Intern, IRS

C O N F I D E N T I A L

37

1      Q.    Do you have any opinion as to what the

2   cause of Ms. Bearman's depressive condition was in

3   the fall of 1999?

4      A.    Yes.

5           It seemed to me that once I started

6   seeing her much more frequently and also for much

7   longer sessions, not just 20 or 30 minute

8   medication visits, but the typical 50 minute or

9   longer sessions, in which to really try to get at

10  the root of what was going on in addition to trying

11  to medicate what was happening, I became convinced

12  that this was work-related and that it was

13  connected to the fact that she is a quite

14  intelligent, intellectually proud and

15  intellectually smart person who found herself in a

16  position in which a main project she had had been

17  taken away from her and that she was doing

18  incredibly boring and dull work.

19          Also it became clear from what she was

20  describing that there seemed to be an atmosphere

21  of, I don't know what else to call it other than

22  harassment.  Her boss, I gather, was a person who

CONFIDENTIAL

57

1    vulnerabilities will vary.

2           For her, I am trying to explain what is
3    important to her, how her self-esteem was
4    structured and therefore why, again, being in an
5    environment in which she would be given something,
6    if you will, to put her teeth into, her
7    intellectual teeth into, to be able to do, that
8    would be meaningful, that would be important and it
9    also would hopefully be, because she would produce
10   a good work product, get positive feedback, would
11   be enormously important and would resuscitate her
12   fallen sense of self-esteem.

13         Q.   Did you feel being in an attorney
14   position would enable her to become well?

15         A.   I wouldn't put it quite that way.  It is
16   that being in an attorney's position would result
17   in an environment in which not only the negative
18   trigger would be removed, but in which the
19   environment would be healing and that she would
20   become capable of functioning in that environment.

21         Again, the fact is that that happened
22   when she was in fact transferred to a different

CONFIDENTIAL

1    testifying, don't discuss it with anybody other

2    than Mr. Quinn.

3              Thank you.

4              Mr. Quinn.

5                   DIRECT EXAMINATION

6              BY MR. QUINN:

7         Q.    Please state your full name for the

8    record.

9         A.    Theresa Ellen Bearman.

10        Q.    Can you give me some background of where

11   did you grow up and where did you attend school?

12        A.    I grew up in Westchester County, New

13   York.

14             I went to private high school in Rye,

15   New York.  I went to both the University of

16   Pennsylvania and the University of Arizona

17   undergraduate.  I graduated Phi Beta Kappa,

18   Magna Cum Laud.  Then I went to law school at the

19   University of North Carolina, Chapel Hill.

20        Q.    What was your major in college?

21        A.    I double majored in history and

22   microbiology.

CONFIDENTIAL

91

1    Q.    What year did you graduate?

2    A.    In 19 -- it was so long ago -- 1975 I got

3  my bachelor's degree.

4    Q.    When did you graduate from law school?

5    A.    1978.

6        Then shortly thereafter I moved to

7  Washington and entered the graduate program in tax

8  law at Georgetown University and received my LLM in

9  the early part of 1982.

10    Q.    How did you do at Georgetown?

11    A.    B-plus average.

12    Q.    What did you do after you graduated from

13  Georgetown Law School with an LLM in Tax?

14    A.    Well, I was working.  I was working as a

15  Legislative Aid to a Congressman from Illinois who

16  was on the House Ways and Means Committee, which is

17  the committee which all tax legislation passes.  I

18  was his tax assistant.

19        As a lot of people know, to their

20  chagrin, tax law changes an awful lot and in the

21  1980s there were several very large pieces of tax

22  legislation and I worked on a number of the major

CONFIDENTIAL

92

1    issues in those bills, even drafted some

2    legislation that made it into law.

3           Following my stint with the Congressman,

4    his name was Marty Russo, I worked for awhile with

5    a trade association, Edison Electric Institute, as

6    a Senior Legislative Representative for Tax Issues.

7           Following that, I entered in the summer

8    of 1984 the Office of Chief Counsel at the IRS.  I

9    was in what was then the Legislation and

10   Regulations Division.  I entered as a GS-12 because

11   I had a master's degree.  Normally the entry level

12   is GS-11.

13          I was very fortunate in that I received

14   one of the highest priority projects as soon as I

15   got there and I worked for two-and-a-half years on

16   it and at the completion I received a Certificate

17   of Merit for my work on the project and a cash

18   award from the Commissioner.

19          Then they had reorganized within the

20   Office of Chief Counsel.  They put all the

21   international functions together in one shop.  I

22   switched over to there and spent a year-and-a-half

C O N F I D E N T I A L

93

1    on very sophisticated international tax issues

2    dealing with foreign currency markets, the types of

3    things that Merrill Lynch and Solomon Brothers and

4    Goldman Sachs, the types of products they produce.

5         While I was there, because this was the

6    first time that the IRS was addressing really

7    complicated financial instruments, I set up a

8    liaison relationship with a number of Wall Street

9    firms and through me we worked out a system where

10   once a month a group of them would come down and

11   they would do a briefing for a handful of us who

12   were working on this and explain to us, teach us,

13   all about these financial products, what they were

14   for or whatever.

15        Just prior to my leaving we had come out

16   with the first guidance that the IRS had ever

17   published in this area.  I had worked on it.

18        Following that I was hired by the law

19   firm of Mayer, Brown & Platt to be a tax associate.

20   Q.   Let me stop you there.

21        You left the Office of Chief Counsel to

22   work at Mayer, Brown & Platt?

C O N F I D E N T I A L

94

1    A.    Yes.

2         When you go into the Office of Chief

3    Counsel and you have to sign a four-year

4    commitment.  It is excellent training for anyplace

5    else you want to go.  You sign the four-year

6    commitment and after the four years you can either

7    stay or you can seek employment in the private

8    sector.  A lot of people, depending on the economy,

9    do their four years and then go to work in the

10   private sector.  That is what I did.

11             JUDGE KHARE:  In '98?

12             THE WITNESS:  In '88.

13             JUDGE KHARE:  '88.

14             BY MR. QUINN:

15   Q.    You were there for the full four years?

16   A.    I was there for three-and-a-half years.

17   I had secured a waiver from the person who was then

18   the Head of the Chief Counsel International's

19   Office.  I had secured a written waiver from him

20   that I could leave six months early because I had

21   this job offer.

22        Q.    And it is fair to say that that job that

CONFIDENTIAL

95

1    you had in the International Section of the Chief

2    Counsel's Office, for someone fairly short out of

3    law school, would be regarded as a plumb position?

4         A.    Yes.   Definitely.

5         Q.    What did you do at Mayer, Brown & Platt?

6         A.    I did a lot of work that was related to

7    the major project I had worked on in Chief Counsel.

8    It was a set of rules.   It was a major, major

9    change in the law and the way that lawyers, people,

10   did business, the tax ramifications of those

11   businesses, and it affected real estate, the real

12   estate market.

13              At the time I went to Mayer, Brown &

14   Platt I was one of maybe 25 people in the country

15   who knew these new rules in and out.   They pretty

16   much drew on my expertise of those rules in a

17   variety of transactions that they had with clients

18   in the firm.

19        Q.    How long were you at that law firm?

20        A.    I was there for a year-and-a-half.

21        Q.    Why did you leave and where did you go?

22        A.    I went to another law firm in Chicago

CONFIDENTIAL

96

1    because the atmosphere at Mayer, Brown & Platt,

2    just the atmosphere in private practice generally,

3    I found not to be something that was compatible

4    with what my goals were.  I wasn't sure whether it

5    was that particular firm or whether it was private

6    practice in general.

7         I had met, in the course of my dealings,

8    a tax partner at the second firm I went to and we

9    just hit it off.  So, I went over to work over

10   there for awhile, but then I realized that the

11   hours that were required of you were incredibly

12   grueling and it left no time for a private life, it

13   left no time for anything else, and I realized that

14   I wanted a more balanced life.

15        Q.   Give us the time frame.  Obviously, you

16   left the second law firm at some point in time.

17             When was that?

18        A.   I was with IRS Chief Counsel from 1984

19   through 1987.

20             Mayer, Brown & Platt, I was there all of

21   '88 through the spring of '89 and then I went to

22   the second firm, Sonnerschein, in '89 and '90.

C O N F I D E N T I A L

97

1    Q.    What did you do after you left

2    Sonnerschein?

3    A.    I went back to school part-time.  I had

4    enrolled in what was a post-baccalaureate pre-med

5    program, basically a pre-med program for people who

6    have already established themselves in one

7    profession, but maintained an interest in medicine.

8         It is not as uncommon as one would think.

9    There were quite a number of people in this

10   program.  It was at Loyola University.

11        I did that on a part-time basis and then

12   eventually I relocated back to Washington.

13   Q.    When did you come back to Washington?

14   A.    I came back to Washington in August of

15   1991.

16   Q.    What did you do professionally when you

17   came here?

18   A.    I was working pretty much as an

19   independent consultant picking up work as and when

20   I could.  The country was in a very deep recession

21   at that point and work was not easy to find.

22        Then in the spring of 1991 I received a

CONFIDENTIAL

98

1    phone call from home that my mother had ovarian

2    cancer and they were operating the next day.  It

3    turned out that not only did she have cancer, but

4    my father, who also suffers from clinical

5    depression, but had never really been diagnosed,

6    himself had a major depressive disorder.  He could

7    not function at all.

8          So, at the time they lived in New Jersey

9    and I went up and basically lived with them, took

10   care of both of them, ran the house, took care of

11   the finances, dealt with the insurance company,

12   took my mother to chemotherapy appointments and the

13   blood transfusions.

14         I am the only child.  So, I was the only

15   one who could deal with this.  So, I was taking

16   care of two very sick parents, which took up all my

17   time.

18        Q.    What is the time frame of this?

19        A.    This is June of '91 through Labor Day.

20        Q.    Then did you come back here to Washington

21   to work again?

22        A.    I would go back and forth.  I was looking

CONFIDENTIAL

99

1   for work.   I picked up part-time things here and

2   there.   It was a difficult time.   I wasn't able to

3   find permanent employment until January of 1993

4   when I was hired by Congressman William Jefferson

5   of Louisiana who needed a tax attorney on his staff

6   because he was newly appointed to the Ways and

7   Means Committee.

8          So, I did another stint on Capitol Hill

9   working strictly -- well, not strictly.   I did tax

10  and trade work.   I was there from '93 to January of

11  '95.   Mr. Jefferson was a Democrat and when the

12  House of Representatives turned over he lost his

13  seat on the Committee and didn't need a tax person

14  anymore.

15         I had been recruited by somebody in the

16  Legislative Affairs Office at the IRS.   They found

17  out about my background in income and international

18  tax and they asked me if I would be interested in

19  coming to work for them.   So, ultimately, that is

20  where I went next.

21     Q.   When was that?

22     A.   February 1995.

C O N F I D E N T I A L

100

1      Q.    What did you do for the Legislative

2    Affairs Office?

3      A.    I would say 99 percent of us were

4    attorneys.  A couple had advanced degrees like I

5    did.  We analyzed the post-tax legislation.  We

6    drafted legislative proposals in the tax

7    administrative area, things that the IRS needed to

8    be able to do to more effectively administer the

9    tax system.

10          Then I had a very large project.  It was

11   called the Taxpayer Bill of Rights.  I was the sole

12   IRS representative on the Hill.  The person who was

13   drafting legislation had been a colleague of mine

14   and we worked together on it.  My purpose was to

15   represent the IRS's needs and points of view as far

16   as what we were going to be required to do.  I

17   spent several months working with the committee

18   staff on the legislation.

19          When the legislation was passed I had to

20   draft what is called an implementation plan.

21   Basically I had to sit down and work out for every

22   division and function in the IRS how this piece of

CONFIDENTIAL

101

1    legislation was going to impact them, what forms of

2    publications they were going to have to revise,

3    whether they were going to need to hire people,

4    whether they were going to need to upgrade their

5    equipment.   I did this for the entire Agency.

6           In an implementation plan you set down

7    specific goals function by function in a timetable.

8    That was an enormous amount of work, but it was

9    fun.

10          I also acted as a liaison.   I had

11   contacts on both tax committees from my days on the

12   Hill and we were very much encouraged to maintain

13   those relationships to keep in touch with people to

14   find out what was going on to be able to give them

15   more input.

16          That is predominately what I did in that

17   job from 1995 through 1998 roughly, when I joined

18   the Office of Public Liaison, Small Business

19   Affairs.

20     Q.   Did you work with Senator Breaux at some

21   point in time?

22     A.   Yes.  I did.  I was on a six-month detail

CONFIDENTIAL

102

1    in the fall of 1995, early 1996. I was detailed as

2    an IRS Fellow. The Senate Finance Committee was

3    putting together another major tax bill and Senator

4    Breaux needed somebody to help him. I went to the

5    Hill and I was his tax person.

6              That is where I first met David Williams.

7        Q.    What is an IRS Fellow?

8        A.    It just means you are somebody that has

9    been temporarily detailed to another portion of the

10   government, but the IRS is your employer, the IRS

11   pays your salary.

12             They like to send people on details so

13   that we get experience with other government

14   agencies and it helps facilitate doing your work if

15   you understand the needs and how you are supposed

16   to interact with other parts of the government.

17       Q.    Again, who was Mr. Williams working with

18   at that time?

19       A.    I was the Tax Aide to Senator Breaux and

20   Mr. Williams was the Finance Committee Aide for

21   Senator Bradley.

22             Mr. Williams had come to Mr. Bradley from

C O N F I D E N T I A L

1     the Senate Budget Committee staff and I understood

2     he had a very strong background in economics,

3     budgetary matters.   Nonetheless, he had to do

4     Senator Bradley's tax work as well.

5            During that period of time all the

6     Democratic tax aides to Senators, we worked very

7     closely.   We coordinated.   It was a team effort.

8     And Mr. Williams and I had a very amicable

9     relationship.   I was very much aware of his

10    extensive background in economics and he was very

11    much aware of my technical expertise in tax.

12           When the detail fellowship ended, I

13    returned to the Office of Legislative Affairs.

14          Q.    And how did it come about that you moved

15    from the Office of Legislative Affairs -- a job I

16    take it you liked?

17          A.    Yes.

18          Q.    How did it happen you moved from the

19    Office of Legislative Affairs to the Office of

20    Public Liaison?

21          A.    In 1998 Congress passed a major

22    restructuring bill for the IRS.   The IRS was going

C O N F I D E N T I A L

104

1    to be completely restructured along very, very

2    different lines.

3         So, the office I was in, the first thing

4    that happened was a lot of our most important

5    functions were taken away and given to another

6    office.  So, our reason for being sort of

7    evaporated.  Most of us were kind of left to find

8    other positions.

9         It was roughly around this time that

10   Dave Williams had come to the IRS as the Chief of

11   the area that Legislative Affairs and that Small

12   Business and Public Liaison was in.  We went from

13   being colleagues on the Hill to him coming in a

14   position where he was three management levels above

15   me and he was responsible for reorganizing the

16   Legislative Affairs Branch, which I had been in.

17        Things were pretty uncertain there for

18   awhile.  We didn't exactly know what was going to

19   happen.  I called him up and went to his office.

20   He and I would meet in the hallway.  We would have

21   casual conversations.  I went to his office and I

22   said, you know, I am trying to think about where to

C O N F I D E N T I A L

105

1    go.  I said that perhaps an obvious place would be

2    Chief Counsel, that I was just beginning to put out

3    feelers.

4            He told me that he had something very

5    much in mind for me, that he had been thinking

6    about it.  He said there is this new office that

7    was just getting started and it was an area that

8    the Commissioner was very, very excited about.  It

9    was really two offices that were being run under

10   the same rubric.  It was Small Business Affairs and

11   Public Liaison.  But because it was in the

12   embryonic stage when they were put together, and

13   Sue Sottile was at the time the Acting Director, he

14   said to me go talk to Sue.

15           The way he described it was that he

16   thought as the office evolved it would be very

17   helpful to her to have somebody with my kind of

18   technical background in tax.  I had done some work

19   and written some legislation when I was on the Hill

20   specifically affecting taxation of small

21   businesses.  So, it appeared to be a good fit.

22   While it was, you know, that nobody knew how this

C O N F I D E N T I A L

106

1    office was going to develop because it was in the

2    very early stages, I thought this might be a good

3    idea.

4              There was no formal application process.

5    It was just David said go talk to Sue, if you two

6    think you want to try it, fine.  And that is how it

7    started.

8         Q.    And your understanding at the time was

9    that whatever you would be doing would be

10   substantive work?

11        A.    Yes.

12        Q.    And it was substantive work requiring

13   your high level of tax expertise?

14        A.    And they would be relying on my tax

15   expertise.

16        Q.    When did you move to the Office of Public

17   Liaison?

18        A.    That is the same thing.  Sue.

19              JUDGE KHARE:  The date of that move was

20   when?

21              THE WITNESS:  September '98.

22              BY MR. QUINN:

1    Q.    Can you describe how the job went for the

2  first six months or so?

3    A.    There were only nine of us on the staff.

4  It was kind of fly by the seat of your pants, but

5  it was stimulating because I worked directly with

6  Sue.  She had an open door policy.  You could walk

7  into her office at will and sit down and brainstorm

8  and usually out of a brainstorming session an idea

9  would come up.

10      The basic mission of the office was we

11  were supposed to be like a central clearinghouse,

12  the intermediary between the business community and

13  the other functions in the IRS, talking to and

14  getting from the business community and the various

15  professionals and people who, as a large part of

16  their work, have to deal with the IRS, problems

17  that they were having with the way the IRS

18  operated, with the day-to-day details of getting

19  liens and getting liens lifted and particular

20  problems.  It was our job to maintain relationships

21  with these groups, collect the information, the

22  input they were giving us and then forward it

C O N F I D E N T I A L

108

1    internally.

2              Sue really wanted to make a good

3    impression and she encouraged all of us to come up

4    with our own ideas.  In the beginning it was fun.

5    I came up with some things.

6         Q.    Let me stop you there before you get into

7    too much detail.

8         A.    Yes.

9         Q.    Let me bring up an entirely different

10   subject, your health at this time frame.

11        A.    Yes.

12        Q.    Obviously, there has been testimony that

13   you have suffered from what is diagnosed as chronic

14   low grade depression.

15              How long have you had that?

16        A.    I have had it for as long as I can

17   remember, but when I was a child I don't think they

18   knew what depression was, so they attributed it to

19   moodiness.  But I have had this since childhood,

20   and I am not the only member of my family that has

21   been afflicted with it.

22        Q.    What was your condition like in terms of

C O N F I D E N T I A L

109

1   your chronic low grade depression say in the

2   one-year period surrounding your move to the Office

3   of Public Liaison, six months before, six months

4   after?

5       A.    Chronic low grade depression is the type

6   of thing where you can function perfectly normally.

7   You are not at all intellectually impaired.  Your

8   moods may blip up and down.

9           It is really like if you and I went

10  outside on a beautiful spring day and you would be

11  able to see all the colors of all the beautiful

12  flowers that were out there and I wouldn't be able

13  to see the color.  It is like your view of life

14  where you would experience things, there is no

15  color.  It is what they call a flattened affect.

16          I have been living with this for a long

17  time and most people who live with depression, it

18  is like a diabetic has to take insulin, but they

19  can do whatever they need to do during the course

20  of their day.  It is the same type of thing.  You

21  are aware of it, but it doesn't impair your ability

22  to do what you need to do.

CONFIDENTIAL

110

1    Q.    As far as you were concerned, the
2    condition was manageable?
3    A.    It was being managed very well.
4    The anti-depressant medications only came
5    out, I think in the late '80s, and I was started on
6    them in 1991.  I found that medication did help to
7    a certain degree and it did manage.  What
8    medication does mostly is it keeps you grounded.
9    It stabilizes your mood so you don't really have
10   high highs, you don't have low lows, you are just
11   somewhere in between.
12   Q.    With the exception of occasional blips,
13   by blips I mean downward blips, your condition was
14   stable for this entire period?
15   MS. SOBCZAK:  Object to the leading
16   questions.
17   MR. QUINN:  I am just trying to shorten
18   things.
19   JUDGE KHARE:  I understand.  The
20   Complainant needs to come up with the answers.
21   THE WITNESS:  I would occasionally over
22   the years have some contact with my family and that

C O N F I D E N T I A L

111

1    could cause me anxiety for a day, a day-and-a-half.

2    That is what I call a blip.

3            Again, it is something I have been

4    dealing with my whole life.  You deal with it.  It

5    is just one of those things.  It is the hand of

6    cards you are dealt and you deal with it.

7            But for the most part my mood is fairly

8    well stable at a point where I don't feel the least

9    bit impaired.

10            BY MR. QUINN:

11        Q.    Before we get back to your job at the

12    Office of Public Liaison, a couple more questions

13    about your background.

14            Do you have any other degrees besides a

15    tax degree and an LLM in Tax?

16        A.    Yes.

17            In 1996 while I was working full-time at

18    the IRS, I entered a part-time graduate program at

19    Johns Hopkins University.  I was studying for a

20    Masters Degree in Biotechnology.  It was a field

21    that I had been fascinated by for quite a number of

22    years.  I went to school, I took my classes at

C O N F I D E N T I A L

112

1    night a few days a week, and after two years I

2    received the degree.

3            I also in the summer of '97, still while

4    working full-time, sat for the Patent Bar Exam and

5    passed.

6            So, I have an MS in Biotechnology and I

7    am a Licensed Tax Attorney as well.

8        Q.    What other Bars do you have, by the way?

9        A.    California and Illinois.

10       Q.    Not the District of Columbia?

11       A.    No.  They won't waive the multi-state

12   score.

13       Q.    So, you were relatively satisfied with

14   what was going on in the Office of Public Liaison

15   for the first six months?

16           Is that how I understand your testimony?

17       A.    Yes.

18           What was particularly nice about it was

19   that it was very free-flowing, it wasn't at all

20   bureaucratic.  Sue seemed to appreciate, and she

21   liked very much, the brainstorming when we came in

22   in the mornings.  You know, I was thinking about

CONFIDENTIAL

113

1    something.  She liked that and for a number of the

2    ideas she would basically say run with it.

3        Q.    What about the level of substantive work

4    that you were getting say in the first half of

5    1999?  How was that?

6        A.    It was good.  She had me involved.

7              Every year there is an annual meeting

8    with our most important, what they call stakeholder

9    groups, one of which is the American Bar

10   Association, another one is the AICPA, the

11   accountants, Tax Executive Institute.  These are

12   professional tax people, either attorneys or CPAs

13   or whatever.  I was the one responsible for

14   organizing these meetings, for talking to these

15   people, finding out what they needed.

16             Sue would get inquiries from some groups.

17   One in particular was the International Fiscal

18   Association.  She didn't know what it was and I

19   told her.  It was a very prominent group of

20   business leaders and professionals and I knew a lot

21   of people who were members.  I said they would be a

22   good group to add to our list.  So, she sent me out

C O N F I D E N T I A L

114

1    to go have a meeting with them and find out what

2    their concerns were.

3         We ultimately ended up setting a private

4    meeting with the Commissioner because they had some

5    issues that I thought were very, very important and

6    timely.

7         I enjoyed doing that kind of work.

8    Q.    What about substantive tax law?  Were you

9    doing much of that?

10   A.    Only to the extent that the concerns that

11   were expressed by the groups that I was dealing

12   with had to do with specific substantive areas of

13   the Code where there was insufficient guidance or

14   guidance wasn't coming out.

15        I mean, they could talk to me about, in

16   technical language, what the problems were with

17   particular pension regulations and whatever and

18   what I was able to do was to turn around and

19   explain in plain English, in laymen's terms, what

20   their problem was and how I thought we needed to

21   remedy it, who we needed to talk to and why it was

22   important that we get these things fixed.

CONFIDENTIAL

115

1    Q.    Was Barry Fulcher working with you at the

2    time?

3    A.    He was a co-worker.  Yes.  He was.

4    Q.    What was his job?  Again, the first half

5    of 1999.

6    A.    I really don't know what Barry worked on,

7    but it was not any of the same issues I worked on.

8    Q.    Did you develop your own work or were you

9    given assignments to do?

10    A.    In the beginning I usually created my own

11    work.  I would come across something of interest

12    and bring it to Sue's attention and say this might

13    be something you want to look into.

14         From the beginning there were two

15    projects that were of paramount importance to the

16    office.  One was developing a Web site and the

17    other was putting together a CD-ROM for the small

18    business community that had all the information you

19    ever wanted to know about how the tax laws affect

20    small business, in what ways you could simplify

21    your clients' lives by how you could get things

22    done through the IRS, the way to do it.

CONFIDENTIAL

116

1        I came up with one project that I was
2    really excited about and Sue was excited about.
3    Since I had spent two years in International Tax in
4    Chief Counsel and that was an area of expertise of
5    mine, I said since so much business nowadays is
6    global, and we are not just taking about the major
7    companies, we are talking small businesses, it
8    would be a good idea to have a separate section on
9    the CD-ROM that explained certain things for small
10   businesses that were doing business abroad, how
11   they would have to deal with income earned abroad
12   and if they were hiring foreign nationals.  She
13   thought it was a great idea and since I was the
14   only one in the office at that time who had the
15   background or the credentials to do this project,
16   it was sort of run with it, and I was only supposed
17   to coordinate with the woman who was in charge of
18   the CD-ROM project.

19       What I did from the very beginning, I
20   brought the Office of Chief Counsel into this when
21   I first had the idea.  I phoned one of the key
22   officials in the International Side of the of

C O N F I D E N T I A L

117

1   Counsel.  I told her what I was thinking about and

2   described it because I was very careful to make

3   sure I didn't step on any toes.  It would be really

4   good for us if Chief Counsel, if we had their

5   support in doing this.

6          So, I started out by maintaining a

7   discussion with this woman in International and I

8   had developed a time line, different stages and

9   whatever, and I presented that to Sue and she said

10  fine.  I started working on the project.

11         Q.   Did your circumstances change at any time

12  in the first say eight months of 1999?

13         A.   From September through the spring of '99,

14  from September '98 when I joined the office to the

15  spring of '99, the office grew exponentially.  We

16  went from 9 people, you know, all of whom dealt

17  with Sue informally, assignments were never

18  written.  It took Sue several months just to learn

19  how to use e-mail.  So, you know, things were oral.

20  All of a sudden they just started hiring more and

21  more people.

22         We went from a staff of 9 to a staff of,

C O N F I D E N T I A L

118

1    I think around 20 or 25 very quickly, and it went

2    from my being able to deal directly with Sue,

3    having conversations with her and developing things

4    that way, to having 2 people interposed between me

5    and Sue.  They had hired a Deputy Director and then

6    in July of 1999 a man who had been my co-worker,

7    Barry Fulcher, all of a sudden became my

8    supervisor.

9            JUDGE KHARE:  Did that upset you?

10           THE WITNESS:  I was curious as to how

11   somebody with his background could supervise the

12   work that I was doing.  He certainly couldn't have

13   reviewed it substantively.

14           It was like overnight.  One day he is my

15   co-worker and we had a good relationship.  We would

16   discuss books we read and movies we had seen.  He

17   would talk about his personal life and I would talk

18   about my personal life.  Then all of a sudden he is

19   my supervisor and his whole demeanor instantly

20   changed.

21           BY MR. QUINN:

22       Q.   Previous to these events, had you said

C O N F I D E N T I A L

119

1    anything to Ms. Sottile or anybody else in the

2    office to suggest that perhaps the job wasn't quite

3    what you were expecting it would be?

4         A.    Well, as we progressed in the year 1999

5    and as the office got bigger and bigger and became

6    more bureaucratized there were branches set up.  I

7    think eventually we had three branches.  There were

8    branch chiefs.  I remember the selection criteria

9    for a branch chief was who is interested in being a

10   branch chief.  That was the sum total of the

11   criteria.

12        Everything became very formalized.  All

13   communications went through several levels.  Every

14   week or every other week we were being handed a

15   memo with new office procedures and the office

16   procedures changed from week to week.

17        It was very confusing for a lot of us

18   because we started with a very open free-flowing

19   office and now, you know, more people came, the

20   more rigid structure came, your freedom of movement

21   and your ability to really optimize what you could

22   do became severely restricted.

C O N F I D E N T I A L

1      Q.    My question was had you expressed some

2    concern about that to Ms. Sottile before

3    Mr. Fulcher was appointed your supervisor?

4      A.    It was roughly the same time.

5      Q.    What did Mr. Sottile say to you, if you

6    remember?

7      A.    I expressed the view that I felt I was

8    being under utilized and that I really didn't in

9    the beginning envision the office developing this

10    way.  I thought perhaps my particular skills could

11    be better used if I had far more substantive work,

12    hopefully of a legal or quasi-legal nature.

13         I mean, gradually I would be asked to set

14    up meetings and was never allowed to use my

15    substantive knowledge and I was regarded by the

16    people that I worked with from the outside groups

17    as just sort of somebody who put together

18    conferences.

19      Q.    But after you expressed these concerns to

20    Ms. Sottile, what happened to your CD-ROM project?

21      A.    It started gradually to go downhill.

22         Around this time, or shortly before that,

C O N F I D E N T I A L

121

1   Ms. Sottile had hired a Deputy, Mr. Fitzpatrick.

2   I had been working on the CD-ROM project, as I

3   said, together with Chief Counsel, with a woman who

4   was in charge of the CD-ROM project, and then all

5   of a sudden Mr. Fitzpatrick interjects himself and

6   he is taking over the project.

7          Nobody had told me that.  I don't know if

8   he was even told that the genesis of the project

9   was with me.  I attempted to sit down with him and

10  I wanted to explain it to him, my vision of it, my

11  timetable, whatever.  He refused to meet with me.

12  He refused to let me brief him and he just started

13  demanding things, drafts of things.

14          JUDGE KHARE:  This was in the summer of?

15          THE WITNESS:  Of '99.

16          JUDGE KHARE:  Of '99.

17          Just an aside, did anybody at this point

18  know about your depression, that you were being

19  treated for it?

20          THE WITNESS:  Ms. Sottile did because in

21  the very beginning when we had to choose our tour

22  of duty most of the people in that office, either

CONFIDENTIAL

122

1   because they had small children or they had a long

2   commute, worked a 7:30 to 4:00 schedule. I said,

3   well, I would prefer to work 9:00 to 5:30. I said

4   I do take medication, antidepressants, and they are

5   known to have somewhat of a morning hangover effect

6   and it would really be helpful to me if I could

7   work from 9:30 to 6:00. And she said, no, because

8   most of the other people in the office worked from

9   7:30 to 4:00 and it was crucial that I be there no

10  later than 9:00.

11          JUDGE KHARE:  And when she said no, did

12  you follow up with anybody or did you just report

13  to work at 7:30?

14          THE WITNESS:  No.  I was allowed to work

15  from 9:00 to 5:30.

16          JUDGE KHARE:  But not the 9:30 to 6:00?

17          THE WITNESS:  No.

18          JUDGE KHARE:  Did you talk to anybody

19  about that at that time or did you just let it go?

20          THE WITNESS:  I let it go.

21          BY MR. QUINN:

22      Q.   How did your workload progress?

C O N F I D E N T I A L

123

1          I guess we are now in July '99.  Say for
2    the next couple of months how was your workload?
3          A.    Well, as the office was segmented into
4    branches and everything was funneled, the only
5    contact I had was with Mr. Fulcher.  It became more
6    and more what I refer to as secretarial and
7    clerical, and by that I mean the type of work that
8    you would normally expect somebody who was a GS-7
9    or a GS-8 to be doing.  It drew not at all on my
10   education, my experience, my background.
11          For example, I would be told to go to a
12   meeting and take down the minutes.  By minutes they
13   meant so-and-so said A, B and C, Person Number 2
14   said C, D, and E, Person Number 3 said blah, blah,
15   blah.
16          JUDGE KHARE:  How often was that?
17          THE WITNESS:  Pretty often.
18          JUDGE KHARE:  Pretty often meaning once a
19   week, twice a week, couple of times a month?
20          THE WITNESS:  Couple of times a month.
21   And then go back and type it up.
22          When it came to arranging meetings on

CONFIDENTIAL

124

1    topics, on substantive tax issues that our outside

2    groups needed to educate us about, my function was

3    limited to making the phone calls to the people who

4    were to be invited to the meeting, talking with

5    their secretaries to coordinate everybody's

6    calendar, preparing an agenda and a briefing book,

7    but any substantive material that went into the

8    briefing book was not written by me.  I had to go

9    find people in Chief Counsel whose area it was.

10   They wouldn't take anything that I wrote on a

11   technical subject.

12          JUDGE KHARE:  They being?

13          THE WITNESS:  Ms. Sottile and

14   Mr. Fulcher.  They made it very clear that they

15   felt, despite my background, that they wouldn't

16   feel comfortable or some such thing.

17          Basically to get the briefing books.  I

18   would draw up a list after collecting RSVPs of who

19   was attending that day and take it down to the

20   security office so they could be allowed into the

21   building.  I would be responsible for reserving the

22   room.  Things like that.  That, to me, is

C O N F I D E N T I A L

125

1    ministerial.

2                JUDGE KHARE:  Did they give you a reason

3    for not wanting you to do the substance?

4                THE WITNESS:  No.

5                JUDGE KHARE:  Did you ask?

6                THE WITNESS:  Yes.  They said, no, you

7    get it from Chief Counsel.

8                JUDGE KHARE:  That being Fulcher and

9    Sottile said?

10               THE WITNESS:  Well, Fulcher didn't become

11   my supervisor until the summer of '99.  Prior to

12   that, at some point in the middle of '99, I no

13   longer had access to Sue Sottile at all.  Orders

14   came down from Mr. Fitzpatrick.  And then when

15   Mr. Fulcher became my supervisor it went from

16   Mr. Fitzpatrick to Mr. Fulcher to me.

17               JUDGE KHARE:  And during that time -- I

18   am sorry, Mr. Quinn.  You will be able to resume in

19   a minute.

20               During that time Ms. Sottile had been

21   sort of bumped up two levels?

22               I mean, there were two levels between you

CONFIDENTIAL

133

1    cause of it.  I think Dr. Nowak already

2    testified --

3            JUDGE KHARE:  I don't think we are so

4    much worried about the cause as how the Agency

5    handled things afterwards.  That is what is at

6    issue here.  I think I have a pretty good idea of

7    how things were in the office.  So, move forward,

8    please.

9            BY MR. QUINN:

10   Q.    Let me ask you then about your medical

11   condition say in the September or October time

12   frame.

13           What was your condition in terms of your

14   chronic depression?

15   A.    I was becoming increasingly stressed as a

16   result during the time period when Mr. Fulcher

17   became my supervisor.

18           The one project that was my baby was

19   being taken away from me by Mr. Fitzpatrick.  I had

20   gone to Sue and indicated that I just didn't think

21   that the position, as it was originally described,

22   was working out the way I had envisioned and would

CONFIDENTIAL

134

1   she help me, either providing me with better work

2   or helping me to transfer to a position where they

3   could really use my skills.  The answer that came

4   back was, no, we will not do anything to either

5   change your workload or to do anything to help you,

6   even to move to another position.  No reason was

7   given.

8           At that time, contaminant with that,

9   Mr. Fulcher was constantly watching me.  My

10  co-workers in the office were being asked to

11  report --

12          JUDGE KHARE:  This was before you went

13  out on your depression?

14          THE WITNESS:  Yes.  But this is what

15  caused me to go from chronic depression into the

16  acute depressive disorder.

17          BY MR. QUINN:

18      Q.   When did you feel you were slipping into

19  a more acute stage of depression?

20      A.   It started really in the middle of the

21  summer and then it deteriorated until the morning

22  of October 4th when Mr. Fitzpatrick, as he did a

C O N F I D E N T I A L

135

1    number of times that summer, ordered me into his

2    office to dress me down about some infraction of

3    the rules.  He did this repeatedly from July to

4    October and he would always have a staff assistant

5    sitting there listening while he basically said you

6    violated this rule, you violated that rule.  And it

7    was an atmosphere where I was being watched like a

8    hawk by somebody who had been my co-worker.

9              JUDGE KHARE:  Why did you feel they were

10   scrutinizing you so heavily?

11             THE WITNESS:  Because I had registered my

12   dismay with the way the position was working out.

13   All that really would have been necessary --

14             JUDGE KHARE:  I got your response.

15             Mr. Quinn.

16             BY MR. QUINN:

17        Q.   Apparently your depression was at the

18   point you felt you couldn't work any longer?

19        A.   Not in that environment.

20             The morning of October 4th I was summoned

21   once again to Mr. Fitzpatrick's office because I

22   had been down in the library.  I left a note on my

C O N F I D E N T I A L

1    computer saying where I was, but when I came back

2    to the office, you know, I was told to go see him.

3    This was his staff assistant who called me.

4            I said, you know, this really isn't

5    necessary.  I left a note on my computer so that

6    you would know where I was.

7            She called me back five minutes later and

8    she ordered me to be in Mr. Fitzpatrick's office at

9    10:00 o'clock and threatened me with discipline,

10   disciplinary action.

11           At that point I broke.  I started shaking

12   from head to toe.  I had trouble breathing.  It was

13   the proverbial last straw after many weeks of being

14   humiliated, being put under a microscope, having my

15   co-workers required to report on me.  I couldn't

16   take it anymore.

17           I went in to Ms. Sottile and I said I

18   have to take medical leave.  I was visibly in bad

19   shape and she was initially sympathetic and said

20   don't worry about anything and we will take care

21   of, you know, making sure you get your leave

22   approved and you call me any time you want.  She

CONFIDENTIAL

137

1    even volunteered to donate two days leave to me,

2    which you can do.

3         I left and Ms. Sottile never spoke to me

4    again until the day that she showed up for the

5    deposition last year.  I left phone messages for

6    her.

7         The first thing I had to do was get

8    approval that I could be out for more than three

9    days for medical reasons.  That is the first thing

10   you have to do.  You know, she had said they would

11   get the information to me, don't worry about it,

12   they will handle it.  Well, I called several times

13   and left messages.  She never returned my calls.

14   Finally I had to go back in just to pick up the

15   information I needed.

16        JUDGE KHARE:  Did you try calling

17   Mr. Fulcher since he was your direct supervisor?

18        THE WITNESS:  I don't recall whether I

19   did or not, but Ms. Sottile led me to believe that

20   I could count on her to ease any of the paperwork

21   and stuff.  She was very concerned about my

22   condition and to the extent she would take care of

CONFIDENTIAL

138

1   everything, call her any time.

2           JUDGE KHARE:  Mr. Quinn.

3           THE WITNESS:  And she never donated the

4   two days leave.

5           BY MR. QUINN:

6       Q.   Let's talk about your status.

7           From the time you left in early October,

8   your status was on paid sick leave; is that

9   correct?

10      A.   When I got the medical documentation to

11  them I was approved for 30 days of advanced sick

12  leave, which is standard.  If you can provide

13  medical certification, you can be advanced that

14  much sick leave, and that was paid leave.  That ran

15  out at the end of November.

16      Q.   At the end of November did you seek leave

17  without pay?

18      A.   Yes.  I did.

19          My medical documentation that provided me

20  initially with the advanced sick leave had gone to

21  Dr. Presant.  He is the one the Agency uses in

22  these circumstances.  He was the one that wrote up

CONFIDENTIAL

139

1    the letter approving that.

2              I was advised by Mr. Fulcher by letter

3    that my paid sick leave would terminate November

4    29th and then I would be in leave without pay

5    status and that Dr. Presant had authorized, had

6    said, that I would be on approved leave without pay

7    through December 28th.

8              JUDGE KHARE:  That would be your FMLA

9    leave?

10             THE WITNESS:  No.  And then I applied for

11   FMLA.

12             BY MR. QUINN:

13       Q.   There was a letter, I don't know exactly

14   where it is in the file, but it is in the

15   investigative file.  I will put it in later.

16             JUDGE KHARE:  Can we go off the record a

17   second?

18             (Discussion off the record.)

19             (Whereupon, at 12:15 p.m., the deposition

20   recessed, to reconvene at 1:15 p.m. this same

21   day.)

22

CONFIDENTIAL

149

Q.    When did you begin making that request
for reassignment to that position?

A.    In November of '99.

Q.    And what was done about it, to the best
of your knowledge?

A.    Nothing.

Q.    Did there come a point in time in
December where you decided that you would like to
return to work?

A.    I was facing a situation where I had to
choose between paying rent and food and I needed to
go back to work, at least on a part-time basis, so
that I didn't end up on the street.    I went back.
I was out of the office continuously from October
4th, '99 to December 15th, 1999.

Q.    When you returned?

A.    When I returned on that day after having
been gone for two months, I walked in the office.
The first thing I found on my chair was a copy of
the office time and leave procedures with an e-mail
that said since you have been out of the office for
awhile, we thought it would be a good idea to

CONFIDENTIAL

150

1    refresh your recollection of the rules.

2            Then I was presented immediately after

3    that with an e-mail from Mr. Fulcher stating you

4    have been placed on absence without leave for the

5    last two days and this morning.

6        Q.    What is absent without leave?

7        A.    An unexcused absence.

8            This was the minute I walked in the door.

9    He didn't greet me and ask me how I was feeling.

10   Just right away. Boom. You are AWOL. Boom. You

11   better learn these time and leave procedures.

12       Q.    I am confused. I thought you were

13   approved for leave without pay status through

14   December 28th.

15       A.    So did I. The letter said I was approved

16   for leave without pay status through December 28th

17   and I would be expected to return to work on

18   December 28th, 1999. It was my understanding that

19   my absences were excused, not pay status, but

20   excused through December 28th of '99.

21       Q.    Did you have any work assignments when

22   you came back on December 15th?

CONFIDENTIAL

151

1    A.    Other than making one or two phone calls,
2    no.

3    Q.    Were there any special rules applied to
4    you in terms of signing out and notifying people?

5    A.    Yes.

6         The different branches were physically
7    located in different offices on the same hall.  I
8    was told that if I was going to leave my desk for
9    more than 15 minutes, I had to walk down the hall
10    into the front office and sign out on the board.

11         This was news to me because we never had
12    to do it before.  It is not anywhere in their
13    so-called time and leave rules.  So, I was kind of
14    astounded with that.  I didn't know if it applied
15    only to me.  It appeared to.

16    Q.    Was your computer use monitored in any
17    way?

18    A.    Yes.

19         Well, remember Mr. Fulcher and I were
20    about as far away from each other as Ms. Sobczak
21    and I are now.  There was no partition between us.

22         JUDGE KHARE:  Complainant is referring to

CONFIDENTIAL

152

1    a space of about three feet, two feet?

2                THE WITNESS:  Yes.  About three feet.

3    Yes.

4                I was looking something up on the

5    computer.  I happened to be on the IRS Intranet.

6    It was something work-related.  He came over to me

7    and said that he was writing me up because we are

8    not allowed to use the computer for other than

9    work-related issues.  And I said, but I am on the

10   IRS Intranet.  I don't think he grasped that.

11               Then I had a conversation, a telephone

12   conversation, with my father who at the time was

13   very concerned about how I was doing.  Mr. Fulcher

14   listened to all my phone conversations and came

15   over to me and said he was writing me up because I

16   am not allowed to make non-business related phone

17   calls.

18               JUDGE KHARE:  Did he indeed write you up

19   or did he just threaten to?

20               THE WITNESS:  He said he was writing me

21   up.

22               JUDGE KHARE:  He said he was writing you

C O N F I D E N T I A L

153

1   up, but then did you ever get anything?  Was

2   anything put in your personnel file?

3         THE WITNESS:  I don't know whether it was

4   put in my personnel file or not.

5         BY MR. QUINN:

6     Q.   How do you know he was watching your

7   computer, he being Mr. Fulcher?

8     A.   Because I saw him looking over my

9   shoulder every time I was on the computer and he

10  would comment on it.  He was watching to see what

11  Web sites I was going to.

12    Q.   What did you do in your job during this

13  time frame after December 15th?

14    A.   Basically, for the time I was there, I

15  was required to sit at my desk and look busy.  I

16  couldn't leave my desk except maybe for a five

17  minute bathroom break.  I couldn't read.  I

18  couldn't write a letter.  I couldn't look on the

19  computer unless it was the IRS or Treasury

20  Intranet.

21         I basically felt like a hostage because

22  my every move was being watched by Mr. Fulcher, who

CONFIDENTIAL

154

1    was only three feet from me. And on occasion when

2    he had to leave the office he would come back in

3    and question my co-workers, if they saw me leave,

4    where did I go, what time was it. I know this

5    because one of my co-workers approached me and told

6    me she resented being put in that position.

7            JUDGE KHARE: Which co-worker was this?

8            THE WITNESS: Her name was Sharon. I

9    don't remember her last name. She ultimately got

10    permanently detailed out at her request.

11            BY MR. QUINN:

12    Q.    Did you feel you had other people in the

13    office reporting on your whereabouts during that

14    period of time?

15    A.    Well, within the physical space of our

16    office there was another woman, Marlene, who I know

17    they would ask when did you see Terri, what time

18    did she come in, when did she leave?

19            One of the branches was one floor down

20    way at the other end of the hall. So, I don't know

21    what was said to any of those people. I know the

22    people in the front office, which was across the

CONFIDENTIAL

155

1   hall from me, whenever they came into our office

2   they would always check where I was.  But nobody

3   ever spoke to me.

4       Q.   Did you have any work assignment

5   whatsoever?

6       A.   No.

7       Q.   What information, what feedback, had you

8   gotten from other people at the Department of

9   Treasury concerning the status of your request for

10  accommodation?

11      A.   Ms. Weiss repeatedly made requests of

12  Ms. Barry by letter.

13           I repeatedly made requests of Mr. Fulcher

14  by e-mail and in person, please give me the status,

15  what is being done?  I pointed out to him that

16  there is an interactive process, that as part of

17  that process under the Rehabilitation Act and the

18  ADA they are supposed to keep me informed, that

19  this is supposed to be something that we are

20  working together to find a solution, it is not

21  supposed to be an adversarial relationship.

22           Every one of my requests went unanswered.

CONFIDENTIAL

160

1    you took leave?

2        A.    In October when I took leave I was

3    already in a major severe depressive episode, but

4    by December let's say the bottom just kept getting

5    lower and lower and lower.  When Mr. Burns told me

6    that nothing was being done and that they were just

7    immovable, it precipitated a panic attack and I

8    decided it was time to try to appeal to the

9    Commissioner's office for some help.

10        JUDGE KHARE:  What was the date of that,

11    approximately?

12        THE WITNESS:  The first week in January

13    of 2000.

14        BY MR. QUINN:

15        Q.    Did you lead the Commissioner's office to

16    believe that you were suicidal at that time?

17        A.    What happened was back in November I

18    had written a letter to the Commissioner, I

19    hand-delivered it to his office, explaining that I

20    was getting no feedback, I had no idea what was

21    going on, could he please help?  I hand-delivered

22    the letter.

C O N F I D E N T I A L

161

1      When I called up they claimed they never

2  got it.  So, I went back and hand-delivered another

3  letter and this time got a receipt.

4      I called a few days later and they

5  couldn't find it in the system.  Then I called a

6  few days later and got somebody on the staff who

7  told me to fax it to her.

8      The Commissioner has an office that deals

9  with employee complaints and there is a Director

10  and his name is Steve Whitlock.  She gave me the

11  phone number.  She said try calling him.  For

12  several days I did and I left several messages.

13      Finally, it was either the last week in

14  November or early December, I got a phone call from

15  a woman named Gail Carroll, who worked with

16  Mr. Whitlock, and her reply to me was talk to your

17  supervisor, Mr. Fulcher, he is in charge of finding

18  your accommodation.  I said, well, did you read my

19  letter?  I said, Mr. Fulcher is the one who will

20  not give me any information.  She said, well, there

21  is nothing else I can tell you.  And she hung up.

22      So, then this first week in January when

C O N F I D E N T I A L

162

1    I had been told that they were not doing anything,

2    I got on the phone one afternoon, I called and said

3    I would like to make an appointment with

4    Commissioner Rossotti, this is a very important

5    issue.  They said, well, we will have his

6    appointment secretary call you back.

7         I waited half an hour and after 45

8    minutes I called back.  They took another message.

9    Another hour went by and he didn't return the phone

10   call.  I was getting desperate.

11        I called back and I said, look, I have a

12   very serious issue, the people who are supposed to

13   be dealing with this appear not to be dealing with

14   it, nobody will tell me or give me any idea of what

15   they are doing, even a target time frame.  And I

16   said, I need to see the Commissioner.

17        So, they started, nobody gets in to see

18   the Commissioner.  I said, look, this is a matter

19   of life and death.  I said, I want somebody to call

20   me back before the close of business today or I

21   will have no choice but to be there when the

22   building opens in the morning and sit in the

CONFIDENTIAL

163

1    waiting room outside the Commissioner's office

2    until I get the chance to talk to him.

3        Well, that finally prompted a return

4    phone call from Mr. Whitlock, who had not returned

5    any of my previous calls.  He promised me that he

6    would do something.

7        The following day at about 11:00 o'clock

8    in the morning I get a phone call from Mr. Fulcher

9    saying I was not to even try to come into work that

10    day, that I was being put on paid administrative

11    leave for the day, that I should wait to hear from

12    him, but I should definitely not come in.

13        Then later that day I was informed that I

14    was being put on paid administrative leave

15    indefinitely.  This was January 6th.  Mr. Fulcher

16    informed me and I asked him, could you please

17    confirm this in writing for me so there is no

18    confusion about why I didn't come in on the 6th and

19    that I had been officially on paid administrative

20    leave?

21        The letter was dated January 12th.  I got

22    it on the 14th.  And his letter stated, you know,

C O N F I D E N T I A L

164

1    based on your phone calls to the Commissioner's

2    office, we are very concerned for your state of

3    health and we are putting you on paid

4    administrative leave, we think this is the best

5    thing until we can sort this out and see what the

6    situation is.  Then it said, please provide me by

7    the 18th a letter from your physician indicating

8    when you will be able to return to work.

9              So, I replied to his letter, which was

10   dated the 16th, and I said, I only received your

11   letter on the 14th, and there was a holiday weekend

12   in between, President's Day weekend.  I said, I may

13   not be able to speak until Dr. Nowak until the

14   18th.  So, I will definitely get the letter you

15   requested, but she may need a couple of extra days

16   and because of the medical information, I will have

17   her send the letter to Dr. Presant.  I sent that

18   letter on the 16th I believe and I heard nothing

19   from Mr. Fulcher after that.

20             Dr. Nowak did in fact fax Dr. Presant the

21   letter that was requested on the 21st of January

22   and the letter said what most of her previous

C O N F I D E N T I A L

165

1   letters had said, that my condition had

2   deteriorated so badly that I needed to be removed

3   from that work environment and that I would not be

4   able to return to work until they took some action,

5   whether it be a temporary nature or a permanent

6   nature, to put me in a different work environment.

7          Then I believe it was the 26th or the

8   27th of January, it was a Friday afternoon.  I got

9   home.  At 5:00 o'clock there was a voice mail

10  message on my machine from Barry Fulcher saying my

11  paid administrative leave was being terminated as

12  of Monday and I was to return to work.  I was not

13  notified in writing.  No reason was given.

14         JUDGE KHARE:  And the date of that voice

15  mail was when?  I am sorry.

16         THE WITNESS:  I would have to look at a

17  calendar.  I think the Monday he was requesting me

18  to come back to work was I think January 29th.  So,

19  it would have been the 26th, five days after we

20  sent Dr. Nowak's letter.

21         Then I sat down and wrote him a letter

22  which I faxed him and we had a conversation the

C O N F I D E N T I A L

166

1    next day.

2            His initial letter, the letter of the

3    12th, I need to say that -- well, I did say that

4    they were very concerned about my state of health.

5    So, I called Mr. Fulcher and I said, well, I guess

6    you got my doctor's letter, you are terminating my

7    paid administrative leave, I guess that means you

8    worked something out for me, have you found a

9    reasonable accommodation?  He said, no.  I said,

10   have you found a short detail?  He said, no.  I

11   said, well, what is going to be different from the

12   circumstances that existed on the date that you put

13   me on paid administrative leave because of concerns

14   for my health and now you are requiring me to come

15   back but you are telling me nothing is different?

16            He said to me, well, you can work

17   part-time whenever you want.  And I said, but I was

18   entitled to do that under the FMLA back at the

19   beginning of January, nothing has changed.  He had

20   no answer for me, but I was required to return to

21   work.

22            JUDGE KHARE:  You said I was able to do

C O N F I D E N T I A L

167

1    that under the FMLA and then what did he say in

2    response to that?

3           THE WITNESS:  He didn't say anything.

4           JUDGE KHARE:  Just dead silence on the

5    end of the phone?

6           THE WITNESS:  He could not give me any

7    answer as to what would be different on the day

8    that I returned from the day that they decided I

9    needed to be put on paid administrative leave.

10          After that I went back in as much as I

11    could.  I was still monitored.  He was still in my

12    face every morning.

13          I believe it was sometime in February

14    that they found out that there was an opening in

15    the Virginia, West Virginia office.

16          BY MR. QUINN:

17    Q.    What were you told about this Chief

18    Counsel position that had been open since October?

19    A.    Julie Barry early on said we don't have

20    to transfer her to Chief Counsel.  We provided her

21    with citations, case law and various other

22    precedent indicating that that was not correct.

CONFIDENTIAL

168

1    She basically said she didn't care, the Chief

2    Counsel was not part of the IRS, they were never

3    going to transfer me and they would take it all the

4    way to hearing if they had to.

5        Then finally after at least two months of

6    asking Mr. Fulcher for a status report, his letter

7    notifying me that I was on paid administrative

8    leave finally in the last paragraph said, you have

9    asked to know the status of our search and he just

10   said he sent a couple of letters out.  That was the

11   sum total of his status report.  He did include

12   that they were not going to transfer me to the

13   Office of Chief Counsel because they claimed they

14   had no legal obligation to because the Office of

15   Chief Counsel is not part of the IRS.  And I

16   pointed out that both the IRS and the Office of

17   Chief Counsel are part of the Department of

18   Treasury.

19        That was it.

20        BY MR. QUINN:

21    Q.    Let me direct your attention to Page 157

22   of the record.

C O N F I D E N T I A L

184

1      Q.    In 1999.  Okay.

2            In the year 2000, can you explain how you

3      arrived at the difference of $15,713?

4      A.    Yes.

5            For the first three pay periods of the

6      year 2000 I was still a GS-14, Step 5.  Just prior

7      to my accepting reasonable accommodation with the

8      pay retention agreement I had got my step increase

9      to a Step 6, and it was the GS-14, Step 6 salary to

10     which the pay retention agreement applied.

11           So, I prorated for the number of pay

12     periods during the year that I was paid at a Step 5

13     level and I prorated how many pay periods during

14     the year I was paid at a Step 6 level.  I added the

15     two amounts and the result is the actual amount of

16     money I would have earned in the year 2000.

17     Q.    So, the number for the year 2000 would be

18     the same as 1999 in the sense it reflects only

19     leave without pay time or perhaps some AWOL time?

20     A.    Yes.  That is correct.

21     Q.    In the year 2001 I see you have come up

22     with a differential of $6,071.  That is the

CONFIDENTIAL

324

1    right hand?

2         Whereupon,

3                   SUSAN NIESER

4    was called as a witness and, having been first duly

5    sworn by the Administrative Judge, was examined and

6    testified as follows:

7         JUDGE KHARE:   When you are done here

8    please don't discuss what you have said here today

9    with anybody else.

10        Ms. Sobczak.

11                 DIRECT EXAMINATION

12        BY MS. SOBCZAK:

13   Q.   Ms. Nieser, please state your name.

14   A.   Susan Nieser.   The last name is

15   N-I-E-S-E-R.

16   Q.   Who is your employer?

17   A.   I work for the IRS Office of Chief

18   Counsel.

19   Q.   How long have you worked for the Office

20   of Chief Counsel?

21   A.   Since 1989.

22   Q.   What is your position?

**C O N F I D E N T I A L**

325

1      A.    I am the Director of Labor and Employee

2   Relations.

3      Q.    How long have you held this position?

4      A.    I came to that position on a detail in

5   late 1999 and I have held the position permanently

6   since the fall of 2000.

7      Q.    What are your duties?

8      A.    I supervise a staff of Labor and Employee

9   Relations Specialists that are located across the

10  country and I am responsible for all union matters,

11  negotiation matters, discipline, termination,

12  issues like that, for the IRS Office of Chief

13  Counsel.

14     Q.    How many people do you supervise?

15     A.    I currently supervise six people.

16     Q.    Could you explain the difference between

17  the IRS and the Office of Chief Counsel?

18     A.    Yes.

19           The IRS and the Office of Chief Counsel,

20  the IRS Office of Chief Counsel, are separate

21  agencies.  Basically the IRS Office of Chief

22  Counsel is the lawyer to the IRS.  The IRS has many

**C O N F I D E N T I A L**

1    thousands of employees.  The IRS Office of Chief

2    Counsel only has about 2400 employees and our

3    employees are all attorneys or support personnel

4    related to those attorneys.

5         Some people call the IRS Office of Chief

6    Counsel the largest tax law firm in the world.  We

7    are the tax lawyers for the IRS, but we are

8    separate agencies for all personnel purposes.

9         Q.   Are you familiar with the appointing

10   authorities of the IRS in the Office of Chief

11   Counsel?

12        A.   Yes.  I am particularly familiar with the

13   appointing authorities within the IRS Office of

14   Chief Counsel since that is my employer and who I

15   work for.

16        Q.   How are you familiar with them?

17        A.   I am familiar with those because it comes

18   into play in my job because we have a separate

19   bargaining unit from the IRS.  The IRS Office of

20   Chief Counsel and the IRS are both unionized

21   agencies, but we have a separate bargaining unit,

22   separate union contract, separate personnel rules,

CONFIDENTIAL

327

1  and I am very familiar with the differences between

2  those because they are important to my job.

3       Q.    Has the separation of appointing

4  authorities been looked at by any fora?

5            MR. QUINN:  Objection.

6            By fora you mean court?

7            MS. SOBCZAK:  Or administrative body.

8            MR. QUINN:  This is way out of line for a

9  witness to testify as to what courts have said.

10           JUDGE KHARE:  You are asking her to

11  recite case law it seems to me.  So, could you

12  please rephrase your question?

13           MS. SOBCZAK:  Sure.

14           BY MS. SOBCZAK:

15      Q.    In your work as Chief of Labor Relations,

16  have you had occasion to be involved in any

17  litigation involving separate appointing

18  authorities of IRS and Office of Chief Counsel?

19           MR. QUINN:  Same objection, Your Honor.

20  She is trying to solicit information which is

21  essentially a legal opinion from this witness as to

22  what they claim courts have said about this issue.

CONFIDENTIAL

328

1    It is all in their brief, of course.

2           This is just way out of line.  The

3    witness should not be testifying.  She can testify

4    to facts, not what has happened in courts or

5    opinions of law, and that is what they are trying

6    to do.  It is just improper.

7           MS. SOBCZAK:  I believe I asked her a

8    fact about whether she has been involved in such

9    litigation.

10          JUDGE KHARE:  I will allow the litigation

11   question.  I don't want to hear what they said.

12   You can go into her training, if you would like to,

13   but I don't need to hear the legal opinion.

14          MS. SOBCZAK:  Well, basically this line

15   of questioning is to enable me to get this exhibit

16   into evidence, but my understanding is that this is

17   attached to a motion.

18          JUDGE KHARE:  If it is already attached,

19   I have it.

20          That is the FLRA opinion?

21          MS. SOBCZAK:  FLRA opinion.

22          JUDGE KHARE:  Yes.  It was attached to an

CONFIDENTIAL

329

1    earlier motion.  So, it is already in.  So, you

2    don't need to do that.  I am aware of it.

3                MS. SOBCZAK:  Okay.  Thank you.

4                JUDGE KHARE:  Sure.

5                BY MS. SOBCZAK:

6        Q.    Could you please explain the appointing

7    authorities in the two organizations?

8                MR. QUINN:  Again I think she is calling

9    for legal opinions here.

10               JUDGE KHARE:  I don't think she is.  I am

11   not going to sustain that objection, Mr. Quinn.  I

12   think she is explaining her understanding of the

13   functioning, of how they function.

14               Is that correct?

15               MS. SOBCZAK:  Correct.

16               THE WITNESS:  The IRS Office of Chief

17   Counsel functions as its own appointing authority.

18   We have independent authority to hire and that is

19   the traditional concept of appointing authority by

20   ourselves.  We have it centrally located.  The IRS

21   has many different appointing authorities among

22   themselves, but they are separate.  We don't need

C O N F I D E N T I A L

330

1    to go to the IRS to ask for permission to hire

2    someone.

3                  BY MS. SOBCZAK:

4        Q.    What is your understanding of what

5    employment authority is?

6                  MR. QUINN:  Objection.  This is again

7    calling for a legal conclusion.  The definition of

8    appointing authority is a legal issue in this case

9    and she is asking this witness to testify to it.

10                 JUDGE KHARE:  Actually I think she was

11   asking for her understanding of the rules, which I

12   would like to know because it reflects on the

13   decision-making process with relation to your

14   client.

15                 So, you can answer the question,

16   Ms. Nieser.

17                 THE WITNESS:  Your Honor, the appointing

18   authority is the power to hire essentially and

19   particular agencies have appointing authority,

20   which means that they are able to make a decision

21   about who to hire without going to ask OPM or

22   without going to ask some other higher authority.

CONFIDENTIAL

331

1    And the IRS Office of Chief Counsel makes its own

2    independent hiring decisions and that is my

3    understanding of what appointing authority is.

4                JUDGE KHARE:   So, if the Department of

5    Treasury had a hiring freeze universally, like the

6    EEOC has had a hiring freeze now for years, the

7    Department of Treasury has a hiring freeze, does

8    that affect your office?

9                THE WITNESS:   If that went down to the

10   different sub-bureaus, it would.   IRS Office of

11   Chief Counsel doesn't fall directly under Treasury.

12   We fall under the Treasury General Counsel.   So, we

13   would have to go ask the Treasury General Counsel

14   if it also applied to us.   They would be our

15   sub-bureau underneath Treasury.

16               JUDGE KHARE:   Ms. Sobczak.

17               BY MS. SOBCZAK:

18       Q.   So, does the Department of Treasury have

19   appointing authority over the IRS and the Office of

20   Chief Counsel?

21       A.   Again, the Office of Chief Counsel has

22   its own appointing authority.   It has been

CONFIDENTIAL

332

1   delegated down separately.  And that is a separate

2   line from the IRS.  As I said, Chief Counsel falls

3   underneath Treasury General Counsel.  The IRS

4   directly reports to the Department of Treasury.

5         Q.    I am showing you what has been marked for

6   identification as Agency Exhibit 3.

7             JUDGE KHARE:  Agency exhibit what?

8             MS. SOBCZAK:  3.

9             This is also attached to our motion.

10            JUDGE KHARE:  We are looking at a letter

11  dated May 4th, 1999, subject line, Personnel

12  Authority Over Personnel Employed by the Office of

13  Chief Counsel, Internal Revenue Service, signed by

14  Robert Rubin.

15            BY MS. SOBCZAK:

16        Q.    Ms. Nieser, do you recognize this?

17        A.    Yes.

18        Q.    What is it?

19        A.    It is called Treasury Order 107-07.  It

20  is up in the upper right-hand corner.  This is the

21  Order from the Secretary of Treasury that delegates

22  authority, personnel authority, for the IRS Office

**C O N F I D E N T I A L**

1    of Chief Counsel to the General Counsel and then

2    says it may be redelegated down and it has been

3    redelegated down to the IRS Office of Chief

4    Counsel, the man called our Chief Counsel, a

5    Presidential appointee.

6             MS. SOBCZAK:  If I need to, I would like

7    to enter this into evidence.

8             JUDGE KHARE:  Have you already submitted

9    it as an attachment?

10            MS. SOBCZAK:  Yes.

11            JUDGE KHARE:  Then you don't need to.

12            BY MS. SOBCZAK:

13        Q.    Could you explain the chain of command

14   for the two agencies?

15        A.    Sure.

16            The chain of command for the IRS Office

17   of Chief Counsel is we have a Presidential

18   appointee, a Chief Counsel.  His name is B. John

19   Williams today.

20            Then our chain of authority above the IRS

21   Office of Chief Counsel would be the Treasury

22   General Counsel.  His name is David Aufhauser,

**C O N F I D E N T I A L**

1    A-U-F-H-A-U-S-E-R.

2             Then from the Treasury General Counsel it

3    would go to the Treasury Secretary and the IRS's

4    chain of authority would go from the Commissioner

5    of the IRS directly to the Secretary of the

6    Treasury.

7             So, they are different chains.

8             MS. SOBCZAK:  Thank you.

9             That is all I have.

10            JUDGE KHARE:  Mr. Quinn

11                 CROSS EXAMINATION

12            BY MR. QUINN:

13    Q.    Nice to see you again, Ms. Nieser.

14            I would like to direct your attention to

15    a document that is in our exhibit book.  It is

16    marked as No. 27.  Here is a copy of it.

17            JUDGE KHARE:  Complainant is looking at a

18    flow chart entitled Office of Chief Counsel.

19            BY MR. QUINN:

20    Q.    Is that accurate?

21            JUDGE KHARE:  Not the Complainant.  The

22    witness is looking at the flow chart entitled

C O N F I D E N T I A L

335

1    Office of Chief Counsel.

2            THE WITNESS:  It looks like some of the

3    people's names are not accurate today.  It was

4    probably accurate in February of 2003.  Just with

5    people leaving.

6            There are two lines above the Chief

7    Counsel.

8            BY MR. QUINN:

9        Q.   So, your testimony you just gave was not

10   full and complete, was it?

11       A.   No.  I don't agree with that.

12       Q.   Well, when Ms. Sobczak asked you who the

13   Chief Counsel reported to you only said General

14   Counsel of Treasury, right?

15       A.   For all personnel purposes the Chief

16   Counsel reports to the General Counsel of the

17   Treasury.

18       Q.   For personnel purposes.  But you didn't

19   mention the fact that the Chief Counsel also

20   reports to the Commissioner of the Internal Revenue

21   Service, did you?

22       A.   In my testimony I said that the IRS

C O N F I D E N T I A L

336

1    Office of Chief Counsel is the lawyer for the

2    Commission.

3        Q.    The Commission of the Internal Revenue

4    Service can tell the Office of Chief Counsel to

5    hire an employee, can't they?

6        A.    No.

7        Q.    They cannot.   Only the Department of

8    Treasury?

9        A.    Yes.

10       Q.    But the Department of Treasury has the

11   authority, don't they?

12       A.    The Department of Treasury is the chain.

13            JUDGE KHARE:   So, if the Department of

14   Treasury wanted the Chief Counsel's Office to hire

15   somebody, if their Chief Counsel wanted you all to

16   hire somebody, you all would oblige?

17            THE WITNESS:   That is where the personnel

18   authority would come from.   It would not come from

19   anything to do with the IRS.

20            I have never been familiar with a

21   circumstance like that.

22            JUDGE KHARE:   I understand.   But it could

**C O N F I D E N T I A L**

337

1    happen that you all would get word from the General

2    Counsel of the Treasury to hire this guy and you

3    all would do it?

4                    THE WITNESS:   I suppose that is possible.

5    Yes.

6                    BY MR. QUINN:

7          Q.    Well, it is possible you would be

8    required to do it, wouldn't you?

9          A.    Again, the General Counsel or the

10   Secretary of Treasury or the President frankly, but

11   not the Commissioner of the IRS, for anything to do

12   with any personnel issues.   That is what this order

13   says.

14         Q.    So, the answer is yes.   The General

15   Counsel of the Department of Treasury and probably

16   several other Treasury officials can tell the

17   Office of Chief Counsel that they have to take

18   somebody, can't they?

19         A.    I suppose that would be a possibility.

20         Q.    Okay.

21                Do you know in this particular case

22   whether or not anybody at the Department of

CONFIDENTIAL

338

1    Treasury was even asked to place Ms. Bearman in

2    your office?

3           MS. SOBCZAK:  Objection.  Outside the

4    scope of direct examination.

5           JUDGE KHARE:  Ms. Nieser is not one whose

6    testimony you were going to submit, was it, by

7    deposition?

8           MR. QUINN:  Yes.  It is submitted by

9    deposition.

10          JUDGE KHARE:  I am going to allow it,

11    Ms. Sobczak.

12          You can answer the question.

13          THE WITNESS:  I don't know the answer to

14    that question.

15          BY MR. QUINN:

16    Q.   But that was one of issues.

17          Take a look at Exhibit No. 1, would you

18    please, in the book?

19          JUDGE KHARE:  She doesn't have the book.

20          MR. QUINN:  I am sorry.

21          BY MR. QUINN:

22    Q.   Here is a copy of Exhibit No. 1.

**C O N F I D E N T I A L**

1           You recall that document, don't you,

2     Ms. Nieser?

3           A.   I remember looking at at least parts of

4     this document.   Yes.

5           Q.   And you recall being appointed as the

6     official of the Department of the Treasury to

7     testify to whether or not that inquiry had ever

8     been made of the Department of Treasury or the

9     request that Ms. Bearman be placed in the Chief

10    Counsel's Office?

11          A.   I remember being deposed.   I don't know

12    whether I was asked that particular question or

13    not.

14          Q.   Well, if you want to look through the

15    list of subject matters in your deposition, I can

16    give you that if you want to take a minute to look

17    at the subjects.

18          You were stipulated to testify to 5, 7,

19    8, 9, 11, 12, 13, 14, 15 and 16.

20          A.   What is the question you are asking me

21    about?

22          Q.   All the reasons why Ms. Bearman was not

CONFIDENTIAL

340

1    placed in a position in the Chief Counsel's office.

2         JUDGE KHARE:  I don't understand the

3    question either, Mr. Quinn.

4         MR. QUINN:  Well, a request had been made

5    by Ms. Bearman to be placed in the Chief Counsel's

6    Office and Ms. Nieser has testified that someone at

7    the Department of Treasury could have done it.  I

8    just want to know, and she is the one that as I see

9    it was appointed by Treasury to testify to this

10   issue, why it wasn't done.

11        JUDGE KHARE:  Why nobody in Treasury

12   called the Chief Counsel's Office and said --

13        MR. QUINN:  Place her.

14        JUDGE KHARE:  I think that is purely

15   speculation.  I think you can ask her if it was

16   done, but she can't read the minds of the Treasury

17   officials.

18        BY MR. QUINN:

19   Q.   Was it done?

20   A.   No.  Not to my knowledge.

21   Q.   And let me ask, looking again at that

22   organizational chart --

**C O N F I D E N T I A L**

341

1          MS. SOBCZAK:  What exhibit is that?

2          MR. QUINN:  That is our 27, I think.

3          BY MR. QUINN:

4     Q.    I see Richard Milhelcic fairly

5   prominently up on this list.

6     A.    Yes.

7     Q.    He is the EEO Officer for the Office of

8   Chief Counsel?

9     A.    No.  He is not the EEO Officer.

10    Q.    He is in charge of the Equal Opportunity

11  Program?  Is that what it is?

12    A.    Yes.  He is in charge of that particular

13  program, but he is not the EEO Officer.

14    Q.    Is it accurate to say that General Legal

15  Services is part of the Office of Chief Counsel?

16    A.    Yes.

17    Q.    That would be Ms. Sobczak's office?

18    A.    Yes.

19    Q.    And Ms. Julie Barry's office as well.  Is

20  that fair to say?

21    A.    Yes.

22    Q.    Are there any provisions, I guess they

CONFIDENTIAL

342

1    would be personnel provisions, that apply in a case

2    where the Office of Chief Counsel is advising an

3    Agency like the Internal Revenue Service -- I guess

4    it is all it advises is the Internal Revenue

5    Service, right?

6        A.    Yes.   We are their lawyer.

7        Q.    Are there any provisions for conflicts

8    between the Office of Chief Counsel and the --

9            MS. SOBCZAK:   Objection.   Relevance.

10    Outside the scope of direct.

11            MR. QUINN:   I will link it up very

12    quickly.

13            JUDGE KHARE:   I am going to allow him to

14    finish that question.

15            BY MR. QUINN:

16        Q.    Are there any provisions that deal with

17    the issue of conflicts where the Chief Counsel has

18    their own opinion on an issue and the Internal

19    Revenue Service has their own opinion on an issue

20    how it gets resolved?

21            JUDGE KHARE:   I am going to allow it

22    because it goes to the structure of the office.

**C O N F I D E N T I A L**

1          THE WITNESS:  I am not sure I understand
2   the question.
3          BY MR. QUINN:
4      Q.   How is that resolved?
5          Let me just give you a little background
6   why I am asking this question.
7          I am asking about conflicts of interest.
8   In this case, as I understand the record, the
9   Office of Chief Counsel's opinion, and apparently
10  your opinion today, is that they didn't have to
11  take Ms. Bearman, she couldn't be placed in your
12  office, correct?
13     A.   That is my understanding of our position
14  in the case.
15     Q.   And the IRS was being asked to place
16  Ms. Bearman in your Office of Chief Counsel,
17  correct, by Ms. Bearman?
18          You don't know?
19     A.   I am not sure I understand.
20     Q.   Ms. Bearman was asking as a reasonable
21  accommodation as an employee of the Internal
22  Revenue Service to be reassigned to the Office of

**C O N F I D E N T I A L**

344

1    Chief Counsel.

2         A.    But, again, they are different agencies.

3         Q.    Right.

4              But didn't the Chief Counsel's Office

5    itself have some interest in the issue of whether

6    or not employees from the IRS could be reassigned

7    to the Office of Chief Counsel?

8         A.    We are our own agency.  We make our own

9    independent decisions about those things.  We are

10   separate from the IRS.

11        Q.    But at the same time you are advising the

12   IRS that you are an independent entity that makes

13   its own decision?

14        A.    I mean, we have sub-parts of all of our

15   agencies.

16        Q.    Could I get a yes or no to that?

17        A.    At the same time.

18             Well, I mean the larger agency, not an

19   individual part.

20        Q.    But at the same time the Office of Chief

21   Counsel had its own opinion that it didn't have to

22   accept someone from the IRS, you were advising the

**C O N F I D E N T I A L**

1    Internal Revenue Service on that same issue?

2          A.    If you are talking about me as a person,

3    no.

4          Q.    The Office of Chief Counsel was.

5          A.    You are talking about the agency as a

6    whole?

7          Q.    Julie Barry was.

8          A.    I don't know that of my own opinion.

9                I mean, I don't have personal knowledge

10   about those things.

11         Q.    My question is what procedures are in

12   place where the Office of Chief Counsel has what

13   would be considered, I think at least in law firms,

14   as a conflict of interest in their rendering of

15   legal opinions on what they are supposed to do?

16         A.    Well, when the Office of Chief Counsel is

17   giving advice to the IRS?

18         Q.    Yes.

19         A.    As I told you, we are the tax law firm.

20   The client has the final decision about whether to

21   accept or not accept that particular advice.

22         Q.    But in this case you were giving the

CONFIDENTIAL

346

1   Internal Revenue Service legal advice on personnel

2   matters, weren't you, you being the Office of Chief

3   Counsel?

4       A.   I mean, it is my understanding that yes,

5   there was advice offered, not by myself, but by

6   General Legal Services.

7       Q.   And the issue involved in that legal

8   advice was one that the Office of Chief Counsel had

9   an interest in, correct?

10      A.   General Legal Services, for instance,

11  advises the IRS Office of Chief Counsel on a

12  variety of matters.  The Office of Chief Counsel is

13  its own agency.  So, I can don't see an inherent

14  conflict there.

15      Q.   You understand my question, don't you?

16  That the Office of Chief Counsel was advising the

17  IRS on the issue of whether or not Ms. Bearman

18  could be placed in the Office of Chief Counsel?

19          MS. SOBCZAK:  Objection.  Asked and

20  answered.

21          JUDGE KHARE:  I am still missing your

22  point.  I think you are leaving something off the

C O N F I D E N T I A L

347

1    end of your question.

2              You said they were advising the IRS on

3    whether or not they had to take Ms. Bearman.   What

4    is the conflict that you see?

5              MR. QUINN:   The Office of Chief Counsel,

6    General Legal Services, was advising the Internal

7    Revenue Service on an issue that the Office of

8    Chief Counsel itself had its own separate opinion

9    on --

10             JUDGE KHARE:   And interest in?

11             MR. QUINN:   -- and its own interest in,

12   that being the issue of whether or not agencies

13   that they deemed to be independent or separate from

14   Chief Counsel could have employees reassigned to

15   Chief Counsel's Office as part of the reasonable

16   accommodation process.

17             To me that is a pretty stark conflict of

18   interest.   They are advising an agency, which they

19   deem to be a separate agency, on an issue that

20   their own agency has an interest in.

21             JUDGE KHARE:   That affects them.

22             MR. QUINN:   Yes.

CONFIDENTIAL

348

```
 1            JUDGE KHARE:  Is your question did you

 2   advise the IRS that you all didn't have to take her

 3   because you didn't want her?

 4            MR. QUINN:  No.  My question was simply

 5   what procedures are in place for resolving

 6   conflicts of interest in the Chief Counsel's

 7   Office?

 8            MS. SOBCZAK:  And I think the witness

 9   testified that she did not see a conflict of

10   interest.

11            JUDGE KHARE:  If you had seen a conflict

12   of interest, Ms. Nieser, what would you have done?

13   Who do you refer those kinds of problems out to?

14            THE WITNESS:  There are some guidelines

15   in the Chief Counsel's internal regulations about

16   dealing with particular conflicts of interest.

17   That would be one place that you would go to to

18   look for advice.

19            JUDGE KHARE:  So, you would farm out the

20   decision somewhere else?  Have you sort of

21   contracted out decisions before?

22            THE WITNESS:  Contracted outside the IRS
```

CONFIDENTIAL

349

1    Office of Chief Counsel?

2            JUDGE KHARE:  Yes.

3            THE WITNESS:  I am not familiar with us

4    doing that.

5            BY MR. QUINN:

6        Q.    Isn't it fair to say if there is a

7    conflict of interest, Ms. Nieser, involving whether

8    the Office of Chief Counsel has a conflict in

9    advising the Internal Revenue Service on an issue,

10   that the appropriate step would be to go to the

11   Department of Treasury's Office of General Counsel

12   for resolution of that issue?

13       A.    No.  I disagree.  The IRS Office of Chief

14   Counsel has its own ethics officials.

15       Q.    Were those ethics officials contacted

16   about this issue?

17       A.    I don't know the answer that question.

18           MR. QUINN:  I don't have any further

19   questions.

20           JUDGE KHARE:  Ms. Sobczak, do you have

21   anything else?

22           MS. SOBCZAK:  No.  I don't.

CONFIDENTIAL

350

1          JUDGE KHARE:  You are done, Ms. Nieser.

2     Thank you.

3          We can go off the record.

4          (Recess.)

5          JUDGE KHARE:  Let's go on the record.

6          The next witness is Barry Fulcher.

7          Mr. Fulcher, could you please raise your

8     right hand?

9          Whereupon,

10                   BARRY FULCHER

11    was called as a witness and, having been first duly

12    sworn by the Administrative Judge, was examined and

13    testified as follows:

14          JUDGE KHARE:  Thank you.

15          When you are done testifying here please

16    don't discuss your testimony with anyone.

17          THE WITNESS:  Okay.

18                 DIRECT EXAMINATION

19          BY MS. SOBCZAK:

20     Q.    Good morning, Mr. Fulcher.

21          Please state your name for the record.

22     A.    Barry Fulcher.

CONFIDENTIAL

351

1      Q.    Who is your employer?

2      A.    Internal Revenue Service.

3      Q.    How long have you worked for the IRS?

4      A.    Approximately 29 years.

5      Q.    What is your position?

6      A.    Senior Program Analyst.

7      Q.    For which office?

8      A.    Office of Tax Administration.

9      Q.    How long have you held this position?

10     A.    It will be three years this September.

11     Q.    What was your previous position?

12     A.    Chief of Business Liaison.

13     Q.    In which division?

14     A.    It was National Public Liaison, which is

15   part of Communication & Liaison.

16     Q.    Was that the position you held when you

17   supervised Ms. Bearman?

18     A.    Yes.

19     Q.    What were your duties in that position?

20     A.    We were primarily responsible for

21   improving products and services for the small

22   business community.  We also had significant

C O N F I D E N T I A L

352

1   interaction with various small business

2   stakeholders.

3       Q.   How many people did you supervise?

4       A.   Generally there were about five.

5       Q.   Were you involved with Ms. Bearman's

6   request for reasonable accommodation?

7       A.   Yes.

8       Q.   When did you first become aware of her

9   request?

10      A.   I don't recall specifically, but my best

11  guess would be approximately November of 1999.

12      Q.   How did you become aware of her request?

13      A.   I believe it was a result of seeing the

14  letter from her physician requesting the

15  accommodation.

16      Q.   After you saw that letter what happened?

17  What was your next involvement with her request for

18  accommodation?

19      A.   The next involvement was really awaiting

20  the decision of the Internal Revenue Service

21  physician, Dr. Presant.  On December 3rd he

22  concurred that a reasonable accommodation or he

C O N F I D E N T I A L

353

1    recommended that a reasonable accommodation be

2    taken for Ms. Bearman.

3         Q.    What was that reasonable accommodation?

4         A.    That either the job be restructured so

5    that it would entail attorney related

6    responsibilities or that she be reasonably

7    accommodated outside the office to another office

8    that would hire her as an attorney.

9         Q.    How did you learn about the December 3rd

10   letter from Dr. Presant?

11        A.    Again, I don't recall specifically, but

12   my best guess is that I would have seen the letter

13   itself.

14        Q.    Do you know how you came to see the

15   letter?

16        A.    Probably from either Mr. Fitzpatrick or

17   Ms. Sottile.

18        Q.    Did they give it to you?

19        A.    A copy.  Yes.

20        Q.    Why did they give it to you?

21        A.    Because they asked for me to take

22   whatever actions I could to accomplish the

354

1    accommodation.

2        Q.    What, if anything, did you do once you

3    received the December 3rd letter from Dr. Presant?

4        A.    I contacted our Labor Relations Office,

5    also contacted EEO, and soon thereafter set up a

6    meeting including those parties plus several

7    others, that included Appeals, to see what could be

8    done to provide a detail for Ms. Bearman while the

9    reasonable accommodation issue was being worked.

10       Q.    Why did you contact Labor Relations?

11       A.    For guidance.

12       Q.    Why did you contact EEO?

13       A.    For the same reason.  For guidance.

14           JUDGE KHARE:  I am sorry.  Did I just

15   understand you said that you were looking for a

16   detail for her while you were also looking for an

17   accommodation?

18           THE WITNESS:  Yes.

19           The reason for that is it looked like the

20   detail -- well, certainly we were hopeful that a

21   detail could be accomplished quickly.  It looked

22   like the reasonable accommodation route would be a

C O N F I D E N T I A L

355

1    little more protracted.

2            JUDGE KHARE:   Thank you.

3            BY MS. SOBCZAK:

4        Q.    You mentioned a meeting.   When did that

5    meeting occur?

6        A.    I believe the meeting was December 16th.

7        Q.    What happened at that meeting?

8        A.    We discussed the best way to accomplish

9    the reasonable accommodation.   There was an

10   individual manager from Appeals at the meeting who

11   expressed interest in arranging a detail if she

12   could receive approval from her executive, who was

13   Dan Black at the time.

14       Q.    Who was at that meeting?

15       A.    Let's see.   I believe Annie Brown from

16   Appeals.  Rob Fitzpatrick.   I think John Burns.   I

17   think Paula Fyne, who was employed as Dave Williams

18   Executive Assistant.   And I believe maybe Mendola

19   from Appeals.   Perhaps Kathy King.

20            There is a list of the actual people that

21   were attending.   I don't recall every name.

22       Q.    What did you do after the meeting?

CONFIDENTIAL

356

1    A.    I remember meeting with John Burns

2    thereafter and really using him as a sounding board

3    to see if he thought that what we were taking was a

4    reasonable approach and he concurred with that.

5         Also I am sure I would have met with my

6    managers, Susan Sottile and Rob Fitzpatrick, to let

7    them know.  Of course, Rob was at the meeting, but

8    just to discuss the results of the meeting.

9    Q.    What action did you take next with regard

10   to the reasonable accommodation request?

11   A.    I followed up on the possibility of a

12   detail and also started looking at what the best

13   remedy would be in terms of accomplishing a

14   permanent reasonable accommodation through a

15   transfer to another office that employed attorneys.

16   Q.    So, did you do anything next with regard

17   to that?

18   A.    By early January, I think it was

19   January 4th, memorandums were prepared for several

20   offices within the national office area, in one

21   case for counsel requesting a detail, in other

22   cases notifying three other offices, advising them

CONFIDENTIAL

357

1    that the detail or reassignment was really

2    mandatory and asking what they had available.

3         Q.    And when did you prepare the memo?

4         A.    It would have been not long after the

5    December 16th meeting.

6              That type of memorandum, as I found out,

7    required quite a bit of review through EEO and

8    Labor Relations and my manager to make sure that it

9    was properly prepared.

10        Q.    I am going to show you a document at

11   page 25 of the file.

12             Do you recognize that document?

13        A.    Yes.

14        Q.    What is that?

15        A.    It is the memorandum going to Assistant

16   Commissioners, Examination International and to the

17   Director of Appeals signed by me.

18        Q.    What is the date on that?

19        A.    January 4th, 2000.

20        Q.    So, that is the memo you sent out?

21        A.    Yes.

22        Q.    Take a look at page 22 of the file.

C O N F I D E N T I A L

358

1          Do you recognize that document?

2     A.    Yes.  This is a similar memorandum going

3  to the Chief Counsel, F&M, dated January 4th, 2000.

4     Q.    And that is a memorandum that you also

5  sent out?

6     A.    Yes.

7     Q.    What happened after you sent the memos?

8     A.    Nothing immediately.  I did meet with

9  counsel seeing if they had something available and

10  also followed up with the various offices of the

11  other memorandum that went out to January 4th to

12  determine what they could do with the accommodation

13     Q.    Did you receive any response with regard

14  to the memos?

15     A.    I didn't get all the information on the

16  same day, but during the period following the

17  memorandum, and following up in each case,

18  determined that there were no positions available.

19     Q.    How did you follow-up?

20     A.    Generally by telephone calls.  Either I

21  would call them or in some cases I think they may

22  have called me.  Also through e-mails.

C O N F I D E N T I A L

359

1      Q.    Did you receive any response from the

2   Office of Chief Counsel?

3      A.    I don't believe there was a formal

4   written response, but the best I remember is that

5   they were not able to accommodate her.  There was

6   quite a bit of give-and-take apparently in regards

7   to their office's responsibility to provide

8   Ms. Bearman a position.

9           JUDGE KHARE:  You said they said they

10  were unable to accommodate her.  What did they say

11  specifically?

12          THE WITNESS:  During the meeting --

13          JUDGE KHARE:  Which meeting is this?

14          THE WITNESS:  This is the face-to-face

15  meeting I had with one of the managers and counsel.

16          JUDGE KHARE:  Which happened

17  approximately when?

18          THE WITNESS:  It would have been either

19  late in '99, like in late December, or in early

20  January.  I just don't recall the exact date.

21          That meeting, it was held at my request.

22  I remember discussing the issue as to what type of

CONFIDENTIAL

360

1    accommodation could be provided, if any, and

2    leaving that meeting I don't remember that counsel

3    had a firm answer one way or the other.  It was

4    like a wait and see, we will see what we can do.

5              BY MS. SOBCZAK:

6        Q.    After the first go around where you

7    didn't receive any positive responses, what

8    happened next?

9        A.    We had the dual track in place to provide

10   a detail through Appeals and while that was working

11   it was really a matter of waiting to see what the

12   other offices were saying.  When those responses

13   came back negative, then I pursued other options.

14       Q.    And what other options did you pursue?

15       A.    I checked with the offices of the

16   District Director for Maryland, Delaware and for

17   Richmond and West Virginia to see if they had

18   positions available.

19       Q.    What happened with regard to those

20   offices?

21       A.    The office of Virginia, West Virginia,

22   did provide an offer for a position, which

C O N F I D E N T I A L

361

1    Ms. Bearman ultimately accepted.

2        Q.    Where was the position located?

3        A.    The position was located in Bailey's

4    Crossroads, Virginia, as a Grade 12 attorney.

5        Q.    And when was that position located?

6        A.    When?

7        Q.    When?

8        A.    The initial offer I believe, or at least

9    tentative offer, was made to John Burns.  I think

10   it was February 7th of 2000.  And from that point

11   things solidified until they made a formal offer,

12   and I believe that was March 7th of 2000.

13       Q.    What happened with regard to the

14   difference in grade?

15       A.    That accounted for some of the delay from

16   the initial February 7th to March 7th and the final

17   result of that was the District offered pay

18   retention.

19       Q.    Now, you mentioned that John Burns was

20   present at the meetings.  What was his role?

21       A.    His role was as an EEO, I believe

22   Counselor.  I am sure he was a Counselor or

CONFIDENTIAL

362

1    Investigator.  It was to monitor the situation.

2    He also apparently played a pretty active role in

3    assisting with the accommodation since he is the

4    person that advised me in February that the

5    Richmond/West Virginia District had contacted him

6    in regards to the possibility of providing the

7    accommodation.

8        Q.    Did Mr. Burns ever talk to you about the

9    steps that were being taken to locate a position

10   for Ms. Bearman?

11       A.    Well, generally the steps that were being

12   taken were being initiated by me and EEO was kept

13   closely informed of the results of that.

14       Q.    Did he ever tell you that the process was

15   taking too long?

16       A.    No.

17       Q.    Did Mr. Burns ever tell you that you

18   weren't acting appropriately in looking for a

19   position?

20       A.    Not at all.  To the contrary, on more

21   than one occasion in talking to Mr. Burns and

22   really using him as a sounding board, one of the

CONFIDENTIAL

363

1    sounding boards, he indicated that the actions I

2    was taking were appropriate.

3        Q.    Did Mr. Burns ever tell you that you

4    were imposing restrictive work conditions on

5    Ms. Bearman?

6        A.    No.

7        Q.    Did you keep anyone informed of the steps

8    you had taken?

9        A.    Well, certainly my supervisors.  Also I

10   was working the issue pretty closely with Labor

11   Relations.

12           As I mentioned earlier, Mr. Burns was in

13   more than one conversation that I had in regards to

14   the progress that was being made to accommodate

15   Ms. Bearman.

16       Q.    It sounds like you were spending a lot of

17   time trying to find a position.

18           MR. QUINN:  Objection to the form of the

19   question.

20           BY MS. SOBCZAK:

21       Q.    How much time did you spend trying to

22   find a position for Ms. Bearman?

C O N F I D E N T I A L

364

1    A.    The process was very, very time

2  consuming.    The number of hours I don't know.    I am

3  sure it was more a matter of days than hours.

4    Q.    Did you inform Ms. Bearman of the steps

5  that you were taking?

6    A.    I provided her a formal update in January

7  as to the results of her reasonable accommodation

8  efforts.    I believe there was a memorandum I think

9  around mid January of 2000.

10    Q.    Did you ever tell Ms. Bearman in person

11  the steps that were being taken?

12    A.    As events unfolded Ms. Bearman really

13  wasn't in the office very often because of her

14  illness.    I don't recall telling her in person what

15  the results were, but it was certainly no secret.

16    Q.    So, from the time that you received

17  Dr. Presant's December 3rd, 1999 letter until the

18  time you found a position how much time elapsed?

19    A.    From the time that the Richmond, West

20  Virginia District made their initial overture was

21  about two months, until the time the formal offer

22  was made was about three months.

C O N F I D E N T I A L

377

1    regarding the issue with Customer Service and

2    Ms. Bearman owing money?

3        A.    Yes.

4            I received a call from a Customer Service

5    employee by the name of Nancy Green and that was

6    November 13th of '99.  Ms. Green complained that

7    she had been trying to reach Ms. Bearman, but that

8    Ms. Bearman would not return her calls.

9        Q.    What is Customer Service?

10       A.    They provide an array of services to

11   Headquarters office employees from assistance I

12   believe with computer related services to providing

13   office space, to providing meeting rooms, things of

14   that nature.

15       Q.    What was the substance of Ms. Green's

16   call?

17       A.    In talking to Ms. Green she said that

18   Ms. Bearman had an agreement or an arrangement to

19   repay money that was given to her in the form of an

20   emergency salary payment and that the emergency

21   salary payment had been made one week because

22   Ms. Bearman's salary, for whatever reason, the

C O N F I D E N T I A L

378

1    check had not been sent.  Then a couple of weeks

2    after that emergency salary payment was made the

3    late payment was made for the full amount.

4              Ms. Bearman then soon thereafter went

5    ahead and repaid the emergency salary payment, but

6    the check failed to clear the bank.  Then some

7    arrangement had been made to repay that over a

8    period of time, I am not sure how long, and in the

9    intervening one year only one payment had been made

10   and that was for the amount of $50.  So, Ms. Green

11   was calling Ms. Bearman for the late payments.

12        Q.    What did you do after you received the

13   phone call?

14        A.    I went down and met with Ms. Green to see

15   what documentation she had.  It wasn't much.  That

16   was about it in regards to my dealings with her.

17             I called Ms. Green's manager to find out

18   what this process was for these arrangements and

19   there really wasn't much in the way of any

20   documentation there.  It seemed to be almost an

21   ad hoc type of arrangement.

22        Q.    So, did you intervene in the payment

CONFIDENTIAL

379

1    arrangement?

2        A.    Yes.  I did.

3            At that point there was no payment

4    arrangement because whatever arrangement had been

5    made was not being complied with, hence Ms. Green's

6    contacts or attempted contacts with Ms. Bearman.

7            The employee rules of conduct are very

8    clear in saying that employees are not to have any

9    delinquencies, any payment delinquencies, and any

10   debt should be satisfied quickly and in this case

11   that was certainly not the case.

12           I met with Labor Relations to obtain some

13   guidance from them and the result of that was three

14   days later, November 16th, a memorandum was sent to

15   Ms. Bearman stating that the payment needed to be

16   made by, I think it was early December, I think

17   around December 10th, or that disciplinary action

18   could be taken.

19       Q.    Did you discipline Ms. Bearman?

20       A.    No.  She made the reimbursement within

21   the required time period of the memorandum.

22       Q.    In December of 1999 did you deny

CONFIDENTIAL

380

1    Ms. Bearman's request for advanced compensatory

2    leave for religious observance?

3        A.    Yes.

4        Q.    Could you please explain the

5    circumstances?

6        A.    There are several requirements that

7    generally have to be met before really this comp

8    time is granted.  The most significant requirement

9    is that the leave, the requested leave, advanced

10   leave, be satisfied within the next 120 days.

11   There is also a requirement that the request be

12   made within 15 business days of the anticipated

13   start date.

14            On the basis of that, first, she had come

15   in with a request for the religious comp time to

16   begin December 6th and she made the request on

17   December 7th.  Also on the basis of her time in

18   office, the anticipated time that she would be in

19   the office, it seemed very, very unlikely that she

20   would be able to repay that 40 hours a week within

21   the next 120 days.  And finally there are records

22   indicating that she currently had a 42 hour

CONFIDENTIAL

381

1    religious comp time deficit for the last time that

2    she had requested leave.

3        So, on the basis of those three reasons,

4    particularly the first reason, the request was

5    refused.

6        Q.    Did you seek advice from anyone regarding

7    this matter?

8        A.    Yes.  Again I went through our Labor

9    Relations Office for guidance.

10       Q.    I am showing you a document located at

11   page 158 of the file.

12       Do you recognize that?

13       A.    Yes.  That is the request from

14   Ms. Bearman for the religious comp time leave.

15       Q.    And what is the date on that?

16       A.    It is dated December 7th.

17       Q.    I would like you take a look at page 159

18   of the file.

19       What is that?

20       A.    That is the memorandum that I sent to

21   Ms. Bearman declining her request for the leave.

22       Q.    Did you deny Ms. Bearman's request in

CONFIDENTIAL

382

1    order to harass her?

2        A.    No.   Absolutely not.

3        Q.    Did Ms. Bearman request to be placed on a

4    detail?

5        A.    Yes.   I believe there is some mention in

6    a document, I forget which, in regards to her

7    request, or at least where she cites a request for

8    a detail.   I think her physician also asked for a

9    detail for Ms. Bearman.

10       Q.    What, if anything, did you do in response

11   to that request?

12       A.    I contacted the Appeals Office, which has

13   attorneys on staff within Headquarters, to see if

14   they could accommodate her.

15       Q.    Did you ignore her request for a detail?

16       A.    No.   To the contrary, that was one of the

17   very, very first actions that I took since that

18   seemed to provide the most potential for providing

19   her immediate relief.

20       Q.    Did anyone tell you to ignore her request

21   for a detail?

22       A.    No.

CONFIDENTIAL

383

1    Q.    Did you charge Ms. Bearman AWOL on

2    December 13th, 14th, and 15th of 1999?

3    A.    She was charged AWOL on the 13th and 14th

4    and on the 15th she was charged AWOL for two hours.

5    Q.    Why did you charge her AWOL?

6    A.    Because she did not come into the office

7    and I had an expectation that she would be coming

8    into the office and I didn't receive any

9    information from her that she would not be in the

10    office those three days.

11    Q.    Why were you expecting her to be in the

12    office?

13    A.    Well, her physician said that she would

14    be in the office those days.  There was a letter

15    saying that she would be in the office beginning, I

16    believe it was December 6th, which was also the

17    week of the religious comp time issue.  Although

18    that leave was denied, we didn't place her on AWOL

19    for that.  She was placed on leave without pay for

20    that week.  But on the basis of the doctor's letter

21    saying that I could expect Ms. Bearman on the 6th

22    of December and absent any information from her to

CONFIDENTIAL

384

1    the contrary, she was placed on AWOL.

2        Q.    Did Ms. Bearman ever explain to you why

3    she did not come to the office on those days?

4        A.    I don't recall ever getting an

5    explanation.

6        Q.    Did you ask her?

7        A.    No.   The information I had from her

8    physician and from her is that she would be in the

9    office.   I don't recall her explaining why she

10   wasn't.

11       Q.    Did the letter from Ms. Bearman's doctor

12   excuse her from work for that week?

13       A.    No.   It said that she would be working

14   and I believe would be coming in for six hours a

15   day.

16       Q.    Did the doctor's letter state that

17   Ms. Bearman wouldn't be able to call in if she

18   would not be in to work?

19       A.    No.

20       MR. QUINN:   You know, if we are talking

21   about a document, the witness ought to produce the

22   document.

C O N F I D E N T I A L

385

1            Is there something in the record?

2            JUDGE KHARE:  What letter are you

3    referring to?

4            MS. SOBCZAK:  It is the document that I

5    showed the Complainant yesterday.

6            BY MS. SOBCZAK:

7        Q.   If you take a look at page 73 of the

8    file, is this the letter from Ms. Bearman's doctor

9    you are referring to?

10       A.   Yes.

11            I just need to finish reading it.

12       Q.   Sure.

13       A.   (Witness reading document.)

14            Yes.

15       Q.   Did Ms. Bearman call in at all to tell

16   you she would not be at work on those days?

17       A.   No.

18       Q.   Did you call her?

19       A.   I tried to reach her on the 14th of

20   December.  I don't recall exactly why, but the only

21   reason I can think of was to find out why she

22   hadn't been in the office.  I didn't talk to her

386

1    directly, but she did respond.

2       Q.    What was her response?

3       A.    She e-mailed me saying that the phone,

4    her fax line I guess, had rung several times that

5    day and her point was that she didn't want me

6    contacting her at home because she was trying to

7    recover from a serious illness.

8       Q.    I am showing you Agency Exhibit 1.   This

9    was entered into evidence yesterday.

10          What is this document, Mr. Fulcher?

11      A.    It is an e-mail from Ms. Bearman to me

12   dated December 14th in the afternoon saying that I

13   had phoned her home several times attempting to

14   send a fax and please refrain from phoning her at

15   home for any reason since she finds it intrusive

16   and not helpful to her recovery.   In case you have

17   missed the point, I am trying to recuperate from a

18   serious illness.

19          JUDGE KHARE:   Just a second, Mr. Fulcher.

20          I can hear you all whispering and it is

21   distracting because it makes me unable to

22   concentrate on what the witness is saying.

C O N F I D E N T I A L

387

1          You can continue.

2          THE WITNESS:  If you need to communicate

3    with me, please use the mail, as you have done

4    successfully on several previous occasions.  I

5    anticipate your cooperation with this request.

6          BY MS. SOBCZAK:

7     Q.    Did you put Ms. Bearman on AWOL to harass

8    her?

9     A.    No.

10    Q.    Did you monitor Ms. Bearman's telephone

11   calls and Internet usage on December 23rd, 1999?

12    A.    No.

13          One thing to keep is mind, we need to

14   keep in mind, is the way the office layout was

15   designed, and that is that there was no partition

16   between mine and Ms. Bearman's work areas and her

17   work area was about from here to the door from me.

18    Q.    How far is that?

19    A.    Maybe 10 feet, 12 feet.

20    Q.    And what is the significance of that?

21    A.    The significance is that she could make

22   telephone calls and it would be impossible not to

CONFIDENTIAL

388

1    overhear her on some occasions. Same with me. I

2    could be making a phone call and she could probably

3    overhear me.

4            But a direct answer to your question, no,

5    I did not monitor her telephone calls.

6        Q.    Did you monitor her Internet usage?

7        A.    No. But, again, our computers were

8    situated very close to our phones right on our

9    desks. So, if I was getting up from my desk, her

10   computer was there. So, I might glance at it.

11   But, again, I was not monitoring her use of the

12   Internet.

13           JUDGE KHARE: Did you ever comment to her

14   about what she had up on her computer, what she was

15   looking at?

16           THE WITNESS: I don't remember doing

17   that. No.

18           BY MS. SOBCZAK:

19       Q.    Did you ever take any action against

20   Ms. Bearman because of telephone calls or Internet

21   usage?

22       A.    No.

C O N F I D E N T I A L

389

1    Q.    Was Ms. Bearman working part time?

2          MR. QUINN:   Time frame direction, please.

3          MS. SOBCZAK:   I will get there.

4          BY MS. SOBCZAK:

5    Q.    Was Ms. Bearman working part time during

6    your supervision of her?

7    A.    Again, she was there infrequently, but by

8    request of her physician she was working six hour

9    days.

10   Q.    When was that?

11   A.    I believe the effective date for that

12   was, the physician's letter was, I think it was

13   December 3rd, and it would have been at that point.

14   Q.    Did you expect her to perform the work of

15   a full time employee while she was working part

16   time?

17   A.    No.  What I expected of her was that for

18   the period of time that she was in the office that

19   she would work according to her Job Description.

20   Q.    Was Ms. Bearman placed on administrative

21   leave in January of 2000?

22   A.    Yes.

CONFIDENTIAL

390

1    Q.    Why?

2    A.    She had made contacts with the

3  Commissioner's office and with the Commissioner's

4  complaint staff that led them to believe that she

5  could be dangerous to herself.  She had used words

6  like this is a matter of life and death.  Based on

7  that and ensuing conversations or meetings with the

8  Commissioner's complaint staff and my management

9  and Labor Relations, it was determined that it

10  would be in Ms. Bearman's and IRS's best interest

11  if she were placed on administrative leave.

12    Q.    Was she paid during this time?

13    A.    Yes.

14    Q.    Did Ms. Bearman request that you respond

15  to her regarding the decision to place her on

16  administrative leave?

17    A.    Yes.

18    Q.    When did she make that request?

19    A.    I believe it was made on January 6th,

20  which was the date that she was placed on

21  administrative leave.  It was effective

22  January 6th.

CONFIDENTIAL

391

1    Q.    Did you respond to her request?

2    A.    Yes.

3    Q.    When?

4    A.    I am going from memory now, but I believe

5    it was the next day or very, very soon thereafter.

6    Q.    I am showing you a document located at

7    page 167 of the file.

8         Do you recognize this document?

9    A.    Yes.

10   Q.    What is it?

11   A.    It is dated January 12th.  It is a

12   memorandum to Ms. Bearman explaining that she is

13   being placed on administrative leave.

14   Q.    And that is January 12th of what year?

15   A.    2000.

16   Q.    So, why did it take from January 6th, the

17   date Ms. Bearman made the request, to January 12th

18   to respond?

19   A.    The memorandum is pretty sensitive and we

20   wanted to make sure that we were acting

21   appropriately, that the wording was correct, and

22   the letter, the memorandum, went to more than one

CONFIDENTIAL

392

1  person, it went through Labor Relations.  It just

2  took some administrative time to insure that it was

3  prepared correctly and met our needs as well as the

4  employees.

5      Q.    Did you take from January 6th to

6  January 12th to send this letter in an attempt to

7  harass Ms. Bearman?

8      A.    No.

9      Q.    Did you take any of these actions that we

10  discussed today to retaliate against Ms. Bearman

11  for requesting an accommodation?

12          MR. QUINN:  Again this is leading

13  questions.

14          JUDGE KHARE:  I am going to allow it.

15          THE WITNESS:  Absolutely not.

16          MS. SOBCZAK:  Thank you, Mr. Fulcher.

17  That is all I have.

18          JUDGE KHARE:  I have a quick question

19  before you start, Mr. Quinn.

20          Mr. Fulcher, what was the workload like

21  for your office as a whole in December of 1999?

22  What was going on?

C O N F I D E N T I A L

411

1     A.    Yes.

2     Q.    And then another three weeks later

3     letters were sent out.

4           Is that fair to say?

5     A.    From December 16th?

6     Q.    Yes.

7     A.    Yes.

8     Q.    Okay.

9           Now, I think you testified that on

10    December 16th the issue of looking for a detail

11    came up, that you were looking for a detail?

12    A.    On December 16th?

13    Q.    Yes.

14    A.    Yes.

15    Q.    And it is true, isn't it, that at least

16    two entities within the Internal Revenue Service

17    were interested in taking Ms. Bearman on as a

18    detail, weren't they?

19    A.    I believe it was one.  I think it was

20    just Appeals.

21    Q.    And what happened to that?

22    A.    It continued to be an active issue well

CONFIDENTIAL

412

1    into I believe January.

2        Q.    Why was it an active issue well into

3    January?

4        A.    There were issues as to whether they had

5    the position available and also how it was going to

6    be funded.

7        Q.    The issue was funding, wasn't it?

8        A.    That was I think what it came down to

9    eventually or ultimately.

10       Q.    And that was Mr. Williams decision, is

11   that fair to say, that he wouldn't fund it?

12       A.    Yes.

13       Q.    Did you discuss this with Mr. Williams,

14   the issue of funding?

15       A.    No.  I don't remember discussing that

16   with him.  That wouldn't be my call.

17       Q.    Do you know one way or the other whether

18   any consideration was given to the budgetary

19   concerns of Mr. Williams' own office or was it the

20   Department of Treasury as a whole?

21       A.    I don't know one way or the other.

22   Typically budgeting is done within an office and

CONFIDENTIAL

425

1    A.    That is correct.

2    Q.    But the understanding with Ms. Green,

3  according to your testimony, was that it wouldn't

4  be due until January.

5    A.    Well, I think the understanding with

6  Ms. Green was that it wasn't going to be necessary

7  for her to call me to get Ms. Bearman to meet the

8  obligations of the agreement.

9    Q.    But the obligations of the agreement, as

10  you testified earlier, didn't have to be met until

11  January.

12    A.    That was apparently the understanding

13  that Ms. Bearman had with Ms. Green.   However,

14  Ms. Green was calling me because the payment or

15  payment arrangement had not been complied with.

16    Q.    Why would it have been an issue on

17  November 13th that she hadn't complied with an

18  agreement that didn't require any compliance until

19  January?

20    A.    Well, why was Ms. Green attempting to

21  contact Ms. Bearman and she wasn't returning her

22  calls?

CONFIDENTIAL

426

1    Q.   Well, would you agree with me,

2   Mr. Fulcher, that three days later after you first

3   got involved in this matter that payment agreement

4   that the money didn't have to be paid back until

5   January was unraveled and she had to pay the money

6   back immediately?

7    A.   No.  I would say it was already

8   unraveled.  That is how I got involved with it to

9   begin with.

10    Q.   I thought you said when you got involved

11   in it in the first place the understanding was she

12   didn't have to pay the money back until January.

13    A.   You said that.  What I said is that I

14   never saw any documentation to the effect that the

15   payment had to be made in January.

16    JUDGE KHARE:  So, you didn't believe it?

17    THE WITNESS:  It wasn't a matter of not

18   believing it.  What Ms. Green said was that the

19   understanding she had with Ms. Bearman was not

20   being complied with, hence she was trying to

21   contact Ms. Bearman and she wasn't returning her

22   calls.  Otherwise, Ms. Green wouldn't have called

C O N F I D E N T I A L

427

1    me.

2                    BY MR. QUINN:

3        Q.    I will let the record speak for itself,

4    Mr. Fulcher, but my recollection of your testimony

5    was that you told me --

6                    JUDGE KHARE:   Mr. Quinn, if you are

7    letting the record speak for itself, you don't have

8    to re-testify.

9                    MR. QUINN:   That is fine.

10                   JUDGE KHARE:   I have a question

11   backtracking to the accommodation.

12                   Who had the final say so on what

13   accommodation the Agency was going to offer

14   Ms. Bearman.

15                   I mean, once you found one did it have to

16   get approved up the chain?

17                   THE WITNESS:   My understanding, and this

18   is what apparently we acted on, was that the letter

19   from Dr. Presant on December 3rd recommended a

20   reasonable accommodation and the IRS, the

21   impression I had was that that was the

22   recommendation we were going to act on and then do



Exhibit 4

**Terri Bearman**

Call received from Nancy Green explaining that Terri owes approximately $1,300 in backpay for emergency salary payment. Nancy said that Terri had not been returning her calls. I reviewed records at Customer Service and determined that emergency salary had been received by Terri along with regular salary the following pay period creating a balance due. Terri sent a check that pay period which bounced due to insufficient funds.

Certified letter sent to Terri advising her of debt and that it must be repaid.

Received call from Nancy Green saying that Terri called her complaining that she had agreed to pay the debt next January when she filed her tax return. I told Nancy not to negotiated issue but to refer Terri to me or to Nancy[]s manager.

12/9 - Met with Stuart Fields in LR and Madeline Mendola. Discussed Terri[]s request for religious comp. Time. Called Terri an 10:45 and explained that it was not likely her request would be approved and that it would be charged as LWOP. Terri said I could fax her the letter once decision was made later this morning.

12/16 - Meeting held to discuss Terri[]s Reasonable Accommodation. Attending:
Paula Fyne CL:
John R. Burns EOM
Kathy Glover (King) EOM
Julie Berry GLS
Rob Fitzpatrick
Barry Fulcher
Madeline Mendola LR
Joan McIver - LR
Annie Brown - Appeals

12/21 - Terri in office spoke to her about her doctor[]s letter and that it set approximate office hours at 10:00 to 4:00. I explained that she needed to include 30 minutes for her lunch time. She said she did not think that was necessary. I told her I would confirm with LR. I also asked her if she had any questions re: the time and attendance memos that Rob and Sue had sent to all employees (I gave her copies again). She said no and that she would comply. I explained that she had been charged with AWOL for the portions of 3 days during the preceding week - she said that she understood that. Terri said she planned on putting in for leave under the Employee Leave Act. I asked if she

fulcher
EXHIBIT
2  3.11.02

had the forms and she said yes and would not need any assistance. I explained to Terri that while she was in the office she would be expected to do her work in accordance with her performance standards. She said that her doctor[]s excuse allowed her flexibility in that regard, I replied that it only covered her absences. She said she would have doctor[]s note asap explaining her work limitations in greater detail.

Rob and I drafted a memo to Counsel, A/C International and Examination requesting Reasonable Accommodation. I sent e-mail version to Paula Fyne, John R. Burns and Julie Barry for comment prior to sending it.

12/23 - Form on my chair from Terri requesting 480 hours of LWOP beginning 12/28. Also letter from her doctor explaining that Terri is limited in her duties. Spoke to Madeline Mendola in LR. She said that leave request can be approved by me. Terri is required under federal regs. To have lunch time allotted if she works more than 4 hours a day. Also that Terri is expected to work in accordance with her performance standards. Explained same to Terri - she agreed with the lunch provisions but said that she is excused from meeting her performance standards according to her EEO Counselor Eddie Coleman 202-283-7480. Called Julie Barry, she said she will talk to Eddie Coleman for clarification.

Provided Terri her annual appraisal and FY 2000 Performance Standards. I told her that Rob and I will be available to talk to her today. However, after today only Rob until I return on 1/3. Terri said she will need time to review documents and will then discuss.

Met with Rob this a.m and he said that Paula does not want to sent memo and would prefer that executives meet to discuss and do the accommodation. She said she will talk to Dave Williams and let us know his thoughts.

Spoke to EEO Counselor Colman on 12/23 at my home via telephone. I explained Terri[]s claim that she was not required to meet Critical elements and Performance Standards per her conversation with him. Mr. Coleman said that was incorrect and that Terri was required to meet them. I updated him on our letter to EP/EO et al and he said that was a good plan.

1/4 - Prepared and signed memos to A/C Exam, International, Appeals and Associate Chief Counsel notifying them reasonable accommodation request. Memos were prepared with assistance of Julie in GLS. Rob Fitzpatrick and I met with EEO Counselor Edward Coleman and briefed him on actions the Service has taken to reasonably accommodate. Gave him copies of memos. He suggested that we consider the following:

Get opinion from LR/GLS as to whether IRS should modify Terri[]s job standards;

1.  Get opinion from GLS whether it might be construed as coercive if the Service raises the issue of disability retirement;

2.    Determine whether agency can remove employee if they are unable to meet performance standards eventhough disabled.

1/6 - In office in a.m and met with Sue at her request. She said Terri‖s case had come up in a meeting with Dave Williams, Steve Whitlock, Dave Mader and COR. I had a call from Gail Carrol who said that Terri had called the COR‖s office yesterday and that she had made remarks to Steve W. that she might hurt herself. A meeting was planned for 10:10 that would include Steve, Gail, Julie Barry and John Burns and myself. I checked my voicemail prior to going to the meeting and there was a message from Terri saying she would be coming in at 11:00.   I advised Gail of this and Steve suggested and I readily concurred that I should call Terri immediately and advise her not to come into the office. I did so telling Terri that she would be on admin leave today. I called Security leaving an urgent message for Jim May to let him know of the change in Terri‖s status to see what, if anything he wanted to do.

10:10 Meeting - We discussed the case in general and Terri‖s comments in particular. It was agreed that her comments to Steve may or may not be construed as suicidal but that the IRS should come down on the side of caution until someone qualified could make that determination. The process for doing that would be for Julie to contact Dr. Presant who would in turn discuss the issue with Terri‖s physician asap. We also discussed at length the reasonable accommodation issue and what the Service should do in the light of Appeals (Johnnie Brown) continuing consideration of a detail for Terri to that organization. We tentatively agreed that work on the detail should be delayed until the medical issue was resolved.  During the meeting Steve discussed athe meeting that had occurred the preceding day between him, Dave Mader, Dave Williams and COR. Terri‖s case (she was not mentioned by name) had surfaced as an aside and it was discussed that employees should not be allowed to abuse the reasonable accommodation program. On the heels of this meeting had come the call from Terri to COR‖s secretary who transferred the call to Steve.

I had received a call from Paula prior to the meeting asking that I call her back and summarize the meeting. After the meeting I called Paula and explained what had happened and she said that Dave Williams would probably want to discuss the issue. I got a call back soon thereafter and Julie and I went and briefed Dave on what had occurred.

Dave was unhappy with Dr. Presant‖s granting of reasonable accommodation since he may not have had sufficient input from a psychologist or psychiatrist. I told Dave that issue had been raised at the preceding meeting and that John Burns said that Dr. Presant may have worked the issue with other staff doctors. Dave thought that it might be worthwhile to get additional information about that decision making process. I explained to Dave the recommendation that Terri be placed on admin. Leave and he concurred since we could not be certain of her state of mind. Dave agreed that Julie should contact Dr. Presant so he in turn could talk to Terri‖s physician and explain what had happened and decide whether she should remain on admin leave. A letter would go to Dr. Presant and be cleared through Kathy King first who is the reasonable accommodation contact working Terri‖s case. Dave also said he wanted the letter to address the inconsistencies in Terri‖s doctors letters since in one she said Terri could not work but in the

...ater one (once Terri said she was experiencing financial problems) that she could work.

Following the meeting with Dave, I went to LR and spoke to Madeline Mendola regarding the Admin Leave issue as to how to work it. Madeline said that the decision can be made at my level and that a memo to Terri explaining that she is on admin leave would be o.k. I returned to my office and called Terri advising her she would be on admin leave until further notice. Terri was agreeable and asked whether she would be paid while she was on admin leave - I replied in the affirmative. I met with Sue and Rob and briefed them on the days events. Sue was concerned that we should make sure that the issues be worked at the appropriate levels and by the appropriate people. We did not disagree.

Paula called and said that Dave Mader was going to review the case and asked if I could match her file with mine and add any relevant documents. I did so and added a transmittal addressed to her and Dave Williams.

1/7 - I drafted the admin leave memo and sent it to Jule, Madeline, Kathy King for comment. I cc'd Paula, Sue and Rob. Sue told me that Robin would be assisting me in working the case and that she did not want anything else to go out of the office without her o.k.

John Burns called and said that he had spoken to Jonnie Brown and that she was still interested in the detail for Terri and would meet with her Director Dan Black.

1/10 - Worked on wording of Ltr to Terri with Julie, Sue and Robin.

1/11 - Robin and I met with Joan McIver in LR - Madeline and Stuart Fields not available. Discussed draft ltr. and it was reviewed by Joan who said it looked fine. I asked Joan about the Letter of Reprimand for late payment of emergency salary increase, she said she would supports concept. I asked her about progressive discipline, she will check and make sure that a letter rather than other disciplinary action is warranted and call me back today.

I sent copy of ltr. to Julie for comment. I called Debbie Holland X36393 to make sure that Terri's payment cleared the bank (the last check bounced). I also asked about the tax consequences for the 1998 emergency salary payment. Debbie said that a W-2 should have been sent to Terri to report the payment as income and that she (Debbie) will check that out also. 1/12 - Heard back from Debbie Holland. Terri's payment cleared and she was issued a W-2 for 1998 for the emergency salary payment.

Completed letter to Terri after clearing thru LR (Joan McIver) and GLS. Sent it certified and regular mail to Terri.

Received call (voice mail) from Exec. Asst Steve Lisante at A/C International. Steve said they do not have any Atty. positions. I called him back and L/M to call me. I want to get info. In writing along with # of positions they are authorized and whether they anticipate any vacancies or staffing increases.

Met with Joan McIver re: draft Ltr. Of reprimand. Joan will research and make sure that we are

on solid footing for the ltr. I told her of results of telephone call with D. Holland.
Sent e-mail to King and Burns re: info. from A/C International.

1/13 -

Received voicemail and e-mail from Fisher in A/C International - no positions available and
none expected in foreseeable future. Rec[]d call from Terri, she said that she did not receive
anticipated salary - I told her I would check with timekeeper. I also told her that I[]d heard she
had 44 hours of leave contributed to her this pay period. Terri said that she is applying for the
leave bank and next pay period leave will go to that. She said paperwork was sent to Renee
Marbaly already by her.

I called and spoke to Stuart Fields in LR and Julie re: the Reasonable Accomodation guideslines
#27 that indicated that federal agencies must accommodate outside agency if nothing is available
within the agency. This means that Counsel might have to take Terri. Stuart said he will
research.

1/15-

Rec[]d voice mail from Stuart saying he researched the RA issue and that he thinks IRS has to go
to Counsel and outside if necessary. He said he discussed with Julie and that

1/18 -

Rec[]d fax from Terri saying that she is aware that Counsel has 3 positions open and that RA
requires IRS to accommodate her in one of those positions. Sent copy of fax and transmittal to
Stuart, Julie and Paula requesting expeditious resolution of issue. I called Paula and updated her
and she said that Dave Williams is still waiting on letter from Julie asking that an independent
evaluation be done on Terri. I said that the RA issue could be worked independent of that and
that we should not delay it while we await the independent evaluation. She said she will discuss
with Dave.

Rec[]d call from Romona Johnson the office timekeeper. She said that The Leave Donation
Office had incorrectly told her that Terri had 44 hours of leave donated to her in Pay Period One
- (I had communicated to Terri the preceding week that she had received the 44 hour donation
and Terri requested that it be applied to earlier payperiods to offset LWOP). Romona said that
the Leave Donation Office had incorrectly reported to her and that the 44 hours actually
represented **all** donated leave. I asked Romona to provide me e-mail with cc to Rene Marbaly in
Leave Donation to confirm the error and the actual amount of leave that Terri has so I can notify
Terri.

1/20 - Rec[]d verification of leave and faxed short memo to Terri explaining problem. Fax
receipt confirmed. Mailed letter also.

Voice mail from Terri - transcript follows:

Hi Barry this is Terri. It is ten before five on Friday afternoon and I just now received your message. I won't be returning Monday. Number one I have the flu but number two my doctor made it clear that my condition is not going to improve any until some kind of action is taken on my request for Reasonable Accommodation now I have requested an interim accommodation of a 120 day detail. So far nothing from what I can see, nothing has happened. It's the 30 day counseling period has run out and before I return to work I would like to know what, if anything has been done on the accommodation and I think I have made it clear that I cannot return to the position in the Office of Public Liaison. This is just not going to work. So I would appreciate it if you would please inform me as to what the plans are as far as reassigning me and I would like to know that as soon as possible on Monday and if you could tell me. Please call me at home and then follow it up with a letter. I would really appreciate some information and some closure on this because I have other options open to me but returning to that position is not going to be one of them. Thanks

2/1 - Met with Julie, Paula, Robin and Stuart to discuss drafted letter. Made revisions to everyone's satisfaction. Deleted reference to Appeals detail. Paula indicated that Dave Williams did not want to pay for detail and we should check with Appeals to see if they are willing to pay. This may be feasible since we are getting ready to detail a person from Appeals to my office. I will call Annie Brown asap.

2/2 - Made revisions to letter - will try and get it out tomorrow. Called Terri, told her ltr. Should be mailed to her tomorrow and that it addresses Reasonable Accommodation and reconfirms that Admin. Leave was terminated last Friday. She said that she did not think that was adequate notice. I pointed out to her that the decision is final.
Faxed copy of letter to Julie. Sent voice mail to Julie and Stuart Fields.

Tried calling Terri back - no answer - phone only rang. Will try again later.
Ditto above.

2/3 - Sent ltr. Certified and regular mail to Terri outlining actions taken to achieve RA. Call made to Annie Brown to see if they will absorb cost of Terri's detail as we are picking up costs associated with an Appeals employee. L/M/T/C
Later - Spoke to Annie, she said that she does not expect that Appeals will be able to pickup funding for detail due to costs. She will check with Dan Black and get back to me shortly.

2/4 - Worked on letter to Terri explaining that she will need medical clearance soon after return to work. Stuart ████████ are supportive of this approach based on Terri's doctor's mixed messages about her condition. Overriding concern is for her welfare and employees. Julie sent her draft ltr. Around for review. Focus of ltr. Is to seek clarification on Terri's condition based on mixed messages from Terri's physician.
Paula said Dave W. reviewed ltr and agreed with it.

2/8 - Received acknow. Fax from Terri that she rec'd ltr that I sent her. Ltr. Thanks me for the

information I provided and said she will be into work on Monday.  Ltr dated 2/8 in error - I received ltr. 2/8 and Terri writes that she will be in office on Monday - she was planning on coming 2/7.  Rec'd e-mail from Annie - Appeals cannot fund detail - it is now a closed issue.

I was out on 2/7 - VMS fro Terri, []something came up - will not be in[].  VMS from Terri on 2/8 - will not be in, not feeling well.

Rec'd call from John Burns.  He rec'd call from Va.-WV District[]s Sue Williams 804-916-8700 re: request for RA.  She is seeking additional time to respond.  John told her she needs to clear that with me.  I will call her on 2/9.

2/9 - VMS from Terri - []back is bothering me, I won[]t be in, maybe in this afternoon.  T/C to Sue Williams - L/M/T/C me.  Rec'd call from Sue Williams - she requested until 2/22 to respond to memo.  I agreed.

2/14 - 2/15 - I was out of office on leave, Terri came in on Monday and Tuesday.

2/16 - Spoke to Julie, she said Richmond District said they may have a GS-12 atty position available at Bailey[]s Crossroads, Va. That Terri would be eligible for.  She is checking out pay retention possibilities now.  I conveyed info. To Paula, John Burns and Stuart.  Julie is going to review ltr. To Terri that I wrote re: obtaining medical certification. ███████████████ ████████████████████████████████████████████████ Julie also said that EEO wants the Dr. Present ltr to come from me since I am Terri[]s employer.  I will review that.  Terri called saying she will not be in today (initially this a.m she called on my voice mail saying she would be in at 12:30.  Both messages were on voice mail.

2/18 - Rec'd voice mail from Va/WV ADD Wm. Robertson, he said they will pay salary difference if it is o.k with GLS and NO.  I Relayed message to Julie.  Rec'd memo from Exam - they have no 905 atty positions.

3/1 - Ltr drafted to Terri authorizing RA.  I am holding it pending response from Md-Del re: RA request.  Phoned Md-Del staff asst Kim Sasajima 410-962-3084 asking for response to memo.  I e-mailed Marie Medeck the AD but she is out for the rest of the week.  Kim said she will check and call me back asap.  I phoned William Robertson the AD in VA-WV District asking for something in writing that they will offer Terri the job with pay retention.  He asked me to call his chief Personnel, Cindy Powell to resolve the authorization for the pay retention.  He said the pay retention is o.k but he thought GLS would want to provide some background on it to Cindy.

3/6 - Rec'd fax from Richmond Va. Saying they will offer position to Terri along with pay protection.  I called EEO (John Burns), Stuart Fields and Julie Barry and updated them on the offer.  I put the finishing touches on the offer letter for Terri and will present it to her on 3/7 in the company of EEO and Stuart..

3/7 - Terri not in - I called her and left a message to call me.

3/8 - Terri not in, message from her said she would like to receive offer by fax and then discuss in the p.m. I voice mailed John, Julie and Stuart asking if they are o.k with that. Sent Terri an e-mail requiring SF-71s for missed time and for future leave.

3/9 - Rec'd mssg. From Terri on voice mail - she is unhappy about not yet being in the Leave Bank and threatened to file amend her EEO complaint to include me if it was not resolved by next week. I'd met with the timekeeper previously to review problem and it appears to be rooted in Terri's failure to submit leave slips and time sheets.

3/13 - Recd voice mail from Gina Reyes - adjustment made on time cards and Terri should be in leave bank in near future.

3/13 - Called Stuart re: an e-mail I received from Terri last week while I was out saying she cannot fill out the SF-71 due to hand tremors but that she can sign them if I have them filled out for her. If this is the case, then how can she do her job?? I discussed with Stuart and Julie and we will wait to see results of whether she accepts or rejects the offer later this week.

*Exhibit 5*

DECEMBER 21, 1999

MEMORANDUM FOR DISTRIBUTION

FROM:              CHIEF, BUSINESS LIASION   CL:SB

SUBJECT:           Attorney-Advisor [] GS-905 Series positions

General Legal Service and Human Resources advised us to send this request
for reasonable accommodation of an employee that has requested reassignment
to the Office of Chief Counsel. Please advise whether you have any vacancy to
accommodate an individual with a disability.

We would appreciate your response by December 30, 1999. General Legal
Services also advised that the Internal Revenue Service must accommodate this
individual and therefore we are sending this request to all parts of the Service
(within the commuting area) that we are aware of as having GS-905 series
positions.

If you need further background concerning this matter, please contact Julie Barry
in General Legal Services at 283-7912, John Burns in Human Resources at 622-
8367 or call me directly at 622-6051.

Distribution:
Associate Chief Counsel (F&M)  CC:F&M
Assistant Commissioner (Examination)
Assistant Commissioner (International)
National Director of Appeals



0000005

000024

Exhibit 6

February 3, 2000

Ms. Theresa E. Bearman
2911 South Dinwiddie Street
Apartment C-2
Arlington, Virginia 22206

Dear Terri:

The purpose of this letter is to confirm in writing a voice mail message I left at your home last week, to address your voice mail reply to me, and to respond to the concerns raised in your January 30, 2000 letter to me, which I received on January 31.

On Friday, January 28, 2000, at about 3:15 p.m., I left a voice mail message at your home informing you that your administrative leave status was being terminated effective close of business that day. I also informed you that the Service would continue to allow you to work a flexible schedule in your present position, as requested by Dr. Judith A. Nowak, your treating physician, in her December 3, 1999 letter to Joan C. McIver, Acting Chief, Labor Relations Section.

I received Dr. Nowak's January 21, 2000 letter on January 28, 2000. In accordance with that letter, and the fact that you informed me you are suffering from influenza, you will continue in an approved leave status (sick leave, annual leave, or leave without pay, depending on your preference and leave account availability) until further notice. This decision takes into consideration the concerns raised in your January 28, 2000 voice mail to me, Dr. Nowak's most recent medical opinion and your January 30, 2000 letter.

Terri, as requested in your January 30, 2000 letter I am providing you an update of the Service's efforts to achieve an appropriate reasonable accommodation for you. I have been in contact with the Office of the Assistant Commissioner (Examination) and expect to receive a reply from that office in the next several days as to whether they are able to offer you a GS-905-14 position.

I have also been in contact with the Office of the Assistant Commissioner (International) regarding appropriate reassignment possibilities. On January 18, 2000, I was informed that they do not have any vacant GS-905-14 positions and do not believe they will have any such positions in the near future.

I also asked the District Directors for Virginia-West Virginia and Delaware-Maryland to

Fulcher
EXHIBIT
bab 7 3-19-02

000026

0000017

2

determine if they can assist you within our commuting area. I expect to hear back from them by mid-February.

We have been in contact with the Office of the Chief Counsel in an effort to reasonably accommodate you. However, that office is not part of the Service and the Service has no authority to offer you a position outside the agency. Nevertheless, we shared your resume with that office and informed them of your interest. I understand you have applied for vacant positions in the Office of the Chief Counsel and encourage you to continue to apply for all positions for which you qualify and are interested.

Terri, I hope this addresses your immediate concerns regarding your leave status and the Service□s continuing efforts to obtain an appropriate reasonable accommodation for your medical condition. If you wish to discuss the contents of this letter, or have any questions, please give me a call on (202) 622-6051.

Sincerely,


Barry P. Fulcher
Chief, Business Liaison

cc: Joan A. McIver
    John Burns
    Steve Whitlock

000027

0000018

POSITION DESCRIPTION *(Please Read Instructions on the Back)*

| | |
|---|---|
| **2. Reason for Submission** | |
| ☐ Redescription   ☐ New | **1. Agency Position No.** 544-94 |
| ☐ Reestablishment   ☐ Other | |
| **3. Service** ☐ Hdqrs.   ☐ | **6. OPM Certification No.** |
| **4. Employing Office Location** Washington, DC | **5. Duty Station** Washington, DC |

**...ation (Show any positions replaced)**

...NK CHANGES FOR
... RGANIZATIONAL TITLES.  DLD 8/96

| | |
|---|---|
| **7. Fair Labor Standards Act** ☐ Exempt   ☐ Nonexempt | **8. Financial Statements Required** ☐ Executive Personnel Financial Disclosure   ☐ Employment and Financial Interests |
| **10. Position Status** ☐ Competitive   ☐ Excepted (Specify in Remarks)   ☐ SES (Gen.)   ☐ SES (CR) | **9. Subject to IA Action** ☐ Yes   ☐ No |
| | **11. Position is:** ☐ Supervisory   ☐ Managerial   ☒ Neither 5 | **12. Sensitivity** ☐ 1—Non-Sensitive   ☐ 3—Critical Sensitive   ☒ 2—Noncritical Sensitive   ☐ 4—Special Sensitive | **13. Competitive Level Code** 0466 |
| | | | **14. Agency Use** |

**15. Classified/Graded by**

| | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| **a. U.S. Office of Personnel Management** | | | | | | |
| **b. Department, Agency, or Establishment** | | | | | | |
| **c. Second Level Review** | | | | | | |
| **d. First Level Review** | Program Analyst | GS | 343 | 14 | DD | 8-6-96 |
| **e. Recommended by Supervisor or Initiating Office** | | | | | | |

**6. Organizational Title of Position (if different from official title)**
Senior Program Analyst

**17. Name of Employee (if vacant, specify)** Woldimar...

**8. Department, Agency, or Establishment**
Internal Revenue Service

**a. First Subdivision**
Office of the Commissioner

**b. Second Subdivision**
Small Business Affairs

**c. Third Subdivision**

**d. Fourth Subdivision**

**e. Fifth Subdivision**

**Employee Review—This is an accurate description of the major duties and responsibilities of my position.**

**Signature of Employee (optional)**

**...ory Certification.** *I certify that this is an accurate statement of ...duties and responsibilities of this position and its organizational ...lationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the* knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

**Typed Name and Title of Immediate Supervisor**
Barbara Jenkins
Director, Small Business Affairs

**b. Typed Name and Title of Higher-Level Supervisor or Manager (optional)**
Darlene Berthod
Chief of Staff

| Signature | Date | Signature | Date |
|---|---|---|---|
| | | | 3/4/96 |

**Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

**22. Position Classification Standards Used in Classifying/Grading Position**
OPM Administrative Analysis Grade Evaluation
Guide  TS-98,  8/90

**...ed Name and Title of Official Taking Action**
Sylvia McCormick, Section Chief
Commissioner's Complex Personnel Section

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| Signature | Date |
|---|---|
| | 8-6-96 |

**Position Review**

| | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Employee (optional) | | | | | | | | | | |
| Supervisor | | | | | | | | | | |
| Classifier | | | | | | | | | | |

**Remarks**

NO PROMOTION POTENTIAL EXISTS IN THIS POSITION.   NBU
MANAGEMENT OFFICIAL

**Description of Major Duties and Responsibilities (See Attached)**

000048

7540-00-634-4265    Previous Edition Usable

5008-106

OF 8  (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

## Small Business Affairs
## Program Analyst 343/14

### A. Major Duties

As a program analyst in the Small Business Affairs Office, the incumbent is involved in responsible and confidential services on projects delegated by the Director. These projects are related to policy and operational issues at the highest level in the Internal Revenue Service and involve integrating or coordinating activities across IRS organizational lines with other Federal agencies, members of the small business community, and other outside groups.

He/she is frequently called upon to represent the Director both within and outside the Service. Specifically the incumbent;

Compliance

- Plans, coordinates, and directs studies of projects to assess how well IRS' policies, processes, procedures, and practices meet the needs of the small business community.

- Identifies and advises the Director, Small Business Affairs, on concerns and issues of the small business community.

- Initiates and fosters actions that address small business needs as well as further the IRS mission.

Examination

- Analyzes/reviews current Service policies, programs, and procedures to advise the Director of their potential impact on small business taxpayers.

- Using systems management techniques, formulates and recommends to the Director changes to policies, practices, procedures, and processes to improve work methods and develops and recommends new strategies and policies to enhance current programs.

- Maintains effective liaison with all organizational entities in IRS, a wide range of Federal departments and agencies and state and local governments and members of the small business community concerning tax administration.

- Identifies and informs the Director of areas of tax law that may confuse small business taxpayers or create an unfair burden or inequity.

- Acts as a liaison for small business taxpayers and organizations to communicate concerns regarding the Service's policies, practices, processes, procedures, regulations, and tax laws.

000049

2

- Provides guidance and advice to IRS components regarding small business issues and needs.

- Responsible for identifying small business values and needs and initiating their incorporation in customer-valued actions in the Service's Business Master Plan.

- As directed serves as personal representative of the Director on committees, task forces, to other agencies, the Congress, tax authorities and the public on matters within his/her functional area. Assignments may involve the resolution of issues of concern to the Director, Commissioner or to the IRS.

B.    Factors

1.    Knowledge Required by the Job

Expert knowledge of the Internal Revenue Service, and administrative and management procedures, policies, and related portions of the Internal Revenue Manual.

An exceptional ability to meet and deal harmoniously with a variety of contending viewpoints as well as an exceptional ability to develop and maintain effective communications and interpersonal relationships with individuals at all levels of the organization, i.e., senior management officials in National Office, other Government agencies, members of the small business community and other members of the private sector.

An excellent understanding of, and the ability to apply, systems management techniques.

Expert ability to communicate effectively, convincingly, and persuasively, both orally and in writing.

Expert skill to establish effective controls and monitoring of work progress, make or recommend adjustments promptly and decisively, and take measures to prevent recurrence or errors.

Comprehensive knowledge of ongoing program activities of other Service functional areas.

An extensive understanding of the Service's activities with external stakeholders.

General knowledge of Compliance operations.

000050

*Extensive knowledge of Examination activities, policies, and programs.

3

Good skill in effectively accomplishing assigned objectives within appropriate time constraints.

2.    Supervisory Controls

General supervision is provided by the Director, Small Business Affairs and is limited to setting overall objectives for assignments. The incumbent is given wide latitude to exercise sound judgment and to independently plan and execute assignments, coordinating the work with others as necessary. The incumbent is delegated total responsibility to independently evaluate and analyze programs, issues, and prioritize duties to accomplish desired results. Work products are normally accepted as authoritative. The supervisor is consulted only to secure concurrence on especially controversial issues. Results of the work are accepted without significant changes in the majority of situations. The work is reviewed in terms of accomplishment of objectives and conformance with policy.

3.    Guidelines

Broad policy directives set the parameters for assignments. However, specific guidelines are often inadequate. Substantial individual initiative, resourcefulness, thoroughness, judgment, diplomacy and tact are required to interpret, adapt and apply broad guidelines to specific situations. The incumbent uses independent judgment and discretion to interpret and revise existing policy and guidelines. Often the incumbent must develop new guidelines and is recognized as an expert in the specialized area of responsibility.

4.    Complexity

The work is professional in nature and complex in that it covers the entire spectrum of the Internal Revenue Service, its programs, operations and relationships and involves participation with high levels of agency management. Special projects and studies undertaken often require novel analysis of interrelated and conflicting issues; and innovative approaches in their design, methodology, and implementation. The incumbent determines the criteria to evaluate the effectiveness of complex programs impacting his/her assigned area. Incumbent identifies deficiencies and strengths of programs while devising unique and imaginative methods to maximize program effectiveness.

5.    Scope and Effect

The work performed provides authoritative information and analyses that form a

\* Use as selective placement factor.

000051

4

basis for decisions affecting major current and long-range policies and programs that affect the activities and operations of the IRS as well as external stakeholders. Recommendations made will often result in substantive program changes, procedural changes, revised program emphasis, or organizational changes within the IRS.

6.    Personal Contacts

Contacts are with executive and managers at all levels within the Service and with top level officials in Treasury, other government departments, members of the small business community as well as other members of the private sector.

7.    Purpose of Contacts

Contacts are to convey the Director's views and conclusions; participate in planning sessions, discuss problems of mutual concern and, if necessary, persuade others to accept a different course of action and, if necessary, to negotiate compromises among stakeholders with competing objectives or resources.

8.    Physical Demands

There are no unusual requirements. However, frequent travel to various field offices and seminars sponsored by professional groups, frequently on short notice, requires above-range stamina and the physical ability to adapt to time-zone changes.

9.    Work Environment

Work is performed primarily in an office setting, frequently under time constraints.