COPY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF COLUMBIA
 3
 4  - - - - - - - - - - - - - - - - -x
 5  TESSA E. BERGMAN           :
 6          Plaintiff          :
 7      vs.                    :  Case No: 06-0303 (GK)
 8  JOHN W. SNOW, SECRETARY     :
 9  U.S. DEPARTMENT OF THE TREASURY   :
10          Defendant          :
11  - - - - - - - - - - - - - - - - -x
12
13                    Washington, D.C.
14                  Monday, March 12, 2007
15
16
17  Deposition of:
18              TESSA E. BERGMAN
19  the Deponent, called for examination by counsel for the
20  Defendants, pursuant to notice and agreement as to time and
21  place, at 501 3rd Street, N.W., Room 3811, Washington, D.C.,
22  before Heather Kilbourne, a Notary Public in and for the
23  District of Columbia.
24
25
```

Page 2

```
 1  APPEARANCES:
 2              On Behalf of the Plaintiff:
 3              JOHN D. QUINN, ESQUIRE
 4              910 16th Street, N.W.
 5              Fifth Floor
 6              Washington, D.C.  20006-2992
 7              (202) 833-4170
 8
 9              On Behalf of the Defendant:
10              RHONDA FIELDS, ESQUIRE
11              Assistant United States Attorney
12              501 3rd Street, N.W.
13              Washington, D.C.  20530
14
15              On Behalf of the Internal Revenue Service:
16              DEANNE SOBCZAK, ESQUIRE
17
18
19
20
21
22
23
24
25
```

Page 3

```
                              I N D E X
WITNESS:            EXAMINATION:              PAGE:
Tessa Bergman       Direct - Ms. Fields        4
                    Cross - Mr. Quinn          82
                    Redirect - Ms. Fields      83


                        E X H I B I T S
EXHIBIT NO.:            DESCRIPTION:            PAGE:
     1          Correspondence from Mr. Fulcher    61
     2          Correspondence from Mr. Fulcher    62
                dated December 15, 1999
     3          Letter from Dr. Nowak dated        73
                October 11, 1999
     4          Letter from Dr. Nowak              78
```

Page 4

```
 1              P R O C E E D I N G S
 2                    (11:49 a.m.)
 3  Whereupon,
 4              TESSA E. BERGMAN
 5  was called as a witness and after having been first duly
 6  sworn, was examined and testified as follows:)
 7              DIRECT EXAMINATION
 8      BY MS. FIELDS:
 9      Q. My name is Rhonda Fields and I'm an Assistant U.S.
10  Attorney representing the Defendant in this matter.  We're
11  here to take the deposition of Ms. Bergman --
12      A. Bergman.
13      Q. -- Bergman concerning her complaint of
14  discrimination in relation to her disability, retaliation and
15  hostile work environment.  Could you state your full name for
16  the record, please?
17      A. Tessa Elaina Bergman.
18      Q. Okay.  And, Ms. Bergman, you understand that this is
19  your deposition --
20      A. Yes.
21      Q. -- and a deposition is merely a discovery taking
22  mechanism in a civil matter?
23      A. Yes.
24      Q. You yourself are an attorney, is that correct?
25      A. That's correct.
```

Page 5

1    Q. So you understand what a deposition is?
2    A. Yes, I do.
3    Q. Have you taken depositions before?
4    A. No, I haven't taken depositions before, no.
5    Q. Have you ever been deposed before?
6    A. Yes.
7    Q. Okay.
8        MR. QUINN: And let me just say something here. You
9   know, she's already been deposed once and has testified once
10  about all these same subject matters so I, first of all, hope
11  we don't have to redo old ground but, secondly, you know, to
12  the extent that the earlier deposition was taken much more
13  proximate -- the time of the OA deposition was much more
14  proximate to the events that happened, she, of course -- Ms.
15  Bergman would reserve the right, of course, to refresh her
16  recollection by reading that deposition, so whatever she said
17  in the earlier deposition would likely be more --
18        WITNESS: Accurate.
19        MR. QUINN: -- more accurate in terms of facts.
20        MS. FIELDS: Okay, thank you.
21        BY MS. FIELDS:
22   Q. Now, Ms. Bergman, you've been deposed before?
23   A. Yes.
24   Q. Okay. In this matter?
25   A. Yes.

Page 6

1    Q. Have you been deposed in any other matters?
2    A. No.
3    Q. Okay. Now you understand, of course, that your
4   testimony is under oath the same as if you were in court?
5    A. Absolutely.
6    Q. And pursuant to the penalties of perjury?
7    A. Absolutely.
8    Q. Now when did your name change to Bergman from
9   Bearman?
10   A. Oh, about two, three years ago.
11   Q. Okay. And that is a legal name change?
12   A. Yes --
13   Q. Is it a marital --
14   A. -- by court order.
15   Q. By court order.
16        REPORTER: Can you spell your name originally, first
17  name?
18        WITNESS: My original name is Theresa, T-H-E-R-E-S-
19  A, Ellen, E-L-L-E-N, Bearman, B-E-A-R-M-A-N.
20        BY MS. FIELDS:
21   Q. And it was changed to Bergman, B-E-R-G-M-A-N.
22   A. Um-hum.
23   Q. And what court was it changed to Bergman in?
24   A. I forget. I have a copy of the court order.
25   Q. Do you remember what state?

Page 7

1    A. Well, I live in Virginia.
2    Q. Was it a court in Virginia?
3    A. Yes.
4    Q. Okay. And may I -- what's the reason you changed
5   your name?
6    A. Personal reasons that have no bearing on the present
7   action.
8    Q. Now during 1999, where were you living?
9    A. I was living in Alexandria, Virginia.
10   Q. And what was your street address there?
11   A. 2911 S. Dinwiddie Street, D-I-N-W-I-D-D-I-E, Street,
12  Apartment C-2.
13   Q. Okay. And where are you currently residing?
14   A. 2102 Arlington Terrace, Alexandria, Virginia.
15   Q. And do you reside with anyone?
16   A. I have a roommate.
17   Q. Okay. And did you reside with anyone in 1999 --
18   A. No.
19   Q. -- at Dinwiddie? When did you acquire a roommate?
20   A. Yesterday.
21   Q. Okay. Prior to yesterday, had you lived alone?
22   A. Yes.
23   Q. When you lived in Alexandria, how did you commute
24  back and forth to work?
25   A. I drove.

Page 8

1    Q. Okay. And where was your work located?
2    A. National office downtown on Constitution Avenue.
3        MR. QUINN: You're talking about 1999?
4        MS. FIELDS: Yes.
5        MR. QUINN: Yeah, okay.
6        BY MS. FIELDS:
7    Q. And you left Constitution Avenue for a position in
8   Virginia, is that correct?
9    A. That's correct.
10   Q. And where is that located?
11   A. Bailey's Crossroads, 5205 Leesburg Pike, Falls
12  Church, Virginia.
13   Q. And how do you get back and forth to work?
14   A. Well, I work flexi-place, so I work from home most
15  of the time. The occasional times that I go into my POD, I
16  drive.
17   Q. Okay. How long have you been working flexi-place?
18   A. About six years.
19   Q. Now Dr. Nowak --
20   A. Nowak.
21   Q. Nowak, thank you. I didn't know that. She became
22  your physician sometime in 1996, is that correct?
23   A. She treated me for medication beginning sometime in
24  the 1990s, and then in the late 1990s she also began treating
25  -- well, became my therapist, as well.

| Page 9 |
| --- |

1    Q. Okay. Who is Betty Anne Ottinger?
2    A. She was my previous therapist.
3    Q. Okay.
4    A. She's not an M.D., so I had to see Dr. Nowak for
5 medication.
6    Q. Okay. So what kind of therapist is she, though?
7    A. She's a Ph.D. in psychiatric social work.
8    Q. And how long did you see Dr. Ottinger?
9    A. Oh, on and off for 20 years.
10    Q. And when you began with Dr. Nowak, were you still
11 seeing Dr. Ottinger?
12    A. When I began with Dr. Nowak for medication only, I
13 was seeing Dr. Ottinger for therapy.
14    Q. Okay. And how often did you see Dr. Ottinger for
15 therapy?
16    A. About once a week.
17    Q. Now in 1991 approximately you were hospitalized for
18 major depression, is that correct?
19    A. Yes.
20    Q. What was that -- do you know what caused that
21 depression?
22        MR. QUINN: Well, I'm going to object to the form of
23 the question, first of all. She's not a medical expert. She
24 can't give medical testimony.
25        MS. FIELDS: I'm not asking for medical testimony.

| Page 10 |
| --- |

1        MR. QUINN: You're asking for a layperson's
2 understanding of --
3        BY MS. FIELDS:
4    Q. Would you tell me your understanding of what caused
5 that episode?
6    A. I didn't like my work. I was living in Chicago and
7 I had no family or friends. I was isolated, completely
8 isolated, and things were -- to the best of my recollection,
9 things were not going very well for me, and I couldn't work
10 any more, and my doctor decided that I needed to be
11 hospitalized.
12    Q. And what was your work at that point in time, what
13 were you doing?
14    A. I was with a private law firm and I was a tax
15 attorney.
16    Q. And what was it about your work that you didn't like
17 at that time?
18    A. I was constantly being reprimanded in front of my
19 peers for things that I didn't understand. I was -- I had
20 been lied to about the terms of my employment, and I couldn't
21 do anything about it once I got there. And it was a very
22 unfriendly and very personally abusive atmosphere.
23    Q. What law firm was that?
24    A. I was at two law firms, Maya, Brown and Pratt, and
25 Sonenshine, Napp and Rosenthal (phonetic sp.).

| Page 11 |
| --- |

1    Q. And which was the law firm where you indicate you
2 were reprimanded?
3    A. That was in Sonenshine.
4    Q. Sonenshine. You say that you were lied to about the
5 terms of your employment?
6    A. Yes.
7    Q. What lie was made to you?
8    A. They had a very complicated description of the
9 compensation package, and I was led to believe that I would be
10 making a certain amount of money, and it turned out that they
11 misrepresented the amount of money that I would be making.
12 That's the best I can recollect at this time.
13    Q. Okay. And how long were you hospitalized?
14    A. Two months.
15    Q. Did you attempt suicide?
16    A. No.
17    Q. Any suicidal thoughts?
18    A. What they call suicidal ideation, but never did I
19 ever entertain thoughts of actually acting on it.
20    Q. Okay. I take it there came a time when you left
21 Sonenshine?
22    A. Yes, when I felt I could not function any more.
23    Q. Was that before or after your hospitalization?
24    A. Before.
25    Q. Now after your hospitalization -- approximately when

| Page 12 |
| --- |

1 was that, by the way?
2    A. The summer of 1991.
3    Q. After your hospitalization, what did you do in terms
4 of employment?
5    A. I moved back to Washington and I spent all my time
6 looking for a job. We were in the middle -- if you recall, in
7 1990 there was a terrible recession, '91. I worked part-time
8 for a very significant other of a friend, but then both of my
9 parents became very seriously ill. They lived in New Jersey.
10 My mother had cancer and my father was in an acute depression,
11 and I had to go and take care of both of them.
12    Q. And how long did you take care of them?
13    A. Six months, and I had to live with them at the time
14 to do that.
15    Q. Now were you in therapy at that time?
16    A. No.
17    Q. Okay. And what happened to your parents?
18    A. They both got better. They got divorced. And I
19 eventually got back to Washington and obtained employment in
20 January of '93.
21    Q. And where did you obtain employment?
22    A. I worked for Congressman William Jefferson.
23    Q. What did you do for Congressman Jefferson?
24    A. I was his tax counsel and legislative director.
25    Q. What does that involve, what do you do?

Page 13

1   A. He was on the House Tax Committee, so I was
2 responsible for monitoring all legislation -- legislative
3 proposals, going to all the hearings, preparing him for
4 hearings, preparing questions for people who are going to
5 testify before the Committee, dealing with constituents who
6 had tax problems, dealing with constituents who had tax
7 proposals. I also oversaw -- there was one other legislative
8 assistant and I oversaw some of the areas -- she did Budget
9 and Appropriations, and I oversaw -- she was new, so I made
10 sure she understood what it was to be a legislative assistant
11 and kept tabs on her committee work, and also did some work
12 for the Congressional Black Caucus because Mr. Jefferson was a
13 member.
14   Q. And how long were you with Mr. Jefferson?
15   A. For two years.
16   Q. That's January '93 to approximately '95?
17   A. Yes.
18   Q. And were you undergoing any therapy during that
19 period of time?
20   A. Yes.
21   Q. With whom?
22   A. A Dr. Stewart Gorman.
23   Q. And what were you under therapy for?
24   A. It was following up from my hospitalization for
25 clinical depression and Anxiety Disorder.

Page 14

1   Q. Were you clinically depressed at all during that
2 period of time?
3   A. Yes. I have never not been clinically depressed.
4   Q. Okay. Did you have to take off any time from your
5 work while you were working for Mr. Jefferson due to your
6 clinical depression?
7   A. Periodically.
8   Q. When you say periodically, can you give me an
9 estimate of what you mean?
10   A. The months of November and December are particularly
11 difficult because of the lack of daylight. I also suffer from
12 Seasonal Affective Disorder, and there were times when I would
13 have to take some leave time because -- just couldn't get it
14 together.
15   Q. Approximately how long have you suffered from
16 Seasonal Affective Disorder to your knowledge?
17   A. All my life, as long as I've known that it existed.
18 Let me put it that way.
19   Q. Okay. Which would be -- you need to give me
20 approximately when.
21   A. Twenty years.
22   Q. And approximately how long did you have to take off
23 in November and December?
24   A. Usually just a day or two.
25   Q. Were you ever unable to work for an extended period

Page 15

1 of time while you were working for Mr. Jefferson?
2   A. No.
3   Q. And after working for Mr. Jefferson where did you go
4 to work?
5   A. I went to work for the Legislative Affairs Office at
6 the IRS.
7   Q. Okay. What was your position there?
8   A. I was a Legislative Analysis Officer.
9   Q. And what does that job involve?
10   A. Most of us were attorneys. Most of us had advanced
11 degrees in tax law. I had responsibility for all the
12 international tax legislation in that office. We analyzed all
13 the legislative proposals that were before the Tax Committees
14 on Capitol Hill. We were responsible for coming up with or
15 creating legislation that various offices within the IRS
16 deemed necessary. They would come to us if they felt they
17 needed legislation to accomplish something that they needed.
18 And when legislation was passed, we were the office that was
19 responsible for putting together an agency-wide implementation
20 plan of the new legislation.
21   Q. Who was your supervisor, direct supervisor, in that
22 position?
23   A. I can't remember his name. You'd have to look to my
24 prior.
25   Q. How many other Legislative Analysis Officers were

Page 16

1 there approximately?
2   A. There was somewhere between 10 and 12.
3   Q. And did you all do approximately the same thing --
4   A. Yes.
5   Q. -- just in different subject matter areas?
6   A. Yes.
7   Q. Okay. And did you continue in therapy while you
8 were with the Legislative Affairs Office at IRS?
9   A. Yes. I've been in therapy continually since 1991.
10   Q. Okay. Now did you have to take off any time from
11 work due to your depression while you were with the
12 Legislative Affairs Office?
13   A. Never more than you would have had to take off for
14 having a common cold.
15   Q. Okay. When you had to take off, for what reason
16 would have you have to take off for when you were with
17 Legislative Affairs?
18   A. The symptoms of depression are most of the time -- I
19 have what's called a chronic low grade depression, which means
20 -- it's as if you look at the world and you see it in colors,
21 and I look at the world and I see it in just shades of gray.
22 And you don't feel the upper range of emotions, and --
23   Q. When you say upper ranges, do you mean happiness?
24   A. Happiness, the good emotions.
25   Q. Okay.

Page 17

1    A. Excessive fatigue, feelings of hopelessness, of
2  loneliness, inability to just overcome a certain amount of
3  inertia.
4    Q. And when you took off, that was because you could
5  not do what at your job?
6    A. I couldn't get there.
7    Q. Okay. You couldn't get out of bed?
8    A. Sometimes.
9    Q. How often did that occur while you were with
10 Legislative Affairs?
11   A. Rarely.
12   Q. Rarely. Other than not being able to get out of bed
13 rarely, were those the occasions when you couldn't get there,
14 when you couldn't get out of bed?
15   A. Yes.
16   Q. and what did you do?
17   A. I stayed in bed.
18   Q. Did you have to -- did you talk to your therapist
19 about changes in medication?
20   A. Yes. That was always the resort. When I was with
21 Dr. Ottinger, because she was not an M.D., she did have the
22 facility with the psychokinetic drugs that Dr. Nowak has, but
23 she would send me to Dr. Nowak and we would talk about
24 changing my medication regimen to give me a little more of a
25 stimulant effect so that these things didn't happen.

Page 18

1    Q. And was that successful during that period of time?
2    A. More often than not, yes.
3    Q. Okay. Now when you say you couldn't get out of bed,
4  would that be for hours or in the morning or for a day, for
5  how long?
6    A. Usually in the mornings.
7    Q. But once you became stabilized you were able to go
8  back to work?
9    A. Yes.
10   Q. Okay. Were you able not to carry out the functions
11 of your job?
12   A. No.
13   Q. You could always carry out the functions of your
14 job?
15   A. Yes.
16   Q. And what would you say were the major functions of
17 your job?
18   A. Which job are we talking about?
19   Q. We're talking Legislative Affairs Officer.
20   A. I think I already told you what the major functions
21 of that job were.
22   Q. Well, clarify it for me because I'm not familiar
23 with the job.
24   A. I analyzed legislation that was -- pending
25 legislation before the Tax Committees, legislation that had

Page 19

1  been passed into law, legislation that offices in the IRS
2  asked us to draft and present to the Tax Writing Committees
3  for consideration.
4    Q. I see.
5    A. And when tax legislation was passed into law, which
6  meant that the IRS had to administer the new legislation, we
7  had to figure out what every office in the Agency had to do to
8  be able to implement this new legislation. This was called an
9  Implementation Plan. So those were the major duties in that
10 job.
11   Q. Did you interact with people on the hill?
12   A. Oh, yes.
13   Q. What about what the IRS may call clients?
14   A. One piece of legislation I handled entirely on my
15 own. I negotiated with a staff director of one of the
16 subcommittees on the House side. I helped draft the
17 legislation. When it was passed into law I did the
18 Implementation Plan for the entire IRS, and I received a
19 commendation from the Commissioner for my work on that
20 project.
21   Q. Now when did your position with Legislative Affairs
22 end approximately?
23   A. There was reorganization going on and I -- it ended
24 around September of 1998.
25   Q. Okay. And what did you do in relation to that

Page 20

1  reorganization?
2    A. I wanted to go back to Chief Counsel and I had had a
3  conversation with the new chief of our function. We were
4  within the communications and legislation function —
5  communications and liaison function, and the chief was a
6  former colleague of mine and I told him that it was my desire
7  to go back to Chief Counsel, but he mentioned that there was a
8  new office being started and it was a combined office that
9  would later be separated out. Basically it had to do with
10 small business issues, and that the Commissioner was very big
11 on this. This was — the new Commissioner was Commissioner
12 Rosati (phonetic sp.), and this issue was very important to
13 him and that I might want to consider working as the legal
14 expert in that office.
15   Q. And who was the person that you were talking to?
16   A. His name was David Williams.
17   Q. Okay. Did you talk to anyone else about the
18 position?
19   A. Yes. He told me to talk to the woman who was the
20 Acting Director at the time. Her name was Suzanne Sottile.
21   Q. Would you spell that for the court reporter?
22   A. Suzanne, S-U-Z-A-N-N-E, Sottile, S-O-T-T-I-L-E.
23   Q. And did you talk with her?
24   A. I did talk with her and —
25   Q. Tell me about that conversation.

Page 21

1    A. It was very kind of amorphous because the -- again,
2    the office was new. She only had a staff of nine people. She
3    was doing double duty. It was supposed to be both small
4    business affairs and nationally public liaison, which meant
5    that we dealt with what they call stakeholders, people on the
6    outside who have small business tax issues with the IRS, and
7    we were supposed to be the liaison between these people and
8    the other functions of the IRS. And it sounded interesting to
9    me. It sounded like I would have a lot of leeway and that
10    there would be some creativity in the job, and that I would be
11    like her right-hand person.
12    Q. What types of things did she tell you you would be
13    doing?
14    A. I would be doing all the analysis of tax issues that
15    affected the small business community and anything that I
16    could think up that would add to the cache of the office. One
17    of the things I thought of and one of the things I managed to
18    do was the whole IRS was undergoing a restructuring at the
19    time and I told her that I had a background in international
20    tax, which I did, and that I thought there needed to be more
21    of an emphasis on international tax. And I introduced her to
22    people at the -- very well know, well respected trade
23    association, International Fiscal Association, and we go them
24    in to see the Commissioner to talk about the priority of
25    international issues in the Service, and they offered me a

Page 22

1    membership in their organization and I would be their point
2    person to deal with them.
3        But mostly Suzanne was not a very organized person
4    and things were kind of -- it was kind of brainstorm, whatever
5    you can come up with. If you come up with a good idea, bring
6    it to me and if I like it, you can run with it, but -- and
7    that did happen in the beginning, but ultimately the running
8    with it ended up nowhere.
9    Q. Well, let's talk about the beginning. You said
10    there's a staff of nine.
11    A. Nine people.
12    Q. What were the other people on the staff, not by
13    name, but by what they did?
14    A. I don't recall.
15    Q. Okay.
16    A. It was too long ago.
17    Q. Okay. What was your relationship with Ms. Sottile?
18    A. In the beginning it was amicable. We had a lot of
19    personal interaction. She liked my ideas. She would send me
20    out to be her representative at certain meetings and things,
21    and with certain organizations that she cared about.
22    Q. And what would you do in representing her?
23    A. I would explain the function of our office and
24    explain to, say, the American Bar Association Tax Section,
25    their attorneys, explain to them the function of our office

Page 23

1    and how we could help them with issues that they had, and
2    that, you know, I was their point person, their contact
3    person. And I would take any issues that they had and I would
4    take them to Sue and we would -- you know, we would develop
5    them as far as we could and try and help them with any issues
6    that they had with tax administration basically.
7    Q. And what other things did you do for her?
8    A. That was it basically really.
9    Q. Okay. Were you working on any other types of
10    projects independently?
11        MR. QUINN: What point in time?
12        MS. FIELDS: We're talking the beginning, when she
13    was --
14        MR. QUINN: When she first -- the first few months?
15        WITNESS: It's very hard -- in the first few months,
16    like I said, it was a new staff. It was nine people. Sue was
17    not very organized. There was no real mechanism for assigning
18    projects. It was kind of like catch as catch can. Okay?
19    That's the best way I can describe it to you.
20        BY MS. FIELDS:
21    Q. How was your job satisfaction during this initial
22    period?
23    A. The initial period, it was kind of fun. We thought
24    it was -- we might be onto something interesting.
25    Q. Then what changed, what happened?

Page 24

1    A. Then they started what I refer to as empire
2    building. Within 9 to 10 months we went from a staff of 9
3    people to a staff of almost 30 people. I never saw Sue
4    anymore. I never got to talk to her. They divided the groups
5    -- every week there was a new organizational structure. We
6    were divided into branches. In the middle of the winter of
7    1999 they brought on a Deputy Director, a Mr. Fitzpatrick, who
8    I did not get along with and who was responsible for taking
9    away the only really good project I had come up with and was
10    working on.
11    Q. That was the CD ROM project?
12    A. Yes.
13    Q. Okay. How long had you been working the CD ROM
14    project?
15    A. It started about a month-and-a-half or two months
16    before he even joined the office, and my understanding was
17    that I was -- since I developed the project. I came up with
18    it. I developed a time line and a -- you know, an outline for
19    how it was to be done and in what phases it was to be done,
20    and the only other person I had to work with was the person
21    who was doing the CD ROM. And then all of a sudden Mr.
22    Fitzpatrick starts demanding things from me on this project.
23    Q. Explain to me what you envisioned for the project.
24    A. What I envisioned was I was going to go through all
25    of the publications that we had in the IRS that had anything

Page 25

1 to do with international tax issues affecting small
2 businesses, and I was going to take all of them and I was
3 going to do a -- I was going to organize them and do a
4 narrative write-up for the CD ROM of the major international
5 tax issues that impacted small businesses with heavy cross-
6 references to applicable publications, forms, IRS
7 announcements, any kind of IRS guidance on the subject. It
8 was going to be a huge project.
9     Q. So you were going to basically do the legal part of
10 that?
11     A. I was going to do all the legal work because I was
12 the only one in the office with the legal background to do it.
13     Q. And then you had a technical person who was going to
14 help you --
15     A. I had coordinated from the very beginning with the
16 Office of Chief Counsel International, with the Deputy
17 Associate Chief Counsel International, and I had -- was
18 coordinating with her all the way along and was going to run
19 everything by her so that Chief Counsel, which is the legal,
20 you know, arm of the IRS, would be on board with everything I
21 was doing and there wouldn't be any question that, you know,
22 Chief Counsel didn't know anything about this or that there
23 were any inconsistencies or errors or anything. I had
24 coordinated with them from the beginning.
25     Q. Prior to Mr. Fitzpatrick coming on board, how far

Page 26

1 along had you gotten into the project?
2     A. I was in the process of vetting the publications
3 that we had. There were quite a number of publications and I
4 was going through them and pulling out the pieces that had
5 international sections.
6     Q. When you say the publications, you mean IRS
7 publications?
8     A. Yeah, yeah. I had like -- I had a drawer full of
9 about 30 to 40 publications, all of which -- I mean some of
10 them might have had maybe just a paragraph. Some of them may
11 have had several pages, you know. And I was going to take --
12 I was going through them and I was compiling a list of the
13 issues that applied to small business in the international tax
14 context. That's what I was in the process of doing.
15     Q. Now prior to Mr. Fitzpatrick coming in, were you
16 working on any other projects or is that it?
17     A. The work I had to do when I had any work to do was
18 strictly what I would call secretarial or clerical. It would
19 be on phoning various --
20     MR. QUINN: Do you have the time context? Was it
21 prior to Mr. Fitzpatrick coming on the job?
22     MS. FIELDS: Yes. I'm talking about prior to --
23     WITNESS: Oh, prior to Mr. Fitzpatrick?
24     BY MS. FIELDS:
25     Q. Yes, prior to him coming on.

Page 27

1     A. I was finishing up some of the thought projects that
2 Sue had back in the days when we talked directly. I was
3 finishing up some of the, you know, go with that, development
4 it, and I was writing memos and submitting them to her and
5 asking for feedback.
6     Q. Do you have an example of what you're talking about?
7     A. You know, it was so long ago I really can't
8 remember.
9     Q. Okay.
10     A. I really can't remember. I probably had a better
11 recollection in my prior deposition, so I would refer you to
12 that.
13     Q. Okay. Did any of these projects that you did for
14 her, were they ever completed?
15     A. No, not a one.
16     Q. Okay.
17     A. Nor did I ever receive any feedback from her after
18 the point that Mr. Fitzpatrick came into the office.
19     Q. Now at the point when Mr. Fitzpatrick came into the
20 office, I think you said that was about mid-1999?
21     A. Around March 1999.
22     Q. Okay. Were you in a branch at that point in time?
23     A. No. The branching occurred toward around June or
24 July.
25     Q. Okay. So where were you organizationally?

Page 28

1     A. He was the Deputy Director, Suzanne was the
2 Director, and I was in a small business -- we were physically
3 in three different places and I was in the small business
4 area, but technically once Mr. Fitzpatrick was brought in as
5 Deputy Director then I worked for him.
6     Q. Now prior to him coming in, was Ms. Sottile your
7 direct supervisor?
8     A. Yes.
9     Q. When he came in he became your direct supervisor?
10     A. And then in June or July one of my coworkers was
11 made Branch Chief and he became my front first line
12 supervisor, so it was went from in September of '98 my having
13 day to day direct verbal face-to-face contact with Ms. Sottile
14 to nine months later there were two people interposed between
15 me and her, and I never got to see or talk to her or got any
16 feedback from her when I requested it from that point on.
17     Q. Now your colleague who became the Branch Chief, that
18 was Mr. --
19     A. Fulcher.
20     Q. -- Fulcher?
21     A. Um-hum, Barry Fulcher.
22     Q. Was that a merit promotion? Was that an advertised
23 position? What --
24     A. No.
25     Q. What was that?

Page 29

1   A. The criteria for being a branch chief was whoever
2 was interested in it.
3   Q. Were you interested in it?
4   A. No.
5   Q. So you didn't apply for it?
6   A. No.
7   Q. Okay. Now you said that when Mr. Fitzpatrick came
8 in he became involved in the CD ROM project.
9   A. Without my knowledge, yes.
10   Q. When did you find out that was he involved?
11   A. When he started demanding certain things from me in
12 relation to the project.
13   Q. Prior to Mr. Fitzpatrick coming on board, were you
14 happy with the work you were doing?
15   A. Not entirely. I was beginning -- just beginning to
16 see that the job was not going to work out the way it had been
17 represented to me, but I wasn't unhappy on a day to day basis,
18 no.
19   Q. Were you able to do the work?
20   A. I was able to do whatever was asked of me.
21   Q. Now you said that you started to see that it wasn't
22 going to work out. What do you mean by that?
23   A. That -- an example was when we had a meeting with,
24 as I referenced before, the ABA Section, Tax Section. Every
25 time we had once of these what they called stakeholder

Page 30

1 meetings we had to put together briefing books, and instead of
2 letting me do the briefing papers on the substantive tax
3 issues, I was not allowed to do any substantive tax work. I
4 was supposed to go to Chief Counsel, find somebody in Chief
5 Counsel to do the substantive tax work, and all I was supposed
6 to was the -- putting together the agenda, making it look
7 pretty, putting together a list of people who were coming and
8 taking it down to Security so they would know to let them in
9 the building. I wasn't getting the substantive tax work.
10 They were completely bypassing me.
11   Q. Now who told you that you had to take everything to
12 the Chief Counsel?
13   MR. QUINN: In what time reference?
14   WITNESS: I don't recall. It was one of -- it was
15 either -- if it was prior to this -- it was mid-1999, it would
16 have been Mr. Fitzpatrick. If it were when Mr. Fulcher became
17 my supervisor, it would have been him on the word of Mr.
18 Fitzpatrick.
19   BY MS. FIELDS:
20   Q. And what types of matters did you then take to
21 General Counsel's Office?
22   A. Oh, they were technical tax matters that I couldn't
23 begin to remember.
24   Q. Technical tax matters concerning what?
25   A. Oh, small business issues.

Page 31

1   Q. Okay. And were you told why they wanted you to go
2 to Counsel's Office?
3   A. No, but the implication was clear that they did not
4 want me -- they would not take my work. They didn't have --
5 they didn't believe that I was competent to do the work when I
6 was taken on specifically to do just that work and they knew
7 my background, that I had spent three-and-a-half years in
8 Chief Counsel.
9   Q. Well, let me ask you, did you draft up documents and
10 then take them to have Chief Counsel vet them?
11   A. No.
12   Q. Okay.
13   A. I wasn't even allowed to do that.
14   Q. So --
15   A. I would call Chief Counsel and I would say we have
16 an issue here. This is the issue and we would like a small
17 presentation done for the ABA attorneys who are coming in.
18 This is the issue, these are the Code sections, and usually
19 the Chief Counsel attorney would be familiar with it. Then
20 they would take it and they would do a two- or three-page
21 briefing paper. And then I was responsible for getting the
22 briefing paper from me on deadline and putting it into the
23 briefing book.
24   Q. Okay.
25   A. That was the extent of my responsibilities.

Page 32

1   Q. What other types of things did Mr. Fitzpatrick have
2 you doing when he came on board?
3   A. Nothing.
4   Q. Okay. So what did you do with your days? This is
5 between the time Mr. Fitzpatrick came on board and Mr. Fulcher
6 became the supervisor.
7   A. Other than the CD ROM project I had no work to do.
8   Q. So did you spend your days doing the CD ROM project?
9   A. Until it was taken away from me, yes.
10   Q. And --
11   A. And then I had nothing to do and I was expected to
12 sit at my desk eight hours a day. There was not enough work
13 to go around. This was a problem in the office, but other
14 people could read books or write letters to take up their
15 time. I was expected to sit at my desk and look busy.
16   Q. This is by Mr. Fulcher?
17   A. Fulcher, Fitzpatrick and Sottile.
18   Q. I'm sorry. Let's just talk about the period before
19 Mr. Fulcher came on.
20   A. Mr. -- yes.
21   Q. Okay.
22   A. Yes.
23   Q. Now where was your office, where were you located?
24   A. The main office was here. I was here.
25   Q. Okay. Let's try to -- were you on the same floor as

Page 33

1  --
2      A. Same floor.
3      Q. You were on the same floor.
4      A. Same floor, same hallway.
5      Q. Same hallway. And you were approximately how many
6  offices down the hallway from the main office?
7      A. Two.
8      Q. Two offices, okay. And your office, did you share
9  it with anyone?
10     A. We had cubicles.
11     Q. Okay.
12     A. I was -- as far away from you as I am now is how far
13  Mr. Fulcher and I sat.
14     Q. Could you estimate?
15        MS. FIELDS: I'm very bad at estimating, John.
16        WITNESS: Three to five feet.
17        MR. QUINN: Three to five feet, okay.
18        BY MS. FIELDS:
19     Q. Okay. So you were three to five feet apart from Mr.
20  Fulcher.
21     A. And before he was my supervisor we used to
22  commiserate. I had told him -- we used to talk. I had told
23  him that I suffered from depression. This was before he
24  became my supervisor. He used to spend most of his mornings
25  on personal phone calls, and in the afternoon we would meet

Page 34

1  each other outside -- there was statue garden on the corner --
2  because he also did not have a lot of work to do.
3      Q. You said most of the people didn't have a lot of
4  work to do?
5      A. That's right, most of them did not, at least in the
6  -- what I was able to see in the office I was in. I can't
7  speak for the offices I was not in. The office that I was in,
8  there were about eight to ten people and most of them were
9  reading books.
10     Q. And those eight to ten people, were they also
11  analysts like you?
12     A. No. I was -- I don't know what they were. I don't
13  know what anybody's responsibilities were. The only person
14  whose job I knew was Mr. Fulcher as of June or July of '99
15  became the Branch Chief of the Small Business Branch.
16     Q. Did you interact with the other people who were in
17  the office with you?
18     A. At what point in time?
19     Q. This is -- let's start during the time that Mr.
20  Fitzpatrick came on board, before Mr. Fulcher became your
21  supervisor.
22     A. Yes, I interacted with people. I had a pretty
23  amicable relationship with people in the office, but once Mr.
24  Fitzpatrick started calling me into his office and dressing me
25  down for various alleged violations of office policy, people

Page 35

1  stopped talking to me and stopping having anything to do with
2  me.
3      Q. Now where was Mr. Fitzpatrick's office?
4      A. Like I showed you before, same hallway, across the
5  hall about two doors down.
6      Q. Okay.
7      A. And I just want to add one thing to give you a
8  flavor of the atmosphere of the office. Both he and Ms.
9  Sottile had locks put on their office doors and they had the
10  door knobs removed from the conference room door. It was a
11  totally paranoid atmosphere once Mr. Fitzpatrick came on.
12        MR. QUINN: Can I interject? It might be better if
13  you tried to answering the questions more directly.
14        MS. FIELDS: She's fine.
15        MR. QUINN: Well --
16        MS. FIELDS: If I want to interrupt her, I will.
17        MR. QUINN: Well --
18        MS. FIELDS: Please.
19        MR. QUINN: -- I know. It's just getting a little
20  bit off the point.
21        MS. FIELDS: If you would, do an objection.
22        MR. QUINN: That's an objection.
23        MS. FIELDS: Speak your objection. Okay. Just let
24  me conduct the examination, please.
25        BY MS. FIELDS:

Page 36

1      Q. Okay. Now Mr. Fulcher became your supervisor?
2      A. Yes.
3      Q. Okay. Now prior to the time that Mr. Fulcher became
4  your supervisor, did you have to take off work due to your
5  depressive situation?
6      A. No.
7      Q. Okay. You would able to come to work and no
8  problems?
9      A. Yes.
10     Q. Okay. Now Mr. Fulcher becomes your supervisor and,
11  first of all, did your seating arrangement change when he
12  became your supervisor?
13     A. No.
14     Q. So he remained sitting approximately --
15     A. Three to five feet away from me.
16     Q. -- three to five feet? Was there any kind of
17  partition between you?
18     A. No.
19     Q. Just your desks almost abutted each other or did
20  abut each other?
21     A. My desk was behind me, his desk was behind him, so
22  we faced -- we could -- if we turned around we faced each
23  other. He could see my computer. He could see what I was
24  looking at on my computer and he could hear my phone
25  conversations.

Page 37

1    Q. Now prior to Mr. Fulcher becoming your supervisor,
2 okay, did Mr. -- you said that Mr. Fitzpatrick would call you
3 into his office and -- I think you said dressed you down. Was
4 this prior to Mr. Fulcher becoming your supervisor?
5    A. Yes.
6    Q. Okay. And what would he "dress you down" about?
7    A. An example, I was told by e-mail -- Ms. Sottile
8 asked me to attend a hearing. She gave me the time and the
9 place for the hearing, but I knew well enough -- I double-
10 checked and I called the subcommittee to make sure that it was
11 starting at the time I was told and the place I was told, and
12 I checked the subcommittee's web site and it was supposed to
13 start at 10:00 that morning. I got to the office at 10 to 9
14 and I got to the hearing at 10 to 10. Unbeknownst to me the
15 night before they changed the time, and when I walked in the
16 Commissioner was in the middle of testifying. Well, Mr.
17 Fitzpatrick immediately got a phone call from Mr. Williams
18 saying that he was embarrassed that I walked in late.
19    Q. Mr. Williams being?
20    A. David Williams being the chief of the function, Ms.
21 Sottile's boss, so two people up from Mr. Fitzpatrick.
22    Q. Called Mr. Fitzpatrick to say he was --
23    A. To say why was I late. And Mr. Fitzpatrick calls me
24 in his office and he had written up a memo that he was going
25 to put in my file citing me for being late to the press

Page 38

1 conference -- to the hearing, and I wrote a memo in response
2 and I added a copy of the e-mail I got from Ms. Sottile, a
3 copy of the web site from the subcommittee, and a copy of the
4 hearing panel that I picked up at the hearing and the
5 documents at the hearing said so and so hearing beginning 10
6 a.m. So apparently the Commissioner at the last minute had
7 needed to testify earlier and it was -- there was no way I
8 could have known that.
9    Q. And did you get any kind of reprimand or --
10    A. Yeah.
11    Q. -- about those actions?
12    A. That letter went in my file.
13    Q. Okay.
14    A. Yes, and Mr. Fitzpatrick had a habit of having his
15 assistant always there when he would be berating me for
16 violating some office policy or being late or you were --
17    Q. How often did that occur prior to Mr. Fulcher
18 becoming your supervisor?
19    A. It was starting to become more and more regular.
20    Q. What other types of issues did he berate you
21 concern?
22    A. We were not allowed to be away from our desks for
23 more than 15 minutes at a time, and if we were going to be
24 away from our desks for more than 15 minutes at time -- well,
25 the procedures kept changing. First, you had to leave -- you

Page 39

1 were supposed to leave a note on your computer screen. Then
2 apparently you were supposed to go up to the front office and
3 sign out on the office board, which this one I never knew
4 about. I was told after the fact. But you couldn't be away
5 from your desk for more than 15 minutes at a time.
6    Q. Without leaving a note as to where you were?
7    A. Right, and even leaving a note -- I always left a
8 note, but it didn't matter because every time I left a note I
9 got called into Mr. Fitzpatrick's office.
10    Q. And were you written up concerning these matters?
11    A. Yes.
12    Q. Are they in your personnel file?
13    A. I believe they are.
14    Q. Did you receive personnel actions?
15    A. No.
16    Q. Did you receive any written personnel actions
17 concerning these issues?
18    A. I don't -- I really don't remember.
19    Q. Okay. Do you have a grievance procedure at the IRS?
20    A. Yes, we do.
21    Q. Okay. And have you ever grieved any personnel
22 actions that Mr. Fitzpatrick did?
23    A. I did when I was in Legislative Affairs.
24    Q. What did you grieve in Legislative -- I'm not
25 talking about Legislative Affairs. I'm talking about under

Page 40

1 Mr. Fitzpatrick.
2    A. No, no, no. What I did was in the summer of 1999 I
3 asked for a consult with an EEO counselor, and her name was
4 Marlene Curry, C-U-R-R-Y. And some negative e-mails had
5 transpired between me and Mr. Fitzpatrick that led me to
6 believe that they were trying to build a case against me to
7 fire me for cause, and I spoke to Ms. Curry and I told her
8 about my conversation with Mr. Williams when I left
9 Legislative Affairs and how I had wanted to go back to Chief
10 Counsel because I was a tax lawyer, but I was told about this
11 particular position and how it was described to me, but that
12 it wasn't working out. I told her -- I showed her the e-mails
13 from Mr. Fitzpatrick. I showed her the reprimand from Mr.
14 Fitzpatrick.
15    Q. The reprimand concerning the hearing?
16    A. Right, and my response and she said to me you need
17 to get out of there. And so she went to Ms. Sottile and she
18 said --
19    Q. Were you with her when she went?
20    A. No.
21    Q. Okay. She told you about this?
22    A. She said to me would you like me to ask Ms. Sottile
23 if she would help you get back into Chief Counsel and I said
24 yes, that's really what I think would be best. And so she
25 went to Ms. Sottile and Ms. Sottile apparently said to her she

Deposition of                                    Condensit!                                    Tessa E. Bergman

Page 41

1  needed some time to consult with Mr. Williams. And then Ms.
2  Curry came back to me in -- I believe it was August of '99,
3  and said to me that Ms. Sottile said that the answer on behalf
4  of her and Mr. Williams was that they would not lift a finger
5  to help me.
6      Q.  To help you get back to Counsel's Office?
7      A.  To do anything to help me to get to Chief Counsel's
8  Office, to give me more work, to give me more substantive
9  work, to give me some work, to do anything to ameliorate the
10  situation I was in which was sitting at my desk eight hours a
11  day with no work to do and being constantly reprimanded by Mr.
12  Fitzpatrick if I left my desk.
13     Q.  Did you directly ask Mr. Fitzpatrick for more work?
14     A.  I don't remember.
15     Q.  Did you ever send him any memos?
16     A.  I asked Mr. Fulcher.
17     Q.  Let's stick with Mr. Fitzpatrick. Did you ever send
18  Mr. Fitzpatrick any memos asking for more work?
19     A.  I don't recall.
20     Q.  What about Ms. Sottile, did you ever send any memos
21  asking for more work?
22     A.  I don't remember.
23     Q.  Did you ever specify what kind of work you wanted
24  when you asked for more work?
25     A.  Well, you're assuming that I did ask for more work.

Page 42

1  What I told Ms. Curry was I had 20 years experience as an
2  international tax attorney and that was the type of work I
3  wanted to do, and that was the type of work I expected to be
4  doing.
5      Q.  Now you remember talking to Ms. Curry --
6      A.  Yes.
7      Q.  -- but you have no memory of talking to Mr.
8  Fitzpatrick about more work, is that your testimony?
9      A.  Mr. Fitzpatrick did not allow me access to him and
10  our e-mails had become so hostile that I felt it better not to
11  communicate with him at all, so I don't recall remember in
12  that context whether I would have said to him could you please
13  give me more work.
14     Q.  So it's your testimony that you have no memory of
15  asking him directly for more work?
16     A.  No.
17     Q.  Okay. And it's your testimony that you did not send
18  him any e-mails or written memoranda requesting more work?
19     A.  No.
20     Q.  Did you send any e-mails or written memoranda to Ms.
21  Sottile asking for more work?
22     A.  I don't recall.
23     Q.  Do you have any such documents?
24     A.  All the document I had were lost when my house was
25  flooded this summer.

Page 43

1      Q.  And that was --
2      A.  I live in the Huntington section of Alexandria.
3      Q.  So that was this summer of --
4      A.  This past summer, last June.
5      Q.  2006?
6      A.  2006.
7      Q.  2006.
8      A.  All my documents were lost.
9      Q.  Okay. Well, you've had an EEO claim in relation to
10  this. Did you give any such documents to the EEO counselor?
11     A.  Everything I had is in the investigative file.
12     Q.  Okay. So if no such memoranda are in the
13  investigative file, then you didn't have any, is that your
14  testimony?
15         MR. QUINN:  Well, I think she -- I mean there were
16  documents --
17         WITNESS:  Excuse me.
18         MR. QUINN:  I know there was discovery in this case.
19         WITNESS:  It means I didn't have any e-mails in my
20  -- it means the e-mails were not in the investigative file.
21  It didn't mean that they didn't exist.
22  BY MS. FIELDS:
23     Q.  Well, did you -- did the EEO counselor ask you for a
24  substantiation of the claims that you made?
25     A.  Oh, yes. I showed her the e-mails that transpired

Page 44

1  between me and Mr. Fitzpatrick and those are in the
2  investigative file.
3      Q.  So all the e-mails that transpired between you and
4  Mr. Fitzpatrick are in the EEO file?
5      A.  That were --
6          MR. QUINN:  She didn't say that.
7          WITNESS:  That were -- all of the e-mails that
8  transpired between me and Mr. Fitzpatrick that were the basis
9  of my going and asking an EEO counselor for help were in the
10  investigative file.
11  BY MS. FIELDS:
12     Q.  And the help that you asked for --
13     A.  Was to go -- help to go back to Chief Counsel.
14     Q.  Okay. So, therefore, if there were any e-mails in
15  your file for help to go back to Chief Counsel between you and
16  Mr. Fitzpatrick, you would have given them to the EEO
17  counselor, is that correct?
18     A.  The only person I asked -- it was Ms. Curry who
19  said to me would you like me to approach Ms. Sottile about
20  helping you to get back to the Office of Chief Counsel and I
21  said yes, I would, so the only person who was approached about
22  my going back to the Office of Chief Counsel were Ms. Sottile
23  and Mr. Williams.
24     Q.  Now did you --
25         MR. QUINN:  Could we take a little break? I need to

Page 45

1 use the restroom.
2      WITNESS: So do I.
3      MS. FIELDS: Certainly.
4          (OFF THE RECORD)
5          (ON THE RECORD)
6      MS. FIELDS: Okay. Would you tell me what my last
7 question was?
8      REPORTER: You were still asking about if there were
9 any e-mails and she answered the only person I asked was Ms.
10 Sottile, and then he asked for a break.
11     MS. FIELDS: Okay.
12     BY MS. FIELDS:
13     Q. Now you indicated that Ms. Curry asked you if you
14 would like her to talk to Ms. Sottile about getting you moved
15 to Counsel's Office, correct?
16     A. Yes.
17     Q. Okay. Did she offer to talk to her about getting
18 you additional duties?
19     A. I don't recall.
20     Q. When you say I don't recall, sometimes I don't
21 recall means I don't recall it happened meaning it didn't
22 happen or I don't recall meaning I don't remember.
23     A. I don't recall whether it happened or not.
24     Q. Okay. Now Mr. Fulcher then became your direct
25 supervisor?

Page 46

1      A. Yes.
2      Q. Okay. Prior to Mr. Fulcher becoming your direct
3 supervisor, had you had any occasions when you couldn't come
4 into the office and function because of your depression?
5      A. I don't remember. You'd have to look at my leave
6 records.
7      Q. Okay. Now Mr. Fulcher becomes your supervisor.
8      A. Um-hum.
9      Q. Did your relationship with Mr. Fulcher change?
10     A. Yes.
11     Q. Okay. How did it change?
12     A. He became Mr. IRS. Everything was rules and
13 regulations, and he took over the primary responsibility for
14 abrading me for not following -- for alleged infractions of
15 the rules. He monitored — one day he was watching what I was
16 doing on the computer and came over and told me that it was
17 against office policy to surf the Internet. Well, I was on
18 the IRS intranet at the time, and he said he was going to
19 write — record me for that. And then another time --
20     Q. And what did you respond to him?
21     A. I said to him do what you have to do.
22     Q. Did you tell him you were on the IRS intranet?
23     A. If he was actually -- if he could actually see my
24 computer, he would have seen that.
25     Q. But my question was did you tell him that —

Page 47

1      A. Did I tell him that?
2      Q. Yes.
3      A. I don't recall whether I told him that or not.
4      Q. And did you get a written action against you?
5      A. No, no.
6      Q. No?
7      A. No. He said he was going to make a note of it, and
8 after that we were not friendly at all.
9      Q. Okay. And he still was -- his desk was still across
10 from yours?
11     A. Yes, same distance.
12     Q. Okay. Are you an only child?
13     A. Yes.
14     Q. There came a time when you stopped therapy with Dr.
15 Ottinmeier [sic], is that correct?
16     A. Ottinger.
17     Q. Ottinger. Is that correct?
18     A. Yes.
19     Q. Was that approximately March of 1999?
20     A. No. It was earlier than that.
21     Q. When did you stop therapy with him?
22     A. I don't know exactly, but I know it was
23 approximately the year before I resumed therapy with Dr.
24 Nowak, so it was probably the previous summer.
25     Q. You stopped seeing Dr. --

Page 48

1      A. Ottinger, but I was still under Dr. Nowak's care.
2      Q. A year before you started seeing Dr. Nowak?
3      A. For therapy --
4      Q. For therapy.
5      A. -- as well as medication. I was constantly under
6 Dr. Nowak's care for medication. I stopped seeing Dr.
7 Ottinger for therapy sometime at the end of 1998.
8      Q. 1998? You didn't see Dr. Ottinger for therapy after
9 sometime in 1998?
10     A. There was about a year's period when I was not in
11 therapy.
12     Q. Okay.
13     A. But I was under Dr. Nowak's care for medication --
14     Q. For medication?
15     A. -- and was on medication.
16     Q. What was the reason you stopped therapy with Dr.
17 Ottinger?
18     A. I wanted to take a break.
19     Q. Was there any financial reason that you stopped
20 seeing Dr. Ottinger?
21     A. No.
22     Q. You had no problem financially?
23     A. No.
24     Q. Did you ever incur a debt that you had a problem
25 paying off?

Page 49

1    MR. QUINN: Ever in her life?

2    MS. FIELDS: I'm talking about during this 1998/99

3 period.

4    WITNESS: I owed Dr. Ottinger -- I got behind in

5 some of my payments to Dr. Ottinger, but I ultimately paid her

6 the full amount I owed her.

7    BY MS. FIELDS:

8    Q. When did you ultimately pay her?

9    A. By the end of the year.

10    Q. By the end of 1998?

11    A. I believe so. I'm not entirely sure.

12    MR. QUINN: Can we talked about relevance here?

13 What does her paying her bills have anything to do with

14 anything in this case?

15    BY MS. FIELDS:

16    Q. Do you remember approximately when Mr. Fulcher was

17 your supervisor?

18    A. I believe I stated either June or July of 1999.

19    Q. Other than the incident concerning your computer,

20 did you have any other incidents with him?

21    A. Yes.

22    Q. What?

23    A. He listened in on my phone calls.

24    Q. When you say he listened in on your phone calls,

25 what do you mean?

Page 50

1    A. I called my father one time and he told me it was

2 against the rules to make personal phone calls, to which I

3 replied that he did the same thing.

4    Q. So he was sitting across from you again and he heard

5 your end of your phone call? When you say he --

6    A. He heard my end of the phone call, yes --

7    Q. Okay.

8    A. -- and walked over to me when I hung up and said

9 it's against the office policy to make personal phone calls

10 and I said you do it all the time.

11    Q. And approximately when was that that he did that?

12    A. Shortly after he became my supervisor.

13    Q. Okay. What else did he do?

14    A. He took over for Mr. Fitzpatrick. Whenever I was

15 not at my desk he would show me a copy of the time and leave

16 policy and say you can't be away from your desk for more than

17 15 minutes at a time. When I -- after I had taken a two-and-

18 a-half month leave for a medical absence from October to

19 December in 1999, the day I came back after being out of the

20 office for two-and-a-half months he didn't say hello, he

21 didn't say how are you, he didn't say are you feeling better.

22 I found a memo on my chair that said I was being listed as

23 AWOL because I didn't come back when he thought I was going to

24 come back.

25    Q. And anything else that he did to you?

Page 51

1    A. I cannot recall the details now. I think they're

2 elucidated in my prior deposition.

3    Q. So those are the details that you recall now?

4    A. That's all that I recall now, yes.

5    Q. Okay. Now when Mr. Fulcher became your supervisor,

6 did he give you assignments?

7    A. Not very many.

8    Q. What types of assignments did he give you?

9    A. To make phone calls.

10    Q. To make phone calls to who?

11    A. To people to set up meetings.

12    Q. And did you do that?

13    A. Yes, I did.

14    Q. What else did you do in relation to those meetings?

15    A. Took notes.

16    Q. What kind of notes did you take, during, before --

17    A. During the meetings.

18    Q. Okay. Did you do anything to pull the meetings

19 together?

20    A. No.

21    Q. What kind of meetings were these?

22    A. Stakeholder meetings. I don't recall the

23 substantive content right now.

24    Q. Who else from the IRS was at the meetings other than

25 you?

Page 52

1    A. I don't recall.

2    Q. Would Mr. Fulcher be there?

3    A. Yes.

4    Q. Were you in the meeting?

5    A. Yes.

6    Q. Did you ever run any meetings?

7    A. No.

8    Q. Once he became the supervisor you never ran any

9 meetings?

10    A. No.

11    Q. Okay. Other than take notes at the stakeholder

12 meetings, what else, if anything, did he assign you to do?

13    A. Nothing.

14    Q. Who else did he supervise?

15    A. I don't know. I know there were three or four

16 people in our branch. I don't know who they were and I don't

17 recall who he supervised. I know he had more than just me to

18 supervise. That's the extent of my recollection.

19    Q. Did you ever talk to anybody else in that office

20 about Mr. Fulcher --

21    A. Nobody would talk to me.

22    Q. Excuse me. Did you ever talk to anybody in that

23 office about Mr. Fulcher's supervision?

24    A. I don't recall.

25    Q. Okay. And you said no one would talk to you. How

**Page 53**

1  many people were in your office at that point in time when Mr.
2  Fulcher was the supervisor?
3      A. About ten people.
4      Q. Okay. And you say that you had no cordial
5  relationship with anyone in that office?
6      A. No.
7      Q. And had no chit-chat conversations with anyone in
8  the office?
9      A. Nobody would come near me.
10     Q. Did you ever ask Mr. Fulcher directly for more work
11  to do?
12     A. I don't recall.
13     Q. Meaning?
14     A. Meaning I do not know now whether or not I asked him
15  for more work.
16     Q. Now in October, approximately October the 4th, I
17  believe, you told Ms. Sottile that you need to leave your
18  office?
19     A. Um-hum.
20     Q. Can you tell me what happened?
21     A. Mr. Fitzpatrick had called me into his office again
22  and I felt myself on the verge of a breakdown. I could not
23  take one more abrading from him. I had been in the Chief
24  Counsel Library and had left a note on my computer to that
25  effect, and when I got back from the office I got a phone call

**Page 54**

1  from his assistant saying Mr. Fitzpatrick wanted to see me,
2  and I knew it was because of the note, and I said I really
3  don't think it's necessary. I was in the Chief Counsel
4  Library. And then this woman who was his assistant called me
5  up and ordered me to be in his office.
6      Q. What's her name?
7      A. I don't remember her name.
8      Q. It was like his secretary or --
9      A. His assistant.
10     Q. His assistant.
11     A. Someone subordinate to me --
12     Q. Okay.
13     A. -- ordered me into his office, at which point I
14  started to shake and felt myself having a massive anxiety
15  attach, and I went in to Ms. Sottile and I told her that I
16  needed to take an extended medical leave.
17     Q. Now prior to this happening, had you been coming
18  into the office?
19     A. Yes.
20     Q. Okay. What did you tell Ms. Sottile when you met
21  with her?
22     A. I told her I was ill, I needed some time off, and
23  she was -- that I would provide her with the documentation she
24  needed so that it would be an approved leave. I didn't have a
25  lot of sick leave, so I asked her if she would get for me the

**Page 55**

1  information I needed to provide to get an advance of sick
2  leave, and she said she would. And she told me to take care
3  of myself and to keep in touch with her, and I left.
4      Q. So it was Mr. Fitzpatrick's having his assistant
5  direct you to come to the office that --
6      A. That was the proverbial straw.
7      Q. And did you contact your doctor?
8      A. Oh, yes.
9      Q. Okay. What did you tell your doctor?
10     A. That's privileged information.
11         MR. QUINN: Are you talking about Dr. Nowak?
12         MS. FIELDS: Yes.
13         WITNESS: Well, everything I told Dr. Nowak is
14  documented in detail in the medical records.
15         BY MS. FIELDS:
16     Q. What do you remember telling Dr. Nowak?
17     A. I have -- I don't -- it's seven years ago. I don't
18  remember. I would direct you to her medical records because
19  they will be meticulously detailed.
20     Q. So you have -- are you testifying that you have no
21  memory of what you told Dr. Nowak?
22     A. I told her that I felt myself going into a very deep
23  depression, that I could not go back to that office, and that
24  I needed help.
25     Q. Now during this period of time were you seeking

**Page 56**

1  employment -- other employment independently?
2      A. No. I was in no condition to be seeking employment.
3      Q. Prior to October the 4th, 1999, had you
4  independently sought an other position -- any other positions?
5      A. I have no recollection of whether I did or didn't.
6      Q. Prior to October of 1999, had you gotten your --
7  passed the patent bar?
8      A. I passed the patent bar. I took it in the summer of
9  1997 and passed.
10     Q. Did you attempt to get any jobs in the patent field
11  prior to October of 1999?
12     A. Oh, yes. I attempted many times with no success.
13     Q. Okay. Did you prior to October independently make
14  any application to Chief Counsel's Office for a position?
15     A. Yes, I did.
16     Q. What happened?
17     A. I got one letter that said I couldn't apply because
18  I wasn't -- the position was only open to current Chief
19  Counsel employees and I wasn't a current Chief Counsel
20  employee. And the second one, I got a very strange letter
21  because normally when they apply to an application they use a
22  form letter, but this letter was a two line letter that said
23  we cannot consider -- we're sorry, but we cannot consider your
24  application at this time.
25     Q. This was prior to October of 1999?

| Page 57 | Page 59 |
|---|---|
| 1 A. Yes. | 1 Q. -- Ms. Sottile? |
| 2 Q. Okay. Had you attempted to get any positions other | 2 A. Um-hum. |
| 3 than as a latent lawyer or in Chief Counsel's Office prior to | 3 Q. Okay. And prior to October 1999, did you feel at |
| 4 October of 1999? | 4 that time that you were able to carry out the functions of an |
| 5 A. Not to my recollection, no. | 5 attorney in the Chief Counsel's Office? |
| 6 Q. Okay. The job that you had under Mr. Fitzpatrick | 6 A. Absolutely. |
| 7 and Mr. Fulcher, okay, what was your understanding as to what | 7 Q. Okay. Did you feel that you were able to carry out |
| 8 the functions were supposed to be? | 8 the functions of the previous job that you had in Legislative |
| 9 A. I didn't have any understanding. My understanding | 9 Affairs? |
| 10 was that I was to sit at my desk for eight hours a day and | 10 A. Absolutely. |
| 11 look busy, that I was not to leave my desk for more than 15 | 11 Q. Okay. Was there any job that you felt you could not |
| 12 minutes at a time. That was the understanding of what my job | 12 carry out the functions of? |
| 13 was under Mr. Fitzpatrick and Mr. Fulcher. | 13 A. The only thing I could not do was sit at my desk |
| 14 Q. Well, let me ask you this. You indicated that there | 14 eight hours a day with nothing to do. |
| 15 wasn't enough work for everybody. Okay. What was your | 15 Q. Okay. Did you review any documents to refresh your |
| 16 understanding, if any, that the function of your job was | 16 recollection prior to your testimony or in preparation for |
| 17 supposed to be if there were sufficient work for people? | 17 your testimony here today? |
| 18 MR. QUINN: At what point in time? | 18 A. I reviewed my testimony from -- I reviewing the |
| 19 MS. FIELDS: During 1999. | 19 hearing record from the prior proceeding. |
| 20 MR. QUINN: At any time during 1999? | 20 Q. Anything else? |
| 21 MS. FIELDS: Yes. | 21 A. No. |
| 22 MR. QUINN: I think she's testified there's been a | 22 Q. Now you were out from October the 4th to December |
| 23 wide range of change over that period of time. | 23 the 15th, is that correct? |
| 24 MS. FIELDS: Well, I'm talking about her position in | 24 A. I don't remember the exact dates, but that sounds |
| 25 -- as this public liaison. | 25 approximately correct. |

| Page 58 | Page 60 |
|---|---|
| 1 WITNESS: I was in small business. | 1 Q. Okay. Did you have any interaction with Ms. Sottile |
| 2 BY MS. FIELDS: | 2 prior to you coming back in December of 1999? |
| 3 Q. Okay, in small business. | 3 A. None whatsoever. |
| 4 A. By the time Mr. Fulcher was my supervisor and Mr. | 4 Q. What about Mr. Fitzpatrick? |
| 5 Fitzpatrick was on board -- | 5 A. None whatsoever. |
| 6 Q. Um-hum. | 6 Q. What about Mr. Fulcher? |
| 7 A. -- I had no understanding of what my position was | 7 A. Yes. |
| 8 supposed to be. | 8 Q. Okay. Did you have -- let's talk orally, oral |
| 9 Q. Okay. Prior to them coming on board, what was your | 9 contact with him prior to you -- |
| 10 understanding as to what your position in small business was | 10 A. No, it was written contact. |
| 11 supposed to be? | 11 Q. It was all written contact? |
| 12 A. When I first joined the office in September of 1998, | 12 A. All. |
| 13 my understanding was that I was to be the principle legal | 13 Q. And what was the written contact that you had? |
| 14 advisor as to how -- as to tax issues affecting the small | 14 A. I had asked for religious comp time for the week of |
| 15 business community, and that I was to provide any guidance | 15 Hanukkah and he wrote back that I had a deficit of religious |
| 16 necessary relative to those issues. | 16 comp time and couldn't give it to me. And then I went and I |
| 17 Q. And you were perfectly able to carry those functions | 17 checked my time sheets and I discovered that there had been |
| 18 out, is that correct? | 18 errors in recording time in the time system, and I brought |
| 19 A. Yes. | 19 that to his attention and I asked him to please look -- I |
| 20 Q. Okay. What you had a problem with was not having | 20 documented the errors and I asked him to please look into it |
| 21 something to do, is that correct? | 21 because I did not have such a deficit. He did not respond. |
| 22 A. Exactly. | 22 Q. So you did not receive comp time for the religious |
| 23 Q. Okay. And the people who did not let you have | 23 holiday. Were you put on LWOP, leave without pay, for that |
| 24 something to do were Mr. Fulcher, Mr. Fitzpatrick and Ms. -- | 24 time period? |
| 25 A. Ms. Sottile. | 25 A. I was on leave without pay for that time period. |

middle**Page 61**

1 Q. So you were on leave without pay?

2 A. Yes.

3 Q. Okay.

4 A. And I had been approved to be on leave without pay

5 through the end of December by Dr. Presant.

6 Q. Okay. So you had written contact with him

7 concerning the comp time for leave -- for the religious leave.

8 What else?

9 A. I had an outstanding emergency salary payment that I

10 needed to pay back, and I was given a date by which I had to

11 pay it back and I paid it back by that date, and --

12 Q. And that was by a letter or a memo also, correct?

13 A. Yes.

14 Q. Anything else?

15 A. No.

16 Q. Okay.

17 A. Not that I can recall right now.

18 Q. Did you also get a letter from him indicating that

19 your paid leave was running out? Was that also correspondence

20 that you got from him prior to you coming back?

21 A. I may have. I don't recall.

22 Q. Now you indicated that when you came back you found

23 a memo on your desk.

24 A. On my chair.

25 Q. On your chair. And that was in relation to what?

**Page 62**

1 A. That I was being -- I believe I came back in the

2 middle of the week and I was being listed as AWOL from the

3 beginning of the week until the day I came back. That's what

4 the memo said. Because I had told him I would be back the

5 week of whatever that week began with, and he interpreted that

6 to mean that Monday, and I interpreted it to mean sometime

7 that week.

8 MS. FIELDS: Would you mark that as Number 1,

9 please?

10 (Whereupon, the document that

11 was referred to as Exhibit

12 Number 1 was marked for

13 identification.)

14 MR. QUINN: Is there a copy --

15 MS. FIELDS: Exhibit Number 1 --

16 MR. QUINN: -- for me?

17 MS. FIELDS: Sure is.

18 WITNESS: I was on approved leave during that --

19 MR. QUINN: Hold on. Before you answer anything,

20 let me take a look at this.

21 WITNESS: Okay.

22 MS. FIELDS: Exhibit Number 1, is that the document

23 that you're referring to?

24 MR. QUINN: Can you give me just a minute to read

25 it? Okay.

**Page 63**

1 WITNESS: There is another letter from Dr. Presant

2 that says that I am approved for leave without pay through

3 December 29th.

4 BY MS. FIELDS:

5 Q. Okay. Let me just back up. First of all, what's in

6 Exhibit Number 1, was that in the document that you received

7 from Mr. Fulcher that was on your desk -- I mean on your

8 chair?

9 A. Not that I recall, no.

10 Q. Okay.

11 A. I may have been. I don't know whether it was an e-

12 mail or a memo or a handwritten letter. I just know there was

13 something on my chair --

14 Q. Okay.

15 A. -- to this effect.

16 Q. Now did you have any conversation with Mr. Fulcher

17 about what was on your chair?

18 A. I don't recall. I believe I may have responded to

19 him in writing.

20 Q. Okay.

21 MS. FIELDS: Mark that Number 2.

22 (Whereupon, the document that

23 was referred to as Exhibit

24 Number 2 was marked for

25 identification.)

**Page 64**

1 BY MS. FIELDS:

2 Q. Document Number 2, take time to look at that.

3 A. Okay.

4 Q. Did you receive Document Number 2 on December 15th

5 from Mr. Fulcher?

6 A. It's dated December 15th. Whether or not I received

7 it that day, I have no current recollection.

8 Q. Do you remember ever receiving that from him?

9 A. It looks familiar.

10 Q. Okay. Have you had a chance to read it?

11 A. Yes.

12 Q. In reading it, does that refresh your recollection

13 as to whether or not you received it?

14 A. Um-hum.

15 Q. And did you receive it?

16 A. Oh, at some point in time I received it. I just

17 don't know when.

18 Q. Okay. Did you have any conversation with Mr.

19 Fulcher about Exhibit Number 2?

20 A. No. You have to understand I'd been out on a two-

21 and-a-half month medical leave. This was dated the day I came

22 back. I was not in a mental state to be engaging in this

23 degree of detail.

24 Q. Did you have any conversation with Mr. Fulcher --

25 A. No.

Page 65

1  Q. -- when you came back?
2  A. I avoided conversations with Mr. Fulcher as much as
3  possible because I did not trust him.
4  Q. Well, when you came back did you have any
5  conversations with him in which he gave you assignments?
6  A. Not to my recollection.
7  Q. Did you have any interaction with him orally at all
8  when you came back?
9  A. Only when he was telling me that I was doing
10  something wrong. Every day it was something different.
11  Q. And what did he tell you you were doing wrong when
12  you came back?
13  A. First, I was AWOL. Then I was away from my desk. I
14  was five minutes late arriving at the office, things like
15  that.
16  Q. And he had no conversation with you concerning your
17  duties?
18  A. Not to my recollection.
19  Q. Did he have any conversations with you concerning
20  assignments?
21  A. Not that I remember. He may have, but I don't
22  remember them.
23  Q. So you indicated that you tried to avoid Mr. Fulcher
24  as much as you could when you came back, is that correct?
25  A. Yes. I was in a very fragile state and it was clear

Page 66

1  to me that it was his job to harass me.
2  REPORTER: Can we go off the record so I can change
3  the tape?
4  (OFF THE RECORD)
5  (ON THE RECORD)
6  MS. FIELDS: And what were the things that he did to
7  harass you?
8  MR. QUINN: Other than she's already testified to?
9  WITNESS: I believe I've made a rather complete
10  statement as to how he harassed me.
11  BY MS. FIELDS:
12  Q. You said that he talked to you about -- that he gave
13  you a memo concerning being AWOL, that he talked to you about
14  being away from your desk.
15  A. I would refer you to the affidavit I gave that is in
16  the investigative file from the previous proceeding. I went
17  into great detail as to what transpired between me and Mr.
18  Fulcher. I have no present recollection of what's in that
19  affidavit.
20  Q. You have no present -- do you have any present
21  recollection of what occurred between the two of you? I'm not
22  asking what's in the affidavit. I'm asking for your present
23  recollection of what occurred.
24  MR. QUINN: In addition to what she's already
25  testified to today? She's testified to a whole bunch of

Page 67

1  things.
2  WITNESS: Not in addition to what I've testified to.
3  BY MS. FIELDS:
4  Q. Okay. So sitting here today your claim that he
5  harassed you when you came back is based on the documents that
6  he left on your chair when you came back, is that correct?
7  A. Yes.
8  Q. Okay. It's based on -- is it based on comp time not
9  being approved for your religious holiday?
10  A. Yes. It's on failure to look into an obvious and
11  very -- since time and leave was so important to them, I would
12  think that a documented error in the recording of leave would
13  be looked into and it was not. It was ignored.
14  Q. That's -- okay. And also he had conversations with
15  you concerning being away from your desk. What else?
16  A. Monitoring my computer use, listening to my phone
17  calls, my end of my phone calls.
18  Q. Let me ask you could you hear his end of his phone
19  calls?
20  A. Yes, but I wasn't his supervisor.
21  Q. You could hear your end of your [sic] phone call the
22  same way that you can hear me talking to you right now?
23  A. Um-hum.
24  Q. Okay. And could he observe your computer from where
25  he was sitting?

Page 68

1  A. Yes, he could.
2  Q. Without having to do anything special, is that
3  correct?
4  A. Correct.
5  Q. Did he ever make any negative comments to you
6  concerning your request for an accommodation?
7  A. Define negative.
8  Q. Did he ever make any disparaging statements to you
9  concerning your request for an accommodation?
10  A. Disparaging of me?
11  Q. Did he ever make any disparaging comments to you
12  concerning your request for an accommodation?
13  MR. QUINN: Disparaging of whom was the question,
14  though.
15  MS. FIELDS: Yes.
16  MR. QUINN: Of her?
17  MS. FIELDS: Yes.
18  WITNESS: Of me? No, of other people.
19  BY MS. FIELDS:
20  Q. What do you mean by that?
21  A. He told me he was in a difficult situation because
22  he was trying very hard to get me an accommodation and he was
23  being blocked by upper management.
24  Q. So he never indicated any negative feelings towards
25  you concerning your request for an accommodation, is that

Page 69

1 correct?
2     MR. QUINN: Just let me get a -- your question is he
3 never indicated to her --
4     MS. FIELDS: I'll ask -- I'll rephrase the question.
5     MR. QUINN: Rephrase the question, please.
6     BY MS. FIELDS:
7     Q. Did he ever say anything negative to you concerning
8 your request for an accommodation?
9     A. Yes. He said to me that I was limiting myself by
10 insisting on full time legal work.
11     Q. What else did he say?
12     A. That's the only disparaging or the only negative
13 comment he made to me concerning the reasonable accommodation.
14     Q. That you were limiting yourself by asking only for
15 --
16     A. Full-time legal work.
17     Q. -- full-time legal work? And what did you take that
18 comment to mean from him?
19     A. That they were not going to consider reassigning me
20 to one of the vacant positions in the Office of Chief Counsel.
21     Q. That it limited the scope of positions that you
22 might be able to acquire at a 14 level?
23     A. That they were refusing to consider the positions
24 that were open at the 14 level in the Office of Chief Counsel.
25     Q. Were you willing to take a position at a 14 level in

Page 70

1 any other office?
2     A. I wanted full-time legal work at a Grade 14 level.
3 I was offered nothing of that nature.
4     Q. I asked you were you willing to take another
5 position not in Office of Chief Counsel at a 14 level?
6     A. No. I wanted full-time -- well, I wanted full-time
7 legal work at a 14 level. If there was such a position in the
8 IRS, I would have been willing to consider it.
9     Q. Were you willing to consider a 14 position that was
10 not an attorney position?
11     A. No, and the recommendation --
12     Q. There's no question pending. Sorry. Thank you.
13 Now when you left your position under Mr. Fulcher, what
14 position did you accept?
15     A. Under duress I accepted the position of estate tax
16 attorney in examinations in the field at Bailey's Crossroads.
17     Q. Okay. And what are the duties of that position?
18     A. It's basically a glorified revenue agent. We audit
19 large estates and give tax returns.
20     Q. Okay. And are you able to do that?
21     A. Yes.
22     Q. What are the other functions of that job other than
23 auditing?
24     A. That's it. We have our own inventories of cases.
25 We audit the cases. We close them out.

Page 71

1     Q. Approximately how many cases do you carry?
2     A. Between 15 and 20.
3     Q. Now you indicated that you're on flexi-place?
4     A. Yes.
5     Q. When did you go to flexi-place?
6     A. Approximately November of 2000.
7     Q. And you've been on flexi-place since November of
8 2000?
9     A. Yes.
10     Q. Okay. Is that an accommodation that you requested?
11     A. Yes.
12     Q. Did you request it as an accommodation or did you
13 just request it as flexi-place?
14     A. Both. It was both. All of the attorneys in my
15 group are on flexi-place.
16     Q. Okay. And have you had to take off any significant
17 periods of time from this position due to your depression?
18     A. Yes, when my home was flooded in June and I lost my
19 car and a great many personal possessions.
20     Q. Approximately how long did you take off in June when
21 your home was flooded?
22     A. Well, my supervisor granted me three weeks
23 administrative leave without my even requesting it. Recently
24 a very close relative of mine is in the end stages of lung
25 cancer, and I have had to take some time off to be with her,

Page 72

1 and a couple of days now and then because of depression.
2     Q. Okay. So let me back up to make sure I understand.
3 When your house flooded you took off a significant amount of
4 -- was flooded you took off a significant amount of time,
5 correct?
6     A. Um-hum.
7     Q. Okay. Was that because of the situation that you
8 had to deal with getting your house taken care of?
9     A. It was both.
10     Q. Okay. Did you also -- so are you saying you also
11 went into clinical depression because of that?
12     A. Yes, I did.
13     Q. Okay. And --
14     A. But what do yo mean by went into clinical
15 depression? I mean I have always had clinical depression.
16     Q. Did you have exacerbation of your problem due to
17 your house being flooded? Were you unable to cope?
18     A. I wasn't unable to cope. I was perfectly able to
19 cope. I just had trouble -- a great deal of trouble with
20 anxiety.
21     Q. You had trouble with anxiety. However, were you
22 able to, for example, deal with the insurance?
23     A. I dealt with the insurance. I dealt with the
24 contractors. I dealt with every -- I had to deal with
25 everything because there was nobody else to do it and I did.

Page 73

1   Q. So you were not immobilized --
2   A. No.
3   Q. -- due to your depression?
4   A. No.
5   Q. Okay. In relation to your relative who is ill --
6   A. I have had days where I have been immobilized.
7   Q. And how many days has that been?
8   A. Maybe a week --
9   Q. Okay.
10  A. -- added up.
11  Q. Okay. And when you say immobilized, meaning --
12  A. Meaning I can't get out of bed, and have had -- I
13  don't know if you know what free floating anxiety is, but
14  Anxiety Disorder can be very disabling, and I've had problems
15  with that in the recent page, causes tremors. Your hands
16  shake. Your arms shake. It's very difficult to work when it
17  happens.
18  Q. It's very difficult to work because of the shakes?
19  A. Because of the shakes.
20  Q. The physical --
21  A. Yeah.
22  Q. Okay. Does it impair your ability to concentrate
23  cognitively?
24  A. It can, yes. Acute Anxiety Disorder does, yes.
25  Q. Now I guess I'm asking in your particular case did

Page 74

1   it?
2   A. I have had several days where I was impaired.
3   Q. During the period of time when your home flooded or
4   during the period of time when your --
5   A. The recent months when my relative has been ill.
6   Q. Okay. When Dr. Nowak sent various communications to
7   your employer, did you review those documents before they went
8   out?
9   A. Not all of them, no.
10  Q. Let me show you Dr. Nowak's letter dated October the
11  11th, 1999.
12              (Whereupon, the document that
13              was referred to as Exhibit
14              Number 3 was marked for
15              identification.)
16  WITNESS: Okay.
17  BY MS. FIELDS:
18  Q. Are you familiar with that letter?
19  A. Yes.
20  Q. Did you see this letter before it went out?
21  A. I don't know.
22  MR. QUINN: Is this marked as an exhibit?
23  MS. FIELDS: It's Exhibit Number 3.
24  WITNESS: No, it's not marked.
25  MS. FIELDS: I have the marked one.

Page 75

1   BY MS. FIELDS:
2   Q. On the second page of the letter it says Ms. Bearman
3   simply cannot stay at her desk or attend to her work. Even at
4   home Ms. Bearman is requiring the aid of family and friends
5   with basis demands of daily living. In October of 1999 what
6   family and friends were aiding you?
7   A. My best friend who lives here and my family mostly
8   by phone.
9   Q. Who's your best friend?
10  A. Her name is Holly Alpert.
11  Q. Spell the last name.
12  A. A-L-P-E-R-T.
13  Q. Where does she live?
14  A. Arlington, Virginia.
15  Q. Do you know her address?
16  A. 3520 North Abingdon Street.
17  Q. North --
18  A. Abingdon, A-B-I-N-G-D-O-N, Street.
19  Q. In?
20  A. Arlington.
21  Q. And a telephone number?
22  A. (703) 534-4340.
23  Q. Okay. And she's been your best friend for how long?
24  A. Thirty years.
25  Q. Okay. And in October 1999 what types of things did

Page 76

1   she do to help you?
2   A. I have no current recollection. It was seven years
3   ago and I was in -- I don't remember.
4   Q. Well --
5   A. Other than being my best friend.
6   Q. Okay. Other than -- well, did she talk to you? Did
7   you talk to her?
8   A. She listened to me. She talked to me. She spent
9   time with me.
10  Q. And you say you talked --
11  A. I can't be more specific than that.
12  Q. And you say you also talked to your family on the
13  telephone?
14  A. Yes, my cousin, the person who is currently dying.
15  Q. So they gave you moral support by talking to you?
16  A. Um-hum.
17  Q. Were you in need of any other type of support?
18  A. Psychiatric.
19  Q. Did you have to have someone come in to dress you?
20  A. No.
21  Q. Did you have to have someone come in and cook your
22  food?
23  A. I didn't eat.
24  Q. Did you have to have someone drive you from place to
25  place?

## Page 77

1  A. I didn't go anywhere.
2  Q. Did you go to see Dr. Nowak?
3  A. Yes.
4  Q. How did you get from home to see Dr. Nowak?
5  A. I drove.
6  Q. You drove?
7  A. Um-hum. I didn't sleep. I didn't eat.
8  Q. For how long did you not sleep or eat?
9  A. Weeks.
10 Q. So you stayed awake --
11 A. That's right.
12 Q. -- without any sleep for weeks?
13 A. That's right.
14 Q. In October 1999?
15 A. And prior to.
16 Q. And prior to. But just so I'm clear, during this
17 period of time you were able to dress yourself?
18 A. Yes.
19 Q. You were able to drive your car?
20 A. Yes.
21 Q. You were able to talk on the telephone?
22 A. Yes.
23 Q. Do you have any pets? Did you have any pets at that
24 time?
25 A. Yes.

## Page 78

1  Q. What kind of pet?
2  A. A cat.
3  Q. Were you able to feed your cat?
4  A. Yeah.
5  Q. Clean its litter box?
6  A. Um-hum.
7  Q. Is that a yes?
8  A. Yes.
9  Q. You indicated you were unable to sleep.
10 A. That's right.
11 Q. You were unable to eat?
12 A. I was unable to get more than -- I could not get
13 more than an hour's rest at a time. I could not even -- I
14 could not get two consecutive hours of sleep. I call that not
15 being able to sleep.
16 Q. How long have you had insomnia?
17     MR. QUINN: I don't think she said she did generally
18 have insomnia.
19     WITNESS: I had insomnia at that time. It's a part
20 of Acute Depressive Disorder.
21     BY MS. FIELDS:
22 Q. Did you have insomnia prior to that time?
23 A. I've had episodes of insomnia in my life, yes.
24 Q. When did you have episodes of insomnia?
25 A. I said I've had episodes in my life. I don't know

## Page 79

1  how far -- like most people do.
2  Q. Have you had severe insomnia all of your life?
3  A. No.
4  Q. Did you have -- well, you said as most people do.
5  Have you been diagnosed as having insomnia?
6  A. I've been diagnosed as having a sleep disorder.
7  Q. And when were you diagnosed as having a sleep
8  disorder?
9  A. A couple of years ago. It was a couple of years
10 after the events we're talking about.
11     MS. FIELDS: Would you mark that for me, please? I
12 don't have a copy, so you'll have to use the one up here.
13         (Whereupon, the document that
14         was referred to as Exhibit
15         Number 4 was marked for
16         identification.)
17     MS. FIELDS: That's Exhibit Number what, 4?
18     REPORTER: 4.
19     BY MS. FIELDS:
20 Q. Have you ever seen Exhibit Number 4 before?
21 A. No.
22 Q. Exhibit Number 4 is on the letterhead of Dr. Nowak
23 and there's a signature. Do you recognize that signature?
24 A. Um-hum.
25 Q. Is that Dr. Nowak's signature?

## Page 80

1  A. Um-hum.
2     REPORTER: Can you say yes or no?
3     WITNESS: Yes. Thank you.
4     BY MS. FIELDS:
5  
6  
7  A. Nearly.
8  Q. Is that a --
9  A. I didn't have it as a child. I didn't have it as an
10 adolescent. I didn't have it as a young adult.
11 Q. But other than as a child, an adolescent and a young
12 adult, you did not have it [sic]? Following that you did have
13 insomnia?
14     MR. QUINN: You mean all the time?
15     MS. FIELDS: No.
16     MR. QUINN: It's episodic.
17     MS. FIELDS: I understand.
18     WITNESS: I had episodes.
19     BY MS. FIELDS:
20 Q. Yes, you did have -- yes.
21 A. Episodes
22 Q. Okay.
23 A. A lot of the time, that was a side effect of
24 medication that I was on.
25 Q. A lot of the time --

Page 81

1  A. Many psychotropic have as a side effect insomnia,
2  and since I've been on psychotropic drugs for nearly 30 years,
3  I have experienced episodes of insomnia, some of them
4  prolonged, some of them not.
5  Q. Due to the side effects of the drugs, is that what
6  you're indicating?
7       MR. QUINN: I mean she's not an expert.
8       WITNESS: I can't -- Dr. Nowak would be better able
9  to tell you to what extent insomnia is caused by drugs and to
10 what extent it is a symptom of Acute Depressive Disorder. I'm
11 not qualified to tell you to what extent.
12      BY MS. FIELDS:
13 Q. Okay. But you are saying that for the past 30 years
14 approximately you have had episodes of insomnia, is that
15 correct?
16 A. Yes.
17 Q. Okay.
18      MS. FIELDS: Why don't we take a little --
19      MR. QUINN: Is that Number 4 you're sticking in
20 front of it?
21      MS. FIELDS: Thanks. Let's take a brief break.
22          (OFF THE RECORD)
23          (ON THE RECORD)
24      BY MS. FIELDS:
25 Q. Since you -- I'm sorry. What is your position in

Page 82

1  Virginia called again?
2  A. Attorney, Estate Tax.
3  Q. Attorney, Estate Tax. Since you have become an
4  Attorney, Estate Tax, have you received performance
5  evaluations?
6  A. Yes.
7  Q. And have they been acceptable performance
8  evaluations?
9  A. Yes.
10 Q. Okay. Have they been -- what scale are you on?
11 A. They just changed it. I have no idea.
12 Q. Before it changed, what scale were you on?
13 A. What do you mean scale, merit or narrative or what?
14 Q. Well, some places in the government have like pass
15 or fail.
16 A. I was fully successful.
17 Q. Okay. That's what I was asking. Have you always
18 been fully successful?
19 A. Yes.
20 Q. Okay. No other questions. Thank you.
21      MR. QUINN: I just have a couple questions.
22          CROSS EXAMINATION
23      BY MR. QUINN:
24 Q. Ms. Fields ask you some questions about considering
25 other GS-14 positions that were not legal, and I think you

Page 83

1  indicated no.
2  A. That's correct.
3  Q. Was there a reason why you said that?
4  A. I said that because Dr. Nowak had requested -- and
5  Dr. Presant who was the occupational physician that the IRS
6  used. Dr. Presant set the parameters and his recommendation
7  was that I be given full-time legal work, so my answer was in
8  the context of the IRS having set that parameter. Had they
9  not set that parameter, had there been a GS-14 position that I
10 was fully qualified for and it had not been legal and Dr.
11 Presant had not said -- recommended that I be given full-time
12 legal work, then yes, I would have considered it.
13 Q. Okay. No further questions. Thank you.
14          REDIRECT EXAMINATION
15      BY MS. FIELDS:
16 Q. Would you at this time consider taking a GS-14
17 position that you were qualified for which was not an attorney
18 position?
19 A. It would depend on -- yes.
20 Q. Okay. Thank you.
21      MR. QUINN: Okay. All right.
22      REPORTER: Does your client wish to waive signature?
23      MR. QUINN: No.
24      (Reading and signature not waived.)
25      (Whereupon, at 2:14 p.m., on Monday, March 12, 2007,

Page 84

1  the deposition was concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Sottile Sue M**

| | |
|---|---|
| **From:** | Fulcher Barry P |
| **Sent:** | Wednesday, December 15, 1999 2:16 PM |
| **To:** | Bearman Terri |
| **Cc:** | Sottile Sue M; Fitzpatrick Robert J |
| **Subject:** | FW: Reminder |

**Importance:**    High

Terri, since you have been away from the office for awhile I wanted to be sure that you remember our office policies regarding signing out when you are away from your desk. Please review the expectations that were prepared by Robert Fitzpatrick (see below).

Additionally, I am providing you a hardcopy of the memorandum prepared by Sue Sottile on October 5, 1999, Subject: Office Time and Attendance Procedures/Guidelines Please see me promptly if there are any questions concerning these requirements.

**Barry Fulcher**

——Original Message——
| | |
|---|---|
| **From:** | Fitzpatrick Robert J |
| **Sent:** | Sunday, October 03, 1999 8:52 AM |
| **To:** | Lane Sharron M; Bearman Terri; Criste Marlene A; Chandler Alicia R; Brendes Lisa M; del Toro Merci J; Ryan Candace C; Singleton Michael K; Wilds Lorenza; Lyons Matthew S; Desler Anne C; Desler Anne C; Brungard Rebecca M |
| **Cc:** | Fulcher Barry P; Turville Mary A; Robinson Robin D; Sottile Sue M |
| **Subject:** | Reminder |
| **Importance:** | High |

For most of you this has always been your practice but I want to remind everyone in the office that I and Sue must know where you are in case we need to get a hold of you during the day. So please keep this in mind if you step away from your desk for more than a short period (please get a copy of the office procedures from Robin if need another copy). It is not uncommon for Sue or other IRS executives to have questions concerning one of your projects that needs to be answered right away. If we can't find you it can be embarrassing for the office. If you are going to be away from your desk please follow our office procedures and mark the board in the front office. For those of you in the external modernization branch (since you names are not on board) please leave a note on your computer screen or the like. Thanks for your cooperation.

Robert J. Fitzpatrick
Deputy National Director
(Public Liaison & Small Business Affairs)
(202) 927-5646

1



Judith A. Nowak, M.D., P.C.
908 New Hampshire Avenue, NW
Suite 302
Washington, D.C. 20037-2346
202-887-5495
F. 202-466-5582
11 October 1999

Neil Presant, MD                                    Re: Theresa Bearman
Internal Revenue Service
HQ:HR:MP:L, 1042IR
1111 Constitution Avenue, NW
Washington, DC 20224

Dear Dr. Presant:

I am writing to document that Ms. Bearman has suffered an acute exacerbation of a chronic medical illness which necessitates a medical leave of absence.

Ms. Bearman suffered from chronic low grade depressive symptoms(Dysthymic Disorder DSMIV 300.40) with distinct periods of worsening consistent with a diagnosis of Major Depressive Disorder( DSMIV 296.33) since childhood. There is a significant family history of depression on both the maternal and paternal side. Ms. Bearman has been in treatment nearly consistently since her early twenties.

She was hospitalized in 1991 with an acute depressive episode. She was treated with Prozac and rapidly responded. There have been no subsequent hospitalizations since that time. Ms. Bearman demonstrates a pattern of initial good response to several antidepressants followed by relapse of more severe symptoms. She has had brief periods of euthymia but even at best functioning has displayed some residual symptoms (sleep disorder characterized by frequent awakenings, low energy, and a mood she characterizes as "looking at life through a gray veil."). She has normal thyroid functioning and no evidence of any other contributory medical problem. She drinks almost no alcohol and uses no drugs.

I have been following Ms. Bearman since June, 1996 for psychopharmacological treatment of her depression. Prior to our work together, she had tried multiple pharmacological regimens which included SSRI's(Zoloft and Prozac), TCA's(Pamelor), augmentation strategies using Lithium and Ritalin(both unsuccessful and abandoned). We have tried Effexor, at times of exacerbation of symptoms, to doses as high as XR 375mg qd. There is a side effect ceiling such that high doses cause a severe worsening of sleep disturbance which cannot be readily treated with Trazodone. In recent months, Ms. Bearman was doing rather well on a combination of Effexor XR 150mg qd and Celexa 20mg qd.



There has been a gradual deterioration of her symptoms since approximately mid August 1999 with a dramatic worsening over the past week to ten days. This has resulted in a relapse into severe Major Depressive Disorder (DSMIV 296.34). Her symptoms include severe fatigue, irritability, marked difficulty concentrating, much difficulty taking initiative, social withdrawal, anhedonia and a depressed hopeless mood but no suicidal ideation. Ms. Bearman simply cannot stay at her desk or attend to her work: even at home, Ms. Bearman is requiring the aid of family and friends with basic demands of daily living. Therefore, she is unable to work. There are no accommodations that could be made at the present time by her employer that would result in her being able to work.

Ms. Bearman is engaged in an intensive outpatient program of psychotherapy and medication readjustment. We will certainly use other resources (eg hospitalization) if those prove to be necessary. For now, we are working on psychosocial stressors, reevaluating her medical status, and adjusting her medication--most recently, by increasing her Celexa to 30mg qd. Her past responsiveness to these interventions suggests that her condition has not become static and well stabilized (that is--there is no evidence of chronic disability). I cannot predict with great specificity how long it will be before Ms. Bearman is able to return to work but the time course of past periods required for recovery suggests that a period of 30 days out of work is a reasonable expectation.

Please let me know if you require any further information.

Sincerely,

Judith A. Nowak, MD