EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
1400 L Street, NW., Suite 200
Washington, D.C. 20005

| | |
|---|---|
| Theresa E. Bearman,<br>　　Complainant,<br><br>　　　　v.<br><br>Paul H. O'Neill, Secretary,<br>　US Department of the Treasury,<br>　　Agency. | EEOC No. 100-A1-7426X<br><br>Agency No. 00-1103 |

## DECISION

　　Pursuant to the EEOC's regulations at 29 C.F.R. § 1614.109 (2002), I conducted a hearing in the above-captioned matter on March 18-19, 2003. The procedural facts are contained in the case file and will not be reiterated in this decision. All jurisdictional requirements have been met.

　　In addition to the parties' pleadings, the record before me consists of the Report of Investigation (ROI) and the Hearing Transcript (HT). Judith Nowak, Complainant, John Burns, David Williams, Kathy King, Susan Neiser, Barry Fulcher, and Susanne Sottile testified.

## ISSUE

　　The issues in this matter are:

I. Beginning on October 22, 1999, was the Complainant denied a reasonable accommodation for her disability when her request for job restructuring or reassignment was not granted?

II. Was Complainant subjected to a hostile work environment based on her disability and in retaliation for requesting a reasonable accommodation when:

1. From January 1 to October 4, 1999, she was given secretarial and clerical duties and not work at a GS-14 level;

2. On November 19, 2000, management intervened and a payment arrangement made by Complainant and IRS Customer Service and threatened Complainant with discipline once the money was repaid;

3. In December 1999, Complainant's request for compensatory leave for a religious observance was denied;

4. Complainant's repeated requests to be placed on a 120-day detail as an interim accommodation were denied;

5. Between December 13 and 15, 1999, Complainant was charged absent without leave for 14 hours;

6. On December 23, 1999, management monitored Complainant's phone and Internet use;

7. On January 3, 2000, Complainant was expected to perform full-time work while working part-time; and

8. On January 6, 2000, management delayed responding to Complainant's request regarding being placed on administrative leave.

## FACTS

During the time at issue, Complainant was a GS-14 step 6 Management Program Analyst the Office of Public Liaison, Small Business Affairs, with the Agency. HT at 101, 106; ROI at 113. Prior to holding that position, she practiced tax law for approximately fifteen years and had an L.L.M. in taxation. ROI at 166.

Susanne Sottile (no disability) was Complainant's first-level supervisor until July 1999, when she became Complainant's third-level supervisor and Barry Fulcher (no disability) became Complainant's first-level supervisor. HT at 118. Robert Fitzpatrick (no disability) was her second-level supervisor.

Sottile knew Complainant suffered from depression beginning in September 1998 when Complainant told her in relation to a scheduling request. HT at 122. Complainant also told Fulcher when they were coworkers that she suffered from depression. HT at 126.

In the spring of 1999, Complainant complained to Sottile that the nature of her work was less substantive than she would like. After that, a CD-ROM project she was spearheading "started gradually to go down hill." HT at 120.

2

On October 4, 1999, Complainant took medical leave for the onset of a severe major depressive episode. ROI at 113.

On October 11, 1999, Complainant's psychiatrist, Judith Nowak, wrote the Agency's physician, Neil Presant (disability status unknown), to request a medical leave of absence for her client.

On October 22, 1999, Complainant requested an accommodation in writing through Presant and David Williams, the chief of Communications and Liaison, of which Complainant's office was a division. Complainant provided a letter from Nowak indicating that Complainant was experiencing a severe major depressive order, including "severe fatigue, irritability, marked difficult concentrating, much difficulty taking initiative, social withdrawal, anhedonia, and a depressed hopeless mood but no suicidal ideation. Nowak indicated that job restructuring or a transfer would accommodate Complainant's disability. ROI at Exs. 3 & 4.

Complainant heard nothing, and on November 15, 1999, her counsel tried to contact Williams by phone. Counsel was unsuccessful and followed up in writing. Williams then called counsel on either November 15 or 16 and told her the matter had been assigned to Labor Relations.

On November 23, the Agency requested authorizations from the Complainant to discuss her work history performance with her prior supervisors. Complainant provided that authorization on November 24, 1999.

Sometime in November 1999, Fulcher became aware of Complainant's request for an accommodation when he saw a letter from Complainant's physician, Judith Nowak. HT at 352. Fulcher testified at the hearing that he became the "point person" for the accommodation search. HT at 381. Sottile was to "provide concurrence with [Fulcher's] recommendations if appropriate." Williams also had the option to weigh in on any accommodation Sottile and Fulcher settled on. HT at 491-492.

On November 26, 1999, Complainant exhausted all of her sick, annual, and advanced sick leave. ROI at Ex. 3. Fulcher notified her of this in writing and placed her on leave without pay (LWOP) beginning November 28, 1999 through December 28, 1999. ROI at Ex. 3.

On December 3, 1999, the Agency's physician, Presant, recommended Complainant be accommodated. He recommended that her job either be restructured or that Complainant be transferred. HT at 353. One of Fulcher's supervisors then asked him to act on Complainant's request. HT at 353-54. Fulcher began looking into the accommodation as well as a detail for Complainant to occur until an accommodation could be granted. HT at 354.

On December 15, 2003, Complainant returned to the office to work part time with Nowak's approval. She was to work 6 hours a day with a flexible start time.

3

On December 16, 1999, Fulcher held a meeting to discuss accommodations for Complainant. ROI Ex. 5.

On December 21, 1999, Complainant requested three months leave under the Family Medical Leave Act (FMLA), to begin on December 28, 1999. Fulcher approved that leave on December 23, 2003. Complainant continued to come to work, however, and when Fulcher asked about it, she indicated she wouldn't be out every day, just some. HT at Ex. 3.

On January 4, 2000, Fulcher issued a memorandum to offices "within the national office area" asking what positions they had available to which Complainant could be detailed. HT at 357. Fulcher followed up on the memo via email and telephone. In late December or early January, he also met with the Counsel's office. HT at 360.

In mid-January 2000, Fulcher updated Complainant in a formal memorandum about the efforts being taken to accommodate her. HT at 364.

On February 7, 2000, Fulcher secured an informal offer for an accommodation from one of the Agency's district offices and on March 7, 2000, a formal offer was made. Complainant accepted the offer.

The entire time Complainant was seeking an accommodation, there were attorney vacancies for which she was qualified in the Agency's Chief Counsel's Office. HT at 148.

## ANALYSIS

To establish a *prima facie* case of disability discrimination under a failure to accommodate theory, the complainant must demonstrate that: 1) she is an "individual with a disability" as defined in 29 C.F.R. § 1630.2(g); 2) she is a "qualified individual with a disability" as defined in 29 C.F.R. § 1630.2(m); and 3) she was subjected to an adverse personnel action under circumstances giving rise to an inference of disability discrimination and/or denied an accommodation. 29 C.F.R. § 1630.2(g) defines an individual with a disability as one who: (1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) has a record of such impairment; or (3) is regarded as having such an impairment. Major life activities include, but are not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." An impairment is substantially limiting when it prevents an individual from performing a major life activity or when it significantly restricts the condition, manner or duration under which an individual can perform a major life activity, compared to the average person in the general population. *Durinzi v. United States Postal Serv.*, EEOC Appeal No. 01A11800 (Jul. 18, 2003)(citations omitted).

Absent undue hardship, an employer must provide reasonable accommodation for the physical or mental limitations of an employee (or applicant for employment) if the employee (or

4

applicant) is an individual with a disability who is otherwise qualified. The term ""qualified individual with a disability," with respect to employment, is defined as a disabled person who, with or without a reasonable accommodation, can perform the essential functions of the position held or desired. 29 C.F.R. § 1630.2(m). The term "position" is not limited to the position held by the employee, but also includes positions that the employee could have held as a result of reassignment. 29 C.F.R. §1630.2(o)(2)(ii).

It is well-settled that harassment based on an individual's religion and disability is actionable. In order to establish a claim of harassment under those bases, the complainant must show that: (1) she belongs to the statutorily protected classes; (2) she was subjected to unwelcome conduct related to his membership in those classes; (3) the harassment complained of was based on her religion and/or disability; (4) the harassment had the purpose or effect of unreasonably interfering with her work performance and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability to the employer. The harasser's conduct should be evaluated from the objective viewpoint of a reasonable person in the victim's circumstances. *Frazier v. United States Postal Serv.*, EEOC Appeal No. 01A02260 (Sept. 4, 2002)(citations omitted).

Once Complainant has established her prima facie case, the burden then shifts to the Agency to articulate a legitimate, non-discriminatory rationale for its action. *Burdine*, 450 U.S. at 253-54, n. 6; *McDonnell Douglas*, 411 U.S. at 802. If the Agency can produce this rationale, the Complainant must then show that the articulated rationale was not the true reason, but a pretext for discrimination. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804. The ultimate burden of persuasion to the issue of discrimination always remains with the Complainant. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

I. Beginning on October 22, 1999, was the Complainant denied a reasonable accommodation for her disability when her request for job restructuring or reassignment was not granted?

There is no dispute that Complainant is an qualified individual with a disability entitled to an accommodation. I find, however, that contrary to her assertion, Complainant was not denied a reasonable accommodation. Complainant was reassigned to an attorney position consistent with her needs. The real issue therefore is the delay in the reassignment, and it is clear that the Agency acted with sufficient haste. An employer should respond expeditiously to a request for reasonable accommodation. In determining whether there has been an unnecessary delay in responding to a request for reasonable accommodation, relevant factors would include: (1) the reason(s) for the delay, (2) the length of the delay, (3) how much the individual with a disability and the employer contributed to the delay, (4) what the employer was doing during the delay, and (5) whether the required accommodation was too complex to provide. *Spotts v. Dep't of Transportation*, EEOC Appeal No. 01A23852 (Oct. 27, 2003)(citations omitted)(Agency did not

5

act when it spent several months purposely selecting merchandise that would accommodate complainant's needs and where most of what complainant desired was accomplished within a few months except the part-time clerical help, which required more time given its complexity).

Complainant first requested reassignment or restructuring on October 22, 1999. The record shows that Complainant's request was forwarded to the Labor Relations Office. The employee to which it was assigned for processing retired however, and the office then reassigned the case on November 16, 1999. On November 23, 1999, the Agency requested an authorization from Complainant to look into her past work history, and on December 3, 1999, Presant concurred with Nowak's recommendation to restructure Complainant's position or reassign her. Fulcher testified that either Sottile or Fitzpatrick asked him to act on Complainant's request. HT at 353-354. Fulcher then contacted the Labor Relations office and the EEO office for guidance and held a meeting on December 16, 1999. HT at 354-355. An appeals office representative, Robert Fitzpatrick, Williams's executive assistant, John Burns form the EEO office, Mendola from Appeals, and Kathy King attended the meeting. Fulcher then met with Burns to double check the approach he was taking, i.e., researching the possibility of a detail and a transfer to an office that employed attorneys. HT at 356.

Three weeks later, on January 4, 2000, Fulcher, after review by Sottile, the EEO office, and Labor Relations, sent a letter to offices within the national office area to find out what was available. HT at 357, 410. He followed up via phone and email. HT at 358. No national office had a vacancy, so Fulcher checked with the offices of the District Director for Maryland, Delaware, Richmond, and West Virginia. As a result, on February 7, 2000, the office of West Virginia tentatively offered Complainant a GS-12 attorney slot in Bailey's Crossroads. They made a formal offer that included pay retention on March 7, 2000. HT at 360-361. Fulcher credibly testified that the delay between the tentative and formal offers was partially a result of the need to work out pay retention. Because the accommodation Complainant requested was complex and the record is rife with evidence that the Agency was actively seeking a position for her throughout the entire period at issue, I find that the delay between request and accommodation was reasonable.

I also find that the Agency did not discriminate against Complainant when it reassigned her to a GS-12 slot. When there are no vacant equivalent positions available, the agency must then look to reassign the employee to a vacant lower level position for which the individual is qualified. *Olson v. Dep't of the Treasury*, EEOC Appeal No. 01983200 (Jul. 19, 2001)(citations omitted). Here, there is no evidence that any other vacancy existed.

I next find that the Agency did not discriminate against Complainant when it did not restructure her program analyst position to be a legal position. When it restructures a position, an Agency has no duty to accommodate an employee by eliminating the essential functions of the position. *Gong v. United States Postal Serv.*, EEOC Appeal No. 01A05584 (Mar. 19, 2003).

I also find that the Agency did not discriminate against Complainant when it reassigned

6

her instead of placing her on detail. The record indicates that while working on the reassignment, Fulcher also tried to find Complainant a detail and that the Appeals Division offered Complainant a detail but that Williams was reluctant to fund it. HT at 411-412. If more than one accommodation is effective, "the preference of the individual with a disability should be given primary consideration; however, the employer providing the accommodation has the ultimate discretion to choose between effective accommodations." 29 C.F.R. § 1630.9; *See also Enforcement Guidance*, Question 9 (Mar. 1, 1999); *Polen v. Dep't of Defense*, EEOC Appeal No. 01970984 (Jan. 16, 2001). Thus, while complainant may be entitled to an effective reasonable accommodation under the Rehabilitation Act, she is not entitled to the accommodation of her choice. *Olson v. Dep't of the Treasury*, EEOC Appeal No. 01983200 (Jul. 19, 2001). Here, Complainant was timely accommodated with one of the options she presented to the Agency.

As evidence that the delay was pretextual, Complainant pointed to the fact that there were vacant attorney positions available in the Chief Counsel's office while the Agency was looking for a slot for her.[1] However, I find this evidence to be non-persuasive.[2] Under section 501 of the Rehabilitation Act at 29 C.F.R. § 1614.203, in effect at the time Complainant sought reassignment, the Agency was only required to offer reassignment to a funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level. Here, Williams testified, and Complainant did not rebut, that the Chief Counsel's Office was under a different appointing authority than the Office of Communications and Public Liaison.[3]

Complainant also proffered as evidence of pretext that in January 2000, Williams was unhappy with Presant's concurrence with Nowak's recommendation, and considered asking him

---

[1] Complainant applied for the position independently of her Division's efforts on her behalf. She was not selected, but that vacancy announcement is not before me.

[2] The parties are advised that 29 C.F.R. § 1614.203(g), which governed and limited the obligation of reassignment in the Federal sector, has been superseded and no longer applies. 67 Fed. Reg. 35732 (5/21/01), to be codified as 29 C.F.R. § 203(b). The ADA standards apply to all conduct on or after June 20, 2002, and emphasize, among other things, a broader search for a vacancy. The ADA regulations regarding reassignment can be found at 29 C.F.R. §§ 1630.2(o) and 1630.9. Additional information can be found in the Appendix to the ADA regulations and in the EEOC's Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (March 1, 1999) at Questions 25 - 30. These documents are available on the EEOC's website at www.eeoc.gov.

[3] Although the Chief Counsel's office was under no obligation to take Complainant, Fulcher met in late December 1999/early January 2000 with them to try to arrange reassignment there, anyway. HT at 359.

to independently examine Complainant. He even went so far as to have a letter drafted to that effect, but it was not sent. There is no evidence, however, that any misgivings Williams had interfered with Fulcher's efforts.

Finally, as pretext evidence, Complainant offered the testimony of John Burns. He testified that the Agency was not really working to accommodate her and was dragging its feet because it considered her to be a problem. HT at 226. I find that Burns was not credible because he then refused to say the delay was deliberate. HT at 231. He also claimed to have knowledge of other people who were transferred out of their hiring authority but was unable to cite a single example.

II. Was Complainant subjected to a hostile work environment based on her disability and in retaliation for requesting a reasonable accommodation when:

1. From January 1 to October 4, 1999, she was given secretarial and clerical duties and not work at a GS-14 level;

I find that Complainant failed to state a prima facie claim of retaliation regarding this claim. She did not request a reasonable accommodation until October 22, 1999, after the assignments at issue.

I also find that Complainant failed to state a prima facie case of disability discrimination regarding any change in her duties. Complainant testified that beginning in July 1999, her work became "more and more . . . secretarial and clerical . . . ," that she was told several times a month to go to meetings and take notes, and was limited to arranging meeting logistics instead of playing a substantive role.. HT at 126. In August 1999, she was reprimanded for arriving late at a Congressional hearing that she was assigned to cover. She also testified that in the summer of 1999, Robert Fitzpatrick took over a CD-ROM project she had been heading and then refused to meet with her. HT at 121. She claimed that she was denied the opportunity to provide substantive contributions to briefing books used for meetings. Complainant also alleged that Sottile would not provide feedback on her work and that she was not being assigned new projects. HT at 124-128. I find that Complainant failed to link any of these assignments (or lack thereof) to her depression.

2. On November 19, 2000, management intervened and a payment arrangement made by Complainant and IRS Customer Service and threatened Complainant with discipline once the money was repaid;

On September 28, 1999, the Agency paid Complainant $1,321 in an emergency salary payment. Complainant wrote a check to repay the advance on October 7, 1998, but the check was not honored because of insufficient funds. ROI at 189. Complainant then made one $50.00 payment on September 23, 1999, but the balance remained and on November 19, 1999, Fulcher wrote Complainant and told her she needed to repay the money by December 10, 1999, because she was violating the employee code of conduct. HT at 379. I find Complainant failed to show that Fulcher's order to repay the money was linked to either of her protected categories and therefore failed to establish a prima facie case. I also find that even assuming arguendo that she had stated a prima facie case, the Agency articulated a legitimate, non-discriminatory rationale for its actions. Fulcher credibly testified he intervened because customer service called him to say she had been unable to reach Complainant. He followed up, found out Complainant owed money in violation of the employees' code of conduct, and met with Labor Relations.

Complainant offered as evidence of pretext her unsupported assertion that Fulcher intervened and called customer service, not that it called him. However, Complainant could have called the customer service representative to testify, and did not.

3. In December 1999, Complainant's request for compensatory leave for a religious observance was denied;

On December 7, 1999, Complainant, who was out of the office on leave without pay status, faxed a request for advanced religious compensatory time off for December 6-11, 1999, so that she could celebrate Hanukkah. Fulcher denied the leave. I find that Complainant failed to state a prima facie case of harassment with regard to Fulcher's denial, for she made no connection between his denial and her protected categories.[4]

I next find that even if Complainant had stated a prima facie case, Fulcher articulated a legitimate, nondiscriminatory rationale for denying the leave. He testified he denied the leave because Complainant waited until the day after the time off she wanted began to request it when office procedures required she make her request no later than 15 days in advance; she seemed unlikely to be able to repay the leave within the necessary time period, and she already had a 42 hour religious compensatory time deficit. HT at 381, ROI at 138 & 39.

I also find that Complainant failed to show Fulcher's rationale was pretextual. On December 16, 1999, Complainant wrote Fulcher a memo in which she showed that her leave records were incorrect and that she really owed only 18 hours from 1997 and 1998 to the

---

[4] Complainant was not denied the time off to observe the holiday, so this will not be analyzed as a denial of an accommodation request.

9

Agency when she made her December 7, 1999, request. Rather than support her argument of pretext, it only buttresses Fulcher's belief that she was unlikely to be able to repay any additional compensatory time.

    4. Complainant's repeated requests to be placed on a 120-day detail as an interim accommodation were denied;

    I find Complainant failed to link any detail denial to her protected categories, and even if she did, the Agency articulated a legitimate, non-discriminatory rationale for its actions. When he received her request, one of the first actions Fulcher took was to contact the Appeals Office in headquarters to see if a detail could be arranged. HT at 347. On January 4, 2000, Fulcher contacted offices in Headquarters to find a detail and prepared several memoranda to offices within the national office area, in one case for counsel requesting a detail, in other cases notifying three other offices, advising them that the detail or reassignment was really mandatory and asking what they had available. HT at 357. Sottile and Fulcher both testified that the Appeals Office detail ultimately fell through because of funding issues. HT at 412, 492. Complainant presented no evidence to the contrary.

    5. Between December 13 and 15, 1999, Complainant was charged absent without leave for 14 hours;

    On December 3, 1999, Nowak wrote the Agency and indicated that Complainant was improved enough to return to work for six hour days beginning the week of December 6. On December 7, 2003, Complainant faxed Fulcher and indicated she would be back in the office the week of December 13, 1999.

    On December 14, 1999, Fulcher called Complainant at home but she didn't answer it. Instead, she emailed him and said:

> Please refrain from phoning me at home for any reason for I find this intrusive and not helpful to my recovery. In case you have missed the point, I am trying to recover from a serious illness.
>
> If you need to communicate with me, please use the mail, as you have done successfully on several previous occasions.

HT Exhibit 3.

On December 16, 2003, Fulcher charged Complainant with 14 hours AWOL time.

I find that Complainant failed to show that Fulcher's action was a result of her protected categories, and if she had, the Agency articulated a legitimate, nondiscriminatory rationale for its actions. At the hearing, Fulcher testified that, based on correspondence form Complainant's doctor, he expected Complainant to be in the office beginning December 13, 1999, and she was not. HT at 383 & 384. Complainant failed to show that this rationale was pretextual. She argued that she had been approved for LWOP until December 28, 1999; however, her correspondence indicated that plan had changed and she would be back in the office. She was not.

6. On December 23, 1999, management monitored Complainant's phone and Internet use;

Complainant alleges, based on her own observations and alleged remarks by two other employees that Fulcher monitored her phone and internet use from his desk, which was approximately three feet from hers.[5] However, she failed to link this activity to her protected categories. Fulcher credibly denied monitoring Complainant but did testify he could see and hear because there was no partition between their offices. HT at 389. Complainant offered no evidence that his rationale was pretextual.

7. On January 3, 2000, Complainant was expected to perform full-time work while working part-time; and

I find Complainant failed to establish that this occurred. There is no evidence in the record that she was expected to do eight hours of work in a partial day.

8. On January 6, 2000, management delayed responding to Complainant's request regarding being placed on administrative leave.

On January 5, 2000, Complainant repeatedly called the Commissioner's office regarding her accommodation and told them it was a matter of life and death that she be given an appointment. On January 6, 2000, Fulcher placed Complainant on administrative leave during a telephone conversation. ROI at Ex. 5. He testified that he did so because of Complainant's calls

---

[5]Complainant did not call either of the employees who allegedly commented as witnesses.

11

to the Commissioner's office the day before. On January 12, 2000, Fulcher issued Complainant a memorandum indicating he was placing her on administrative leave. I find that Complainant failed to show that the six day delay between notified orally of being placed on leave and receiving written notification was related to her protected categories.

## DECISION

For the reasons set forth above, I find that Complainant did not prove by a preponderance of the evidence that she was discriminated against on the basis of her disability or protected activity.

November 25, 2003

*[signature]*

Laura Khare

## NOTICE TO THE PARTIES

***TO THE AGENCY:***

This office will hold the report of investigation and the complaint file for sixty days, during which time the agency may arrange for their retrieval. If we do not hear from the agency within sixty days, we will destroy our copy of these materials.

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. *See* EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### *TO THE COMPLAINANT:*

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. *See* EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

### *WHERE TO FILE AN APPEAL:*

All appeals to the Commission must be filed by mail, hand delivery or facsimile.

#### BY MAIL:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

P.O. Box 19848

Washington, D.C. 20036

#### BY PERSONAL DELIVERY:

Director, Office of Federal Operations

Equal Employment Opportunity Commission

1801 L Street, NW

Washington, D.C. 20507

**BY FACSIMILE:**

Number: (202) 663-7022

*Facsimile transmissions of more than ten (10) pages will not be accepted.*

## COMPLIANCE WITH AN AGENCY FINAL ACTION

Pursuant to 29 C.F.R. § 1614.504, an agency's final action that has not been the subject of an appeal to the Commission or a civil action is binding on the agency. If the complainant believes that the agency has failed to comply with the terms of this decision, the complainant shall notify the agency's EEO Director, in writing, of the alleged noncompliance within 30 days of when the complainant knew or should have known of the alleged noncompliance. The agency shall resolve the matter and respond to the complainant in writing. If the agency has not responded to the complainant, in writing, or if the complainant is not satisfied with the agency's attempt to resolve the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

## **CERTIFICATE OF SERVICE**

I certify that on November 26, 2003, the foregoing decision was sent to the following:

John Quinn
Claxton, Sale, & Quinn, P.C.
910 16th St., NW
Suite 500
Washington, DC 20006

Deanne M. Sobzcak
General Legal Services
Office of Chief Counsel
IRS
P.O. Box 22369
Washington, DC 20026

Mariam Harvey, Acting, Director
Office of Equal Opportunity Programs
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Metropolitan Square, Room 6037
Washington, D.C. 20220

_____
Laura Khare