CONFIDENTIAL

428

1  what we could to achieve the accommodation.
2      JUDGE KHARE: Well, what about this issue
3  of Mr. Williams being unhappy with Dr. Presant's
4  recommendation and not understanding his
5  recommendation?
6      Was Mr. Williams involved?
7      It seems to me that he had his finger in
8  the pot, so to speak, because everything was being
9  run by him. Is that accurate? Whatever
10 accommodation efforts you were making and whatever
11 you were going to offer her.
12     THE WITNESS: I would say certainly broad
13 authority and direction, but in terms of day-to-day
14 involvement I really didn't see that. I think I
15 only had one or two meetings with him over the span
16 of two or three months.
17     JUDGE KHARE: Okay. But didn't
18 Mr. Williams tell you to get another evaluation
19 regarding Ms. Bearman's condition?
20     THE WITNESS: He didn't tell me.
21     What he was interested in was getting a
22 second opinion because his concern was that



EXHIBIT
EEO TR
428-438
Bates 24-26

CONFIDENTIAL

429

1  Dr. Presant may not have taken other accounts into
2  consideration. For example, the first letter from
3  the physician indicated that based on Ms. Bearman's
4  condition that no accommodation was possible at
5  all.
6       JUDGE KHARE: But he was actively then
7  involved in the process. If he was reading the
8  letters and seeing the inconsistencies, he was
9  actively involved. He had an active role in this.
10      THE WITNESS: I don't recall him ever
11 saying we need to do this reasonable accommodation.
12 It was more or less the letter from Dr. Presant
13 that was the determinant, that was the basis for
14 seeking the reasonable accommodation. From there
15 it was a closed issue.
16      JUDGE KHARE: Except that Dr. Presant's
17 letter came out in December and according to your
18 notes in January, on January 6th, Dave was unhappy
19 with Dr. Presant's screening of reasonable
20 accommodation, told Dave that the issue had been
21 raised at a preceding meeting and that -- I am
22 taking out a little from this -- Dr. Presant may

1  have worked there too with other staff doctors.
2       So, in January, in early January,
3  Mr. Williams was raising issues regarding the
4  accommodation, was he not?
5       He was involved in January with your
6  deliberations and your finding.
7       Is that accurate?
8       THE WITNESS:  Yes.
9       JUDGE KHARE:  Okay.  That answers my
10 question.
11      I am sorry, Mr. Quinn.  You can continue.
12      BY MR. QUINN:
13   Q.   And that continued right up to January
14 18th, correct?
15      January 6th he told you he was unhappy.
16 On January 18th Dave Williams is still waiting for
17 a letter from Julie asking for an independent
18 evaluation.
19   A.   Yes.
20   Q.   And that was sort of delaying things,
21 wasn't it?
22   A.   No.  Not at all.  We were continuing to

1  proceed with the reasonable accommodation.
2          I believe, without going through these,
3  that there were contacts with the offices that we
4  were seeking a reasonable accommodation with.  At
5  no time did Dave Williams say stop with the
6  reasonable accommodation.  I would have documented
7  it if he had.
8      Q.   I am glad you brought that up,
9  Mr. Fulcher, because looking at your note of
10 1/18 --
11          JUDGE KHARE:  And these notes are
12 Exhibit 2 in the Complainant's proposed exhibits?
13          MR. QUINN:  Yes.
14          BY MR. QUINN:
15     Q.   Looking at your note of January 18th
16 where you acknowledge again that Dave Williams is
17 waiting for this letter requiring Ms. Bearman to
18 submit to an independent evaluation, you went on to
19 say -- this is you talking to Paula, who is David's
20 assistant, right?
21     A.   Yes.
22     Q.   "I said that the RA issue could be worked

1   independent of that and that we should not delay it
2   while we await the independent evaluations. She
3   said she will discuss with Dave."
4        It was your perception at that time that
5   the reasonable accommodation work was being delayed
6   so Mr. Williams could get a second opinion and
7   support the whole process?
8        A.   I wouldn't say that it should be delayed.
9   What it says here is that we should not delay it.
10  Okay?  That may have been an issue, but my
11  impression was, no, that we should not delay it and
12  I didn't.  I proceeded with the reasonable
13  accommodation.
14       Q.   Why would you even bring that up,
15  Mr. Fulcher, if you didn't think it was being
16  delayed?  And why would Ms. Fyne have to tell you
17  that she would discuss it with Dave?
18       A.   Maybe actually what I was going to do.
19  I was going to proceed with the reasonable
20  accommodation effort absent anybody telling me to
21  stop, and that is exactly what I did.
22       Q.   Then sometime later Mr. Williams told you

1    he thought Ms. Bearman was abusing the reasonable
2    accommodation process.
3            Do you remember that?
4       A.   Where is that?
5       Q.   I will find it for you.
6            JUDGE KHARE: Please do.
7            It is on page 6, end of the second full
8    paragraph.
9            BY MR. QUINN:
10      Q.   Yes. Page 6.
11           MS. SOBCZAK: Which page 6 are you
12   referring to?
13           JUDGE KHARE: It is the small number 6,
14   the handwritten 6, in his proposed Exhibit 2.
15           BY MR. QUINN:
16      Q.   At the meeting of 1/6 did Mr. Williams
17   say in that meeting that he felt Ms. Bearman was
18   abusing the reasonable accommodation process?
19      A.   Let me just read it. Hold on.
20           The last paragraph? Hold on.
21           JUDGE KHARE: It is the second paragraph
22   that starts off "10:10 meeting".

1      THE WITNESS: Okay. Thank you.

2      (Witness reading.)

3      Okay. If you would ask the question

4  again.

5      BY MR. QUINN:

6      Q. Well, the question was did Mr. Williams

7  say or suggest that he felt Ms. Bearman's

8  reasonable accommodation request was an abuse of

9  the reasonable accommodation process?

10     A. I don't know if her name was mentioned

11 per se because what it says in here the employee's

12 name was not mentioned.

13     JUDGE KHARE: But wasn't the entire

14 meeting about Ms. Bearman?

15     THE WITNESS: Yes.

16     JUDGE KHARE: It was about her?

17     THE WITNESS: Yes.

18     Well, I wasn't at the meeting, but

19 obviously that came up in the meeting. Whether

20 there were other issues discussed at the meeting I

21 don't know. But yes, that came up in the meeting.

22     JUDGE KHARE: But I mean the meeting that

1  you had on December 6th at 10:10 in the morning you
2  were at. These are your minutes. This is your
3  recollection from the meeting.
4        THE WITNESS: From the 10:10?
5        JUDGE KHARE: Yes.
6        THE WITNESS: No. I wasn't at that
7  meeting.
8        Wait a minute.
9        It is referring back to another meeting
10 that Dave Williams was in with Dave, Mader and the
11 Commissioner, and I definitely wasn't at that
12 meeting.
13       JUDGE KHARE: Okay. But at the meeting
14 that you were at on the 6th the subject was
15 Ms. Bearman?
16       THE WITNESS: Yes.
17       JUDGE KHARE: Okay. Thank you.
18       BY MR. QUINN:
19   Q. Let me ask: Mr. Williams was a pretty
20 powerful guy, wasn't he?
21   A. Yes.
22   Q. Still is, right?

1    A.   Yes.

2    Q.   You are how many rungs down the ladder
3  from Mr. Williams?

4    A.   At that time I was, let's see, about
5  three.

6    Q.   Is it fair to say that if Mr. Williams
7  thinks that someone is abusing the reasonable
8  accommodation process, someone like yourself, just
9  a cog in the wheel pretty far down the line, who
10 helps her get her accommodation, is not going to be
11 looked on unfavorably?

12   A.   I didn't see it that way and I think the
13 documentation supports that.

14        I proceeded with the reasonable
15 accommodation. At no time in here will you see
16 that, gee, I better stop because Dave Williams
17 thinks there may be a problem here. I proceeded
18 with the reasonable accommodation.

19        You will also see that within a month of
20 this meeting that we had a contact to Mr. Burns
21 making the tentative offer for the reasonable
22 accommodation. I think if anything had been done

1   to stop this at any time, that it would have taken
2   a heck of a lot longer before we got anything for a
3   reasonable accommodation.
4       Actually not being real familiar with
5   this, it would take longer to hire somebody in the
6   IRS than it took for us to reasonably accommodate
7   her, which is a considerably more complex process.
8       Q.   But suffice it to say that you and the
9   others involved in the process knew that
10  Dave Williams' personal opinion was that
11  Ms. Bearman was abusing the process?
12      A.   That could very well have been.  Yes.
13  That could certainly have been his opinion.
14      Q.   Okay.
15      JUDGE KHARE:  Did you feel that that was
16  his opinion?  Was that the feeling that you got
17  from this?
18      I mean, you weren't in Mr. Williams'
19  brain, but did you walk away with the perception
20  that that was one of his concerns?
21      THE WITNESS:  Yes.  I think that is fair.
22      BY MR. QUINN:

1   Q.   Mr. Williams quest to have an independent
2   medical evaluation continued right on into February
3   in fact, didn't it?
4   A.   Going from memory, yes.
5   Q.   Did anybody, or did you, as far as you
6   know, did anybody go back to Dr. Nowak herself
7   during that period of time and ask her about an
8   independent medical evaluation?
9   A.   I don't think so.  I don't have any
10  knowledge of that.
11  Q.   Did anybody go to Dr. Presant and ask for
12  it?
13  A.   Not that I am aware of.
14  Q.   This was all done by people looking for a
15  reasonable accommodation.
16       JUDGE KHARE:  Was any third independent
17  evaluation ever made?
18       THE WITNESS:  No.  I don't believe so.
19       JUDGE KHARE:  Okay.
20       BY MR. QUINN:
21  Q.   You never asked Dr. Nowak to clarify her
22  opinions either.

Exhibit 4

### Terri Bearman

Call received from Nancy Green explaining that Terri owes approximately $1,300 in backpay for emergency salary payment. Nancy said that Terri had not been returning her calls. I reviewed records at Customer Service and determined that emergency salary had been received by Terri along with regular salary the following pay period creating a balance due. Terri sent a check that pay period which bounced due to insufficient funds.

Certified letter sent to Terri advising her of debt and that it must be repaid.

Received call from Nancy Green saying that Terri called her complaining that she had agreed to pay the debt next January when she filed her tax return. I told Nancy not to negotiated issue but to refer Terri to me or to Nancy's manager.

12/9 - Met with Stuart Fields in LR and Madeline Mendola. Discussed Terri's request for religious comp. time. Called Terri an 10:45 and explained that it was not likely her request would be approved and that it would be charged as LWOP. Terri said I could fax her the letter once decision was made later this morning.

12/16 - Meeting held to discuss Terri's Reasonable Accommodation. Attending:
Paula Fyne CL:
John R. Burns EOM
Kathy Glover (King) EOM
Julie Berry GLS
Rob Fitzpatrick
Barry Fulcher
Madeline Mendola LR
Joan McIver - LR
Annie Brown - Appeals

12/21 - Terri in office spoke to her about her doctor's letter and that it set approximate office hours at 10:00 to 4:00. I explained that she needed to include 30 minutes for her lunch time. She said she did not think that was necessary. I told her I would confirm with LR. I also asked her if she had any questions re: the time and attendance memos that Rob and Sue had sent to all employees (I gave her copies again). She said no and that she would comply. I explained that she had been charged with AWOL for the portions of 3 days during the preceding week - she said that she understood that. Terri said she planned on putting in for leave under the Employee Leave Act. I asked if she

Fulcher
EXHIBIT
2  3-18-02

000006
0000022

had the forms and she said yes and would not need any assistance. I explained to Terri that while she was in the office she would be expected to do her work in accordance with her performance standards. She said that her doctor's excuse allowed her flexibility in that regard, I replied that it only covered her absences. She said she would have doctor's note asap explaining her work limitations in greater detail.

Rob and I drafted a memo to Counsel, A/C International and Examination requesting Reasonable Accommodation. I sent e-mail version to Paula Fyne, John R. Burns and Julie Barry for comment prior to sending it.

12/23 - Form on my chair from Terri requesting 480 hours of LWOP beginning 12/28. Also letter from her doctor explaining that Terri is limited in her duties. Spoke to Madeline Mendola in LR. She said that leave request can be approved by me. Terri is required under federal regs. To have lunch time allotted if she works more than 4 hours a day. Also that Terri is expected to work in accordance with her performance standards. Explained same to Terri - she agreed with the lunch provisions but said that she is excused from meeting her performance standards according to her EEO Counselor Eddie Coleman 202-283-7480. Called Julie Barry, she said she will talk to Eddie Coleman for clarification.

Provided Terri her annual appraisal and FY 2000 Performance Standards. I told her that Rob and I will be available to talk to her today. However, after today only Rob until I return on 1/3. Terri said she will need time to review documents and will then discuss.

Met with Rob this a.m and he said that Paula does not want to sent memo and would prefer that executives meet to discuss and do the accommodation. She said she will talk to Dave Williams and let us know his thoughts.

Spoke to EEO Counselor Colman on 12/23 at my home via telephone. I explained Terri's claim that she was not required to meet Critical elements and Performance Standards per her conversation with him. Mr. Coleman said that was incorrect and that Terri was required to meet them. I updated him on our letter to EP/EO et al and he said that was a good plan.

1/4 - Prepared and signed memos to A/C Exam, International, Appeals and Associate Chief Counsel notifying them reasonable accommodation request. Memos were prepared with assistance of Julie in GLS. Rob Fitzpatrick and I met with EEO Counselor Edward Coleman and briefed him on actions the Service has taken to reasonably accommodate. Gave him copies of memos. He suggested that we consider the following:

Get opinion from LR/GLS as to whether IRS should modify Terri's job standards;

1. Get opinion from GLS whether it might be construed as coercive if the Service raises the issue of disability retirement;

000007

0000023

2. Determine whether agency can remove employee if they are unable to meet performance standards eventhough disabled.

1/6 - In office in a.m and met with Sue at her request. She said Terri's case had come up in a meeting with Dave Williams, Steve Whitlock, Dave Mader and COR. I had a call from Gail Carrol who said that Terri had called the COR's office yesterday and that she had made remarks to Steve W. that she might hurt herself. A meeting was planned for 10:10 that would include Steve, Gail, Julie Barry and John Burns and myself. I checked my voicemail prior to going to the meeting and there was a message from Terri saying she would be coming in at 11:00. I advised Gail of this and Steve suggested and I readily concurred that I should call Terri immediately and advise her not to come into the office. I did so telling Terri that she would be on admin leave today. I called Security leaving an urgent message for Jim May to let him know of the change in Terri's status to see what, if anything he wanted to do.

10:10 Meeting - We discussed the case in general and Terri's comments in particular. It was agreed that her comments to Steve may or may not be construed as suicidal but that the IRS should come down on the side of caution until someone qualified could make that determination. The process for doing that would be for Julie to contact Dr. Presant who would in turn discuss the issue with Terri's physician asap. We also discussed at length the reasonable accommodation issue and what the Service should do in the light of Appeals (Johnnie Brown) continuing consideration of a detail for Terri to that organization. We tentatively agreed that work on the detail should be delayed until the medical issue was resolved. During the meeting Steve discussed a the meeting that had occurred the preceding day between him, Dave Mader, Dave Williams and COR. Terri's case (she was not mentioned by name) had surfaced as an aside and it was discussed that employees should not be allowed to abuse the reasonable accommodation program. On the heels of this meeting had come the call from Terri to COR's secretary who transferred the call to Steve.

I had received a call from Paula prior to the meeting asking that I call her back and summarize the meeting. After the meeting I called Paula and explained what had happened and she said that Dave Williams would probably want to discuss the issue. I got a call back soon thereafter and Julie and I went and briefed Dave on what had occurred.

Dave was unhappy with Dr. Presant's granting of reasonable accommodation since he may not have had sufficient input from a psychologist or psychiatrist. I told Dave that issue had been raised at the preceding meeting and that John Burns said that Dr. Presant may have worked the issue with other staff doctors. Dave thought that it might be worthwhile to get additional information about that decision making process. I explained to Dave the recommendation that Terri be placed on admin. Leave and he concurred since we could not be certain of her state of mind. Dave agreed that Julie should contact Dr. Presant so he in turn could talk to Terri's physician and explain what had happened and decide whether she should remain on admin leave. A letter would go to Dr. Presant and be cleared through Kathy King first who is the reasonable accommodation contact working Terri's case. Dave also said he wanted the letter to address the inconsistencies in Terri's doctors letters since in one she said Terri could not work but in the

ater one (once Terri said she was experiencing financial problems) that she could work.

Following the meeting with Dave, I went to LR and spoke to Madeline Mendola regarding the Admin Leave issue as to how to work it. Madeline said that the decision can be made at my level and that a memo to Terri explaining that she is on admin leave would be o.k. I returned to my office and called Terri advising her she would be on admin leave until further notice. Terri was agreeable and asked whether she would be paid while she was on admin leave - I replied in the affirmative. I met with Sue and Rob and briefed them on the days events. Sue was concerned that we should make sure that the issues be worked at the appropriate levels and by the appropriate people. We did not disagree.

Paula called and said that Dave Mader was going to review the case and asked if I could match her file with mine and add any relevant documents. I did so and added a transmittal addressed to her and Dave Williams.

1/7 - I drafted the admin leave memo and sent it to Jule, Madeline, Kathy King for comment. I ccd Paula, Sue and Rob. Sue told me that Robin would be assisting me in working the case and that she did not want anything else to go out of the office without her o.k.

John Burns called and said that he had spoken to Jonnie Brown and that she was still interested in the detail for Terri and would meet with her Director Dan Black.

1/10 - Worked on wording of Ltr to Terri with Julie, Sue and Robin.

1/11 - Robin and I met with Joan McIver in LR - Madeline and Stuart Fields not available. Discussed draft ltr. and it was reviewed by Joan who said it looked fine. I asked Joan about the Letter of Reprimand for late payment of emergency salary increase, she said she would supports concept. I asked her about progressive discipline, she will check and make sure that a letter rather than other disciplinary action is warranted and call me back today.

I sent copy of ltr. to Julie for comment. I called Debbie Holland X36393 to make sure that Terri's payment cleared the bank (the last check bounced). I also asked about the tax consequences for the 1998 emergency salary payment. Debbie said that a W-2 should have been sent to Terri to report the payment as income and that she (Debbie) will check that out also.
1/12 - Heard back from Debbie Holland. Terri's payment cleared and she was issued a W-2 for 1998 for the emergency salary payment.

Completed letter to Terri after clearing thru LR (Joan McIver) and GLS. Sent it certified and regular mail to Terri.

Received call (voice mail) from Exec. Asst Steve Lisante at A/C International. Steve said they do not have any Atty. positions. I called him back and L/M to call me. I want to get info. In writing along with # of positions they are authorized and whether they anticipate any vacancies or staffing increases.

Met with Joan McIver re: draft Ltr. Of reprimand. Joan will research and make sure that we are

000009

0000025

on solid footing for the ltr. I told her of results of telephone call with D. Holland. Sent e-mail to King and Burns re: info. from A/C International.

1/13 -

Received voicemail and e-mail from Fisher in A/C International - no positions available and none expected in foreseeable future. Rec'd call from Terri, she said that she did not receive anticipated salary - I told her I would check with timekeeper. I also told her that I'd heard she had 44 hours of leave contributed to her this pay period. Terri said that she is applying for the leave bank and next pay period leave will go to that. She said paperwork was sent to Renee Marbaly already by her.

I called and spoke to Stuart Fields in LR and Julie re: the Reasonable Accomodation guidelines #27 that indicated that federal agencies must accommodate outside agency if nothing is available within the agency. This means that Counsel might have to take Terri. Stuart said he will research.

1/15-

Rec'd voice mail from Stuart saying he researched the RA issue and that he thinks IRS has to go to Counsel and outside if necessary. He said he discussed with Julie and that

1/18 -

Rec'd fax from Terri saying that she is aware that Counsel has 3 positions open and that RA requires IRS to accommodate her in one of those positions. Sent copy of fax and transmittal to Stuart, Julie and Paula requesting expeditious resolution of issue. I called Paula and updated her and she said that Dave Williams is still waiting on letter from Julie asking that an independent evaluation be done on Terri. I said that the RA issue could be worked independent of that and that we should not delay it while we await the independent evaluation. She said she will discuss with Dave.

Rec'd call from Romona Johnson the office timekeeper. She said that The Leave Donation Office had incorrectly told her that Terri had 44 hours of leave donated to her in Pay Period One - (I had communicated to Terri the preceding week that she had received the 44 hour donation and Terri requested that it be applied to earlier payperiods to offset LWOP). Romona said that the Leave Donation Office had incorrectly reported to her and that the 44 hours actually represented all donated leave. I asked Romona to provide me e-mail with cc to Rene Marbaly in Leave Donation to confirm the error and the actual amount of leave that Terri has so I can notify Terri.

1/20 - Rec'd verification of leave and faxed short memo to Terri explaining problem. Fax receipt confirmed. Mailed letter also.

000010

0000026    3

Voice mail from Terri - transcript follows:

Hi Barry this is Terri. It is ten before five on Friday afternoon and I just now received your message. I won't be returning Monday. Number one I have the flu but number two my doctor made it clear that my condition is not going to improve any until some kind of action is taken on my request for Reasonable Accommodation now I have requested an interim accommodation of a 120 day detail. So far nothing from what I can see, nothing has happened. It's the 30 day counseling period has run out and before I return to work I would like to know what, if anything has been done on the accommodation and I think I have made it clear that I cannot return to the position in the Office of Public Liaison. This is just not going to work. So I would appreciate it if you would please inform me as to what the plans are as far as reassigning me and I would like to know that as soon as possible on Monday and if you could tell me. Please call me at home and then follow it up with a letter. I would really appreciate some information and some closure on this because I have other options open to me but returning to that position is not going to be one of them. Thanks

2/1 - Met with Julie, Paula, Robin and Stuart to discuss drafted letter. Made revisions to everyone's satisfaction. Deleted reference to Appeals detail. Paula indicated that Dave Williams did not want to pay for detail and we should check with Appeals to see if they are willing to pay. This may be feasible since we are getting ready to detail a person from Appeals to my office. I will call Annie Brown asap.

2/2 - Made revisions to letter - will try and get it out tomorrow. Called Terri, told her ltr. Should be mailed to her tomorrow and that it addresses Reasonable Accommodation and reconfirms that Admin. Leave was terminated last Friday. She said that she did not think that was adequate notice. I pointed out to her that the decision is final.
Faxed copy of letter to Julie. Sent voice mail to Julie and Stuart Fields.

Tried calling Terri back - no answer - phone only rang. Will try again later.
Ditto above.

2/3 - Sent ltr. Certified and regular mail to Terri outlining actions taken to achieve RA. Call made to Annie Brown to see if they will absorb cost of Terri's detail as we are picking up costs associated with an Appeals employee. L/M/T/C
Later - Spoke to Annie, she said that she does not expect that Appeals will be able to pickup funding for detail due to costs. She will check with Dan Black and get back to me shortly.

2/4 - Worked on letter to Terri explaining that she will need medical clearance soon after return to work. Stuart ▓▓▓▓▓ are supportive of this approach based on Terri's doctor's mixed messages about her condition. Overriding concern is for her welfare and employees. Julie sent her draft ltr. Around for review. Focus of ltr. Is to seek clarification on Terri's condition based on mixed messages from Terri's physician.
Paula said Dave W. reviewed ltr and agreed with it.

2/8 - Received acknow. Fax from Terri that she rec'd ltr that I sent her. Ltr. Thanks me for the

000011
0000027

information I provided and said she will be into work on Monday. Ltr dated 2/8 in error - I received ltr. 2/8 and Terri writes that she will be in office on Monday - she was planning on coming 2/7. Rec'd e-mail from Annie - Appeals cannot fund detail - it is now a closed issue.

I was out on 2/7 - VMS fro Terri, [something came up - will not be in]. VMS from Terri on 2/8 - will not be in, not feeling well.

Rec'd call from John Burns. He rec'd call from Va.-WV District's Sue Williams 804-916-8700 re: request for RA. She is seeking additional time to respond. John told her she needs to clear that with me. I will call her on 2/9.

2/9 - VMS from Terri - [back is bothering me, I won't be in, maybe in this afternoon. T/C to Sue Williams - L/M/T/C me. Rec'd call from Sue Williams - she requested until 2/22 to respond to memo. I agreed.

2/14 - 2/15 - I was out of office on leave, Terri came in on Monday and Tuesday.

2/16 - Spoke to Julie, she said Richmond District said they may have a GS-12 atty position available at Bailey's Crossroads, Va. That Terri would be eligible for. She is checking out pay retention possibilities now. I conveyed info. To Paula, John Burns and Stuart. Julie is going to review ltr. To Terri that I wrote re: obtaining medical certification. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Julie also said that EEO wants the Dr. Present ltr to come from me since I am Terri's employer. I will review that. Terri called saying she will not be in today (initially this a.m she called on my voice mail saying she would be in at 12:30. Both messages were on voice mail.

2/18 - Rec'd voice mail from Va/WV ADD Wm. Robertson, he said they will pay salary difference if it is o.k with GLS and NO. I Relayed message to Julie. Rec'd memo from Exam - they have no 905 atty positions.

3/1 - Ltr drafted to Terri authorizing RA. I am holding it pending response from Md-Del re: RA request. Phoned Md-Del staff asst Kim Sasajima 410-962-3084 asking for response to memo. I e-mailed Marie Medeck the AD but she is out for the rest of the week. Kim said she will check and call me back asap. I phoned William Robertson the AD in VA-WV District asking for something in writing that they will offer Terri the job with pay retention. He asked me to call his chief Personnel, Cindy Powell to resolve the authorization for the pay retention. He said the pay retention is o.k but he thought GLS would want to provide some background on it to Cindy.

3/6 - Rec'd fax from Richmond Va. Saying they will offer position to Terri along with pay protection. I called EEO (John Burns), Stuart Fields and Julie Barry and updated them on the offer. I put the finishing touches on the offer letter for Terri and will present it to her on 3/7 in the company of EEO and Stuart.

3/7 - Terri not in - I called her and left a message to call me.



3/8 - Terri not in, message from her said she would like to receive offer by fax and then discuss in the p.m. I voice mailed John, Julie and Stuart asking if they are o.k with that. Sent Terri an e-mail requiring SF-71s for missed time and for future leave.

3/9 - Rec'd mssg. From Terri on voice mail - she is unhappy about not yet being in the Leave Bank and threatened to file amend her EEO complaint to include me if it was not resolved by next week. I'd met with the timekeeper previously to review problem and it appears to be rooted in Terri's failure to submit leave slips and time sheets.

3/13 - Rec'd voice mail from Gina Reyes - adjustment made on time cards and Terri should be in leave bank in near future.

3/13 - Called Stuart re: an e-mail I received from Terri last week while I was out saying she cannot fill out the SF-71 due to hand tremors but that she can sign them if I have them filled out for her. If this is the case, then how can she do her job?? I discussed with Stuart and Julie and we will wait to see results of whether she accepts or rejects the offer later this week.