**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| TESSA E. BERGMAN | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. <u>06-0303 (GK)</u> |
| v. | : | |
| | : | |
| HENRY M. PAULSON, JR. | : | |
| SECRETARY OF THE TREASURY | : | |
| | : | |
| Defendant. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT'S MOTION**
**FOR SUMMARY JUDGMENT**

Plaintiff Tessa E. Bergman ("Plaintiff") submits her Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, and states as follows:

<u>Preliminary Argument</u>

This opposition should only be a few pages long. To make its case for summary judgment, defendant Henry M. Paulson, Jr., Secretary of the Treasury ("Defendant"), as required by Local Rule 56.1, submitted a Statement of Material Facts stating the facts that it contends are uncontested that form the basis for entry of summary judgment. Defendant submitted a statement containing only *three* alleged material facts it contends are not in dispute:

1. An excerpt of a letter from Plaintiff's expert Judith Nowak, M.D., dated October 11, 1999, stating that Plaintiff is unable to work due to depression;

2. An excerpt from a letter from Dr. Nowak dated October 22, 1999, stating that Plaintiff could return to her job and work if she received a reasonable accommodation for her depression (substantive work) and that Plaintiff could work in another position

if she received a reasonable accommodation under the Act (a job involving substantive work); and

3.  An excerpt from Plaintiff's Rule 26 expert opinion statement from Dr. Nowak stating that "In October 1999 Ms. Bergman had a disability as a result of her depression that prevented her from doing her job as then configured."

If these three facts have probative value at all, they establish that Plaintiff met the legal criteria of a qualified individual with a disability under the Rehabilitation Act. However, from this narrow statement of material facts not in dispute, Defendant proceeds to submit a 45-page Memorandum of Points and Authorities ("Defendant's Memorandum") containing arguments mixed together with deposition quotations and references to documents that are not mentioned in Defendant's Statement of Material Facts ("Defendant's SOMF") and which do not relate to any material fact alleged not to be in dispute in Defendant's SOMF. Defendant does not provide a "separate" or "concise" statement isolating pertinent material facts it claims are not in dispute as required by Rule 56.1. *Robertson v. American Airlines, Inc.,* 239 F. Supp.2d 5, 9 (D.D.C. 2002). In effect, Defendant has filed no statement of material fact at all. Consequently, in responding, Plaintiff does not have a fair opportunity to respond to a clear and concise universe of specific facts with an argument as to why those facts do not entitle Defendant to summary judgment. As the court observed in *Robertson*:

> The Rule 56.1 procedure 'isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.' Thanks to Rule 56.1, the district court is not 'obligated to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [an] analysis and determination of what may, or may not, be a genuine issue of material disputed fact.' Instead, the rule 'places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record.'

> Although the rule's directive to movants varies slightly from the rule's directive

> to non-movants, both the movant and the non-movant bear the obligation of clarifying relevant issues for the district court. LCvR 56.1. As our court of appeals has stated, the purposes of the rule 'clearly are not served when one party, particularly the moving party, fails in his statement to specify the material facts upon which he relies.'

> Because the rule helps the district court maintain docket control and decide motions for summary judgment efficiently, the D.C. Circuit has repeatedly upheld district court rulings that hold parties to strict compliance with this rule.

*Id,* pp. 7-9 (citations omitted). Defendant does not isolate specific material facts that it claims entitle Defendant to summary judgment on any of the grounds asserted in the motion for summary judgment. Instead, the text of Defendant's points and authorities contains quotations from deposition testimony, letters and medical records, many of which are taken out of context and which are neither cited in Defendant's SOMF nor even logically connected to the three narrow facts alleged in Defendant's SOMF. Defendant has, in the text of its points and authorities, simply thrown out a series of diffuse quotes intermingled with argument in a manner that makes it extremely difficult for Plaintiff to respond. The net result of Defendant's failure to comply with the rules is that Plaintiff is not only denied the opportunity afforded by Rule 56.1 to respond to specific alleged facts relating to each ground asserted for summary judgment, but Plaintiff is forced to respond in the same manner.

With all due respect, Defendant is far too competent and experienced to submit a motion for summary judgment in this form by mistake. Rather, Defendant's apparent tactic in omitting a meaningful statement of material fact and then mixing fact and argument together is an attempt to force Plaintiff to file a long, detailed opposition in the same form to leave the impression that there are truly disputed facts. Defendant's filing in this manner is part and parcel to Defendant's response to Plaintiff's Motion for Partial Summary Judgment. There, as here, Defendant does not provide specific material facts in dispute on the key allegations of Plaintiff's SOMF

submitted in support of Plaintiff's Motion for Partial Summary Judgment, but instead Defendant incorporates by reference its arguments on pages 13-33 of Defendant's Memorandum.    Thus, Defendant has not designated specific facts in dispute here both to avoid responding directly to Plaintiff's Motion for Partial Summary Judgment and to leave the impression that there are disputes of material fact where none exist.    Plaintiff respectfully submits that Defendant's motion for summary judgment must be denied for failure to comply with the Local Rules of this Court.

<u>Preliminary Statement</u>.

It is uncontroversial in this case that Plaintiff has suffered from chronic depression for her entire life.    In the fall of 1999, Plaintiff's depression deteriorated to acute depression and disabled her from work  The acute depression was precipitated by Plaintiff's work circumstances where, as a GS-14 Program Analyst, Plaintiff's only job responsibilities were to perform clerical and secretarial work.    When she was not performing clerical or secretarial work, Plaintiff's job involved sitting at her desk doing nothing at all, because office rules and monitoring practices prevented her from leaving her office or having personal phone conversations or private Internet access.

This job was emotionally devastating to Plaintiff who is a highly educated, intelligent and motivated individual.    Plaintiff repeatedly requested that she be assigned substantive work to do, but those requests were not acted upon by Defendant.    In early October 1999, Plaintiff's psychiatrist, Judith Nowak, M.D., determined that Plaintiff was unable to work due to a major depressive disorder resulting directly and proximately from her secretarial and clerical job functions and the lack of any substantive work.    Dr. Nowak advised Defendant that Plaintiff would be capable of working if she received one simple accommodation--a job that involved

substantive legal work commensurate with Plaintiff's education, training and intellect. Accordingly, Dr. Nowak recommended that Plaintiff's position be restructured to include legal work or that Plaintiff be assigned to a position involving legal work. An independent physician hired by Defendant to evaluate Plaintiff's disability reached exactly the same conclusion and recommended that Plaintiff be provided either a job restructuring or reassignment to a position involving substantive legal work.

Plaintiff remained disabled from October 1999 through March 2000 when Defendant finally offered her a position in an IRS field office as an estate tax attorney. Since late March 2000, when she started the new job involving substantive legal work, Plaintiff has performed all of her job functions without difficulty. Thus, the accommodation requested by Dr. Nowak and Defendant's own independent physician retained to evaluate Plaintiff in 1999 actually worked. Plaintiff is a productive estate tax attorney and has not taken any time off work because of depression.

The issues before the Court in this case relate to what happened between the time Plaintiff requested a reasonable accommodation under the Act in October 1999 and the time she finally received a job transfer, and a two-grade level demotion, in March 2000. Before that reassignment in March 2000, Defendant refused to transfer Plaintiff to any of the vacant, funded positions in the IRS' Office of Chief Counsel in Washington, D.C., at Plaintiff's then current grade level for which Plaintiff was fully qualified. Plaintiff claims that this action violated the Rehabilitation Act. In addition, Defendant retaliated against Plaintiff for filing the request for a reasonable accommodation under the Act by intentionally delaying and obstructing the reasonable accommodation process.

This case is before the Court on cross-motions for summary judgment, as it was in the administrative proceedings below. In both cases, Defendant moved for summary judgment on the basis of uncontested material facts. Defendant's motion for summary judgment here is nothing short of remarkable in that the material facts Defendant now claims are uncontested[1] are the exact *opposite* of the material facts Defendant previously agreed were uncontested facts at the administrative level. Specifically, Defendant now asserts that there is no dispute of material fact that Plaintiff is *not* a qualified individual with a disability within the meaning of the Rehabilitation Act, when Defendant represented below on summary judgment that there was no dispute that Plaintiff *was* a qualified individual with a disability.

Thus, when Plaintiff filed a motion for summary judgment below asserting that there was no dispute that Plaintiff was an individual with a disability entitled to an accommodation under the Act, Defendant filed a cross-motion for summary judgment attesting that there were no material facts in dispute and that Defendant *had* provided a reasonable accommodation under the Act as a matter of law. Defendant now apparently recognizes that the legal argument made below that Defendant had provided Plaintiff with a reasonable accommodation under the Act as a matter of law is so weak that it cannot survive scrutiny. To accomplish this reversal, Defendant simply changes the facts.

Thus, the central fact Defendant previously asserted was true beyond dispute--that Plaintiff was a qualified individual with a disability--Defendant now certifies is not true beyond dispute. This claim is based solely on the argument of counsel. Plaintiff submitted the expert testimony of Judith Nowak, M.D., who attested that Plaintiff has a disability that requires a reasonable accommodation under the Act. An independent expert retained by Defendant in 1999

---

[1] Defendant does not even state in Defendant's SOMF that Plaintiff is not a qualified individual with a disability and only makes that argument in the text of its Memorandum.

to review Plaintiff's request for a reasonable accommodation under the Act also determined that Plaintiff had a disability that required a reasonable accommodation under the Act. In this proceeding, Defendant had Plaintiff examined by a second expert, Martin Allen, M.D., who is also unable to disagree with Dr. Nowak's findings.

In the proceedings below, Defendant's employees, including the employee designated as the agency representative under F. Rule Civ. P. 30(b)(6), testified repeatedly and consistently that Defendant determined on December 3, 1999, that Plaintiff was a qualified individual with a disability and that the determination was conclusive and final. Defendant now seeks to undo what was done before by relying on small excerpts of deposition testimony that do not challenge the underlying expert opinion that Plaintiff was a qualified individual with a disability.

Defendant's motion for summary judgment is wholly without merit and, if anything, it makes the case for entry of summary judgment for Plaintiff.

I.    <u>Plaintiff Is A Qualified Individual With A Disability.</u>

   A.  <u>Statement of Facts</u>.

Defendant moves for summary judgment on the basis that Plaintiff is *not* a qualified individual with a disability. Plaintiff has also moved for partial summary judgment on the basis, in part, that Plaintiff *was* a qualified individual with a disability. The only medical testimony in this case, including the opinions of *two* experts retained by Defendant, is that Plaintiff was disabled from work due to acute depression and that she is a qualified individual with a disability. In addition, Defendant testified *repeatedly* below in its defense that Plaintiff is a qualified individual with a disability.

Plaintiff was hired in 1998 to be the tax law advisor to the Office of Public Liaison and Small Business Affairs ("OPL"). By July 1999, OPL had grown rapidly in terms of the number

of employees, but there was little or no substantive work to do in the office.  Exh. C, HT (Burns), p. 222.[2]  EEOC investigator John Burns testified that there was only enough work in the entire office to keep one or two employees busy, and most employees in the office simply had no substantive work to do.  Exh. C, HT (Burns), pp. 221, 222.  The only substantive work project Plaintiff had in 1999 was a small business CD-ROM project that she created herself, and that project was taken away from Plaintiff in July by a newly hired supervisor who also apparently had little work to do.  Exh. A, Affidavit of T. Bergman, ¶ 5.

In the summer of 1999, Plaintiff began asking her supervisor for work to do.  There was no substantive work to do, so Plaintiff was given clerical or non-professional work, such as putting together briefing books for meetings and calling various scheduling secretaries of IRS officers to get them to attend meetings.  Exh. A, ¶ 5.  At the same time, employees of the office were subjected to close monitoring of their comings and goings and personal phone calls, and personal Internet use were restricted.  Exh. C, HT (Burns), pp. 223-225.  Because of the combination of close time and attendance monitoring, restrictions on personal activities and little or no substantive work, Plaintiff and others in the office either performed clerical duties or simply sat idle at their desks.  This was not only a colossal waste of public money, but it also created an unhealthy work environment.  The work conditions were particularly damaging to Plaintiff, who is a highly intelligent and motivated individual suffering from chronic depression.

Plaintiff has had mild, chronic depression all of her adult life.  After months of performing only clerical work and, when no clerical work was available, being required to sit at her desk and do nothing while being monitored closely by her office mate and manager, Plaintiff

---

[2] Plaintiff's citations are to documents included as exhibits to Plaintiff's Statement of Material Facts as to Which there Is No Genuine Dispute submitted previously with Plaintiff's Motion for Partial Summary Judgment.

began to slip into acute depression.  Exh. C, HT (Nowak), pp. 32, 36-38.  Finally, on October 4, 1999, Plaintiff took an extended medical leave.

Up to this point in her work experience, Plaintiff's mild, chronic depression had been easily managed with medication and did not interfere with her work.  Exh. C, HT (Nowak), pp. 30-32.  In October 1999,  Plaintiff's therapist, Dr. Judith Nowak, who heretofore had only been monitoring Plaintiff's medication, diagnosed Plaintiff as suffering from acute depression.  Dr. Nowak opined that Plaintiff's request for medical leave should be granted, and that the likely cause of Plaintiff's depression was having no substantive work to do and from being assigned work that was far below her abilities.  Exh. C, HT (Nowak), pp. 36-43; 46-48.  Dr. Nowak testified that Plaintiff was fully capable of working but that her disability required that she be placed in a position involving substantive work commensurate with her intellect and abilities.  On October 22, 1999, through a letter from her attorney, Plaintiff submitted a written request for a reasonable accommodation under the Act.   Exh. A, ¶ 7.  Also in October 1999, Defendant retained Dr. Presant to evaluate Plaintiff's medical condition.  Exh. C, HT (Burns), p. 222.  Defendant does not dispute that Dr. Presant was offered access to Plaintiff's medical and psychiatric records, that he talked with Dr. Nowak about Plaintiff's medical condition at least twice and that he reviewed two letters written by Dr. Nowak about Plaintiff.

On December 3, 1999, Dr. Presant determined that Plaintiff had a disability, acute depression, that required an accommodation under the Act.  Exh. C, HT (Sottile), pp. 488-89; Exh. A, ¶ 10, Attachment 1.    The accommodation requested by Plaintiff and recommended by Dr. Presant was quite modest--that Plaintiff be assigned substantive legal work commensurate with her intellect and abilities or that she be assigned to a position where she would have substantive legal work to do.  Thus, Dr. Presant recommended that Plaintiff's position be

restructured to include legal work or that she be transferred to a position that involved legal work. David Williams, the Chief of the Office that employed Plaintiff, testified that Dr. Presant's decision was "dispositive" and that, once the decision was made, "we have to follow it, and we did." Exh. C, HT (Williams), p. 265. Mr. Williams also testified that, "When Dr. Presant, as the agency third party validator, said this is a reasonable accommodation case, that is the end of the story." Exh. C, HT (Williams), p. 266. The official appointed as Defendant's designee under Rule 30(b)(6) to testify as to whether Plaintiff was a qualified individual with a disability, Barry Fulcher, testified that Dr. Presant's December 3rd opinion was the "final say-so," Exh. C, HT (Fulcher), at 427, and that, after Dr. Presant made his determination, Defendant was "in fact required to find a reasonable accommodation" for Plaintiff under the Act. Exh. B, pp. 11-12; 123-24.

A job transfer to a position involving substantive legal work was the only possible accommodation for Plaintiff.[3] In the months leading up to October 1999, Plaintiff repeatedly requested that she simply be assigned substantive work to do. Instead of assigning work to Plaintiff, Defendant took the only substantive work she had away from her. Defendant knew that Plaintiff was suffering from severe depression and that Plaintiff's depression improved when she had substantive work to do (Exh. C, HT (Sottile), p. 548). Nevertheless, when Defendant's Rule 30(b)(6) witness was asked what was done in response to Plaintiff's numerous requests to be assigned work, he candidly responded "nothing." Exh. B (Fulcher Deposition), pp. 66-67. As EEOC specialist John Burns admitted, the office simply had no work to do, and the work Plaintiff was given was clerical and secretarial work.

---

[3] Defendant admits that it was not possible to restructure plaintiff's Program Analyst position in OPL. See, Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, Statement of Genuine Issues, ¶ 9, admitted.

Williams, who was one of the most senior executives in the IRS, was "unhappy" that Dr. Presant had determined that Plaintiff was to be granted a reasonable accommodation under the Act. Exh. C, HT (Williams), pp. 245, 272; Exh. B (Fulcher Depo), p. 109. Mr. Williams complained to the former IRS Commissioner that he believed the reasonable accommodation process was being abused at IRS, and he took a personal interest in Plaintiff's request for a reasonable accommodation and the resultant job search. Exh. C, HT (Sottile), p. 527. Through January 2000, Williams was pressuring his subordinates to reverse Dr. Presant's opinion, and in January 2000 he even went so far as to have a letter drafted instructing Plaintiff to submit to another medical examination. Exh. C, HT (Williams), pp. 269-70.

John Burns, the Department of Treasury EEOC Liaison Officer, testified that Williams was blocking the reasonable accommodation process. Burns testified that Williams told him on several occasions that he did not want to transfer Plaintiff to another job because he would not "move a problem." Exh. C, HT (Burns), pp. 221, 226. Mr. Burns has stated that, despite being counseled that he was violating the law, Mr. Williams repeatedly told Mr. Burns that he was not going to transfer Plaintiff anywhere. Exh. C, HT (Burns), pp. 225-28. Mr. Burns heard the same thing from Barry Fulcher and from Sue Sottile. *Id.* He confronted Mr. Williams several times, one on one, and advised Williams that the law required Defendant to move Plaintiff to an open position in OCC. Burns stated that he repeatedly got the same answer--Mr. Williams stated that he was not moving "a problem" regardless of what the law said. *Id.*

Plaintiff claimed in the administrative proceedings that Williams' actions delayed the reasonable accommodation process and thereby effectively denied Plaintiff a reasonable accommodation under the Act. Williams testified at the administrative hearing that his involvement did not delay the reasonable accommodation process. Most significantly, Williams

testified that he merely had questions about Dr. Presant's report and felt that further inquiry was necessary. To support his contentions that his involvement did not cause any delay and that Defendant did not question that Plaintiff had a disability, Williams testified repeatedly and consistently that Dr. Presant's decision on December 3, 1999, was "conclusive" and "the end of the story" and that it meant that Plaintiff was entitled to a reasonable accommodation under the Act.

The evidence offered at the administrative proceeding was unusual for a disability case, because Defendant presented evidence that usually would be presented by a plaintiff--that Plaintiff was a qualified individual with a disability. Defendant offered redundant testimony that Plaintiff *was* a disabled individual for whom they were required to find a reasonable accommodation under the Act. Defendant offered this evidence to show that the government acted quickly on Plaintiff's request for a reasonable accommodation under the Act to rebut Plaintiff's case that Defendant delayed the reasonable accommodation process. Further, Defendant presented the evidence that Dr. Presant's determination was conclusive, final and "the end of the story" to rebut Plaintiff's claims that Williams personally attempted to reverse Dr. Presant's opinion and to respond to the testimony of Burns that he was delaying and obstructing the process. Defendant succeeded in using this evidence to persuade the ALJ that it had not unreasonably delayed the reasonable accommodation process while Mr. Williams tried to undo Dr. Presant's opinion. See, Exh. D. pp. 7-8.

> B. <u>Defendant Cannot Contest That Plaintiff Is A Qualified Individual With A Disability Under the Act</u>.

Plaintiff argued in its motion for summary judgment that Defendant must be judicially estopped by the position it has taken, and prevailed on, in former litigation that Plaintiff was a qualified individual with a disability. This Circuit does recognize that where, as here, a party

prevailed at the administrative level by asserting a position, it may be judicially estopped from asserting a contrary position in subsequent proceedings. *Smith v. District of Columbia,* 295 F. Supp. 2d 53, 56 (D.D.C. 2003). Plaintiff acknowledges that judicial estoppel is not applied against the government, except in the most extreme circumstances involving misconduct. *International Union v. Clark,* 2006 U.S. Dist. LEXIS 64449 at 42. While the change in position Defendant takes in this case clearly is "extreme," Plaintiff does not allege misconduct by the government.

However, this Circuit does recognize that a party may not contradict its own sworn testimony at deposition and at trial, as follows:

> Courts have long held that a party may not create a material issue of fact simply by contradicting its prior sworn testimony. See, e.g., *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 975-76 (4th Cir. 1990); *Farrell v. Automobile Club of Michigan*, 870 F.2d 1129, 1131-32 (6th Cir. 1989); *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 520-21 (7th Cir. 1988); *Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 706 (3d Cir. 1988) (citing cases); *Van T. Junkins and Associates v. United States Industries*, 736 F.2d 656, 657 (11th Cir. 1984); *Radobenko v. Automated Equipment* [**29] *Corp.*, 520 F.2d 540, 544 (9th Cir. 1975); *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969); *Kizas v. Webster*, 492 F. Supp. 1135, 1147 n.42 (D.D.C. 1980), rev'd. on other grounds, 227 U.S. App. D.C. 327, 707 F.2d 524 (D.C. Cir. 1983). 'The objectives of summary judgment would be seriously impaired if the district court were not free to disregard [the later testimony].' *Martin*, 851 F.2d at 706. Some courts have extended the doctrine to cover even a non-party witness brought forward to advance the party's case, see, e.g., *Adelman-Tremblay, 859 F.2d at 521,* but where as here the affiant is the sole shareholder and president of the plaintiff corporation, we need not reach that extension. The upshot is that the prior sworn statement will receive controlling weight unless the shifting party can offer persuasive reasons for believing the supposed correction. E.g., *Farrell, 870 F.2d at 1131-32.*

*Pyramid Securities Limited, Appellant v. IB Resolution, Inc.,* 924 F.2d 1114, 1123 (D.C. Cir. 1991); see also, *Globalaw Ltd. v. Carmon & Carmon Law Office & Globalaw, Inc.,* 452 F. Supp. 2d 1, 14 (D.D.C. 2006). Defendant must not be permitted to contradict its prior sworn testimony simply to defeat summary judgment. David Williams, the Chief of the office in which

Plaintiff worked, said that once the decision was made, "we have to follow it, and we did." Exh. C, HT (Williams), p. 265. Mr. Williams also testified that, "When Dr. Presant, as the agency third party validator, said this is a reasonable accommodation case, that is the end of the story." Exh. C, HT (Williams), p. 266. The official appointed as Defendant's designee under Rule 30(b)(6) to testify as to whether Plaintiff was a qualified individual with a disability, Barry Fulcher, testified that Dr. Presant's December 3rd opinion was the "final say-so," Exh. C, HT (Fulcher), at 427, and that, after Dr. Presant made his determination, Defendant was "in fact required to find a reasonable accommodation" for Plaintiff under the Act. Exh. B, pp. 11-12; 123-124. Fulcher himself stated no less than <u>six</u> times in his deposition that, based on Dr. Presant's determination, Defendant was obligated to find a new job involving legal work for Plaintiff in response to her request for a reasonable accommodation under the Act. Exh. B, pp. 11-12, 56, 72, 73, 74, 75, 123-124.

Defendant must not be permitted to contradict this overwhelming and unequivocal testimony to defeat summary judgment.

C.    <u>The Record Establishes That Plaintiff Was A Qualified Individual With A Disability Under the Act</u>.

A plaintiff presents a *prima facie* case of discrimination under the ADA by demonstrating: (1) that she is a *disabled* person within the meaning of the ADA; (2) that with respect to such disability, she is a *qualified individual with a disability* under the ADA; and (3) that she has suffered an adverse employment action as a result of discrimination. *Gaul v. Lucent Technologies, Inc.,* 134 F.3d 576, 580 (3rd Cir. 1998).

1.    <u>Plaintiff Is an Individual With an ADA Disability</u>.

Defendant's argument that Plaintiff is not an individual with a disability is not supported by any specific material facts in Defendant's SOMF and must be rejected for this reason alone.

*Robertson v. American Airlines, Inc.,* 239 F. Supp.2d 5, 9 (D.D.C. 2002).   Rather than base its motion for summary judgment on discrete and specific facts, Defendant instead submits a long argument mixing law with fact, including facts that often require explanation or correction.   This approach appears calculated to allow Defendant to respond to Plaintiff's motion for Partial Summary Judgment, without specific facts, and to leave the impression that there are factual disputes where no disputes really exist.   The only expert testimony in this case established clearly that Plaintiff is disabled and is a qualified individual with a disability within the meaning of the Act.

The Act defines an individual with a disability as a person with "a physical or mental impairment, which substantially limits one or more of such person's major life activities."   29 U.S.C. 705(20)(b).   A major life activity includes functions such as caring for one self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and *working*. (Emphasis added.)   *Stein v. Ashcroft,* 284 F.3d 721, 724 (7th Cir.2002).

Defendant offers long quotations from depositions and medical records to make the point that Plaintiff was not an individual with a disability, because her disability did not prevent her from working at the time she requested a reasonable accommodation under the Act on October 22, 1999.   These quotations present a misleading picture of Plaintiff's real medical condition in the days leading up to her request for a reasonable accommodation under the Act on October 22, 1999.   Thus, while Defendant includes a reference from October 11, 1999, suggesting that Plaintiff's depression had gotten better, Defendant fails to note that Dr. Nowak was so concerned about Plaintiff's condition that she was planning to prescribe powerful, anti-depressant medication (Depakote) and that Dr. Nowak actually testified that Plaintiff's medical condition on October 11, 1999, was precarious as follows:

> By Dr. Nowak:   I would not be thinking about putting her on Depakote, okay?  I would not be talking to her father about her medical history, family medical history.  I would not be doing that if I was not concerned that I was now dealing with a person who was falling apart in front of me.

> By Ms. Fields:  So at that point you thought she was falling apart?

> By Dr. Nowak:  I did.

Exh. H (Nowak) , p. 53.

Defendant then quotes a portion of Dr. Nowak's testimony about an office visit on October 20, 1999, where Dr. Nowak acknowledged that Plaintiff did not at that time have any impairment of certain major life functions including "walking, talking, breathing, eating and sleeping."  Defendant's Memorandum, p. 20.  However, Defendant did not include the follow-up to that question where Dr. Nowak testified as follows:

> By Ms. Fields:  Is there any major life functions which you would say during this period of time in October that she could not carry out?

> By Dr. Nowak:  *She was not able to work during that period of time*, and she did need some support from friends and family.  They either invited her to dinner or cooked for her, or helped her to do various things around the house.

Exh. H (Nowak), p. 71 (emphasis added).

Notwithstanding Defendant's unsupported arguments to the contrary, the only evidence was that Plaintiff was unable to work when she requested the reasonable accommodation under the Act on October 22, 1999.[4]   Defendant's own expert, Dr. Allen, examined Plaintiff, reviewed all of her medical records and testified unequivocally as follows:

> By Mr. Quinn:  You do not question Dr. Nowak's opinions that Ms. Bergman was unable to work because of her depression in the October December [1999] time frame?

---

[4] As explained by Dr. Nowak, when she indicated that Plaintiff could not work in October 1999, she meant that Plaintiff could not work in her Program Analyst position without a reasonable accommodation of a job restructuring.  Exh. K, ¶ 8.

By Dr. Allen:  That is correct.

Exh. I (Allen), p. 9.

The inability to work *is* an impairment of a major life function. *Stein,* 284 F.3d at 724. Dr. Nowak, and *two* defense experts, Dr. Allen and Dr. Presant, provide testimony and letters in the record stating that Plaintiff was disabled from working at the time of her request for a reasonable accommodation under the Act.

While Defendant's memorandum of points and authorities suggests that Dr. Nowak only offered summary opinions that Plaintiff was disabled from work, in fact Dr. Nowak offered specific and detailed testimony about Plaintiff's impairments.  Dr. Nowak testified repeatedly that Plaintiff's cognitive abilities were impaired by her depression.  Dr. Nowak described Ms. Bergman's cognitive impairment as if she had "cotton wool in her brain . . .  it's like thinking through molasses."  Dr. Nowak described the effect of Ms. Bergman's cognitive impairment as follows:

> [I]t is very difficult [for her] to plan work organization and then to be able to follow through with the work organization. It's difficult to – we call it executive functioning, plan tasks, think through and actually act.  It's actually subtle, high integrative, cognitive dysfunction.

Exh. H (Nowak), pp. 90-91.

Courts have held that evidence that the "ability to perform cognitive functions on the level of an average person" constitutes a major life activity. *Battle v. UPS***,** 438 F.3d 856 , 862 (8th cir 2006), quoting *Brown v. Lester E. Cox Med. Ctrs.*, 286 F.3d 1040, 1045 (8th Cir. 2002).  Accordingly, thinking and concentrating qualify as "major life activities" under the ADA.  *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999).  Specifically, having depression that substantially limits a person's "ability to think and concentrate" as compared to the average person in the general population is a disability that limits a major life function.  *Battle,* 438 F.3d at 862.

While the testimony offered by Dr. Nowak is consistent with the opinions of the two defense experts, Dr. Nowak's specific explanation that Plaintiff's depression substantially limited her cognitive abilities establishes beyond question that Plaintiff's disability substantially impaired a major life function. This is the only evidence in this case. Defendant overlooks Dr. Nowak's testimony that Plaintiff was unable to manage such routine daily matters as food preparation and housekeeping. Exh. H (Nowak), p. 71.

In sum, the only evidence of record is that Plaintiff had a disability that affected a major life activity.

Defendant also argues that Plaintiff has only claimed that she was disabled from performing her particular job and was not disabled from performing a category or type of job. *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 491-92 (1999). Defendant's brief, p. 22. This argument is also unsupported by any specific material facts alleged not to be in dispute and must also be disregarded. It is also inaccurate. Plaintiff's expert, Dr. Nowak, testified that Plaintiff is disabled from performing jobs that involve non-substantive work, such as clerical work. Plaintiff submitted an opinion of Dr. Nowak pursuant to Rule 26(a)(2) that Plaintiff's major depressive episode "was caused by work place circumstances, including the lack of any substantive work." Exh. C, HT (Nowak), pp. 36-43. She offered the opinion that Ms. Bergman required a job that involved "substantive work commensurate with her intellectual abilities." Exh. C, HT (Nowak), pp. 40-41. At the administrative hearing in this case, Dr. Nowak testified that Plaintiff was fully capable of working, but that her disability required that she be placed in a position involving substantive work commensurate with her intellect and abilities. Exh. C, HT (Nowak), pp. 36-43; 46-48. In her 2007 deposition, Dr. Nowak described Plaintiff as someone who has the type of depression that makes her "very vulnerable to develop . . . moderate major

depression." Exh. C, HT (Nowak), p. 49. She described Plaintiff's job as follows: "she was expected to do really clerical level work, and this is a person who's incredibly intelligent and smart." Exh. C, HT (Nowak), p. 66.

Defendant took Dr. Nowak's deposition over three hours and only skimmed the surface on this issue but elicited sufficient information to conclude that Plaintiff is precluded from performing clerical and secretarial duties. Dr. Nowak submits an affidavit herewith, where she provides details of her opinions that were not asked for by Defendant during her deposition. Dr. Nowak states unequivocally that Plaintiff was not only disabled from a single position but is precluded by her disability from a broad category of work, as follows:

> Ms. Bergman has suffered from clinical depression all of her life and there is a constant risk that she will slide into the more severe form, acute depressive disorder throughout her life.

> Ms. Bergman is always at risk of her generally benign depression becoming acute depression and must manage her life accordingly. Like many people with depression, Ms. Bergman is highly intelligent and motivated by personal intellectual accomplishment. Any employment position that involves only duties that are clerical and secretarial in nature will ultimately cause her to become acutely depressed.

> Ms. Bergman could not function in the position of Management Program Analyst in the IRS' Office of Public Liaison and Small Business Affairs because her job functions were, at best, clerical and menial. Specifically, Ms. Bergman was, for a considerable period of time beginning in the early summer of 1999, in a job that involved only clerical and secretarial tasks. In the long run, these work conditions are simply incompatible with Ms. Bergman's depressive disability, ongoing depression. This is borne out by the fact that, although Ms. Bergman was still suffering from acute depression in March 2000, she was fully capable of performing as a tax attorney when she was transferred to a position in the IRS field office as a tax attorney. Thus, although her depression remained, it did not interfere at all with her performing duties as a tax lawyer.

> Individuals without medical psychiatric training sometimes have difficulty understanding that depression is a biological medical condition. In Ms. Bergman's case, that depression must be managed over the long term in relation to her professional life. Her condition can be analogized to an individual with a chronic low-grade back problem. An individual with such a condition can have a

normal productive work life, but probably could not perform a job as a store sales clerk in the long term because standing for long periods of time would likely cause him excruciating pain and probably exacerbate his back injury. He would require a position that involved some sitting and some standing and the ability to shift positions. No one would question that such an accommodation of job functions would be reasonable. So, too, Ms. Bergman, like the individual with a back injury cannot perform a job that involves standing all day over the long term, cannot perform a job that involves clerical duties over the long term.

In October 1999 Ms. Bergman's condition was such that she could not continue performing a job that involved clerical tasks. She could have performed a job that involved substantive and intellectually challenging work, such as legal work. That is why I recommended that Ms. Bergman's job functions be changed to include full time legal work. Ms. Bergman suffers from a refractory form of depression, which means simply that it is not possible to put her into full remission of symptoms. She is always disabled by depression and she must manage her life in a way that prevents her from falling into acute depression. This requires that she avoid work that involves primarily clerical duties. Accordingly, because of her depression, Ms. Bergman is disabled from the broad job category of positions involving clerical duties.

Exh. K. Three experts, including two for the defense, agreed that Plaintiff was disabled from work in October 1999 and thereafter as a result of acute depression. However, Plaintiff's depression is chronic and ongoing. While it may be benign if managed properly, Plaintiff's disability disables her *at all times* from performing job duties that are primarily clerical in nature. Plaintiff is disabled at all times from performing those job duties, because she will inevitably become sick if she performs primarily clerical duties over the long term. The only evidence in this case is that Plaintiff is unable to perform the broad category of jobs involving primarily clerical work.

Finally, Defendant tries to trivialize Dr. Nowak's opinions by arguing that Plaintiff is asking for an accommodation to bolster her self-esteem or to escape the "boredom" of her current position. Defendant's Memorandum, pp. 23-24. From this, Defendant argues that Plaintiff's claims that she was unable to work because of "boredom" or because her job damaged her "self-esteem" are insufficient disability as a matter of law. Defendant is not fairly quoting

Dr. Nowak.  Dr. Nowak's office notes mention that Plaintiff's having a job involving clerical duties "triggered self-esteem issues and depression."  Exh. H (Nowak), p. 52.  Dr. Nowak made it very clear in her deposition testimony that she did not regard Plaintiff as disabled because she suffered a loss of self-esteem, and her observation that Plaintiff had suffered a loss of "self-esteem" had nothing to do with Plaintiff's depression as follows:

> By Ms. Fields:  So the loss of self-esteem--is that in and of itself having to do with her mental issues, her depression?
>
> By Dr. Nowak:  No.
>
> By Ms. Fields:  It's separate from that?
>
> By Dr. Nowak:  It's separate from that.

Exh. H (Nowak), p. 55.  Thus, when Dr. Nowak gave the unequivocal opinion that Plaintiff was disabled from performing a job that involved primarily clerical duties, the opinion was that Plaintiff was disabled due to depression, not because of damaged "self-esteem" as Defendant suggests.   Dr. Nowak also made it clear in her deposition that when she referred to Plaintiff as being depressed from having "boring" work to do, the word "boring" was merely a description of clerical work.  Thus, Dr. Nowak explained clearly that when she said Plaintiff had "boring" work to do, she used that term to mean "clerical" work that "was not commensurate with her job description."  Exh. H (Nowak), p. 68.  Dr. Nowak's opinion was and is that Plaintiff is disabled from performing  jobs involving primarily clerical and secretarial tasks and that Plaintiff required a reasonable  accommodation  in  the  form  of  a  job  that  involved  substantive  legal  work commensurate with Plaintiff's abilities and training.

   2.  Plaintiff Is A Qualified Individual With A Disability Under the Act.

A two-part test is used to determine whether a person is a "qualified individual with a disability" under the Act.  29 C.F.R. 1630 App. at 353-54.  First, a court must consider whether

"the individual satisfies the prerequisites of the position, such as possessing the appropriate educational background, employment experience and skills." *Id*. at 353. Defendant concedes this point.[5] Second, the court must consider "whether or not the individual can perform the essential functions of the position *held* or *desired*, *with* or *without* an accommodation." *Id*. at 353-54. Defendant apparently concedes this issue in its SOMF by including the following quotation from Dr. Nowak:

> I believe she [Plaintiff] could function at her [then current] job and return to work if an accommodation is made. The accommodation is a job restructuring so that the functions of her position . . . . include the full time practice of law.. . . If this is not possible in her current position, I would recommend a transfer to the Chief Counsel's office where [Plaintiff] worked for over three years and received a certificate of merit.

Defendant's SOMF, ¶ 2. Thus, Defendant's undisputed facts are: (1) that Plaintiff could perform the *position held* (Program Analyst) *with* an accommodation if the job were restructured to include substantive legal work; and (2) that Plaintiff could perform the *position desired* at OCC *without* any accommodation. Defendant's own statement of material facts not in dispute makes a *prima facie* case that Plaintiff meets the statutory test of a qualified individual with a disability.

In addition to the foregoing concession in Defendant's SOMF, and in addition to the redundant testimony at the administrative level, the only expert testimony in this case also shows that Plaintiff was a qualified individual with a disability. Dr. Nowak offered the opinion, to a reasonable degree of medical certainty, that Plaintiff was fully capable of performing the job she then held if it were restructured to include substantive legal work and that she could perform

---

[5] Defendant concedes that Plaintiff has the necessary education and skills and was otherwise qualified for the OCC positions that were open and vacant during the relevant time period. (Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Partial Summary Judgment, Statement of Genuine Issues, ¶ 22, Defendant's Response admitted.)

another position if she was reassigned to a position where she would have substantive work to do consistent with her experience and abilities. Exh. C, HT (Nowak), pp. 40-41. Dr. Nowak recommended an immediate transfer, because Plaintiff could not perform her current duties without an accommodation. The clerical and secretarial duties and lack of substantive work were a major contributor to Plaintiff's acute depression. *Id.* Dr. Nowak's opinion that Plaintiff's acute depression was a result of her job involving work that was far below her abilities was, and is, the only medical opinion in this case. Exh. C, HT (Nowak) pp. 36-43, 46-48. Dr. Presant, also retained by Defendant, issued an opinion in December 1999 that Plaintiff had a disability that required a work reassignment to a position involving full-time legal work. Exh. C, HT (Fulcher), pp. 352-54; (Sottile), pp. 488-89; Exh. B, pp. 11-12, 123-24; Exh. A, Attachment 1. In rendering this opinion, Dr. Presant was provided unrestricted access to Plaintiff's medical records and agreed with Dr. Nowak's opinions.[6]

The only medical evidence in this case, including Defendant's own statement of material facts as to which there is no genuine issue, establish that Plaintiff is a qualified individual with a disability under the Act.

3. <u>Plaintiff Suffered Adverse Employment Action.</u>

It is conceded in this case that Plaintiff was fully qualified for the open positions at OCC in Washington, D.C., at Plaintiff's grade level and that she was instead appointed to a position two grades lower in an IRS field office. Defendant did not claim that transferring Plaintiff to OCC would cause any undue hardship and, in fact, Defendant admitted in response to interrogatories requesting every reason why Plaintiff was not reassigned to OCC that the "only"

---

[6] Exh. E, Nowak Aff., ¶¶ 4-5. While Defendant submits an affidavit of Dr. Presant stating that he relied on two letters written by Dr. Nowak and two telephone conversations with her, Defendant does not deny that Dr. Presant was offered access to Plaintiff's medical records or that he agreed with Dr. Nowak's opinions.

reason it did not transfer Plaintiff to OCC was that Defendant did not have to transfer an IRS employee to OCC  because OCC and IRS were "different appointing authorities."  Thus, this issue turns on whether the "undue hardship" standard set forth in 29 C.F.R. 1630.2(o) or the "same appointing authority" criteria of 29 C.F.R. 1614.203(g) applies to define Defendant's obligation to reassign Plaintiff in the reasonable accommodation process.

4. <u>1992 Amendments to the Act Eliminated the Separate Appointing Authority Distinction</u>.

Under the pre-1992 Act, a federal agency was only required to appoint an employee to a position in the "same appointing authority" when searching for a reasonable accommodation under the Act.  Congress amended the Act to extend the broader protections of the Americans with Disabilities Act of 1990 (hereinafter "ADA") (Pub. L. 101-136*)* to employees of federal agencies, as well as to employees of the private sector through enactment of the 1992 Amendments.  The 1992 amendment to the Rehabilitation Act provides that:

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201-12204 and 12210), as such sections relate to employment.

In amending the Act in 1992, Congress directed that the *standards applied* under 42 U.S.C. 12111 (the ADA standards) *shall be the standards applied* to all reasonable accommodation claims by federal employees under the Act.  At the time, and at all times thereafter, the "standards applied under . . .  42 U.S.C. 12111" were and are the regulations promulgated under 42 U.S.C. 12111 set forth in 29 C.F.R. 1630.2.  Those regulations limit the scope of the search for a reasonable accommodation only to the extent that the government agency can establish that a job transfer involves "undue hardship."  29 C.F.R. 1630.2(o).

Plaintiff contends that the standards applied under 42 U.S.C. 12111 can only mean that the regulations promulgated under 42 U.S.C. 12111 and published in 29 C.F.R. 1630.2(o) applied in 1999 at the time Plaintiff's claims arose.  If there is any question whether the statutory language of the 1992 amendment stating that the "standards applied under 42 U.S.C. 12111 shall apply" means "apply now," it is very clear from the legislative history of the 1992 Act when Congress specifically stated its intent that the law was effective immediately.  The legislative history to the 1992 Amendment Act specifically states that the law is to be "effective on enactment" (*i.e.*, on October 29, 1992).  See, 29 U.S.C. 791(g), History and Notes; 29 U.S.C. 701, History and Notes, setting forth the effective date of the 1992 amendments.  Also see, *Kemer v. Johnson,* 900 F. Supp. 677, 681, n.6 (S.D.N.Y. 1995), stating that the effective date of the 1992 amendments to the Rehabilitation Act was October 29, 1992, and that all actions arising after that date are subject to the 1992 amendments.

Defendant argues that the language of the 1992 amendments to the Act stating that the "*standards applied* under 42 U.S.C. 12111 (the ADA standards) *shall be the standards applied"* under the Rehabilitation Act means that nothing changed and that the Rehabilitation Act standards continued to apply to reasonable accommodation cases.  Defendant's argument here is that the 1992 amendments to the Act did not become effective until June 2002--10 years after the Act was amended--because the EEOC did not publish final regulations implementing the 1992 Act until 2002.  This argument is not only illogical, but it is also contrary to the clear statutory language and legislative history of the 1992 amendments to the Act.

Defendant's arguments are particularly strained in the context of this statutory amendment, because EEOC made it clear that the ADA Regulations set forth in 29 C.F.R. 1630(o) applied to Rehabilitation Act cases after the 1992 amendments were signed into law.  To

explain the history further, EEOC first published Rehabilitation Act Regulations in April 1992,

just a few months before the entire Act was amended in October 1992.  See, 57 FR 12646, Apr.

10, 1992.  The April 1992 regulations contain the language that Defendant relies on for its

argument that the search for a reasonable accommodation is limited to jobs available at "the

same appointing authority" (29 C.F.R. 1614.203(g)) while the ADA regulations in 29 C.F.R.

1630.2(o) do not contain the "same appointing authority" limitation and only limit the search for

a reasonable accommodation where an employer can establish "undue hardship."  Rather than

amend their newly published Rehabilitation Act regulations to conform with the ADA

regulations, EEOC merely issued guidelines directing that the ADA regulations should be

utilized and, specifically, that the "same appointing authority" limitation should no longer be

utilized to determine the scope of a reasonable accommodation search.  Thus, instead of

withdrawing its regulations, EEO, after some delay, issued a guidance memorandum as to why

the regulations at 29 C.F.R. 1614.203(g) were no longer applicable and instructing the public

instead to apply the ADA standards of 29 C.F.R. 1630.2(o), as follows:

> … The Rehabilitation Act regulations governing reassignment of federal employees with disabilities, which were promulgated several months prior to the enactment of the Rehabilitation Act Amendment, differ in several respects from the ADA's requirements.  See, 29 C.F.R. 1614.203(g) (1997).  **For non-discrimination purposes, federal agencies must follow the ADA standards.** [emphasis added]
> _Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act_, _Number 915.001, March 1, 1999 (Enforcement Guidelines)_ footnote 71.

The 1999 _Enforcement Guidance,_ at Question 27, further states:

> Is an employer's obligation to offer reassignment to a vacant position **limited to those vacancies within an employee's office, branch, agency, department, facility, personnel system** (if the employer has more than a single personnel system) **or geographical area?** (emphasis added)

No.  This is true even if the employer has a policy prohibiting transfers from one office, branch, agency, department, facility, personnel system, or geographical area to another.  The ADA contains no language limiting the obligation to reassign only to positions within an office, branch, agency, etc.  Rather the extent to which an employer must search for a vacant position will be an issue of undue hardship….

EEOC cases also make it clear that after the 1992 amendments became law (*i.e.*, in 1992), the ADA regulations governed the scope of a search for a reasonable accommodation under the Rehabilitation Act.  Thus, in *Flowers v. Henderson,* 1999 WL 767730 (EEOC), n.5,  Defendant's argument that the pre-1992 "same appointing authority" language applied after the law was signed in 1992, was squarely rejected, as follows:

Pursuant to 29 C.F.R. 1614.203(g), the agency's reassignment obligation is limited to any 'funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level.'  In this regard, the agency is advised, however, that under the Americans with Disabilities Act (ADA), and in accordance with the Commission's March 1, 1999, policy guidance on reasonable accommodation, the employer's obligation to offer reassignment to a vacant position **is not so limited** [emphasis added].  The Commission's guidance on reasonable accommodation, which clearly sets forth the ADA requirements made applicable to Rehabilitation Act cases pursuant to the October 29, 1992 amendments to the Rehabilitation Act, observes that the ADA contains no language limiting the obligation to reassign only to positions within a particular office, branch, etc., but advises that 'rather, the extent to which an employer must search for a vacant position will be an issue of undue hardship….'

The Rehabilitation Act regulations were not amended until 2002, 10 years after the Rehabilitation Act was amended in October 1992.   When the EEOC finally proposed the regulations in 2000, it stated in a Notice of Proposed Rulemaking that the ADA standards concerning "undue hardship" had been effective since 1992, as follows:

For the federal employer, the most notable change resulting from the 1992 Amendments is that reassignment is now treated as a reasonable accommodation pursuant to express language in the ADA.  42 U.S.C. 12111(9)(B).   An employer's duty to provide reassignment *is limited only by 'undue hardship.'*

65 FR 11019 March 1, 2000 (emphasis added).   All EEOC did when it finally amended the

Rehabilitation Act regulations was merely to restate the statutory language of the 1992

amendments and add one sentence stating the obvious--that the standards applied under 42

U.S.C. 12111 are the standards under 29 C.F.R. 1630:

> The standards used to determine whether section 501 of the Rehabilitation Act of
> 1973, as amended (29 U.S.C. 791), has been violated in a complaint alleging
> nonaffirmative action employment discrimination under this part shall be the
> standards applied under Titles I and V (sections 501 through 504 and 510) of the
> Americans with Disabilities Act of 1990, as amended (42 U.S.C. 12101, 12111,
> 12201), as such sections relate to employment. *These standards are set forth in
> the Commission's ADA regulations at 29 CFR part 1630.*

67 FR 35732, 35735, May 21, 2002.  Thus, even though the EEOC published Guidelines stating

in the statutory language of the 1992 amendment that "*standards applied* under 42 U.S.C. 12111

(the ADA standards) *shall be the standards applied*" under the Act means that the regulations

under 29 C.F.R. 1630.2 shall apply to the Rehabilitation Act, and even though the language of the

1992 amendments to the Act and its legislative history are clear that the 1992 amendments

incorporate the standards of 29 C.F.R. 1630.2 "effective on enactment,"   Defendant argues that

the 1992 law did not become effective until 10 years later in 2002 when the EEOC finally

withdrew the regulations it previously indicated were inapplicable and simply referenced the

ADA regulations as the applicable standard under the Act.

The EEOC's interpretation of its own regulations must be given persuasive weight.  As an

administrative interpretation of the Act by the agency responsible for enforcing the Act, the

EEOC Guidelines, "while not controlling upon courts by reason of their authority, do constitute a

body of experience and informed judgment to which courts and litigants may properly resort to

guidance." *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 65, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49

(1986) (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141-42, 97 S. Ct. 401, 410-11, 50 L.

Ed. 2d 343 (1976), and *Griggs v. Duke Power Co.,* 401 U.S. 424, 433-34, 91 S. Ct. 849, 855, 28 L. Ed. 2d 158 (1971)) (citation omitted).

The law in this Circuit is that the ADA "undue hardship" standard applies to claims under the Rehabilitation Act arising after 1992 (but before amended regulations were published in 2002). Thus, in *Taylor v. Rice*, 451 F.3d 898, 908 (D.C. Cir. 2006), the D.C. Circuit simply applied the "undue hardship" standards of the ADA as stated in 29 C.F.R. 1630(o) in a federal employee case governed by the Rehabilitation Act, stating as follows:

> The Disabilities Act does not provide a comprehensive definition of 'reasonable accommodation,' but it gives examples of what the term 'may include.' 42 U.S.C. § 12111(9); 29 C.F.R. § 1630.2(o)(2); *see id.* § 1630.2(o)(1) (defining 'reasonable accommodation').
>
> * * * *
>
> An accommodation may be unreasonable "if it either imposes 'undue financial and administrative burdens' . . . or requires 'a fundamental alteration in the nature of [the employer's] program.'" *Arline*, 480 U.S. at 287 n.17 (1987) (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412, 99 S. Ct. 2361, 60 L. Ed. 2d 980 (1979)).
>
> * * * *
>
> An accommodation - even a reasonable one - imposes undue hardship on an employer if it 'requir[es] significant difficulty or expense, when considered in light' of several statutory factors. 42 U.S.C. § 12111(10)(A); *see* 29 C.F.R. § 1630.2(p)(1). * * * * An employer invoking the undue hardship defense must use these factors to 'show special (typically case-specific) circumstances that demonstrate  undue hardship in the particular circumstances.' *Barnett*, 535 U.S. at 402.

In another case that originated in this court before the 2002 regulations were published, this court held that "The Rehabilitation Act of 1973 governs employee claims of handicap discrimination against the Federal Government . . . Its basic tenet is that the Government must take reasonable affirmative steps to accommodate the handicapped, except where *undue hardship* would result." *Bramwell v. Blakey,* 2006 U.S. Dist. LEXIS 32728 at p. 17 (D.D.C. 2006) (emphasis added). The Court further observed that for disability discrimination purposes, the Rehabilitation Act and

the   ADA   are   effectively   one   and   the   same   thing.   *Id.*   Note   5.

Other courts also regard the Rehabilitation Act and the ADA as one and the same for disability discrimination purposes and simply apply the ADA in place of the Rehabilitation Act in a federal employee reasonable accommodation case. *Office of the Architect v. Office of Compliance,* 361 F.3d 633 (Fed. Cir. 2004*).* There, the court observed with respect to a claim arising before 2002 that the 1992 amendment of the Rehabilitation Act requires application of 42 U.S.C. § 12111(9)(B) in a federal employment case, and stated that, "The plaintiff at all times retains the burden of proving that she has been the victim of illegal discrimination; the burden of production shifts to the employer to show that it is unable to accommodate the plaintiff without 'undue hardship.'" *Id.* 361 F.3d at 639, n.2.

Other courts concur. In *Mengine v. Runyon*, 114 F.3d 415, 420 (3rd Cir.1997), the court recognized that, after the 1992 amendments to the Act, the standards for reasonable accommodation under the Rehabilitation Act are defined by the ADA standards. As amended, the Rehabilitation Act includes the duty to reassign an employee subject only to the ADA standards of whether the reassignment would cause the employer "undue hardship." *Id.* at 418. The Sixth Circuit applies the ADA standards in post-1992 (and pre-2002) Rehabilitation Act cases to require a federal "employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Gaines v. Runyon*, 107 F.3d 1171, 1776 (6th Cir. 1997). While Defendant argues without explanation that *Nighswander v. Henderson,* 172 F. Supp.2d 951 (N.D. Ohio 2000) holds otherwise (See Opposition Memorandum, p. 16), the case clearly states that the Act "requires federal employers to provide reasonable accommodation to employees with disabilities unless the accommodation would be an undue hardship." *Id.* at 956.

The foregoing cases reflect the fact that the 1992 amendments directing that the "*standards applied* under 42 U.S.C. 12111 (29 C.F.R. 1630) *shall be the standards applied"* in Rehabilitation Act cases were self-implementing and "effective on enactment."   The unusual circumstances where the EEOC issued Guidelines indicating its regulations were not to be applied, without formally revoking them, has caused some confusion in the courts and among counsel.  Thus, in a Rehabilitation Act case cited prominently by Defendant, one court ruled that reassignment is "mandatory, unless the reassignment would cause the agency undue hardship" but, at the same time, referred to the former Rehabilitation Act regulations at 29 C.F.R. 1614.203 as its source.  *Shiring v. Runyon*, 90 F.3d 827, 832 (3rd Cir. 1996).   The language of the *Shiring* case was picked up in other cases, leading to confusion.[7]   Thus, Defendant relies on other cases where courts have: indicated that ADA standards apply to Rehabilitation Act cases; cited the "undue hardship" standard of the ADA as reflected in 29 C.F.R. 1630(o); and mistakenly cited 29 C.F.R. 1614.203(g) as the source.  See, *e.g., Craig v. Potter*, 2003 WL 21349469, at 7 (N.D. Inc. 2003) where the court found that a federal employer must accommodate the "known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of business" properly citing 42 U.S.C. § 12112 but mistakenly referring to 29 C.F.R. § 1614.203(g).  The same obvious error occurs in *Bennett v. Henderson,* 15 F. Supp.2d 1097, 1108

---

[7] The reference in *Shiring v. Runyon*, 90 F.3d 827, 832 (3rd Cir. 1996) to 29 C.F.R. 1614.203 reflects apparent confusion, because the court does apply both the ADA "undue hardship" standard and the Rehabilitation Act standards.  The court in *Robinson v. Runyon*, 987 F. Supp. 620, 622 (N.D. Ohio 1997), quoted *Shiring* for the same confusing and contradictory statement that the "undue hardship"  standard applies under the old Rehabilitation Act Regulations, 29 C.F.R. 1614.203(g). The 3rd Circuit's subsequent decision in *Mengine v. Runyon*, 114 F.3d 415, 420 (3rd Cir. 1997), apparently recognized the mistake and applied the "undue hardship" standard of 29 C.F.R. 1630.2(o) and did not include the erroneous reference to 29 C.F.R. 1614.203(g) as the source.

(D. Kan. 1998). Thus, Defendant seizes on the confusion caused by EEOC's implementation of the 1992 amendment to argue that the self-implementing law that was "effective on enactment" did not become law for 10 years.

In *Mitchell v. Crowell,* 975 F. Supp. 1440, 1444 (N.D. Ala. 1997), an Alabama District Court ruled that it would not reconsider a plaintiff's earlier denied argument that the "broader standards of the ADA . . supercede any limitations imposed upon a plaintiff's right to transfer under 29 C.F.R. 1614.203(g)." The case merely refers to a previous ruling of the court that the court declined to reconsider and includes no statement of the arguments made by counsel in Alabama and is no specification of the case authority applied by the Alabama court. In all likelihood, the Alabama court relied on the confusing and contradictory cases cited by Defendant, and the other Alabama case cited by Defendant indicates that the courts have made that mistake. Thus, *Jacobs v. Henderson*, 2001 U.S. Dist. LEXIS 26032 , 55-56 (M.D. Ala. 2001), cites the "undue hardship" standard of the ADA regulations (29 C.F.R. 1630.2); erroneously gives the former Rehabilitation Act regulations at 29 C.F.R. 1614.203 as the source of the "undue hardship" standard; and cites as authority the case that caused the confusion, *Shiring v. Runyon*, 90 F.3d 827, 832 (3rd Cir. 1996).

The 1992 amendments to the Act clearly state that ADA regulations "*shall be the standards applied*" in Rehabilitation act cases. This law is self-implementing on its face and "effective on enactment." The EEOC has always maintained that the ADA regulations of 29 C.F.R. 1630.2(o) must be applied to post-1992 Rehabilitation Act cases, and this Circuit has so applied the law correctly in the cases cited above. Defendant is merely relying on confusion created by the unfortunate decision of the EEOC to revoke the regulations at 29 C.F.R. 1614.203(g) through Guidelines and rather than by publishing the actual regulations until 10 years later.

3. Defendant Violated the Act By Refusing to Assign Plaintiff to OCC.

The ADA and the Rehabilitation Act of 1973, as amended by the Rehabilitation Act Amendments of 1992 (the "Act"), define discrimination as follows:

> …not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an **undue hardship** on the operations of the business of such covered entity; … (emphasis added)
> 42 U.S.C. 12112(b)(5)(A)(B).

The law is clear that where, as here, an employee shows that a reasonable accommodation is possible and that she is qualified, the employer bears the burden of proving that providing that accommodation would impose an undue hardship on Defendant. *Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 728 (6th Cir. 2000). An employer *must* reassign the employee to a vacant position. *Smith v. Midland Brake, Inc.,* 180 F.3d 1154, 1165 (10th Cir. 1999). While an employee cannot force an employer to provide a specific accommodation if another reasonable accommodation is available, an employer fails to provide a reasonable accommodation if he appoints an employee to a lower graded position when an accommodation is available at the employee's current pay level. *Id. Citing, Hankins v. The Gap, Inc.,* 84 F.3d 797, 800 (6th Cir. 1996). Specifically, a job reassignment does not constitute a reasonable accommodation under the Act where an employer appoints an employee to a position with lower pay and benefits and less advantages than a former position when other positions are available that do not involve lower pay and benefits. *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 99 (2nd Cir. 1999).

Defendant denied that transferring Plaintiff to OCC would cause any undue hardship. Specifically, in response to interrogatories requesting every reason why Plaintiff was not reassigned to OCC, Defendant stated that the "only" reason it did not transfer Plaintiff to OCC

was that Defendant did not have to transfer an IRS employee to OCC because OCC and IRS were "different appointing authorities."   Defendant's Rule 30(b)(6) designees repeatedly stated the same exclusive reason for not transferring Plaintiff to OCC.   Defendant thus violated the Act by not assigning Plaintiff to a vacant, funded position in OCC but by instead assigning her to a lower graded position in an IRS field office after four-and-a-half months of delay.

     5.   <u>Plaintiff Was Damaged.</u>

Plaintiff submitted detailed damages calculations showing lost wages of over $68,000. This evidence is not challenged in any way by Defendant and must be accepted as true for purposes of summary judgment.

     II.   <u>Plaintiff Can Sustain A  Retaliation Claim and An Unreasonable Delay Claim</u>.

Defendant's arguments that Plaintiff was not subject to retaliation, that Defendant did not unreasonably delay the search for a reasonable accommodation under the Act and that Defendant did engage in an interactive process with Plaintiff encompass 19 pages of argument intermingled with citations to portions of depositions, the administrative record, letters and memoranda.  Not one fact supporting any of these arguments is even *mentioned* in Defendant's SOMF and little, if any, of the reference material supporting the motion on these issues was even attached to the motion.  The motion on these grounds must be denied, because it does not meet the requirement of Local Rule 56.1 that a party moving for summary judgment submit a discrete and specific statement of material facts not in dispute that form the basis of the motion.  It is also extremely unfair to Plaintiff, because it does not permit Plaintiff to address and to deny the specific facts upon which Defendant is moving for summary judgment, nor does it give Plaintiff the ability to respond to an isolated universe of facts that Defendant claims authorizes summary judgment.

     A.   <u>There Is Evidence of Retaliation</u>.

It is extremely difficult for Plaintiff to respond to the diffuse facts and arguments Defendant presents in support of its motion for summary judgment on the retaliation claim. Plaintiff regrets that she has no option but to respond in the same manner.  However, the record is clear that there are more than enough facts to support a retaliation claim here.

Plaintiff submitted her formal request for a reasonable accommodation under the Act on October 22, 1999.  After more than a two-month absence, she returned to the office on a part-time basis on December 15, 1999, because she was unable to pay her bills.  Intense efforts to force Plaintiff to resign began immediately upon her return.  Although Plaintiff had been on approved medical leave beyond December 15, 1999, Mr. Fulcher, her first-line supervisor, informed her that she had been listed as "AWOL."[8]  Exh. C, HT (Fulcher), pp. 464-68.  A copy of the office time and leave policy was placed on her chair when she returned to work that day. *Id.*  Regardless of whether Defendant's AWOL notice was just a mistake or whether Defendant had the right to leave a copy of office time and leave policy on Plaintiff's chair, the fact that these were Defendant's first two acts to greet a returning employee who had been on a two-month medical leave for acute depression suggests a very hostile work environment.

Mr. Fulcher, who was also Plaintiff's office mate as well as her first-line supervisor and who sat just a few feet away from her, also monitored Plaintiff's Internet and telephone usage. Exh. C, HT (Burns), p. 223.  Although Defendant knew that Plaintiff was suffering from severe depression and that Plaintiff's depression improved when she had work to do (Exh. C, HT (Sottile), p. 548), Plaintiff was given no substantive work to do, other than clerical work.  When Defendant's Rule 30(b)(6) witness was asked what was done in response to Plaintiff's numerous

---

[8] Plaintiff was on approved leave through December 28, 1999.  Defendant claims, however, that Plaintiff's physician, Dr. Nowak, had written a letter (not included in the record) stating that Plaintiff would return to work on December 13, 1999.  There is no evidence that Plaintiff indicated she would return to work on December 13, 1999.

requests to be assigned work, he candidly responded "nothing." Exh. B (Fulcher Deposition), pp. 66-67. Plaintiff was given no work to do but was expected to sit at her desk for eight hours and do nothing yet, at the same time, her office mate, Fulcher, had been assigned to monitor Plaintiff to ensure that she scrupulously followed time and leave policy. Exh. C, HT (Burns), pp. 223, 226-27; Exh. A, ¶¶ 5-8.

In January, after making no effort to find a job transfer for Plaintiff, other than writing two four-line memos, making a few phone calls and sending a few e-mails, Mr. Fulcher focused his attention on enforcing progressive disciplinary action against his office mate for nonrepayment of an emergency salary disbursement that Plaintiff had, in fact, repaid. Mr. Fulcher further inquired into the potential income tax consequences to Plaintiff due to the emergency payment for 1998, and even inquired about the possibility of firing Plaintiff for failure to perform her job.

Before her return, Plaintiff requested paid religious leave for the week of the Jewish holiday of Hanukah. Mr. Fulcher denied the request, claiming that Plaintiff already had a negative 42-hour balance for paid religious leave. When Plaintiff showed Mr. Fulcher that his information was incorrect, he failed to take any action to correct the error although it is his responsibility to see that all timesheets are accurate and that any errors are investigated and corrected. That error remains on Plaintiff's time records to this date, seven years later.

The involvement of David Williams, Chief of the IRS' Office of Communications and Liaison, contributed to the unusual circumstances where OCC refused even to consider placing a highly qualified tax lawyer and former distinguished employee of OCC into an open position at OCC as an accommodation under the Act. Williams, a close associate of a former IRS Commissioner who is self-described as "one of the most senior executives in the IRS," managed

approximately 600 employees, including Plaintiff.  Exh. C, HT (Williams), pp. 245, 272. Defendant admitted that Mr. Williams was "unhappy" that Dr. Present had determined that Plaintiff was to be granted a reasonable accommodation under the Act.  Exh. B (Fulcher Depo), p. 109.  Mr. Williams complained to the former IRS Commissioner that he believed the reasonable accommodation process was being abused at IRS and took a personal interest in Plaintiff's request for an accommodation and the resultant job search.  Exh. C, HT (Sottile), p. 527.  Through January 2000, Williams was pressuring his subordinates to reverse Dr. Present's opinion, and he even went so far as to have a letter drafted instructing Plaintiff to submit to another medical examination.  Exh. C, HT (Williams), pp. 269-70.  Mr. Williams was particularly opposed to moving Plaintiff to OCC, because he felt it was inappropriate for Plaintiff to use the reasonable accommodation process to attain a position that she could not get through the normal application process.[9]  Exh. C, HT (Williams), pp. 274-75.

John Burns was the Department of Treasury EEOC Liaison Officer assigned to Plaintiff's case from its inception.  Exh. C, HT (Burns), p. 221.  Mr. Burns (now retired) had worked for the Department of Treasury for 30 years, first as a full-time investigator for the EEOC office and as an EEOC Liaison for the last 17 years.  Mr. Williams informed Mr. Burns on several occasions that Defendant was required to transfer Plaintiff to an open OCC position.  Burns testified that Mr. Williams refused and stated that he did not want to find an accommodation for Plaintiff because he did not want to "move a problem."  Exh. C, HT (Burns), p. 226.  Mr. Burns has stated that, despite being counseled that he was violating the law, Mr. Williams repeatedly told Mr. Burns that he was not going to transfer Plaintiff anywhere.  Exh. C, HT (Burns), pp. 225-28.  Mr.

---

[9]   Williams was apparently unaware that Plaintiff had submitted an application to OCC to facilitate the reasonable accommodation search, and OCC refused even to consider the application.  Exh. A, ¶ 13.

Burns heard the same thing from Barry Fulcher and from Sue Sottile. *Id.* He confronted Mr. Williams several times, one on one, and repeatedly got the same answer. Mr. Williams stated that he was not moving "a problem" regardless of what the law said. *Id.*

To make a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) the employer was aware of the activity, (3) the plaintiff suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *McGill v. Munoz*, 340 U.S. App. D.C. 185, 203 F.3d 843, 845 (D.C. Cir. 2000). Under the Rehabilitation Act, statutorily protected activity includes "opposing any act or practice made unlawful by this Act or . . . making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203(a). To establish a claim of retaliation, Plaintiff must present some evidence that Defendant took adverse action against an employee claiming a disability that was "causally related to the exercise of his rights." *Holcomb v. Powell,* 433 F.3d 889, 901-02 (D.D.C. 2006). Here, Plaintiff has alleged, and Defendant apparently admits, that Plaintiff suffered a two-grade demotion in the reasonable accommodation process because Defendant delayed her transfer and refused to transfer her to a vacant, funded position in OCC. It is only necessary that Plaintiff has offered some evidence of a causal connection between this protected activity and the adverse action or delay in finding her accommodation. *Duncan v. Washington Area Metro Trans Auth*., 214 F.R.D. 43 50 (D.D.C. 2003). EEOC Officer Burns testified that Defendant was intentionally blocking the reasonable accommodations process. Burns testified Williams told him on several occasions that he did not want to transfer Plaintiff to another job because he would not "move a problem." Exh. C, HT

(Burns), pp. 221, 226.   Mr. Burns heard the same thing from Barry Fulcher and from Sue Sottile. Exh. C, HT (Burns), pp. 225-28.   There is evidence that Williams was "unhappy" that Dr. Presant had determined that Plaintiff was to be granted a reasonable accommodation (Exh. B, Fulcher Depo, p. 109), that he was a critic of the reasonable accommodation process in general (Exh. C, HT (Sottile), p. 527), and that he was pressuring his subordinates to reverse Dr. Presant's opinion as late as February 2000, almost four months after Plaintiff made her request for a reasonable accommodation under the Act (Exh. C, HT (Williams), pp. 269-70). Burns testified that Williams had decided that they would not restructure Plaintiff's job and would not transfer Plaintiff, "so that she can either sit there and like it or get the hell out of dodge."  Exh. C HT Burns, p. 227.  Mr. Williams said that Plaintiff was abusing the reasonable accommodation process, apparently operating under the mistaken belief that Plaintiff was attempting to secure a position that she could not get through the normal application process.[10]  Exh. C, HT (Williams), pp. 274-75.

The EEOC Enforcement Guidance, as well as the TIGTA Manual, provide that once an individual provides sufficient documentation to show the existence of an ADA disability and the need for a reasonable accommodation under the Act, which Plaintiff did, in the opinion of Dr. Presant, the agency's designated decision maker, any further attempts to require the employee to see a health professional chosen by the employer could be considered retaliation.  An employer is not precluded from getting such further independent medical assessment, but a prerequisite to doing so is that the employee must first be informed that the medical documentation is considered insufficient and then be given the opportunity to rectify the situation.  Only if the

---

[10]   Williams was apparently unaware that Plaintiff had submitted an application to OCC to facilitate the reasonable accommodation search, and OCC refused even to consider the application. Exh. A, ¶ 13.

employee fails to do so may the employer require further medical assessments.   See, EEOC Enforcement Guidance, Question #7 and fn. 33; TIGTA Manual 200-70.1.4.4.   Throughout Mr. Williams' two-month-long, behind-the-scenes attempt to undo Dr. Presant's determination, Defendant did not contact Plaintiff and request further information concerning her medical condition.   Defendant's violations of the EEOC Guidelines must be considered retaliatory, especially when considered in light of Mr. Williams' stated disdain for the reasonable accommodation process, his statements that Plaintiff was abusing that process and should not be allowed to do so, and his assertion that he did not want to move a "problem" to another part of the IRS.

  B. <u>Defendant Delayed the Reasonable Accommodation Process</u>.

  For the same reasons stated above, there is evidence that Defendant unreasonably delayed the reasonable accommodation process.

  According to EEOC Enforcement Guidance, Question #10, an unnecessary delay in providing an employee with a reasonable accommodation under the Act may also be a violation of the Act, resulting in a finding of discrimination.   The relevant factors to consider in determining whether there has been such a delay are set forth in footnote 35 of the EEOC Enforcement Guidance, as follows:

1. the reason for the delay
2. the length of the delay
3. how much the individual with a disability and the employer each contributed to the delay
4. what the employer was doing during the delay, and
5. whether the required accommodation was simple or complex to provide.

  A finding of unnecessary delay is another potential violation of the Act that can result in a finding of discrimination.   Additionally, the failure to make a good faith effort by the employer

to engage in an interactive process with the employee may be grounds for damages. See, *Flowers v. Henderson,* 1999 WL 767730 (EEOC), fn. 5.

In this case, the first delay occurred in getting Dr. Presant's recommendation regarding the need for an accommodation. Dr. Presant already had possession of Plaintiff's medical information prior to the date of Plaintiff's request for a reasonable accommodation under the Act on October 22, 1999. That information was contained in letters written by Dr. Nowak dated October 11 and 21, 1999. However, Dr. Presant had requested additional information in the form of a work history assessment on Plaintiff. This request was made of Paula Fyne, Executive Assistant to David Williams, on November 1, 1999. Ms. Fyne replied that they would be unable to provide such information. HT at Exhibit 9, p. 75. This failure to provide the requested information was recounted by both Kathy King, the EEOC Reasonable Accommodation Specialist working on the case and, independently, by Mr. Burns. HT at 221. Thus, there was a five-week delay from the date of Plaintiff's request to Dr. Presant's recommendation.

The real logjam in the process, however, concerned the pivotal legal issue as to whether OCC was required to take Plaintiff under the ADA. There was also the appearance, if not the fact, of a conflict of interest on the part of the OCC. On the one hand, OCC was acting as independent legal advisors to the IRS. OCC was advising the IRS as to whether OCC would be required to accept an IRS employee as part of the reasonable accommodation process. OCC management refused even to consider taking Plaintiff through a reasonable accommodation transfer and maintained that IRS could not force a transfer on OCC. Thus, OCC was advising IRS on an issue in which OCC had a direct adverse interest from the interest of its client, the IRS.

Fulcher stated repeatedly that he advised IRS officials and the Associate Chief Counsel that it was a requirement to take Ms. Bergman if there was a vacancy available and that OCC "must place her in any open position they have." Exh. B, pp. 72. Fulcher testified on behalf of Defendant that OCC was told that "there was a requirement to take [Plaintiff] if there was a vacancy available" in OCC. Exh. B, p. 75. Although OCC's own attorneys assisted in drafting the memo from IRS to OCC informing OCC that it was obligated to place Plaintiff in a vacant position (*Id.*, Exh. C, HT (Fulcher), pp. 356-58; 448-51), OCC nevertheless, through December 1999 and January 2000, regarded its obligation to accept Plaintiff as an "open issue."[11] Exh. B (Fulcher Depo), p. 30; Exh. C, HT (Sottile), pp. 530-32. The IRS' Labor Relations Office advised OCC that OCC was "required to accommodate" Plaintiff under the Act by placing Plaintiff in one of the open OCC positions. Exh. C, HT (Fulcher), pp. 449-50. Despite the opinion of IRS' Office of Labor Relations, citations provided by Plaintiff of pertinent case authorities and EEOC regulations[12] that required Plaintiff's assignment to OCC, and the opinions of OCC staff lawyers, OCC nevertheless refused to take Plaintiff and refused to give any reason for not hiring her. Mr. Burns testified that Defendant was required to place Plaintiff in one of the open OCC positions, and Williams simply refused, stating alternatively that he did not want to "move a problem" and that he did not believe it was fair that Plaintiff should get a job through

---

[11] General Legal Services, a branch of OCC with offices in the IRS that advised the IRS on personnel matters, apparently assisted Fulcher in drafting the memo from IRS to OCC advising OCC that it was obligated to place Plaintiff in a vacant position in OCC. The "open issue" as to OCC's obligation was apparently the view of OCC's management.

[12] During the search for a reasonable accommodation, Plaintiff informed Defendant that the then current EEOC Enforcement Guidance manual indicated that Plaintiff's reassignment to one of those vacancies was mandatory under the Rehabilitation Act and that the "same appointing authority" criteria had not been the law since 1992. Exh. A, ¶ 16, Attachment 3.

the reasonable accommodation process that she could not get competitively.[13]   Given the overwhelming opinions Defendant received that it was obligated to transfer Plaintiff to OCC and the very clear law requiring Defendant to move Plaintiff to any open position in the Department of Treasury, limited only by undue hardship, the refusal to transfer Plaintiff to OCC must be regarded as an intentional violation of law.  At a minimum, the OCC's ethical issues in advising IRS certainly delayed the reasonable accommodation process.

Mr. Fulcher himself admitted that had this legal issue been resolved in Plaintiff's favor, she would have been transferred to OCC in early December and the reasonable accommodation would have been achieved.   However, no one ever went to Treasury management to seek resolution of the issue.

A further delay in the process occurred in early January when Mr. Williams attempted to subvert the reasonable accommodation by belatedly attempting to reverse Dr. Presant's recommendation.   Mr. Williams gave two reasons for this curious intervention by a high government official.  The first was that Dr. Presant wasn't a psychiatrist and the second was that there were alleged inconsistencies in Dr. Nowak's letters back in October, three months earlier, and Mr. Williams wanted the inconsistencies explained to him, despite the fact that Dr. Presant saw no such inconsistencies.  Mr. Burns had told him that the first issue had been discussed and that Dr. Presant had probably consulted other staff doctors, and further that Dr. Presant had been performing this service for the IRS for many years in hundreds of cases.   Nonetheless, Mr. Williams, who has no medical training, took it upon himself to overrule the medical judgment of

---

[13] Williams was operating under the mistaken belief that Plaintiff had applied for an OCC position in August 1999 and had been rejected.  In fact, Plaintiff did apply to OCC in August but was informed that the positions open in OCC at that time were only available to current OCC employees.   See Exh. C advising her that she was not among the eligible group of OCC applicants (because she was not an OCC employee).

two physicians and require Plaintiff to undergo an independent medical examination by a psychiatrist chosen by the agency.  At this point, all efforts to secure a temporary detail and a permanent accommodation for Plaintiff were halted while a letter was drafted to Plaintiff for Dr. Presant's signature concerning the need for further medical evaluation.  This drafting exercise went on into February when Mr. Burns was notified of a possible attorney position in the field.

The Act, as amended by the ADA provisions, generally requires that a reasonable accommodation be found as expeditiously as possible.  In October 2000, Executive Order 13164 was issued requiring all federal agencies to develop and disseminate to all employees detailed procedures for the processing of requests for reasonable accommodation, including specific timelines for action, within one year's time.  While IRS had failed to do so at the time of the administrative proceedings, the Department of Treasury, however, had issued such guidelines. [14] Those procedures, like the ones adopted by the EEOC itself, provide that in most cases, requests for accommodation must be processed and acted upon within **15 to 20 days.**  See**,** TIGTA Manual at sec. 70.1.4.1.  A four-and-a-half month delay doesn't even fall within the ballpark required by Defendant's own procedures.

Ms. King, when questioned as to what standard the IRS was using in the absence of detailed procedures, replied that under pre-E.O. 13164 rules, they generally were required to process a request within 30 days.  HT at 322.

---

[14] Executive Order 13164 was published in October 2000 and required all executive agencies to develop and make available to all employees detailed procedures for the processing of requests for reasonable accommodation within one year.  The Defendant's Office of Treasury Inspector General for Tax Administration (TIGTA) procedures can be found in its Operations Manual, Chapter 200-70, Equal Employment Opportunity (EEO), Diversity, Special Emphasis, July 9, 2002 (TIGTA Manual).  These procedures incorporate the same time frames for processing a request for a reasonable accommodation.  TIGTA Manual at 200.70.1.4.1.  Although Defendant has delegated the responsibility to each of its subunits to draft and disseminate their own procedures, the IRS has so far failed to do so.

Defendant did not assign Plaintiff to any of the open positions at Plaintiff's grade level in the same agency in Washington, D.C.-- positions for which Plaintiff was eminently qualified--but instead waited several months to reassign her to a field office position at a lower grade level. An employer violates the Rehabilitation Act when, as here, it fails to enter into a good faith search for accommodations and a flexible, interactive process with the employee. The heart of the interactive process is communication between employer and employee:

> The 'reasonable accommodation' element of the Act imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee….so that, together, they might identify the employee's precise limitations and discuss accommodations, which might enable the employee to continue working. See 29 C.F.R. section 1630.2(o)(3); see also 29 C.F.R. Pt. 1630, App. Section 1630.9.

Hendricks-Robinson v. Excel Corp., 154 F.3rd 685, 693 (7th Cir. 1998).

In this case, the communication was one way only--with Plaintiff requesting reassignment to OCC and Defendant responding with silence until Defendant advised Plaintiff on February 3, 2000, that OCC was not obligated to accept her. There was simply no communication with Plaintiff about the job search and no discussion of alternative positions in the IRS or in Treasury as a whole. Moreover, failure to so engage in a good faith search not only violates the Rehabilitation Act and the ADA, but also can leave the employer liable for compensatory and/or punitive damages. See, *Flowers v. Henderson,* 1999 WL 767730 (EEOC), fn.5. Thus, there remains a significant dispute as to whether Defendant satisfied these obligations.

## Conclusion.

Plaintiff respectfully requests that the Court deny Defendant's motion for summary judgment and that the Court enter summary judgment in favor of Plaintiff and against Defendant

and award such relief as requested by Plaintiff in her motion for partial summary judgment.

Respectfully submitted,

_____/ss/_____
John D. Quinn, Esq,
Stephen Sale, Esq.
Sale & Quinn, P.C.
910 16th Street, N.W., Suite 500
Washington, DC  20006
Tel:  (202) 833-4170
Fax: (202) 887-5137

Counsel for Plaintiff

May 21, 2007